## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| SAUL ORTEGA AND DAVID ROGERS, JR. | § § § | Case No. 23-_____ |
| | § | On review from AA-EC-2017-44 |
| *Petitioners,* | § § | and AA-EC-2017-45 |
| v. | § § | Petition for Review of Final Decision |
| | § | of the Comptroller of the Currency |
| OFFICE OF THE COMPTROLLER OF THE CURRENCY | § § | |
| | § | |
| *Respondent.* | § | |

## PETITION OF SAUL ORTEGA AND DAVID ROGERS, JR. FOR REVIEW OF FINAL DECISION OF THE OFFICE OF THE COMPTROLLER OF THE CURRENCY

Pursuant to 12 U.S.C. § 1818(h) and Federal Rule of Appellate Procedure 15(a), Petitioners Saul Ortega and David Rogers, Jr., hereby petition the Court for review of the Final Decision of the Comptroller of the Currency, Orders of Prohibition against both Petitioners Ortega and Rogers, and Orders Assessing Civil Monetary Penalty against both Petitioners Ortega and Rogers, issued on December 1, 2023 and entered in AA-EC-2017-44 and AA-EC-2017-45, as well as the Order Granting Cross-Motions for Interlocutory Review and Vacating and Reversing in Part April 9 Order, issued on December 18, 2020 and entered in AA-EC-2017-44 and AA-EC-2017-45.

Pursuant to Fifth Circuit Rule 15.l(b), a copy of the orders to be reviewed are

attached hereto as Exhibits A-1 and A-2.  Pursuant to Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Rule 28.2.1, the certificate of interested persons is attached hereto as Exhibit B.  Pursuant to Federal Rule of Appellate Procedure 15(c)(2), a list of those persons served is attached hereto as Exhibit C.

Wherefore, Petitioners respectfully request that the Court, on review, vacate or modify, in whole or in part, the foregoing orders of which Petitioners seek review, or, in the alternative, render judgment for Petitioners.  Petitioners also request such other and further relief to which they may be entitled.

Dated:   December 1, 2023

Respectfully submitted,


By:   /s/ *Frank Brame*
        Thomas S. Leatherbury
        Texas Bar No. 12095275
        Thomas S. Leatherbury Law, PLLC
        Cumberland Hill School Building
        1901 N. Akard Street
        Dallas, Texas 75201
        Telephone: (214) 213-5004
        Tom@tsleatherburylaw.com

        Frank C. Brame
        Texas Bar No. 24031874
        The Brame Law Firm PLLC
        4514 Cole Ave., Suite 600
        Dallas, Texas 75205
        Telephone: (214) 665-9464
        frank@bramelawfirm.com

        Bill Sims
        Texas Bar No. 18429500
        4234 Shorecrest Drive
        Dallas, Texas 75209
        Telephone: (214) 458-6970
        bsims1119@gmail.com

        **COUNSEL FOR PETITIONERS**

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, a true and accurate copy of the foregoing Petition for Review with exhibits was served on the parties identified in Exhibit C by email and by placing in the United States mail, in addition to filing with the Court by ECF document filing system:

/s/ *Frank C. Brame*
Counsel for Petitioners

**CERTIFICATIONS OF ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ *Frank C. Brame*
Counsel for Petitioners

# EXHIBIT A

# EXHIBIT A-1

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
| President, Chief Executive Officer, and | ) | |
| Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

**FINAL DECISION OF THE COMPTROLLER OF THE CURRENCY**

I.    STATEMENT OF JURISDICTION ................................................................... 6

II.   PROCEDURAL HISTORY.............................................................................. 6

  A.  Proceedings Under Judge McNeil and Judge Miserendino ................................. 6

  B.  Reassignment to Judge Whang ........................................................................ 7

  C.  Respondents' Request for Interlocutory Review of Rulings Regarding the Appointments Clause ................................................................................................................... 8

  D.  Statute-of-Limitations Orders .......................................................................... 9

  E.  Hearing and Post-Hearing Procedures ............................................................ 10

III.  SCOPE OF REVIEW ................................................................................... 11

  A.  Waiver by Enforcement Counsel .................................................................... 12

  B.  Waiver by Respondents ................................................................................. 13

IV.  APPLICABLE LEGAL STANDARDS ......................................................... 19

  A.  Section 1818(e) Prohibitions.......................................................................... 20

  B.  Section 1818(i) Civil Money Penalties ........................................................... 20

V.  RESPONDENTS' EXCEPTION REGARDING TIMELINESS ..................... 21

  A.  Interlocutory Rulings Regarding the Statute of Limitations............................. 22

  B.  Respondents' Exception 1 Is Deemed Moot in Part and Rejected in Part ......... 24

VI.  RESPONDENTS' EXCEPTION REGARDING THE SEVENTH AMENDMENT ....... 26

VII.  RESPONDENTS' EXCEPTIONS REGARDING THE APPOINTMENTS CLAUSE ... 27

  A.  Judge Whang Was Properly Appointed ........................................................... 28

B.   Respondents Received the Remedy Required by *Lucia* ................................................. 28

C.   Respondents' Arguments Are Unavailing ....................................................................... 30

VIII.   RESPONDENTS' EXCEPTIONS REGARDING RULINGS ON CERTAIN AFFIRMATIVE DEFENSES AND EVIDENTIARY MATTERS ................................... 32

IX.   FINDINGS OF FACT .............................................................................................................. 36

A.   The Bank's Failure ............................................................................................................ 36

B.   Respondents' Roles at the Bank ..................................................................................... 38

C.   Capital Raise Strategy ..................................................................................................... 40

   1.   Communications with OCC Following Fannie Mae and Freddie Mac Investment Loss 40

   2.   Private Placement Memorandum and Everhard Loan ............................................ 42

   3.   Implementation of Capital Raise Strategy ............................................................ 43

   4.   Ongoing Communications with OCC and Capital Injections ............................... 44

   5.   "Downstreaming" of Loan Proceeds ..................................................................... 46

   6.   Features of Capital Raise Loans ............................................................................ 47

   7.   Misleading Loan Purposes ..................................................................................... 49

   8.   Efforts to Conceal Capital Raise Strategy ............................................................ 50

   9.   Losses Associated with the Capital Raise Strategy .............................................. 51

D.   OREO Strategy .................................................................................................................. 51

   1.   Respondents' Involvement in OREO Strategy ...................................................... 51

   2.   OCC Communications Regarding OREO Strategy ............................................... 52

   3.   Features of OREO Loans ....................................................................................... 53

   4.   NAHS Loan and OREO Loan Losses .................................................................... 55

   5.   OREO Strategy Alternatives ................................................................................. 57

   6.   OREO Strategy Accounting-Related Misconduct ................................................ 58

E.   Nonaccrual Loan Accounting Practices ........................................................................ 59

   1.   Cash-Basis and Cost-Recovery Accounting ......................................................... 59

   2.   The Bank's Accounting System ............................................................................ 60

   3.   Warnings About the Bank's Accounting Practices ............................................... 61

F.   Loans to Rogers III Entities ............................................................................................ 63

   1.   February 2009 Email from Rogers III's Attorney ................................................. 63

   2.   Griqualand Loans .................................................................................................. 65

   3.   Petro Icon Loans .................................................................................................... 66

    4.   Financial Losses ................................................................................ 67

  G.  Other Factual Findings.......................................................................... 67

X.      CONCLUSIONS OF LAW ........................................................................ 68

  A.  Capital Raise Strategy.......................................................................... 69

    1.   Misconduct ..................................................................................... 69

    2.   Effect .............................................................................................. 77

    3.   Culpability...................................................................................... 82

  B.  OREO Strategy .................................................................................... 85

    1.   Misconduct ..................................................................................... 87

    2.   Culpability...................................................................................... 95

    3.   Section 1818(i) ............................................................................... 98

    4.   Respondents' Exception 18 ............................................................ 99

  C.  Nonaccrual Loan Accounting Practices ............................................. 99

    1.   Misconduct ..................................................................................... 99

    2.   Effect ............................................................................................ 103

  D.  Loans to Rogers III Entities .............................................................. 103

    1.   Misconduct ................................................................................... 104

    2.   Effect ............................................................................................ 105

  E.  The Civil Money Penalty Assessment is Appropriate ...................... 107

XI.    REQUEST FOR ORAL ARGUMENT .................................................... 109

XII.   REQUEST FOR STAY .......................................................................... 109

XIII.  CONCLUSION ....................................................................................... 109

This is a Final Decision in an enforcement action brought by Enforcement Counsel of the Office of the Comptroller of the Currency ("OCC") against Saul Ortega ("Respondent Ortega") and David Rogers, Jr. ("Respondent Rogers") (together, "Respondents"), former directors and officers of First National Bank, Edinburg, Texas ("Bank"). Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty ("Notice") against Respondents. The Notice's charges arise from four distinct series of events. First, the Notice charges that Respondents engaged in lending-related misconduct and accounting-related misconduct in connection with a strategy to raise capital (hereinafter, "Capital Raise Strategy") following the Bank's $174 million loss on its investments in the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"). Second, the Notice charges that Respondents engaged in lending-related misconduct and accounting-related misconduct in connection with a strategy to reduce the Bank's Other Real Estate Owned ("OREO" or "ORE") portfolio (hereinafter, "OREO Strategy"). Third, the Notice charges that Respondents engaged in misconduct in connection with the Bank's accounting treatment of nonaccrual loans (hereinafter, "Nonaccrual Loan Accounting Practices"). Fourth, the Notice charges that Respondent Rogers engaged in misconduct in connection with a series of loans made to entities affiliated with his son, David Rogers III (hereinafter, "Loans to Rogers III Entities").

A twelve-day virtual hearing before Administrative Law Judge ("ALJ" or "Judge") Jennifer Whang was held between January 31, 2022, and February 15, 2022. On September 30, 2022, the ALJ issued a decision ("Recommended Decision" or "RD") recommending that the Acting Comptroller of the Currency ("Comptroller") enter an order of prohibition against Respondent

Rogers in connection with the charge arising from Loans to Rogers III Entities. The ALJ concluded that Enforcement Counsel had not established all elements of proof required to support orders of prohibition against Respondents based on charges arising from the Capital Raise Strategy, OREO Strategy, or Nonaccrual Loan Accounting Practices. The ALJ also recommended that civil money penalties of $250,000 be assessed against each Respondent. With respect to Respondent Ortega, the ALJ recommended civil money penalties in connection with charges arising from the Capital Raise Strategy, OREO Strategy, and Nonaccrual Loan Accounting Practices. With respect to Respondent Rogers, the ALJ recommended civil money penalties in connection with charges arising from lending-related misconduct associated with the Capital Raise Strategy and OREO Strategy, as well as the charge arising from Loans to Rogers III Entities.

Enforcement Counsel and Respondents timely filed exceptions to the Recommended Decision. Enforcement Counsel argues that the ALJ erred in concluding that certain elements of proof had not been established and urges the Comptroller to enter orders of prohibition against both Respondents based on charges arising from their lending-related misconduct in connection with the Capital Raise Strategy and OREO Strategy. Respondents argue that the action should be dismissed because, *inter alia*, all charges are time-barred by the statute of limitations, Enforcement Counsel did not establish any of the charges against them, and these proceedings violate various rights guaranteed to them under the United States Constitution.

On April 3, 2023, the Comptroller certified that the record of the proceeding was complete, and the parties were notified that the matter had been submitted to the Comptroller for final decision. Upon careful review of the full administrative record, including the Recommended Decision and the parties' exceptions thereto, and for the reasons set forth in this decision, the Comptroller adopts in part and rejects in part the ALJ's recommendations. As explained herein,

the Comptroller enters orders of prohibition against both Respondents based on charges arising from their lending-related misconduct associated with the Capital Raise Strategy; assesses a second-tier civil money penalty of $250,000 against Respondent Rogers based on charges arising from his lending-related misconduct associated with the Capital Raise Strategy; assesses first-tier and second-tier civil money penalties totaling $250,000 against Respondent Ortega based on charges arising from his lending-related misconduct associated with the Capital Raise Strategy (second-tier), accounting-related misconduct associated with the Capital Raise Strategy (first-tier and second-tier), accounting-related misconduct associated with the OREO Strategy (first-tier and second-tier), and Nonaccrual Loan Accounting Practices (first-tier and second-tier). The Comptroller dismisses all other charges.

## I.  STATEMENT OF JURISDICTION

At all times relevant to the facts alleged in the Notice, the Bank was an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2), and Respondents were "institution-affiliated parties" ("IAPs") as defined in § 1813(u). *See* Joint Stipulation of Facts and Law ("Joint Stip.") ¶¶ 1-2. The Bank was also a national banking association within the meaning of § 1813(q)(1)(A) and was chartered and examined by the OCC. *See id.* ¶ 3. Pursuant to § 1813(q), the OCC is the "appropriate Federal banking agency" with jurisdiction over the Bank and its IAPs, and the OCC is authorized to initiate and maintain this prohibition and civil money penalty action against Respondents. *See id.* ¶ 3-4.

## II.  PROCEDURAL HISTORY

### A.  Proceedings Under Judge McNeil and Judge Miserendino

The Notice charges that Respondents engaged in unsafe or unsound practices, breached their fiduciary duties, violated 12 U.S.C. § 161, and violated final orders. *See* Notice, Arts. III-VI.

Respondents raised various affirmative defenses, asserting, as relevant, that the charges against them were time-barred; that the ALJ presiding over the proceedings held his position in violation of the Appointments Clause; that Respondents lost money in connection with the Bank's failure (hereinafter, "Sixth Affirmative Defense"); and that because the Federal government did not "support the preferred stock of Fannie Mae and Fredd[ie] Mac," the Bank suffered a "loss of over $176,000,000 or 60% of the Bank's capital" from which it could not recover (hereinafter, "Fannie Mae and Freddie Mac Defense"). *See* Resp'ts' Answer and Affirmative Defenses to Notice ("Answer") at 8-9. Enforcement Counsel moved to strike, *inter alia*, the Sixth Affirmative Defense and the Fannie Mae and Freddie Mac Defense. *See* OCC's Mot. to Strike Resp'ts' First, Second, Third, and Sixth Affirmative Defenses ("Motion to Strike") at 2. The ALJ initially assigned to this matter, Judge Christopher B. McNeil, granted the motion, reasoning, *inter alia*, that these were not properly pled affirmative defenses and that the Fannie Mae and Freddie Mac Defense was irrelevant. *See* Order Regarding OCC's Mot. to Strike Resp'ts' First, Second, Third, and Sixth Affirmative Defenses ("Order Granting Motion to Strike") at 4.

In August 2018, in response to the Supreme Court's decision in *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018), the Comptroller reassigned Judge C. Richard Miserendino to this matter and directed him to provide the parties an opportunity to file objections to any actions taken by the prior ALJ. *See* Order in Pending Enforcement Cases in Resp. to *Lucia v. SEC*. Thereafter, Respondents filed objections to orders entered by Judge McNeil. *See* Resp'ts' Obj. to Orders Issued by ALJ.

### B. Reassignment to Judge Whang

While Respondents' written objections to the orders entered by Judge McNeil remained pending, Judge Miserendino retired, and the Comptroller reassigned the matter to Judge Whang.

The Comptroller directed Judge Whang to provide the parties an opportunity to file objections to any actions taken by a prior ALJ; to review all such actions; and, for each action reviewed, to "adopt or revise the action as [the ALJ] deem[ed] appropriate." *See* Order in Pending Enforcement Cases at 2. In January 2020, Judge Whang issued an order directing the parties to file any objections to her assignment to the case or to any actions taken by the previously assigned ALJs. *See* Notice of Reassignment and Order Regarding the Comptroller's Order in Pending Enforcement Cases at 2. In response, Respondents moved for summary disposition based on purported violations of the Appointments Clause, specifically objected to the Order Granting Motion to Strike, and generally objected to all orders entered by Judge McNeil and Judge Miserendino. *See* Resp'ts' Mot. for Summ. Disposition on the Appointments Clause and Obj. to Orders Issued by ALJ at 2-3.

### C. Respondents' Request for Interlocutory Review of Rulings Regarding the Appointments Clause

On March 17, 2020, Judge Whang adopted the prehearing actions taken by the previously assigned ALJs and concluded that *Lucia* did not support Respondents' contention that the appropriate remedy for an Appointments Clause violation should be nullification of the entire action. *See* Order Den. Resp'ts' Mot. for Summ. Disposition on the Appointments Clause at 4-5; Order Reviewing Prior ALJs' Prehearing Actions. Respondents thereafter moved for the Comptroller to conduct interlocutory review of these rulings. *See* Resp'ts' Mot. for Interlocutory Review. The Comptroller denied the motion, reasoning that none of the criteria supporting interlocutory review had been satisfied. *See* Order Den. Resp'ts' Mot. for Interlocutory Review; *see also* 12 C.F.R. § 19.28(b) (setting forth criteria supporting interlocutory review). Respondents then petitioned in the United States Court of Appeals for the Fifth Circuit for review of the ALJ's rulings and Comptroller's order denying interlocutory review thereof. The OCC moved to dismiss

the petition for lack of jurisdiction, and the Fifth Circuit granted the OCC's motion. *See Ortega v. OCC*, 20-60590, *per curiam* (5th Cir. Sept. 3, 2020).

### D. Statute-of-Limitations Orders

Respondents and Enforcement Counsel filed cross-motions for summary disposition on the issue of whether the Notice was timely filed under the governing five-year statute of limitations set forth at 28 U.S.C. § 2462. *See* Resp'ts' Mot. for Summ. Disposition on the Statute of Limitations and Br. in Support; OCC's Mot. for Partial Summ. Disposition on Resp'ts' Seventh and Ninth Affirmative Defenses; Br. in Support of OCC's Mot. for Partial Summ. Disposition on Resp'ts' Seventh and Ninth Affirmative Defenses. In an April 9, 2020 order, the ALJ recommended the partial entry of summary disposition in favor of Respondents, concluding that "when a particular statutory 'effect' is alleged . . . then the cause of action for a given claim against Respondents is complete, and the limitations period begins to run, upon the *first instance* of the alleged effect with respect to the misconduct at issue." *See* Order Den. Enforcement Counsel's Mot. for Partial Summ. Disposition and Granting in Part and Den. in Part Resp'ts' Mot. for Summ. Disposition on the Statute of Limitations (hereinafter, "ALJ's SOL Order") at 31-32. The parties then filed cross-motions requesting that the Comptroller conduct interlocutory review of the ALJ's SOL Order. *See* Order Referring Parties' Cross-Mots. for Interlocutory Review. The Comptroller granted interlocutory review; concluded that, because separate occurrences of effects give rise to separate accruals, an action is timely if it is commenced within five years of the date of the last "effect" resulting from the charged underlying misconduct; and remanded the matter for further proceedings consistent with the Order. *See* Order Granting Cross-Mots. for Interlocutory Review

and Vacating and Reversing in Part April 9 Order (hereinafter, "Comptroller's Interlocutory SOL Order").

### E. Hearing and Post-Hearing Procedures

The parties filed various prehearing submissions, and on Enforcement Counsel's motion, the ALJ excluded Respondents' evidence and testimony on various topics, including the Fannie Mae and Freddie Mac Defense. *See* Order Granting in Part and Den. in Part Enforcement Counsel's Mot. in Lim. to Exclude Resp'ts' Irrelevant Evid. The matter proceeded to a hearing, during which the ALJ heard testimony from ten fact witnesses, including Respondents, and three expert or hybrid fact/expert witnesses. Four hundred seventeen exhibits were introduced and admitted in connection with witness testimony, and the parties presented eighteen demonstrative exhibits. *See* RD at 4-5.

Following the hearing, Respondents submitted an offer of proof regarding various topics excluded from the hearing and the proposed interrogation of certain witnesses. *See* Resp'ts' Additional Offer of Proof. In June 2022, approximately four months after the hearing had concluded, Respondents submitted to the ALJ a demand for a jury trial or, in the alternative, dismissal of the proceedings based on purported violations of their rights under the Seventh Amendment to the United States Constitution. *See* Resp'ts' Demand for Jury Trial. The ALJ denied the requested relief on substantive and procedural grounds. *See* Order Den. Resp'ts' Demand for Jury Trial and Mot. to Dismiss.

On September 30, 2022, the ALJ issued the 188-page Recommended Decision. On Respondents' motion, the Comptroller extended the time for the parties to file exceptions to the Recommended Decision to March 16, 2023. *See* Order Regarding Resp'ts' Mot. to Stay or Extend Exceptions Deadline. Respondents timely submitted to the Comptroller twenty-seven exceptions

and supporting briefing, totaling 130 pages. *See* Resp'ts' Exceptions to the ALJ's RD, Supporting Br., and Request for Oral Argument (hereinafter, "Resp'ts' Exceptions"). Enforcement Counsel timely submitted six exceptions, including numerous subparts; fifteen proposed findings of fact; and three proposed conclusions of law, including subparts, which are accompanied by a separate briefing document and together total 78 pages. *See* Enforcement Counsel's Exceptions to the ALJ's RD (hereinafter, "EC's Exceptions"); Br. in Support of Enforcement Counsel's Exceptions to the ALJ's RD (hereinafter, "EC's Exceptions Br."). Pursuant to 12 C.F.R. § 19.13, upon finding that the complexity of this matter and the volume of the administrative record presented good cause, the Comptroller *sua sponte* extended the time to issue a final decision.

## III.    SCOPE OF REVIEW

The Comptroller is the final agency decisionmaker in this enforcement action. *See* 12 C.F.R. § 19.40(c)(1). The final decision is based on review of the entire record, *see id.*, and "[t]he Comptroller is free to accept or reject the ALJ's recommendations," *see In the Matter of Adams*, OCC AA-EC-11-50, 2014 WL 8735096, at *7 (OCC Sept. 30, 2014).

A party's failure to file written exceptions to the ALJ's recommended decision, findings, conclusions, admission or exclusion of evidence, or failure to make a ruling proposed by a party is deemed a waiver of objection thereto. *See* 12 C.F.R. § 19.39(a), (b)(1). Furthermore, "[n]o exception need be considered by the Comptroller if the party taking exception had an opportunity to raise the same objection, issue, or argument before the [ALJ] and failed to do so." *See id.* § 19.39(b)(2). All exceptions must, *inter alia*, set forth "page or paragraph references to the specific parts of the [ALJ's] recommendations to which exception is taken" and "the legal authority relied upon to support each exception." *See id.* § 19.39(c)(2). In reaching a final decision,

"the Comptroller may limit the issues to be reviewed to those findings and conclusions to which opposing arguments or exceptions have been filed by the parties." *See id.* § 19.40(c)(1).

### A. Waiver by Enforcement Counsel

Enforcement Counsel did not take exception to the ALJ's conclusions that the "effect" prong of § 1818(e)[1] was not established as to charges arising from Respondents' accounting-related misconduct in connection with the Capital Raise Strategy or OREO Strategy, or as to charges arising from Nonaccrual Loan Accounting Practices. *See* EC's Exceptions Br. at 5, n.6 ("Enforcement Counsel has chosen not to take exception to the ALJ's factual findings and legal conclusions regarding the Bank's accounting practices."); *see also* RD at 163, 173. Therefore, based on this waiver, the Comptroller adopts the ALJ's conclusions and dismisses the § 1818(e) prohibition charges against Respondents arising from accounting-related misconduct associated with the Capital Raise Strategy, OREO Strategy, and Nonaccrual Loan Accounting Practices.

Enforcement Counsel also did not take exception to the ALJ's conclusions that the "personal dishonesty" and "willful disregard" predicates of the "culpability" prong of § 1818(e)[2] were not established as to charges arising from Respondents' lending-related misconduct associated with the Capital Raise Strategy or OREO Strategy. *See* EC's Exceptions Br. at 10, n.11 ("Herein, we argue solely that Respondents' misconduct demonstrated their continuing disregard for the Bank's

---

[1] The "effect" prong is one of three elements that must be established to support an order of prohibition. *See infra* Part IV.A.
[2] The "culpability" prong is one of three elements that must be established to support an order of prohibition. *See infra* Part IV.A.

safety or soundness"); *see also* RD at 120-21, 123, 146. Therefore, the Comptroller adopts the ALJ's conclusions that these culpability predicates were not established.

Finally, for purposes of assessing civil money penalties pursuant to § 1818(i),[3] Enforcement Counsel did not take exception to the ALJ's declarations that she was not reaching conclusions as to the following: whether Respondent Ortega (1) breached his fiduciary duty in connection with accounting-related misconduct associated with the Capital Raise Strategy or the OREO Strategy, *see* RD at 172-73; (2) *recklessly* engaged in unsafe or unsound practices in connection with the Capital Raise Strategy, OREO Strategy, or Nonaccrual Loan Accounting Practices*, see id.* at 131; 152; 170, n.801; or (3) engaged in a pattern of misconduct in connection with lending-related misconduct associated with the Capital Raise Strategy or OREO Strategy, *see id.* at 131, 152. Nor did Enforcement Counsel take exception to the ALJ's declarations that she was not reaching conclusions as to whether Respondent Rogers (1) *recklessly* engaged in unsafe or unsound practices in connection with lending-related misconduct associated with the Capital Raise Strategy or OREO Strategy, *see id.* at 131, 152; or (2) engaged in a pattern of misconduct in connection with lending-related misconduct associated with the Capital Raise Strategy or OREO Strategy, or in connection with Loans to Rogers III Entities, *see id.* at 131, 152, 183. The Comptroller declines to consider these issues in the first instance based on Enforcement Counsel's waiver.[4]

### B.  Waiver by Respondents

In numerous instances throughout Respondents' exceptions briefing, Respondents present exceptions in a perfunctory manner, without any citation to supporting legal authority. Under the

_____

[3] The elements that must be established to support the assessment of a civil money penalty pursuant to § 1818(i) are set forth at *infra* Part IV.B.

[4] Enforcement Counsel did not take exception to various other issues as to which the ALJ declined to reach a conclusion. The Comptroller declines to consider these issues in the first instance and

applicable rules of procedure, such exceptions are fatally underdeveloped. *See* 12 C.F.R. § 19.39(c)(2) (requiring, *inter alia*, citations to supporting legal authorities). The Comptroller is unable to evaluate vague assertions with no accompanying analysis or citation to legal authority, and he will not guess the bases of Respondents' inadequately presented arguments. *See Carr v. Saul*, 141 S. Ct. 1352, 1358 (2021) (observing that, in an adversarial proceeding, "claimants bear the responsibility to develop issues for adjudicators' consideration"). Additionally, the Comptroller declines to consider exceptions that Respondents did not first raise to the ALJ if they were afforded such an opportunity. *See* 12 C.F.R. § 19.39(b)(2).

As discussed more fully below, because Respondents did not raise the following exceptions in the manner prescribed by 12 C.F.R. § 19.39, the Comptroller deems them waived and declines to consider them, in full or in part as specified: **Respondents' Exception 3** (in part), **Respondents' Exception 5** (in part), **Respondents' Exception 6** (in full), **Respondents' Exception 7** (in full), **Respondents' Exception 8** (in full), **Respondents' Exception 9** (in part), **Respondents' Exception 10** (in full), and **Respondents' Exception 11** (in full).

**Respondents' Exception 3** asserts, in relevant part, "This proceeding was conducted in violation of the . . . Take Care Clause, and applicable statutes governing ALJs." *See* Resp'ts' Exceptions at 2. As far as Respondents' briefing indicates, Respondents raise these challenges for the first time in their exceptions despite having had opportunities to raise them to the ALJ. Respondents do not reference any ruling regarding the Take Care Clause or ALJ removals to which an exception is taken. Nor do they otherwise indicate that these challenges were raised

---

does not deem it necessary to exhaustively list all such issues, particularly where some concern charges that are dismissed herein.

below. Therefore, to the extent that Respondents' Exception 3 raises these challenges,[5] it is deemed waived.[6] *See Smith v. Bd. of Governors of Fed. Rsrv. Sys.*, 73 F.4th 815, 822-23 (10th Cir. 2023) (concluding that Appointments Clause challenge was forfeited where respondents in § 1818(e) enforcement action failed to raise issue before the ALJ or Federal Reserve Board and nothing had barred them from doing so; observing that "structural challenges have no special entitlement to review" (internal quotation marks and citation omitted)).

**Respondents' Exception 5** asserts, "The ALJ's pretrial orders contain errors of fact and law and violated the Administrative Procedure Act and the Uniform Rules of Practice and Procedure." *See* Resp'ts' Exceptions at 2. The corresponding section of Respondents' Exceptions contains citations to the administrative record, but notably lacks any citation to supporting legal authority beyond incorporating by reference a section discussing the Fannie Mae and Freddie Mac Defense. *See id.* at 88-89. The Comptroller addresses the merits of Respondents' various exceptions regarding the Fannie Mae and Freddie Mac defense at *infra* Part VIII. To whatever extent Respondents' Exception 5 intended to assert a distinct challenge that is not coextensive with their exceptions discussed at *infra* Part VIII, Respondents' Exception 5 is deemed waived.

**Respondents' Exception 6** asserts: "The ALJ prohibited Respondents from testifying as experts even though they were designated timely and submitted reports." *See* Resp'ts' Exceptions

---

[5] Respondents' discussion of ALJ removals is tagged on the end of their discussion of their properly preserved exception regarding the Appointments Clause. *See* Resp'ts' Exceptions at 87-88. The constitutionality of the removability of ALJs is a separate issue from the constitutionality of the manner of ALJ appointments, and Respondents cannot breathe life into their forfeited ALJ-removals challenge by shoehorning it into their Appointments Clause discussion.

[6] Respondents do not assert that raising such a challenge to the ALJ would have been futile. Rightfully so—such an assertion would be unavailing. Because these proceedings are adversarial and the applicable procedural regulations impose an issue exhaustion requirement, the Comptroller does not accept futility as an excuse. *See Carr*, 141 S. Ct. at 1359. Additionally, the Comptroller observes that any perception of futility did not deter Respondents from raising their Appointments Clause challenge initially to the ALJ.

at 2. The corresponding discussion consists of four sentences, including a reiteration of the exception and the following: "Obviously, if Respondents can be held liable for knowing that a loan was unsafe and unsound, one might think their opinion was also relevant. In fact, it was error to conclude otherwise." *See id.* at 92. Legal authority supporting the proposition that it was error to prohibit Respondents from testifying as experts in the very administrative enforcement action pending against them is far from "obvious," and because none is cited, Respondents' Exception 6 is deemed waived in full. In any event, the Comptroller concurs with the ALJ's analysis of this issue in her Order Granting Enforcement Counsel's Motion in Limine to Exclude Proposed Expert Testimony by Respondents.

**Respondents' Exception 7** asserts the following:

> . . . [T]he ALJ allowed the OCC's surprise witness, Michael Brickman, to testify as an expert even though he was not designated timely, did not provide a report, and was not disclosed on the witness list. Mr. Brickman was also permitted to opine on market interest rates despite having no expertise in the area and not having conducted any analysis on the topic or providing any reports or other analyses in advance of trial. In addition, OCC witnesses were permitted to testify as to fiduciary duty with no legal training and no legal expertise in such matters.

*See* Resp'ts' Exceptions at 2-3. In their discussion of this exception, Respondents again fail to cite supporting legal authority. Respondents' Exception 7 is therefore deemed waived in full. Moreover, the Comptroller observes that in the discussion corresponding with this exception, Respondents cite their December 17, 2021 Motion to Exclude Witnesses and the ALJ's January 11, 2022 Order Granting in Part Enforcement Counsel's Motion for Denial of Third-Party Subpoena Application and Granting in Part Respondents' Motion to Exclude Witnesses. *See id.* at 91. The cited motion raises (and the cited order addresses) the argument that Mr. Brickman had not been timely identified and disclosed as a hybrid fact/expert witness. To the extent that Respondents' Exception 7 challenges the lack of an expert report by Mr. Brickman, the

appropriateness of Mr. Brickman's testimony on market interest rates, or the appropriateness of the testimony of other OCC witnesses (who Respondents did not see fit to identify), such challenges are deemed doubly waived because Respondents did not cite to any corresponding conclusions by the ALJ and Respondents do not indicate that they ever raised such objections to the ALJ despite having the opportunity to do so. *See* 12 C.F.R. § 19.39(b), (c)(2).[7]

**Respondents' Exception 8** asserts, "The ALJ denied Respondents' Motion to Exclude Mary Jane Locke as a trial witness even though she was not disclosed timely." *See* Resp'ts' Exceptions at 3. **Respondents' Exception 10** provides, "The ALJ prohibited Respondents from calling Andrew Moss, an OCC employee, as a witness." *See id.* In their discussion of these exceptions, Respondents assert, without meaningful argument, the following: "Siding with the OCC, the ALJ decided that the government could add multiple witnesses late, but that Respondents could not add Andrew Moss. Respondents take exception to these rulings." *See id.* at 92-93. Mere mentioning of facts in the absence of argument or citation to relevant legal authority is insufficient to effectively raise an issue to the Comptroller. Respondents' Exceptions 8 and 10 are therefore deemed waived in full.

**Respondents' Exception 9** asserts, "The ALJ granted the OCC's pretrial motion to exclude relevant evidence at the hearing, including the presentation of the Fannie Mae/Freddie Mac preferred stock issue." *See* Resp'ts' Exceptions at 3. As best as the Comptroller can tell, Respondents' discussion of this exception appears in the three sentences appearing beneath the

---

[7] In any event, the Comptroller notes that the ALJ was not bound by the Federal Rules of Evidence; that she found the testimony to be relevant, *see* Order Granting in Part Enforcement Counsel's Mot. for Den. of Third-Party Subpoena Application and Granting in Part Resp'ts' Mot. to Exclude Witnesses at 4-5; and that "relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law," *see* 12 C.F.R. § 19.36(a).

heading, "The ALJ Granted Pretrial Motions to Exclude Other Relevant Evidence," on page ninety-three of Respondents' Exceptions. There is no mention here of the "Fannie Mae/Freddie Mac preferred stock issue," which is addressed in various other exceptions that the Comptroller does not deem waived. Rather, the relevant discussion consists of two sentences related to rulings preventing Respondents' questioning of witnesses "about OCC policies on minority banks and minority bankers" and a third sentence stating, "In violation of the Uniform Rules, the ALJ also denied the Respondents the right to make offers of proof including direct witness interrogation." *See id.* at 93. Again, there is no citation to supporting legal authority and the Comptroller cannot piece together any cognizable argument from these four sentences, which seemingly address three distinct issues. Respondents' Exception 9 is deemed waived, except to the extent that it concerns the striking of the Fannie Mae & Freddie Mac Defense, which the Comptroller deems properly (if duplicatively) raised in various other exceptions discussed at *infra* Part VIII.

**Respondents' Exception 11** asserts:

> The ALJ admitted and considered certain OCC exhibits that were improper and inadmissible. The ALJ admitted and considered exhibits that were hearsay and/or were used solely for impeachment or refreshing recollection, contrary to applicable law. This included transcripts for depositions where the Respondents were not notified and allowed to attend and cross-examine. This violated the Due Process Clause, the right to confront witnesses against the accused, the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

*See* Resp'ts' Exceptions at 3. Respondents' discussion of this exception largely consists of conclusory bullet points with no meaningful analysis or citation to supporting authority. *See id.* at 93-94. For example, Respondents assert, "In some cases, [sworn] statements were taken without Respondents' counsel present and without any opportunity to cross-examine. This was a violation of the Due Process Clause, the confrontation clause, the Seventh Amendment, and Respondents' right to fair proceeding under the APA and the Uniform Rules." *See id.* at 94. Without more precise

argumentation or citation to supporting legal authority, these sweeping assertions of constitutional, statutory, and regulatory violations do not satisfy the requirements of 12 C.F.R. § 19.39. The Comptroller's role is not to flesh out skeletal arguments, particularly where controversial extensions of or changes to settled law are seemingly implicated. *See Dutton v. Evans*, 400 U.S. 74, 97 n.4 (1970) (J. Harlan, concurring) ("the Confrontation Clause, which applies only to criminal prosecutions, was never intended as a constitutional standard for testing rules of evidence"); *see also United States v. Cunningham*, 679 F.3d 355, 383 (6th Cir. 2012) (explaining that Federal Rule of Evidence 801(d)(2)(A) allows "a party's own statement to be offered as evidence against that party even where the statement would otherwise be inadmissible as hearsay"); 12 C.F.R. § 19.36(a)(2) (permitting admission of evidence that would be admissible under Federal Rules of Evidence). Respondents' Exception 11 is thus waived in full.

## IV.    APPLICABLE LEGAL STANDARDS

When reviewing the record, the Comptroller "determine[s] whether, in his judgment, Enforcement Counsel has met its burden of supporting its allegations by a preponderance of the evidence in the record." *See Adams*, 2014 WL 8735096, at *7 (citing 5 U.S.C. § 556(d); *Steadman v. Sec. & Exch. Comm'n*, 450 U.S. 91 (1981)); *see also In the Matter of Ellsworth*, OCC AA-EC-11-41, OCC AA-EC-11-42, 2016 WL 11597958, at *8, n.10 (OCC Mar. 23, 2016).[8] Under this standard, Enforcement Counsel must adduce evidence that the existence of a fact is more probable

---

[8] **Respondents' Exception 27** asserts, "Applicable law required application of a higher standard or proof where the sanction or hardship imposed was particularly severe, thus the ALJ should have applied a 'clear and convincing' evidence standard as the burden of proof." *See* Resp'ts' Exceptions at 6. Respondents cite no legal authority in support of this assertion. Respondents' Exception 27 is rejected.

than its nonexistence. *See Concrete Pipe & Prods. of Calif. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993).

### A. Section 1818(e) Prohibitions

For the Comptroller to enter an order of prohibition against an IAP pursuant to § 1818(e), Enforcement Counsel must establish the separate elements of misconduct, effect, and culpability. *See* 12 U.S.C. § 1818(e)(1)(A), (B), & (C); *Kim v. Off. of Thrift Supervision*, 40 F.3d 1050, 1054 (9th Cir. 1994) (labeling the three elements). The misconduct element may be satisfied by, among other means, showing that the IAP has "directly or indirectly" violated any law or regulation; "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution . . ."; or "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty." *See* 12 U.S.C. § 1818(e)(1)(A). The effect element may be satisfied by showing that, "by reason of" the misconduct, the institution at issue "has suffered or will probably suffer financial loss or other damage," that the institution's depositors' interests "have been or could be prejudiced," or that the charged party "has received financial gain or other benefit." *Id.* § 1818(e)(1)(B). Finally, the culpability element may be satisfied when the alleged misconduct "involves personal dishonesty" or "demonstrates willful or continuing disregard by [an IAP] for the safety or soundness of such insured depository institution . . .." *Id.* § 1818(e)(1)(C).

### B. Section 1818(i) Civil Money Penalties

Pursuant to § 1818(i)(2), the Comptroller may assess civil money penalties, categorized by escalating "tiers," including first-tier penalties of up to $5,000 per day of continued misconduct and second-tier penalties of up to $25,000 per day of continued misconduct. Here, Enforcement

Counsel seeks a first-tier civil money penalty against Respondent Ortega and second-tier civil money penalties against both Respondents. *See* RD at 6, n.6.

For the Comptroller to assess a first-tier civil money penalty against an IAP, Enforcement Counsel must establish one element: misconduct, which, as relevant to the instant proceeding, can take the form of a violation of any law. *See* 12 U.S.C. § 1818(i)(2)(A). To assess a second-tier civil money penalty against an IAP, Enforcement Counsel must establish two elements: misconduct and effect. As relevant to the instant proceeding, misconduct can take the form of a violation of law, breach of fiduciary duty, or the reckless engagement in an unsafe or unsound practice in conducting the affairs of the institution in question. *See id.* § 1818(i)(2)(B)(i). To satisfy the "effect" prong, Enforcement Counsel must also establish that the misconduct "is part of a pattern of misconduct'" that it "causes or is likely to cause more than a minimal loss to such depository institution"; or that it "results in pecuniary gain or other benefit to such party." *Id.* § 1818(i)(2)(B)(ii); *see also In the Matter of Blanton*, OCC-AA-EC-2015-24, 2017 WL 4510840, at \*16 (OCC July 10, 2017) (referring to § 1818(i)(2)(B)(ii) as the statute's "effect" prong).

## V.  RESPONDENTS' EXCEPTION REGARDING TIMELINESS

Respondents dedicate a substantial portion of their exceptions briefing to arguing that the charges against them are untimely. In this briefing, Respondents appear to misapprehend the ways in which certain interlocutory rulings interpreting the statute of limitations relate to the charges in this matter. The Comptroller thus takes this opportunity to clarify these prior rulings and their

relationship to the charges at issue here. As explained more fully below, the charges against Respondents are timely.

### A. Interlocutory Rulings Regarding the Statute of Limitations

Under the applicable statute of limitations, the agency has "five years from the date when the claim first accrued" in which to commence proceedings. *See* 28 U.S.C. § 2462. The Notice initiating the instant action was filed on September 25, 2017. Therefore, any claim that first accrued on or after September 25, 2012, is timely for present purposes.

An interlocutory review by the Comptroller pursuant to 12 C.F.R. § 19.28 centered on the parties' contrasting views as to when the claims against Respondents "first accrued" within the meaning of § 2462. As the ALJ correctly stated, "the standard rule is that a claim accrues when the plaintiff has a complete and present cause of action—that is, when all elements of an actionable claim have been met and can be pled." *See* ALJ's SOL Order at 13 (internal quotation marks omitted). "[A]ny discussion of the accrual of claims under a given statute—in this case, Section 1818(e) for the agency's prohibition claims and Section 1818(i) for its civil money penalty claims—must begin with the statutory elements." *See id*. To reiterate, the three elements of a § 1818(e) prohibition are misconduct, effect, and culpability, *see* 12 U.S.C. § 1818(e)(1)(A), (B), & (C); the two elements of a second-tier civil money penalty are misconduct and effect, *see id.* § 1818(i)(2)(B); and each of these elements may be established through a showing of any one of multiple alternative predicates, *see supra* Part IV.

In the ALJ's SOL Order, the ALJ rejected Respondents' argument that the five-year limitations period for prohibition and second-tier civil money penalty charges begins to run at the time of the alleged misconduct, reasoning that "Respondents pay too little heed to the elements necessary for a claim to accrue under Sections 1818(e) and 1818(i)" and that, in many instances, Respondents'

interpretation "would start the limitations period before the OCC could even bring suit." *See* ALJ's SOL Order at 12-13. The ALJ also rejected Enforcement Counsel's argument that an action is timely if commenced within five years of an effect resulting from the alleged misconduct. *See id.* at 31. Instead, the ALJ concluded that "when a particular statutory 'effect' is alleged . . . then the cause of action for a given claim against Respondents is complete, and the limitations period begins to run, upon the *first instance* of the alleged effect with respect to the misconduct at issue." *See id.* at 31-32. Thus, under the ALJ's interpretation, "the OCC cannot use actual loss that occurred during the five-year period prior to the commencement of enforcement proceedings as the point at which its claims against Respondents 'first accrued' if, in fact, actual loss also had occurred prior to that period." *See id.* at 25.

In connection with the interlocutory review of the ALJ's SOL Order, the Comptroller issued the following relevant rulings. First, the Comptroller agreed with the ALJ and reaffirmed that the statute of limitations does not begin to run until *all* factual and legal prerequisites for filing a notice of charges are in place ("Interlocutory Ruling 1"). *See* Comptroller's Interlocutory SOL Order at 14 & n.6; ALJ's SOL Order at 13; *see also Blanton v. OCC*, 909 F.3d 1162, 1171 (D.C. Cir. 2018) ("A claim generally accrues 'when the factual and legal prerequisites for filing suit are in place.'" (quoting *Proffitt v. Fed. Deposit Ins. Corp.*, 200 F.3d 855, 862 (D.C. Cir. 2000))); *Proffitt*, 200 F.3d. at 863 ("Because misconduct and effect are separate prongs, the underlying conduct may not always immediately effect a [§ 1818(e)] violation and thus the accrual of the claim"). Second, the Comptroller reaffirmed that occurrences of alternative statutory effect predicates trigger accruals of separate claims ("Interlocutory Ruling 2"). *See* Comptroller's Interlocutory SOL Order at 13-14, 16; *see also Proffitt*, 200 F.3d at 864 ("Separate accrual for each alternative effect gives meaning to all of the statutory language."). For example, a § 1818(e) prohibition charge predicated

on the statutory effect of financial loss to a depository institution is a separate claim from (and may accrue at a different time than) a § 1818(e) prohibition charge predicated on the statutory effect of prejudice to depositors. *Cf.* ALJ's SOL Order at 25 ("an agency can perhaps choose whether to take action based on the first occurrence of actual loss or the first occurrence of actual depositor prejudice"). However, the Comptroller disagreed with the ALJ that an action must be commenced within five years of the first occurrence of the type of statutory effect on which the action is predicated. Instead, the Comptroller clarified that, because separate occurrences of effects (for example, separately occurring financial losses to the depository institution) trigger separate claim accruals, an action is timely if it is commenced within five years of the date of an effect resulting from the charged misconduct, even if there were an earlier occurrence of a statutory effect of the type on which the action is predicated ("Interlocutory Ruling 2a"). *See* Comptroller's Interlocutory SOL Order at 13-16.[9] The matter was remanded to the ALJ for further proceedings consistent with the Comptroller's Interlocutory SOL Order.

In the Recommended Decision, the ALJ expressed that she disagreed with Interlocutory Ruling 2a and "remains hopeful that this ruling will be revisited." *See* RD at 144-45.

### B. Respondents' Exception 1 Is Deemed Moot in Part and Rejected in Part

**Respondents' Exception 1** asserts that "The charges against Respondents are barred by the statute of limitations contained in 28 U.S.C. § 2462." *See* Resp'ts' Exceptions at 1. As a basis to support this exception, Respondents repeatedly emphasize the ALJ's stated disagreement with Interlocutory Ruling 2a. *See* Resp'ts' Exceptions at 46 (quoting RD at 144-45), 49 (same), 51 (same), 59-60 (same). Yet Respondents invoke the ALJ's disagreement with Interlocutory Ruling

---

[9] The Comptroller's Interlocutory SOL Order did not use the terms "Interlocutory Ruling 1," "Interlocutory Ruling 2," or "Interlocutory Ruling 2a." The Comptroller uses those terms here in the interest of clarity.

2a (charge is timely if brought within five years of occurrence of effect) in connection with charges that would not be deemed timely *solely* through application of this ruling. The charges that Respondents discuss in connection with Interlocutory Ruling 2a can instead be deemed timely through Interlocutory Ruling 1 (charge is timely if brought within five years of date when all elements have been met and can be pled) and Interlocutory Ruling 2 (charge is timely if brought within five years of date when last alternative predicate underlying effect prong has been met and can be pled),[10] both longstanding interpretations of which the ALJ and Comptroller are—at least on the present facts—seemingly in agreement. In any event, for reasons unrelated to the statute of limitations and discussed more fully herein, charges that *might* be deemed timely solely through application of Interlocutory Ruling 2a are herein dismissed.[11] Therefore, the Comptroller declines

---

[10] For example, Respondents invoke the ALJ's disagreement with Interlocutory Ruling 2a in connection with the timeliness of lending-related charges arising from the Capital Raise Strategy. *See* Resp'ts' Exceptions at 46. Such charges do not require application of this ruling to be deemed timely. As the ALJ explained, Enforcement Counsel adduced evidence that the Bank recorded losses on loans associated with the Capital Raise Strategy within the five-year limitations period. *See* RD at 117-18. The ALJ then rejected Respondents' arguments that, notwithstanding those losses, the underlying charges were untimely because certain *alternative* § 1818(e) effect predicates—namely, the onset of *probable* financial loss, *see* § 1818(e)(1)(B)(i)—had previously occurred outside of the limitations period. *See* RD at 118. The ALJ correctly reasoned that "it is settled law . . . that it is meaningless for limitations purposes that an agency could conceivably have brought its claim earlier based on a different effect (and thus a different cause of action) that it did not plead." *See id.* This analysis is consistent with Interlocutory Ruling 1 and Interlocutory Ruling 2. Respondents thus miss the mark by invoking the ALJ's disagreement with Interlocutory Ruling 2a to argue that charges arising from the Capital Raise Strategy are untimely.

[11] Upon review on the full record, the Comptroller questions whether *any* charges in this matter would require application of Interlocutory Ruling 2a to be deemed timely. *See, e.g.,* RD at 180 (discussing timeliness of charges arising from Loans to Rogers III Entities and concluding that, even if certain factual predicates were excluded based on the statute-of-limitations interpretation supported by the ALJ, other factual predicates underlying the charge give rise to "a separate and separately accruing, breach of fiduciary duty . . . , rendering the Article VI claim timely regardless."); RD at 144-45 (discussing timeliness of charges arising from lending-related misconduct associated with OREO Strategy and concluding that even if the post-closure losses to FDIC were disregarded, "there is no dispute that the Bank itself, pre-closure, recorded losses on multiple OREO loans" and thus "the agency's claims on the OREO lending issue would still have been timely asserted."); *infra* Part X.A.2.b (discussing timeliness of accounting-related charges

the ALJ's invitation to revisit Interlocutory Ruling 2a, and to the extent that Respondents' Exception 1 challenges Interlocutory Ruling 2a, it is deemed moot.

Respondents also reiterate various arguments that have already been presented to and rejected by the Comptroller in connection with the interlocutory review. The Comptroller will not restate or reexamine these arguments here. However, to the extent that Respondents' arguments specifically concern charges arising from the Capital Raise Strategy and are further elucidated by the full record, the Comptroller addresses the timeliness of the Capital Raise Strategy charges at *infra* Part X.A.2.b. For the reasons stated here and at Part X.A.2.b, Respondents' Exception 1 is, to the extent not deemed moot, rejected.

## VI.    RESPONDENTS' EXCEPTION REGARDING THE SEVENTH AMENDMENT

**Respondents' Exception 2** asserts, "This proceeding was conducted in violation of the Respondents' right to a trial by jury." *See* Resp'ts' Exceptions at 2. In their exceptions, Respondents argue that, in light of *Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023), they "were entitled to have this case submitted to a jury under the Seventh Amendment [to] the United States Constitution." *See* Resp'ts' Exceptions at 61. Respondents further assert the following:

> The Comptroller already utilizes an ALJ to handle these proceedings as a bench trial, and it would not alter the statutory purpose at all to have the same ALJ preside over a jury trial. Judges handle both bench trials and jury trials all the time, and it would be appropriate for ALJs to do so as well.

*See* Resp'ts' Exceptions at 67.

---

arising from Capital Raise Strategy). The Comptroller need not address this point further because the charges arising from Loans to Rogers III Entities and lending-related misconduct associated with the OREO Strategy are dismissed for reasons unrelated to the statute of limitations. *See infra* Part X.B, Part X.D.

Notably, Respondents raised the Seventh Amendment issue for the first time in a June 13, 2022 filing, in which they requested that the ALJ "summon a jury of Respondents' peers to hear this case" or, in the alternative, that the action be dismissed. *See* Resp'ts' Demand for Jury Trial at 2. The ALJ denied the motion on both procedural and substantive grounds, reasoning that it was procedurally improper because it was submitted more than one year after the deadline for dispositive motions and *four months after* the administrative hearing in this matter had been held; that neither the governing rules of practice and procedure nor the statutory scheme authorize the empanelment of juries; and that Respondents are not entitled to a jury trial in connection with these proceedings. *See* Order Den. Resp'ts' Demand for Jury Trial and Mot. to Dismiss.

The Comptroller rejects Respondents' Exception 2 and adopts the ALJ's recommendation as to this issue. The Comptroller agrees with the ALJ that Respondents' demand for a jury trial was procedurally improper and untimely; that the governing statute and regulations do not authorize the empanelment of a jury; and that, in any event, Respondents are not entitled to a jury trial in connection with proceedings pursuant to § 1818(e) or (i).

## VII.    RESPONDENTS' EXCEPTIONS REGARDING THE APPOINTMENTS CLAUSE

**Respondents' Exception 3** asserts, to the extent not deemed waived, *see supra* Part III.B, that "This proceeding was conducted in violation of the Appointments Clause of the United States Constitution, as well as the Due Process Clause, [and] Separation of Powers . . . ." *See* Resp'ts' Exceptions at 2. **Respondents' Exception 4** asserts, in pertinent part:

> ALJ McNeil, who was an unauthorized actor and not appointed consistent with the Constitution, made rulings striking Respondents' pleadings and evidence . . . At trial, ALJ Whang felt bound by these unconstitutional rulings and prohibited Respondents from presenting a full and complete defense, which violated the Appointments Clause [and] the Due Process Clause . . . .

*See id.*[12]

Respondents brief the Appointments Clause issue at considerable length. *See id.* at 68-88. The Comptroller finds that this briefing largely concerns immaterial or undisputed issues. The core inquiry relevant to Respondents' Appointments Clause challenge is whether Respondents were afforded the relief required by *Lucia*: a new hearing before a properly appointed ALJ. Ample record evidence demonstrates that they were. To the extent that Respondents' Exceptions 3 and 4 raise challenges under the Appointments Clause, these exceptions are rejected.

### A. Judge Whang Was Properly Appointed

As an initial matter, record evidence establishes that Judge Whang was properly appointed, *see* OCC's Opp. to Resp'ts' Mot. for Summ. Disposition on the Appointments Clause and Resp. to Obj. to Orders Issued by ALJ, Exs. 1-3, and the Comptroller finds that there was no error in denying Respondents discovery regarding her appointment. With respect to whether Respondents received a new hearing within the meaning of *Lucia*, Respondents assert that Judge Whang "felt bound" by or merely ratified pre-hearing rulings issued by previously assigned ALJs. *See* Resp'ts' Exceptions at 2. Such assertions are flatly contradicted by various orders (including the ones cited by Respondents), and Respondents have adduced no evidence that these orders mean anything other than what they say.

### B. Respondents Received the Remedy Required by *Lucia*

Turning to the relevant orders, in January 2020, the Comptroller issued an Order in Pending Enforcement Cases, reassigning the matter to Judge Whang and stating, as relevant, the following:

> . . . [I]n *Lucia v. SEC*, 138 S. Ct. 2044 (2018), the Supreme Court determined that [ALJs] performing adjudicative duties for the federal government are inherently

---

[12] In this part, the Comptroller discusses Respondents' Exception 4 to the extent that it asserts violations of the Appointments Clause and Due Process Clause. Other challenges asserted in connection with Respondents' Exception 4 are discussed at *infra* Part VIII.

inferior officers of the United States and therefore must be appointed as provided in the Appointments Clause . . ..

. . . [T]he Secretary of the Treasury, by order dated November 14, 2019, appointed Jennifer Whang as an [ALJ] for the OCC pursuant to the appointment power granted to him as the Head of a Department by Article II of the United States Constitution, and by 31 U.S.C. § 301(b) and 5 U.S.C. § 3105 . . ..

. . .

Promptly after reassignment, the newly assigned ALJ shall issue a Notice . . . providing each party an opportunity to file an Objection . . . to any of the actions taken by the prior ALJ. . .. The ALJ should thereafter issue a decision on reconsideration of the actions to which an Objection was filed . . . With respect to actions to which no Objection is filed the ALJ shall review the action and adopt or revise the action as the ALJ deems appropriate. . ..

. . . This order is issued in light of the Supreme Court's decision in *Lucia*. Accordingly, an [ALJ] may . . . reach the same recommendations as the previously assigned [ALJ], but the [ALJ] is also free to reach different recommendations from those of the initial [ALJ].

*See* Order in Pending Enforcement Cases at 1-2 (internal quotation marks omitted). Pursuant to the order, Judge Whang subsequently directed the parties, *inter alia*, to file objections to any of the previous actions taken by prior ALJs. *See* Notice of Reassignment and Order Regarding the Comptroller's Order in Pending Enforcement Cases.

In response, Respondents moved for summary disposition, arguing that, under *Lucia*, the proceedings against them were commenced and continued to proceed in violation of the Appointments Clause. *See* Resp'ts' Mot. for Summ. Disposition on the Appointments Clause and Obj. to Orders Issued by ALJ at 2-3. Respondents also specifically objected to the Order Granting Motion to Strike and generally objected to all orders entered by Judge McNeil and Judge Miserendino, arguing that these orders should be "vacated and voided" because those ALJs lacked authority to proceed under the Appointments Clause. *See id.* at 3.

On March 17, 2020, Judge Whang issued an Order Reviewing Prior Administrative Law Judges' Prehearing Actions ("Order Reviewing Prior Actions") and an Order Denying Respondents' Motion for Summary Disposition on the Appointments Clause ("Order Regarding the Appointments Clause") (together, "March 2020 Orders"). In the Order Reviewing Prior Actions, Judge Whang expressed agreement with Judge McNeil's determination that the Fannie Mae and Freddie Mac Defense was an irrelevant or improper affirmative defense; explained that she had examined the prehearing actions taken by the previously-assigned ALJs, had found that the actions were "consistent with the OCC's Uniform Rules, 12 U.S.C. § 1818[], and with the provisions of the Administrative Procedure Act; and "[u]pon finding that cause to revise [previously-entered] orders has not been shown," adopted them. *See* Order Reviewing Prior Actions at 3-5. In the Order Regarding the Appointments Clause, Judge Whang concluded that *Lucia* did not support Petitioners' contention that the appropriate remedy for an Appointments Clause violation should be nullification of the entire action; rather "it is enough for the case to be heard anew by an ALJ who has been properly appointed." *See* Order Regarding the Appointments Clause at 4-5.

### C. Respondents' Arguments Are Unavailing

Notably, Respondents cite the March 2020 Orders for the following proposition: "The current ALJ has ruled that the OCC may continue forward with this proceeding under a 'reassignment and ratification' approach, where it assigns a new ALJ to the case who then ratifies the prior void rulings by the unauthorized and illegal ALJs." *See* Resp'ts' Exceptions at 68 & n.167. Neither of the March 2020 Orders uses any variation of the term "ratification," and Respondents' characterization of Judge Whang's March 2020 Orders is refuted by orders issued by Judge Whang and the Comptroller in January 2020. The Comptroller's order made clear that Judge Whang was

free to dispose of issues differently than the ALJs previously assigned to this case had. Following the parties' briefing on the previously entered orders, Judge Whang ruled that the prior orders were correctly decided for the same reasons stated by the previously assigned ALJs. There is no indication that Judge Whang failed to review these orders *de novo* or that, in the words of Respondents, she was not presented with the issues "*tabula rasa.*" *See id.* at 81-82 ("The new ALJ should not be presented with unconstitutional rulings and asked to approve them—rather she should be presented with these issues *tabula rasa.*"). Respondents apparently suggest that a "new hearing" must consist of an entirely new-from-scratch proceeding rather than an independent review of the record by a newly and properly appointed adjudicator. *See id.* at 78. But the Comptroller agrees with Judge Whang that "[a]t no point did the [*Lucia*] Court appear to entertain the possibility that the action itself was invalid and should be brought from scratch, or that respondents before an unconstitutionally appointed tribunal are entitled to have the proceedings dismissed in full." *See* Order Den. Resp'ts' Mot. for Summ. Disposition on the Appointments Clause at 4 (citing *Lucia*, 138 S.Ct. at 2055, n.5); *see also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 124 (D.C. Cir. 2015) (explaining that "not every possible kind of taint is fatal because, if it were, there would be no way to remedy an Appointments Clause violation"). Respondents had an opportunity to specify alleged defects in pre-hearing rulings issued by prior ALJs. They did so, and thereafter, Judge Whang independently considered the merits of the prior rulings. In short, Respondents were afforded all that *Lucia* required.

Respondents' Due Process Clause challenge is fully subsumed by their Appointments Clause challenge and addressed above.[13] To the extent Respondents intended to assert a distinct Due

---

[13] The Comptroller observes that Respondents asserted the following as their ninth affirmative defense: "Respondents object to this proceeding insofar as the administrative procedures in place violate the Due Process Clause of the United States Constitution, fail to comply with the

Process Clause challenge, such challenge is deemed waived for failure to cite relevant legal authority. *See supra* Part III.

## VIII. RESPONDENTS' EXCEPTIONS REGARDING RULINGS ON CERTAIN AFFIRMATIVE DEFENSES AND EVIDENTIARY MATTERS

**Respondents' Exception 4** asserts, in pertinent part, the following:

> ALJ McNeil . . . made rulings striking Respondents' pleadings and evidence—including evidence that McNeil's own department head, Treasury, took over Fannie Mae and Freddie Mac and destroyed their preferred stock (after having encouraged the investment) causing a $174 million loss to the Bank from which it could not recover. At trial, ALJ Whang felt bound by these . . . rulings and prohibited Respondents from presenting a full and complete defense, which violated . . . the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

*See* Resp'ts' Exceptions at 2. **Respondents' Exception 9** asserts, "The ALJ granted the OCC's pretrial motion to exclude relevant evidence at hearing, including presentation of the Fannie Mae/Freddie Mac preferred stock issue." *See id.* at 3. **Respondents' Exception 12** asserts, "The ALJ excluded certain exhibits of Respondents that were highly relevant." *See id.* **Respondents' Exception 13** asserts:

> The ALJ refused to allow offers of proof for evidence that was excluded from the record at trial, depriving the Respondents and the reviewing court the opportunity for meaningful judicial review. This violated the Due Process Clause, the Separation of Powers, the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

*See id.* **Respondents' Exception 14** asserts:

> The parties were ordered to give advance disclosure of exhibits and page numbers for each witness. While Respondents painstakingly complied with this order, the OCC grossly over-designated its exhibits and page cites thus obscuring and denying

---

Administrative Procedures Act, and/or deny the Respondents a meaningful opportunity to be heard." *See* Resp'ts' Answer and Affirmative Defenses to Notice of Charges at 9. And in a status report regarding this defense, Respondents stated, "Respondents view this issue as having already been briefed and addressed in the prior Appointments Clause briefing before the Court and do not request additional briefing on the Ninth Defense." *See* Resp'ts' Status Report on its Ninth Affirmative Defense. The Comptroller takes this as an indication that Respondents' Due Process Clause and Appointments Clause challenges fully overlap.

> Respondents a meaningful disclosure. The ALJ overruled Respondents' objections
> in this regard.

*See id.* at 4.

In their briefing on Exceptions 4, 9, 12, 13, and 14, Respondents argue, *inter alia*, that the ALJs erred in striking the Fannie Mae and Freddie Mac Defense because it was "highly relevant" to the reasonableness of Respondents' actions, "the OCC's own lack of credibility . . . in bringing this enforcement action," and Respondents' lack of culpability. *See* Resp'ts' Exceptions at 89. They further argue that this ruling violated Respondents' due process rights by depriving them of a full and fair hearing, and that motions to strike are disfavored under the Federal Rules of Civil Procedure and not authorized by 12 C.F.R. Part 19, except where a party fails to sign a pleading. *See id.* at 83-85, 89. Respondents also argue that Judge Whang erred (1) by striking their Sixth Affirmative Defense, "which raises the fact that Respondents did not profit but rather lost as a result of the events described in the Notice of Charges"; (2) by prohibiting questioning of witnesses on topics related to the Fannie Mae and Freddie Mac Defense and Respondent Ortega's experience at another national bank; (3) by admitting sworn statements and hearsay testimony; and (4) by excluding certain exhibits, which "showed, among other things, the effect of the crisis and Fannie Mae Collapse on community banks, disparate treatment received by community banks, that Treasury's decisions were what caused the problem including the failure of many community banks, and the unavailability of [the Troubled Assets Relief Program] to community banks." *See id.* at 85, 95-96. Respondents also argue that Judge Whang erred by prohibiting offers of proof at various points throughout the hearing and that Respondents were prejudiced by Enforcement Counsel's over-designation of exhibits in connection with a witness disclosure list. *See id.* at 95-96.

The Comptroller has reviewed Respondents' additional offer of proof, which was submitted after the hearing and in which Respondents assert that, if permitted, they would offer evidence that "the actions and inactions of the United States government . . . during and in the wake of the 2008-09 financial crisis caused [the Bank] to suffer staggering financial losses which le[d] to the series of events giving rise to this case and ultimately the Bank's failure." *See* Resp'ts' Additional Offer of Proof at 2. Respondents further assert that "[t]his evidence is relevant to issues of causation and materiality of financial loss, the OCC witnesses' credibility, and also to the issue of Respondents' culpability . . ." *Id.* at 3. Respondents conclude that, "In short, the Fannie Mae/Freddie Mac disaster is the elephant in the room as the central cause of the Bank's decline and fall and should be thoroughly developed in the record to be evaluated in this case." *See id.* at 13.

Under the applicable rules of practice and procedure, ALJs may exercise discretion to determine the scope of the proceedings. *See* 12 C.F.R. § 19.5 (authorizing ALJs, *inter alia*, to conduct proceedings to "avoid unnecessary delay," "receive relevant evidence," "regulate the course of the hearing," "consider and rule upon all procedural and other motions appropriate in an adjudicatory proceeding," and "do all other things necessary and appropriate to discharge the duties of a presiding officer"). The regulations also provide that evidence that would be admissible under the Federal Rules of Evidence is admissible in adjudicatory proceedings, *id.* § 19.36(a)(2), and that except as otherwise provided, "relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law," *id.* § 19.36(a)(1). If evidence meets this latter standard but would be inadmissible under the Federal Rules of Evidence, the ALJ may not deem the evidence inadmissible. *Id.* § 19.36(a)(3).

The Comptroller adopts the undisputed factual findings that, in September 2008, the Bank suffered a $174 million investment loss in connection with the failure of Fannie Mae and Freddie Mac and that this loss created an "exigent" need for the Bank to raise capital. *See infra* Part IV.A, To the extent that the Fannie Mae and Freddie Mac Defense rebuts evidence presented by Enforcement Counsel, the Comptroller considers the Bank's substantial investment loss and the subsequent exigencies faced by Respondents at relevant points herein. *See e.g., infra* Parts X.A.2-3, X.B.2. The Comptroller concludes that further development of the record relating to the Fannie Mae and Freddie Mac Defense would be unduly repetitive and, for this reason, any error in the ALJ's analysis or recommendations regarding the striking of this defense is harmless. *See* 12 C.F.R. § 19.4 (authorizing Comptroller to perform any act which could be done or ordered by ALJ); *id.* § 19.5 (authorizing ALJ to exercise all powers necessary to avoid unnecessary delay); *see also Heller Fin., Inc. v. Midwhey Powder Co., Inc.* 883 F.2d 1286, 1294 (7th Cir. 1989) (noting that motions to strike are generally disfavored but may be used to expedite a case and "remove unnecessary clutter").

The Comptroller finds no error in the other challenged rulings regarding the scope of the proceedings[14] or the admissibility of evidence and further finds that Respondents' hearsay objections, to the extent not previously deemed waived, *see supra* Part III.B, are not well taken. *See, e.g., Cunningham*, 679 F.3d at 383 (noting that under Federal Rules of Evidence, a party's

---

[14] Respondents challenge the striking of their Sixth Affirmative Defense, which purportedly "raises the fact that Respondents did not profit but rather lost as a result of the events described in the [Notice]," on the ground that "the very statute under which the [Notice] was brought is based on whether 'such party has received financial gain or other benefit by reason of such violation, practice, or breach.'" *See* Resp'ts' Exceptions at 85 (citing § 1818(e)(1)(B)(iii)). While Respondents are correct that financial gain is one of several *alternative* predicates through which the effect prong may be established, Enforcement Counsel did not seek to prove this predicate in this action. *See* RD at 11. Accordingly, the Sixth Affirmative Defense was properly stricken as immaterial.

own statement may be offered as evidence against that party even where the statement would otherwise be inadmissible as hearsay); 12 C.F.R. § 19.36(a)(2) (permitting admission of evidence that would be admissible under Federal Rules of Evidence). If the ALJ erred with respect to Enforcement Counsel's alleged over-designation of exhibits or the exclusion of proffers, such errors were harmless due to the abundance of unchallenged evidence in the record, including Respondents' own testimony supporting the established charges, and the Comptroller's consideration of Respondents' written proffers.[15] Respondents' Exceptions 4, 9, 12, 13, and 14, to the extent not deemed waived, are rejected.

## IX.    FINDINGS OF FACT

To the extent consistent with the findings stated herein, the Comptroller adopts the findings of fact contained in the Recommended Decision.

### A.  The Bank's Failure

The Bank, which was a community bank headquartered in Edinburg, Texas, had approximately $3.1 billion in total assets and $2.3 billion in total deposits as of June 30, 2013. *See* Joint Stip. ¶ 5. The Bank was a wholly owned subsidiary of First National Bank Group, Inc. ("Holding Company"), a bank holding company. *Id.* ¶ 6. During the financial crisis of the late 2000s, the Bank faced severe challenges to its operations. *See* RD at 15. Beginning in 2008, the Bank's OREO assets—*i.e.*, (in the context of the present action) real estate acquired in satisfaction of a debt—

---

[15] Alternatively, the Comptroller concludes that Respondents' Exception 14, which concerns Enforcement Counsel's alleged over-designation of exhibits, was untimely raised to the ALJ and thus waived. Enforcement Counsel filed the witness list at issue on December 10, 2021. Despite filing a Motion to Exclude Witnesses on December 17, 2021, *see* Resp'ts' Mot. to Exclude Witnesses, Respondents apparently did not raise this objection until February 7, 2022, during the hearing, *see* Resp'ts' Exceptions at 96 (citing Enforcement Counsel's Dec. 10, 2021 Hearing Witness List at Ex. B and Hr'g Tr. 1223:17-1224:19 ("Before we get started, I would just like to make an objection on the record that I mentioned this morning. We'd like to object to the calling of this witness at this time."; identifying over-designation of exhibits as basis of objection)). Respondents should have raised this issue in their December 17 motion.

began to grow significantly. *See id.* at 15-16, 44. Such assets are nonperforming and their associated costs (which might include operational, maintenance, or repair costs and payment of taxes and insurance) can significantly strain a bank's financial condition. *See id.* at 16; Hr'g Tr. 370:19-24 (examination of Respondent Rogers), 953:14-954:11 (examination of Respondent Ortega), 1293:9-22 (examination of Ramah Chansen).

The Bank's condition further deteriorated when, in September 2008, government-sponsored enterprises Fannie Mae and Freddie Mac were placed under the conservatorship of the Federal Housing Finance Agency. As a result, the Bank's preferred stock in these entities was rendered "virtually worthless" and the Bank realized a $174 million loss upon selling the stock. *See* RD at 22 (quoting OCC Ex. 148 at 3). This loss caused the Bank to fall from "well capitalized" to "adequately capitalized" within the meaning of 12 U.S.C. § 1831*o,* which sets forth requirements for Federal banking agencies to take prompt corrective action "to resolve the problems of insured depository institutions at the least possible long-term loss to the Deposit Insurance Fund." *See* 12 U.S.C. § 1831*o*(a), (b)(1); RD at 16-17. In early 2009, the OCC described the Bank's need for higher capital levels as "exigent" and instituted measures requiring that the Bank, *inter alia*, achieve and maintain higher capital levels and minimum capital ratios and improve accounting for nonaccrual loans. *See* RD at 17; OCC Ex. 147 at 2. The OCC advised the Bank that failure to achieve the capital ratios would be considered an unsafe or unsound banking practice and that failure to submit an acceptable capital plan would result in further action by the OCC. *See* RD at 17; OCC Ex. 147 at 5.

By mid-August 2009, the Holding Company had injected $35 million into the Bank. *See* RD at 18. Nevertheless, over the following years, the Bank continued to experience significant challenges. In February 2011, the OCC issued a consent order that again required the Bank to

increase its minimum capital ratios and to correct unsafe or unsound practices related to loan portfolio management and the treatment of nonaccrual loans. *See id.*; *see also* Joint Ex. 12. Following a June 2011 OCC examination, the Bank's executive management team changed significantly, with Respondent Rogers resigning and Respondent Ortega assuming new roles, among other changes. *See* RD at 18. The OCC's 2012 Report of Examination found, *inter alia*, that while new management, under the direction of Respondent Ortega, had "made some positive strides in changing the corporate culture," the Bank's "problems continue[d] to grow," supervision by management and the Board "remain[ed] critically deficient," and the new team "to-date ha[d] been ineffective overall in reversing the Bank's negative course." *See* Joint Ex. 6 at 1-2, 38; *see also* RD at 19. The OCC described the Bank's capital position as "critically deficient" and identified the Bank's OREO portfolio as a significant problem, stating that it was "at an extremely high unsafe and unsound level . . . due primarily to a credit culture that fostered poor credit risk selection and lax underwriting standards." *See* Joint Ex. 6 at 2, 47; RD at 19. By June 2013, the Bank had become "critically undercapitalized." *See* RD at 19. On September 13, 2013, the OCC closed the Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. *See* RD at 19, 42; Joint Stip. ¶ 9.

### B. Respondents' Roles at the Bank

Respondent Rogers served as Chairman of the Bank from 1981 to November 2011. *See* RD at 12; Joint Stip. ¶ 2. As Chairman, Respondent Rogers was responsible for ensuring senior executive management followed the Bank's policies and procedures.[16] *See* OCC Ex. 373 at 1. He was also responsible for participating in reviews of the Bank's strategic plan and raising capital funds "as

---

[16] This factual finding is submitted as **Enforcement Counsel's Exception 5n**. *See* EC's Exceptions at 5. This finding is supported by the record. Enforcement Counsel's Exception 5n is thus adopted.

needed to maintain required capitalization at terms and conditions most advantageous to the Bank." *See id.*; *see also* Hr'g Tr. 76:18-77:18 (examination of Michael Brickman); RD at 21.

Respondent Ortega served as the Bank's Chief Financial Officer from 1994 through October 2011. *See* RD at 12; Joint Stip. ¶ 2. In this capacity, Respondent Ortega was responsible for financial reporting, accounting, and maintaining the Bank's books and records. *See* RD at 13. With assistance from attorneys and accountants, he was also responsible for drafting the Bank's capital plans. *See* RD at 21-22; Hr'g Tr. 499:6-14 (examination of Respondent Ortega). In November 2011, Respondent Ortega replaced Respondent Rogers as Chairman; Respondent Ortega served in this capacity until the Bank's failure in 2013. *See* RD at 12; Joint Stip. ¶ 2. Beginning in January 2012, Respondent Ortega also served as the Bank's President and Chief Executive Officer. *See* RD at 12; Joint Stip. ¶ 2.

Respondents were members of the Bank's Board of Directors ("Board") and served as officers and directors of the Holding Company from at least January 2008 until November 2011. *See* RD at 12; Joint Stip. ¶ 6. As directors, Respondents swore an oath that, *inter alia*, they had a "legal responsibility and a fiduciary duty . . . to administer the [Bank's] affairs faithfully and to oversee its management"; they would "exercise reasonable care and place the interests of the [Bank] before [their] own interests"; they would "diligently and honestly administer" the affairs of the Bank; and they would "participate fully on all committees" to which they were appointed. *See* OCC Ex. 446 at 3-4. As members of the Board, Respondents were responsible for overseeing the Bank's risk profile, including the types of lending in which the Bank engaged. *See* Hr'g Tr. 83:24-84:4 (examination of Michael Brickman).[17] Additionally, between 2008 and 2011, Respondents served

---

[17] This factual finding is submitted as **Enforcement Counsel's Exception 5a**. *See* EC's Exceptions at 3. This finding is supported by the record. Enforcement Counsel's Exception 5a is thus adopted.

as voting members of the Bank's Loan and Discount Committee ("L&D Committee"), which was charged with approving all loans of more than $1 million, overseeing all lending activities within the Bank, ensuring that loans complied with the Bank's policies and procedures, and maintaining a broad perspective of the Bank's overall concentration risk and capital position. *See* RD at 13-14; *see also* Joint Exs. 8-10. The Bank's loan policy informed L&D Committee members, including Respondents, that "[o]bjective, prudent and conscientious voting [was] the sacred right and serious responsibility assigned to each member of the committee." *See* Joint Ex. 8 at 29; Joint Ex. 9 at 32; Joint Ex. 10 at 34.[18]

### C. Capital Raise Strategy

#### 1. Communications with OCC Following Fannie Mae and Freddie Mac Investment Loss

During the OCC's September 2008 examination of the Bank and in the immediate aftermath of the Bank's Fannie Mae and Freddie Mac investment loss, the Bank received a $24 million injection of capital from the Holding Company, and Respondent Rogers and Bank management committed to raising an additional $35 million in capital by March 31, 2009. *See* RD at 22; Joint Ex. 1 at 3. Respondent Rogers represented to the OCC that capital would be raised through selling common stock of the Holding Company. *See* RD at 22; Joint Ex.1 at 3, 7. On February 18, 2009, pursuant to 12 U.S.C. § 3907(a)(2) and 12 C.F.R. Part 3, Subpart C, the OCC formally imposed an individual minimum capital ratio ("IMCR"), requiring the Bank, by May 10, 2009, to have a Tier 1 Leverage Ratio at least equal to eight percent of adjusted total assets and a Total Risk-Based Capital Ratio at least equal to twelve percent, as defined in 12 C.F.R. Part 3. *See* OCC Ex 147; *see also* RD at 23. To achieve these ratios, the Bank would need to raise between $50 million and $75

---

[18] This factual finding is submitted as **Enforcement Counsel's Exception 5b**. *See* EC's Exceptions at 3. This finding is supported by the record. Enforcement Counsel's Exception 5b is thus adopted.

million in additional capital. *See* OCC Ex. 147 at 1; *see also* RD at 23. The OCC stated that "there remains an exigent need for the Bank to increase capital due to weak supervision by the Board and management, the deterioration in the quality of the Bank's assets, negative earnings, concentration risk, and weaknesses in credit administration" and that the Bank "needs a higher level of capital in order to operate in a safe and sound manner." *See* OCC Ex. 147 at 4; *see also* RD at 17, 23. The OCC required the Bank to develop and submit a capital plan to achieve the IMCR. *See* OCC Ex. 147 at 4; RD at 23. The OCC stated that it would only accept a plan that "is based on realistic assumptions, is likely to succeed in restoring the Bank's capital[,] and will not increase the risk to the Bank." *See* OCC Ex. 147 at 4-5; RD at 23.

In late February 2009, the Bank submitted its capital plan, which was signed by Respondent Ortega. *See* OCC Ex. 148. The plan stated that the Holding Company was "actively pursuing an offering of shares of its common stock to raise capital" and that "any portion" of the proceeds from this offering that were "injected into the Bank would count as Tier 1 capital." *See* OCC Ex. 148 at 3; RD at 24. In the plan, the Bank did not disclose any intent to finance purchases of Holding Company stock. *See* Hr'g Tr. 124:14-17 (examination of Michael Brickman). On April 3, 2009, Respondents attended a meeting with OCC officials. *See* RD at 24; OCC Ex. 548. An OCC official's notes from this meeting reflect that Bank management discussed the Bank's upcoming offering of Holding Company stock and efforts "to shrink the Bank in order to comply with the IMCR," noting that these efforts included reducing lending activity such that there was "virtually NO lending occurring." *See* OCC Ex. 548; *see also* RD at 24; Hr'g Tr. 324:17-325:1 (examination of Respondent Rogers). The notes also reflect that Respondent Rogers and his family had committed to contributing at least $10 million to the capital raise. *See* OCC Ex. 548; *see also* RD at 24. Again, Bank management did not disclose to the OCC any intent to finance purchases of

Holding Company stock. *See* RD at 25; Hr'g Tr. 328:8-12 (examination of Respondent Rogers), 129:2-6 (examination of Michael Brickman).

### 2. Private Placement Memorandum and Everhard Loan

On April 14, 2009, eleven days after the meeting with OCC officials, two key events occurred. First, the Holding Company issued a Private Placement Memorandum, which offered up to 650,000 shares of its common stock, with a minimum subscription requirement equivalent to $75,000, and stated, *inter alia*, that a portion of the proceeds of the offering would be used to inject capital into the Bank; that remaining proceeds would be used for other purposes and possible future capital injections; and that any questions about the memorandum should be directed to Respondent Ortega. *See* OCC Ex. 143 at 2, 8, 23, 31, 75; *see also* RD at 24-25.

The second key event of April 14, 2009 was the L&D Committee's approval of a $500,000 unsecured loan to Kenneth Everhard, a friend of Respondent Rogers. *See* OCC Ex. 196 at 1; Hr'g Tr. 342:9-24 (examination of Respondent Rogers); RD at 29. According to the L&D Committee's meeting minutes, the loan proceeds were "to be used as a revolving line of credit for working capital." *See* OCC Ex. 196 at 1; RD at 29; Hr'g Tr. 342: 9-24 (examination of Respondent Rogers). Thereafter, on April 29, 2009, Mr. Everhard purchased $500,025 in Holding Company stock. *See* OCC Ex. 158 at 3, 9, 12; RD at 29. The stock certificate associated with this purchase was delivered to Respondent Rogers. *See* OCC Ex. 158 at 9. Respondent Rogers affirmed that he was contemporaneously aware, despite the loan purpose reflected in the Bank's records, that Mr. Everhard had "borrowed money from the Bank to invest in holding company stock." *See* Hr'g Tr. 345:2-5 (examination of Respondent Rogers); RD at 29. Respondent Rogers also affirmed that if the loan purpose reflected in Bank records was inaccurate based on his knowledge, he should have ensured that it was corrected. *See* Hr'g Tr. 341:15-18 (examination of Respondent Rogers).

### 3. Implementation of Capital Raise Strategy

The Everhard loan and subsequent stock purchase are the first in a series of Board-approved transactions (referred to here as the "Capital Raise Strategy") wherein the Bank extended loans ("Capital Raise Loans"),[19] of which the proceeds were used for the purchase of Holding Company stock; meanwhile, the Holding Company reinjected or "downstreamed" between $3 million and $17.3 million in Bank-financed stock purchases into the Bank as putative capital. *See* RD at 21, 29, 41-42; Hr'g Tr. 328:13-329:6 (examination of Respondent Rogers). The ALJ aptly compared the downstreaming aspect of the strategy to "someone transferring a twenty[-]dollar bill from their left pocket to the kitchen table to their right pocket and then claiming to be twenty dollars richer when they then switch the bill again to the pocket from which it started." *See* RD 29.

As the ALJ observed, "[i]t is incontrovertible that the Bank made loans to investors in order for those investors to purchase Holding Company stock; the evidence strongly reflects this, and Respondents have acknowledged as much." *See id.* at 30; *see also* Hr'g Tr. 330:16-19 (examination of Respondent Rogers; agreeing that he "approved loans to investors to buy holding company stock"), 491:20-492:1 (examination of Respondent Ortega; agreeing that he was "aware that the Bank was making loans to purchase holding company stock"). In connection with the Capital Raise Strategy, Respondents solicited investments from family and friends as well as Bank officers, directors, and lower-level employees. *See* RD at 33; *see also* Hr'g Tr. 264: 11-16, 278:10-16

---

[19] **Enforcement Counsel's Exception 6** asserts that the ALJ made a "factual error" in noting that the Bank approved the first Capital Raise Loan "three weeks after" the April 3, 2009 meeting with OCC officials. *See* EC's Exceptions Br. at 22, n. 18; *see also* EC's Exceptions at 5. Enforcement Counsel explains that the Everhard loan was approved less than two weeks after that meeting and asks the Comptroller to find the correct fact. *See* EC's Exceptions Br. at 22, n. 18. Enforcement Counsel's Exception 6 is adopted, and the Comptroller finds that the first Capital Raise Loan was approved less than two weeks after Respondents' April 3, 2009 meeting with OCC officials. *See* OCC Ex. 548 at 1; OCC Ex. 196 at 1; Hr'g Tr. 342:9-12 (examination of Respondent Rogers regarding OCC Ex. 196).

(examination of Respondent Rogers). To the extent that such individuals could not afford or did not wish to expend funds on the investments, the Bank lent them money. *See* RD at 33; *see also* Hr'g Tr. 278:10-16 (examination of Respondent Rogers).

The following are included among the "flurry of rapid-fire Bank loans and corresponding stock purchases" made in April and May 2009. *See* RD at 30 (citing OCC Ex. 374A, rows 29-34, 36-37, 43, 52-53, 55, 58-60). On April 28, the Bank issued to Margaret Scott a loan of $75,000; the following day, she purchased $75,000 in Holding Company stock. *See* RD at 30. On May 4, the L&D Committee approved a $112,500 loan to Curtis Brockman; on May 8, Mr. Brockman purchased $112,500 in Holding Company stock. *See* OCC Ex. 169; OCC Ex. 158 at 1; Hr'g Tr. 347:9-349:18 (examination of Respondent Rogers). Also on May 8, the L&D Committee approved a $250,000 loan to Blanca Gonzalez; on May 11, she purchased $250,050 in Holding Company stock. *See* RD at 30; OCC Ex. 226; OCC Ex. 228; OCC Ex. 237 at 4; OCC Ex. 374A, row 48; Hr'g Tr. 558:9-559-13 (examination of Respondent Ortega).

### 4.  Ongoing Communications with OCC and Capital Injections

Meanwhile, on April 28, 2009, the Bank's then-President and CEO, Robert Gandy, sent an OCC official a letter stating that the Bank had "communicated with 231 prospective stock purchasers so far," had received $15 million in purchases, and had "firm commitments" of an additional $12 million in purchases. *See* OCC Ex. 149 at 1; RD at 26. The letter predicted that the Bank would achieve the required Tier 1 capital ratio by the established May 10, 2009 deadline but would fall short of achieving the required risk-based ratio. *See* OCC Ex. 149 at 2; RD at 26. Again, the letter did not disclose that the Bank was offering loans to finance the purchase of Holding Company stock. *See* RD at 26. On April 30, the OCC responded by, *inter alia*, requiring that the

Bank submit a new capital plan as soon as possible since it did not expect to meet the risk-based capital ratio by the established deadline. *See* OCC Ex. 336 at 6; RD at 26-27.

On May 11, 2009, the Holding Company injected $30 million into the Bank. *See* OCC Ex. 151 at 1; RD at 27. Prior to the capital raise efforts that began in April, the Holding Company had approximately $8.8 million in cash and equity securities. *See* RD at 27. As of May 11, the Holding Company had raised approximately $30.38 million, including $9 million from Respondent Rogers and his family. *See id.* On May 12, Respondent Ortega reported at a Board meeting that the Bank had achieved the required Tier 1 capital ratio and would submit a revised capital plan to the OCC. *See* OCC Ex. 336 at 1; RD at 27. The revised plan, submitted to the OCC the same day, noted that the Holding Company "is actively pursuing an offering of shares of its common stock to raise capital" and that "proceeds from such an offering . . . injected into the Bank would count as Tier 1 capital." *See* OCC Ex. 151 at 1, 4. Again, the revised plan did not disclose to the OCC that the Bank was actively financing purchases of Holding Company stock. *See* Hr'g Tr. 132:18-133:24 (examination of Michael Brickman).

On August 12, the Holding Company injected another $5 million into the Bank. *See* OCC Ex. 366 at 6; RD at 28. From the date of the offering through August 12, the Holding Company raised a total of $38.16 million from stock sales. *See* RD at 28, 34-35. In an August 14 letter to the OCC, the Bank's then-President and CEO represented that the Bank had achieved the required minimum capital ratios. *See* OCC Ex. 366 at 6; RD at 28. As with all previous communications about capital raise efforts, the letter did not mention that the Bank had been and continued to be actively financing purchases of Holding Company stock. *See* RD at 28.

### 5. "Downstreaming" of Loan Proceeds

Enforcement Counsel's expert identified sixty-three Capital Raise Loans, which were issued between April 2009 and March 2011 and the proceeds of which were used to purchase approximately $22 million in Holding Company stock. *See* RD at 30; Hr'g Tr. 1233:6-1234:10 (examination of Ramah Chansen). The Comptroller accepts the ALJ's finding that somewhere between $3 million and $17.3 million in proceeds from Holding Company stock purchases financed by Capital Raise Loans were reinjected into the Bank as putative capital. *See* RD at 21, 41-42. Respondents themselves acknowledge that at least some of the proceeds of Holding Company stock purchases financed by Capital Raise Loans were downstreamed in this manner. *See id.* at 21, 41 (citing Hr'g Tr. 328:13-20 (examination of Respondent Rogers; "Q: You have indicated that the board of directors approved the plan to extend bank loans to investors to buy FNBG stock and then downstream those same funds back to the bank as Tier 1 capital, correct? A: Basically, that's what happened . . . yes, ma'am."), 493:15-17 (examination of Respondent Ortega; "So I mean, I would say that some of the stock, some of those loans actually came back to the bank."); OCC Ex. 569 (Respondent Ortega Dep.) at 34:24-35:4 (agreeing that the Bank "[made] loans that the borrower would then use the proceeds of the loan to purchase stock in the bank holding company and the bank holding company would then downstream the funds back to [the Bank]")).

As Enforcement Counsel's expert explained, "For regulatory purposes, a bank can't create capital on its own by creating a loan and extending that money. You know, you're essentially making money out of thin air by orchestrating a scheme like this. So it is not permissible to treat it as regulatory capital." *See* Hr'g Tr. 135:14-25 (examination of Michael Brickman). Nevertheless, the Bank reported the total $35 million in capital injections as regulatory capital on

its balance sheet and on all subsequent Call Reports until the Bank's failure. *See* RD at 34, 41. The Bank's capital levels from the second and third quarters of 2009 through the remainder of its operations were thus overstated by the amount that Capital Raise Loan proceeds were reinjected into the Bank. *See id.* at 41-42; *see also* Hr'g Tr. 1783:10-16 (examination of Christine Salvato; "Q: For 2009 through 2013, and under [Generally Accepted Accounting Principles], call report instructions, and other guidance . . . was it permissible for the bank to treat proceeds from capital raise loans as new capital? A: In my opinion, no."). Respondent Ortega testified that the OCC's ability to perform its regulatory duties would be impeded if the Bank misstated its capital. *See* OCC Ex. 569 at 28:6-22 (Respondent Ortega Statement Trans.).[20] Additionally, both Respondents knew that they had an obligation to ensure that the Bank accurately reported its capital and income. *See* OCC Ex. 568 at 30:8-31:10 (Respondent Rogers Statement Trans.); OCC Ex. 569 at 27:20-28:22 (Respondent Ortega Statement Trans.).[21]

### 6. Features of Capital Raise Loans

Capital Raise Loans were issued on concessionary terms. Most were unsecured and offered at a low interest rate of 4.25 percent. *See* RD at 32 (citing Hr'g Tr. 146:11-14 (examination of Michael Brickman; noting that because unsecured loans are riskier, "the bank typically will charge a higher rate of interest in order to recover costs across the entire portfolio . . .."), 147:12-15 (examination of Michael Brickman; opining that a 4.25 percent interest rate is "incredibly low . . . for an unsecured loan portfolio."), 1256:5-9 (examination of Ramah Chansen; opining that it would

---

[20] This factual finding is submitted as **Enforcement Counsel's Exception 5g**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5g is thus adopted.

[21] This factual finding is submitted as **Enforcement Counsel's Exception 5h**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5h is thus adopted.

have been "very unlikely [in 2009] that borrowers would have been able to obtain an unsecured loan especially at a 4.25 percent interest rate")); *see also* Hr'g Tr. 549:15-18 (examination of Respondent Ortega; "Q: The [Bank's] policy notes that unsecured loans by their nature can be the highest risk credit the bank will extend, correct? A: Right."). Some provided for interest-only payments for the life of the loan before a balloon payment at maturity. *See* RD at 32. Most were renewed at least once, which according to Enforcement Counsel's expert, "calls into question [the borrower's] ability to repay the debt as originally structured . . .." *See* Hr'g Tr. 1256:20-1257:9 (examination of Ramah Chansen); *see also* RD at 32. Furthermore, for certain borrowers, the Bank offered better terms on the unsecured Capital Raise Loans than on any secured loans issued to those same borrowers, which again signals that individual borrowers' ability to repay was not a primary consideration when it came to Capital Raise Loans. *See* RD at 32. Respondent Rogers testified that obtaining reasonable assurance a borrower is willing and able to pay a loan back according to its terms protects a bank's capital and that lending without reasonable assurance would increase risk to the Bank. *See* OCC Ex. 568 at 69:23-70:12 (Rogers Statement Trans.).[22] Respondent Rogers admitted that the quality of a Bank's loan portfolio has a significant influence on the amount of capital a bank requires; the more problems in the portfolio, the more capital the bank needs. *See* OCC Ex. 568 at 49:14-50:3 (Rogers Statement Trans.).[23] Both Respondents testified that it would be unsafe or unsound to approve a loan without reasonable assurances from the borrower that the borrower is willing and able to pay a loan back according to its terms. *See* OCC Ex. 568 at 24:4-21 (Respondent Rogers Statement Trans.); OCC Ex. 569 at 23:24-24:16

---

[22] This factual finding is submitted as **Enforcement Counsel's Exception 5e**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5e is thus adopted.
[23] This factual finding is submitted as **Enforcement Counsel's Exception 5d**. *See* EC's Exceptions at 3. This finding is supported by the record. Enforcement Counsel's Exception 5d is thus adopted.

(Respondent Ortega Statement Trans.); *see also* OCC Ex. 568 at 31:2-10 (Respondent Rogers Statement Trans.) (confirming he held these views on safety and soundness during the entire period he was Chairman).[24]

### 7. Misleading Loan Purposes

Despite Bank policy requiring that the purpose of all unsecured loans be clearly stated in Bank records, the stated purposes of Capital Raise Loans were *in all instances* deceptive and misleading. *See* RD at 30-31; *see also* Hr'g Tr. 152:9-20 (examination of Michael Brickman; "In my view every single one of them is inaccurate and false relative to the actual purpose of purchasing capital in the holding company."; ". . . none of them expressly states they are used to purchase capital in the holding company."). Respondent Ortega testified that running the Bank in a safe and sound manner meant following policies and procedures in a sound manner "[m]ost of the time." *See* Hr'g Tr. 581:14-583:23 (examination of Respondent Ortega).[25]

Bank records reflected that the proceeds of a $500,000 loan to Bank director Jack McClelland were "to be used as a revolving line for working capital for personal ventures," even through Respondent Ortega knew, at the time of the loan's approval, that the proceeds would be used to purchase Holding Company stock. *See* OCC Ex. 247 at 2; OCC Ex. 143 at 35; OCC Ex. 158 at 9; Hr'g Tr. 530:12-19 (examination of Respondent Ortega); RD at 31; *see also* OCC Ex. 246 at 1. Similarly, Bank records reflected that an unsecured $200,000 loan to Bank director Oscar Garza was "for rodeo riding arena event costs and promotions and other business purposes," but the loan was linked to a contemporaneous purchase of Holding Company stock in the amount of $200,025.

---

[24] This factual finding is submitted as **Enforcement Counsel's Exception 5f**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5f is thus adopted.
[25] This factual finding is submitted as **Enforcement Counsel's Exception 5m**. *See* EC's Exceptions at 5. This finding is supported by the record. Enforcement Counsel's Exception 5m is thus adopted.

*See* RD at 31 (citing OCC Ex. 237 at 4; OCC Ex. 374A, row 88). And the purpose of the aforementioned Capital Raise Loan to Ms. Gonzalez is described in a Bank record as a "business investment," while *in the very same record*, the purpose of a secured loan to another individual is plainly stated as for the purchase of "6,250 shares of Lone Star National Bank stock." *See* OCC Ex. 237 at 4; RD at 31.[26] As this contrast amply shows, the stated loan purposes of Capital Raise Loans were "demonstrably deceptive." *See* RD at 115.

### 8. Efforts to Conceal Capital Raise Strategy

Although it was imperative for the Bank to disclose the Capital Raise Strategy to the OCC at its inception, the strategy was never described in Bank books or records or revealed in communications with the OCC. *See* Hr'g Tr. 155:22-157:14 (examination of Michael Brickman). As Enforcement Counsel's expert explained, "A bank's books and records are critically important. It's the basis by which [the OCC] make[s] decisions about whether the bank is in safe and sound condition or whether there are any necessary corrective actions that the bank needs to undertake." *See* Hr'g Tr. 85:11-16 (examination of Michael Brickman). Respondents admitted they had never heard of another bank financing its own capital raise with bank loans. *See* OCC Ex. 568 at 37:3-23 (Respondent Rogers Statement Trans.); Hr'g Tr. 494:22-496:9 (examination of Respondent Ortega; comparing hearing testimony to sworn statement testimony).[27] And Enforcement Counsel's expert testified that if the Bank had disclosed the Capital Raise Strategy to the OCC, the OCC would have informed the Bank that "the capital raised through loans from the bank would

---

[26] Further demonstrating the concessionary terms of Capital Raise Loans, the loan to Ms. Gonzalez was unsecured and had a 4.25 percent interest rate, while the loan to the other individual to purchase shares in Lone Star National Bank was secured and had a five percent floor interest rate. *See* OCC Ex. 237 at 4; RD at 31, n. 136.

[27] This factual finding is submitted as **<u>Enforcement Counsel's Exception 5c</u>**. *See* EC's Exceptions at 3. This finding is supported by the record. Enforcement Counsel's Exception 5c is thus adopted.

not qualify as Tier 1 capital and would not meet the requirements of the IMCR." *See* Hr'g Tr. 158:15-25 (examination of Michael Brickman).

### 9. Losses Associated with the Capital Raise Strategy

On June 12, 2013, the Bank recorded combined losses of $387,240.63 on Capital Raise Loans that it had made to Ms. Gonzalez and Jose Rodriguez. *See* RD at 42 (citing OCC Ex. 389 (Bank Loan Losses and Recoveries, 1994 to 7/12/2013), rows 24107, 24108). These loans and their corresponding purchases of Holding Company stock were made in early to mid-2009; the loan proceeds were thus commingled with other Holding Company funds at the time of the capital injections. *See* RD at 42. At the time of the Bank's failure in September 2013, numerous other Capital Raise Loans had not been paid off. *See id.* (citing Hr'g Tr. 1242:13-1243:11 (examination of Ramah Chansen)). The FDIC, in its capacity as receiver following the Bank's failure, suffered $3,808,058.28 in losses when certain outstanding Capital Raise Loans were charged off as part of the receiver's efforts to maximize recovery on Bank assets for the receivership. *Id.* at 42 (citing Hr'g Tr. 1994:24-2006:3 (examination of Mary Jane Locke)).

### D. OREO Strategy

#### 1. Respondents' Involvement in OREO Strategy

Beginning in 2008, as the Bank's OREO portfolio began increasing significantly, OCC examiners and Bank management recognized an urgent need for the Bank to reduce its OREO portfolio. *See* RD at 44-45. Around this time, Bank management adopted an aggressive approach to selling its OREO properties at appraised values and on lenient loan terms. *See id.* at 43, 46-47; *see also* Hr'g Tr. 377:1-3 (examination of Respondent Rogers; agreeing that the Bank was "more lenient on loan terms after the crisis trying to turn ORE assets into earning assets"), 617:3-4 (examination of Respondent Ortega; "I'm going to say we were more flexible with the conditions back then."), 618:1-12 (examination of Respondent Ortega; "A: . . . We were mainly

accommodating loans for our ORE and our better customers. Q: But the bank made loans that it normally would not have made had the purchase not been to purchase Bank ORE, correct? A: Yeah, I agree. It's our ORE, yeah.").

As members of the L&D Committee, Respondents regularly approved or ratified OREO Strategy loans without having first obtained financial spreads and a credit analysis (or "credit review"), as required by Bank policy, and in the case of Respondent Ortega, without having read the credit review if it were obtained. *See* Hr'g Tr. 379:3-12 (examination of Respondent Rogers), 622:6-22 (examination of Respondent Ortega), 646:3-20 (examination of Respondent Ortega); RD at 44, 58-59, 133. Enforcement Counsel identified fourteen OREO Strategy loans—issued between April 2009 and October 2012 and ranging from $3 million to $56 million—which one or both Respondents approved without having obtained a credit review. *See* RD at 59.

However, the ALJ noted that, when "discussing specific OREO loans during the hearing," Respondents and other Bank management "repeatedly referenced the fact that the borrowers were known to the Bank." *See* RD at 52; *see also e.g.,* Hr'g Tr. 386:9-14 (examination of Respondent Rogers; noting that he "had no problem voting for" a particular OREO loan because he was familiar with the borrower, who had done "a good job" with other properties), 619:13-18 (examination of Respondent Ortega; stating that an OREO loan was approved without financial projections because "we know that these guys know how to develop").

### 2. OCC Communications Regarding OREO Strategy

Reports of Examination reflect that, as early as 2009, OCC examiners had at least a general awareness of the OREO Strategy and had initially expressed approval of the strategy. *See* RD at 53. The 2009 Report of Examination noted that "management has aggressively managed OREO . . . Most parcels have equity and management has been able to sell the parcels to individuals they

believe have the ability to manage the project or repay the debt. These actions minimize the risk of write-downs due to fair market value declines . . .." *See* Joint Ex. 2 at 40; *see also* RD at 53. And the 2010 Report of Examination noted that "Management has developed a comprehensive and dynamic approach to OREO resolutions . . . and the Bank plans to continue with this approach. . . To date, the results have shown low losses when compared with other bank OREO processes." *See* Joint Ex. 3 at 11-12; *see also* RD at 53-54. This report further observed that "[n]ew loans to finance sales of OREO . . . are underwritten more liberally than set forth in the loan policy," these "lending practices are liberal because most [are] related to the financing and often improvement of OREO or problem loan workouts." *See* Joint Ex.3 at 24; *see also* RD at 54.

However, by 2011, OCC examiners observed a worrying pattern: the Bank was making "loans to borrowers or guarantors with little financial repayment capacity" to finance OREO purchases; as a result, many OREO properties were returning to the Bank's portfolio after they had been sold. *See* Joint Ex. 4 at 5; *see also* RD at 55. OCC examiners also began to note that the Bank's practices surrounding the OREO Strategy resulted in "the financing of OREO with little or no down payment, on liberal terms, with below-market interest rates, and to individuals who did not demonstrate the ability to service the debt" and further noted that "[t]he Bank's strategy to reduce criticized assets through the financing of OREO was not appropriate and has resulted in additional asset quality concerns and accounting issues." *See* Joint Ex. 4 at 46.

### 3. Features of OREO Loans

Many of the OREO Strategy loans violated the Bank's loan policy in that the loans lacked equity contributions from borrowers, lent additional money over and above the property's purchase price, were issued to newly-formed entities with no financial history, lacked guarantees, or provided funding for payment of property taxes or past-due loans. *See* RD at 61-64. Respondent

Rogers admitted that OREO Strategy loans with one hundred percent financing (*i.e.*, no equity contribution) should be graded substandard and that it would be unsafe or unsound to approve a loan graded substandard at origination. *See* Hr'g Tr. 390:8-13 (examination of Respondent Rogers), 381:13-21 (examination of Respondent Rogers).[28] Similarly, Respondent Ortega admitted that the very definition of an unsafe or unsound practice was providing one hundred percent financing without having financial information on the borrower. *See* Hr'g Tr. 610:23-611:14 (examination of Respondent Ortega); OCC Ex. 569 at 172:15-23 (Respondent Ortega Statement Trans.).[29] Moreover, the interest rates for many OREO Strategy loans were lower than rates established in the Bank's Market Rate Matrix, which Board members, including Respondents, approved in December 2009 as an indicator of Bank management's views on what constituted a market rate for OREO loans; Respondents thus knew what the Bank deemed to be a market rate for OREO loans. *See* RD at 63; *see also* OCC Ex. 338; OCC Ex. 339; OCC Ex. 343 at 5 ("The bank has established a Market Rate Matrix to ensure compliance with term and pricing of these loans."), 8 ("The Market Rate Matrix will be used for all ORE financing loans."), 20 (Market Rate Matrix).[30] Quoting at length and crediting the testimony of Enforcement Counsel's experts, the ALJ found that "the Bank's OREO lending strategy increased risk to the Bank to the extent that it increased the likelihood of OREO properties returning to the Bank's books through, *inter alia*, looser underwriting standards, approval of loans without proper documentation of borrower credit and finances, and overly liberal loan terms." *See* RD at 55-56.

---

[28] This factual finding is submitted as **Enforcement Counsel's Exception 5i**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5i is thus adopted.
[29] This factual finding is submitted as **Enforcement Counsel's Exception 5j**. *See* EC's Exceptions at 5. This finding is supported by the record. Enforcement Counsel's Exception 5j is thus adopted.
[30] Aspects of this factual finding are submitted as **Enforcement Counsel's Exception 5k**, *see* EC's Exceptions at 5, and are supported by the record. Enforcement Counsel's Exception 5k is thus adopted.

### 4.  NAHS Loan and OREO Loan Losses

The details surrounding a $54 million loan to NAHS Real Estate, L.P. ("NAHS") are representative of the OREO Strategy. *See* RD at 65. NAHS was formed on or around June 17, 2010, for the purpose of purchasing a hospital that was part of the Bank's OREO portfolio. *See id*. At a June 8, 2010 L&D Committee meeting, Respondent Ortega and other committee members (not including Respondent Rogers) verbally approved, "subject to formal loan presentation," *inter alia*, a $54 million loan to NAHS, which included $38 million to purchase the unfinished hospital and $16 million in additional money for construction. *See* OCC Ex. 30 at 6; RD at 65. Prior to this verbal approval, the L&D Committee had not been presented with any loan package. *See* RD at 66. Respondent Ortega testified that he relied on the loan officers' recommendations and did not focus on the borrowers' creditworthiness, repayment ability, or projected cash flow. *See* Hr'g Tr. 586:1-2, 607:12-18, 985:3-22, 986:5-11, 987:8-23 (examination of Respondent Ortega); *see also* RD at 66.

On June 10, the loan department prepared a one-page memorandum providing minimal additional details about the prospective loan. *See* RD at 66; *see also* OCC Ex. 31 at 6. The Bank formally entered the loan agreement with NAHS on June 22. *See* RD at 65-66. On June 23, a two-page loan-officer recommendation was completed. *See id.* at 67. Among other features, this document did not include any projections of the hospital's cash flow, graded the proposed loan as "satisfactory," determined that "financials will be waived" for NAHS initially because it was a new entity, and stated that "credit review will be performed at the end of the fiscal year." *See* OCC Ex. 31 at 4-5; *see also* RD at 67.

The NAHS loan was ratified by Respondents and others at an August 2010 L&D Committee meeting. *See* RD at 65-66; OCC Ex. 35 at 3. The loan enabled the Bank to sell the hospital at cost

basis on its books for $37,811,851 and avoid recognizing a loss on the sale. *See* RD at 66. The

loan terms included thirty months of interest-only payments at a 3.25 percent interest rate, followed

by a twenty-five year repayment term at a variable rate not to exceed six percent. *Id.* at 68. The

loan terms also did not require any equity contribution from NAHS or its owner-guarantors and

provided that the two principal owner-guarantors would guarantee only $3 million of the $54

million loan. *Id.* at 68-69. There is evidence that a credit analysis of the NAHS loan was finalized

in September 2010 in anticipation of an upcoming OCC examination. *See id.* at 67-68. This

analysis showed that the NAHS owner-guarantors had approximately $150,000 in combined

liquidity and that one owner-guarantor had a Fair Isaac Corporation (or "FICO") score of less than

five hundred. *Id.* at 68; *see also* Joint Ex. 10 (2010 Loan Policy) at 97 (noting that for loans

designated with the collateral code 394, "Credit score < 650" would be a "waiver/exception item"

subject to L&D Committee approval); OCC Ex. 31 at 1 (indicating that the NAHS loan is given

the collateral code 394). The NAHS loan violated the Bank's loan policy in multiple ways. *See*

OCC Ex. 48 at 1, 13; *see also* RD at 67-68.[31] The Bank gave NAHS substantial repayment

assistance during the life of the loan. *See* RD at 69-70.

The Bank recorded losses of approximately $7.3 million on six OREO loans between

September 27, 2012 and March 5, 2013. *See id.* at 143. Following the Bank's failure on September

13, 2013, the FDIC as receiver suffered a $35.15 million loss on the loan to NAHS. *See id.* at 75-

---

[31] For example, among the "prohibited loans" identified in the Bank's loan policy were "loans to companies or individuals who lack evidence of repayment ability, even if the loan is to be fully secured"; NAHS did not exhibit evidence of repayment ability. *See* Joint Ex.10 at 20; Hr'g Tr. 1356:2-6 (examination of Ramah Chansen). This factual finding is submitted as **Enforcement Counsel's Exception 5l**. *See* EC's Exceptions at 5. This finding is supported by the record. Enforcement Counsel's Exception 5l is thus adopted.

76, 143. The FDIC as receiver also suffered approximately $61.4 million in losses related to other loans associated with the OREO Strategy. *Id.* at 76.

### 5. OREO Strategy Alternatives

Enforcement Counsel asserts that it would have been prudent for the Bank to have sold its OREO properties below appraised values or to have avoided in-house financing of purchases of OREO rather than to have implemented the OREO Strategy. *See* Enforcement Counsel's Proposed Findings ("ECPF") ¶¶ 188, 211; *see also* RD at 47. However, the ALJ "credit[ed] the weight of the testimony by Respondents and others in Bank management that they viewed those other options as either undesirable or infeasible at the time . . . and f[ound] that there is an element of hindsight in [Enforcement Counsel's] current position." *See* RD at 47. Quoting extensively from the hearing transcript, the ALJ found as follows.

> In detailed and credible testimony, Respondent Ortega and [the Bank official charged with implementing the OREO Strategy] acknowledge that it would have been possible for the Bank to sell its OREO at a reduced price rather than financing purchases itself at the appraised value, but state that the motivations for not doing so stemmed, at least in part, from a good faith belief that the properties were worth more in the long run than the 'speculators' and 'scavengers' of the time were willing to pay.

*See id.* at 47-48. The ALJ further credited the testimony of the Bank official charged with implementing the OREO strategy as providing a "plausible explanation for Bank management's reluctance to lower the asking price on the Bank's OREO properties in order to get them sold": "management felt that doing so would not reflect the properties' true value over time" and "believed that other avenues were available that would enable the Bank to reduce its OREO holdings by selling them at their appraised value." *See id.* at 49. The ALJ also noted that Respondents and other witnesses offered unrebutted testimony that the Bank had no choice but to

finance purchases of its own OREO because, during the relevant timeframe, no banks were amenable to financing the purchases of another bank's OREO. *See id.* at 50.

### 6. OREO Strategy Accounting-Related Misconduct

Turning to the charged accounting-related misconduct associated with the OREO Strategy, the OCC's 2009 Report of Examination determined that the Bank had sold and financed $133 million of OREO with liberal underwriting terms and without ensuring proper accounting. *See* RD at 70; *see also* Joint Ex. 2 at 12. The OCC issued a Matter Requiring Attention ("MRA") requiring that the Bank record losses on OREO loans with below-market interest rates by using a present-value-of-future-cash-flows analysis. *See* RD at 70; *see also* Joint Ex. 2 at 12. In another MRA issued in connection with the 2011 Report of Examination, the OCC determined that, between 2008 and June 30, 2011, the Bank had originated over $309 million in OREO loans with interest rates below the then-market rate of 5.5 percent and had failed to perform present-value calculations and record discounts on OREO loans with below-market interest rates. *See* RD at 72; *see also* Joint Ex. 4 at 11-12, 47-48, 81. The 2011 Report of Examination also cited a violation of 12 U.S.C. § 161(a) on grounds that the Bank's quarterly Call Report filings were inaccurate due to "[t]he Bank's failure to adhere to proper accounting guidelines regarding OREO sales, which were financed below a fair market rate . . .." *See* Joint Ex. 4 at 81; *see also* RD at 72. The OCC directed the Bank to "review all OREO financings to assure proper accounting and income recognition," calculate the appropriate losses, and include the adjustment in the December 31, 2011 Call Report. *See* Joint Ex. 4 at 48; *see also* RD at 72-73.

The Bank recorded only a $4.8 million discount of its $309 million OREO portfolio in the December 31, 2011 Call Report. *See* OCC Ex. 363 ¶ 36; *see also* RD at 74. According to Enforcement Counsel's expert, the Bank's underlying decisions leading to its $4.8 million discount

were inappropriate under Generally Accepted Accounting Principles ("GAAP"), and the Bank's improper accounting of OREO loans caused the Bank's assets and capital to be overstated by at least $9.5 million beginning with the December 31, 2011 Call Report[32] and continuing through the Bank's failure. *See* OCC Ex. 363 ¶¶ 46-47; *see also* RD at 44, 74-75.

### E. Nonaccrual Loan Accounting Practices

#### 1. Cash-Basis and Cost-Recovery Accounting

When a bank expects to fully collect on a loan, interest accrues on the loan daily, and the bank reports the interest as income earned even though payment for that interest has not yet been received. *See* RD at 77; ECPF ¶ 534. Loan payments are typically recorded in two parts: principal and interest. *See* RD at 77-78; ECPF ¶ 536. The principal payment reduces the balance of the loan receivable, and the bank records the cash proceeds to settle the interest receivable. *See* RD at 77-78; ECPF ¶ 536. If, however, there is doubt as to the ultimate collectability of a loan, the bank must determine whether the loan should be placed on nonaccrual status, which would mean that the bank would not accrue interest on the loan. *See* RD at 77-78; ECPF ¶¶ 538-39.

Nonaccrual loans are accounted for using either the cost-recovery method or cash-basis method. *See* RD at 77. Under the cost-recovery method, a bank applies all payments to a loan's principal balance and does not recognize any interest income. *Id.* The cash-basis method permits a bank to separate loan payments into principal and interest and treat the interest portion as income (although an interest receivable is not accrued). *See* RD at 78; ECPF ¶ 545.

At all relevant times, the cost-recovery method was the "general rule" for accounting purposes when a bank had any doubt as to the ultimate collectability of a nonaccrual loan. *See* RD at 77-78;

---

[32] Banks are required to periodically file with the OCC a "Call Report" describing the bank's financial condition. *See infra* Part X.A.1.c.

*see also* OCC Ex. 359 (June 2009 Instructions for Preparation of Consolidated Reports of Condition and Income) at 453-54 ("When doubt exists as to the collectability of the remaining recorded investment in an asset in nonaccrual status, any payments received must be applied to reduce the recorded investment in the asset to the extent necessary to eliminate such doubt."). The Instructions for Preparation of Consolidated Reports of Condition and Income ("Call Report Instructions") provide that cash-basis accounting may only be used on nonaccrual loans when "the bank determines, after analysis and with supporting documentation, that the remaining recorded asset is fully collectible." *See* RD at 78 (quoting ECPF ¶ 546). Specifically, both the June 2009 and March 2012 Call Report Instructions provided that "[a] bank's determination as to the ultimate collectability of the asset's remaining recorded investment must be supported by a current, well documented credit evaluation of the borrower's financial condition and prospects for repayment, including consideration of the borrower's historical repayment performance and other relevant factors." *See* OCC Ex. 359 (June 2009 Call Report Instructions) at 455; OCC Ex. 354 (March 2012 Call Report Instructions) at 545. The OCC's Bank Accounting Advisory Series ("BAAS") likewise provided that cash-basis accounting should not be used unless "the bank can demonstrate [that] doubt about the ultimate collectability of principal no longer exists," and that collateral values alone are insufficient to resolve the issue of collectability. *See* OCC Ex. 353 (December 2008 BAAS) at 38; *see also* RD at 79.

## 2. The Bank's Accounting System

Around 2007, the Bank transitioned to a new loan accounting system. *See* RD at 79. The default setting of this system was to apply cost-recovery accounting to nonaccrual loans, but "Enforcement Counsel has presented credible and uncontroverted evidence that the Bank changed the default accounting treatment of nonaccrual loans in the [vendor's] system from the cost recovery method

to the cash basis method to conform to [Bank] management's preferred practice of automatically recording interest income on nonaccrual loans." *See id.* at 79-80. As members of senior management of the Bank, Respondents (particularly Respondent Ortega, who oversaw the Bank's accounting and information technology departments) were aware or should have been aware that this inappropriate system change had been made, even if they were not the ones who authorized it. *See id.* at 80. "This change caused the Bank to deviate, indiscriminately and on a blanket basis, from the 'general rule' of the Call Report Instructions that cost recovery accounting be used on all nonaccrual loans unless and until it is determined, through 'a current, well documented credit evaluation,' that a specific loan is fully collectible.'" *See id.* (quoting OCC Ex. 359 (June 2009 Call Report Instructions) at 545).

### 3. Warnings About the Bank's Accounting Practices

In January 2009, the OCC and the Bank entered a Memorandum of Understanding ("MOU"), requiring, *inter alia*, that the Bank "immediately reverse or charge off all interest that has been accrued contrary to the requirements contained in the Instructions for Preparation of Consolidated Reports of Condition and Income ("Call Report Instructions") governing nonaccrual loans" and directing the Board to "develop and implement a written policy governing the identification of and accounting treatment for nonaccrual loans [that] shall be consistent with the accounting requirements contained in the Call Report Instructions." *See* Joint Ex. 11 at 6-7; *see also* RD at 81. Respondents were members of the Bank's MOU Compliance Committee and were thus responsible for ensuring compliance with the January 2009 MOU. *See* RD at 81.

By March 2009, the Bank's policy regarding nonaccrual loans had purportedly "been modified to include the accounting requirements specified in the Call Report Instructions." *See* OCC Ex. 319 at 1; *see also* RD at 82. But the revised policy fell short of its goal. It did not require Bank

employees to undertake or document the required analysis to determine that collectability was no longer in doubt before applying cash-basis accounting. *See* RD at 82-83. Nor did it address or even mention the Bank's practice of automatically applying cash-basis accounting to all nonaccrual loans. *See id.* Rather, the new policy stated that "a bank is allowed to maintain a loan on a cash basis as long as the borrower is able to make regular payments," which is not the standard articulated by the Call Report Instructions or the OCC's BAAS. *See* OCC Ex. 319 at 11; *see also* RD at 83. The policy further stated that it "is [the Bank's] intent to utilize cash basis nonaccrual accounting whenever it is applicable." *See* OCC Ex. 319 at 11; *see also* RD at 83.

In June 2009, the Bank's audit department informed senior Bank management that the "use of cash basis of accounting on all nonaccrual loans" was unsatisfactory and recommended that the Bank set a dollar threshold at which all nonaccrual loans would be required to have a credit evaluation. *See* OCC Ex. 321 at 5; *see also* RD at 83-84. There is no indication that Respondents or other Bank management responded to the audit department's concerns or recommendations. *See* RD at 84.

Consent orders entered between the Bank and OCC in February 2011 and January 2012 reiterated the 2009 MOU's requirement that the Bank reverse or charge off interest that had been accrued contrary to requirements contained in the Call Report Instructions and that the Bank ensure compliance with policies and procedures consistent with the Call Report Instructions. *See* Joint Ex. 12 at 12; Joint Ex. 13 at 16; RD at 84. However, there is no evidence that Respondents caused the Bank's policies or accounting systems to comply with Call Report Instructions or caused the Bank to make the required charge-offs. *See* RD at 83-84.

In October and December 2012, the Bank's chief audit officer reiterated, including to Respondent Ortega, his concerns about the Bank's practice of using cash-basis accounting for

nonaccrual loans *en masse* and without supporting documentation. *See* RD at 85; *see also* OCC Ex. 323; Resp'ts' Ex. 68; OCC Ex. 325. Nevertheless, the Bank continued to use cash-basis as the default method of accounting for nonaccrual loans. *See* RD at 85; *see also* Resp'ts' Ex. 68.

Following a March 2013 examination, the OCC concluded that Bank management had "failed to follow cost recovery treatment for non-accrual loans and follow guidelines within the Call Report Instructions," noting that the Bank's incorrect practices had "been in place for many years." *See* Joint Ex. 7 at 6; *see also* RD at 85-86. As a result, the Bank's capital and earnings were overstated "for 2011, 2012, and the first quarter of 2013 by $1.4 million, $9.8 million, and $3.6 million, respectively." *See* Joint Ex. 7 at 2; *see also* RD at 87. The Bank refiled its December 2012 Call Report to reduce its reported interest income for 2011 and 2012 and adjusted its March 2013 Call Report before it was filed. *See* RD at 87. The Report of Examination cited the Bank for a violation of § 161(a) based on the inaccurate December 2012 Call Report, finding that the primary cause of the overstatement of income "was inappropriate recognition of interest income for non-accrual loans." *See* Joint Ex. 7 at 22; *see also* RD at 87.

### F. Loans to Rogers III Entities

#### 1. February 2009 Email from Rogers III's Attorney

Respondent Rogers's son, David Rogers III ("Rogers III"), had ownership interests in multiple companies, including a homebuilding company called Obra Homes, Inc. ("Obra"), of which he also served as President. *See* RD at 91. In or around early 2009, Obra had numerous outstanding loans with the Bank that were personally guaranteed by Rogers III and secured by real property.

*Id*. Rogers III had previously been a Bank director and was generally known by Bank management and the Board. *Id*.

On February 11, 2009, Rogers III forwarded to Respondent Rogers an email that Rogers III had received from his attorney two days earlier. *See* OCC Ex. 269; RD at 91-92. The attorney explained that Obra likely would be placed into receivership as a result of an adverse judgment in one or more of the eighteen pending lawsuits against the company. *See* OCC Ex. 269; *see also* RD at 91. He further stated that such an outcome "would result in [Rogers III's] total loss of control of Obra and its assets" and would frustrate efforts to liquidate such assets "to satisfy obligations to [the Bank and another institution]." *See* OCC Ex. 269; *see also* RD at 92. The attorney proposed that Rogers III work with the Bank to empty Obra of all assets through foreclosure, thus leaving nothing for Obra's other creditors and obviating any concern about possible judgments. He also suggested that Rogers III form "another corporation" and reacquire the foreclosed-upon assets. *See* OCC Ex. 269; *see also* RD at 92.

Rogers III seemingly acted on his attorney's advice, securing releases of his personal guarantees and foreclosures, and then repurchasing the foreclosed-upon collateral through newly formed or acquired entities. *See* RD at 93, 95-96. Respondent Rogers testified that he believed that the arrangement proposed by his son's attorney would not be in the Bank's best interest. *See* Hr'g Tr. 403:7-11 (examination of Respondent Rogers; "Q: In your experience, the proposed arrangement that [Rogers III's attorney] advises your son about would not be in the bank's best interest, would it? A: I wouldn't think so."); RD at 90. Despite this, it is uncontroverted that, although Respondent Rogers abstained from participating in decisions related to loans to his son's entities, Respondent Rogers never raised the information contained in the February 11, 2009 email

with anyone at the Bank responsible for managing the lending relationship with Rogers III. *See* RD at 91, 95, 98.

### 2. Griqualand Loans

In April 2009, the L&D Committee approved a $3,234,688.90 loan to Griqualand, LLC ("Griqualand"), a newly-formed entity in which Rogers III had a one hundred percent ownership interest, for the purchase of foreclosed-upon Obra properties. *See* RD at 95-96. As reflected in Bank records, the stated purpose of the loan was to purchase OREO property to develop and resell. *See* OCC Ex. 349; *see also* RD at 96. The Bank did not require any equity contribution from Griqualand or Rogers III, and it financed one hundred percent of the purchase price and an additional $100,000 for development expenses. *See* RD at 96-97. Additionally, no appraisal was conducted, no financial information on Griqualand was obtained or reviewed by the L&D Committee, and "to facilitate" the sale, no personal guarantee was required by the Bank from the borrower. *See* RD at 97; OCC Ex. 349 at 5. Although the assigned loan officer testified that she was contemporaneously aware that foreclosed Obra properties were effectively being repurchased by Rogers III through Griqualand, the loan package presented to the L&D Committee did not disclose this information. *See* RD at 97; OCC Ex. 349 at 5. Rather, the package "appears to actively go out of its way to avoid making a connection to Rogers III," making only a single, oblique reference to him, *see* RD at 97-98: "Griqualand's investors include a prominent homebuilder and financier who have [sic] substantial experience as a developer and real estate investor," *see* OCC Ex. 349 at 5.

Regarding the L&D Committee's knowledge of Rogers III's involvement with Griqualand and Obra's financial difficulties, the ALJ found the evidence to be inconclusive, stating the following.

> At the summary disposition stage, the undersigned concluded that it was a disputed
> question of material fact whether the other Board members had all relevant

information regarding Rogers III's ownership of Griqualand, including the financial difficulties experienced by Obra and his plan to reacquire the foreclosed assets without a personal guarantee, at the time that they approved the loan. The hearing did not do much to clarify matters—Respondents continue to assert that "the Bank and L&D Committee knew of Rogers III's involvement," and Enforcement Counsel did not adduce any further evidence to resolve the question. It is also possible that full knowledge of the circumstances might have made individuals on the L&D Committee *more* likely to approve the loan, if they viewed Rogers III as a reliable borrower and saw the transaction as a way to remove encumbrances from the assets. Respondent Ortega, for instance, testified that a transaction in which "the bank foreclosed and then resold the same assets back to the borrower in a new entity but with no personal guarantee" would be risky and irrational if the Bank's management was not familiar with the borrower, but that in this case "we kind of knew [that] Mr. Rogers III was involved in this thing."

*See* RD at 98-99 (internal citations omitted) (emphasis in original) (alterations in original). The ALJ focused primarily on Respondent Rogers's inaction, stating the following.

In some sense, however, the L&D Committee's actual knowledge of who owned Griqualand is immaterial. What matters is that Respondent Rogers was aware of the circumstances surrounding the Griqualand loan and yet did not take steps to ensure that the rest of the Committee members were fully informed, despite believing that the arrangement described in [Rogers III's attorney's] email—and in particular the lack of personal guarantee by a borrower currently experiencing financial difficulties and defaulted loans—would or could be harmful to the Bank.

*See id.* at 99. Finally, with respect to the matter of the L&D Committee's general knowledge of the information contained in the email, the ALJ found that "L&D Committee members might have known this information independently and incorporated it into their determination of whether the Griqualand loan was in the Bank's best interest—but Respondent Rogers did not see fit to ask." *See id.* at 100.

### 3. Petro Icon Loans

In or around January 2010, the L&D Committee approved loans of $421,437 and $20,229 to Petro Icon, LLC ("Petro Icon"), of which Rogers III had recently purchased one hundred percent ownership. *See* RD at 100. Through Petro Icon, Rogers III repurchased foreclosed-upon Obra properties. *See id.* Prior to foreclosure, loans on the Obra properties had been backed by the

personal guarantee of Rogers III. *Id.* at 100-01. However, the terms of the new loans to Petro Icon were not backed by a personal guarantee and did not require any equity contribution from Petro Icon or Rogers III. *Id.* at 101. Additionally, the loan packages did not contain any financial information on Petro Icon, did not mention Rogers III by name or identify him as the company's sole owner. *Id.* at 100-01; OCC Ex. 314 at 3, 7. Although Enforcement Counsel did "not offer additional evidence regarding the ratification of the Petro Icon loans," the ALJ found as follows:

> . . . there is no evidence that Respondent Rogers ever raised the matter of his son's ownership of Petro Icon with the L&D Committee members or expressed any concerns that the Petro Icon loan package omitted information that was pertinent to the Committee's approval of the Petro Icon loans—namely that the loans would permit Rogers III to reacquire property that had just been foreclosed upon, at more favorable terms to Rogers III and less favorable terms to the Bank.

*See* RD 101-02.

## 4. Financial Losses

The Bank suffered a $432,000 loss on the Griqualand loan on September 13, 2012. *See* RD at 103. Following the Bank's failure in September 2013, the Griqualand loan was acquired by PlainsCapital Bank ("PlainsCapital"), which ultimately charged off $110,000 of the loan, resulting in an $88,000 loss to the FDIC as receiver pursuant to its loss-sharing agreement with PlainsCapital. *See id*. Prior to the Bank's failure, the Bank did not suffer a loss on the Petro Icon loans, but pursuant to a loss-sharing agreement, the FDIC as receiver incurred $170,978 in combined losses on the Petro Icon loans. *Id.*

## G. Other Factual Findings

Included as part of the ALJ's factual findings is a section titled, "Additional Evidence Bearing on Culpability," wherein the ALJ "marshals the most salient examples" of "various pieces of evidence in support of [Respondents'] argument that they have not demonstrated a requisitely culpable state of mind over the course of their alleged misconduct." *See* RD at 103. These examples

include Respondents' purported reputation among OCC examiners and Respondent Ortega's health in February 2013. *Id.* at 103-05. It is unclear how much weight the ALJ assigned to any one of these factual findings in connection with her culpability-prong analyses. *See generally id.* at 120-30, 146-52, 166-69, 173-74, 181-83.

**Enforcement Counsel's Exception 4** asserts that "The ALJ erred as a matter of law to whatever extent she considered the factors discussed in the 'Additional Evidence Bearing on Culpability' section." *See* EC's Exceptions at 3. Enforcement Counsel argues that the culpability-prong analysis "requires an objective look at the misconduct, and what Respondents knew or should have known at the time they engaged in it"; that "Respondents' reputations before, during, or after they engaged in misconduct are irrelevant"; and that "none of Respondent Ortega's Capital Raise Loans or OREO lending misconduct at issue . . . occurred during or after his health suffered, so that too, is irrelevant." *See* EC's Exceptions Br. at 61. The Comptroller agrees with Enforcement Counsel that such factors are immaterial and should not have been assigned any weight pursuant to the relevant legal standards stated at *infra* Part X.A.3. Enforcement Counsel's Exception 4 is adopted.[33]

## X.    CONCLUSIONS OF LAW

In the Comptroller's assessment, the ALJ correctly stated the applicable legal standards. In certain instances, however, the Comptroller concludes that the ALJ either misapplied those standards to the facts or, despite having stated the correct standard, effectively applied some other incorrect standard in the course of her analysis. In this part, the Comptroller reaches his

---

[33] The Comptroller nonetheless considers certain of these factors, including Respondent Ortega's health concerns, in connection with assessing the appropriateness of the civil money penalties assessed. *See infra* Part X.E.

independent conclusions of law and explains the extent to which his analysis either parallels or diverges from the ALJ's analysis.

### A. Capital Raise Strategy

In connection with the Capital Raise Strategy, the ALJ concluded that Enforcement Counsel had established the misconduct and effect prongs by a preponderance of the evidence but had not so established the culpability prong. *See* RD at 108. The parties take various exceptions to these conclusions. As discussed more fully below, the Comptroller disagrees, in part, with the ALJ's analysis and concludes that, in addition to establishing the misconduct and effect prongs, Enforcement Counsel has amply established the culpability prong. The Comptroller therefore issues orders of prohibition and assesses civil money penalties against both Respondents based on charges arising from lending-related misconduct associated with the Capital Raise Strategy. The Comptroller also assesses a civil money penalty against Respondent Ortega based on accounting-related misconduct associated with the Capital Raise Strategy. The Comptroller adopts the ALJ's conclusions regarding the Capital Raise Strategy only to the extent consistent with the analysis set forth herein.

#### 1. Misconduct

##### a. Unsafe or Unsound Practices

The ALJ concluded that, in connection with the lending-related misconduct associated with the Capital Raise Strategy, Respondents engaged in unsafe or unsound practices, which include "any action or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." *See*

RD at 108; *see also Adams*, 2014 WL 8735096, at *11.[34] In applying this standard, the ALJ reasoned, *inter alia*, as follows. Respondents risked the Bank's existing capital by approving dozens of concessionary loans to potentially unqualified borrowers at a time when the Bank urgently needed to increase its capital ratios and had represented to the OCC that virtually no lending was occurring. *See* RD at 109. This "jeopardized the Bank's overriding priority" to raise new regulatory capital and "generally placed the Bank in a more uncertain financial position than it would have been without the loans." *See id.* at 110. Furthermore, the "[l]ack of accurate documentation and loose underwriting standards . . . increased the risk that the Capital Raise Loans were being made to unqualified borrowers who were likely to default." *See id.* at 111. Respondents also "increased the risk to the Bank by failing to ensure that the unsecured Capital Raise Loan portfolio was tracked and monitored for risk and that the loan proceeds themselves were accounted for correctly, if not fully segregated from any funds to be downstreamed from the Holding Company to the Bank as regulatory capital." *See id.* at 111-12. To make matters worse, the OCC's ability to effectively supervise the Bank was impeded by Respondents' failure to disclose the Capital Raise Strategy. *See id.* at 112-13. Additionally, the $3 million to $17.3 million in Capital

---

[34] **Respondents' Exception 25** asserts, "The ALJ applied the wrong definition of 'unsafe or unsound practice.'" *See* Resp'ts' Exceptions at 6. Some courts have required that an unsafe or unsound banking practice have a "reasonably direct effect on an institution's financial soundness," *see, e.g., Frontier State Bank v. FDIC,* 702 F.3d 588, 604 (10th Cir. 2012); *De La Fuente v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003), while others have declined to impose that requirement, *see, e.g., Greene County Bank v. FDIC*, 92 F.3d 633, 636 (8th Cir. 1996); *Doolittle v. Nat'l Credit Union Assoc.,* 992 F.2d 1531, 1538 (11th Cir. 1993). The ALJ correctly applied the legal standard that the Comptroller analyzed extensively and reaffirmed in *Adams*, 2014 WL 8735096, and Respondents offer no reason to depart from this precedent. In any event, in all instances in which the Comptroller concludes that unsafe or unsound practices are established in connection with this matter, the facts support such a conclusion under either standard. Respondents' Exception 25 is thus rejected.

Raise Loan proceeds downstreamed to the Bank created reasonably foreseeable heightened risk to the Bank by masking its true financial condition, by overstating its loan portfolio and capital position, and by misleading regulators, investors, potential investors, shareholders, and depositors. *See id.* at 114.

The Comptroller concurs with the ALJ and adopts the conclusion that Respondents engaged in unsafe or unsound practices in connection with the lending-related misconduct associated with the Capital Raise Strategy.[35] *See In the Matter of Conover*, 2016 WL 10822038, at *16 (FDIC Dec. 14, 2016) ("Failure to properly underwrite a loan by accurately evaluating the borrower's ability to repay constitutes an unsafe and unsound practice."); *see also First State Bank of Wayne County v. FDIC*, 770 F.2d 81, 82 (6th Cir. 1985) (accord); *In the Matter of Haynes,* 2014 WL 4640797, at *8 (FDIC July 15, 2014) (accord); *In the Matter of Grubb,* 1992 WL 813163, at *29 (FDIC Aug. 25,1992) (accord); *In the Matter of the Stephens Security Bank*, 1991 WL 789326, at *1 (FDIC Aug. 9, 1991) (accord); *In the Matter of Clark*, 1991 WL 757819, at *2 (FDIC Jan. 29,1991) (accord).

**Enforcement Counsel's Exception 3a** asserts that the ALJ committed legal error by not concluding that Respondents' failure to correct inaccurate loan purposes as documented in loan packages constituted an unsafe or unsound practice. *See* EC's Exceptions at 2. **Enforcement Counsel's Exception 3b** asserts that the ALJ committed legal error when she did not conclude that Respondents' failure to disclose the Capital Raise Strategy to the OCC constituted an unsafe or unsound practice. *See id.* at 2. The Comptroller agrees with Enforcement Counsel that these

---

[35] The ALJ did not reach a conclusion as to whether Respondents' accounting-related misconduct associated with the Capital Raise Strategy constituted unsafe or unsound practices. *See* RD at 172-173. Enforcement Counsel did not take exception to this and the Comptroller declines to consider this issue in the first instance.

conclusions are supported by ample record evidence and the ALJ's own factual findings. *See* RD 15, 25-26, 29-31, 112-17; Hr'g Tr. 128:22-129:6, 150:15-151:4, 152:21-153:11 (examination of Michael Brickman); Hr'g Tr. 341:4-18, 336:13-339:8, 360:17-21, 328:8-20 (examination of Respondent Rogers); Hr'g Tr. 546:10-19, 547:1-3, 565:5-566:25 (examination of Respondent Ortega); OCC Ex. 143; OCC Ex. 144; OCC Ex. 149 at 1-2; OCC Ex. 151 at 1-11; OCC Ex. 363 at 8-9; OCC Ex. 366 at 6; OCC Ex. 374 at 1; OCC Ex. 548 at 1. To the extent these conclusions were not reached by the ALJ (they arguably were), the Comptroller readily concludes that Respondents' failures to correct inaccurate loan purposes as documented in Bank records and their failure to disclose the Capital Raise Strategy to the OCC constituted unsafe or unsound practices. *See Dodge v. OCC*, 744 F.3d 148, 151, 156-57 (D.C. Cir. 2014) (misrepresenting bank's financial condition to regulators is an unsafe or unsound practice); *De La Fuente*, 332 F.3d at 1224 (failing to disclose relevant information to regulator can constitute an unsafe or unsound practice). Enforcement Counsel's Exceptions 3a and 3b are adopted.

### b. Breach of Fiduciary Duty

The ALJ concluded that Respondents breached their fiduciary duty of care in connection with lending-related misconduct associated with the Capital Raise Strategy. *See* RD at 116. The duty of care requires that bank officers and employees act with the care that an ordinarily prudent and diligent person would exercise under similar circumstances. *See In the Matter of Watkins*, 2019 WL 6700075, at *7 (FDIC Oct. 15, 2019). Furthermore, as Bank directors and officers, Respondents were required "to act in good faith and in a manner reasonably believed to be in the bank's best interests," *see Ellsworth*, 2016 WL 11597958, at *15, and "to act diligently, prudently, honestly, and carefully in carrying out their responsibilities," *see Grubb*, 1992 WL 813163, at *28. This duty also demanded "proper supervision of subordinates" and "constant concern for the safety

and soundness of the bank." *See* RD at 116 (quoting *Conover*, 2016 WL 10822038, at *19). The ALJ reasoned that Respondents "fail[ed] to act prudently, diligently, and carefully in the course of their own responsibilities"; failed to "properly supervis[e] the risky or imprudent decisions of subordinates"; "approv[ed] and/or ratif[ied] loans with vague and/or misleading loan purposes, given that Respondents knew or should have known that the purpose of the Capital Raise Loans was to purchase Holding Company stock"; "failed to ensure that the Bank disclosed to the OCC or its own outside accountants that it was financing dozens of purchases of Holding Company stock at the time of the capital raise"; and "fail[ed] to ensure that the proceeds of the Holding Company stock purchases were not downstreamed back to the Bank and improperly treated as new regulatory capital." *See* RD at 116-17 (internal quotation marks omitted); *see also Conover*, 2016 WL 10822038, at *20 ("Extending credit without adequate assurances of repayment constitutes a breach of fiduciary duty."); *Grubb*, 1992 WL 813163, at *28 (stating that bank directors' and officers' fiduciary duty requires a "duty to investigate, verify, clarify, and explain"). The Comptroller concurs and adopts the conclusion that Respondents breached their fiduciary duty of care in connection with lending-related misconduct associated with the Capital Raise Strategy.[36]

### c. Section 161(a)

Banks are required to file with the OCC periodic Call Reports describing the bank's financial condition. *See* 12 U.S.C. § 161(a); *see also Blanton*, 909 F.3d at 1174. Call Reports must, *inter alia*, "accurately reflect the capital" of the bank, *see* 12 U.S.C. § 1831n(a)(1)(A); *see also Blanton*, 909 F.3d at 1174, and the bank officer who signs the report must attest that it is "true and correct

---

[36] The ALJ did not reach a conclusion as to whether Respondents' accounting-related misconduct associated with the Capital Raise Strategy constituted a breach of fiduciary duty. *See* RD at 172-73. Enforcement Counsel did not take exception to this, and the Comptroller declines to consider this issue in the first instance.

to the best of his knowledge and belief," *see* 12 U.S.C. § 161(a). Call Reports must be prepared in accordance with GAAP and the Call Report Instructions. *See* 12 U.S.C. § 1831n(a)(2)(A) (providing that "the accounting principles applicable to reports or statements required to be filed with Federal banking agencies by all insured depository institutions shall be uniform and consistent with generally accepted accounting principles"); 12 C.F.R. § 304.3(a) (requiring that Call Reports be filed in accordance with Call Report Instructions). Filing of materially inaccurate Call Reports can give rise to a violation of § 161(a). *See Blanton*, 909 F.3d at 1174; *Yates v. Jones Nat'l Bank*, 206 U.S. 158, 176-77 (1907).

The ALJ concluded that Respondents violated § 161(a), reasoning that Call Reports filed between 2009 and 2013 overstated the Bank's regulatory capital to whatever extent proceeds of Capital Raise Loans were downstreamed from the Holding Company to the Bank, *i.e.*, an amount somewhere between $3 million and $17.3 million, and that Respondents did not have a reasonable belief that Capital Raise Loan proceeds could be treated as new capital. *See* RD at 171. For the same reasons stated by the ALJ, the Comptroller adopts the ALJ's conclusion that Respondents violated § 161(a). Again, as a result of Enforcement Counsel's waiver of arguments as to certain effect-prong predicates, this conclusion ultimately matters only as to Respondent Ortega and only as to the assessment of civil money penalties against him. *See* Part III.A (discussing waiver of charges by Enforcement Counsel).

### d. Respondents' Exception 15

The Comptroller now turns to **Respondents' Exception 15**, which asserts:

> With respect to the Capital Raise Loans, the finding and conclusion that Respondents should not be banned from banking should be affirmed. However, insofar as the ALJ ruled against Respondents, any finding and conclusion that the Capital Raise Loans were an unsafe or unsound practice for which Respondents were responsible, were not accounted for correctly, were [a] breach of fiduciary

duty, or otherwise met the misconduct prong of the statute, was not supported by the evidence or applicable law.

*See* Resp'ts' Exceptions at 4.

In support of this exception, Respondents reiterate several arguments that were rejected by the ALJ as unpersuasive. First, Respondents argue that the "[d]ownstreaming [a]llegation" was not proven. *See* Resp'ts' Exceptions at 98. The Comptroller agrees with the ALJ that this argument is contradicted by record evidence and by Respondents' own testimony. *See* RD at 114-15; *see also supra* Part IX.C.5. Second, Respondents argue that "the Capital Raise Loans were not required to be used for stock" and were not unsafe or unsound because "[b]orrowers were free to use the loan proceeds as they wished." *See* Resp'ts' Exceptions at 99. The Comptroller agrees with the ALJ that this argument "misunderstands the inquiry" and concurs with her further assessment of this argument:

> [A]s stated above, risking the Bank's capital by making dozens of unsecured, poorly underwritten loans—many with demonstrably *deceptive* stated loan purposes—at a time when the Bank's need for capital was exigent, while representing to the OCC that the Bank had almost entirely curtailed its lending activity, would be unsafe and unsound if the loans were spent on jellybeans, lottery tickets, or anything else; this aspect of the Capital Raise Loans misconduct has very little to do with the actual capital raise.

*See* RD at 115 (emphasis original). Third, Respondents argue that the Capital Raise Loans "were not material" and "would not have had a significant impact on the Bank's ratings," noting that Enforcement Counsel's expert accountant determined that, even if the full amount of Capital Raise Loans were excluded from the Bank's reported capital, the Bank would have achieved its IMCR. *See* Resp'ts' Exceptions at 100. Again, the Comptroller agrees with the ALJ that "this does not alleviate the riskiness of the loan portfolio itself, let alone the Bank's failure to track and monitor the loans or to disclose to the OCC that Bank-financed stock purchases were a significant component of the capital plan." *See* RD at 115. Fourth, Respondents argue that they should be

excused from liability because they "did not make the Capital Raise Loans" but "relied on the expertise of the loan department" and were not "the ones responsible for how the loans were characterized in the Bank's records." *See* Resp'ts' Exceptions at 102-03. The Comptroller agrees with the ALJ that Respondents did not fulfill their "independent and affirmative responsibilities," in their capacities as officers and directors of the Bank and members of the L&D Committee, "to ensure that the Bank's lending decisions were appropriate and did not improperly increase the Bank's risk exposure." *See* RD at 116. Nor did Respondents fulfill their responsibilities to develop, implement, and oversee the Bank's capital strategy "in a manner that did not expose the Bank to inordinate risk." *Id.* Shifting blame to subordinates is not a colorable defense. *See, e.g.*, *In the Matter of Leuthe*, 1998 WL 438324, at *39 (FDIC Feb. 13, 1998) (noting that "abdication of duty by directors to officers is not a defense," and that "Respondent's duty as a board member, and particularly as Chairman of the Board, was to monitor the activities of bank management, to ensure compliance with laws, regulations, cease and desist orders and the Bank's own loan policy."); *Rankin v. Cooper*, 149 F. 1010, 1013 (C.C.E.D. Ark. 1907) ("Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them."). And Respondents' misconduct is no less actionable because others contributed to the Capital Raise Strategy. *See Landry v. FDIC*, 204 F.3d 1125, 1139 (D.C. Cir. 2000) (concluding that the fact that others may have been "more guilty" does not absolve respondent from responsibility for his actions).

Respondents also assert that the "Capital Raise [L]oans did not constitute an unsafe or unsound practice or a breach of fiduciary duty." *See* Resp'ts' Exceptions at 103. They argue that these loans were safe and sound "given the borrowers . . . and the circumstances in the economy at the time" and that Respondents had been assured by loan officers that the loans presented "good risks." *See id.* at 103. Respondents further argue that there was no evidence that the loans were offered at

below-market terms. *Id.* The Comptroller concludes that these arguments are strongly refuted by ample record evidence, including numerous Bank records demonstrating that Capital Raise Loans were frequently unsecured and offered at a uniformly low rate of 4.25 percent, while secured loans were contemporaneously extended to the same borrowers at higher interest rates. *See supra* Part IX.C.6. This strongly indicates that Capital Raise Loans were issued pursuant to a coordinated effort to artificially inflate the Bank's capital positions rather than on the strength of individual credit determinations or assessments of borrowers' ability to repay. *Id.*

Finally, Respondents argue that Enforcement Counsel did not establish the accounting-related misconduct associated with the Capital Raise Strategy. *See* Resp'ts' Exceptions at 100. Because Enforcement Counsel has waived prosecution of certain charges and predicates thereof, *see supra* Part III.A, this argument is only relevant as to Respondent Ortega and only with respect to the assessment of civil money penalties based on a violation of § 161(a). The Comptroller concurs with the ALJ's determination that Enforcement Counsel's experts offered credible testimony supporting the conclusion that Respondents violated § 161(a). The Comptroller thus adopts the ALJ's conclusion that a violation of law is established as to Respondent Ortega in connection with the Capital Raise Strategy.

For these reasons, Respondents' Exception 15 is rejected.

### 2. Effect

The ALJ concluded that the effect prong had been satisfied as to lending-related misconduct associated with the Capital Raise Strategy. *See* RD at 117-18. The ALJ reasoned that on June 12, 2013 (a date that is less than five years prior to the issuance of the September 25, 2017 Notice), the Bank recorded combined losses of $387,240.63 on two of the Capital Raise Loans and "there can be no serious disagreement that this loss occurred by reason of the alleged misconduct" as "the

loans would not have been made were it not for Bank management's decision to finance the purchase of Holding Company stock in this manner." *See id.* (internal quotation marks omitted); *see also* 12 U.S.C. § 1818(e)(1)(B). Additionally, with respect to § 1818(i) charges against Respondent Ortega based on accounting-related misconduct associated with the Capital Raise Strategy, the ALJ concluded that "Respondent Ortega's violation of 12 U.S.C. § 161(a) over the course of several Call Reports, the effect of which continued into the five-year limitations period window, was a pattern of misconduct sufficient to meet the standard for first- and second-tier civil money penalty assessments under Section 1818(i) . . .." *See* RD at 174.[37] The Comptroller adopts these conclusions for the reasons set forth in the Recommended Decision. The Comptroller also adds that the financial losses sustained by the Bank and the FDIC in its capacity as receiver for the failed Bank, *see supra* Part IX.C.9 (finding that the FDIC as receiver suffered $3,808,058.28 in losses when certain outstanding Capital Raise Loans were charged off), were wholly foreseeable consequences of Respondents' lending-related misconduct associated with the Capital Raise Strategy, *see supra* Part IX.C.6-8. Nonetheless, Respondents' Exceptions regarding effects associated with the Capital Raise Strategy are addressed below.

### a. Respondents' Exceptions Regarding Showing of Effects

**Respondents' Exception 16** asserts the following, as relevant, "the ALJ's finding and conclusion that the Bank suffered a loss (or otherwise triggered the "effects prong") by reason of the Capital Raise Loans was not supported by the evidence or applicable law." *See* Resp'ts' Exceptions at 4. Dedicating only a few sentences to this assertion, Respondents argue that "[t]he problem" with the ALJ's conclusion that the effect prong was satisfied as to the lending-related

---

[37] The Comptroller's discussion of charges based on accounting-related misconduct associated with the Capital Raise Strategy is limited to first- and second-tier civil money penalties against Respondent Ortega. *See supra* Part III.A (discussing waiver of various charges).

misconduct associated with the Capital Raise Strategy is that the underlying transactions "involved no cash loss to the Bank," purportedly because "the Bank received a note, which is an asset to the Bank." *See id.* at 104. Respondents' assertion is invalid. The Notice charged that the Bank suffered financial loss by reason of Respondents' misconduct, and Enforcement Counsel adduced evidence establishing as much. *See supra* Part IX.C.9. Respondents' Exception 16 is thus rejected.

**Respondents' Exception 21** asserts that the "ALJ's finding and conclusion that Ortega engaged in a pattern of misconduct with respect to accounting claims was without support and a legal basis." *See* Resp'ts' Exceptions at 5 (internal quotation marks omitted). In support of this exception, Respondents state, without further explanation, that there was no evidence presented of a pattern of misconduct. *See id.* at 121. The Comptroller finds ample evidence establishing a pattern of accounting-related misconduct spanning multiple years. *See supra* Part IX.C.5. Respondents' Exception 21 is rejected to the extent that it concerns the Capital Raise Strategy.

**Respondents' Exception 26** asserts, "The ALJ failed to consider the law of causation as part of the 'effects' analysis"; Respondents further assert that the effects analysis incorporates "both 'but for' and 'proximate' causation." *See* Resp'ts' Exceptions at 6, 127-28. Although the ALJ did not expressly state what causation standard was applied, as far as the Comptroller can tell, the ALJ did not expressly reject the standards advanced by Respondents (*i.e.,* actual and proximate causation). Furthermore, the ALJ's analysis of the effect prong as it relates to the lending-related charges associated with the Capital Raise Strategy appears consistent with an actual and proximate causation analysis. *See, e.g.*, RD at 118. Assuming for purposes of the instant analysis that the effect prong incorporates actual and proximate causation, the Comptroller concludes that it is satisfied as to the lending-related charges associated with the Capital Raise Strategy. Respondents' argument that they did not legally cause loan losses since "all of the loans at issue in this case had

enough votes on the L&D Committee to be approved, with or without the Respondents," *see* Resp'ts' Exceptions at 128, is unpersuasive, *see e.g.,* Restatement (Second) of Torts § 439, cmt. b ("If the harm is brought about by the substantially simultaneous and active operation of the effects of . . . the actor's negligent conduct and [the] [wrongful] act of a third person . . . the conduct of each is a cause of the harm, and both . . . are liable."). Respondents' Exception 26, as applied to the lending-related charges associated with the Capital Raise Strategy, is rejected.[38]

### b. Respondents' Exception 1 as Applied to Capital Raise Strategy Charges

Although rejected at *supra* Part V.B, the Comptroller here revisits **<u>Respondents' Exception 1</u>** and Respondents' statute-of-limitations arguments as they relate specifically to the Capital Raise Strategy. To recap the discussion at Part V.A, in a prior order entered in this matter, the Comptroller issued the following: Interlocutory Ruling 1, which reaffirmed that the five-year statute of limitations set forth at § 2462 does not begin to run until all factual and legal prerequisites for filing a notice of charges are in place; Interlocutory Ruling 2, which reaffirmed that occurrences of alternative effect predicates trigger accruals of separate claims; and Interlocutory Ruling 2a, which clarified that because separate occurrences of effects trigger accruals of separate claims, an action is timely if it is commenced within five years of the date of the last effect resulting from the charged misconduct, even if there were an earlier occurrence of an effect of the type on which the action is predicated.

Respondents argue that "the last date on which a Capital Raise Loan could have been made was August 12, 2009." *See* Resp'ts' Exceptions at 43.[39] According to Respondents, because

---

[38] As applied to all other relevant charges, Respondents' Exception 26 is deemed moot. *See infra* Parts X.B.4, D.2.

[39] Although the Comptroller agrees that this is the last date on which the proceeds of a Capital Raise Loan could have been downstreamed to the Bank, the Comptroller agrees with the ALJ's characterization of a "Capital Raise Loan" as a Bank loan used to purchase Holding Company

Enforcement Counsel may seek a prohibition or civil money penalty when a loan is "likely to cause more than a minimal loss," or "will probably suffer financial loss or other damage" or when "depositors . . . could be prejudiced," "the latest a claim could have 'first accrued' was in 2009"— *i.e.,* at the time the "last" Capital Raise Loan was issued. *See id.* at 44-45. This argument is unpersuasive. As frequently stated in these proceedings, "[i]t is settled law . . . that it is meaningless for limitations purposes that an agency could conceivably have brought its claim earlier based on a different effect (and thus a different cause of action) that it did not plead." *See* RD at 118; *see also Blanton*, 909 F.3d at 1172 ("[E]ven though the OCC might well have brought an action earlier, its failure to do so does not make the claims it elected to bring untimely." (internal quotation marks omitted)); *Proffitt*, 200 F.3d at 863 ("The same misconduct can produce different effects at different times, resulting in separate section [1818(e)] claims and separate accruals."); *id.* at 864 (noting that § 1818 was intended to provide enforcement agencies with some flexibility when determining when to bring actions). The charges arising from the Capital Raise Strategy are timely pursuant to Interlocutory Ruling 1 and Interlocutory Ruling 2.

Neither the lending-related charges against Respondents nor the accounting-related charges against Respondent Ortega based on the Capital Raise Strategy require the application of Interlocutory Ruling 2a to be deemed timely. With respect to the lending-related charges, it is undisputed that the date of the earliest alleged financial loss associated with the Capital Raise Strategy is June 12, 2013. *See, e.g.*, Resp'ts' Exceptions at 44 ("the OCC offered evidence and the ALJ found that the 'effects' prong of the statute was met on June 12, 2013, when the Bank suffered a loss on one of the loans and when the FDIC suffered losses many years later on other Capital

---

stock, and thus finds record evidence showing that Capital Raise Loans were issued through March 2011. *See* RD at 30, 129-30.

Raise Loans.") (citing RD at 42, 117-18). Because the record is devoid of evidence or allegations concerning financial losses associated with the Capital Raise Strategy occurring prior to June 12, 2013, Interlocutory Ruling 2a is not at issue when it comes to assessing the timeliness of the Capital Raise Strategy lending-related charges against Respondents. With respect to the accounting-related charges against Respondent Ortega, Interlocutory Ruling 2a (which, again, contemplates separate claims arising from separate occurrences of the same types of effects) is essentially built into the statutory "effect" provided for at § 1818(i)(2)(B)(ii)(I) (requiring that misconduct be "part of a pattern") in that this effect is characterized by repeated occurrences of misconduct. In other words, a claim accrued "each time" Respondent Ortega violated § 161(a) as part of a pattern of misconduct. *See Blanton*, 909 F.3d at 1171. Thus, the accounting-related civil money penalty charges against Respondent Ortega are not deemed timely through application of Interlocutory Ruling 2a. For these reasons, and the reasons stated at *infra* Part V.B, Respondents' Exception 1 is rejected.[40]

### 3. Culpability

For the Comptroller to impose an order of prohibition, Enforcement Counsel must establish "a degree of culpability well beyond mere negligence." *See* RD at 120 (quoting *Kim*, 40 F.3d at 1054). The requisite culpability may be shown by evidence of "continuing disregard" for a bank's safety or soundness. *See* 12 U.S.C. § 1818(e)(1)(C). Continuing disregard is conduct that has been "voluntarily engaged in over a period of time with heedless indifference to the prospective consequences." *See Grubb v. FDIC*, 34 F.3d 956, 962 (10th Cir. 1994). It is a mental state "akin

---

[40] Respondents assert that "because the [FDIC] receivership is still open" and "could book a loss at any time," they still "do not have repose." *See* Resp'ts' Exceptions at 45-46. However, the Comptroller notes that the OCC cannot initiate an action against an IAP unless the notice of charges is "served before the end of the 6-year period beginning on the date such party ceased to be such a party with respect to such depository institution." *See* 12 U.S.C. § 1818(i)(3).

to recklessness." *See Kim*, 40 F.3d at 1054; *Brickner v. FDIC,* 747 F.2d 1198, 1203, n.6 (8th Cir. 1984). "Recklessness is established by acts committed 'in disregard of[] and evidencing conscious indifference to a known or obvious risk of a substantial harm.'" *See Conover*, 2016 WL 10822038, at *27 (quoting *Cavallari v. OCC*, 57 F.3d 137, 142 (2d Cir. 1995)). It may also be demonstrated through "voluntary and repeated inattention to" unsafe and unsound practices, or the "knowledge of and failure to correct clearly imprudent and abnormal practices that have been ongoing." *See In the Matter of Swanson,* 1995 WL 329616, at *5 (OTS Apr. 4, 1995). The "continuing" aspect of "continuing disregard" requires repetition of the misconduct, *see id.*, "over a period of time," *see Grubb*, 34 F.3d at 962.

The ALJ concluded that Enforcement Counsel had not carried its burden, reasoning, *inter alia*, that "while actionable misconduct certainly occurred, there is substantial evidence—backed by credible testimony—that Respondents found themselves in a difficult and exigent situation with no good solutions and that their actions were motivated by a good faith concern for the Bank and its depositors during a time of crisis." *See* RD at 120. The ALJ further stated that "[t]here is no evidence that Respondents acted with recklessness or heedless indifference" because "Respondents' actions evinced good faith concern for the Bank . . . [and] they were taking steps, in the moment, to improve the capital conditions of the Bank and the Holding Company at a time when the Bank's deficient capital levels were unsafe and unsound." *See id.* at 130.[41]

Enforcement Counsel objects to the ALJ's conclusion regarding Respondents' culpability for the Capital Raise Strategy. **<u>Enforcement Counsel's Exception 1</u>** asserts the following.

---

[41] The ALJ considered whether Respondents demonstrated continuing disregard by evaluating their conduct over the "two periods" before and after the Holding Company's second capital injection. *See* RD at 129-30. The Comptroller does not deem such a bifurcation material to the analysis here.

The ALJ committed legal error when she concluded that Enforcement Counsel did not meet its burden of showing that Respondents acted with necessary culpability to warrant a prohibition—namely, that Respondents' lending-related misconduct pursuant to the Capital Raise Loans scheme did not demonstrate their continuing disregard for the safety or soundness of [the Bank].

*See* EC's Exceptions at 2-3. Enforcement Counsel argues, *inter alia*, the following. In connection with the Capital Raise Strategy, Respondents voluntarily engaged in repeated lending-related misconduct by approving dozens of Capital Raise Loans despite being aware that the purposes of such loans, as stated in loan packages presented to the L&D Committee, were misleading. Respondents' misconduct demonstrated heedless indifference in that it risked the Bank's existing capital by means of extending liberal and concessionary loans. Such loans were issued at a time when the Bank urgently needed to increase its capital ratios and had represented to the OCC that virtually no lending was occurring. Respondents further demonstrated their heedless indifference by implementing a strategy that did not generate new capital and by failing to disclose the Capital Raise Strategy to the OCC or to correct misleading Bank records regarding Capital Raise Loans. *See* EC's Exceptions Br. at 27-41.

The Comptroller finds merit in Enforcement Counsel's arguments and concludes that the Recommended Decision is internally inconsistent when it comes to Respondents' culpability in connection with the Capital Raise Strategy. The ALJ's own findings and analysis—including that Respondents engaged in "demonstrably *deceptive*" practices, *see* RD at 115 (emphasis in original); "admitted habitual inattention," *see id.* at 123; and that the Capital Raise Strategy "raised sham capital using the Bank's existing funds," *see id.* at 108—conflict with and undermine her conclusions elsewhere that Respondents acted in "good faith" or took steps "to improve the capital conditions of the Bank," *see id.* at 120, 130. Enforcement Counsel need not show that Respondents *intended* to harm the Bank, *see Conover*, 2016 WL 10822038, at *26, as portions of the ALJ's

analysis seem to suggest. Respondents' conduct was plainly deliberate and they knew or should have known—as demonstrated by their contacts with the OCC regarding capital-raise efforts and the Bank's own policies—that such conduct presented grave risks to the Bank. *See supra* Part IX.C.6-7.

To highlight what is perhaps the plainest demonstration of Respondents' culpability, ample record evidence, including Respondents' own testimony, shows that despite being in virtually continuous contact with the OCC and under an obligation to be fully transparent about the Bank's capital-raise efforts, Respondents participated in concerted efforts to conceal or misrepresent the Capital Raise Strategy to the OCC and in Bank records. *See supra* Part IX.C.1, 4, 7; *cf. Ellsworth*, 2016 WL 11597958, at *17 (holding that respondents demonstrated continuing disregard by, *inter alia*, "withholding material information from . . . the OCC [and] . . . directing false Bank documents to be created . . ."); *Conover*, 2016 WL 10822038, at *26 ("Respondent's lack of candor with the Bank . . . reflects . . . continuing disregard."); *In the Matter of Shaffer*, 2009 WL 1677055, at *6 (FDIC Apr. 23, 2009) ("misrepresenting or failing to disclose facts to the Bank" constitutes willful and continuing disregard); *In the Matter of De La Fuente II*, 2004 WL 614659, at *5 (FDIC Feb. 27, 2004) ("deliberate steps—including knowingly misrepresenting facts to the Bank's board and to FDIC examiners . . ." indicated willful and continuing disregard), *aff'd*, 156 F. App'x 44 (9th Cir. 2005). No degree of exigency can justify this dishonesty. Enforcement Counsel's Exception 1 is therefore adopted.

### B. OREO Strategy

In connection with the § 1818(e) prohibition charges arising from the lending-related misconduct associated with the OREO Strategy, the ALJ concluded that Enforcement Counsel had established the misconduct and effect prongs by a preponderance of the evidence but had not so

established the culpability prong. *See* RD at 131-32. With respect to the assessment of § 1818(i) civil money penalties based on lending-related misconduct associated with the OREO Strategy, the ALJ concluded that the statutory predicates supporting penalties had been met because—as she concluded in connection with her § 1818(e) analysis—Respondents breached their fiduciary duties and caused more than minimal loss to the Bank. *See id.* at 152. The ALJ did not find it "necessary to further resolve" whether the charged alternative predicates supporting civil money penalties based on lending-related misconduct associated with the OREO Strategy[42] had been established. *See id.* Enforcement Counsel does not take exception to this aspect of the ALJ's analysis. Finally, the ALJ concluded that all elements required to support assessment of a civil money penalty against Respondent Ortega for accounting-related misconduct associated with the OREO Strategy had been satisfied. *See id*. at 174.

As discussed more fully in the paragraphs below, the Comptroller adopts in part and rejects in part the ALJ's analysis regarding the OREO Strategy. As a result, the Comptroller dismisses the lending-related charges against Respondents arising from the OREO Strategy but assesses a civil money penalty against Respondent Ortega for accounting-related misconduct associated with the OREO Strategy. The Comptroller concludes this subsection by addressing the merits of the parties'

---

[42] Namely, the charged alternative predicates are, for purposes of the misconduct prong, whether Respondents *recklessly* engaged in unsafe or unsound practices and, for purposes of the effect prong, whether Respondents' misconduct constituted a pattern of misconduct.

exceptions to the ALJ's conclusions concerning the OREO Strategy to the extent those exceptions are not deemed moot.

### 1. Misconduct

#### a. Unsafe or Unsound Practices

The ALJ concluded that "Enforcement Counsel makes a more than sufficient showing that Respondents engaged in unsafe or unsound practices with respect to the Bank's OREO lending during the relevant time period." *See* RD at 132. The ALJ reasoned that Respondents abdicated their responsibilities as members of the L&D Committee and as Bank officers and directors by, *inter alia*, failing to adequately review loan packages[43] and "habitually relying solely on the recommendations of loan officers to approve loans with incomplete documentation, inadequate underwriting, and concessionary terms that foreseeably and unduly increased the Bank's risk." *See id*. More specifically, Respondents frequently approved loans greater than $500,000, including the $56 million loan to NAHS, even when the loan packages did not contain detailed financial documents regarding borrowers' ability to repay, as required by the Bank's loan policy, and the terms of the loans were liberal or concessionary in that they, *inter alia*, required little to no down payment or guarantees. *See id*. at 132-36. The Comptroller agrees with the ALJ's analysis and

---

[43] **Enforcement Counsel's Exception 3c** asserts that the ALJ committed legal error when she failed to find that Respondents' failure to adequately review loan packages constituted an unsafe or unsound practice. *See* EC's Exceptions at 2. The Recommended Decision arguably reaches this conclusion. *See, e.g.,* RD at 132-36 (discussing Respondents' failure to adequately review loan documentation in connection with OREO Strategy analysis under heading, "Approval without Credit Review"). In any event, the Comptroller finds ample evidence in support thereof. *See id.* at 14-15, 59, 132-35; Hr'g Tr. 101:1-102:13 (examination of Michael Brickman), 646:1-12, 665:15-666:1 (examination of Respondent Ortega), 1288:13-1289:8, 1314:3-14 (examination of Ramah Chansen). Enforcement Counsel's Exception 3c is thus adopted.

adopts the conclusion that Respondents engaged in unsafe or unsound practices in connection with lending-related misconduct associated with the OREO Strategy.[44]

### b. Breach of Fiduciary Duty

The ALJ concluded that Respondents breached their fiduciary duty of care when they: (1) approved "risky loans to finance the sale of Bank OREO without any credit analysis to assess the borrower's repayment ability"; and (2) approved "numerous [OREO] loans containing terms that did not comply with the standards set forth in the Bank's loan policy, which Respondents and the rest of the Board approved annually as 'principles that are fundamental to sound lending.'" *See* RD at 142 (quoting Joint Ex. 10 (2010 Loan Policy)). Although a close question is presented, the Comptroller concludes that Enforcement Counsel did not satisfy its burden of proof as to this issue.

It may often be the case that the outcomes of analyses of breach of fiduciary duty and unsafe or unsound practices are parallel. However, having concluded at *supra* Part X.B.1.a that Respondents' lending-related misconduct associated with the OREO Strategy constituted unsafe or unsound practices, the instant facts present the unique opportunity to highlight two important points. First, breach of fiduciary duty and unsafe or unsound practices are separate tools that Congress authorized the Federal banking agencies to utilize in prosecuting administrative enforcement actions. Second, there are key differences between the standards underlying these two predicates that can, as here, drive diverging outcomes. As previously discussed, an unsafe or unsound practice is any action or omission "which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or

---

[44] The ALJ did not reach a conclusion as to whether Respondents' accounting-related misconduct associated with the OREO Strategy constituted unsafe or unsound practices. *See* RD at 172-173. Enforcement Counsel did not take exception to this and the Comptroller declines to consider this issue in the first instance.

loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." *See Adams*, 2014 WL 8735096, at *11. By comparison, an IAP breaches their fiduciary duty when they fail to exercise the level of care that an ordinarily prudent and diligent person "would exercise *under similar circumstances*." *See Watkins*, 2019 WL 6700075, at *7 (emphasis added). Thus, unlike the standard for unsafe or unsound practices, the standard of care relevant to assessing breach of fiduciary duty is, on a case-by-case basis (at least to a certain extent[45]), tailored to the IAP's particular situation and that of the institution.

Bearing this in mind, the Comptroller concludes that the ALJ committed legal error by failing to fully consider and give sufficient weight to the specific circumstances faced by Respondents at the time relevant to the OREO Strategy.[46] The ALJ's analysis with respect to the culpability prong did, however, discuss these circumstances in depth and that discussion highlights the lack of comprehensiveness in the Recommended Decision's analysis of breach of fiduciary duty. The Comptroller therefore views the culpability prong and breach of fiduciary duty analyses as internally inconsistent and in need of reconciliation and correction. To that end, as explained below, the Comptroller considers the relevant portions of the ALJ's culpability-prong analysis and applies this reasoning to the standard for breach of fiduciary duty. In doing so, the Comptroller concludes that Enforcement Counsel did not carry its burden.

---

[45] The Comptroller is cognizant that this standard of care applies to individuals whose roles ultimately affect the safety and soundness of the banking system. Accordingly, there are limits on the extent to which this standard can be permitted to account for specific circumstances. It is not necessary to further explore such limitations here.

[46] It is somewhat less clear that the ALJ committed a similar error in connection with the charges associated with the Capital Raise Strategy because it is readily apparent that Respondents' deceptive and misleading conduct in connection with those charges is beyond the pale of ordinarily prudent behavior, even under exigent circumstances. *See supra* Part IX.C.1, 4, 7.

In support of the conclusion that Respondents did not demonstrate the requisite culpability, the ALJ cited, as relevant, the following. It is uncontroverted that the OCC expressed to the Bank the urgent need to sell its OREO and that the OCC initially approved of the Bank's aggressive efforts to do so through self-financing. *See* RD at 147. In light of the "substantial monthly costs of maintaining [OREO] properties, the deterioration of the value of the properties due to market conditions, and the fact that more new ORE was continuing to flood the Bank's books each month," holding existing OREO for a sustained period was not an option. *See id.* at 146-47. In short, "taking measures to constantly sell existing OREO quickly was potentially a matter of life and death for the Bank from the fall of 2008 onward." *See id.* at 147. With respect to the possibility of lowering the asking price of the properties or finding qualified buyers with financing from other banks, "both the record and the weight of the testimony" suggest that, at the time, these would not have been easy or clear-cut choices, and "Respondents and other Bank personnel offered credible, detailed rationales for not pursuing those alternate paths that were not refuted by Enforcement Counsel witnesses." *See id*. The OCC's 2012 Report of Examination also acknowledged the Bank's difficult position, stating "The level of OREO continues to grow. Holding costs and losses on sales are severely impacting earnings. OREO volume must be reduced." *See id.* at 149 (quoting Joint Ex. 6 at 4). And even though Respondents approved loans without first obtaining adequate documentation, *see supra* Part IX.D.1, they "based their lending decisions in part on their personal knowledge of the prospective borrowers," *see* RD at 149-50. Finally, without necessarily sharing the perspective, the ALJ recognized as "broadly reasonable" the view that "*in the specific climate faced by the Bank at the time*[,] reducing the Bank's OREO was important and urgent enough that considerations of future risk of default and foreclosure mattered somewhat less when taking steps to achieve that aim." *See id.* at 151 (emphasis added).

To reiterate, the record reflects that Respondents violated Bank policies in approving concessionary loans in connection with the OREO Strategy; failed to obtain adequate documentation demonstrating borrowers' repayment abilities; and failed to adequately review loan packages. *See supra* Part IX.D.1, 3. These findings are sufficient to establish unsafe or unsound practices and, in many instances, would be sufficient to establish breach of fiduciary duty. However, the Comptroller finds no error in or basis to depart from the ALJ's characterization of the circumstances facing Respondents at the time relevant to the OREO Strategy, and it is against this backdrop that Respondents' acts or omissions must be evaluated. As probative of the issue of whether Respondents exercised ordinary prudence *under the circumstances*, the Comptroller considers the following. The OCC was contemporaneously aware that the loans associated with the OREO Strategy violated the Bank's loan policy and nonetheless initially described the Bank's OREO Strategy as achieving favorable results. *See supra* Part IX.D.2. There was detailed and credible testimony to the effect that the OREO Strategy, considered as a whole,[47] reflected Respondents' considered—if ultimately imprudent—selection among various undesirable options. *See e.g.,* RD at 147.[48] In view of these findings and, importantly, the ALJ's recognition that Respondents' efforts in connection with the OREO Strategy were "broadly reasonable" under the circumstances, the Comptroller concludes that, although a close question is presented, on balance,

---

[47] Except for the NAHS loan, the parties' arguments surrounding the lending-related charges associated with the OREO Strategy generally treat alleged features of the strategy and associated losses in the aggregate. Although the Comptroller is entitled to conduct a *de novo* review, considering the volume and complexity of the record in this matter, the Comptroller declines to examine individual loans underlying the OREO Strategy to determine whether a prohibition would be warranted against either Respondent in connection with individual loans. Instead, mirroring the parties' presentation of arguments and ALJ's analysis, the Comptroller examines the OREO Strategy overall, using the NAHS loan as an exemplar.

[48] By contrast, Respondents' misconduct in connection with the Capital Raise Strategy involved calculated and covert efforts to raise sham capital through the proceeds of uniformly lenient loans. *See supra* Part IX.C.

Enforcement Counsel has not established by a preponderance of the evidence that Respondents' lending-related conduct in connection with the OREO Strategy rose to the level of breach of fiduciary duty.

This analysis does not diminish the gravity of Respondents' OREO Strategy misconduct. As previously stated, the Comptroller has no difficulty concluding that Respondents' acts and omissions in connection with the OREO Strategy constituted unsafe or unsound practices. When evaluated against the body of generally accepted standards of prudent operation, Respondents' conduct clearly does not measure up and presented abnormal risk of loss. Rather, as warranted in this particular matter, the Comptroller's analysis recognizes and gives meaningful effect to different statutory predicates underlying the misconduct prong. To put a finer point on it, because the breach-of-fiduciary-duty inquiry involves measurement against the level of care of an ordinarily prudent and diligent person under similar circumstances, efforts that may be validly characterized as "broadly reasonable" under the circumstances cannot, as a matter of law, constitute a breach of fiduciary duty. Finding no basis to depart from the ALJ's factual findings supporting such a characterization, the Comptroller concludes that Respondents' lending-related misconduct associated with the OREO Strategy does not constitute a breach of fiduciary duty based on the record here and the credibility determinations made at the hearing.[49]

### c. Section 161(a)

The ALJ concluded that Respondents violated § 161(a) in connection with accounting-related misconduct associated with the OREO Strategy. *See* RD at 171-72. The ALJ credited the finding

---

[49] The ALJ did not reach a conclusion as to whether Respondents' accounting-related misconduct associated with the OREO Strategy constituted a breach of fiduciary duty. *See* RD at 172-173. Enforcement Counsel did not take exception to this and the Comptroller declines to consider this issue in the first instance.

of Enforcement Counsel's accounting expert that the Bank had "improperly accounted for its OREO sales . . . by failing to discount loans with below-market interest rates to their present value of future cash flows" and that this materially overstated the Bank's earnings and capital. *See id*. The ALJ reasoned that the MRAs issued by the OCC in 2009 and 2011 and the Bank's own Market Rate Matrix should have alerted Respondents that the Bank was not correctly accounting for loans associated with the OREO Strategy. *See id.* at 172. The Comptroller agrees and adopts the ALJ's conclusion.[50]

### d. Respondents' Exception 17

Respondents object to the ALJ's conclusions regarding misconduct associated with the OREO Strategy. **Respondents' Exception 17** asserts the following: "the ALJ's finding and conclusion that the OREO Loans were an unsafe or unsound practice . . . were accounted for incorrectly, were a breach of fiduciary duty or otherwise met the misconduct prong . . . was not supported by the evidence or applicable law." *See* Resp'ts' Exceptions at 4. In support of this exception, Respondents reiterate various arguments raised below: Respondents were not loan officers and appropriately relied on the expertise of lenders and credit staff; Respondents reasonably believed that OCC examiners knew of and concurred with the Bank's OREO Strategy; and loans associated with the OREO Strategy were not proven to be unsafe or unsound because the evidence did not establish that such loans were offered at "below market" interest rates and because "OREO loans created a benefit to the Bank by generating cash from a money losing asset." *See* Resp'ts' Exceptions at 105-08. Respondents also argue that because Enforcement Counsel did not adduce sufficient evidence showing that loans associated with the OREO Strategy were offered at "below

---

[50] Again, due to Enforcement Counsel's waiver of certain effect-prong predicates, this conclusion ultimately matters only as to Respondent Ortega and only as to the assessment of civil money penalties against him. *See supra* Part III.A.

market" terms, the ALJ erred by concluding that accounting-related misconduct was established. *See* RD at 110-12.

The Comptroller agrees with the ALJ that "[n]one of Respondents' arguments change the conclusion that the Bank's OREO lending practices . . . foreseeably increased the risk to the Bank by offering consistently liberal loan terms to borrowers who had not demonstrated the ability to service the debt." *See id.* at 140. Moreover, "a finding of unsafe or unsound practices . . . does not depend on whether, for example, the interest rates on an OREO loan were lower than some market rate baseline, but on whether the terms of the loan overall posed a reasonably foreseeable undue risk to the institution." *See id.* (internal quotation marks omitted). The Comptroller has already rejected Respondents' argument grounded in their reliance on loan officers and does so again here. *See supra* Part X.A.1.d. With respect to accounting-related misconduct associated with the OREO Strategy, the Comptroller finds ample evidence—including the Bank's own Market Rate Matrix and contemporaneous OCC Reports of Examination—establishing that loans associated with the OREO Strategy were offered on below-market terms. *See* RD at 172; *see also* Joint Ex. 2 at 12; Joint Ex. 4 at 47-48, 81; OCC EX 343 at 5, 8, 20. Accordingly, to the extent Respondents' Exception 17 objects to the ALJ's conclusions regarding unsafe or unsound practices or violations of § 161(a), it is rejected. And to the extent Respondents' Exception 17 objects to the ALJ's conclusions regarding breach of fiduciary duty in connection with OREO Strategy lending-related misconduct, it is deemed moot in light of the Comptroller's independent analysis and conclusion that Enforcement Counsel has not satisfied its burden of establishing breach of fiduciary duty. *See supra* Part X.B.1.b.

## 2. Culpability

Once actionable misconduct has been established, the Comptroller may proceed to consideration of either the effect prong or the culpability prong, as each course inquires as to features of the underlying misconduct. *See* 12 U.S.C. § 1818(e)(1)(B)-(C). In the interest of administrative economy, the Comptroller now takes up the culpability prong. Again, for purposes of the instant matter, the relevant inquiry asks whether Respondents' lending-related misconduct demonstrated "continuing disregard" for the safety or soundness of the Bank. *See supra* Part III.A (discussing waiver of certain culpability predicates). The ALJ concluded that Enforcement Counsel had not met its burden in this regard. *See* RD at 146. She reasoned that "there is credible testimony and substantial record evidence that, in aggressively financing the sale of OREO to remove it from the Bank's balance sheet, Respondents believed they were acting in the Bank's best interest in the face of an unprecedented crisis." *See id.* She further reasoned that "there is substantial evidence that the OREO lending strategy was undertaken, even if misguidedly in the details, with the Bank's well-being firmly in mind" and that "[o]verall, Enforcement Counsel has not proven that Respondents showed a degree of culpability well beyond mere negligence in their actions relating to the sale of OREO during the relevant period." *See id.* at 152 (internal quotation marks omitted).[51]

Enforcement Counsel objects to this conclusion. **Enforcement Counsel's Exception 2** asserts that "[t]he ALJ committed legal error when she concluded that . . . Respondents' lending-related misconduct pursuant to the [OREO Strategy] did not demonstrate their continuing disregard for the safety or soundness of the Bank." *See* EC's Exceptions at 2. In support of this exception,

---

[51] Additional reasons supporting the ALJ's conclusion regarding the culpability prong are quoted at length at Part X.B.1.b and will not be repeated here.

Enforcement Counsel argues, *inter alia*, the following. It was improper for the ALJ to consider whether Respondents "believed they were acting in the Bank's best interests, or that they did not intend to harm the Bank" and to measure Respondents' culpability "against the backdrop of the difficult and exigent economic circumstances." *See* EC's Exceptions Br. at 55-56 (internal quotation marks omitted). Additionally, Enforcement Counsel contends that the ALJ's conclusion "allow[s] the bar for bankers' conduct to fluctuate with the overall state of the economy" and that "during economic crises, bankers could engage in all manner of unsafe or unsound practices, secure in the knowledge that their conduct would not meet the culpability requirement due to the exigent economic circumstances." *See id.* at 56.

To an extent, the Comptroller agrees with Enforcement Counsel's arguments. Enforcement Counsel is correct that the continuing-disregard inquiry has little to do with what Respondents subjectively believed but more appropriately examines whether Respondents "knew or should have known" that their conduct "exposed the Bank to an abnormal risk of loss" and, if so, whether they "proceeded anyway." *See Conover*, 2016 WL 10822038, at *24. Enforcement Counsel is also correct that neither economic crisis nor exigency may shield IAPs from the panoply of actions available to Federal banking agencies. That said, the existence of crisis or exigency can be probative of what Respondents *knew or should have known* about their lending-related OREO Strategy misconduct when it occurred.

The Comptroller agrees with Enforcement Counsel that there can be no serious doubt that Respondents' lending-related misconduct constituted unsafe or unsound practices and was repeatedly and voluntarily engaged in over a period of time. This, however, is insufficient to meet the *scienter* requirement of continuing disregard. To reiterate, Enforcement Counsel needed to establish that Respondents' conduct rose above the level of ordinary negligence and amounted to

something "akin to recklessness." *See Kim*, 40 F.3d at 1054. For largely the same reasons that led the Comptroller to conclude that Enforcement Counsel did not establish that Respondents' conduct constituted breach of fiduciary duty, the Comptroller now concludes that Enforcement Counsel did not establish that Respondents acted with the requisite *scienter* for continuing disregard. As previously stated, the Comptroller finds significant the following. The ALJ characterized Respondents' approaches, at least in theory, as "broadly reasonable," *see* RD at 151; the OCC was contemporaneously and broadly aware of the OREO Strategy and, at least in its early years, described the strategy in approving terms, *see supra* Part IX.D.2; and there is evidence to the effect that the OREO Strategy reflected Respondents' considered—if ultimately imprudent—selection among various undesirable or infeasible options, *see e.g.,* RD at 147; *see also Haynes*, 2014 WL 4640797, at *13 ("violations must be more than technical or inadvertent to satisfy the culpability standard" (internal quotation marks omitted)). On balance, the Comptroller concludes that Enforcement Counsel did not carry its burden of proving by a preponderance of the evidence that Respondents *knew or should have known* that their misconduct exposed the Bank to an abnormal risk of loss.

As a final note on this issue, while the ALJ in some respects treats the Capital Raise Strategy and OREO Strategy culpability-prong analyses as adjoined, the Comptroller observes material distinctions between the mental states underlying these separate sets of misconduct. Most obviously, Respondents' misconduct in connection with the Capital Raise Strategy is grounded in deliberate falsity—both in the efforts to raise "sham" capital and in the efforts to conceal or misrepresent the strategy in communications with the OCC and in Bank records. *See supra* Part IX.C.3-5, 7-8. Such falsity, which is a strong indicator of continuing disregard for the Bank's safety or soundness, is not present in the record in connection with the OREO Strategy.

For these reasons, Enforcement Counsel's Exception 2 is rejected.

### 3. Section 1818(i)

With respect to Respondents' lending-related misconduct in connection with the OREO Strategy, the ALJ recommended the assessment of civil money penalties based, in part, on her conclusion that the misconduct prong of § 1818(i) was satisfied because Respondents had breached their fiduciary duties of care; she then concluded that it was "not necessary to further resolve whether Respondents' actions meet the standard for reckless engagement [in] unsafe or unsound practices . . .." *See* RD at 152. The Comptroller disagrees with the ALJ's conclusion regarding the establishment of breach of fiduciary duty in connection with the lending-related misconduct associated with the OREO Strategy, *see supra* Part X.B.1.b, and declines to consider in the first instance whether Respondents recklessly engaged in unsafe or unsound practices. Because the misconduct-prong underlying § 1818(i) lending-related charges against Respondents in connection with the OREO Strategy has not been satisfied, the Comptroller dismisses such charges.

With respect to the accounting-related misconduct underlying the OREO Strategy, the ALJ recommended assessing a civil money penalty against Respondent Ortega based on conclusions that he violated § 161(a) and that such misconduct was part of a pattern that continued into the five-year statute-of-limitations window. *See* RD 174. The Comptroller adopts these conclusions. To the extent that **Respondents' Exception 21** challenges that Respondent Ortega engaged in a pattern of accounting-related misconduct in connection with the OREO Strategy, this exception is rejected. To the extent that **Respondents' Exception 1** challenges the timeliness of the accounting-related OREO Strategy charges, this exception is rejected for the same reasons discussed in connection with the accounting-related Capital Raise Strategy charges. *See supra* Part X.A.2.b.

The Comptroller thus assesses first- and second-tier civil money penalties against Respondent Ortega based on his accounting-related misconduct in connection with the OREO Strategy.

### 4. Respondents' Exception 18

The Comptroller dismisses the § 1818(e) prohibition charges and § 1818(i) civil-money-penalty charges against Respondents based on lending-related misconduct associated with the OREO Strategy because certain necessary elements have not been satisfied. Thus, **Respondents' Exception 18**, which asserts that "the ALJ's finding and conclusion that the Bank suffered a loss (or effect) by reason of the OREO Loans was not supported by the evidence or applicable law," *see* Resp'ts' Exceptions at 5, is deemed moot.

### C. Nonaccrual Loan Accounting Practices

The ALJ recommended that the Comptroller assess first- and second-tier civil money penalties against Respondent Ortega in connection with the accounting treatment of nonaccrual loans based on her conclusions that Respondent Ortega violated § 161(a) and breached his fiduciary duty of care, and that such misconduct was part of a pattern. *See* RD at 152-53, 168-69. For the reasons discussed below, the Comptroller adopts these conclusions and assesses first- and second-tier civil money penalties against Respondent Ortega.

### 1. Misconduct

### a. Section 161(a)

The ALJ concluded that the Bank filed materially inaccurate Call Reports from June 30, 2009 through December 31, 2012. *See* RD at 154. She reasoned that the reports "inappropriate[ly] recogni[zed] interest income on nonaccrual loans on a blanket basis without documentation or justification," and thus "improperly overstat[ed] the Bank's earnings and capital for those periods." *See id.* "It is beyond dispute that the Bank's practice of automatically recognizing interest income

on loans that have been placed on nonaccrual status—without a determination of full collectability supported by a current, well documented credit evaluation—is contrary to the Call Report Instructions and to GAAP." *See id.* at 154-55 (internal quotation marks omitted). All Call Reports filed during the relevant timeframe reflected this practice and are thus "inarguably inaccurate." *See id.* at 155. These inaccuracies were qualitatively material because, *inter alia*, they implicated considerations—including compliance with regulatory requirements, masking changes in earnings, and changing loss into income—found in SEC Accounting Bulletin No. 99, *Materiality* ("SAB 99") and because the applicable Call Report Instructions noted that "[g]uidance on the consideration of all relevant facts when assessing the materiality of misstatements" could be found in SAB 99. *See id*. at 157-59 (quoting OCC Ex. 359 at 380).

Respondent Ortega signed multiple Call Reports in question even though he "did not have a reasonable basis to believe in the accuracy of the Bank's nonaccrual loan accounting" due to "repeated warnings from the OCC and the Bank's internal auditor that treating all nonaccrual loans on a cash basis as a general rule did not comply with the Call Report Instructions." *See* RD at 154; *see also id.* at 161. More specifically, "the nonaccrual loan accounting issue was raised with Bank senior management three times by the Bank's Chief Audit Officer (in June 2009, October 2012, and December 2012) and three times by the OCC (in January 2009, February 2011, and January 2012)." *See id*. at 161.

The Comptroller agrees with the ALJ and adopts the conclusion that Respondent Ortega violated § 161(a) in connection with Nonaccrual Loan Accounting Practices.

### b. Breach of Fiduciary Duty

The ALJ reasoned that Respondent Ortega breached his fiduciary duty of care by failing to address the Bank's improper nonaccrual loan accounting from 2009 through 2012 and instead

permitting the Bank to apply a default method that he knew or should have known would result in improperly recognized interest income and inaccurate Call Reports. *See* RD at 162. She further reasoned that this did not demonstrate "constant concern for the safety and soundness of the bank, and is not what an ordinarily prudent person, acting diligently and carefully, would have done in those circumstances." *See* RD at 162 (internal quotation marks omitted); *see also Conover*, 2016 WL 10822038, at *19; *Watkins*, 2019 WL 6700075, at *7; *Michael v. FDIC*, 687 F.3d 337, 350-51 (7th Cir. 2012). The Comptroller concurs and adopts the ALJ's conclusion.

### c. Unsafe or Unsound Practices

The ALJ also concluded that Respondent Ortega engaged in unsafe or unsound practices in connection with Nonaccrual Loan Accounting Practices, reasoning as follows.

> The federal banking agencies have held that fiduciary duties define standards of prudent operation[,] and thus an act in violation of such duties is by its nature imprudent and unsafe. To whatever extent those standards are not coextensive here, the undersigned finds it unnecessary to determine whether Respondents' failure to ensure that the Bank corrected its improper nonaccrual loan accounting practices caused a reasonably foreseeable undue risk to the institution, given the clear evidence that Respondents' conduct constituted a violation of 12 U.S.C. § 161(a) and a breach of their fiduciary duty, as detailed above.

*See* RD at 162 (internal quotation marks and citations omitted; alteration in original).

The Comptroller declines to adopt this analysis. The Comptroller did not issue any of the administrative decisions cited for the proposition that misconduct constituting breach of fiduciary duty necessarily constitutes unsafe or unsound practices. Having highlighted the distinctions between the two standards at *supra* Part X.B.1, the Comptroller hesitates to conclude, as a matter of law, that misconduct constituting a breach of fiduciary duty is, *in every instance*, also an unsafe or unsound practice. While this might often hold true in some (if not most) situations, the Comptroller sees no reason to rule out the possibility of a scenario in which, for example, an IAP possesses such special knowledge, skills, or expertise that a higher degree of care than generally

accepted standards of prudent operation would be required under the breach-of-fiduciary-duty standard. Rather, the Comptroller declines to accept the ALJ's recommended conclusion for failure to apply the correct unsafe-or-unsound-practices standard and declines to conduct the requisite analysis in the first instance.

### d. Respondents' Exception 19

Respondents object to the ALJ's conclusions that the misconduct prong is established in connection with Nonaccrual Loan Accounting Practices. **Respondents' Exception 19** asserts, as relevant that "the ALJ's finding and conclusion that the nonaccrual loan accounting was an unsafe or unsound practice, the loans were not accounted for correctly, or otherwise met the misconduct prong of the statute, was not supported by the evidence or applicable law." *See* Resp'ts' Exceptions at 5. In support of this exception, Respondents, *inter alia*, reiterate the following arguments, which were first presented to and rejected by the ALJ. First, the Bank took "a sound, conservative approach" of "automatically mov[ing] loans into non-accrual/cash basis accounting after the loan fell behind more than 90 days" and that "it was the responsibility of credit/lending employees," rather than Respondent Ortega, "to further downgrade the loan if necessary." *See* Resp'ts' Exceptions at 114. The Comptroller agrees with the ALJ and Enforcement Counsel that "the question of *whether* a loan should be placed on nonaccrual status in the first place is separate from the question of, once a loan is *on* nonaccrual status, how a bank must account for interest on that loan and what a bank must do to support its accounting choice." *See* RD at 155 (quoting Enforcement Counsel's Post-Hr'g Reply Br. at 18 (emphasis original)). Second, Respondents assert that the loans at issue were "fully secured with solid appraisals" and, thus, the Bank was entitled to use cash-basis accounting. *See* Resp'ts' Exceptions at 116. The Comptroller again agrees with the ALJ that Respondents never offered evidence of appraisals and, in any event, "they

misstate the standard: banks may not accrue interest on loans in nonaccrual status unless the loans are *both* well secured *and* in the process of collection." *See* RD at 155-56 (quotation marks omitted) (emphasis original). Respondents' Exception 19 is rejected.

### 2. Effect

In connection with recommending the assessment of a second-tier civil money penalty against Respondent Ortega, the ALJ concluded that "Respondent Ortega's failure to address the Bank's improper nonaccrual loan accounting practices from 2009 through 2012, and his signing of multiple Call Reports during that time that he knew or should have known improperly recognized interest income on nonaccrual loans, constitutes a pattern of misconduct." *See* RD at 170. As relevant, **Respondents' Exception 20** and **Respondents' Exception 21** challenge the conclusion that Respondent Ortega engaged in a pattern of misconduct with respect to Nonaccrual Loan Accounting Practices. In support of these exceptions, Respondents present arguments that have already been addressed and dismissed by the Comptroller. To the extent they challenge the existence of a pattern of misconduct, Respondents' Exception 20 and Respondents' Exception 21 are rejected. The Comptroller concurs with the ALJ's reasoning and adopts her conclusion as to this issue.[52]

### D. Loans to Rogers III Entities

The ALJ recommended that the Comptroller impose an order of prohibition and assess a second-tier civil money penalty against Respondent Rogers based on her conclusions that he breached his fiduciary duty to the Bank, thereby satisfying the misconduct prong; that, by reason

---

[52] To the extent that **Respondents' Exception 19** and **Respondents' Exception 20** challenge the ALJ's conclusions, in connection with Nonaccrual Loan Accounting Practices, that the misconduct prong was established as to Respondent Rogers; that unsafe or unsound practices were established as to Respondent Ortega; or that the culpability prong was established as to Respondents, these exceptions are deemed moot. *See supra* Part III.A, X.C.1.c.

of this misconduct, the receivership recorded financial losses, thereby satisfying the effect prong; and that, for purposes of recommending an order of prohibition, Respondent Rogers acted with the requisite culpability. *See* RD at 174-83. As explained more fully below, the Comptroller agrees with the ALJ that that Respondent Rogers's conduct constituted a breach of fiduciary duty but disagrees with the conclusion that Enforcement Counsel carried its burden of establishing the effect prong. Accordingly, the Comptroller dismisses the charges against Respondent Rogers based on Loans to Rogers III Entities.

### 1. Misconduct

The ALJ correctly stated that Respondent Rogers "owed the Bank a fiduciary duty of loyalty that required him 'to avoid conflicts of interests and to act solely for the [Bank's] benefit.'" *See* RD at 175 (alteration in original) (quoting *Ellsworth*, 2016 WL 11597958, at *15). The duty of candor is a crucial component of the duty of loyalty and requires fiduciaries "to disclose to the bank everything they know about transactions in which they hold a personal financial (or familial) interest, even if not asked." *See* RD at 175 (internal quotation marks omitted); *see also De La Fuente,* 332 F.3d at 1222 (recognizing that the duty of candor requires a corporate fiduciary to disclose "everything he knew relating to the transaction," even "if not asked"); *In the Matter of Sapp*, 2019 WL 5823871, at *14 (FDIC Sept. 17, 2019); *Conover*, 2016 WL 10822038, at *19; *In the Matter of Williams*, 2015 WL 3644010, at **8-9 (FDIC Apr. 21, 2015). "Omissions are sufficient to trigger a violation of this duty," *see In the Matter of Smith and Kiolbasa,* 2021 WL 1590337, at *15 (FRB Mar. 24, 2021), and "[s]imply abstaining from voting on the transaction in question is not enough," *see* RD at 176.

The ALJ reasoned that Respondent Rogers "failed to put the Bank's interests above the interests of his son when he allowed the L&D Committee to approve the Griqualand and Petro

Icon loans without disclosing his son's involvement and the circumstances of the Obra Homes defaults, or at least making sure that Committee members were suitably apprised." *See* RD at 176. Respondents' arguments to the contrary are unavailing. **Respondents' Exception 22** asserts that "The finding and conclusion that the loans to companies controlled by David Rogers III were a breach of fiduciary duty was not supported by the evidence and the ALJ misapplied the law." *See* Resp'ts' Exceptions at 5. Respondents argue that because Respondent Rogers abstained from voting on the loans at issue and Rogers III went "through normal channels to do business with the Bank," Respondent Rogers did not breach his fiduciary duties. *See* Resp'ts' Exceptions at 121-22. However, as the ALJ correctly reasoned, Respondent Rogers had a duty to disclose all that he knew about the transaction, even if not asked. Respondents' Exception 22 is rejected, and the Comptroller adopts the ALJ's conclusion that Respondent Rogers breached his fiduciary duty to the Bank. *See Conover*, 2016 WL 10822038, at *20 ("Respondent's failure to candidly disclose the nature of the Bank's extensions of credit breached his duty of care."); *Haynes*, 2014 WL 4640797, at *12 ("lack of candor" with loan committee breached duty of care); *In the Matter of Friese*, 2012 WL 7186316, at *1 (FDIC July 20, 2012) (concealment of conduct from bank board breached fiduciary duty); *In the Matter of Landry*, 1999 WL 440608, at *12 (FDIC May 25, 1999) (officers' failure to disclose personal interests in transactions breached fiduciary duties), *aff'd*, 204 F.3d 1125 (D.C. Cir. 2000).

## 2. Effect

The ALJ concluded that the effect prong was satisfied because various losses to the receivership associated with Loans to Rogers III Entities occurred "by reason of" Respondent Rogers's breach of fiduciary duty. *See* RD at 179 (quoting 12 U.S.C. § 1818(e)(1)(B)), 183

(reaching conclusion as to § 1818(i) effect prong).[53] The ALJ's reasoning as to this issue focuses primarily on whether a "financial loss suffered by the FDIC as receiver for a failed institution must constitute loss to that institution for purposes of Section 1818's effect prongs . . .." *See* RD at 180. She concluded that it must, and the Comptroller concurs. The Comptroller will not further address this point, however, because the Comptroller's independent analysis regarding causation leads to the conclusion that Enforcement Counsel did not carry its burden of establishing the effect prong.

To reiterate, as part of her factual findings regarding Loans to Rogers III Entities, the ALJ stated the following.

> Respondents . . . assert that the Bank and L&D Committee knew of Rogers III's involvement, and Enforcement Counsel did not adduce . . . evidence to resolve the question. It is also possible that full knowledge of the circumstances might have made individuals on the L&D Committee *more* likely to approve the loan, if they viewed Rogers III as a reliable borrower and saw the transaction as a way to remove encumbrances from the assets. . . .
>
> In some sense, however, the L&D Committee's actual knowledge of who owned Griqualand is immaterial. . . .

*See* RD at 98-99 (internal quotation marks and citations omitted). Additionally, with respect to the matter of the L&D Committee's knowledge of the information contained in the email from Rogers III's attorney, the ALJ found that "L&D Committee members *might have known this information independently and incorporated it into their determination of whether the Griqualand loan was in the Bank's best interest* . . ." *See* RD at 100 (emphasis added).

Simply put, this suggests that the failed loans would have been approved *even without* Respondent Rogers's misconduct. Of key importance, the ALJ incorrectly concluded that the L&D Committee's actual knowledge of Rogers III's involvement with the entities at issue was

---

[53] The ALJ did not decide whether Respondent Rogers's misconduct constituted a pattern of misconduct for purposes of satisfying the effect prong of § 1818(i), *see* RD at 183, and the Comptroller declines to consider this issue in the first instance.

"immaterial," and found that the L&D Committee might have had independent knowledge of Rogers III's involvement and that, if they did, such knowledge might have made them *more likely* to approve the loans at issue. If the L&D Committee did have independent knowledge of information regarding Rogers III's involvement in the entities at issue, the L&D Committee's approval of loans to those entities would be a superseding cause, sufficient to break the causal connection between Respondent Rogers's failure to disclose such information to the committee and the financial losses sustained by the receivership. *Cf.* Restatement (Second) of Torts § 440 ("A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."). Because the ALJ's findings go as far as to suggest the existence of such a superseding cause, Enforcement Counsel has not established by a preponderance of the evidence that losses arising from Loans to Rogers III Entities occurred "by reason of" Respondent Rogers's failure to disclose material information to the L&D Committee.[54]

### E.  The Civil Money Penalty Assessment is Appropriate

In determining the amount of any civil money penalty, the Comptroller must consider the appropriateness of the penalty with respect to the financial resources and good faith of Respondents, the gravity of the violations, the history of previous violations, and "such other matters as justice may require." *See* 12 U.S.C. § 1818(i)(2)(G). Upon consideration of these factors

---

[54] In light of the Comptroller's foregoing, independent analysis, **Respondents' Exception 23**, which objects to the ALJ's conclusion that the effect prong is satisfied as to charges based on Loans to Rogers III Entities, is deemed moot. Because the effect prong has not been satisfied in connection with charges against Respondent Rogers based on Loans to Rogers III Entities, such charges are dismissed. **Respondents' Exception 24**, which objects to the ALJ's conclusion that the culpability prong was satisfied in connection with the prohibition charge arising from this misconduct, is also deemed moot.

and Enforcement Counsel's relevant submissions,[55] the ALJ recommended civil money penalties against each Respondent in the amount of $250,000. Although the Comptroller dismisses certain charges that the ALJ deemed established, the Comptroller nevertheless concludes that civil money penalties in the amount of $250,000 are appropriate as to each Respondent.

The parties jointly stipulated that Respondents possess the resources and ability to pay $250,000 civil money penalties. *See* RD at 185 (citing Joint Stip. ¶ 10). Contrary to the ALJ's conclusion, the Comptroller concludes that Respondents' conduct in connection with the Capital Raise Strategy did not reflect that they were "acting in good faith." *Compare* RD at 185, *with supra* Part X.A.3. The Comptroller credits the ALJ's assessment that "Respondents have been reasonably candid and cooperative in the course of these proceedings," with the exception of certain instances, including Respondent Ortega's testimony with respect to Nonaccrual Loan Accounting Practices and his repeated and misleading framing of various related issues. *See* RD at 185-86. The Comptroller reaches the same conclusion as the ALJ that "on balance, Respondents' good faith is not a significant mitigating factor." *See id.* at 186. The Comptroller also agrees that, even upon finding fewer violations than the ALJ, "there is nothing about the gravity of the proven violations that would warrant mitigation of the civil money penalty amount." *See id.* The Comptroller agrees with the ALJ that because Enforcement Counsel represented that "there is no evidence of a history of previous violations and no evidence that Respondents were previously criticized for similar actions by the OCC," this consideration stands as a potential mitigating factor. *See id.* at 187. Enforcement Counsel also acknowledges that Respondents made significant financial investments in connection with the Bank's efforts to raise capital. *See id.* And, as the ALJ did, the Comptroller

---

[55] Respondents have not directly addressed the statutory mitigating factors or the appropriateness of the civil money penalty amount in their briefing before the ALJ or in their exceptions.

credits testimony "regarding the efforts made by Respondent Ortega, at great personal cost to his own health, to address issued raise by regulators in late 2012 and early 2013." *See* RD at 187. Upon consideration of these factors, the Comptroller concurs with the ALJ's conclusion that a $250,000 civil money penalty is appropriate as to each of the Respondents.

## XI.    REQUEST FOR ORAL ARGUMENT

After considering Respondents' request for oral argument, *see* Resp'ts' Exceptions at 129, and the entire record in this matter, the Comptroller finds that no benefit would be derived from oral argument and Respondents will not be prejudiced by the lack of oral argument. Therefore, pursuant to 12 C.F.R. § 19.40(b), the Comptroller denies Respondents' request for oral argument.

## XII.    REQUEST FOR STAY

Respondents request that, "[i]nsofar as the Comptroller enters a final order adverse to Respondents," that "such order be accompanied by a stay under 12 C.F.R. § 19.41 pending judicial review." *See* Resp'ts' Exceptions at 129. Section 19.41 provides the following:

> The commencement of proceedings for judicial review of a final decision and order of the Comptroller may not, unless specifically ordered by the Comptroller or a reviewing court, operate as a stay of any order issued by the Comptroller. The Comptroller may, in his or her discretion, and on such terms as he or she finds just, stay the effectiveness of all or any part of an order pending a final decision on a petition for review of that order.

*See* 12 C.F.R. § 19.41. The Comptroller deems Respondents' request premature. If Respondents petition for judicial review of the instant decision, the Comptroller will consider a request to stay the proceedings.

## XIII.    CONCLUSION

After a thorough review of the record in this proceeding, and for the reasons set forth herein, the Comptroller concludes that an Order of Removal and Prohibition and Assessment of a Civil Money Penalty is warranted against each Respondent. In addition, and also in light of the record,

the Comptroller concludes that the $250,000 civil money penalties imposed are appropriate as to each Respondent.

IT IS SO ORDERED.

Michael J. Hsu
Digitally signed by
Michael J. Hsu
Date: 2023.11.30
16:55:28 -05'00'

MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
| President, Chief Executive Officer, and | ) | |
| Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

## ORDER TO SEAL CERTAIN PARTS OF EXCEPTIONS

Pages twenty-six through twenty-eight of *Respondents' Exceptions to the Administrative Law Judge's Recommended Decision, Supporting Brief, and Request for Oral Argument* discuss in inappropriate detail the condition of an open institution that is supervised by the Office of the Comptroller of the Currency and summarize testimony from portions of the administrative hearing that were closed to the public. The Comptroller *sua sponte* orders that this section—beginning with the last paragraph appearing on page twenty-six and continuing through the first paragraph appearing on page twenty-eight—be sealed.

IT IS SO ORDERED.

_____
MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
| President, Chief Executive Officer, and | ) | |
| Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

## ORDER OF PROHIBITION

Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel for the Office of the Comptroller of the Currency initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty against Respondent Saul Ortega ("Respondent"), former Chief Financial Officer, Director, President, Chief Executive Officer, and Chairman of the Board of First National Bank, Edinburg, Texas. A twelve-day hearing before an administrative law judge was held between January 31, 2022, and February 15, 2022. Respondent appeared at the hearing, was represented by counsel, and was afforded an opportunity to be heard.

Having considered the entire record in this matter, including the evidence presented at hearing, the administrative law judge's recommended decision, and the parties' exceptions thereto, pursuant to 12 U.S.C. § 1818(e):

1. Respondent shall not participate in any manner in the conduct of the affairs of any insured depository institution, agency, or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without

the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D); and

2. Respondent shall not solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights in any institution described in 12 U.S.C. § 1818(e)(7)(A) without the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D); and

3. Respondent shall not violate any voting agreement previously approved by the appropriate Federal banking agency, as that term is defined in 12 U.S.C. § 1813(q); and

4. Respondent shall not vote for a director, or serve or act as an institution-affiliated party, as that term is defined in 12 U.S.C. § 1813(u), of any insured depository institution, agency, or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D).

This ORDER will become effective thirty (30) days from the date of its issuance.

The provisions of this ORDER will remain effective and in force except in the event that, and until such time as, any provision of this ORDER shall have been modified, terminated, suspended, or set aside by the Office of the Comptroller of the Currency.

IT IS SO ORDERED.

Michael J. Hsu
Digitally signed by Michael J. Hsu
Date: 2023.11.30 16:56:09 -05'00'

MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
| President, Chief Executive Officer, and | ) | |
| Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

## ORDER ASSESSING CIVIL MONEY PENALTY

Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel for the Office of the Comptroller of the Currency initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty ("Notice") against Respondent Saul Ortega ("Respondent"), former Chief Financial Officer, Director, President, Chief Executive Officer, and Chairman of the Board of First National Bank, Edinburg, Texas. The Notice sought a civil money penalty of $250,000 pursuant to 12 U.S.C. § 1818(i)(2)(A) and (B). A twelve-day hearing before an administrative law judge was held between January 31, 2022, and February 15, 2022. Respondent appeared at the hearing, was represented by counsel, and was afforded an opportunity to be heard.

Having considered the entire record in this matter, including the evidence presented at hearing, the administrative law judge's recommended decision, and the parties' exceptions thereto, pursuant to 12 U.S.C. § 1818(i)(2)(A) and (B):

IT IS HEREBY ORDERED that Respondent be assessed a civil money penalty in the amount of two-hundred-fifty thousand dollars ($250,000).

Remittance of the civil money penalty shall be payable to the Treasury of the United States and delivered to the Office of the Comptroller of the Currency, Washington, D.C.

The provisions of this ORDER will remain in effect and in force except in the event that, and until such time as, any provision of this Order shall have been modified, terminated, suspended, or set aside by the Office of the Comptroller of the Currency or any other governing authority.

IT IS SO ORDERED.

Michael J. Hsu

Digitally signed by
Michael J. Hsu
Date: 2023.11.30
16:56:26 -05'00'

MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
| President, Chief Executive Officer, and | ) | |
| Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

## ORDER OF PROHIBITION

Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel for the Office of the Comptroller of the Currency initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty against Respondent David Rogers, Jr. ("Respondent"), former Chairman of the Board of First National Bank, Edinburg, Texas. A twelve-day hearing before an administrative law judge was held between January 31, 2022, and February 15, 2022. Respondent appeared at the hearing, was represented by counsel, and was afforded an opportunity to be heard.

Having considered the entire record in this matter, including the evidence presented at hearing, the administrative law judge's recommended decision, and the parties' exceptions thereto, pursuant to 12 U.S.C. § 1818(e):

1. Respondent shall not participate in any manner in the conduct of the affairs of any insured depository institution, agency, or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without

the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D); and

2. Respondent shall not solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights in any institution described in 12 U.S.C. § 1818(e)(7)(A) without the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D); and

3. Respondent shall not violate any voting agreement previously approved by the appropriate Federal banking agency, as that term is defined in 12 U.S.C. § 1813(q); and

4. Respondent shall not vote for a director, or serve or act as an institution-affiliated party, as that term is defined in 12 U.S.C. § 1813(u), of any insured depository institution, agency, or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D).

This ORDER will become effective thirty (30) days from the date of its issuance.

The provisions of this ORDER will remain effective and in force except in the event that, and until such time as, any provision of this ORDER shall have been modified, terminated, suspended, or set aside by the Office of the Comptroller of the Currency.

IT IS SO ORDERED.

Michael J. Hsu
Digitally signed by Michael J. Hsu
Date: 2023.11.30 16:56:46 -05'00'

MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Saul Ortega ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, ) | |
| President, Chief Executive Officer, and ) | |
| Chairman of the Board ) | |
| ) | |
| David Rogers, Jr. ) | AA-EC-2017-45 |
| Former Chairman of the Board ) | |
| ) | |
| First National Bank ) | |
| Edinburg, Texas ) | |

## ORDER ASSESSING CIVIL MONEY PENALTY

Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel for the Office of the Comptroller of the Currency initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty ("Notice") against Respondent David Rogers, Jr. ("Respondent"), former Chairman of the Board of First National Bank, Edinburg, Texas. The Notice sought a civil money penalty of $250,000 pursuant to 12 U.S.C. § 1818(i)(2)(B). A twelve-day hearing before an administrative law judge was held between January 31, 2022, and February 15, 2022. Respondent appeared at the hearing, was represented by counsel, and was afforded an opportunity to be heard.

Having considered the entire record in this matter, including the evidence presented at hearing, the administrative law judge's recommended decision, and the parties' exceptions thereto, pursuant to 12 U.S.C. § 1818(i)(2)(B):

IT IS HEREBY ORDERED that Respondent be assessed a civil money penalty in the amount of two-hundred-fifty thousand dollars ($250,000).

Remittance of the civil money penalty shall be payable to the Treasury of the United States and delivered to the Office of the Comptroller of the Currency, Washington, D.C.

The provisions of this ORDER will remain in effect and in force except in the event that, and until such time as, any provision of this Order shall have been modified, terminated, suspended, or set aside by the Office of the Comptroller of the Currency or any other governing authority.

IT IS SO ORDERED.

Michael J. Hsu

Digitally signed by
Michael J. Hsu
Date: 2023.11.30
16:57:03 -05'00'

MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of December 2023, copies of the November 30, 2023 Final Decision of the Comptroller of the Currency, Order to Seal Certain Parts of Exceptions, Order of Prohibition of Respondent Saul Ortega, Order Assessing Civil Money Penalty against Respondent Saul Ortega, Order of Prohibition of Respondent David Rogers, Jr., and Order Assessing Civil Money Penalty Against Respondent David Rogers, Jr., were served upon the following *via* electronic mail:

Office of Financial Institution Adjudication
3501 N. Fairfax Drive, Suite D8115A
Arlington, VA 22226-3500
ofia@fdic.gov

Respondents' Counsel:
Frank C. Brame
The Brame Law Firm P.C.
4514 Cole Avenue, Suite 600
Dallas, TX 75205
frank@bramelawfirm.com
Bill Sims
4234 Shorecrest Drive
Dallas, TX 75209
bsims1119@gmail.com

Enforcement Counsel:
Susan C. Bowman
Lawrence J. Keen, III
Christopher D'Alessio
Nathan Taran
Erin Healy Gallagher
Michael Laurino
Office of the Comptroller of the Currency
400 7th Street S.W.
Washington, DC 20219
susan.bowman@occ.treas.gov
larry.keen@occ.treas.gov
christopher.dalessio@occ.treas.gov
nathan.taran@occ.treas.gov
erin.healygallagher@occ.treas.gov
michael.laurino@occ.treas.gov

Denise H. Bannister

Digitally signed by Denise H. Bannister
Date: 2023.12.01 10:36:18 -05'00'

Denise H. Bannister, Hearing Clerk
Office of the Comptroller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219

**EXHIBIT A-2**

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
| President, Chief Executive Officer, and | ) | |
| Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

## ORDER GRANTING CROSS-MOTIONS
## FOR INTERLOCUTORY REVIEW AND VACATING AND REVERSING IN
## PART APRIL 9 ORDER

Before the Comptroller of the Currency ("Comptroller") are cross-motions[1] seeking

interlocutory review of a ruling by Administrative Law Judge ("ALJ" or "Judge")

Jennifer Whang disposing of certain causes of action in the case as untimely.[2] The

*Cross-Motions for Interlocutory Review*—referred to the Comptroller on June 1, 2020—

---

[1] *Respondents' Motion for Interlocutory Review (Statute of Limitations)* and *Respondents' Response to OCC's Cross-Appeal Raised in its Response to Respondents' Motion for Interlocutory Review (Statute of Limitations)*, filed by Respondents Saul Ortega and David Rogers, Jr. ("Respondents"); and *OCC's Response to Respondents' Motion for Interlocutory Review (Statute of Limitations)* and *Supplemental Submission to OCC's Response to Respondents' Motion for Interlocutory Review (Statute of Limitations)* ("*Supplemental Submission*"), filed by Office of the Comptroller of the Currency ("OCC") Enforcement Counsel (collectively, "*Cross-Motions for Interlocutory Review*").

[2] On May 7, 2020, Judge Whang issued an *Order Regarding Enforcement Counsel's Response to Respondents' Motion for Interlocutory Review*, finding that Respondents' *Motion for Interlocutory Review (Statute of Limitations)* was timely filed and that Enforcement Counsel's response thereto constituted, in part, an untimely request for interlocutory review. *See Order Regarding Enforcement Counsel's Response to Respondents' Motion for Interlocutory Review.* Judge Whang *sua sponte* granted Enforcement Counsel leave to file out of time its request for interlocutory review and afforded Respondents an opportunity to respond to Enforcement Counsel's initial submission and supplemental submission. *See id.* Accordingly, the Comptroller treats the parties' *Cross-Motions for Interlocutory Review* as timely filed.

seek review of Judge Whang's April 9, 2020 *Order Denying Enforcement Counsel's Motion for Partial Summary Disposition and Granting in Part and Denying in Part Respondents' Motion for Summary Disposition on the Statute of Limitations* ("*April 9 Order*").[3]  On June 18, 2020, the Comptroller granted Respondents' unopposed request to stay the proceedings below until such time as the Comptroller should decide whether to grant or deny interlocutory review. *See Notice of Submission of Parties' Cross-Motions for Interlocutory Review for Final Disposition and Order Granting Respondents' Unopposed Request to Stay Proceedings.*

For the reasons discussed below, the Comptroller hereby grants the Parties' *Cross-Motions for Interlocutory Review* of the *April 9 Order*; vacates and reverses the *April 9 Order* to the extent that it held that Enforcement Counsel must bring an action within five years of the date of the first occurrence of the same type of "effect" caused by an alleged activity that forms the basis for a proposed order of prohibition under 12 U.S.C. § 1818(e) or the assessment of a second-tier civil money penalty under Section 1818(i),[4] and to the extent that it held that the continuing-violations doctrine is unavailable in the

---

[3] On April 13, 2020, Judge Whang referred to the Comptroller Respondents' *Motion for Interlocutory Review*, which requested that the Comptroller review two orders entered by Judge Whang on March 17 ("*March 17 Orders*").  On June 16, after careful consideration of the parties' briefing of the issues, the Comptroller denied Respondents' *Motion for Interlocutory Review* of the *March 17 Orders*.  *See Order Denying Respondents' Motion for Interlocutory Review.*

[4] Here, "effect" is one of three elements that must be satisfied before Enforcement Counsel may bring an action seeking an order of prohibition under Section 1818(e).  *See Proffitt v. Federal Deposit Insurance Corporation*, 200 F.3d 855, 862-63 (D.C. Cir. 2000) (discussing three elements of § 1818(e): misconduct, effect, and culpability).  The assessment of civil money penalties under Section 1818(i) also contains an "effect" element, at least with respect to the imposition of a second-tier penalty, which is sought here.  *See* 12 U.S.C. § 1818(i)(2)(B); *see also Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty* Art. VII.

2

instant action. The Comptroller hereby remands this matter so that the proceedings below may be resumed in a manner consistent with this order.

## I.     BACKGROUND

The *Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty* ("*Notice of Charges*") initiating this matter was filed on September 25, 2017. Respondents filed an *Answer and Affirmative Defenses to Notice of Charges* ("*Answer*"), asserting various affirmative defenses, including that the charges against them were time-barred. In January 2018, Respondents filed their *Motion for Summary Disposition on the Statute of Limitations and Brief in Support* ("*Motion for Summary Disposition*"), arguing that the charges against Respondents first accrued before September 25, 2012 (*i.e.,* more than five years before the instant proceedings were commenced) and that the charges were thus time-barred under the applicable statute of limitations and subject to dismissal. Enforcement Counsel thereafter filed a *Brief in Support of OCC's Motion for Partial Summary Disposition on Respondents' Seventh and Ninth Affirmative Defenses* ("*Motion for Partial Summary Disposition*") and a *Brief in Support of OCC's Opposition to Respondents' Motion for Summary Disposition on the Statute of Limitations* ("*Opposition to Respondents' Motion for Summary Disposition*"). Respondents then filed their *Response and Objections to OCC's Motion for Partial Summary Disposition* ("*Response and Objections*") and Judge Whang entered the *April 9 Order*, which is the subject of the *Cross-Motions for Interlocutory Review*.

A. *Notice of Charges*

Pursuant to Section 1818(e) and (i), the *Notice of Charges* seeks orders of prohibition and the imposition of first- and second-tier civil money penalties against Respondents,

institution-affiliated parties ("IAP") of First National Bank of Edinburg, Texas ("Bank"). The *Notice of Charges* asserts that Respondents engaged in unsafe or unsound practices, breached their fiduciary duties, violated 12 U.S.C. § 161, and violated final cease-and-desist orders "with regard to loans to fund sales of holding company stock and improperly including the loan proceeds as capital" ("Article III"); "with regard to loans to finance sales of OREO and the improper accounting for such sales" ("Article IV"); and "by causing the Bank to accrue interest on nonaccrual loans" ("Article V"). *Notice of Charges* Arts. III-V. The *Notice of Charges* also asserts that Respondent Rogers, separately, "breached his fiduciary duty of loyalty by providing preferential treatment to a member of his immediate family" ("Article VI"). *Id.* Art. VI. Respondents raised various affirmative defenses, including that the charges against them were time-barred. *Answer* at 9.

### B. Parties' *Motions for Summary Disposition*

Throughout these proceedings, the parties have offered contrasting views as to when accrual of a claim first occurs under 28 U.S.C § 2462,[5] where orders of prohibition under Section 1818(e) and civil money penalties under Section 1818(i) are sought. Respondents' *Motion for Summary Disposition* relied on *Gabelli v. Securities and*

---

[5] The parties agree that the applicable statute of limitations is set forth in Section 2462, which provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

*Exchange Commission*, 568 U.S. 442 (2013) (holding that five-year period for Securities and Exchange Commission to commence civil penalty action for fraud begins to run when fraud occurred and not when it is discovered), to argue that the claims against them first accrued at the time of the alleged misconduct. Accordingly, Respondents asserted that the charges against them were time-barred because Respondent Rogers left the Bank in 2011, and each of the allegedly improper loans were made and accounted for before September 25, 2012 (*i.e.*, more than five years before the instant proceedings were commenced). *Motion for Summary Disposition* at 4-5.

Enforcement Counsel moved for partial summary disposition, asserting that there were no genuine issues of material fact and that the Agency was entitled to a ruling in its favor as a matter of law regarding, as relevant, Respondents' affirmative defense that the charges against them were barred by the statute of limitations. Enforcement Counsel distinguished between two general categories of misconduct alleged in the *Notice of Charges*: "lending-related misconduct" and "improper accounting practices." *Motion for Partial Summary Disposition* at 9. Citing *Proffitt v. Federal Deposit Insurance Corporation*, 200 F.3d 855, 863 (D.C. Cir. 2000) ("The same misconduct can produce different effects at different times, resulting in separate section 8(e) claims and separate accruals."), Enforcement Counsel argued that if actionable effects arising from the misconduct have occurred within five years prior to the filing of the *Notice of Charges*, the action is timely. *Id.* at 1, 8-16. Enforcement Counsel also argued that the first- and second-tier civil money penalty actions against Respondents based on improper accounting practices were timely because "the violations occurring before September 25, 2012 and after September 25, 2012 collectively constitute[d] a continuing violation." *Id.*

at 13-14. Relying on *InterAmericas Inv. v. Board of Governors of the Federal Reserve System*, 111 F.3d 376, 381-82 (5th Cir. 1997), which examined provisions of the Bank Holding Company Act ("BHCA") providing for per diem penalties for each day a violation continued, Enforcement Counsel argued that the continuing-violations doctrine was available because Section 1818(i) similarly provided for civil money penalties "for each day during which such violation continues." *Id.* at 14 (quoting § 1818(i)(2)(A)(iv), (B)(ii)(III)).

C. *April 9 Order*

Judge Whang's thorough and carefully considered *April 9 Order* denied Enforcement Counsel's *Motion for Partial Summary Disposition* and granted in part and denied in part Respondents' *Motion for Summary Disposition. April 9 Order* at 2. Judge Whang's *April 9 Order* can be summarized in this fashion:

| **Claims Recommended for Dismissal** | **Retained Claims** |
| --- | --- |
| Lending-related allegations and associated first-tier civil money penalties to the extent that Enforcement Counsel alleged that the Bank first incurred losses on the loans prior to September 25, 2012 | To the extent there exists ambiguity as to the date the Bank first incurred loan losses, lending-related allegations and associated first-tier civil money penalties; Respondents may raise the statute of limitations as an affirmative defense to such allegations |
| Accounting-related allegations and associated first-tier civil money penalties, except those against Respondent Ortega based on Call Reports issued after September 25, 2012 | Accounting-related allegations against Respondent Ortega with respect to Call Reports issued after September 25, 2012 and associated first-tier civil money penalties |
| Second-tier civil money penalties, except to the extent that such penalties were warranted in connection with misconduct | Second-tier civil money penalties in connection with alleged misconduct first causing more than minimal loss to the |

6

| first causing more than minimal loss to the Bank on or after September 25, 2012, or allegations against Respondent Ortega that formed part of a pattern of misconduct extending beyond September 25, 2012 | Bank on or after September 25, 2012, or allegations against Respondent Ortega that formed part of a pattern of misconduct extending beyond September 25, 2012 |
| --- | --- |

More specifically, Judge Whang granted summary disposition in favor of Respondents as to the following. First, summary disposition was granted in favor of Respondents as to the accounting-related allegations against them in Articles III, IV, and V, but summary disposition was denied as to the accounting-related allegations against Respondent Ortega with respect to Call Reports issued after September 25, 2012. Second, summary disposition was granted in favor of Respondents as to lending-related allegations against them in Articles III and IV, to the extent that Enforcement Counsel alleged that the Bank first incurred losses on the loans at issue prior to September 25, 2012. Third, summary disposition was granted in favor of Respondents as to the assessment of first-tier civil money penalties against them in connection with Articles III, IV, V, and VI, except to the extent that a civil money penalty was warranted in connection with either the accounting-related allegations against Respondent Ortega with respect to Call Reports issued after September 25, 2012 or any lending-related allegations against Respondent Ortega for misconduct occurring on or after September 25, 2012. Fourth, summary disposition was granted in favor of Respondents as to the assessment of second-tier civil money penalties against Respondents in connection with Articles III, IV, V, and VI, except to the extent that such penalty is warranted in connection with alleged misconduct by either Respondent that first caused the Bank more than minimal loss on or after September 25, 2012 or allegations against Respondent Ortega in Articles II, IV, or

V that formed part of a pattern of misconduct extending beyond September 25, 2012. *Id.* at 2-3.

Correspondingly, Judge Whang denied summary disposition in favor of Respondents as to the following. First, summary disposition was denied as to accounting-related allegations against Respondent Ortega in Articles III, IV, and V, with respect to Call Reports issued after September 25, 2012. Second, summary disposition was denied as to lending-related allegations against Respondents in Articles III and IV, except that Respondents may raise the statute of limitations as an affirmative defense as to alleged misconduct in connection with any loan with respect to which the Bank first incurred a loss prior to September 25, 2012. Third, summary disposition was denied as to lending-related allegations against Respondent Rogers in Article VI, except that Respondent Rogers would be permitted to raise the statute of limitations as an affirmative defense as to allegations regarding all loans at issue in Article VI to the extent that any of those loans first caused the Bank to incur loss prior to September 25, 2012. Fourth, summary disposition was denied as to any assessment of a first-tier civil money penalty in connection with allegations against Respondent Ortega in Articles III, IV, or V regarding the Call Reports issued after September 25, 2012 or any alleged lending-related misconduct by Respondent Ortega occurring on or after September 25, 2012. Fifth, any assessment of a second-tier civil money penalty in connection with alleged misconduct by either Respondent that first caused the Bank more than minimal loss on or after September 25, 2012, or allegations against Respondent Ortega in Articles III, IV, or V that formed part of a pattern of misconduct extending beyond September 25, 2012. *Id.* at 3.

Although the parties' arguments centered on their varying interpretations of *Gabelli* and *Proffitt*, Judge Whang reasoned that neither *Gabelli* nor *Proffitt* addressed the precise question that was before her: at what point does a claim "first accrue" for purposes of Section 2462 when, as the Judge noted, (1) "the underlying statute contains an 'effect' element separate from the violative conduct that must be satisfied before a claim can be brought"; (2) "that 'effect' prong contains multiple alternative conditions that independently could serve to complete a cause of action at different points in time"; and (3) "the agency does not clearly allege that the 'effect' on which it predicates the completion of each claim *first occurred* within the five-year period prior to institution of the enforcement action." *Id.* at 16-17 (emphasis original). She further reasoned that both Respondents' and Enforcement Counsel's arguments were flawed: Respondents paid "too little heed to the elements necessary for a claim to accrue under Sections 1818(e) and 1818(i)" and Enforcement Counsel gave "short shrift to Section 2462's clear direction that the clock begins to run when a claim 'first accrues,' not when the conditions necessary for accrual are fulfilled for a second time, or a third, or at some other convenient future point." *Id.* at 13. Accordingly, she concluded that, while different claims may "accrue at different times under Sections 1818(e) or (i) from the same alleged misconduct[,] it cannot be the case under the relevant caselaw that the *same* claim can accrue for the first time on multiple occasions." *Id.* at 13 (emphasis original).

Additionally, the Judge rejected Enforcement Counsel's argument that "the improper accounting practices described in the Notice . . . [that] occur[ed] before September 25, 2012 and after September 25, 2012 collectively constitute a continuing violation." *April 9 Order* at 41 (quoting *Motion for Partial Summary Disposition* at 14). Judge Whang

concluded that the "facts as alleged do not permit the agency to avail itself of the continuing violations doctrine" for the following reasons. *Id.* at 43.

First, Judge Whang concluded that the alleged violations could not have become apparent by means of the "cumulative effect of repeated conduct" sometime after September 25, 2012. *Id.* at 44. Second, distinguishing Section 1818(i) from the narrower statute at issue in *InterAmericas*, Judge Whang concluded that the per diem nature of the assessment of money penalties under Section 1818(i) did not necessarily mean that the actionable violations caused a new claim to continuously accrue each day that they went uncorrected; unlike the narrower statute at issue in *InterAmericas*, Section 1818(i) imposes potential liability of parties that violate *any* law or regulation. *Id.* at 43-44. Thus, the "nature of the potential violations" of Section 1818(i) and the BHCA are "very different"; in the Judge's view, "Enforcement Counsel's conception [that] any violation of law, if committed by [an IAP], arguably would be subject to assessment of a first-tier civil money penalty many years after the violation itself had occurred" as long as the conduct went uncorrected represents an impermissibly "expansive" interpretation of the continuing-violations doctrine. *Id.* at 45-46.

Accordingly, the *April 9 Order* found that "each issuance of an allegedly inaccurate Call Report is a discrete act on which action may be premised," and concluded that the first-tier civil money penalties against Respondent Rogers were untimely because they necessarily accrued more than five years before the action was commenced; that the first-tier money penalties against Respondent Ortega were timely insofar as they were warranted in connection with the Call Reports issued after September 25, 2012 or lending-related misconduct occurring on or after September 25, 2012; and that the

second-tier money penalty claims against Respondents were timely only to the extent warranted in connection with alleged misconduct that first caused more than minimal loss on or after September 25, 2012 or in connection with allegations against Respondent Ortega that formed part of a pattern of misconduct extending beyond September 25, 2012. *Id.* at 46-47.

### D. *Cross-Motions for Interlocutory Review*

In their *Cross-Motions for Interlocutory Review*, the parties reiterate their prior arguments before Judge Whang and assert, each for their own purpose, that various factors supporting interlocutory review are satisfied. Respondents "challenge the ruling that lending-related claims in this case are not barred by limitations." *Respondents' Motion for Interlocutory Review (Statute of Limitations)* at 4. Respondents request that the Comptroller find that the lending-related allegations in Articles III, IV, and VI of the *Notice of Charges* are time-barred insofar as the underlying loans were made prior to September 25, 2012; and that the Comptroller find that, for purposes of an enforcement action under Section 1818(e), "a cause of action for unsafe and unsound loans first accrues at the time the loans were made." *Id.* at 6-7. Enforcement Counsel requests that the Comptroller deny Respondents' requested relief and instead urges the Comptroller to "reverse the portion of [the *April 9 Order*] that held that the OCC must bring an action within five years from the date of the first instance of loss," arguing that Judge Whang erred in holding that Enforcement Counsel were required to bring an action "within five years from the date of the first 'effect' and may not bring an action based on a subsequent occurrence of the same 'effect.'" *Response to Motion for Interlocutory Review* at 2, 13.

Additionally, Enforcement Counsel argues that Judge Whang "applied an overly restrictive definition of the continuing violations doctrine," but further states that Enforcement Counsel "does not challenge the Tribunal's application of the continuing violations doctrine to exclude Call Reports filed prior to September 25, 2012" because "raising a challenge at this juncture is unnecessary." *Id.* at 24-25 & n.9. In a subsequent filing, however, Enforcement Counsel contends that "the entirety of the April 9 Order" should be before the Comptroller on Interlocutory Review. *Supplemental Submission* at 2. Respondents thereafter argue that *United States v. Spectrum Brands*, 924 F.3d 337, 355 (7th Cir. 2019), a continuing-violations case cited by Enforcement Counsel, supports their position that limitations period should begin to run at the time of the alleged misconduct. *Response to OCC's Cross-Appeal* at 16.

On June 18, 2020, the Comptroller granted Respondents' unopposed request to stay the proceedings until such time as the Comptroller should decide to grant or deny interlocutory review. *See Notice of Submission of Parties' Cross-Motions for Interlocutory Review for Final Disposition and Order Granting Respondents' Unopposed Request to Stay Proceedings.*

## II.    DISCUSSION

The Comptroller may, at his discretion, exercise interlocutory review of an ALJ's ruling if the Comptroller finds that:

> (1) The ruling involves a controlling question of law or policy as to which substantial grounds exist for a difference of opinion;
>
> (2) Immediate review of the ruling may materially advance the ultimate termination of the proceeding;
>
> (3) Subsequent modification of the ruling at the conclusion of the proceeding would be an inadequate remedy; or

12

(4) Subsequent modification of the ruling would cause unusual delay or expense.

12 C.F.R. § 19.28.

Summary disposition is appropriate when the "undisputed pleaded facts" and other evidence demonstrate that "[t]here is no genuine issue as to any material fact," and "[t]he moving party is entitled to a decision in its favor as a matter of law." *See* 12 C.F.R. § 19.29(a). The summary disposition standard "is similar to that of the summary judgment standard under Rule 56 of the Federal Rules of Civil Procedure." *See In the Matter of William Blanton*, No. 2017-064, 2017 WL 4510840, at *6 (OCC July 10, 2017).

The Comptroller agrees with the parties that this matter raises important and close questions involving the interplay of *Gabelli* and *Proffitt*. The Comptroller thus finds that the criteria supporting interlocutory review are satisfied and grants the parties' requests to exercise interlocutory review.

Having carefully reviewed the *April 9 Order*, *see Condrey v. SunTrust Bank of Georgia*, 429 F.3d 556, 562 (5th Cir. 2005) (reviewing district court's grant of summary judgement *de novo*); *Blanton*, 2017 WL 4510840, at *6 (summary disposition standard is like summary judgment standard), and thoroughly considered the parties' arguments, the Comptroller agrees with Enforcement Counsel that a charge may accrue at the time of the first occurrence of an effect and then re-accrue based on a subsequent occurrence of the same type of effect. With respect to the applicability of *Proffitt* and *Gabelli* to the instant matter, the Comptroller is persuaded by the recent decisions of federal district courts and circuit courts of appeal concluding that *Gabelli* is inapposite where, as here and as in *Proffitt*, the fraud discovery rule is not at issue. *See, e.g., Spectrum Brands*, 924 F.3d at

13

349; *In re Enforcement of Philippine Forfeiture Judgment*, 442 F. Supp. 3d 756, 764–65
(S.D.N.Y. 2020); *see also In the Matter of Joseph Contorinis*, Release No. 3824, 2014
WL 1665995, at *3 & n.21 (SEC Apr. 25, 2014) (concluding that *Gabelli* "did not
purport to address—let alone overturn—established precedent concerning [] applicable
statute of limitations in Commission . . . proceedings"; reiterating *Proffitt's* holding that
"Separate accrual for each alternative [statutory prerequisite] gives meaning to all of the
statutory language.").[6] The Comptroller therefore disagrees with the *April 9 Order's*
conclusion that *Gabelli* "casts some doubt on *Proffitt's* holding . . . that '[t]he same
misconduct can . . . result[] in separate [Section 1818(e)] claims and separate accruals'
for each of the potentially triggering effects that would complete that statute's cause of
action." *April 9 Order* at 25 (quoting *Proffitt*, 200 F.3d at 863). *Proffitt* remains good
law and, contrary to Respondents' arguments and the *April 9 Order*, the Comptroller
concludes that it was not abrogated by *Gabelli*. *See Blanton*, 2017 WL 4510840, at *16-
17.

That a new claim may accrue within the meaning of Section 2462 based on a
subsequent occurrence of the same type of effect is consistent with *Proffitt* and with the
legislative history of the Financial Institutions Reform, Recovery, and Enforcement Act

---

[6] It is also worth noting that the *April 9 Order* correctly explains that the instant matter is
distinguishable from *Gabelli* because there, unlike here, the applicable statutory framework did
not require that an "effects prong" be satisfied to establish a complete cause of action. *See April
9 Order* at 18. Indeed, Respondents' proffered interpretation of the relevant caselaw—that an
action first accrues at the time of the alleged misconduct—would render meaningless the "effects
prong" of Section 1818(e). *See Connecticut Dep't of Income Maintenance v. Heckler*, 471 U.S.
524, 530 n.15 (1985) ("It is a familiar principle of statutory construction that courts should give
effect, if possible, to every word that Congress has used in a statute."). For this reason and the
other reasons stated herein, Respondents' requests on interlocutory review—specifically, that the
Comptroller find that the lending-related allegations are time-barred insofar as the underlying
loans were made prior to September 25, 2012; and that for purposes of an enforcement action
under Section 1818(e), a cause of action for unsafe and unsound loans first accrues at the time the
loans were made—are denied and the *April 9 Order* is affirmed as to these issues.

14

("FIRREA"). In holding that "[t]he same misconduct can produce different effects at different times, resulting in separate section 8(e) claims and separate accruals," the *Proffitt* Court closely examined the legislative history of FIRREA and Congress's intent in lifting certain restrictions that had previously been imposed on banking regulators. *See Proffitt,* 200 F.3d at 863-865. The legislative history examined by the *Proffitt* court is equally apposite here. This history reflects that FIRREA was enacted, in part, to "expand, enhance and clarify enforcement powers of the financial institution regulatory agencies." *See* H.R. REP. 101-54, 311, 1989 U.S.C.C.A.N. 86, 107; *see also Proffitt*, 200 F.3d at 864.

Relatedly, to the extent that the interpretation proffered by Enforcement Counsel and adopted herein is in tension with or risks rendering meaningless the term *"first* accrued" as used in Section 2462, the Comptroller finds that strict application of this term would produce a result demonstrably at odds with the Congressional intent established by the legislative history discussed *supra.* The strict construction of Section 2462 set forth in the *April 9 Order* would incent gamesmanship of the statutory enforcement scheme by conferring immunity on—as one example—a party who can show that he has caused a single, small loss outside the limitations period when he has also caused a subsequent, much larger loss within the limitations period. *See Gov't of Virgin Islands v. Berry,* 604 F.2d 221, 225 (3d Cir.1979) ("Where the plain meaning of a statute would lead to an absurd result, we presume 'the legislature intended exceptions to its language [that] would avoid results of this character.'" (quoting *United States v. Kirby,* 74 U.S. (7 Wall.) 482, 487 (1868))); *cf. Sec. & Exch. Comm'n v. Kokesh*, 884 F.3d 979, 985 (10th Cir. 2018) ("To hold that Defendant's misappropriations constituted only one continuing

violation . . . would confer immunity for ongoing repeated misconduct. . . . Defendant could take $100 a year for five years and then misappropriate tens of thousands without fear of liability. We cannot countenance such a result, nor do we think that a proper interpretation of § 2462 requires us to." (internal citation omitted)); *Birkelbach v. Sec. & Exch. Comm'n*, 751 F.3d 472, 479 (7th Cir. 2014) (finding that it would be "absurd" to accept interpretation that failure to supervise is a single indivisible act which begins on first day of unethical supervision because "if an unethical supervisor were to avoid detection for five years, he could continue his unethical behavior *forever*"). The Comptroller concludes that the *April 9 Order*'s interpretation of Section 2462 produces unjust results, and further concludes that the interpretation proffered by Enforcement Counsel—that each separate occurrence of an effect may give rise to separate accrual, regardless of whether an effect of the same type had previously occurred—is more consistent with Congressional intent reflecting an ongoing duty to supervise financial institutions and affiliated parties. *See Douglass v. Convergent Outsourcing*, 765 F.3d 299, 302 (3d Cir. 2014) ("[I]f the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, then we are obligated to construe statutes sensibly and avoid constructions which yield absurd or unjust results." (internal quotation marks omitted)).

Finally, because the parties have each addressed the continuing-violations doctrine in their *Cross-Motions for Interlocutory Review* and Respondents did so after Enforcement Counsel submitted that the entirety of the *April 9 Order* should be before the Comptroller should interlocutory review be granted, the Comptroller considers the applicability of the continuing-violations doctrine as properly before him. The Comptroller agrees with

16

Enforcement Counsel that the *April 9 Order*'s interpretation of the continuing-violations doctrine is overly restrictive. The Comptroller finds nothing in *InterAmericas* to support the *April 9 Order*'s interpretation that there is a meaningful distinction to be made between the "nature of potential violations" of Section 1818(i) and of the BHCA, which was at issue in that case. *April 9 Order* at 45. On the contrary, the provisions of Section 1818(i) contain language that is comparable to the continuing-violation language of the BHCA's penalty provisions quoted in *InterAmericas*. *Compare* 12 U.S.C. § 1818(i)(2)(A), (B) (insured depository institution or IAP "shall forfeit and pay a civil penalty . . . *for each day during which such violation[] continues*" (emphasis added)) *with InterAmericas*, 111 F.3d at 382 (any company or individual that violates the BCHA "shall forfeit and pay a civil penalty . . . *for each day during which such violation continues*." (quoting 12 U.S.C. § 1847(b)(1)) (emphasis added)). The Comptroller therefore agrees with Enforcement Counsel that the language of Section 1818 supports the conclusion that the continuing-violations doctrine is available in the context of the instant action. *See, e.g.,* 12 U.S.C. § 1818(e)(1)(C)(ii) (contemplating "continuing disregard"), (i)(2)(B)(ii)(1) (contemplating "pattern of misconduct"); *see also Texas v. United States*, 891 F.3d 553, 563 (5th Cir. 2018) (*InterAmericas* "conclusion depended on the text of the statute as well as the relevant agency's interpretation, which we held to be entitled to deference"); *InterAmericas*, 111 F.3d at 382 ("Where the civil penalty provision at hand contemplates per diem penalties for violations, then continuing violations are cognizable under the general statute of limitations.").[7]

---

[7] As noted *supra*, the *April 9 Order* found it significant that potential violations under Section 1818(i) can be based on any violation of law or regulation. However, this is beside the point, as an underlying violation of law or regulation—here, a call report violation under 12 U.S.C. § 161—must be viewed in the context of the operative enforcement statute, Section 1818, which

Furthermore, *Spectrum Brands*—cited by Respondents in support of their misguided contention that the limitations period begins to run at the time of the alleged misconduct, *see supra* note 8—also supports the determination that the text of Section 1818 explicitly compels the conclusion that the continuing-violations doctrine is available here. *See Spectrum*, 924 F.3d at 351 ("We explained that a criminal offense is treated as continuing only if the substantive criminal statute explicitly compels that conclusion *or* if the nature of the crime involved is such that Congress must assuredly have intended it be treated as a continuing one." (internal citation and quotation marks omitted)). For these reasons, the *April 9 Order* erred in concluding that the continuing-violations doctrine is unavailable, and in further concluding that the civil money penalty claims arising from accounting-related allegations against Respondents were timely only as to Call Reports issued after September 25, 2012.

Accordingly, the Comptroller vacates and reverses the *April 9 Order* to the extent that it held that Enforcement Counsel must bring an action within five years of the date of the first of multiple occurrences of the same type of effect within the meaning of Section 1818, and that the continuing-violations doctrine is unavailable in the instant matter. The following allegations recommended for dismissal by the *April 9 Order* are therefore restored:

- Lending-related allegations, including those involving losses first incurred by the Bank prior to September 25, 2012, against Respondents and associated first-tier civil money penalties;
- Accounting-related allegations, including those involving Call Reports issued prior to September 25, 2012, against Respondents and associated first-tier civil money penalties; and

---

plainly contains language contemplating continuing violations. *See Texas*, 891 F.3d at 563 (Fifth Circuit has invoked continuing-violations doctrine when "text of a particular statute, *understood in the appropriate context*, contemplates a continuing violation theory of claim accrual" (internal quotation marks omitted) (emphasis added)).

- Allegations supporting second-tier civil money penalties, to the extent dismissal was recommended.

## III.   CONCLUSION

For the reasons stated, the Comptroller hereby grants the Parties' *Cross-Motions for Interlocutory Review* of the *April 9 Order*; vacates and reverses the portions of the *April 9 Order* holding that the OCC must bring an action within five years from the date of the first instance of loss and that the continuing-violations doctrine is unavailable; and remands this matter so that the proceedings below be resumed in a manner consistent with this order.

It is so ordered.

Date: December 18, 2020

BRIAN P. BROOKS
ACTING COMPTROLLER OF THE CURRENCY

# EXHIBIT B

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| SAUL ORTEGA AND DAVID ROGERS, JR. | § § § | Case No. 23-_____ |
| | § | On review from AA-EC-2017-44 |
| *Petitioners,* | § § | and AA-EC-2017-45 |
| v. | § § | Petition for Review of Final Decision |
| | § | of the Comptroller of the Currency |
| OFFICE OF THE COMPTROLLER OF THE CURRENCY | § § § § | |
| *Respondent.* | § | |

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Petitioners and affiliated entities:

Saul Ortega
David Rogers, Jr.
Texas National Bank, owned by a non-public holding company TNB Bancshares Inc., which has no parent company
First National Bank Edinburg, owned by non-public holding company First National Bank Group, Inc. which has no parent company
No public company owns 10% or more of either Texas National Bank, TNB Bancshares Inc., First National Bank Edinburg, or First National Bank Group, Inc.

Counsel:

Thomas Leatherbury
William D. Sims
Frank Brame

Respondent:

The Office of the Comptroller of the Currency
The Comptroller of the Currency, Michael Hsu

Counsel:
Lawrence J. Keen, III
Christopher D'Alessio
Nathan Taran
Michael Laurino
Susan Bowman
Erin Healy Gallagher
Grant Swanson
Frank Salamone
Office of the Comptroller of the Currency

Administrative Law Judge

Jennifer Whang
Office of Financial Institution Adjudication

Dated:   December 1, 2023

Respectfully submitted,

By:   /s/ *Frank Brame*
     Thomas S. Leatherbury
     Texas Bar No. 12095275
     Thomas S. Leatherbury Law, PLLC
     Cumberland Hill School Building
     1901 N. Akard Street
     Dallas, Texas 75201
     Telephone: (214) 213-5004
     Tom@tsleatherburylaw.com

     Frank C. Brame
     Texas Bar No. 24031874
     The Brame Law Firm PLLC
     4514 Cole Ave., Suite 600
     Dallas, Texas 75205
     Telephone: (214) 665-9464
     frank@bramelawfirm.com

     Bill Sims
     Texas Bar No. 18429500
     4234 Shorecrest Drive
     Dallas, Texas 75209
     Telephone: (214) 458-6970
     bsims1119@gmail.com

     **COUNSEL FOR PETITIONERS**

# EXHIBIT C

**SERVICE LIST**

Hon. Jennifer Whang
Administrative Law Judge
Office of Financial Institutions Adjudication
3501 North Fairfax Drive, Suite D8115A
Arlington, VA 22226-3500
ofia@fdic.gov

Hearing Clerk
Office of the Controller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219
hearingclerk@occ.treas.gov

Lawrence J. Keen, III
Christopher D'Alessio
Nathan Taran
Michael Laurino
Susan Bowman
Erin Healy Gallagher
Office of the Controller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219
Larry.keen@occ.treas.gov
Christopher.dalessio@occ.treas.gov
Nathan.taran@occ.treas.gov
Michael.Laurino@occ.treas.gov
Susan.Bowman@occ.treas.gov
Erin.HealyGallagher@occ.treas.gov