# No. 23-60617

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

SAUL ORTEGA AND DAVID ROGERS, JR.

*Petitioners*,

v.

OFFICE OF THE COMPTROLLER OF THE
CURRENCY

*Respondent.*

---

On Petition for Review of Final Decision of the Comptroller of the Currency
Entered on December 1, 2023 by the Office of the
Comptroller of the Currency
Case Nos. AA-EC-2017-44 and AA-EC-2017-45

---

**EXHIBITS IN SUPPORT OF PETITIONERS' MOTION TO ABATE CASE
OR EXTEND BRIEFING DEADLINES PENDING DISPOSITION OF *SEC
V. JARKESY***

---

Bill Sims
4234 Shorecrest Drive
Dallas, Texas 75209
Telephone: (214) 458-6970

Frank C. Brame
The Brame Law Firm PLLC
4514 Cole Ave., Suite 600
Dallas, Texas 75205
(214) 665-9464

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 213-5004

**COUNSEL FOR PETITIONERS**

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|:---:|:---|
| **A** | Notice of Charges |
| **B** | Recommended Decision |
| **C** | Respondents' Exceptions to the Administrative Law Judge's Recommended Decision, Supporting Brief and Request for Oral Argument |
| **D** | Final Decision of the Comptroller of the Currency, Orders of Prohibition, and Orders Assessing Civil Money Penalty |
| **E** | Respondents' Demand For Jury Trial |

## CERTIFICATE OF SERVICE

I hereby certify that, on January 18, 2024, I caused true and accurate copies of the foregoing Exhibits in Support of Petitioners' Motion to Abate Case or Extend Briefing Deadlines Pending Disposition of *SEC v. Jarkesy* to be served by e-mail, upon the following counsel, in addition to filing via the Court's CM/ECF document filing system:

Hannah Hicks
Office of the Controller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219


/s/ *Frank C. Brame*
Counsel for Petitioners

# EXHIBIT A

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
|   President, Chief Executive Officer, and | ) | |
|   Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

### NOTICE OF CHARGES FOR ORDERS OF PROHIBITION AND
### NOTICE OF ASSESSMENTS OF A CIVIL MONEY PENALTY

Take notice that on a date to be determined by the Administrative Law Judge, a hearing will commence in the Southern District of Texas unless Respondents consent to another place, pursuant to 12 U.S.C. § 1818(e) and (i), concerning the charges set forth herein to determine whether Orders should be issued by the Comptroller of the Currency ("Comptroller") against Saul Ortega, former Chief Financial Officer ("CFO"), director, President, Chief Executive Officer ("CEO"), and Chairman of the Board ("Chairman") ("Respondent Ortega") and David Rogers, Jr., former Chairman ("Respondent Rogers") (collectively, the "Respondents"). Such Orders would prohibit each Respondent from participating in any manner in the conduct of the affairs of any insured depository institution or any other institution, credit union, agency or entity referred to in 12 U.S.C. § 1818(e), and require each Respondent to pay a civil money penalty.

A civil money penalty in the amount of two hundred fifty thousand dollars ($250,000) is hereby assessed against each of the Respondents, pursuant to the provisions of 12 U.S.C. § 1818(i), after having considered the factors set forth in 12 U.S.C. § 1818(i)(2)(G) and after

having solicited and given full consideration to Respondents' views. The penalty is payable to the Treasurer of the United States.

The hearing afforded to Respondents shall be open to the public unless the Comptroller, in his discretion, determines that holding an open hearing would be contrary to the public interest.

In support of this Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty ("Notice"), the Office of the Comptroller of the Currency ("OCC") charges the following:

**ARTICLE I**

**<u>JURISDICTION</u>**

At all times relevant to the charges set forth below:

(1)     The Bank was an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2).

(2)     Respondents were officers and directors of the Bank and were "institution-affiliated parties" of the Bank as that term is defined in 12 U.S.C. § 1813(u), having served in such capacity within six (6) years from the date hereof. *See* 12 U.S.C. § 1818(i)(3).

(3)     The Bank was a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A).

(4)     Accordingly, the OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain these prohibition and civil money penalty actions against Respondents pursuant to 12 U.S.C. § 1818(e) and (i).

**ARTICLE II**

**BACKGROUND**

(5)    This Article repeats and realleges all previous Articles in this Notice.

***Respondents' Background***

(6)    In or around 1981, Respondent Rogers became Chairman and remained in that position until his resignation on or about November 1, 2011.

(7)    In or around 2001, Respondent Ortega became CFO and a director. He remained CFO until September 2011 when he was promoted from CFO to CEO. In or around January 2012, Respondent Ortega became President and Chairman. Respondent Ortega remained President, CEO, and Chairman until the Bank closed in September 2013.

***Respondents' Responsibilities***

(8)    Between 2008 and 2011, Respondents and the Bank's then-President/CEO and then-Chief Lending Officer ("CLO") were responsible for the day-to-day management of the Bank.

(9)    Between 2008 and 2011, Respondents served on the Board of Directors ("Board"). Respondent Rogers resigned from the Board in 2011. Respondent Ortega continued to serve on the Board until the Bank's closure in September 2013.

(10)    Between 2008 and 2011, Respondents were voting members on the Loan and Discount Committee ("L&D Committee"), which consisted of all of the Bank's directors, met weekly, and approved all loans greater than $1 million. On certain occasions, a majority of the L&D Committee approved loans by "telephone tally" before the meeting, and the full L&D Committee ratified such loans at the actual meeting.

3

(11)   At all times relevant to this Notice, the Board and L&D Committee also consisted of four to five outside directors ("Outside Directors").

(12)   As officers and directors of the Bank, Respondents were obligated to comply with all applicable laws and regulations and to carry out their duties and responsibilities in a manner consistent with safe and sound banking practices.

(13)   As officers and directors of the Bank, Respondents owed fiduciary duties of care and loyalty to the Bank.

>   (a)   The fiduciary duty of care required that each Respondent act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interest of the Bank, and ensure the Bank's compliance with laws and regulations.

>   (b)   The fiduciary duty of loyalty required that each Respondent disclose material information to the Bank's Board and refrain from engaging in self-dealing at the expense of the Bank. The duty of loyalty further required Respondents to disclose the existence, nature, and extent of any conflicts of interest with the Bank, refrain from discussing, voting, or having any other involvement on matters where Respondents had a conflict of interest, and to place the interests of the Bank ahead of Respondents' own personal interests at all times.

(14)   Respondents were responsible for ensuring that the Bank filed materially accurate Consolidated Reports of Condition and Income ("Call Reports"), which included ensuring the Call Reports were consistent with generally accepted accounting principles ("GAAP") and regulatory reporting requirements.

4

(15)   As officers and directors of the Bank, Respondents were responsible for ensuring that the Bank complied with OCC enforcement actions and implemented corrective actions to address Matters Requiring Attention ("MRAs") in OCC Reports of Examination ("ROEs").

***Bank Background and Supervisory History***

(16)   The Bank was a community bank headquartered in Edinburg, Texas with approximately $3.1 billion in total assets and $2.3 billion in total deposits as of June 30, 2013.

(17)   The Bank was a wholly-owned subsidiary of First National Bank Group, Inc. ("Holding Company"), a bank holding company. Respondents were also officers and directors of the Holding Company.

(18)   In September 2008, the Bank incurred a $174 million loss on investments in the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation causing the Bank to fall from "well capitalized" to "adequately capitalized" for Prompt Corrective Action purposes. *See* 12 U.S.C. § 1831o.

(19)   In or around 2008, the Bank's other real estate owned ("OREO") increased significantly as a result of increasing delinquencies and foreclosures on loans made prior to 2008.

(20)   On February 18, 2009, the OCC imposed an Individual Minimum Capital Ratio ("2009 IMCR") requiring the Bank to achieve and maintain an 8 percent Tier 1 Leverage Ratio and 12 percent Total Risk Based Capital ("TRBC") Ratio by May 10, 2009.

(21)   The OCC determined that the higher levels of capital specified in the 2009 IMCR were necessary based on the Bank's deteriorating condition, including a deterioration in the Bank's asset quality, high concentrations in speculative commercial real estate, and inadequate risk management systems.

(22)     On January 27, 2009, the OCC and the Bank entered into a Memorandum of Understanding ("2009 MOU") that required the Bank to, among other things, reduce criticized assets, improve loan risk rating accuracy, and improve accounting for nonaccrual loans.

(23)     On February 8, 2011, the OCC issued a Consent Order against the Bank ("2011 Consent Order") that required the Bank to, among other things, achieve and maintain a 9 percent Tier 1 Leverage Ratio and 13 percent TRBC Ratio and correct unsafe or unsound practices concerning the Bank's loan portfolio management and nonaccrual loans.

(24)     On January 18, 2012, the OCC replaced the 2011 Consent Order and with a new Consent Order against the Bank ("2012 Consent Order") that required the Bank to implement additional corrective actions, including, among other things, hiring competent management, addressing excessive compensation, and improving accounting for and management of OREO.

(25)     The Bank's financial condition continued to deteriorate and the Bank became "critically undercapitalized" as of June 30, 2013.

(26)     On September 13, 2013, the OCC closed the Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver.

(27)     As of February 28, 2014, the FDIC estimated that the Bank's failure resulted in $637.5 million in losses to the Deposit Insurance Fund ("DIF").

***Respondents' Efforts to Artificially Improve the Bank's Condition***

(28)     Beginning in or around late 2008, Respondents masked the Bank's deteriorating financial condition through misconduct that inflated earnings and capital and improperly reduced or delayed reported losses. Such misconduct included:

> (a)     Providing unsafe or unsound loans to finance the Bank's capital raise and improperly including the loan proceeds as capital as described in Article III;

6

(b)     Providing unsafe or unsound loans to finance the sales of OREO at above-market prices to improperly reduce the Bank's nonperforming assets and avoid recording losses on the OREO sales as described in Article IV; and

(c)     Improperly accruing interest on nonaccrual loans as described in Article V.

(29)     With regard to one series of unsafe or unsound loans involving sales of OREO, Respondent Rogers also placed the interests of a member of his immediate family above those of the Bank as described in Article VI.

### ARTICLE III

### RESPONDENTS ENGAGED IN UNSAFE OR UNSOUND PRACTICES, BREACHED THEIR FIDUCIARY DUTY, AND VIOLATED 12 U.S.C. § 161 WITH REGARD TO LOANS TO FUND SALES OF HOLDING COMPANY STOCK AND IMPROPERLY INCLUDING THE LOAN PROCEEDS AS CAPITAL

(30)     This Article repeats and realleges all previous Articles in this Notice.

(31)     As described herein, Respondents engaged in unsafe or unsound practices, breached their fiduciary duty of care, and violated 12 U.S.C. § 161. From approximately April 2009 to March 2011, Respondents originated, approved, and/or ratified unsafe or unsound loans to finance the purchase of stock in the Holding Company ("Capital Raise Loans") and then transferred the proceeds to the Bank to raise capital. Contrary to GAAP and regulatory guidance, from June 30, 2009 to June 30, 2013, Respondents caused the Bank to improperly inflate its capital by including the proceeds of the Capital Raise Loans as regulatory capital in the Bank's Call Reports.

(32)     Beginning in or around April 2009 and continuing until approximately March 2011, Respondents offered Holding Company stock to certain Bank officers, directors,

employees, and customers through a private placement memorandum and also offered Bank

loans to finance their purchase of stock.

(33)    Between approximately April 2009 through March 2011, certain Bank officers,

directors, employees, and customers purchased Holding Company stock financed with Bank

loans ("Capital Raise Loan Borrowers").

(34)    The Holding Company, of which Respondents were officers and directors,

transferred the proceeds of the Capital Raise Loans to the Bank.

(35)    Respondents admitted to the OCC that the Bank provided loans to finance the

purchase of Holding Company stock.

(36)    Respondents ultimately originated, approved, and/or ratified approximately 63

Capital Raise Loans and sold approximately $21 million of Holding Company stock to the

Capital Raise Loan Borrowers.

(37)    The Capital Raise Loans had terms or features that included, but were not limited

to:

      (a)    Unsecured or under-secured;

      (b)    Below-market interest rates that were not commensurate with the risk of

      the loan; and

      (c)    Balloon repayment terms.

(38)    Most of the Capital Raise Loan Borrowers lacked the ability and/or intent to repay

the Capital Raise Loans in accordance with their terms. For example, certain internal Bank

documents related to the Capital Raise Loans specified that the borrower would only be required

to pay 5 percent principal at maturity, and several Bank employees testified to the OCC that they

were not expected to pay the loans when due.

(39)    The L&D Committee loan packages only generally indicated that the purposes of the Capital Raise Loans were for "investments" but did not identify that the purposes were to purchase Holding Company stock.

(40)    Respondents knew the loans' true purposes when they approved and/or ratified them. Respondents' failure to ensure that the Bank specified the true purposes of the Capital Raise Loans in the L&D Committee loan packages helped to obscure the specific purposes of the loans from the Bank's regulators.

(41)    Respondents repeatedly approved and/or ratified the renewal of most of the Capital Raise Loans, and most of the Capital Raise Loans were outstanding when the Bank closed in September 2013.

(42)    The Bank incurred $387,241 in losses on two of the Capital Raise Loans in June 2013.

(43)    The DIF incurred approximately $3.8 million in losses on the Capital Raise Loans.

*Materially Inaccurate Call Reports*

(44)    On May 10, 2009 and August 12, 2009, the Holding Company infused $30 million and $5 million, respectively, into the Bank to help meet the 2009 IMCR.

(45)    The combined $35 million infused into the Bank by the Holding Company included proceeds from the sale of Holding Company stock financed with the Capital Raise Loans.

(46)    On August 13, 2009, the Bank notified the OCC that it achieved the minimum capital requirements contained in the 2009 IMCR with a Tier 1 Leverage Ratio of 8.9 percent and TRBC Ratio of 12.01 percent.

(47)     The Bank did not notify the OCC that the $35 million infused into the Bank included the loan proceeds from the Capital Raise Loans.

(48)     Respondents caused the Bank to improperly include the proceeds from the sales of Holding Company stock financed with the Capital Raise Loans in its regulatory capital instead of as a deduction from stockholder's equity as required by GAAP and regulatory guidance. More specifically:

> (a)     Financial Accounting Standards Board Emerging Issues Task Force 85-1 ("EITF 85-1"), *Classifying Notes Received for Capital Stock*, (later codified at Accounting Standards Codification Subtopic 505-10, *Equity - Overall*), which was in effect at all relevant times, provides that there must be "substantial evidence of the ability and intent to pay the loan in a reasonably short period of time" to include stock financed with loans as capital.

> (b)     Between 2008 and 2012, the OCC's Bank Accounting Advisory Series ("BAAS") included a question on EITF 85-1 notifying banks that "[n]otes received in exchange for capital stock should be classified as a deduction from stockholder's equity." In 2012, the OCC incorporated this guidance into the Instructions to the Consolidated Reports of Condition and Income ("Call Report Instructions").

(49)     Because the Bank provided loans to purchase Holding Company stock and most of the loans were outstanding when the Bank closed, the Bank did not have additional ability to absorb losses prior to its closure.

(50)    Respondents admitted to the OCC that, in their experience in banking, they were not aware of any other bank that had raised capital by lending money to investors and including the same money as regulatory capital in the manner described in this Article.

(51)    Respondents never caused the Bank to correct the improper accounting practices described in this Article. Therefore, the Bank's capital continued to be overstated until the Bank closed in September 2013.

(52)    As a result of the accounting practices described within this Article and together with the accounting practices described in Article IV and Article V, Respondents caused, brought about, and/or participated in the Bank filing materially inaccurate Call Reports beginning with the quarter ending June 30, 2009 and continuing through the Call Report for the quarter ending June 30, 2013.

(53)    The foregoing accounting practices, and Respondents' failure to correct them, masked the Bank's true financial condition and prevented the Bank's regulators and depositors from determining whether the Bank had adequate capital to safeguard deposits.

## ARTICLE IV

### RESPONDENTS ENGAGED IN UNSAFE OR UNSOUND PRACTICES, BREACHED THEIR FIDUCIARY DUTY, VIOLATED 12 U.S.C. § 161, AND VIOLATED FINAL ORDERS WITH REGARD TO LOANS TO FINANCE SALES OF OREO AND THE IMPROPER ACCOUNTING FOR SUCH SALES

(54)    This Article repeats and realleges all previous Articles in this Notice.

(55)    As described herein, Respondents engaged in unsafe or unsound practices, breached their fiduciary duty of care, violated 12 U.S.C. § 161, and violated final cease-and-desist orders. Respondents developed and implemented a new lending strategy from late 2008 through at least September 2011 designed to avoid further decreases to the Bank's capital ratios. Respondents reduced the Bank's assets by curtailing non-OREO new loan originations and

avoided reporting further decreases to capital by originating, approving, and/or ratifying unsafe or unsound loans to finance the sales of the Bank's OREO at above-market prices, which enabled the Bank to reduce or avoid reported losses that it would have otherwise recorded on sales at fair market values ("OREO Lending Strategy"). Contrary to GAAP and regulatory guidance, from June 30, 2009 to June 30, 2013, Respondents caused the Bank to inflate its capital by improperly accounting for the OREO sales and loans with below-market interest rates.

(56)    The Bank's culture ensured that loan officers implemented the OREO Lending Strategy. For example:

(a)    The Bank established an incentive compensation program that awarded cash bonuses to loan officers who sold OREO in the same month in which it was acquired, which included higher bonuses for sales at full asking price;

(b)    The then-President/CEO sent frequent emails to the Bank's lending department pressuring loan officers to sell OREO quickly; and

(c)    On at least two occasions, loan officers initially drafted L&D Committee loan packages to explicitly state that they recommended approval of the loan because the borrower was helping the Bank to reduce its loss on the sale of OREO. However, the Chief Credit Review Officer instructed loan officers to remove this language because he recognized that it may indicate that "we over-sold it or might have stretched to underwrite this borrower instead of recognizing a loss and possibly selling to a more qualified borrower."

(57)    Pursuant to the OREO Lending Strategy, the Bank convinced buyers to purchase OREO at above-market prices by offering and issuing unsafe or unsound loans that Respondents originated, approved, and/or ratified. Some of the loans contained terms and features that were

inconsistent with the Bank's Real Estate Loan Policy. These loan terms or features included, but were not limited to:

(a)     Requiring no equity contribution from the borrower while providing new monies to finish construction and development;

(b)     Requiring no personal guarantees or limited guarantees on loans to newly-formed entities that were formed for the sole purpose of purchasing the subject OREO property;

(c)     Providing below-market interest rates that were not commensurate with the risk of the loan;

(d)     Providing excessive interest-only repayment periods; and

(e)     Providing excessive amortizations or terms.

(58)    On certain occasions, the Bank capitalized property taxes and/or interest payments into a loan to improve the appearance of the borrower's repayment performance and further reduce the borrower's investment and risk in the property.

(59)    On certain occasions, when the Bank required the borrower's personal guarantee, the Bank released the guarantee instead of pursuing the borrower for the loan deficiency after defaulting.

(60)    On certain occasions, Respondents originated, approved, and/or ratified loans to finance the sale of OREO without a credit analysis of the borrower from the Bank's Credit Review department.

(61)    Unsafe or unsound loans originated, approved, and/or ratified by Respondents pursuant to the OREO Lending Strategy included, but were not limited to:

13

(a)    $56 million in loans to Company A[1] in June 2010, which consisted of $38 million (the Bank's carrying value) to finance the purchase of an unfinished commercial real estate property from OREO and $18 million in new monies to finish construction. Loan details and terms included:

    i.    No requirement from Company A to contribute any equity;

    ii.    A below-market 3.25 percent interest rate;

    iii.    A 30-month interest-only period and a 25-year repayment term; and

    iv.    Only $1.5 million in personal guarantees from each of the two guarantors (the owners of Company A), who combined had liquidity of $150,000 and one of whom had a credit score of 487.

(b)    Several loans totaling approximately $74.6 million to three borrowers in 2009, which consisted of approximately $53 million to finance the purchase of three commercial real estate properties from OREO and $19 million in new monies. After the Bank foreclosed on the three borrowers, the Bank issued approximately $98 million in loans to three new purchasers in 2011 and 2012, which consisted of approximately $75 million (the Bank's carrying value) to finance the purchase of the OREO and $23 million in new monies;

(c)    Four loans totaling approximately $24 million to Person A though four different single asset entities in 2009 and 2010, which included approximately $15 million to finance the OREO purchase and $9 million in new monies. Person

---

[1] The names of entities and individuals described by alias herein will be separately disclosed to Respondents.

A did not contribute any equity on the four loans and provided minimal financial support with respect to his guarantees;

(d)    Five loans totaling approximately $21.5 million to Person B through the use of two newly-formed entities, which included approximately $20 million to finance the purchase of rental property out of OREO and $1.5 million in new monies. Person B did not contribute any equity, provided minimal financial support, and had no experience in managing real estate; and

(e)    Four loans totaling approximately $5 million to Person W through three newly-formed entities in 2009 and 2010 and described more fully in Article VI.

(62)    Respondents approved the $56 million in loans to Company A referenced in Paragraph (61)(a), which represented the largest loan relationship in the Bank, without a credit analysis from the Bank's Credit Review department. The Bank only prepared a credit analysis after OCC examiners requested it.

(63)    Respondent Rogers and the then-CLO admitted to the OCC that originating the loans to Company A without a credit analysis would constitute an unsafe or unsound practice.

(64)    The former Chief Credit Review Officer testified to the OCC that the Company A loans were unsafe or unsound, and the Bank should not have originated them.

(65)    Throughout the period in which Respondents implemented the OREO Lending Strategy, several individuals at the Bank, including the Chief Credit Review Officer and the Senior Loan Review Officer, repeatedly expressed concerns with the OREO Lending Strategy. For example, in August 2010, the Chief Credit Review Officer expressed concerns with a proposed OREO sale and loan in an email to Respondent Rogers, the Bank's then-President/CEO, and the Bank's then-CLO:

15

> I'm very concerned that we're potentially tying up $9.5mm of the bank's capital in what could easibly [sic] be determined to be a non-performing asset . . . as opposed to finding a number on the sale of the dirt [OREO] that would allow us to not have to offer these kinds of concessions and take on the level of risks that will be associated with such a unique facility.

(66)    Respondents continued implementing the OREO Lending Strategy despite the concerns described in Paragraph (65).

(67)    Respondents caused the Bank to inaccurately risk rate loans and improperly recognize loans as accruing loans to reduce the Bank's reported nonperforming assets in connection with the OREO Lending Strategy. As a result, the OCC issued MRAs related to inaccurate risk rating and nonaccrual recognition every year from 2008 through 2012.

(68)    As late as April 2013, the Bank continued to implement elements of the OREO Lending Strategy. More specifically, the Bank continued to improperly avoid reporting losses on OREO. For example:

> (a)    On April 10, 2013, the Senior Vice President ("SVP") for Special Assets sent an email to Respondent Ortega about the Bank's OREO asking prices noting, "[T]he fact that these properties have been marketed for a year without any reasonable offer being presented is evidence that our pricing is too high." Respondent Ortega responded, "This is not going to work I can't take a $5 million impairment let's review again?" (sic.) meaning that lowering the asking prices would require the Bank to record an impairment.

> (b)    On May 1, 2013, Respondent Ortega sent emails to the SVP for Special Assets pressuring him to accept an offer to purchase OREO because it had a higher purchase price than a competing offer even though the offeror was demanding a loan with liberal terms to finance his purchase. In response, the SVP

16

for Special Assets cautioned Respondent Ortega, "Let's just remember what

happened in the past, when we sold at higher prices and inferior terms. We're still

selling a lot of those properties for the 2nd or 3rd time."

(69)    The Bank incurred at least $42 million in recorded losses on loans issued in

connection with the OREO Lending Strategy, including approximately $12.5 million in losses

recorded between September 25, 2012 and the Bank's closing.

(70)    The DIF incurred at least $103 million in losses on loans issued in connection

with the OREO Lending Strategy.

***Materially Inaccurate Call Reports***

(71)    Between 2009 and 2013, Respondents caused the Bank to fail to adhere to GAAP

and regulatory reporting requirements with respect to the OREO Lending Strategy, causing the

Bank to report inflated earnings and capital in its Call Reports. More specifically:

(a)    Accounting Principles Board Opinion 21, *Interest on Receivables and*

*Payables* (later codified at Accounting Standard Codification 835-30, *Broad*

*Transactions – Interest - Overall*) requires banks to discount loans issued at

below-market interest rates to finance the purchase of OREO to the present value

of the loan's future cash flows using a market interest rate. The discount increases

the bank's loss or reduces the bank's gain on the sale of the property. The

discount is accreted into income as the borrower pays principal over the term of

the loan. If the bank forecloses on the loan, the discount remains on the books as a

reduction in the asset's cost basis.

      (b)     At all times relevant to this Notice, the BAAS provided that banks should discount loans with below-market interest rates to their fair market value using a market rate, which would reduce the effective sales price of the property.

(72)    In the 2009 ROE, the OCC issued an MRA to the Bank related to its accounting for OREO sales financed with below-market rate loans. Specifically, the MRA required the Bank to adhere to Statement of Financial Accounting Standards No. 66, *Accounting for Sales of Real Estate*, properly recognize loans to finance the sale of OREO as nonaccrual, and discount loans using a present value of future cash flows analysis.

(73)    The 2009 ROE indicates that the then-President/CEO committed that, by December 31, 2009, the Bank would review for proper accounting treatment all sales of OREO greater than $750,000. The then-President/CEO also committed that, by March 31, 2010, the Bank would review all OREO sales less than $750,000.

(74)    Respondent Ortega and the Bank's Controller drafted a memorandum dated April 26, 2010, documenting the Bank's corrective actions to respond to the MRA ("April 2010 Memorandum"). Respondent Ortega presented this memorandum to the Board at the May 4, 2010 L&D Committee meeting and attached it to the minutes.

(75)    The April 2010 Memorandum included a one-page materiality analysis of loans to finance OREO sales less than $750,000 but determined not to review those loans for proper accounting treatment. In addition, the memorandum stated that the Bank would increase its threshold and would only review loans to finance OREO sales greater than $1 million. The April 2010 Memorandum did not document a reason for the change, nor did the Bank conduct an analysis of the potential impact increasing the threshold would have on the Bank's Call Reports.

18

(76)     The May 4, 2010 L&D Committee minutes stated that Respondent Ortega represented to the L&D Committee, which consisted of the Board members, that the Bank would review all loans to finance the sale of OREO greater than $750,000. This statement contradicts the April 2010 Memorandum.

(77)     The April 2010 Memorandum indicated that the Bank would conduct present value calculations using a Bank-prepared Market Rate Matrix that established (without justification) interest rates to finance the sale of OREO. The Market Rate Matrix established a fixed interest rate of 4.25 percent for one-year loans escalating to 7.0 percent for loans with terms greater than ten years.

(78)     The Bank submitted the April 2010 Memorandum to the OCC. In 2010, the OCC closed the MRA from the 2009 ROE based, in part, on the memorandum.

(79)     Even after submitting this memorandum to the Board and OCC, Respondents continued to originate, approve, and/or ratify loans to finance OREO with interest rates below those required by the Bank's Market Rate Matrix. In addition, the Bank did not discount any loans to finance OREO that had interest rates below the Bank's Market Rate Matrix.

(80)     In the 2011 ROE, the OCC issued a new MRA to the Bank and cited a violation of 12 U.S.C. § 161 for the Bank's failure to record discounts on loans to finance OREO sales with below-market interest rates in accordance with GAAP and the BAAS.

(81)     As documented in the 2011 ROE, the Bank financed approximately $309 million of OREO with below-market interest rates without recording any discounts.

(82)     In the 2011 ROE, the OCC notified the Bank that the OCC had calculated a $14.3 million discount using a 5.5 percent market rate on a sample of eight loans with an aggregate

principal balance of approximately $93 million. The $14.3 million discount calculated by examiners included a $12.5 million discount on a $54 million loan to Company A.

(83)     In the 2011 ROE, the OCC required the Bank to engage an accounting firm, record discounts on the Bank's entire loan portfolio of former OREO properties, and incorporate the discounts (losses) on that portfolio into the December 31, 2011 Call Report.

(84)     In response to the directive in the 2011 ROE, the Bank only recorded approximately $4 million in discounts in its December 31, 2011 Call Report.

(85)     The Bank's $4 million in discounts were inadequate because:

(a)     The Bank did not record the $12.5 million discount on a $54 million loan to Company A even though it had a 3.25 percent interest rate. Instead:

> i.     The Bank convinced Company A to pay a higher interest rate, even though Company A had no obligation to do so, in exchange for the Bank agreeing to fund a $2.75 million interest reserve for Company A;

> ii.     Accordingly, Respondent Ortega caused the Bank to violate the 2011 Consent Order, which required the Bank to establish and adhere to procedures prohibiting the capitalization of interest;

> iii.     Additionally, around the same time that Company A agreed to restructure its loans, the Bank provided Company A with approximately $6 million in new loans;

(b)     The Bank used a 5 percent market rate even though the Bank's Market Rate Matrix in the April 2010 Memorandum suggested that 7 percent constituted

market rate for most of the loans because of the loan's lengthy terms, including

the $54 million loan to Company A that had a 25-year term; and

(c)    The Bank did not review its OREO financing prior to January 1, 2010,

despite the Bank financing nearly $100 million of OREO loans with below-

market interest rates loans prior to January 1, 2010.

(86)    Respondents never caused the Bank to correct the improper accounting practices

described in this Article. Therefore, the Bank's capital continued to be overstated until the Bank

closed in September 2013.

(87)    As a result of the accounting practices described within this Article and together

with the accounting practices described in Article III and Article V, Respondents caused, brought

about, and/or participated in the Bank filing materially inaccurate Call Reports beginning with

the quarter ending June 30, 2009, and continuing through the Call Report for the quarter ending

June 30, 2013.

(88)    The foregoing accounting practices, and Respondents' failure to correct them,

masked the Bank's true financial condition and prevented the Bank's regulators and depositors

from determining whether the Bank had adequate capital to safeguard deposits.

## ARTICLE V

### RESPONDENTS ENGAGED IN UNSAFE OR UNSOUND PRACTICES, BREACHED THEIR FIDUCIARY DUTY, AND VIOLATED 12 U.S.C. § 161 AND FINAL ORDERS BY CAUSING THE BANK TO ACCRUE INTEREST ON NONACCRUAL LOANS

(89)    This Article repeats and realleges all previous Articles in this Notice.

(90)    As described herein, Respondents engaged in unsafe or unsound practices,

breached their fiduciary duty of care, violated 12 U.S.C. § 161, and violated final cease-and-

desist orders. Beginning as early as 2007 and continuing until March 31, 2013, Respondents

caused the Bank to artificially inflate earnings and capital by improperly accruing interest on nonaccrual loans using cash basis accounting without documented justification as required by the Call Report Instructions.

(91)    At all times relevant to this Notice, the Call Report Instructions required that, when doubt exists as to the collectability of the remaining recorded investment in an asset in nonaccrual status, banks must apply any payments received to reduce the recorded investment in the asset. The Call Report Instructions permitted banks to treat cash payments received as interest income on a cash basis as long as the bank determined that the remaining recorded asset is fully collectible. A bank's determination as to the ultimate collectability must be supported by a "current, well-documented credit evaluation of the borrower's financial condition and prospects for repayment."

(92)    At all times relevant to this Notice, the BAAS provided that banks should not use cash basis accounting when doubt exists about the ultimate collectability of the loan and that collateral values, by themselves, are not sufficient to eliminate the issue of ultimate collectability.

(93)    In 2007, the Bank switched accounting systems. The Bank requested that the vendor create a custom program to change the system's default settings so that the Bank would automatically accrue interest on all nonaccrual loans using cash basis accounting.

(94)    Between 2006 and 2012, the OCC repeatedly directed the Bank to improve its recognition and treatment of nonaccrual loans. For example:

      (a)    In the 2006 ROE, the OCC issued an MRA requiring the Bank to improve its risk rating methodology, in part, to improve its recognition of nonaccrual loans;

22

(b)      In the 2008 ROE, the OCC issued a new credit administration MRA

criticizing the Bank's accounting for nonaccrual loans and noting that the Bank

failed to comply with nonaccrual guidelines;

(c)      In the 2009 ROE, 2010 ROE, 2011 ROE, and 2012 ROE, the OCC issued

repeat credit administration MRAs, which again required the Bank to improve its

compliance with nonaccrual guidelines;

(d)      The 2009 MOU required the Bank to establish and adhere to procedures

for the identification of, and accounting for, nonaccrual loans consistent with the

requirements contained in the Call Report Instructions and immediately reverse or

charge off all interest that was accrued contrary to the Call Report Instructions;

and

(e)      The 2011 Consent Order required the Bank to establish and adhere to

procedures for the identification of, and accounting for, nonaccrual loans

consistent with the requirements contained in the Call Report Instructions and

immediately reverse or charge off all interest that was accrued contrary to the Call

Report Instructions.

(95)      Respondents failed to ensure that the Bank was complying with OCC directives

and enforcement actions described in Paragraph (94).

(96)      The Chief Audit Officer initially expressed concerns with the Bank's improper

accounting for nonaccrual loans in a February 27, 2009 email to the Bank's MOU Committee, of

which Respondents were members. The Chief Audit Officer suggested that the Bank change its

policy for cash basis nonaccrual loans to conform with the BAAS.

(97)    On or around June 30, 2009, in connection with the Bank's quarterly review of nonaccrual loans required under the 2009 MOU, the Chief Audit Officer wrote a memorandum to the then-President/CEO stating that the Bank was improperly accruing interest on nonaccrual loans on a cash basis without documenting justification for doing so as required by the Call Report Instructions.

(98)    Although this memorandum was attached to the back of the August 11, 2009 L&D Committee minutes, the meeting minutes do not indicate that Respondents brought this issue to the Board's attention.

(99)    Two of the Outside Directors testified to the OCC that they would have expected Respondents to verbally inform them that the Bank was not following the Call Report Instructions during the meeting due to the importance of such an issue.

(100)   The 2012 Consent Order again required the Bank to establish and adhere to procedures for the identification of, and accounting for, nonaccrual loans consistent with the Call Report Instructions and immediately reverse or charge off all interest that was accrued contrary to the Call Report Instructions.

(101)   Respondent Ortega failed to ensure that the Bank was complying with the requirements of the 2012 Consent Order.

(102)   At the Consent Order Compliance Committee meeting on December 17, 2012, the Chief Audit Officer presented his findings related to the Bank's quarterly audit of nonaccrual loans as required under the 2012 Consent Order. The Chief Audit Officer notified the Board that the Bank was improperly accruing interest on nonaccrual loans on a cash basis without justification. The Chief Credit Officer represented to the Board that the Bank was modifying its

Credit Review template to include justification for using cash basis accounting on all of its nonaccrual loans. Respondent Ortega attended this meeting.

(103)   Respondent Ortega failed to ensure that the Bank implemented the use of the modified Credit Review template described in Paragraph (102), and the Bank continued to accrue interest on nonaccrual loans without justification until approximately March 2013.

(104)   In or around March 2013, OCC examiners learned that the Bank's practice was to accrue interest on all nonaccrual loans and required the Bank to refile its Call Reports.

(105)   Pursuant to OCC instructions, the Bank corrected its improper accounting practices and refiled its Call Reports for December 31, 2011, December 31, 2012, and March 31, 2013, reducing the Bank's capital by approximately $14.8 million in total.

(106)   Respondents never caused the Bank to correct the improper accounting practices described in this Article. Therefore, the Bank's capital continued to be overstated until April 2013.

(107)   As a result of the accounting practices described within this Article and together with the accounting practices described in Article III and Article IV, Respondents caused, brought about, and/or participated in the Bank filing materially inaccurate Call Reports beginning with the quarter ending June 30, 2009, and continuing through the Call Report for the quarter ending June 30, 2013.

(108)   The foregoing accounting practices, and Respondents' failure to correct them, masked the Bank's true financial condition and prevented the Bank's regulators and depositors from determining whether the Bank had adequate capital to safeguard deposits.

## ARTICLE VI

## RESPONDENT ROGERS BREACHED HIS FIDUCIARY DUTY OF LOYALTY BY PROVIDING PREFERENTIAL TREATMENT TO A MEMBER OF HIS IMMEDIATE FAMILY

(109)   This Article repeats and realleges all previous Articles in this Notice.

(110)   As described herein, Respondent Rogers breached his fiduciary duty of loyalty. Respondent Rogers provided preferential treatment to Person W, a member of his immediate family, by arranging a series of transactions involving loans to finance OREO sales that provided direct financial benefit to Person W and released his personal liability on loans to the Bank, thus causing harm to the Bank.

(111)   Person W owned 100 percent of Company W, a homebuilding company that had loans from the Bank and Bank A.

(112)   Person W personally guaranteed Company W's loans to the Bank.

(113)   Person W personally guaranteed Company W's loans to Bank A.

(114)   On February 9, 2009, Person W's attorney sent Person W an email with a plan for him to work with the banks to release his personal liability on loans to the Bank and Bank A, while maintaining ownership of Company W's assets. The email provided:

> I strongly urge you to consider that option – of working with the Banks to ensure swift foreclosure and an agreement between you and them to market the assets – and possible marketing agreements with [Bank A] and [the Bank] so that you may maintain control of [Company W's] assets, *maximize your chance of eliminating your personal liability to [Bank A] and [the Bank]*, and end your payment of personal assets into [Company W's] coffers. *Remember, you could even have an arrangement with the banks to repurchase the assets in another corporation after foreclosure* (or, with greater risk, at the foreclosure) in order to market them. [Emphasis added.]

(115)   On February 11, 2009, Person W forwarded this email to Respondent Rogers.

26

(116)   Person W was the 100 percent owner of Company X, Company Y, and Company Z. Person W formed the companies solely to obtain Bank loans to purchase the foreclosed assets described herein.

(117)   In or around April 2009, Respondent Rogers arranged for the Bank to foreclose on certain loans to Company W, pay the outstanding property taxes, and then issue a new loan in the amount of approximately $3.2 million to Company X to repurchase the foreclosed assets from the Bank.

(118)   The $3.2 million loan to Company X included $100,000 in new monies, but the Bank did not require any equity contribution from Person W.

(119)   The Bank did not require Person W to personally guarantee the loans to Company X, which violated the Bank's Real Estate Loan Policy.

(120)   The Bank incurred a $432,000 loss on September 25, 2012 on the loans to Company X, and the DIF incurred an $88,946 loss.

(121)   In or around January 2010, Respondent Rogers arranged for the Bank to foreclose on certain loans to Company W and then issue new loans in the amount of approximately $441,000 to Company Y to repurchase the foreclosed assets from the Bank.

(122)   The Bank did not require Person W to personally guarantee the loans to Company Y, which violated the Bank's Real Estate Loan Policy.

(123)   The DIF incurred a $170,979 loss on the loans to Company Y.

(124)   In or around January 2010, Respondent Rogers arranged for the Bank to issue a loan in the amount of approximately $1.3 million to Company W to enable Company W to purchase two delinquent promissory notes it owed to Bank A that Person W personally guaranteed.

(125)   In or around January 2010, Respondent Rogers arranged for the Bank to foreclose on the $1.3 million loan to Company W and then issue a new loan in the amount of approximately $1.2 million to Company Z to repurchase the foreclosed assets from the Bank.

(126)   The Bank did not require Person W to personally guarantee the loans to Company Z, which violated the Bank's Real Estate Loan Policy.

(127)   Although Respondent Rogers abstained or did not vote to approve the loans to Company X, Company Y, and Company Z, he failed to disclose to the L&D Committee the plan to arrange the loans to Company X, Company Y, and Company Z. Consequently, the loans to Company X, Company Y, and Company Z resulted in the Bank releasing Person W's personal guarantees on loans the individual had previously guaranteed with respect to Company W.

(128)   Person W was not identified as an immediate family member of Respondent Rogers in the relevant L&D Committee loan packages. Instead, they were identified only as a "prominent homebuilder and financier."

(129)   Respondent Ortega testified to the OCC that the Bank had no rational reason for issuing the loan to Company X and that it was foreseeable at the time of loan origination that the Bank would incur a loss on the loan to Company X.

## ARTICLE VII

## LEGAL BASES FOR REQUESTED RELIEF

(130)   This Article repeats and realleges all previous Articles in this Notice.

(131)   By reason of Respondents' misconduct as described in Articles III through V, the OCC seeks a prohibition order against each Respondent pursuant to 12 U.S.C. § 1818(e) on the following grounds:

(a)     Respondents engaged in unsafe or unsound practices, breached their

fiduciary duty of care, violated the law, including 12 U.S.C. § 161, and, as

described in Article IV and Article V, violated final cease-and-desist orders;

(b)     By reason of Respondents' misconduct, the Bank suffered or was likely to

suffer financial loss or other damage and the interests of the Bank's depositors

have been or could have been prejudiced; and

(c)     Respondents' misconduct involved personal dishonesty on their part

and/or demonstrated a willful and/or continuing disregard by Respondents for the

safety and soundness of the Bank.

(132)   By reason of Respondent Rogers's misconduct as described in Article VI, the

OCC seeks a prohibition order against Respondent Rogers pursuant to 12 U.S.C. § 1818(e) on

the following additional grounds:

(a)     Respondent Rogers breached his fiduciary duty of loyalty;

(b)     By reason of Respondents Rogers's misconduct, the Bank suffered or was

likely to suffer financial loss or other damage; and

(c)     Respondents Rogers's breach involved personal dishonesty on his part

and/or demonstrated a willful and/or continuing disregard for the safety and

soundness of the Bank.

(133)   By reason of Respondents' misconduct as described in Articles III through V, the

OCC seeks imposition of a civil money penalty against each Respondent pursuant to 12 U.S.C.

§ 1818(i)(2)(A) because Respondents violated the law, including 12 U.S.C. § 161.

(134)  By reason of Respondents' misconduct as described in Articles IV through V, the OCC seeks imposition of a civil money penalty against each Respondent pursuant to 12 U.S.C. § 1818(i)(2)(A) because Respondents violated final cease-and-desist orders.

(135)  By reason of Respondents' misconduct as described in Articles III through V, the OCC seeks imposition of a civil money penalty against each Respondent pursuant to 12 U.S.C. § 1818(i)(2)(B) on the following grounds:

> (a)  Respondents recklessly engaged in unsafe or unsound practices, breached their fiduciary duty of care, violated the law, including 12 U.S.C. § 161, and, as described in Article IV and Article V, violated final cease-and-desist orders; and
>
> (b)  Respondents' violations, practices, and/or breaches were part of a pattern of misconduct and caused more than a minimal loss to the Bank.

(136)  By reason of Respondent Rogers's misconduct as described in Article VI, the OCC seeks imposition of a civil money penalty against Respondent Rogers pursuant to 12 U.S.C. § 1818(i)(2)(B) on the following grounds:

> (a)  Respondent Rogers breached his fiduciary duty of loyalty to the Bank; and
>
> (b)  Respondents Rogers's breach was part of a pattern of misconduct and caused more than a minimal loss to the Bank.

## ANSWER AND OPPORTUNITY FOR HEARING

Respondents are directed to file a written Answer to this Notice within twenty (20) days from the date of service of this Notice in accordance with 12 C.F.R. § 19.19(a) and (b). The original and one copy of any Answer shall be filed with the Office of Financial Institution Adjudication, 3501 North Fairfax Drive, Suite D8115A, Arlington, VA 22226-3500. Respondents are encouraged to file any Answer electronically with the Office of Financial

Institution Adjudication at ofia@fdic.gov. A copy of any Answer shall also be filed with the Hearing Clerk, Office of the Chief Counsel, Office of the Comptroller of the Currency, 400 7th Street SW, Washington, DC 20219, hearingclerk@occ.treas.gov, and with the attorney whose name appears on the accompanying certificate of service. **Failure to Answer within this time period shall constitute a waiver of the right to appear and contest the allegations contained in this Notice, and shall, upon the OCC's motion, cause the Administrative Law Judge or the Comptroller to find the facts in this Notice to be as alleged, upon which an appropriate order may be issued.**

Respondents are also directed to file a written request for a hearing before the Comptroller, along with the written Answer, concerning the Civil Money Penalty assessments contained in this Notice within twenty (20) days after the date of service of this Notice, in accordance with 12 U.S.C. § 1818(i) and 12 C.F.R. § 19.19(a) and (b). The original and one copy of any request shall be filed, along with the written Answer, with the Office of Financial Institution Adjudication, 3501 North Fairfax Drive, Suite D8115A, Arlington, VA 22226-3500. Respondents are encouraged to file any request electronically with the Office of Financial Institution Adjudication at ofia@fdic.gov. A copy of any request, along with the written Answer, shall also be served on the Hearing Clerk, Office of the Chief Counsel, Office of the Comptroller of the Currency, Washington, D.C. 20219, hearingclerk@occ.treas.gov, and with the attorney whose name appears on the accompanying certificate of service. **Failure to request a hearing within this time period shall cause an assessment to constitute a final and unappealable order for a civil money penalty pursuant to 12 U.S.C. § 1818(i).**

## PRAYER FOR RELIEF

The OCC prays for relief in the form of the issuance of Orders of Prohibition pursuant to 12 U.S.C. § 1818(e) against each Respondent and Orders of Assessment of a Civil Money Penalty against each Respondent in the amount of two hundred fifty thousand dollars ($250,000) pursuant to 12 U.S.C. § 1818(i).

Witness, my hand on behalf of the OCC, given at Washington, DC this 25th day of September, 2017.

Michael R. Brickman
Deputy Comptroller for Special Supervision

32

# EXHIBIT B

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY**

|  |  |
|---|---|
| In the Matter of: | Docket Nos.: |
| **SAUL ORTEGA,**<br>Former Chief Financial Officer, Director,<br>President, Chief Executive Officer, and<br>Chairman of the Board, | AA-EC-2017-44 |
| And | |
| **DAVID ROGERS, JR.,**<br>Former Chairman of the Board | AA-EC-2017-45 |
| First National Bank<br>Edinburg, Texas | |

## RECOMMENDED DECISION

Jennifer Whang, Administrative Law Judge
Office of Financial Institution Adjudication
(September 30, 2022)

**Appearances:**

For Enforcement Counsel for the Office of the Comptroller of the Currency:
Susan C. Bowman, Esq., Lawrence J. Keen, III, Esq., Christopher D'Alessio, Esq.,
Erin Healy Gallagher, Esq., Michael Laurino, Esq., Nathan Taran, Esq.
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC 20219

For Respondents Saul Ortega and David Rogers, Jr.:
Frank Brame, Esq.
The Brame Law Firm PLLC
4514 Cole Avenue, Suite 600
Dallas, TX 75205

Bill Sims, Esq.
4234 Shorecrest Drive
Dallas, TX 75209

## TABLE OF CONTENTS

I.      Jurisdiction …………………………………………………….............    5
II.     Applicable Standard ……………………………………………………    5
III.    Elements of Sections 1818(e) and 1818(i) ………………………………    6
IV.     Timeliness ………………………………………………………………    9
V.      Conclusions of Law ……………………………………………………    9
VI.     Findings of Fact ………………………………………………………    11
        A.      Respondents and Their Duties ……………………………………    12
        B.      The Global Financial Crisis and the Bank's Collapse ……………    15
        C.      Capital Raise Loans (Article III) ………………………………    20
                1.      Respondents' Capital Responsibilities …………………...    21
                2.      The Bank's Need for Capital ……………………………    22
                3.      The Stock Offering ………………………………………    25
                4.      The Capital Injections …………………………………    27
                5.      The Capital Raise Loans …………………………………    29
                6.      Downstreaming and the Overstatement of Capital ………    34
                7.      Loss to the Bank ………………………………………    42
        D.      OREO Lending Strategy (Article IV) ……………………………    42
                1.      The Negative Impact of OREO …………………………    44
                2.      OREO Financing and the Bank's Dilemma ………………    46
                3.      The OREO Merry-Go-Round ……………………………    55
                4.      Underwriting Standards …………………………………    56
                5.      Approval Without Credit Review ………………………    58
                6.      Loan Quality ……………………………………………    60
                7.      The NAHS Loan …………………………………………    65
                8.      Accounting for OREO Loans ……………………………    70
                9.      Loss to the Bank ………………………………………    75
        E.      Nonaccrual Loans Accounting (Article V) ………………………    76
                1.      Nonaccrual Loans ………………………………………...    77
                2.      The Bank's Nonaccrual Accounting Practices ……………    79
                3.      The January 2009 MOU …………………………………    81
                4.      The 2011 and 2012 Consent Orders ……………………    84
                5.      The 2013 Target ROE ……………………………………    85
                6.      Materiality ………………………………………………    88
        F.      Loans to Rogers III Entities (Article VI) ………………………    89
                1.      Background ………………………………………………    91
                2.      The Yollick Email ………………………………………    91
                3.      The Griqualand Loan ……………………………………    95
                4.      The Petro Icon Loans ……………………………………    100
                5.      Loss to the Bank and Receivership ……………………    102
        G.      Additional Evidence Bearing on Culpability ……………………    103
VII.    Analysis ………………………………………………………………    107
        A.      Capital Raise Loans ……………………………………………    107
                1.      Unsafe or Unsound Practices ……………………………    108
                2.      Breach of Fiduciary Duty ………………………………...    116

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 3. | Effect | ..................................................... | 117 |
|  | 4. | Culpability | ..................................................... | 120 |
|  |  | Personal Dishonesty | ..................................................... | 121 |
|  |  | Willful Disregard | ..................................................... | 123 |
|  |  | Continuing Disregard | ..................................................... | 129 |
|  | 5. | Section 1818(i) | ..................................................... | 131 |
| B. | | OREO Lending Strategy | ..................................................... | 131 |
|  | 1. | Unsafe or Unsound Practices | ..................................................... | 132 |
|  |  | Approval without Credit Review | ..................................................... | 132 |
|  |  | Loan Quality | ..................................................... | 136 |
|  | 2. | Breach of Fiduciary Duty | ..................................................... | 142 |
|  | 3. | Effect | ..................................................... | 143 |
|  | 4. | Culpability | ..................................................... | 146 |
|  | 5. | Section 1818(i) | ..................................................... | 152 |
| C. | | Nonaccrual Loan Accounting | ..................................................... | 152 |
|  | 1. | Violation of 12 U.S.C. § 161(a) | ..................................................... | 153 |
|  |  | Inaccuracy | ..................................................... | 154 |
|  |  | Materiality | ..................................................... | 157 |
|  |  | Reasonable Belief | ..................................................... | 160 |
|  | 2. | Breach of Fiduciary Duty | ..................................................... | 162 |
|  | 3. | Unsafe or Unsound Practices | ..................................................... | 162 |
|  | 4. | Effect | ..................................................... | 163 |
|  | 5. | Culpability | ..................................................... | 166 |
|  | 6. | Section 1818(i) | ..................................................... | 169 |
| D. | | Other Accounting-Related Claims | ..................................................... | 170 |
|  | 1. | Violation of 12 U.S.C. § 161(a) | ..................................................... | 171 |
|  | 2. | Breach of Fiduciary Duty and Unsafe or Unsound Practices | ........ | 172 |
|  | 3. | Effect | ..................................................... | 173 |
|  | 4. | Culpability | ..................................................... | 173 |
|  | 5. | Section 1818(i) | ..................................................... | 174 |
| E. | | Loans to Rogers III Entities | ..................................................... | 174 |
|  | 1. | Misconduct | ..................................................... | 174 |
|  | 2. | Effect | ..................................................... | 179 |
|  | 3. | Culpability | ..................................................... | 181 |
|  | 4. | Section 1818(i) | ..................................................... | 183 |
| F. | | Civil Money Penalties | ..................................................... | 183 |
|  | 1. | Respondents' Financial Resources | ..................................................... | 185 |
|  | 2. | Respondents' Good Faith | ..................................................... | 185 |
|  | 3. | Gravity of the Violation | ..................................................... | 186 |
|  | 4. | History of Violations | ..................................................... | 187 |
|  | 5. | Such Other Matters as Justice May Require | ..................... | 187 |
| VIII. | | Conclusion and Recommended Orders | ..................................................... | 187 |

The Office of the Comptroller of the Currency ("OCC") commenced this action against Respondents Saul Ortega and David Rogers, Jr. ("Respondents") on September 25, 2017, filing a Notice of Charges ("Notice") seeking an order of prohibition and the imposition of a $250,000 civil money penalty against each Respondent pursuant to 12 U.S.C. §§ 1818(e) and 1818(i). The Notice alleges that Respondents, in their capacities as two of the directors and officers of First National Bank, Edinburg Texas ("the Bank," "First National," or "FNB"), "masked the Bank's deteriorating financial condition through misconduct that inflated earnings and capital and improperly reduced or delayed reporting losses," beginning in the midst of the global financial crisis in late 2008 and continuing in certain respects until the Bank's ultimate failure in September 2013. Notice ¶ 28. The Notice further alleges that Respondent Rogers "placed the interests of a member of his immediate family above those of the Bank" in connection with "one series of unsafe or unsound loans" taking place in or around April 2009 and January 2010. *Id.* ¶ 29.

On October 5, 2021, following briefing by Respondents and Enforcement Counsel for the OCC ("Enforcement Counsel") (collectively "the Parties"), the undersigned issued an order denying the Parties' cross-motions for summary disposition and partial summary disposition ("MSD Order") and identifying a number of disputed questions of material fact as to each of the misconduct, effect, and culpability elements of Sections 1818(e) and 1818(i) to be resolved in a hearing before this Tribunal in its fact-finding capacity.

A twelve-day virtual hearing was held between January 31, 2022 and February 15, 2022 to resolve the questions of material fact that remained in genuine dispute and to address the disposition of all other issues. During the course of the hearing, this Tribunal heard testimony from ten fact witnesses, including Respondents, and three expert witnesses or hybrid fact-expert witnesses. A total of 417 exhibits were introduced and admitted into evidence in connection with

witness testimony, along with eighteen demonstrative exhibits. Now, on the strength of the full record of this case, including the weight of the evidence, established or admitted facts, inherent probabilities, the undersigned's credibility determinations based on the testimony of witnesses, and reasonable inferences drawn from the record as a whole, and after considering the Parties' posthearing briefs ("EC Br." and "Rs Br.") and response briefs ("EC Reply" and "Rs Reply") and associated submissions containing their proposed findings and conclusions, the undersigned makes the following findings of fact, conclusions of law, and recommended orders.

## I.    <u>Jurisdiction</u>

At all times pertinent to this proceeding, the Bank was an insured depository institution pursuant to 12 U.S.C. § 1813(c)(2), and Respondents were institution-affiliated parties ("IAPs") as that term is defined in 12 U.S.C. § 1818(u).[1] The Bank is a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A) and is chartered and examined by the OCC.[2] The OCC is therefore the appropriate federal banking agency with jurisdiction over the Bank and its IAPs for purposes of 12 U.S.C. § 1813(q), and it is authorized to initiate and maintain this prohibition and civil money penalty action against Respondents.[3]

## II.    <u>Applicable Standard</u>

The burden of proof in an administrative proceeding, unless otherwise provided by statute, is on the administrative agency to establish its charges by a preponderance of the evidence.[4] Under the preponderance-of-the-evidence standard, the party with the burden of proof must adduce evidence making it more likely than not that the facts it seeks to prove are true.[5] Here, the OCC

---

[1] *See* December 10, 2021 Joint Stipulation of Facts and Law ("Joint Stip.") ¶¶ 1-2.

[2] *See id.* ¶ 3.

[3] *See id.* ¶ 4.

[4] *See* 5 U.S.C. § 556(d); *Steadman v. SEC*, 450 U.S. 91, 102 (1981).

[5] *See In the Matter of Patrick Adams*, No. AA-EC-11-50, 2014 WL 8735096, at *23 (Sept. 30, 2014) (OCC final decision) (applying preponderance standard in OCC enforcement action); *Concrete Pipe & Prods. of Calif. v. Constr.*

has the burden to prove that the statutory elements for the entry of a prohibition order and the assessment of first- and second-tier civil money penalties have been satisfied.[6] This Tribunal is then tasked with making "a comparative judgment" to determine whether the agency has presented "the greater weight of the evidence" as to the satisfaction of the statutory elements.[7]

## III.   Elements of Sections 1818(e) and 1818(i)

To merit the entry of a prohibition order against an IAP under 12 U.S.C. § 1818(e), an appropriate federal banking agency must prove the separate elements of misconduct, effect, and culpability. The misconduct element may be satisfied, among other ways, by a showing that the IAP has (1) "directly or indirectly violated any law or regulation [or] any cease-and-desist order which has become final," (2) "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution," or (3) "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty."[8] The effect element may be satisfied by showing either that the institution at issue thereby "has suffered or probably will suffer financial loss or other damage," that the institution's depositors' interests "have been or could be prejudiced," or that the charged party "has received financial gain or other benefit."[9] And the culpability element may be satisfied when the alleged misconduct either "involves personal dishonesty" or "demonstrates willful or continuing disregard by [an IAP] for the safety or soundness of such insured depository institution."[10]

---

*Laborers Pension Tr.*, 508 U.S. 602 (1993) ("The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence.") (internal quotation marks and citation omitted).

[6] *See* 12 U.S.C. §§ 1818(e), 1818(i). In this case, the agency seeks the assessment of second-tier civil money penalties against both Respondents, *see, e.g.*, EC Br. at 109-111, 118-119, but a first-tier civil money penalty only against Respondent Ortega and only for the accounting-related allegations, *see id.* at 111-112.

[7] *Almerfedi v. Obama*, 654 F.3d 1, 5 (D.C. Cir. 2011) (internal quotation marks and citations omitted).

[8] 12 U.S.C. § 1818(e)(1)(A).

[9] *Id.* § 1818(e)(1)(B).

[10] *Id.* § 1818(e)(1)(C).

The imposition of a second-tier civil money penalty under 12 U.S.C. § 1818(i) also requires the satisfaction of multiple elements.[11] First, the agency must show misconduct, which can take the form of a violation of "any law or regulation" or final cease-and-desist order,[12] the breach of "any fiduciary duty," or the *reckless* engagement "in an unsafe or unsound practice in conducting the affairs" of the institution in question.[13] Second, the agency must show some external consequence or characteristic of the IAP's alleged misconduct, likewise generally termed "effect" in past decisions issued by the Comptroller of the Currency ("Comptroller"): (1) that it "is part of a pattern of misconduct"; (2) that it "causes or is likely to cause more than a minimal loss to such depository institution"; or (3) that it "results in pecuniary gain or other benefit to such party."[14] Before any civil money penalty can be assessed upon satisfaction of these elements, the agency must take into account the appropriateness of the amount of penalty sought when considered in light of certain potentially mitigating factors, including the "good faith of the . . . person charged," "the gravity of the violation," and "such other matters as justice may require."[15]

Although the misconduct prongs of both Sections 1818(e) and (i) may be satisfied by an IAP's engagement or participation in an "unsafe or unsound practice" related to the depository institution with which he or she is affiliated, that phrase is nowhere defined in the Federal Deposit Insurance ("FDI") Act or its subsequent amendments. John Horne, Chairman of the Federal Home

---

[11] The assessment of a first-tier civil money penalty, by contrast, requires satisfaction of the misconduct element described here, but not the corresponding effect element. *See id.* § 1818(i)(2)(A).

[12] The misconduct elements of both Section 1818(e) and (i) can also be satisfied by the violation of a condition imposed in writing by a federal banking agency or any written agreement between such an agency and the depository institution in question. *See id.* §§ 1818(e)(1)(A)(i), (i)(2)(A). The OCC does not allege such violations in this case.

[13] *Id.* § 1818(i)(2)(B)(i).

[14] *Id.* § 1818(i)(2)(B)(ii). *See In the Matter of William R. Blanton*, No. AA-EC-2015-24, 2017 WL 4510840, at *16 (July 10, 2017) (OCC final decision), *aff'd on other grounds sub nom. Blanton v. OCC*, 909 F.3d 1161 (D.C. Cir. 2018) (referring to this as the statute's "effect" prong).

[15] 12 U.S.C. § 1818(i)(2)(G); *see also In re Sealed Case (Administrative Subpoena)*, 42 F.3d 1412, 1416 (D.C. Cir. 1994) ("In assessing money penalties, Congress requires [banking] agencies to consider several mitigating factors."); *accord, e.g., Blanton*, 2017 WL 4510840, at *27.

Loan Bank Board ("FHLBB") during the passage of the Financial Institutions Supervisory Act of 1966, submitted a memorandum to Congress that described such practices as encompassing "any action, or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds."[16] This so-called Horne Standard has long guided federal banking agencies, including the Comptroller, in bringing and resolving enforcement actions.[17] It has also been recognized as "the authoritative definition of an unsafe or unsound practice" by federal appellate courts.[18] The undersigned accordingly adopts the Horne Standard when evaluating charges of unsafe or unsound practices under the relevant statutes.

It is a central aspect of this statutory scheme that *only one* of the potential triggering conditions is necessary for the satisfaction of each element of Sections 1818(e) and 1818(i). That is, the "misconduct" element of Section 1818(e) is fulfilled if an IAP has breached a fiduciary duty to the institution, regardless of whether the IAP has also violated any laws or engaged in unsafe or unsound practices, and vice versa. Likewise, a second-tier civil money penalty may be assessed (assuming misconduct can be shown) if the misconduct has resulted in pecuniary gain to the IAP, even if it has not caused loss to the institution and is not part of an actionable pattern. Each component of the "misconduct" element is an independent and sufficient basis on which to ground an enforcement action if the other elements have also been shown. The same is true of the "effect" element and the "culpability" element. The OCC need only prove one component of each.

---

[16] *Financial Institutions Supervisory Act of 1966: Hearings on S. 3158 Before the House Comm. on Banking and Currency*, 89th Cong., 2d Sess. 49 (1966) (statement of John H. Horne, Chairman of the FHLBB), 112 Cong. Rec. 26,474 (1966).

[17] *See, e.g.*, *Patrick Adams*, 2014 WL 8735096, at **8-24 (discussing Horne Standard in detail).

[18] *Gulf Federal Sav. & Loan Ass'n of Jefferson Parish v. FHLBB*, 651 F.2d 259, 264 (5th Cir. 1981); *see also Patrick Adams*, 2014 WL 8735096, at **14-17 (surveying application of Horne Standard by various circuits).

## IV.   <u>Timeliness</u>

Under 28 U.S.C. § 2462, the statute of limitations governing OCC enforcement actions, the agency has "five years from the date when the claim first accrued" in which to commence proceedings.[19] Because this action was filed on September 25, 2017, then, any claim asserted in the Notice that "first accrued" on or after September 25, 2012—five years before filing—has been timely brought. The Supreme Court has held, in turn, that "the 'standard rule' is that a claim accrues when the plaintiff has a complete and present cause of action"—that is, when all of the elements of an actionable claim have been met and can be pled.[20] It therefore necessarily follows that if not all of the elements of a cause of action have been met, then a claim has not accrued for purposes of a limitations period. This means that Section 2462's five-year limitations period only begins to run once an agency is capable of bringing an enforcement action against a given respondent—which, in the case of statutes with "effect" elements or other multi-pronged prerequisites, such as Section 1818(e) and the second-tier civil money penalty in Section 1818(i), may well be later than the date of the alleged misconduct.[21]

## V.   <u>Conclusions of Law</u>

The OCC's allegations in this case may be divided into four general topic areas, detailed respectively in Articles III (what will be termed the "Capital Raise Loans" issue), IV ("OREO

---

[19] The full relevant text of Section 2462 is as follows: "Except as otherwise provided by Act of Congress, an action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462.

[20] *Gabelli v. SEC*, 568 U.S. 442, 448 (2013); *see also*, *e.g.*, *FERC v. Powhatan Energy Fund*, 949 F.3d 891, 898 (4th Cir. 2020) (claim accrues "when the plaintiff can file suit and obtain relief") (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)); *Savory v. Cannon*, 947 F.3d 409, 427 (7th Cir. 2020) (all "essential element[s] of [a] claim" necessary for accrual); *Blanton*, 909 F.3d at 1171 ("A claim normally accrues when the factual and legal prerequisites for filing suit are in place.") (internal quotation marks and citation omitted).

[21] *See Proffitt v. FDIC*, 200 F.3d 855, 863 (D.C. Cir. 2000) (noting that "the question of accrual becomes complex when considerable time intervenes between the underlying conduct and the harmful effect").

Lending Strategy"),[22] V ("Nonaccrual Loan Accounting"), and VI ("Loans to Rogers III Entities")
of the Notice. The Capital Raise Loan and OREO Lending Strategy allegations are likewise
divided into two types of misconduct, which Enforcement Counsel has previously distinguished
as "lending-related misconduct" and "accounting-related misconduct."[23]

With respect to the misconduct element of Section 1818(e) and as applicable for Section
1818(i), then, the OCC seeks to prove the following:[24]

| | Article III (Capital Raise Loans) | Article IV (OREO Lending) | Article V (Nonaccrual Loans) | Article VI (Rogers III Loans) |
|---|---|---|---|---|
| **Violated 12 U.S.C. § 161** | accounting only | accounting only | x | |
| **Engaged in unsafe/unsound practices** | x | x | x | |
| **Breached fiduciary duty of care** | x | x | x | |
| **Breached fiduciary duty of loyalty** | | | | x |

With respect to the culpability element of Section 1818(e) and as applicable for Section
1818(i), the OCC seeks to prove the following:

| | Article III (Capital Raise Loans) | Article IV (OREO Lending) | Article V (Nonaccrual Loans) | Article VI (Rogers III Loans) |
|---|---|---|---|---|
| **Personal dishonesty** | x | | | x |
| **Willful disregard** | x | x | x | x |
| **Continuing disregard** | x | x | x | x |
| **Recklessness (1818(i))** | x | x | x | |

---

[22] As discussed further *infra*, "OREO" or "ORE" in an accounting context stands for "Other Real Estate Owned," or collateral in the form of real estate foreclosed upon by banks in lieu of a borrower's ability to make loan payments.

[23] *See* January 16, 2018 Brief in Support of OCC's Motion for Partial Summary Disposition on Respondents' Seventh and Ninth Affirmative Defenses at 9, 10 (noting that "the [actionable] effects in this case are the losses suffered by the Bank as a result of the lending-related misconduct and the prejudice to the Bank's depositors as a result of the improper accounting practices"). With respect to accounting-related misconduct, Enforcement Counsel seeks a first- and second-tier civil money penalty against Respondent Ortega but not Respondent Rogers. *See* EC Br. at 109-112.

[24] The Notice also alleges that Respondents' participation in the OREO Lending Strategy and allegedly improper Nonaccrual Loan Accounting "violated final cease-and-desist orders," a separate and independently actionable act of misconduct. Notice ¶¶ 55, 90, 134-135. However, Enforcement Counsel does not raise this issue as a basis for relief in either its pre- or posthearing briefing, and the undersigned accordingly does not address it here.

And with respect to the effect elements of Section 1818(e) and 1818(i), the OCC seeks to prove the following:

| | Article III (Capital Raise Loans) | Article IV (OREO Lending) | Article V (Nonaccrual Loans) | Article VI (Rogers III Loans) |
|---|---|---|---|---|
| **Financial loss or other damage to the Bank** | lending only | lending only | | x |
| **Depositor prejudice** | x | accounting only | x | |
| **Financial benefit to Respondents** | | | | |
| **Pattern of misconduct (1818(i))** | x | x | x | x |

In consideration of this and the factual record developed by the January 31, 2022 hearing, and as set forth in detail in this Order, the undersigned now concludes that (1) the OCC has demonstrated actionable misconduct as to each category of allegations above; (2) the effect element has likewise been sufficiently satisfied except as to Article V; and (3) the agency has failed to meet its burden with respect to Respondents' culpability, a necessary component of a Section 1818(e) prohibition order, except as to the allegations against both Respondents in Article V and against Respondent Rogers in Article VI. The undersigned also concludes that the elements for the assessment of a Section 1818(i) civil money penalty have been proven as to both Respondents. The undersigned therefore recommends the entry of a prohibition order against Respondent Rogers and the assessment of a $250,000 civil money penalty against each of the Respondents.

## VI.    <u>Findings of Fact</u>

These findings are drawn as appropriate from the Parties' pleadings and stipulations, from the proposed findings of fact submitted in connection with the posthearing briefing ("EPF" and "RPF" respectively),[25] from hearing testimony ("Tr."), and from supporting exhibits admitted

---

[25] The undersigned notes that the conclusions of law accompanying Respondents' proposed findings of fact contain a series of paragraphs challenging the validity of these proceedings on grounds relating to the Appointments Clause of the United States Constitution. *See* RPF ¶¶ 85-101. These issues were addressed in this Tribunal's March 17,

therewith ("EX," "RX," and "JX") and submitted in connection with the Parties' summary disposition briefing and oppositions thereto ("EC-PSD," "R-MSD," "EC-BIO," and "R-BIO"). The undersigned will additionally highlight the genuine questions of materially disputed fact identified at the summary disposition stage, where relevant, and indicate the extent to which these questions have been resolved or narrowed by evidence adduced at the hearing.

## A.   <u>Respondents and Their Duties</u>

Respondent Rogers held the position of Chairman at the Bank from 1981 to November 2011.[26] Respondent Ortega served as the Bank's Chief Financial Officer ("CFO") from 1994 through October 2011, leaving that position and replacing Respondent Rogers as the Bank's Chairman in November 2011, in which capacity he served until the Bank's closure in September 2013.[27] In January 2012, Respondent Ortega also became the Bank's President and Chief Executive Officer ("CEO").[28] Both Respondents served on the Bank's Board of Directors as well as in the capacity of officers and directors of the Bank's holding company, First National Bank Group, Inc. ("the Holding Company," "the Company," or "FNBG") from at least January 1, 2008 until November 1, 2011.[29]

Overall, there can be no dispute that "Respondents served as executive officers in the Bank's senior management, with responsibility for major Bank policies, strategic business decisions, and risk management" during the relevant time period.[30] Between 2008 and 2011, Respondents comprised two of four individuals characterized by the OCC as collectively

---

2020 Order Denying Respondents' Motion for Summary Disposition on the Appointments Clause, and are hereby preserved for Comptroller review.

[26] *See* Joint Stip. ¶ 2.

[27] *See id.*

[28] *See id.*

[29] *See id.* ¶ 6.

[30] EC Br. at 19.

"responsible for the day-to-day management of the Bank," along with then-President/CEO Robert Gandy and then-Chief Lending Officer ("CLO") Michael McCarthy.[31] In his position as CFO, Respondent Ortega was also "responsible for financial reporting, accounting, the Bank's books and records, and computer information systems."[32]

In addition to their other duties, Respondents were voting members of the Bank's Loan & Discount Committee ("L&D Committee") between 2008 and 2011.[33] The L&D Committee consisted of all of the Bank's directors, including five outside directors.[34] Committee members met weekly and were charged with approving all of the Bank's loans greater than $1 million.[35] The L&D Committee would occasionally approve loans by majority vote over the telephone (a "telephone tally") before ratifying those loans before the full Committee at the weekly meeting.[36] The L&D Committee also "exercised [o]versight of all lending activities within the Bank," including acting as the Bank's "primary credit approval body," monitoring credit activity and the Bank's loan review function, and having overall responsibility for the quality of the Bank's loan portfolio.[37]

Although neither Respondent is trained as a lending officer and CLO McCarthy, rather than Respondents, oversaw the Bank's lending department,[38] the undersigned credits the expert hearing testimony of Deputy Comptroller Michael Brickman that the authority exercised by L&D

---

[31] EC-PSD-59 (Declaration of National Bank Examiner Ramah L. Chansen) ("Chansen Decl.") ¶ 4.
[32] EPF ¶ 25.
[33] *See* Joint Stip. ¶ 7.
[34] *See id.*; *see also* Notice ¶¶ 10-11; Answer at 2.
[35] *See* Joint Stip. ¶ 7.
[36] *See id.*
[37] EPF ¶ 43 (citing JX 8 (FNB Loan Policy effective August 14, 2008) ("2008 Loan Policy") at 7; JX 9 (FNB Loan Policy effective August 24, 2009) ("2009 Loan Policy") at 12; JX 10 (FNB Loan Policy effective January 1, 2010) ("2010 Loan Policy") at 13).
[38] *See* EX 568 (Sworn Statement Transcript of David Rogers, Jr.) ("Rogers Dep.") at 14:15-15:11, 21:11-24; EX 569 (Sworn Statement Transcript of Saul Ortega) ("Ortega Dep.") at 11:17-13:21, 35:5-19; EC-PSD-12 (Sworn Statement Transcript of Michael McCarthy) ("McCarthy Dep.") at 18:3-15.

Committee members was "not intended to be a rubber stamp of a lower level decision."[39] Rather, "[a] member of the loan committee is responsible for reviewing the terms and conditions of the loan to ensure that they align with the bank's policies and procedures," not only in isolation but with "a broader perspective of the bank's overall concentration risk [and] capital position."[40] National Bank Examiner ("NBE") Ramah Chansen likewise opined that L&D Committee members are responsible for "reviewing the credit packages being presented to them via the committee" in depth and in detail, making sure that the packages are complete and comprehensive, that any loan policy exceptions are clearly identified and explained, and that "all of the required information is provided to support the credit decision and evaluate the risk associated with that particular request."[41] Finally, it is the OCC's expectation that L&D Committee members track loan policy requests over the life of the loan "to determine the ultimate risk to the Bank."[42]

Notwithstanding these broader responsibilities, Respondent Ortega testified that as an L&D Committee member, he generally trusted the determinations and recommendations of the loan officers and credit department on a given loan package rather than closely reviewing the loan details himself. With respect to loan approvals, for example, Respondent Ortega stated that his decisions were typically "based on the front two pages" of the loan package and that he would not "dive into the numbers" or examine the credit reviews in depth to confirm that the borrower's

---

[39] Brickman Tr. 102:10-11. The designation "Tr." in this Order refers to the official transcript of testimony given during the twelve-day hearing in this matter in late January and early February 2022. The name preceding that designation refers to the witness whose testimony is being given.

[40] *Id.* 101:9-11; *see also id.* 101:19-24 (opining that, in evaluating loans, L&D Committee members should "layer in their expertise in regard to the overall risk profile of the bank and whether or not that loan would pose undue risk to the capital position or to the financial performance of the financial institution").

[41] Chansen Tr. 1290:6-15; *see also id.* 1288:15-1289:4 ("[U]pon their review of those packages, they need to be asking questions to ensure that they understand the request, they understand that structure. They need to understand everything regarding that particular request."); Brickman Tr. 102:4-9 ("A loan committee member has an obligation if there's insufficient information to make a decision to follow up with the loan underwriter or the person responsible for providing the information to gather the necessary information to make the decision.").

[42] Chansen Tr. 1290:21-1291:14.

financial position was adequate or that the loan was likely to be repaid.[43] Respondent Ortega also

testified that he would never question the stated purpose of a loan as recorded in a loan package,

even if he might have had reason to believe that the loan purpose as stated was inaccurate.[44]

### B.     The Global Financial Crisis and the Bank's Collapse

It is no mere happenstance that the Notice's allegations take place against the backdrop of

the global financial crisis of the late 2000s,[45] and the issues of this case, particularly with respect

to culpability, must be examined with that context in mind. As a community bank headquartered

in Texas's Rio Grande Valley, one of the poorest areas of the United States, there is ample evidence

that First National Bank faced especially severe challenges during this time that impacted all

aspects of its operations. Witness after witness testified as to the volatility of the market in 2008

and beyond and the difficult financial climate encountered by banks like First National whose loan

portfolios, capital levels, and real estate holdings were affected by the crisis.[46]

One of the most significant challenges concerned the real estate properties owned by the

Bank because of foreclosed collateral from a defaulted loan—properties known as Other Real

---

[43] Ortega Tr. 643:21-644:19, 645:20-646:6 ("Well, the credit review, I mean, I'll tell you, that's a lot of information for me to review. . . . I have a lot of responsibilities. I wish I could read every credit review, but that was not—I mean, you must have a misconception of my vote on the L&D.").

[44] See id. 546:16-547:5 ("To tell you the truth, over many, many years of being on the L&D Committee, I don't know that I ever really questioned the loan purpose. . . . I don't think I ever questioned the loan purpose. There's a lot of individuals below me that understand this a lot better than I do."); see also Rogers Tr. 341:10-18 ("Q: The documentation that you reviewed at the L&D Committee showed you what the loan purpose of the loan that you were considering for approval was . . . [a]nd if that loan purpose was inaccurate based on your knowledge, you should have ensured that it was corrected, correct? A: That is correct, yes, ma'am.").

[45] See Notice ¶¶ 31-32 (alleged Capital Raise Loans misconduct beginning in April 2009), 55 (OREO Lending Strategy implemented "from late 2008 through at least September 2011"), 90 (improper accrual of interest "[b]eginning as early as 2007 and continuing until March 31, 2013"), 117 (allegedly improper preferential treatment in April 2009).

[46] See, e.g., Chansen Tr. 1617:9-11 (stating that "the [real estate] market was fluctuating and decreasing rapidly during [the 2008 to 2013 timeframe]"); Pena Tr. 1183:10-1184:11 (agreeing that interest rates and real estate prices were extremely volatile in 2009 and 2010); Magee Tr. 2182:16-25 ("[T]he whole downturn in the real estate market was widespread, deep, so nobody was purchasing and nobody was lending."); Gandy Tr. 2227:15-21 ("There was no liquidity in the market. Nobody could go get a loan. The big banks had been told to shrink. . . . So the only way they could shrink was not to make loans. And besides that, they'd dumped billions and billions of dollars of real estate on the market."); Rogers Tr. 382:23-383:5 ("Everybody was fighting and trying to survive. The liquidity wasn't there. ORE wouldn't move. We were doing the best we could do in a really tough environment.").

Estate Owned ("ORE" or "OREO") on the Bank's balance sheet. As with many other financial institutions, the Bank's OREO holdings began to grow significantly in 2008 "as a result of increasing delinquencies and foreclosures" and posed an ever greater risk to its financial health from that point forward.[47] NBE Chansen testified that OREO properties are considered nonperforming assets that "have an adverse effect on [a] bank's financial condition" because they do not earn interest and because the cost for upkeep of the OREO can be substantial, causing the bank to lose money monthly.[48] Accordingly, it is typically in the best interests of a bank to sell its OREO properties "as quickly as possible,"[49] particularly at a time when more OREO is being added to that bank's books every month as a result of further foreclosures and repossessions.[50] The Bank's efforts to sell these nonperforming, costly properties, and the methods by which it sought to remove OREO from its books at the height of the financial crisis, are central to this action and are discussed in much greater detail below.

The Bank also experienced a shockwave in September 2008, when it suffered a $174 million investment loss in connection with the failure of the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie").[51] This caused the Bank to fall from "well capitalized" to

---

[47] EPF ¶ 190.

[48] Chansen Tr. 1293:9-14; *see also id.* 1293:15-22 (noting that the bank has to pay property taxes, maintenance, and insurance on OREO properties); Ortega Tr. 953:14-954:11 (discussing the millions of dollars of costs and expenses incurred by the Bank while holding OREO); Rogers Tr. 370:19-24 ("[W]hen the bank owns ORE, you're doing maintenance, paying taxes, maintaining the property. It was important for us to get it out of the bank and have somebody else maintaining it, paying the insurance, paying the taxes.").

[49] Leal Tr. 2288:11; *see also, e.g.*, Pena Tr. 1185:18-1186:1 (agreeing that putting the ORE "in the hands of a borrower who can make even, say, one payment" would "generate a better situation for the bank than just sitting there and holding it and losing money every month"); Chansen Tr. 1295:15-17 (stating that banks will "take steps to move the OREO off their books because they want to lower the risk within their balance sheet"), 1673:21-23 ("I would agree that holding OREO for an extended period of time is not in the bank's interest.").

[50] *See* Leal Tr. 2287:8-25 (stating that the Bank was repossessing more properties "as the economy continued to suffer" and adding that "we were like drinking out of a firehose. It was coming hard and we were tasked to try to get these sold. You know, you had to sell them. You had to get them back out because we were just going to drown.").

[51] *See* Joint Stip. ¶ 8.

"adequately capitalized" within the meaning of the federal banking agencies' statutory responsibility to take prompt corrective action.[52] Respondent Rogers testified that this investment loss was a "disaster" that "basically shut us down," forcing the Bank to cut back dramatically on its lending and take steps to reduce the size of its operations.[53] Respondents also acknowledged that this loss coupled with the Bank's increasing OREO portfolio led the Bank to adopt a more aggressive strategy for selling OREO properties from the spring of 2009 onward, including becoming "more lenient on loan terms" for borrowers purchasing ORE from the Bank.[54]

In light of the Bank's deteriorating financial condition, the OCC instituted measures in January and February of 2009 requiring the Bank, *inter alia*, to reduce criticized assets, achieve and maintain higher capital levels and minimum capital ratios, improve loan risk rating accuracy, and improve accounting for nonaccrual loans.[55] In doing so, the OCC described the Bank's need for higher capital levels as "exigent."[56] The OCC further underscored the importance of the corrective measures, advising the Bank "that failure to achieve the capital ratios would be considered an unsafe or unsound banking practice and failure to submit an acceptable capital plan would result in further action by the OCC."[57] The Bank's efforts to raise capital in the immediate wake of these communications are described in fuller detail in the appropriate section below, but

---

[52] *See id.*; *see generally* 12 U.S.C. § 1831o.

[53] Rogers Tr. 447:23, 456:22-25; *see also id.* 324:23-325:1 ("We were reducing everything, trying to reduce the loan, reducing the employees. We were trying to deleverage the bank."); Ortega Tr. 618:4-6 ("At this time we were really trying to shrink the bank size, . . . trying to reduce our loan portfolio.").

[54] Rogers Tr. 377:1-4; *see id.* 369:21-370:3 (agreeing that the Bank adopted aggressive strategy to sell OREO properties); Ortega Tr. 616:25-618:8 (agreeing that "[t]he Bank loosened its underwriting criteria in order to get rid of ORE"). The evidence indicates that the OCC at the time supported the Bank's aggressive efforts to reduce its OREO volume—although, again, the legitimacy of the precise methods used by the Bank are at issue here. *See* JX 2 (June 30, 2009 Report of Examination) ("2009 ROE") at 12 ("Management recognizes that holding OREO is not in the best interest of the bank or its shareholders. Management aggressively sells OREO to those they identify as having the best chance for success in holding the OREO and repaying the bank.").

[55] *See* EPF ¶¶ 9-11; Answer at 3.

[56] EX 147 (February 18, 2009 letter from OCC to Bank Board of Directors) ("IMCR Letter") at 2.

[57] EPF ¶ 81 (citing EX 147 (IMCR Letter) at 5).

the undersigned notes two salient facts here: First, the capital raise efforts included a $5 million

contribution from Respondent Rogers and a $1 million contribution from Respondent Ortega, both

made via the purchase of holding company stock and neither contribution financed by the Bank

itself.[58] Second, the Bank's holding company made two capital injections totaling $35 million into

the Bank by mid-August 2009, the result of which was to achieve the desired capital ratios and

address the Bank's capital issues, at least temporarily.[59]

The Bank continued to have difficulty weathering the storm, and the OCC issued a consent

order in February 2011 that once again increased the Bank's minimum capital ratios and required

it to correct what the agency identified as unsafe or unsound practices concerning the Bank's loan

portfolio management and nonaccrual loans.[60] Then, following a June 2011 onsite examination by

the OCC, the Bank made significant changes to its executive management: Gandy, McCarthy, and

Respondent Rogers all resigned from their positions, and Respondent Ortega ultimately assumed

new roles as the Bank's Chairman, President, and CEO along with a new senior management team

that included Chief Operations Officer ("COO") Ryan Leal, formerly the Bank's comptroller, and

Chief Credit Officer ("CCO") Mark Magee.[61] After a January 2012 consent order and another

onsite visit in March 2012, the OCC noted that the "new management team, under the direction of

President Ortega, is much improved," and that the Bank had made "significant progress toward

---

[58] See RPF ¶ 40; EX 374A (spreadsheet entitled Capital Raise Loans Summary) ("Capital Raise Loans Spreadsheet"). Because neither Respondents' contribution is alleged to have been financed by a loan from the Bank itself, they are not part of the allegedly problematic Capital Raise Loans Plan at issue in this action. See Salvato Tr. 1903:18-1904:18 (noting that there is no concern with purchases of holding company stock that are not financed by Bank); Chansen Tr. 1568:3-1569:2 (same). The undersigned also observes that Respondent Ortega's purchase of holding company stock was made in April 2010 and therefore was not part of the initial capital raise efforts in response to the Bank's undercapitalization in the spring of 2009. See EX 374A (Capital Raise Loans Spreadsheet) at 2.

[59] EPF ¶¶ 150, 153 (noting $30 million injection in May 2009 and $5 million injection in August 2009); see also EX 163 (reconciliation of Bank's surplus ledger account dated July 31, 2013) (reflecting the $35 million in capital injections in 2009 and no further capital injections from 2009 through the Bank's closure in 2013).

[60] See RPF ¶ 12; JX 12 (February 2011 Consent Order) at 6-13.

[61] See JX 5 (May 15, 2012 letter from OCC to Bank Board of Directors relaying conclusions of March 2012 target examination) ("2012 Target ROE") at 2.

complying with the Order and [improving] both the credit and operations culture."[62] The OCC's 2012 Report of Examination (or "ROE") likewise recorded improvement, singling out Respondent Ortega again and finding, among other things, that the new management "has initiated a cultural change, set forth proper underwriting parameters for OREO financing, engaged outside firms for capital procurement and comprehensive loan review, and combined with heightened internal loan review and loan officer identification to determine the full extent of problem loans."[63]

Nevertheless, the agency stated that the Bank's overall condition remained "critically deficient" and was getting worse, including a continued decline in capital levels and asset quality.[64] While the OCC found that the new executive management team had "made a significant and aggressive effort to reduce the level of problem assets, address impairments, enhance the real estate appraisal process, and reduce OREO volume," it stated that "the problems continue to grow and this team to date has been ineffective overall at reversing the Bank's negative course."[65] The OCC also continued to identify the Bank's OREO portfolio as a significant problem, stating that it was "at an extremely high and unsafe and unsound level . . . due primarily to a credit culture that fostered poor credit risk selection and lax underwriting standards."[66] By June 2013, the Bank had become "critically undercapitalized," and the OCC ultimately closed the Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver several months later.[67]

---

[62] *Id.*

[63] JX 6 (June 30, 2012 Report of Examination) ("2012 ROE") at 38.

[64] JX 5 (2012 Target ROE) at 1-2.

[65] JX 7 (June 27, 2013 letter from OCC to Bank Board of Directors relaying conclusions of March 2013 target examination) ("2013 Target ROE") at 3.

[66] JX 6 (2012 ROE) at 47; *see also* JX 7 (2013 Target ROE) at 13 (finding that "[t]he high level of nonperforming assets (non-accrual loans and OREO) and lack of management expertise in the lending function are the most significant risks facing the Bank.").

[67] *See* EPF ¶¶ 14-15; Joint Stip. ¶ 9.

### C.     Capital Raise Loans (Article III)

Article III of the Notice alleges that "[f]rom approximately April 2009 to March 2011, Respondents originated, approved, and/or ratified unsafe or unsound loans to finance the purchase of stock in the Holding Company ("Capital Raise Loans") and then transferred the proceeds to the Bank to raise capital."[68] It further alleges that Respondents then "caused the Bank to improperly inflate its capital by including the proceeds of the Capital Raise Loans as regulatory capital in the Bank's Call Reports."[69]

In its October 5, 2021 Order on the Parties' summary disposition motions, this Tribunal identified certain questions of disputed material fact regarding the Capital Raise Loans issue, including the scope of Respondents' responsibility and involvement in the misconduct alleged by the agency; the riskiness of the Capital Raise Loans at the time they were made and the Respondents' understanding thereof; the extent to which the Capital Raise Loans were part of a plan to downstream "sham" capital from the Holding Company to the Bank; and whether and to what extent Respondents' alleged misconduct with respect to the Capital Raise Loans caused loss to the Bank.[70]

Viewing the totality of the evidence, and as elaborated upon below, the undersigned now makes the following core findings: **(1)** Respondents were among the individuals who bore ultimate responsibility for the Capital Raise Loans; **(2)** it is incontrovertible that a number of people borrowed money from the Bank to purchase Holding Company stock, often through unsecured,

---

[68] Notice ¶ 31.

[69] *Id.*; *see also* Brickman Tr. 164:17-165:8 ("A call report is . . . the record of a bank's capital asset quality, liquidity, assets, and liabilities, an overall picture of their financial condition. . . . [T]he OCC requires banks to quarterly file a call report in order to be able to continuously monitor the financial condition of banks within the system.").

[70] *See* MSD Order at 17-18. Enforcement Counsel did not move for summary disposition on its allegations of improper accounting practices relating to the Capital Raise Loans, and Respondents' motion for summary disposition did not discuss those allegations in detail. As a result, there were no genuine questions of disputed material fact identified with respect to accounting-related Capital Raise Loans allegations. *See id.* at 9 n.28.

uniformly low-interest loans at a time when the Bank's capital position required that it be (and Bank management represented that it was) severely limiting its lending activity; **(3)** Respondents acknowledge that at least some of the proceeds of these Bank-financed stock purchases were downstreamed back to the Bank as putative capital, although any Capital Raise Loan—that is, a loan by the Bank for a borrower to then purchase an equivalent amount of Holding Company stock—that was made later than August 12, 2009 could not have been downstreamed to the Bank, because there were no further capital injections after that date; and **(4)** the Bank suffered a loss with respect to certain Capital Raise Loans. In addition, it is undisputed that the Bank's communications with the OCC regarding its capital raise efforts, including its capital plans that Respondent Ortega played a part in drafting, did not disclose that the Bank was making unsecured loans to individuals to finance purchases of holding company stock as part of the capital raise, nor did the Bank indicate that any portion of the proceeds from these Capital Raise Loan-financed stock purchases might be sent from the Holding Company back to the Bank to be treated as an infusion of new regulatory capital.

1.    <u>Respondents' Capital Responsibilities</u>

Both Respondents had multiple responsibilities related to the Bank's capital position, and the 2009 capital raise efforts in particular, in their capacities as officers and directors of the Bank.[71] As Chairman, Respondent Rogers was "responsible for raising capital funds for the Bank and the Bank holding company to maintain required capitalization in terms [and] conditions most advantageous to the Bank."[72] In his role as CFO, Respondent Ortega was responsible for drafting the Bank's capital plans, with the help of counsel and accountants, and leading the efforts to compile the Holding Company's private placement memorandum in connection with its offering

---

[71] *See* EPF ¶¶ 68-71.
[72] Brickman Tr. 76:21-77:5.

of stock.[73] Respondent Ortega also was responsible for "analyzing the overall impact of the capital raise on the Bank[] and tracking the Bank's progress towards meeting its capital goals."[74] And Respondents, along with the rest of the Board of Directors, were generally "responsible for making decisions related to raising capital," including developing and implementing a capital raise strategy when capital is needed.[75]

2.     The Bank's Need for Capital

The September 2008 failure of government-sponsored enterprises Fannie Mae and Freddie Mac rendered the Bank's preferred stock in those entities "virtually worthless," leading the Bank to incur a $174 million loss on that investment.[76] As a result of this loss, the OCC determined that the Bank would need to raise capital "in excess of regulatory minimums," given its high level of classified assets and commercial real estate holdings amidst a "continued weak economy that is having an adverse impact on the commercial real estate portfolio."[77] After injecting $24 million from the Holding Company to the Bank in the immediate wake of the Fannie and Freddie failure, Respondent Rogers and Bank management committed to raising an additional $35 million in capital and achieving the desired capital ratios by March 31, 2009.[78] Respondent Rogers stated that this capital raise would be achieved primarily "by selling holding company common stock"

---

[73] *See* Ortega Tr. 499:6-14, 896:12-19; *see also* EPF ¶ 77.

[74] EPF ¶ 71; *see* Brickman Tr. 136:19-137:11.

[75] EPF ¶ 68; *see* Brickman Tr. 136:6-18.

[76] EX 148 (February 26, 2009 letter from Bank Board of Directors to OCC) ("February 2009 Capital Plan") at 3.

[77] JX 1 (September 30, 2008 Report of Examination) ("2008 ROE") at 3 (noting that the Bank's "[c]lassified assets are heavily concentrated in substandard loans that are secured by real estate for residential land development and construction projects").

[78] *See id.*; *see also* EPF ¶¶ 73-74.

and that initial discussions with the firm retained to assist in the stock offering "indicated a strong interest for participation" by prospective investors.[79]

On February 18, 2009, the OCC formally imposed an individual minimum capital ratio ("IMCR") requiring the Bank to meet ratios of 8 percent for its Tier 1 regulatory capital and 12 percent for its risk-based capital by May 10, 2009.[80] The agency and the Bank agreed that in order to meet these new capital ratios, the Bank would need to raise between $50 and $75 million in additional capital, given "the level of non-performing assets on the Bank's balance sheet and losses from [its] investment portfolio."[81] The agency also stated that the Bank was "exposed to a high degree of asset depreciation and a high volume of, or particularly severe, problem loans."[82] The agency made it clear that the Bank could not be operated in a safe and sound condition "[a]bsent the necessary capital injection."[83]

To effectuate the new minimum capital ratios, the OCC required the Bank to develop a capital plan by late February 2009 setting forth the methods by which the Bank intended to secure "additional capital to meet the Bank's current and future needs."[84] The agency stated that it would only accept a detailed and fully documented plan that was "based on realistic assumptions, is likely to succeed in restoring the Bank's capital, and will not increase the risk to the Bank."[85] Finally,

---

[79] JX 1 (2008 ROE) at 12.

[80] *See* EX 147 (IMCR Letter) at 5.

[81] *Id.* at 1.

[82] *Id.* at 2 (also noting that "[h]igher minimum capital ratios are appropriate for the Bank because of the significant deterioration in the Bank's condition, including considerable problems with asset quality, exposure to substantial risk from concentrations of credit and inadequate risk management systems, and capital that is insufficient to support the risk profile of the Bank").

[83] *Id.* at 3.

[84] *Id.* at 4.

[85] *Id.* at 4-5.

the agency emphasized that "[t]he timeframes in the capital plan *should reflect a sense of urgency and an awareness of the recent rapid deterioration in the Bank's condition*."[86]

The Bank submitted its capital plan on February 26, 2009.[87] Among other things, this plan stated that the Holding Company was "actively pursuing an offering of shares of its common stock to raise capital," and that "any portion" of the proceeds of such an offering that was "injected into the Bank would count as Tier 1 capital, thereby increasing all applicable capital ratios."[88] The capital plan also stated that a certain amount of the stock sale proceeds would be "retained by the Holding Company to service its indebtedness and for other general corporate purposes," so that "both the Holding Company and the Bank would be well-capitalized" at the end.[89] The plan did not mention any possibility that the sale of Holding Company stock through this offering would be financed by loans from the Bank itself.[90]

On April 3, 2009, Respondents and then-President/CEO Gandy met with OCC Deputy Comptroller Gil Barker to discuss the steps being taken by the Bank to improve its capital ratios.[91] In this meeting, Respondents relayed their efforts "to shrink the Bank in order to comply with the IMCR," including by reducing personnel, cutting costs across the board, and scaling back lending operations so that there was "virtually NO lending occurring."[92] Respondents also told Deputy Comptroller Barker that the upcoming offering of Holding Company stock would be sold locally,

---

[86] *Id.* at 5 (emphasis added).

[87] *See* EX 148 (February 2009 Capital Plan).

[88] *Id.* at 3.

[89] *Id.* at 4 (further stating that "[t]he Holding Company would monitor its cash flow needs and the capital needs of the Bank, and may decide to inject additional amounts into the Bank as needed at the Bank (and not immediately needed by the Holding Company)").

[90] *See* Brickman Tr. 124:7-17.

[91] *See* EPF ¶ 92; EX 548 (April 3, 2009 OCC meeting minutes).

[92] EX 548 (April 3, 2009 OCC meeting minutes) at 1 (stating that there was "no lending going on"); *see also* Rogers Tr. 456:24-25 ("We needed to shrink the bank. We needed to cut back on the lending."); Chansen Tr. 1257:13-1258:3 (testifying that by shrinking its loan portfolio, a bank can improve its capital ratio even if its capital levels stay the same).

and that Respondent Rogers and his family had committed to contribute at least $10 million of the $20 to 40 million the Bank was hoping to raise.[93] Once again, Bank management did not disclose to the OCC at this meeting "that the Bank was considering providing, or would be providing, loans to investors to fund their Holding Company stock purchases."[94]

### 3.  The Stock Offering

On April 14, 2009, the Holding Company issued its Private Placement Memorandum ("PPM") in connection with the capital raise stock offering.[95] The PPM stated that the proceeds of the offering would be used to improve the regulatory capital positions of both the Bank and the Holding Company and "for general corporate purposes, including . . . servicing the Company's outstanding debt."[96] Like the Bank, the Holding Company had ceased to be well-capitalized in the fall of 2008, entering into a memorandum of understanding ("MOU") with the Federal Reserve Bank of Dallas as a result that required it to submit its own capital plan to that agency and achieve a certain minimum capital ratio.[97] The PPM estimated that selling the full offering of shares for $48.75 million would "provide the Company with sufficient capital to be classified as well capitalized for regulatory purposes," as well as allowing the Company to capitalize the Bank itself.[98] Although the PPM contemplated only $15 million of the $48.75 million in total stock sales

---

[93] EX 548 (April 3, 2009 OCC meeting minutes) at 1; *see also* Ortega Tr. 564:1-12 (stating that the Bank planned to raise capital from "local customers that were inquiring about investing in the bank, friends and other investors there, in that area," because it had been unsuccessful in finding investors nationally).

[94] EPF ¶ 92; *see also* Rogers Tr. 328:8-12; Brickman Tr. 129:2-6.

[95] *See* EX 143 (2009 Holding Company PPM).

[96] *Id.* at 31 ("We anticipate using a portion of the proceeds from the Offering to inject capital into our Bank. The remaining proceeds will be used for other general corporate purposes of the Company and possible future injections of capital into the Bank.").

[97] *See id.* at 5.

[98] *Id.* (stating that "the Company and the Bank are optimistic that through the continued reduction of the Bank's asset size and the Bank's continued earnings and through the use of at least $15 million [in proceeds] to increase the capital accounts of the Bank, the Bank will comply with the [IMCR] by May 10, 2009").

being downstreamed to the Bank, it noted that "[t]he Company intends to increase the contribution to the Bank to the extent necessary to comply with the Capital Ratio Directive."[99]

To raise the capital required by the OCC, the Bank's Board of Directors focused on finding local investors in their Rio Grande Valley community.[100] While the OCC stated that the Bank's capital raise efforts "may also need to attract institutional investors" from outside the region,[101] then-President/CEO Gandy informed the OCC on April 28, 2009 that "the national capital markets . . . are essentially frozen for all community banks," making the prospect of finding institutional investors infeasible.[102] Still, Gandy expressed optimism regarding the stock offering, noting that the Bank had "communicated with 231 prospective stock purchasers so far" and received $15 million in purchases, with "firm commitments" of another $12 million.[103] Gandy predicted that a combination of the local capital raise and the Bank's efforts to shrink its assets and reduce its loan portfolio would allow the Bank to achieve the desired 8 percent Tier 1 capital ratio by May 10, 2009, although it did not anticipate being in compliance with the 12 percent risk-based ratio until the end of September of that year.[104] The letter did not disclose that the Bank would be providing loans to local investors to finance their Holding Company stock purchases.[105]

The OCC responded to Gandy's letter on April 30, 2009, stating that the February 2009 capital plan "contained a reasonable road map for complying with the IMCR" but requiring the Bank to "submit a new capital plan as soon as possible" in light of the Bank's representation that

---

[99] *Id.* at 31.

[100] This Tribunal takes official notice that Edinburg, Texas, the small city in which the Bank was headquartered, is in the Rio Grande Valley in South Texas near the Mexican border, far from any major metropolitan Texas population center.

[101] EX 147 (IMCR Letter) at 1.

[102] EX 149 (April 28, 2009 letter from Robert Gandy III to the OCC) ("April 28, 2009 Letter") at 1.

[103] *Id.* (also noting that "[w]e are very encouraged by the local reception to the offer").

[104] *See id.* at 2.

[105] *See* EPF ¶ 105.

it would not be able to meet the risk-based capital ratio by the previous deadline.[106] The agency's response underscored that "[c]ompliance with the IMCR is very important and *to avoid a more severe enforcement action, you need to do everything possible to achieve and maintain the capital ratios established in the IMCR* by the commitment date."[107]

### 4. The Capital Injections

On May 11, 2009, the Holding Company transferred $30 million to the Bank as a capital injection.[108] The stock subscription log offered by Enforcement Counsel shows that the Holding Company had raised approximately $30.38 million through its offering as of this date,[109] a total that includes nearly $9 million from Respondent Rogers and his family. The Holding Company's balance sheet as of March 31, 2009 also reflects that the Holding Company had approximately $8.8 million available in cash and equity securities prior to the capital raise.[110] Respondent Ortega reported at the Bank's May 12, 2009 board meeting that the Bank had achieved the required Tier 1 capital ratio as a result of the $30 million injection, and that the Holding Company itself was now "well capitalized with the additional capital already raised."[111]

The Bank submitted a revised capital plan to the OCC on May 12, 2009.[112] In the cover letter to this communication, then-President/CEO Gandy informed the agency that the $30 million injection "increased our leverage capital ratio to 8.43% and our total risk-based capital ratio to

---

[106] EX 336 (May 12, 2009 Board meeting minutes, attaching April 30, 2009 letter from OCC to Bank Board of Directors) ("May 12, 2009 Board Minutes" and "April 30, 2009 Letter," as applicable) at 6.

[107] *Id.* (emphasis added).

[108] *See* EPF ¶ 147; EX 151 (May 12, 2009 letter from Robert Gandy III to OCC attaching revised capital plan) ("May 12, 2009 Letter") ("At close of business last night, we had injected $30MM into the bank.").

[109] *See* EX 374A (Capital Raise Loans Spreadsheet). This figure was arrived at by totaling all of the stock purchases dated May 11, 2009 or earlier, irrespective of whether those purchases are putatively tied to a Capital Raise Loan from the Bank (something that is discussed further *infra*).

[110] *See* RX 87 (March 31, 2009 Holding Company balance sheet) at 5 (reflecting $6.15 million in cash and $2.7 million in equity securities held by the Holding Company); Ortega Tr. 902:24-903:5.

[111] EX 336 (May 12, 2009 Board Minutes) at 1.

[112] *See* EX 151 (May 12, 2009 Letter).

11.53%."[113] Gandy stated that the Bank "will continue our capital raising efforts until we exhaust all possibilities and anticipate that we will continue to have some success in that regard."[114] The revised capital plan cautioned, however, that "[i]n the current environment, it is difficult to raise capital by any mechanism," and that "shrinking the balance sheet of the Company" remained a necessary part of the Bank's efforts to achieve the desired capital ratio.[115] The plan concluded by noting Bank management's intent to continue to offer Holding Company shares "as long as there is interest in the offer," until the full $48.8 million offering could be issued to investors.[116]

On August 12, 2009, the Holding Company made another capital injection in the Bank, this time for $5 million.[117] The stock subscription log reflects approximately $7.78 million in new purchases of Holding Company stock between the two capital injections, for a total of $38.16 million raised by the stock offering as of this date.[118] In his letter to the OCC on August 14, 2009, then-President/CEO Gandy represented that the Bank had now achieved both individual minimum capital ratios that the agency had imposed.[119] As with all previous communications with the OCC, the letter did not mention the possibility that the capital injected back in the Bank by the Holding Company included proceeds of stock sales that had been financed by loans from the Bank itself.[120]

---

[113] *Id.* at 1.

[114] *Id.*

[115] *Id.* at 4.

[116] *Id.* at 6; *see also* Brickman Tr. 132:4-17 (stating that "[t]his version of the capital plan also does not disclose the bank strategy to make loans to potential shareholders and does not disclose that there are shareholders investing in this capital raise that did not independently have the financial wherewithal to participate").

[117] *See* EPF ¶ 153; EX 163 (reconciliation of Bank's surplus ledger account dated July 31, 2013).

[118] *See* EX 374A (Capital Raise Loans Spreadsheet) (totaling all stock purchases between May 12, 2009 and August 12, 2009).

[119] *See* EX 366 (August 18, 2009 Bank board minutes, attaching August 14, 2009 letter from Robert Gandy III to OCC) at 6.

[120] *See* EPF ¶¶ 151, 155.

5.    The Capital Raise Loans

On April 14, 2009, the L&D Committee approved an unsecured loan in the amount of $500,000 to Kenneth Everhard, a personal friend of Respondent Rogers.[121] According to the Committee meeting minutes, the purpose of this loan was "to be used as a revolving line of credit for working capital."[122] On April 29, 2009, Mr. Everhard purchased $500,025 in Holding Company stock.[123] The similarity of these amounts is not coincidence: Respondent Rogers testified that he was contemporaneously aware, despite the stated loan purpose, that Mr. Everhard had "borrowed money from the Bank to invest in holding company stock."[124]

The Everhard loan and subsequent stock purchase is the first of a series of linked transactions beginning in April 2009 that Enforcement Counsel has termed the "Capital Raise Loans Scheme."[125] Broadly speaking, this scheme is said to consist of three discrete components: (1) the Bank used its own funds to extend loans to investors; (2) those investors purchased Holding Company stock with the proceeds from the Bank loans; (3) having received money from the stock sales, the Holding Company then contributed the same funds back to the Bank, where they were treated as new capital.[126] The third leg of this triangle—that the money from the stock sales was downstreamed back to the Bank as new capital, like someone transferring a twenty dollar bill from their left pocket to the kitchen table to their right pocket and claiming to be twenty dollars richer when they then switch the bill again to the pocket from which it started—is addressed in a separate section below. Of the first two, however, there can be no serious doubt.

---

[121] See EX 196 (April 14, 2009 L&D Committee meeting minutes) at 1; Rogers Tr. 342:9-24.
[122] EX 196 (April 14, 2009 L&D Committee meeting minutes) at 1; see EPF ¶ 98.
[123] See EX 158 (Subscription Agreement Log); EPF ¶ 99.
[124] Rogers Tr. 345:2-5; see EPF ¶ 100.
[125] See EPF ¶ 101.
[126] See id. ¶ 102.

It is incontrovertible that the Bank made loans to investors in order for those investors to purchase Holding Company stock; the evidence strongly reflects this, and Respondents have acknowledged as much.[127] Enforcement Counsel's expert, NBE Chansen, has identified 63 such Capital Raise Loans between April 2009 and March 2011, which were used to purchase around $22 million worth of stock in the Holding Company.[128] Crediting NBE Chansen's analysis, it is clear that investor after investor in the Holding Company's offering was given a loan from the Bank for an equivalent amount of their stock purchase a short time beforehand. On April 28, 2009, Margaret Scott received a Bank loan of $75,000; the next day, she purchased $75,000 in Holding Company stock, which was the minimum amount permitted under the PPM.[129] Similarly, on May 8, 2009, Blanca Gonzalez received a loan in the amount of $250,000; her stock purchase of $250,050 came three days later[130]—among a flurry of rapid-fire Bank loans and corresponding stock purchases occurring in the final days prior to the May 11, 2009 capital injection.[131] The list goes on.

The documentation for these Capital Raise Loans did not state that the purpose of the loans was to purchase Holding Company stock, despite it being Bank policy that the purpose of all

---

[127] *See* Rogers Tr. 330:16-19 (agreeing that he "approved loans to investors to buy Holding Company stock" as member of L&D Committee); Ortega Tr. 491:20-492:1 (agreeing that he was "aware that the Bank was making loans to purchase Holding Company stock"), 530:12-19 (stating he knew, at the time the loans were approved, that unsecured $500,000 loans to Bank directors Felo Guerra and Jack McClelland were being made for the purpose of purchasing Holding Company stock).

[128] *See* EPF ¶ 158; Chansen Tr. 1233:20-1234:10 (noting that, to reach these conclusions, it was necessary to prepare her own analysis "using information from the Bank's books and records," because "the Bank, including the Respondents, did not maintain any sort of documentation to track and monitor these types of loans for the stock purchase"); EX 374A (Capital Raise Loans Spreadsheet).

[129] *See* EX 374A (Capital Raise Loans Spreadsheet), row 16; Salvato Tr. 1775:1-1776:1 (discussing Scott's loan and stock purchase); *see also* EX 143 (2009 Holding Company PPM) at 6 (minimum purchase of $75,000).

[130] *See* EX 374A (Capital Raise Loans Spreadsheet), row 48; EX 237 (June 30, 2009 L&D Committee meeting minutes) at 4 (noting that Gonzalez's loan was "due in one year with monthly payments of interest only, unsecured").

[131] *See* EX 374A (Capital Raise Loans Spreadsheet), rows 29-34, 36-37, 43, 52-53, 55, 58-60.

unsecured loans must be clearly stated.[132] The stated purpose of the unsecured $500,000 loan to Bank director Jack McClelland was that it was "to be used as a revolving line for working capital for personal ventures," even though Respondent Ortega knew that the loan was to purchase Holding Company stock at the time it was approved.[133] Likewise, the unsecured $200,000 loan made to Bank director Oscar Garza was stated as "for rodeo riding arena event costs and promotions and other business purposes," but was linked to a contemporaneous $200,025 Holding Company stock purchase.[134] And the purpose of the unsecured loan to Ms. Gonzalez, discussed above, was given as simply "business investment" in the loan package and L&D Committee meeting minutes.[135] This vague description of a Capital Raise Loan stands in contrast to a $250,000 loan to Samuel David Deanda, discussed in the same meeting minutes, for which the purpose was plainly stated as the purchase of "shares of Lone Star National Bank stock."[136]

Moreover, the Capital Raise Loans themselves featured generally liberal terms that increased the risk to the Bank at a time when it should have been curtailing lending activity,[137] which, NBE Chansen opined, signaled that such loans were not made "based on the borrower's ability to repay the loans, but . . . on the borrower's willingness to help the Bank raise additional

---

[132] *See* EPF ¶¶ 134-135, 141-142; Rogers Tr. 341:10-18 (stating that L&D Committee members should have ensured that stated loan purposes were accurate to their knowledge).

[133] EX 247 (May 5, 2009 L&D Committee meeting minutes) at 2; *see* Ortega Tr. 530:12-19.

[134] EX 237 (June 30, 2009 L&D Committee meeting minutes) at 4. NBE Chansen's analysis reflects that Mr. Garza purchased the stock in question on June 24, 2009 and then received the loan one day later, on June 25, 2009. *See* EX 374A (Capital Raise Loans Spreadsheet), row 88. This is close enough in time, and the terms of the loan sufficiently characteristic—unsecured, 4.25 percent interest rate, same amount as stock purchase—that the undersigned comfortably credits NBE Chansen's conclusion that the loan was a Capital Raise Loan.

[135] *See* EX 226 (Gonzalez loan package for Capital Raise Loan) at 1; EX 237 (June 30, 2009 L&D Committee meeting minutes) at 4.

[136] EX 237 (June 30, 2009 L&D Committee meeting minutes) at 4; *see* EPF ¶ 139. The undersigned notes that this loan to Mr. Deanda was also distinguishable from most Capital Raise Loans in that it was secured by collateral and featured a 5 percent floor interest rate. *See* EX 237 (June 30, 2009 L&D Committee meeting minutes) at 4.

[137] *See* Chansen Tr. 1258:14-1269:10 (discussing riskiness of loan terms); Brickman Tr. 147:21-22 (opining that "[t]he sum total of those loans is a big risk to the Bank"); *see also* EX 548 (April 3, 2009 OCC meeting minutes) at 1 (stating that there was "virtually NO lending occurring"); Rogers Tr. 456:24-25 ("We needed to shrink the bank. We needed to cut back on the lending.").

capital."[138] The majority of these loans were unsecured by collateral, which was particularly risky, and offered 4.25 percent interest rates, suggesting that "the Bank did not conduct individual credit determinations."[139] Some of the unsecured loans required just interest-only payments for the life of the loan before a balloon payment of the principal at maturity,[140] and most were renewed at least once, which "call[s] into question the borrower's ability to repay their debts and expose[s] the Bank to additional risks."[141] And the Bank offered significantly better terms on the unsecured Capital Raise Loans of some borrowers than on any secured loans those same borrowers had previously taken out with the Bank, indicating again that the individual borrowers' ability to pay was not a prime criterion for the loan terms.[142]

When viewing the Capital Raise Loans in the context of the Bank's urgent efforts to increase its capital ratios in the spring of 2009, a picture emerges. The OCC repeatedly impressed upon the Bank the exigency of meeting the capital goals and the dire consequences that would follow if it failed to do so.[143] While the sale of Holding Company stock was determined to be the

---

[138] EPF ¶ 132 (citing Chansen Tr. 1258:14-1259:5).

[139] *Id.* ¶ 124; *see also* Brickman Tr. 146:11-14 (noting that because unsecured loans are riskier, "the bank typically will charge a higher rate of interest across the entire portfolio"),147:12-15 (opining that a 4.25 percent interest rate is "incredibly low . . . for an unsecured loan portfolio"); Chansen Tr. 1256:5-9 (opining that it would have been "very unlikely [in 2009] that borrowers would have been able to obtain an unsecured loan especially at a 4.25 percent interest rate").

[140] *See, e.g.*, EX 237 (June 30, 2009 L&D Committee meeting minutes) at 3-4 (reflecting unsecured Capital Raise Loans to Felo Guerra, Jose Rodriguez, and Blanca Gonzalez with interest-only payment terms).

[141] EPF ¶ 131 (citing Chansen Tr. 1256:25-1257:9); *see also id.* ¶¶ 126, 130.

[142] *See id.* ¶ 125 (citing examples). Bank director Jack McClelland, for example, had more than two dozen outstanding secured loans at the time he took out an unsecured $500,000 loan to purchase Holding Company stock, and the vast majority of those secured loans had interest rates of at least 6 percent in comparison to the 4.25 percent rate of his unsecured Capital Raise Loan. *See* EX 246 (McClelland loan package for Capital Raise Loan) at 2 (listing outstanding loans); Ortega Tr. 532:20-533:10 (discussing terms of McClelland loans). The undersigned notes that while a number of Director McClelland's outstanding secured loans were originated prior to the global financial crisis and thus in a distinctly different economic context, there are at least four secured loans on this list that were originated in 2009 with interest rates of 6 percent or higher.

[143] *See* EX 147 (IMCR Letter) at 2 ("[F]ailure to achieve the capital ratios would be considered an unsafe or unsound banking practice and failure to submit an acceptable capital plan would result in further action by the OCC."); EX 336 (May 12, 2009 Board minutes) at 6 ("[T]o avoid a more severe enforcement action, *you need to do everything possible* to achieve and maintain the capital ratios established in the IMCR by the commitment date.") (emphasis added).

best way to generate funds that could be used as Bank capital,[144] "[e]fforts to attract investors . . . via national markets proved unsuccessful" due to the prevailing economic climate.[145] It was therefore necessary to raise the required capital entirely from local investors, including by soliciting investments from family and friends as well as officers, directors, and "lower level employees" of the Bank.[146] And to the extent that low-level Bank employees and other prospective investors in one of the poorest regions of the nation at the height of the global financial crisis could not easily afford the minimum $75,000 investment from their own pockets (or were otherwise reluctant to do so), the Bank lent them the money to make the stock purchases, offering favorable terms as an inducement.[147] Thus the Capital Raise Loans. Furthermore, there can be no doubt of Respondents' involvement and responsibility: even if they did not set the terms of the loans themselves,[148] the undersigned agrees with Deputy Comptroller Brickman that Respondents should have been, and by their own acknowledgment were, aware of the link between loans and stock purchases from their vantage points on the Board of Directors, in approving such loans on the L&D Committee, and as CFO and Chairman in monitoring the stock subscription agreements and implementing the capital plan, and in those positions "directly furthered the strategy to lend money to potential shareholders as part of this capital raise scheme."[149]

---

[144] *See* EX 148 (February 2009 Capital Plan) at 3 (discussing why "the issuance of trust preferred securities and subordinated debentures" were not viable capital options relative to the issuance of common stock by the Holding Company).

[145] EPF ¶ 91; *see also*, *e.g.*, EX 149 (April 28, 2009 Letter) at 1 ("[T]he national capital markets . . . are essentially frozen for all community banks."); Chansen Tr. 1569:23-25 ("I do know that it was hard for institutions to find investors.").

[146] Rogers Tr. 278:10-12; *see also id.* 264:11-16.

[147] *See id.* 278:13-24 (agreeing that Bank employees were given unsecured loans to purchase $75,000 in Holding Company stock).

[148] *See* Ortega Tr. 934:10-16, 938:2-4.

[149] Brickman Tr. 155:13-16; *see id.* 153:12-155:6.

6.     Downstreaming and the Overstatement of Capital

It is a separate question whether, and to what extent, the proceeds from stock sales funded by the Capital Raise Loans were in fact downstreamed from the Holding Company back to the Bank and improperly treated as new capital for purposes of the IMCR and beyond. NBE Chansen has testified, and Enforcement Counsel has at times suggested, that the capital at the Bank was overstated by the full amount of all Capital Raise Loans made over a "nearly two-year period" between April 2009 and March 2011.[150] This cannot be the case, however. Because the August 12, 2009 capital injection was the last time the Holding Company transferred funds to the Bank for capital purposes, any stock purchases made after that date—or, at most, after the third quarter of 2009, which is the timeframe used by Enforcement Counsel accounting expert Christine Salvato— that were funded by Capital Raise Loans necessarily could not have been downstreamed.

That is, the Holding Company made capital injections to the Bank during the relevant period twice, on May 11, 2009 and August 12, 2009, and the Bank reported the entirety of those amounts—$35 million—as Tier 1 regulatory capital on its balance sheet and all subsequent Call Reports.[151] Assuming the accuracy of the stock subscription log proffered by Enforcement Counsel, which Respondents have not contested, the Holding Company had raised $30.38 million through stock sales at the time of the first capital injection, and an additional $7.78 million between the first and second injections, for a total of $38.17 million raised from the date of the offering

---

[150] EC Br. at 25; *see id.* at 23 (stating that the Capital Raise Loans were made "for the sole purpose of inflating the Bank's capital"); Chansen Tr. 1285:7-11 (asserting that "as the Bank's financial condition continued to deteriorate, the omission of the $21 million raised via the Capital Raise Loans would have made a significant impact to ratings and to the OCC's enforcement actions"); Notice ¶ 31 (alleging without limitation that "Respondents caused the Bank to improperly inflate its capital by including the proceeds of the Capital Raise Loans as regulatory capital in the Bank's Call Reports").

[151] *See* EX 367 (Bank Call Report for period ending June 30, 2009) ("June 30, 2009 Call Report") at 8 (Schedule RI-A, Line 11); EX 368 (Bank Call Report for period ending September 30, 2009) ("September 30, 2009 Call Report") at 8 (same); *see also* EPF ¶¶ 152, 157, 403, 406-407; EX 363 (Expert Report of Christine Salvato) ("Salvato Report") ¶¶ 16, 18.

through August 12, 2009.[152] Of this, $15.26 million is ostensibly linked to a Capital Raise Loan and is thus in some sense the Bank's own money being routed to the Holding Company through borrowers.[153] Ms. Salvato and NBE Chansen agree that there is no concern from an accounting or regulatory perspective if (1) stock sales funded by the Capital Raise Loans were used to capitalize the Holding Company itself or to pay the Company's debts or expenses, rather than to serve as supposed new Bank capital;[154] or (2) the Holding Company downstreamed money to the Bank that did not come from the Capital Raise Loans but from other sources, such as the Company's own cash or sales of stock that the Bank did not fund.[155] Proceeds from stock sales occurring after the capital injections are also unproblematic, regardless of whether the sales were tied to Capital Raise Loans, because they could not have been downstreamed to the Bank.[156] Of interest, then, is solely the portion of the capital contributed from the Holding Company to the Bank in May and August 2009 that can be said to have originated from the Bank itself—this was not "new" capital and should not have been treated as such.[157]

---

[152] *See* EX 374A (Capital Raise Loans Spreadsheet), rows 3-91; EX 158 (Subscription Agreement Log).

[153] *See* EX 374A (Capital Raise Loans Spreadsheet), rows 15-18, 20-22, 24, 26, 29-37, 39, 43, 48, 52-53, 55, 58-61, 65-66, 68, 70-74, 76-81, 83, 88-90. In calculating the amount of Capital Raise Loan-funded stock sales through August 12, 2009, this Tribunal used the loan amount tied to a given stock sale unless the loan was larger than the sale amount, in which case the sale amount was used. *See, e.g., id.*, row 32 (reflecting $75,000 purchase of Holding Company stock following $100,000 loan from the Bank).

[154] *See* Chansen Tr. 1598:3-12; Salvato Tr. 1905:16-23; *see also* EX 143 (2009 Holding Company PPM) (at 31 ("We anticipate using a portion of the proceeds from the Offering to inject capital into our Bank. The remaining proceeds will be used for other general corporate purposes of the Company and possible future injections of capital into the Bank.").

[155] *See* Chansen Tr. 1568:3-1569:2; Salvato Tr. 1900:21-1901:24, 1903:18-1904:18.

[156] *See* EX 363 (Salvato Report) ¶¶ 26, 29 (applying conclusions only to "the Capital Raise Loans that were originated in the quarters ending on June 30, 2009 and September 30, 2009," because the funds from these loans "were used to purchase stock in the Holding Company, which then transferred the funds to the Bank as capital contributions").

[157] *See* Brickman Tr. 135:14-25 (not permissible to treat capital injections funded by the Bank as new capital); Chansen Tr. 1607:22-1608:3 ("[T]he loans themselves . . . were not illegal. It was the method of downstreaming the capital via the capital raise loans to the bank, and the bank including that in their capital calculations which overstates the bank's financial condition."); Salvato Tr. 1794:21-1795:1 ("[A]ny of the portion of the capital raise loans that should not have been included in bank equity would have affected and reduced bank equity in all subsequent call reports through the period ending June 2013.").

Relying on the analysis prepared by NBE Chansen and generally credited by this Tribunal, Ms. Salvato concludes that $17.3 million of the $35 million in capital contributed to the Bank by the Holding Company through the two capital injections in 2009 was financed by the Capital Raise Loans and thus should not have been reported as Tier 1 regulatory capital.[158] Ms. Salvato makes several key assumptions in reaching this conclusion, including that the Capital Raise Loan spreadsheet prepared by NBE Chansen accurately and fully reflects which Holding Company stock sales were funded by Capital Raise Loans;[159] that any stock sale funded by a Capital Raise Loan that occurred within the same fiscal quarter of one of the two capital injections should be considered part of that capital injection, even if it occurred after the date of the injection itself;[160] and, most significantly, that every dollar generated from the stock sales funded by Capital Raise Loans in the second and third quarters of 2009 was ultimately downstreamed from the Holding Company to the Bank.[161] Each of these assumptions merits some additional discussion.

First, there is at least one entry on NBE Chansen's spreadsheet, that of Enrique Regules, that is different in several key ways from others denoted as Capital Raise Loans; the undersigned thus finds that there is some reason to question, based on the evidence provided, whether it is appropriately included in Ms. Salvato's calculations.[162] According to the spreadsheet, Mr. Regules purchased $2,025,000 in Holding Company stock on May 8, 2009, and subsequently received a

---

[158] *See* Salvato Tr. 1793:12-14; EX 363 (Salvato Report) ¶¶ 19, 26, 29 (concluding that "the Bank's improper accounting with respect to the Capital Raise Loans caused the Bank's assets and capital to be overstated by $12.6 million beginning with the June 30, 2009 Call Report and $17.3 million as of the September 30, 2009 Call Report"). As discussed further *infra*, the discrepancy between this figure and the figure arrived at by the Tribunal above is explained by Ms. Salvato's use of the third-quarter end of September 30, 2009, rather than the August 12, 2009 capital injection, to capture all Capital Raise Loan-funded stock sales that might have been improperly downstreamed to the Bank. *See* EX 374A (Capital Raise Loans Spreadsheet), rows 92-95 (stock sales totaling $2.08 million occurring between August 14, 2009 and September 22, 2009).

[159] *See* EX 363 (Salvato Report) ¶ 14; Salvato Tr. 1774:3-23 (reliance on accuracy of spreadsheet).

[160] *See* Salvato Tr. 1772:5-1773:7, 1778:9-17.

[161] *See* EX 363 (Salvato Report) ¶ 19; Salvato Tr. 1793:6-17.

[162] *See* EX 374A (Capital Raise Loans Spreadsheet), row 26.

Bank loan in the amount of $2,180,000 on August 21, 2009.[163] The loan, which was in the name of Citricos de Tamiahua, S.A. de C.V. with Mr. Regules as guarantor, was approved at the July 21, 2009 L&D Committee meeting for the purpose of "working capital and business investments," featured a 4.25 percent interest rate, and was secured by 3,700 acres of Mexican farmland.[164]

In terms of inclusion among the cohort of Capital Raise Loans made for the purpose of purchasing Holding Company stock, the details of this loan are problematic in multiple respects. To begin with, the loan itself was made more than three months *after* the stock purchase, meaning that whatever else happened, Mr. Regule did not directly purchase the stock with money provided by the Bank.[165] This is in contrast to almost all of the Capital Raise Loans, in which the loan preceded the stock purchase and can thereby be said to have funded it more straightforwardly.[166]

Furthermore, the loan amount exceeded the amount of stock purchased by $155,000, a number that sticks out in a spreadsheet where most differences between loan amount and purchase amount are either negligible, roundly divisible, or explained in the column entitled "OCC Examiner Notes."[167] No such explanation is provided for the Regules loan. Instead, NBE Chansen notes that it is her understanding that Mr. Regules "indicated to the OCC that he obtained a loan through Citricos de Tamaiahua SA de CV to purchase stock," a recollection that she repeated at

---

[163] *See id.*

[164] EX 201 (July 21, 2009 L&D Committee meeting minutes).

[165] *See* EX 256 (May 8, 2009 Regules subscription agreement) at 2 (indicating that the stock purchase was paid in full at the time of the subscription).

[166] The only other notable exception is the $1,000,000 secured loan made to Norberto Salinas, which is recorded as being made on July 23, 2009, one and a half months after Mr. Salinas's May 8, 2009 purchase of $1,000,000 of Holding Company stock. *See* EX 374A (Capital Raise Loans Spreadsheet), row 35; Chansen Tr. 1246:20-1247:3. In that case, however, Mr. Salinas's loan was approved at the May 5, 2009 L&D Committee meeting, three days prior to his stock purchase, and it is therefore far more reasonable to conclude that the two transactions are linked and that the loan was extended in connection with the Bank's capital raise efforts. *See* EX 247 (May 5, 2009 L&D Committee meeting minutes) at 2; Chansen Tr. 1247:7-12.

[167] *See, e.g.*, EX 374A (Capital Raise Loans Spreadsheet), rows 15-18, 21-22, 24, 29-32, 34-37, 43, 48, 55, 58-60, 65-66, 71-73, 76, 80, 83, 88, 92, 95, 102, 108 (differences of $0, $25, or $50 between loan and stock purchase); *id.*, rows 52, 61, 68, 90, 93-94, 112, 119-121, 126 (in which the loan amount is either half or twice the size of the stock purchase); *id.*, rows 33, 111 (details given re difference in amounts).

the hearing with some variation.[168] The undersigned credits NBE Chansen's recollection, and observes only that the evidence beyond this testimony that Mr. Regules's loan was one of the Capital Raise Loans is scant at best—which illustrates the somewhat precarious foundation on which Ms. Salvato's conclusions regarding overstatement of capital are situated, given that this $2 million in stock proceeds is a significant part of the $17.3 million that was allegedly improperly downstreamed.

Second, there are several Capital Raise Loans for which the corresponding stock purchases totaling $2.08 million took place after the second and final capital injection on August 12, 2009, and yet Ms. Salvato includes them in her calculations of capital that was improperly downstreamed to the Bank because both the capital injection and the loan dates occurred in the third quarter of 2009.[169] There may be a valid accounting reason for dating the respective capital injections "as of June 30, 2009" and "as of September 30, 2009" rather than on the specific dates that the capital was in fact contributed to the Bank,[170] but Enforcement Counsel does not provide one, and the undersigned notes that such an approach results in Ms. Salvato concluding that the $2.08 million in Holding Company stock sale proceeds described above was downstreamed to the Bank before the stock itself was actually sold.[171]

---

[168] *Id.*, row 26; *see also* Chansen Tr. 1231:14-15 (stating that Regules "is one of the borrowers that reached out to the investigator indicating that he had invested in the bank via a loan"),1246:3-9 ("This goes back to my conversation that I had with the FDIC investigator where he informed me that Mr. Regules called the FDIC and informed him that the stock proceeds were used to purchase stock.").

[169] *See* EX 374A (Capital Raise Loans Spreadsheet), rows 92-95. It is unclear why the relevant date for determining whether the proceeds from a stock sale funded by a Capital Raise Loan were improperly downstreamed to the Bank would be the date of the loan rather than the date of the stock purchase, but this was the method employed by Ms. Salvato when the loan and stock purchase occurred in different fiscal quarters. *See* Salvato Tr. 1780:11-23 (placing Regules transaction in third quarter of 2009 for purposes of determining overstatement of capital, when stock purchase occurred in second quarter and loan was made in third quarter).

[170] Salvato Tr. 1772:13-21.

[171] *See id.* 1778:15-17 (noting that when determining which loans should be accounted for in connection with the August 12, 2009 capital injection, she "included all dates between 7/1/2009 and 9/30/2009").

Finally, the undersigned finds that Enforcement Counsel has not adequately established, from an accounting standpoint or as a matter of simple logic, why every possible downstreamed dollar of the May and August 2009 capital injections should be presumed to have improperly originated from Capital Raise Loan-funded stock sales when the Holding Company indisputably had millions of dollars from legitimate sources that could also have been used to capitalize the Bank. According to NBE Chansen's spreadsheet, $19.77 million of the Holding Company stock sold from the beginning of the offering through the first capital injection was not tied to a Capital Raise Loan and could thus be downstreamed to the Bank as new capital without concern.[172] Between the first and second capital injections, another $3.14 million of untainted capital was raised through the stock sale, for a total of $22.91 million as of August 12, 2009.[173] Add to this the $8.8 million in cash and equity securities already held by the Holding Company prior to the capital raise, and the Holding Company had nearly $32 million by which it could have capitalized the Bank without accounting for or including the Capital Raise Loans in any way.[174]

Of course, this is a counterfactual: Over $15 million in Capital Raise Loans-funded stock proceeds was in fact added to the Holding Company's coffers during this time, and there is no way to trace which particular dollars were downstreamed to the Bank and which were used for other

---

[172] *See* EX 374A (Capital Raise Loans Spreadsheet), rows 1-14, 19-20, 23, 25, 27-28, 38, 40-42, 44-47, 49-52, 54, 56-57. This calculation includes the difference between stock purchase amount and loan amount in instances where a Capital Raise Loan borrower purchased more Holding Company stock than the amount of their loan.

[173] *See id.*, rows 62-64, 67, 69, 74-75, 82, 84-87, 89-91.

[174] *See* RX 87 (March 31, 2009 Holding Company balance sheet) at 5 (reflecting $6.15 million in cash and $2.7 million in equity securities held by the Holding Company); Ortega Tr. 902:24-903:5. Respondents assert that the Holding Company had over $38 million in cash not associated with the Capital Raise Loans that it could have downstreamed to the Bank, thus covering both capital injections. *See* RPF ¶ 43. This number, however, includes the proceeds from all of the capital raise efforts up through 2011, not simply the stock sales that occurred prior to the capital injections. *See id.* ("[I]t was undisputed that during the capital raise the Holding Company raised well over $30 million from sources *other* than the so-called capital raise loans.") (emphasis in original); Ortega Tr. 902:2-903:11; Chansen Tr. 1594:19-1596:3. As the undersigned has noted, funds raised after the capital injections could not have been downstreamed to the Bank regardless of their provenance, because the Holding Company did not have those funds when the money was downstreamed, and—as far as this Tribunal is aware—time is linear.

purposes.[175] But it is one thing to conclude that the Bank's regulatory capital was improperly inflated, post-capital injections, by the transfer of some undetermined amount of money from the Holding Company to the Bank that had initially come from the Bank itself—as discussed below, even Respondents themselves concede that proceeds from Capital Raise Loans-funded stock sales made their way into the capital injections to some extent. That does not mean that it is justified to assume, as Enforcement Counsel directed its accounting expert to do when forming her opinions, that *all* of the money that the Holding Company had raised at that point through Bank-financed stock purchases was recontributed to the Bank as "sham" capital in the May and August 2009 capital injections, given the commingling of that money with a large pool of other capital unrelated to the Capital Raise Loans.[176]

At bottom, Ms. Salvato was not asked to take into account any money that the Holding Company already had or had raised by non-Capital Raise Loans means when conducting her analysis,[177] and the undersigned finds that any conclusions regarding the composition of the capital injections and how much "sham" capital they may be said to have contained are outside the scope of her expert opinion as a result.[178] Further, the undersigned agrees with Respondents that the burden is on Enforcement Counsel to show that all of the proceeds from the Capital Raise Loan

---

[175] *See* Chansen Tr. 1597:7-16 (stating that it would be "impossible" for anyone to "track which dollar bills from the Holding Company got downstreamed to the Bank versus other dollar bills," because "the dollar bills in the Holding Company's bank account are all in there in one account"); EC Reply at 14 ("[M]oney is fungible, and all funds maintained by the Holding Company were comingled [*sic*]."); RPF ¶ 44 ("[T]he Holding Company did not segregate its cash by source of funds.").

[176] *See* EX 363 (Salvato Report) ¶¶ 15, 17, 19 (assuming as true, for the purposes of the expert report, that $12.6 million in Capital Raise Loans was financed in the second quarter of 2009, that $4.7 million in Capital Raise Loans was financed in the third quarter of 2009, and that all $17.3 million of Capital Raise Loan-related stock sales was included in the $35 million contributed to the Bank from the Holding Company in the capital injections).

[177] *See* Salvato Tr. 1906:23-1907:18 (stating that she "would be interested in seeing a calculation" of how much other money the Holding Company had at its disposal during the second quarter of 2009).

[178] *See* EX 363 (Salvato Report) ¶ 19 ("Of the $35 million contributed to the Bank by the Holding Company in the quarters ending on June 30, 2009 and September 30, 2009, at least $17.3 million represented cash proceeds generated from the Capital Raise Loans.").

stock sales were downstreamed to the Bank in order to support a conclusion that the Bank's capital was overstated by that amount,[179] and it has not met that burden here.[180]

To some degree, this question is moot, because both Respondents acknowledged during their testimony that at least some of the dollars held by the Holding Company and originating from the Capital Raise Loans were downstreamed back to the Bank.[181] The third leg of the Capital Raise Loan Scheme triangle has thus been established. Yet the issue of exactly *how* overstated the Bank's reported capital was following the capital injections is important in its own right, as it bears upon both the materiality and the scope of the alleged misconduct. This is addressed in the appropriate sections below. For now, it is indisputable that all $35 million of the capital injections were reported as Tier 1 regulatory capital, something that the Bank never adjusted or corrected prior to its failure in 2013,[182] and the undersigned credits Ms. Salvato's expert opinion that any money originating from the Capital Raise Loans would not have counted as Tier 1 regulatory capital for the Bank and should not have been reported as such.[183] The Bank's capital levels from the second and third quarters of 2009 through the remainder of its operation were therefore overstated by whatever amount of Capital Raise Loan-related proceeds were downstreamed—whether that

---

[179] *See* Rs Br. at 26.

[180] *See also* RX 41 (email chain including March 28, 2014 email from B. Paulson to R. Chansen et al.) (internal OCC email stating that "we have not proven that the source of funds for the holding company capital injection was in fact loans from FNB"); Brickman Tr. 197:7-198:2 (identifying email author and recipients as OCC personnel).

[181] *See* Rogers Tr. 328:13-20 ("Q: You have indicated that the Board of Directors approved the plan to extend bank loans to investors to buy FNBG stock and then downstream those same funds back to the bank as Tier 1 capital, correct? A: [T]hat's basically what happened, yes, ma'am."); Ortega Tr. 493:15-17 ("I would say that some of the stock, some of those loans actually came back to the Bank."); EX 569 (Ortega Dep.) at 34:24-35:4 (agreeing that the Bank "[made] loans that the borrower would then use the proceeds of the loan to purchase stock in the bank holding company and the bank holding company would then downstream the funds back to [the Bank]").

[182] *See* EX 363 (Salvato Report) ¶¶ 16, 18 (noting that the Bank recorded the capital injections "as surplus, a component of regulatory capital, . . . and continued to reflect that amount as regulatory capital in each subsequent quarterly Call Report filing until the Bank failed in September 2013"); Salvato Tr. 1795:6-13 ("[T]he Bank did not make any type of adjustment to reduce its capital as reported for the Capital Raise Loans.").

[183] *See* EX 363 (Salvato Report) ¶¶ 21, 30; Salvato Tr. 1770:24-1771:3 ("I believe a faithful representation would have been for the bank to offset the note receivable against the surplus that was reported and, as a result, eliminating any increase in capital.").

amount is $3 million (if one presumes that $32 million of the capital injections came legitimately from the Holding Company's other funds) or $17.3 million (if the assumptions relied upon by Ms. Salvato are justified), or somewhere in-between.[184]

### 7.　　Loss to the Bank

On June 12, 2013, the Bank recorded combined losses of $387,240.63 on Capital Raise Loans that it had made to Blanca Gonzalez and José Rodriguez.[185] Both of these loans and their corresponding purchases of Holding Company stock were made in early to mid-May 2009, and thus the proceeds were part of the Holding Company's commingled funds at the time of the capital injections.[186] NBE Chansen also found that, at the time of the Bank's failure in September 2013, numerous other Capital Raise Loans borrowers had not paid off their loans.[187] As a result, the FDIC as receiver for the failed Bank suffered $3,808,058.28 in losses when certain outstanding Capital Raise Loans were charged off as part of the receiver's efforts to maximize recovery on Bank assets for the receivership.[188]

### D.　　OREO Lending Strategy (Article IV)

Article IV of the Notice alleges that "Respondents developed and implemented a new lending strategy from late 2008 through at least September 2011" ("OREO Lending Strategy") in which the Bank originated, and Respondents approved or ratified, "unsafe or unsound loans to finance the sales of the Bank's OREO at above-market prices, which enabled the Bank to reduce or avoid reported losses that it would otherwise have recorded on sales at fair market values."[189]

---

[184] It should be noted that, as discussed further *infra*, Ms. Salvato testified at the hearing that even if the full amount of $17.3 million had been excluded from the Bank's reported capital, the Bank would still have had an 8.5 percent Tier 1 capital ratio, sufficient to meet the 8 percent IMCR imposed by the OCC. *See* Salvato Tr. 1923:16-1925:1.

[185] *See* EPF ¶ 182; EX 389 (Bank Loan Losses and Recoveries, 1994 to 7/12/2013), rows 24107, 24108.

[186] *See* EX 374A (Capital Raise Loans Spreadsheet), rows 48, 55.

[187] *See* EPF ¶ 183; Chansen Tr. 1242:13-1243:11.

[188] *See* EPF ¶ 184; Locke Tr. 1994:24-2006:3.

[189] Notice ¶ 55.

It furthermore alleges that Respondents then "caused the Bank to inflate its capital by improperly accounting for the OREO sales and loans with below-market rates."[190]

Given the factual complexity of these allegations, Enforcement Counsel's motion for summary disposition addressed this Article solely with respect to the Bank's loan to NAHS Real Estate, L.P. ("NAHS"), which Enforcement Counsel asserted was "representative" of the OREO Lending Strategy.[191] In its October 5, 2021 Order on the Parties' summary disposition motions, this Tribunal identified certain questions of disputed material fact regarding the NAHS loan, including the scope of Respondents' responsibility and involvement in the alleged misconduct related to the NAHS loan; the riskiness of the NAHS loan and other OREO loans at the time they were made and the Respondents' understanding thereof, based on their reliance on the information presented to them and on the expertise and assurances of colleagues; the extent to which the terms of the NAHS loan and other loans were "below-market" or otherwise deviated from typical market conditions at the time; and the extent to which the Bank or the FDIC receivership incurred a loss as a result of the NAHS loan's approval and ratification or the approval and ratification of any of the other loans at issue.[192]

Viewing the totality of the evidence, and as elaborated upon below, the undersigned now makes the following core findings: **(1)** Respondents were among the individuals who bore ultimate responsibility for the OREO Lending Strategy; **(2)** the Bank adopted an aggressive strategy to get rid of its ORE beginning in late 2008, which included loosening its underwriting standards for ORE financing and offering concessionary terms on loans to prospective borrowers identified by

---

[190] *Id.*

[191] EC-PSD-59 (Chansen Decl.) ¶ 29; *see* MSD Order at 18.

[192] *See* MSD Order at 25. Enforcement Counsel did not move for summary disposition on its allegations of improper accounting practices relating to the OREO Lending Strategy, and Respondents' motion for summary disposition did not discuss those allegations in detail. *See id.* at 23 n.86.

the lending department; **(3)** there is extensive evidence that Bank management chose to finance ORE purchases in this manner because it believed the properties to be worth more than what "speculators" and "scavengers" would offer for them, and because borrowers could not get loans from other banks to purchase the Bank's ORE given the financial climate; **(4)** Respondents regularly approved and ratified OREO loans without adequate documentation of the borrowers' finances or ability to pay and, in the case of Respondent Ortega, without reading the loan packages; **(5)** Respondents regularly approved and ratified OREO loans with liberal terms that violated the Bank's loan policy and increased the risk to the Bank; and **(6)** the FDIC as receiver for the Bank suffered loss with respect to certain OREO loans. In addition, the undersigned credits the expert opinion of Ms. Salvato "that the Bank's improper accounting with respect to the OREO loans caused the Bank's assets and capital to be overstated by at least $9.5 million beginning with the December 31, 2011 Call Report" and continuing through the Bank's failure.[193]

### 1.    The Negative Impact of OREO

The amount of OREO on the Bank's balance sheet—foreclosed real estate properties that the Bank owns because the loans for which they served as collateral have defaulted—increased significantly and continuously as the economy crashed in 2008 and throughout the financial crisis, with COO/Comptroller Ryan Leal describing it as "like drinking out of a firehose."[194] Carrying OREO properties has "an adverse effect on [a] bank's financial condition," because they earn the bank no money and can cost a substantial amount monthly.[195] The more OREO that a bank owns,

---

[193] EX 363 (Salvato Report) ¶¶ 46-47; Salvato Tr. 1863:10-1864:25.

[194] Leal Tr. 2287:8-25; *see* EPF ¶¶ 186, 190; Ortega Tr. 944:18-23 (stating that as of early 2013, the Bank was "dealing with about 650 different [ORE] properties . . . [with] close to $300 million in value").

[195] Chansen Tr. 1293:13-14; *see id.* 1293:15-1294:5 (noting that a bank must pay regular property tax, maintenance, insurance, and other costs on an OREO property, all of which "are a hit to the bank's earnings and [its] capital"); Ortega Tr. 953:14-954:11 (discussing the millions of dollars of costs and expenses incurred by the Bank while holding OREO); Rogers Tr. 370:21-24 ("It was important for us to get it out of the bank and have somebody else maintaining it, paying the insurance, paying the taxes.").

the worse it is for the bank; there is no real upside. External accountant Ben Pena testified that

ORE can be projected to cost a bank a great deal of money even if the ORE has a significant

appraised value, and that putting the ORE "in the hands of a borrower who can make even, say,

one payment" would "generate a better situation for the bank than just sitting there and holding it

and losing money every month."[196]

Moreover, banks are not well-equipped to manage OREO properties for an extended term,

whether the property is a vacant lot or empty building that requires development or a business like

a hospital (which the Bank held on its books on multiple occasions during this period) that should

be actively operated in order to maintain its value and continue to provide services.[197] Respondent

Ortega explained the Bank's approach to its OREO holdings during his tenure:

> You try to sell it as quickly as you can. You know, we've got to get
> it into – as banks, I quickly figured out that we – we're bankers.
> We're not good managers of real estate. We're not good managers
> of properties. So you quickly want to get them into the borrowers or
> the people that are interested in the properties. And immediately,
> you know, once you get it in their hand, immediately, they start
> paying the taxes. They start paying the insurance. They start
> maintenancing. They start taking care of the property. So we're way
> ahead once we get them into somebody else's hands.[198]

The value of OREO properties also must be regularly reappraised, which costs money and

can lead to writedowns and losses if the fair market value of a property has declined, as was likely

---

[196] Pena Tr. 1184:22-1186:1; *see also* Chansen Tr. 1665:23-1666:13 (agreeing that it benefits a bank to remove OREO from its books even if it ends up foreclosing on the property again some months later).

[197] *See* Ortega Tr. 961:19-25 ("The value of a hospital usually is the license. . . . [T]he buildings and the real estate are worth so much, but the ability to provide a service and bill and generate revenue, there's no question that if you don't have a license, then the hospital has to be shut down."); *see also id.* 960:12-21 ("[A]t one point we were spending probably a million dollars a month to be able to pay for the supplies. . . . There's patients. There's nurses. There's doctors. These people are trying their best to try to take care of these patients. Obviously there's revenue coming in, but not enough to be able to pay for all their bills and all their payroll."), 961:9-14 ("[J]ust trying to keep this hospital open. . . . It's a very difficult situation, especially when you've got kids in the hospital. You've got older individuals that need services. I wish it was very simple just to come and say, you know, shut it down. We couldn't do it for a few reasons."); JX 6 (2012 ROE) at 48 (stating that hospital properties being carried on the Bank's books "require significant monthly operating capital").

[198] Ortega Tr. 954:15-955:2.

during the global financial crisis.[199] For this reason, "[r]esolving OREO properties in a timely manner is critically important because the value of OREO deteriorates . . . [and] the risk of loss mounts over time."[200] It is therefore in a bank's best interest "to take steps to move the OREO off [its] books" as soon as possible,[201] particularly when more OREO is being added to the bank's books every month as a result of more foreclosures and repossessions.[202] On this issue, as the crisis continued and the OREO holdings mounted, the Bank and the OCC were very much aligned.[203]

## 2.    OREO Financing and the Bank's Dilemma

It appears uncontroverted, then, that beginning in 2008—as the Bank experienced severe capital issues following the failure of Fannie and Freddie—OCC examiners shared a sense of justifiable urgency with Bank management regarding the need to remove OREO from the Bank's balance sheet in whatever way that could be achieved.[204] Management, in turn, made the decision to accomplish that end through an aggressive strategy of finding potential borrowers and financing their purchase of its ORE at the appraised value of the property, often with favorable loan terms

---

[199] *See* JX 3 (June 30, 2010 Report of Examination) ("2010 ROE") at 6 ("[U]ntil the level of OREO is reduced, earnings will be exposed to declines in market values of OREO."); Chansen Tr. 1293:23-1294:2; Ortega Tr. 953:19-24 ("You've got to get appraisals once a year. In the meantime, [the] real estate market is not doing well. So the longer you hold it, the more the chances the value goes down.").

[200] EPF ¶ 187; *see* Brickman Tr. 110:8-112:4.

[201] Chansen Tr. 1295:15-16; *see also id.* 1673:21-23 ("I would agree that holding OREO for an extended period of time is not in the bank's best interest.").

[202] *See* JX 6 (2012 ROE) at 3 ("OREO sales are behind the inflow of new OREO. During this examination the net OREO balance increased $22 million."); Leal Tr. 2287:11-2288:20 ("[W]e knew more was coming so we had to— it's like the produce guy. You know, you move your two-day old bananas up to the front because you've got more bananas coming in. So we had to get those things moved out as quickly as possible.").

[203] *See* JX 2 (2009 ROE) at 12 ("Management recognizes that holding OREO is not in the best interest of the bank or its shareholders."); JX 4 (June 30, 2011 Report of Examination) ("2011 ROE") at 6 ("[T]he growing OREO portfolio combined with increasing loan losses, OREO write-downs, and increased OREO holding costs will continue to negatively impact earnings.").

[204] *See* Ortega Tr. 938:21-23 (stating that examiners "were very involved and really just encouraging us to sell this ORE" because they understood that the Bank holding OREO is "not a good thing. It's not earning for us. It's costing us money. So they're really encouraging us to get it to somebody else, get it earning."), 952:24-25 ("[T]hey're telling us to sell the ORE.").

as an inducement.[205] The OCC now asserts that the Bank should either have lowered its asking price for the OREO (even if it meant writing down the property's value and recording a loss) or sold to interested parties who were being financed by other banks, rather than finance the purchases itself with concessionary terms and ultimately increase the risk to the Bank.[206] The undersigned credits the weight of the testimony by Respondents and others in Bank management that they viewed those other options as either undesirable or infeasible at the time, however, and finds that there is an element of hindsight in the agency's current position.

To begin with, Enforcement Counsel asserts that "it would have been prudent for the Bank to price its OREO properties below appraised values to sell the properties because often the Bank's appraisals were not current or because market conditions warranted a lower asking price."[207] This approach is supported by NBE Chansen's testimony that "most of the banks [that] were actively marketing their OREO properties" during this time period "were taking an active role in reducing the asking prices in order to remove those properties off their books."[208] According to NBE Chansen, the fact that the Bank did not also do this is an indication that Bank management, including Respondents, was improperly seeking to avoid recording losses on property that was not worth what they were asking.[209]

Management offers an alternative explanation. In detailed and credible testimony, Respondent Ortega and Mr. Gandy acknowledge that it would have been possible for the Bank to sell its OREO at a reduced price rather than financing purchases itself at the appraised value, but

---

[205] See, e.g., JX 2 (2009 ROE) at 12 ("Management aggressively sells OREO to those they identify as having the best chance for success in holding the OREO and repaying the bank."); Rogers Tr. 369:21-370:3, 377:1-16, 447:23-448:2 (agreeing that the Bank was aggressive in its efforts to sell ORE "after the [Fannie and Freddie] disaster").

[206] See, e.g., EPF ¶¶ 188, 210-211; Chansen Tr. 1294:17-24, 1295:15-22.

[207] EPF ¶ 211.

[208] Chansen Tr. 1294:17-24; see also id. 1294:25-1295:7 (stating that when a bank lowers its OREO sale price, it will "take a loss relative to the value of what they have it on their books at" when the property is sold).

[209] See id. 1543:6-21; see also EPF ¶¶ 190, 213-214.

state that the motivations for not doing so stemmed, at least in part, from a good faith belief that the properties were worth more in the long run than the "speculators" and "scavengers" of the time were willing to pay.[210] As the individual in charge of implementing the Bank's OREO strategy, Mr. Gandy's perspective on the topic merits extended quotation:[211]

> Well, our philosophy and my philosophy in particular was, okay, we've got the OREO. It's Texas dirt. And if you know anything about economics, Texas dirt is more valuable than dirt anywhere else in the United States. Texas has got those – was at the time and still is and has been for the last 20 or 30 years the strongest market in the United States.
>
> **
>
> So we had a good footprint across the state. We had, as I say, the best dirt in the country even though the whole real estate market was upside-down. This Fannie and Freddie when it blew up and the big banks started dumping their real estate, it blew the heck out of the market. So there wasn't a way to sell anything in sort of the regular market because that market didn't exist. . . . [I]t was not an orderly market. It was a fragmented market that the only people that were in it basically buying stuff were the speculators and the scavengers.
>
> **
>
> So there was not an active market for, you know, people to buy stuff unless you wanted to buy it at 50 cents on the dollar. And we didn't want to sell our valuable real estate at 50 cents on the dollar. We'd rather make a loan to somebody who would take it at the value that it was appraised and put it to work and develop it and make a – have them make a profit and have us get paid. That was sort of the program. And so that's what we did.
>
> **
>
> Say you've got a million-dollar piece of OREO, right? Well, the regulators at that time would say, you need to dump this thing. You need to be like the big banks. You need to throw this thing out in the street and get what you can get for it by the scavengers. Well, the scavengers would give you 50 cents on the dollar, okay? So if you had a million-dollar piece of real estate, the scavengers would give

---

[210] Gandy Tr. 2226:3.

[211] *See* Rogers Tr. 447:13-16 ("[Gandy] was very aggressive. He could see we needed to boot up the ORE. He pushed it. I thought he did a fantastic job. He got ORE back out, earning."); JX 3 (2010 ROE) at 11 (identifying Gandy as the person most responsible for resolving the Bank's OREO); Ortega Tr. 934:2-9 (same).

> you $500,000 cash for it, but it's still a million dollars' worth of real
> estate in Texas in good communities.[212]

Respondent Ortega agreed, testifying that he viewed it as part of his "duty to the bank" not to sell

OREO properties for significantly less than their appraised value:

> I have a responsibility. And I felt very strongly of being extremely
> careful and not selling the properties for a value, you know, lower
> than the appraised value. I think that I could always have taken the
> idea that I'm going to sell these properties for 60, 70 percent of the
> appraised value. I don't know that my duty to the bank would have
> been correct. So any time that we were trying to sell a piece of
> property, I always tried to stay close to the appraised value.[213]

This Tribunal cannot vouchsafe the accuracy of Mr. Gandy's characterization of the real estate

market during those extraordinarily turbulent times, nor does it express any view regarding the

relative value of Texas dirt. But the undersigned credits this testimony as one plausible explanation

for Bank management's reluctance to lower the asking price on the Bank's OREO properties in

order to get them sold, if management felt that doing so would not reflect the properties' true value

over time and if it believed that other avenues were available that would enable the Bank to reduce

its OREO holdings by selling them at their appraised value.[214]

Next, the Parties disagree as to whether the Bank could easily have sold its ORE to parties

financed by other banks rather than financing the purchases itself, and the undersigned finds that

the weight of the evidence lies with Respondents. NBE Chansen testified that most institutions

"would prefer to have the property out of the bank totally and have the OREO financed, if it had

to be financed, outside of their institution to the bank down the street."[215] She stated that none of

---

[212] Gandy Tr. 2224:24-2225:7, 2225:15-2226:3, 2227:22-2228:6, 2233:25-2234:11.

[213] Ortega Tr. 946:23-947:18.

[214] The undersigned also credits evidence adduced by Enforcement Counsel indicating that, even if it was not the sole
motivation, a desire to avoid recording losses on sales did play a part in the Bank's approach to its OREO portfolio
during this period. *See* EPF ¶¶ 214, 216, 245.

[215] Chansen Tr. 1295:15-22.

the other banks in her portfolio at that time were financing their own OREO properties, with the exception of the Bank.[216] She acknowledged, however, that she had no information regarding whether any "potential ORE purchasers ever went to another bank to inquire about financing," let alone whether they could have received it, and thus she could not opine on "what other banks were willing to do" with respect to financing the Bank's OREO specifically.[217]

By contrast, Bank management testified that there was no "bank down the street" that was amenable to financing the purchases of another bank's ORE during this period, at least in the areas in which the Bank was operating, and the undersigned credits this testimony in the absence of meaningful evidence to the contrary from Enforcement Counsel. Mr. Leal, for example, recalled that "at that point in time, nobody—and I mean no banks out there were providing financing for other banks' repossessions. We had no choice. We had to finance our own repossessions because nobody—no other bank was doing that."[218] Mr. Magee stated that "there just wasn't much of a market for real estate period, much less what was being foreclosed on or owned by other banks."[219] Mr. Gandy and Respondents offered similar recollections.[220] And in his April 28, 2009 letter to

---

[216] *See id.* 1295:23-1296:4; *see also id.* 1295:8-12 (testifying that in her experience, it is "unusual for a bank to finance the sale of OREO in-house").

[217] *Id.* 1638:2-18 ("Q: The difficult financial conditions, the horrid financial conditions created a situation where there weren't other banks available to finance ORE transactions, correct? A: Again, you're asking me what other banks were willing to do, and I don't have a response to that."); *see also id.* 1638:23-1639:2 ("I don't know specifically what the potential borrowers – if they actually went to another institution to see if they could obtain a loan. I don't have that information.").

[218] Leal Tr. 2286:12-17.

[219] Magee Tr. 2083:3-18 (stating also that "[a]t that point, I think most banks had stopped lending on real estate relative to the collapse of the market"); *see also id.* at 2182:16-25 ("[T]he whole downturn in the real estate market was widespread, deep, so nobody was purchasing and nobody was lending.").

[220] *See* Gandy Tr. 2227:15-19 ("There was no liquidity in the market. Nobody could go get a loan. The big banks had been told to shrink, shrink, shrink, shrink. So the only way they could shrink was not to make loans."); Rogers Tr. 382:23-383:5 ("Everybody was fighting and trying to survive. The liquidity wasn't there. ORE wouldn't move. We were doing the best we could do in a really tough environment."); Ortega Tr. 617:5-8 ("Real estate markets were horrible. We were coming off of the worst recession since the Depression. There are no other banks that are willing to finance another bank's ORE."), 936:8-14 ("[A]t this point, after the disaster, again, it's a war zone. It's difficult. Other banks don't want to finance ORE. . . . [Y]ou know, why would they want to take our one bank – our bank's other real estate and put it on their books.").

the OCC, Mr. Gandy also framed this issue in no uncertain terms, stating that "[t]he downsizing of [the Bank's] loan portfolio has been greatly impeded by the shutdown of lending by most Texas banks including, importantly, our biggest competitors in the Valley."[221]

On balance, then, the undersigned finds that Enforcement Counsel's current stance—that the Bank could simply have lowered its asking prices or found other qualified purchasers rather than engage in in-house financing of its OREO sales—is not necessarily reflective of the difficult position in which the Bank found itself when seeking to reduce its OREO portfolio as quickly as possible, month after month, in an economically depressed region during one of the greatest financial crises in this nation's history. Because this action hinges in part on Respondents' state of mind over the course of the alleged misconduct, this Tribunal will not presume that the Bank's options were as straightforward as they would have been in more normal times, or that Respondents blithely deviated from the only reasonable paths, if there is at least some credible and uncontroverted evidence to suggest that the decisions faced by Bank management were not easy ones and the solutions in no way as clear-cut as Enforcement Counsel now suggests. This is particularly true given the evidence adduced by Respondents of the OCC examiners' general awareness and approbation of the outline (if not the details) of the Bank's OREO lending strategy in the context of the time, as described further below.[222]

The Bank's approach to selling its ORE during this period relied, at least in theory, on its loan officers' knowledge of the communities in which they operated and their familiarity with potential borrowers and the properties themselves. Then-President/CEO Gandy, the principal architect of the Bank's strategy, described it like this:

---

[221] EX 149 (April 28, 2009 Letter) at 1.
[222] *See, e.g.*, JX 3 (2010 ROE) at 33 (stating that "[m]anagement has been able to sell OREO properties, but has had to finance the sales.").

51

> I tasked our loan officers – I said, you're familiar with your property because you made the loan. You need to find a borrower that knows this property that's in your community that you're familiar with that you have confidence in can make this thing work. You go find a borrower for them, and let's see if we can make a deal with them under some reasonable terms to take the property. . . . I tasked the loan officers with going out and finding customers for these properties and finding buyers for them. And they did. They did. They brought in people that were well-qualified to buy this stuff and to put it to good use. And not that every deal was perfect, but, you know, 95, 99 percent of them worked.[223]

At this point, the Bank had severely curtailed all non-OREO lending activity in an effort to shrink the Bank's balance sheet,[224] which freed up the loan officers to actively "find borrowers that we felt could take a project and make something out of it."[225]

For better or worse, personal—or at least institutional—familiarity with borrowers played a large role for Bank management as well.[226] In discussing specific OREO loans during the hearing, management repeatedly referenced the fact that the borrowers were known to the Bank,[227] in one case describing their ability to monitor the progress of a Bank-financed OREO purchase personally during their daily commutes:

---

[223] Gandy Tr. 2228:13-2229:5; *see also* Ortega Tr. 936:3-7 (stating that Gandy "was selling the real estate. He was trying to get – as soon as we got a piece of property, trying to see if we could improve it, how do we get it in the hands of others, just trying to work."); Rogers Tr. 376:9-22 (stating that "many, many, many of these ORE loans ended up paying off in full. . . . [S]ome of them we foreclosed on again. But dollars and cents wise, common sense wise, I still, to this day, believe we were much better off doing this.").

[224] *See, e.g.*, JX 3 (2010 ROE) at 4 ("Since lending has practically stopped, the roles of existing lending officers are to collect loans and sell OREO.").

[225] Leal Tr. 2288:1-4; *see also* Ortega Tr. 935:14-19 ("We would try to get these properties into the hands of other people that – other borrowers or customers that had more expertise in trying to keep those properties and improving on the properties and developing them."); Gandy Tr. 2226:24-2227:14 (noting that the Bank sought to find buyers "who could bring their expertise and their energy to these properties, just like we would have done in normal lending times, except we were the lender of last resort").

[226] *See* Rogers Tr. 340:10-25 (stating that L&D Committee members relied on loan officers' recommendations and that "[u]nless we knew something really bad about a borrower—we discussed the loan, but unless we knew something really bad about—or some board member knew something bad about a borrower or a potential problem, then we went on with the loan.").

[227] *See, e.g.*, Rogers Tr. 386:9-14 (noting that he "had no problem voting for" a particular OREO loan because he was familiar with the borrower, who had done "a good job" with other properties); Ortega Tr. 619:13-18 (stating that an ORE loan was approved without financial projections because "we know that these guys know how to develop").

> [T]his is one credit I was involved watching. It's just down from my home. We could see the progress. We could see what was happening. This was a 40-acre piece of land that was being developed. And we could see that it was working. And we were trying to move ORE and having it become a performing asset was where we wanted to go. . . . [T]his particular project, McCarthy was watching it, Gandy was watching it, I was watching it. It was all on the way to work, on the way home. We were all up-to-date on this project.[228]

And lack of familiarity also mattered: when explaining the Bank's reluctance to sell OREO at discounted prices to "scavengers" who promised to develop the properties, Mr. Gandy stated that "we really didn't know who they were or whether they could do anything or not."[229]

Contemporaneous reports suggest that the OCC understood that the Bank was financing the purchase of its OREO as part of an aggressive strategy to get the properties off its books, reduce costs, and improve earnings and capital—and, at least initially, supported this approach.[230] In their 2009 Report of Examination, for example, examiners noted that "management has aggressively managed OREO. . . . Most parcels have equity and management has been able to sell the parcels to individuals they believe have the ability to manage the project or repay the debt. These actions minimize the risk of write-downs due to fair market value declines."[231] Likewise, in 2010, examiners again described the Bank's strategy of finding and financing willing ORE purchasers in approving terms:

> Management has developed a comprehensive and dynamic approach to OREO resolutions that is led by [CEO] Gandy and the Bank plans to continue with this approach. Each loan officer is responsible for the 'field' work in preparing the OREO for sale, supervising repairs and researching other property issues as needed, and marketing the property to the local market. . . . The Special Credit Division provides the accounting and file support to track

---

[228] Rogers Tr. 387:9-16, 388:1-5.

[229] Gandy Tr. 2235:2-8.

[230] See, e.g., JX 2 (2009 ROE) at 32 ("To combat the effects of OREO holding costs, management is aggressively marketing OREO through innovative lending programs.").

[231] Id. at 40.

> OREO balances, OREO expenses, and sales. This in-house integrated team has the ability to move quickly to take possession of a property, evaluate it, market it and close it. *To date, the results have shown low losses when compared with other bank OREO processes.*[232]

The Report of Examination went on to state that the Bank's "[l]ending had essentially stopped except for . . . loans to finance OREO sales."[233] It further noted that while "[n]ew loans to finance sales of OREO . . . are underwritten more liberally than set forth in the loan policy," these "lending practices are liberal because most [are] related to the financing and often improvement of OREO or problem loan workouts."[234] And the Report observed broadly that "[m]anagement has been able to sell OREO properties, but has had to finance these sales."[235] In other words, it was no secret to the OCC that the Bank was engaging in extensive OREO financing to get the properties off its balance sheet...and, at first, the strategy appeared to be working.[236]

To be sure, any words of praise regarding the Bank's aggressive OREO lending strategy were always contingent on the Bank adhering to prudent standards of operation and engaging in safe and sound practices when selling its ORE, which OCC examiners increasingly came to believe that the Bank was not doing. The undersigned credits NBE Chansen's expert testimony that a bank that finances its own OREO sales should tighten its underwriting standards and apply extra

---

[232] JX 3 (2010 ROE) at 11 (emphasis added).

[233] *Id.* at 4; *see also id.* at 24 ("The Bank has essentially stopped [commercial real estate ("CRE")] lending, except to finance OREO sales, and aggressively managed problem CRE loans. These actions have reduced CRE loan concentrations."), 28 ("The Bank's current strategy implies a moratorium on all new commercial real estate lending other than financing sales of its OREO."), 31 ("In order to curb the increase in problem assets, management has ceased new lending, with the exception of financing OREO sales and CD secured loans, and focused efforts toward collection, work out, and sale of OREO.").

[234] *Id.* at 24.

[235] *Id.* at 33; *see also id.* at 50 ("Management has been able to sell OREO with little loss.").

[236] *See id.* at 10 ("Management has sold a tremendous amount of OREO. . . . Many OREO sales result in additional funds advanced to finish projects. This workout strategy increases the level of criticized assets but is generally appropriate because of the need to complete the projects."), 34 ("Management has implemented improved tracking and oversight of OREO sales and financing in response to criticisms noted in the prior examination. Since January 2010, management has financed $109 million in OREO sales. The Bank has not reacquired a material number of financed OREO parcels.").

scrutiny to the borrowers' ability to pay, because the OREO property "already carries a significant amount of risk" and because the consequences of the OREO returning to the Bank's balance sheet as the result of a defaulted loan can be severe.[237] Instead, there is extensive evidence that the Bank *loosened* its underwriting standards for OREO loans, frequently lending substantial sums of money to unqualified borrowers without adequate documentation, at liberal terms not commensurate with the riskiness of the loans, at a time when the Bank's financial condition was precarious and its need to reduce the risk level of its portfolio pronounced.

### 3.     The OREO Merry-Go-Round

In its 2011 Report of Examination, the OCC concluded that the Bank was making "loans to borrowers or guarantors with little financial repayment capacity" to finance OREO purchases, and that, consequently, many of the Bank's OREO properties were returning to the Bank's portfolio after they had been sold.[238] NBE Chansen described why this pattern, which she termed "the OREO merry-go-round," was foreseeably harmful to the Bank even if, in the short term, it did relieve the Bank of the obligation of paying OREO upkeep for the period that the properties were off its balance sheet:

> The bank would lend money. They would foreclose on the property. The new borrowers could not support it. They would foreclose on it again, and we just started this repetition of in and out and in and out. And a lot of the loans, again, they extended additional monies to the entity or the borrowers, so that increased the risk that the bank was putting on their books because it's not just the OREO property now.

---

[237] Chansen Tr. 1297:3-8 (stating that "if they're selling this piece of property to a borrower and financing that loan, they want to ensure that the borrower or entity has the ability to support the OREO that they're purchasing"); *see also id.* 1297:14-18 (noting that, as a nonperforming asset, an OREO property "carries a higher degree of risk by putting it back on the books"); Rogers Tr. 378:15-21 (stating that a loan to purchase ORE is "higher risk than your average normal loan").

[238] JX 4 (2011 ROE) at 5; *see also id.* at 56 (finding that the Bank's OREO strategy "has resulted in repeat foreclosures and has contributed to the overall misleading appearance of improvement at the Bank").

> Now, they're extending new money on top of that OREO property, again putting it at additional risk.[239]

Deputy Comptroller Brickman further explained the harmful effects of OREO properties returning to a bank's balance sheet through risky lending practices, and emphasized the importance of continued vigilance on the issue by Bank management:

> [U]ndertaking this strategy where those properties were not effectively resolved by the lending transaction could and did lead to additional losses to the Bank that it would otherwise not have incurred had it appropriately underwritten and gotten qualified borrowers to take on these properties. The risk of financial loss mounts over time relative to a portfolio like this. . . . [A]s the values in those properties deteriorate, the scrutiny and the sensitivity and the heightened attention that a board should pay to it is critically important.[240]

The undersigned credits this testimony and finds that the Bank's OREO lending strategy increased risk to the Bank to the extent that it increased the likelihood of OREO properties returning to the Bank's books through, *inter alia*, looser underwriting standards, approval of loans without proper documentation of borrower credit and finances, and overly liberal loan terms.

### 4.     Underwriting Standards

It appears undisputed that "[t]he Bank loosened its underwriting standards for loans to finance the sale of OREO."[241] Enforcement Counsel offered testimony from Bank loan review manager Rebecca Rodriguez that the Bank's underwriting for OREO loans was "less stringent" than for its non-OREO commercial loans between 2009 and 2011, and that the Bank would make

---

[239] Chansen Tr. 1542:13-24; *see also id.* 1394:5-1395:1 (noting that "this merry-go-round effect . . . increased the risk to the Bank and masked the true condition of the portfolio, the loan portfolio, and the Bank's financial condition").

[240] Brickman Tr. 111:16-112:4; *see also id.* 105:17-24 ("[A] bank in managing a portfolio of OREO has to be aware of the risks associated with the underlying collateral in ensuring that whoever acquires the property has the requisite financial capacity and ability to manage [and] maintain that property in accordance with the new loan terms assigned to it."); EPF ¶ 230.

[241] EPF ¶ 217; *see also*, *e.g.*, JX 2 (2009 ROE) at 25 (stating that "[y]ou must improve your underwriting of loans to finance OREO sales" and referencing "concessionary financing to weaker borrowers").

some OREO loans without performing any underwriting at all.[242] Ms. Rodriguez testified that

these underwriting practices troubled both her and CCO Magee:

> The concern was that there were – like we said, the little
> underwriting, there was little to no equity injected. Sometimes it was
> just to, like, brand new entities without any financial information.
> . . . [T]he quality of the loan was not what I would have liked to see.
> . . . I didn't think that the quality of the credit was there, and I didn't
> think the bank was in any better position with the new loan. I know
> they had to, I mean, move those ORE properties, but sometimes it
> was not to a better borrower.[243]

Moreover, Respondent Rogers agreed that the Bank was "more lenient on loan terms after the

crisis trying to turn ORE assets into earning assets,"[244] and Respondent Ortega acknowledged that

"[t]he L&D Committee approved loans it otherwise would not have approved had the purpose not

been to finance the sale of OREO."[245]

  The OCC required the Bank to improve its underwriting practices in the 2011 and 2012

consent orders.[246] Among other things, the Bank was required to implement a new policy providing

that loans could only be made "after obtaining and validating credit information on the borrower

and any guarantor sufficient to fully assess and analyze the borrower's and guarantor's cash flow,

debt service requirements, contingent liabilities, and global liquidity condition, and only after the

credit officer prepared a documented credit analysis."[247] As described further *infra*, Enforcement

---

[242] Rodriguez Tr. 1480:18-1481:1; *see also* EX 571 (sworn statement of Rebecca Rodriguez ("Rodriguez Dep.") 44:12-15 ("There was no underwriting. There was no equity injection. Really, there was nothing—it seemed like everybody kind of qualified to purchase OREO.").

[243] Rodriguez Tr. 1485:23-1486:21; *see also id.* 1488:11-1493:20 (discussing concerns shared by herself and Magee in September 2011); EX 18 (email chain including September 1, 2011 email conversation between M. Magee and R. Rodriguez).

[244] Rogers Tr. 377:1-3.

[245] EPF ¶ 218; *see* Ortega Tr. 617:3-4 ("I'm going to say we were more flexible with the conditions back then."), 618:1-12 ("A: We were mainly accommodating loans for our ORE and our better customers. Q: But the Bank made loans that it normally would not have made had the purchase not been to purchase Bank ORE, correct? A: Yeah, I agree. It's our ORE, yeah.").

[246] *See* EPF ¶ 242; JX 12 (February 2011 Consent Order); JX 13 (January 2012 Consent Order).

[247] JX 12 (February 2011 Consent Order) at 10; *see* JX 13 (January 2012 Consent Order) at 13.

Counsel asserts that the corrective actions taken by Respondent Ortega pursuant to these consent orders when he became President, CEO, and Chairman "did not fully address the issues,"[248] and the Bank continued to approve loans without a credit analysis in 2011 and 2012.[249]

### 5.    Approval Without Credit Review

Under the Bank's loan policy, packages for all loans greater than $500,000 were required to include financial spreads and a credit analysis (or "Credit Review") "to evaluate the credit worthiness of proposed commercial borrowers [] as well as the economic viability of proposed loans to such borrowers."[250] As Enforcement Counsel notes, "[t]he Credit Review was much more detailed than the other forms contained in the loan package"—namely, the New Loan Request and Loan Officer Recommendation."[251] Unlike the Credit Review, the two other forms "generally did not contain any analysis of the borrowers' ability to repay the loan, or even much financial information on the borrower."[252] Rather, the Loan Officer Recommendation was "a narrative form describing certain aspects of the loan request . . . [that] generally did not contain any financial analysis,"[253] while the New Loan Request contained "only very basic information and [did] not contain any information on whether the borrower could repay the loan."[254]

---

[248] EPF ¶ 243.

[249] *Id.* ¶ 244.

[250] *Id.* ¶ 192 (internal quotation marks and citation omitted); *see* JX 9 (2009 Loan Policy) at 35; JX 10 (2010 Loan Policy) at 37. While some exceptions to the loan policy were permitted with appropriate justification, the policy stated that they "should be disclosed within the credit package," and identified and tracked over the life of the loan "to determine the ultimate risk to the Bank." Chansen Tr. 1289:2-4, 1290:21-1291:14; *see also, e.g.*, JX 9 (2009 Loan Policy) at 36 ("Any exception to the Bank's loan policy should be recognized, highlighted, and specifically approved before the loan is made."), 37 ("[A]ll exceptions must be approved by the Loan & Discount Committee and documented in the appropriate credit file.").

[251] EPF ¶ 193; *see, e.g.*, EX 31 (NAHS loan documentation) at 1-3 (New Loan Request), 4-5 (Loan Officer Recommendation).

[252] EPF ¶ 193.

[253] *Id.* ¶ 206.

[254] *Id.* ¶ 207.

Enforcement Counsel asserts, and the evidence supports, that "[b]ecause of senior management's aggressive push to sell OREO, the Board approved loans without a Credit Review, or in some cases without 'anything on paper' at all."[255] On April 28, 2010, Mr. Magee sent an email to Mr. Gandy, Mr. Leal, Ms. Rodriguez, and others stating that the Bank's credit review department "rarely" had the opportunity "to actually receive or even look at financials before the ORE has been sold, booked and funded" as a result of the Bank's "press to move the ORE before the end of the month in which [it] is acquired."[256] He added that "those financials that we do receive typically provide little if any actual support for the proposed ORE purchase on the larger deals that we've been doing."[257]

Despite the Bank's loan policy, both Respondents acknowledge that they approved loans without any Credit Review during the relevant period,[258] and Enforcement Counsel identifies fourteen OREO loans ranging from $3 million to $56 million that one or both of the Respondents approved or ratified from April 2009 through October 2012.[259] In addition, as already noted, Respondent Ortega testified that even in cases where the Credit Review was supplied, he generally would not read it, preferring to make his decision "on the front two pages" of the loan package—that is, the New Loan Request only.[260]

Respondents assert that they relied on loan officer recommendations in determining whether or not to approve a loan.[261] The undersigned, however, credits the testimony of Deputy Comptroller Brickman and NBE Chansen that L&D Committee members each had an independent

---

[255] *Id.* ¶ 197 (quoting EX 571 (Rodriguez Dep.) 45:1-3); *see also* Magee Tr. 2081:7-16 (agreeing that from 2009 to 2013, there were "very large loans" approved without any credit review).

[256] EX 8 (email chain including April 28, 2010 email from M. Magee to R. Gandy et al.).

[257] *Id.*

[258] *See* Rogers Tr. 379:3-12; Ortega Tr. 622:6-22.

[259] *See* EPF ¶ 201 (citing exhibits).

[260] Ortega Tr. 646:3-20.

[261] *See* RPF ¶¶ 62-63; *see also*, *e.g.*, Ortega Tr. 927:20-929:11 (discussing reliance on lending department).

responsibility to understand the details of a loan, confirm that "all of the required information is provided to support the credit decision"—including, without question, a detailed Credit Review or something similar—and, importantly, ensure that they are sufficiently able to "evaluate the risk associated with [each] particular request."[262] This is particularly the case for OREO loans, given the heightened risk of financial loss associated with such properties if the loans default and they return to the Bank's portfolio, especially in aggregate.[263] Deputy Comptroller Brickman testified that an L&D Committee member should not only "look at the logistics of a loan whether or not it complies with policy," but "also layer in their expertise in regard to the overall risk profile of the bank and whether or not that loan would pose undue risk to the capital position or to the financial performance of the financial institution."[264] The undersigned agrees and finds that Enforcement Counsel has satisfied its burden in showing that Respondents did not act in this manner with respect to, at minimum, many of the OREO loans at issue in this action.

6. <u>Loan Quality</u>

The OCC's 2011 Report of Examination concluded that the Bank's aggressive strategy of financing OREO sales in-house frequently resulted in "the financing of OREO with little or no down payment, on liberal terms, with below-market interest rates, and to individuals who did not demonstrate the ability to service the debt."[265] Enforcement Counsel has catalogued a number of

---

[262] Chansen Tr. 1290:6-15; *see also id.* 1315:9-13 ("[I]f they do not have the credit review, which includes discussions on the borrowers' and/or guarantors' financial ability, they're not making an informed credit decision."); Brickman Tr. 102:4-9 ("A loan committee member has an obligation if there's insufficient information to make a decision to follow up with the loan underwriter or the person responsible for providing the information to gather the necessary information to make the decision.").

[263] *See* Brickman Tr. 105:17-24, 111:16-112:4.

[264] *Id.* 101:4-24.

[265] JX 4 (2011 ROE) at 46; *see also id.* ("The Bank's strategy to reduce criticized assets through the financing of OREO was not appropriate and has resulted in additional asset quality concerns and accounting issues."); Magee Tr. 2083:19-2084:6 ("[T]he sale of OREO and the financing thereof was done at terms which were not necessarily the same terms that you would want to see in a more typical environment, much like the environment that I had when I was a lender, i.e., requiring down payments and things of that nature.").

ways in which the Bank's OREO loans during this period violated Bank loan policy, made it more likely that OREO properties would return to the Bank's portfolio, or otherwise increased the risk to the Bank, and they are detailed below.[266]

Lack of Equity: Although the Bank's loan policy generally required borrowers to provide between 15 and 25 percent hard equity on OREO loans as a down payment, Enforcement Counsel offers evidence that "Respondents regularly approved and/or ratified OREO loans with no equity contribution from the borrower."[267] The undersigned credits NBE Chansen's expert testimony that lack of hard equity reduces borrowers' incentive "to keep making payments if they run into problems" with the property, thereby increasing the risk of the loan's default.[268] Virtually all of the OREO loan packages without sufficient hard equity that were presented to Respondents failed to mention or address this exception to the Bank's loan policy.[269]

New monies: Respondents approved or ratified OREO loans that provided the borrowers with millions of dollars of additional money over and above the property's purchase price.[270] While generally intended to allow borrowers to develop or improve the properties they have purchased,[271] these new monies compound the risk to the Bank in the event that borrowers who have not demonstrated the financial ability to pay the debt ultimately default on their loans.[272]

Newly formed entities: Respondents "often" approved or ratified OREO loans to newly formed entities that had "no financial history or track record or, in some cases, guarantors to support the debt," which increased the risk of default because the L&D Committee did not have a

---

[266] *See* EPF ¶¶ 219-233.

[267] *Id.* ¶ 221 (citing examples).

[268] Chansen Tr. 1302:8-15; *see* EPF ¶ 223.

[269] *See* EPF ¶ 222 (citing examples).

[270] *See id.* ¶ 221(a) (citing examples).

[271] *See, e.g.*, Ortega Tr. 671:7-11 (new monies provided "[f]or construction and build-out").

[272] *See* Chansen Tr. 1544:16-1545:20.

sufficient basis on which to judge these entities' ability to pay.[273] In the NAHS loan transaction, for example, Respondents approved a $56 million combined loan despite having "no [] financials" on the borrower itself as a newly formed entity.[274] The undersigned credits NBE Chansen's opinion that the risks of lending to newly formed entities are exacerbated by loan terms that include no equity contribution and the provision of new monies on top of the purchase price.[275] On the other hand, the undersigned also acknowledges that in certain cases, the individuals behind these borrower entities were known to the Committee even if the entities themselves were new.[276]

<u>Lack of guarantee</u>: Enforcement Counsel adduces evidence that many OREO loans approved or ratified by Respondents had either no personal guarantee or a limited guarantee from a guarantor relative to the loans' size, or were loans "where the guarantors had so much debt with the Bank from purchasing OREO that the value of their guarantees were significantly diminished or worthless."[277] When sampling OREO loans during the 2011 examination, examiners found that "[t]he guarantors did not have the capacity to service the debt and their financial statements reflected little liquidity and marginal cash flow."[278] The undersigned finds that inadequate guarantees foreseeably increase the risk of default and the likelihood of loss to the Bank.[279]

<u>Advancement of property tax or payment of past due loans</u>: The 2011 Report of Examination found that "[m]anagement has masked problems with OREO financing on liberal terms and payment of property taxes and/or allowing customers to maintain loans current through

---

[273] *Id.* 1393:15-25.

[274] EX 33 (email chain including August 4, 2010 email from Loan Officer Rachel Kelman to the Bank's Credit Group); *see also* EPF ¶ 266.

[275] *See* Chansen Tr. 1394:5-22.

[276] *See*, *e.g.*, EPF ¶ 312 (approval of $13.5 million OREO loan to newly formed entity owned by Robert Gandy IV, son of then-President/CEO Gandy).

[277] *Id.* ¶ 226 (citing examples).

[278] JX 4 (2011 ROE) at 46.

[279] *See id.* at 5 ("Often, the Bank made loans to borrowers or guarantors with little financial repayment capacity. Many of the financed properties subsequently return to the Bank's OREO portfolio.").

advances on other loans," which in turn "distorts the borrowers' true performance capabilities as well as the Bank's level of past due and nonaccrual loans."[280] As NBE Chansen explained:

> There was payment of property taxes being included in the dollar amounts lent to the borrowers. And in addition to that, there were also advances in the form of reserves being provided so the borrowers could make payments down the road. And all of those exposed the Bank to additional risk because it increased the level of the financing that was being provided, it masked the true condition of the loan portfolio, and the financial condition of the Bank.[281]

The undersigned credits this testimony, and notes further that the payment of property tax is detrimental to the Bank to the extent that it reduces the cost savings that come from moving expensive OREO off the Bank's balance sheets.[282] In the 2011 Report of Examination, examiners directed the Bank to place $62.2 million in OREO loans on nonaccrual status,[283] largely because "[the] loans had capitalized property taxes or were for the financing of OREO with liberal terms (100 percent financing, below market rates, and to borrowers that did not have the capacity to service amortizations)."[284]

"Below-market" interest rates: Enforcement Counsel presents evidence that the interest rates for many of the OREO loans were lower than the rates established for comparably termed OREO loans in the Bank's own Market Rate Matrix, which it developed in December 2009.[285] For

---

[280] *Id.* at 46; *see also id.* at 49 ("We noted several instances where the Bank paid property taxes and extended new notes to make payments on existing debt. These practices lack any substantive benefit to the Bank [and] only mask the borrower's insufficient repayment capacity.").

[281] Chansen Tr. 1303:10-15.

[282] *See* Rogers Tr. 370:19-24 ("[W]hen the bank owns ORE, you're doing maintenance, paying taxes, maintaining the property. It was important for us to get it out of the bank and have somebody else maintaining it, paying the insurance, paying the taxes.").

[283] Roughly speaking, and as detailed further in Part VI.E *infra*, nonaccrual loans are those for which a lending institution should not accrue interest income because the loans are delinquent or there is reasonable doubt regarding their ultimate collectability. *See* EPF ¶¶ 534, 538, 540.

[284] JX 4 (2011 ROE) at 50; *see* EPF ¶ 233.

[285] *See* EPF ¶¶ 227(a), 465-466; *see also* EX 343 (May 4, 2010 L&D Committee meeting minutes) at 5 ("The bank has established a Market Rate Matrix to ensure compliance with term and pricing of these loans."), 8 ("The Market Rate Matrix will be used for all ORE financing loans."), 20 (Market Rate Matrix).

example, the Market Rate Matrix provides that a fixed interest rate of 4.25 percent is only appropriate for commercial OREO loans with one-year terms, yet Enforcement Counsel identifies "[n]umerous OREO loans" with terms longer than one year and interest rates at or below 4.25 percent.[286] Likewise, the Matrix states that that commercial OREO loans with terms of 10 to 25 years should have a fixed interest rate of 7 percent, and yet the NAHS loan (discussed further below) offered a fixed rate of 3.25 percent over the first two and a half years and then a variable rate not to exceed 6 percent for the remaining twenty-five years of its term.[287]

Respondents assert that "there is no record on which [this Tribunal] can conclude that any specific loan was made at above or below market terms," given the extreme volatility of the market at the time and the presumption that, in the absence of evidence to the contrary, loan terms are "the result of arms-length transactions between a willing borrower and a willing lender."[288] External accountant Ben Pena, whose firm reviewed the Bank's interest rates during this period, also testified that the market rate for commercial OREO loans is dependent on many factors and is "somewhat very subjective."[289] The undersigned credits Mr. Pena's testimony regarding the subjectivity of market rates in this context, particularly at a time—as Respondents state—when the market for commercial real estate was so decidedly abnormal.

Notwithstanding this point, the undersigned finds that the Market Rate Matrix reflected the Bank's broad-based view of what the market rate for commercial OREO was when the Matrix was

---

[286] EPF ¶ 227(a); *see* EX 343 (May 4, 2010 L&D Committee meeting minutes) at 20 (Market Rate Matrix).
[287] *See* EPF ¶ 275(a); EX 31 (NAHS loan documentation) at 1.
[288] RPF ¶¶ 65, 67; *see also* Ortega Tr. 990:13-991:3 (stating that in the volatile market of the financial crisis, "[t]he customer had kind of the upper hand as far as what kind of rate they needed . . . [and] is always going to fight for the lower rate"); Salvato Tr. 1938:2-14 (agreeing that the presumption "is that the willing lender and the willing borrower agree to a fair and adequate interest rate," but only "to the extent that there are no factors that are inappropriately influencing the parties to transact at that value").
[289] Pena Tr. 1189:5-10; *see also* Leal Tr. 2291:10-17 ("It was never in our purview to say if a loan is below some market rate which was not clearly defined – it's unlike a mortgage. A mortgage, you know what the rate is because it's published or credit cards, but commercial loans, there isn't a range of rates that is market rates.").

devised, as Respondents have not provided a plausible basis for concluding otherwise. The severe lack of conformance of so many OREO loans with the Bank's *own* yardstick for what constituted a market interest rate further leads the undersigned to find that Enforcement Counsel has met its burden on this issue and that the Bank's OREO lending strategy led to a proliferation of loans with "below-market interest rates," as the 2011 examination concluded.[290]

### 7.    The NAHS Loan

The details of the approval, terms, and repayment of the $54 million NAHS loan in the summer of 2010 and beyond are illustrative of the misconduct alleged by Enforcement Counsel with respect to Respondents and the OREO lending strategy, and it is worthwhile to examine them in some further depth.

NAHS was formed on or about June 17, 2010 for the primary purpose of purchasing a hospital in Grand Prairie, Texas, which was part of the Bank's OREO.[291] At the L&D Committee meeting on June 8, 2010, Respondent Ortega and the other present Committee members (not including Respondent Rogers) approved two verbal loan requests "subject to formal loan presentation": 1) a $54 million loan to NAHS (what this Order has termed "the NAHS loan"),[292] which included $38 million to purchase the unfinished hospital and $16 million in new monies for construction, and 2) a $2 million loan to North American Hospital Systems, LLC to purchase hospital equipment.[293] The Bank formally entered into the loan agreement with NAHS on June 22, 2010, and the agreement was ratified by Respondents and the other Committee members at the

---

[290] JX 4 (2011 ROE) at 46.

[291] *See* EPF ¶ 248.

[292] Enforcement Counsel notes that the minutes state that the loans would be made to "North American Hospital Systems, LLC"; however, the loan was ultimately made to NAHS, in which North American Hospital Systems, LLC was the general partner. *See id.* ¶ 250.

[293] *See id.* ¶¶ 249, 255; EX 30 (June 8, 2010 L&D Committee meeting minutes) at 6. The NAHS loan made the loan relationship with NAHS one of the largest at the Bank, if not the largest. *See* Ortega Tr. 588:1-3.

August 10, 2010 L&D Committee meeting.[294] The loan enabled the Bank to sell the hospital at cost basis on its books for $37,811,851, "and thus avoid recognizing a loss on the sale."[295]

*Approval of the NAHS Loan*: It is undisputed that the L&D Committee was not presented with any loan package for the $54 million NAHS loan before that loan's initial, conditional approval on June 8, 2010—there was no New Loan Request form, no Loan Officer Recommendation, no Credit Review, no current appraisal of the ORE property, and no financial information on the borrower as a new entity or on the loan's guarantor.[296] Instead, loan officer Curtis Brockman made a presentation to the Committee in which he represented that NAHS was chosen from among "several offers" and that the buyers had "the ability to raise working capital for the hospital."[297] Then-President Gandy, who also supported the loan's approval, "added that this project will be owned and managed by an experienced doctor and should help insure [sic] its success."[298] After discussion, the Committee then approved the loan "subject to formal loan presentation and current appraisal."[299] Respondent Ortega testified that he relied on his loan officers' recommendations when approving the NAHS loan and did not focus on the borrowers' creditworthiness or repayment ability or the projected cash flow of the hospital.[300]

On June 10, 2010, Mr. Brockman authored a one-page memorandum for the L&D Committee that provided further details—albeit not many—on the prospective loan to NAHS.[301] The memorandum stated that the loan department "had several contracts on the sale of the hospital

---

[294] *See* EPF ¶¶ 265, 267; EX 32 (NAHS loan agreement dated June 22, 2010); EX 35 (August 10, 2010 L&D Committee meeting minutes) at 3 (NAHS loan ratification).

[295] EPF ¶ 251.

[296] *See id.* ¶¶ 255-256; Ortega Tr. 587:5-588:13, 590:6-17.

[297] EX 30 (June 8, 2010 L&D Committee meeting minutes) at 6.

[298] *Id.*

[299] *Id.*

[300] *See* EPF ¶¶ 262-263; Ortega Tr. 586:1-2, 607:12-18, 985:3-22, 986:5-11, 987:8-23 (relying on "the lending expertise of the bank" regarding his decision to approve this loan).

[301] *See* EPF ¶ 258; EX 31 (NAHS loan documentation) at 6.

with different terms and conditions," but chose NAHS due to the "background and diversity" of its owners.[302] Specifically, the memorandum noted that "[o]ne partner is a Dr. with Degrease [sic] from Harvard and Yale," while [a]nother partner has experience in running Hospitals and the other partner has raised capital for large companies."[303] Mr. Brockman concluded by writing that the loan department "chose this group because we feel they have the best business plan and present the least amount of risk to the Bank."[304]

A two-page Loan Officer Recommendation was ultimately completed on June 23, 2010, one day after the Bank entered into its loan agreement with NAHS.[305] Among other things, this document stated that one of NAHS's limited partners was an accomplished surgeon, listing his qualifications in detail, while noting briefly that the other two partners had "nine years in health care contracting and medical office development" and "experience in medical management," respectively.[306] The recommendation noted that the loan would be repaid through the collection of accounts receivable from "the normal course of operation" of the hospital, although it did not include any projections of the hospital's cash flow.[307] It also graded the proposed loan as "satisfactory," determined that "financials will be waived" for NAHS initially because it was a new entity, and stated that a "credit review will be performed at the end of the fiscal year."[308]

A credit review of the NAHS loan was not prepared until after the loan's August 10, 2010 ratification, and there is evidence that it was finalized in September 2010 only in order to "give it

---

[302] EX 31 (NAHS loan documentation) at 6.

[303] *Id.*

[304] *Id.*

[305] *See* EPF ¶¶ 259, 265; *see also* EX 31 (NAHS loan documentation) at 4-5.

[306] *Id.* at 4.

[307] *Id.* at 5; *see* Ortega Tr. 607:12-18; JX 3 (2010 ROE) at 64 (analyzing NAHS loan and finding that "repayment is highly dependent on projected cash flow and borrower is a start-up entity (new hospital) with no previous operating experience to support debt service capacity. In addition, financial analysis during the underwriting process was limited and guarantor support is inadequate.").

[308] EX 31 (NAHS loan documentation) at 5; *see also* EPF ¶ 259; RPF ¶ 75.

to the examiner" during that year's examination.[309] The credit analysis showed that the NAHS owner-guarantors of the loan "had approximately $150,000 in combined liquidity, and one owner-guarantor had a [Fair Isaac Corporation ("FICO")] score of less than 500."[310] In his deposition, Respondent Rogers agreed that loaning $54 million to two guarantors with a combined liquidity of $150,000 "would not be a prudent thing for a bank to do."[311] It is also undisputed that a FICO credit score of 500 would be below the "policy minimum of 650," and would therefore generate an exception under the Bank's Loan Policy that would require specific approval by, in this instance, the L&D Committee, for which no evidence has been presented.[312] The Bank's 2011 Annual Loan Review for the NAHS loan also concluded that approving the loan without a credit analysis violated the Loan Policy.[313]

*NAHS Loan Terms*: As stated, the terms of the NAHS loan included 30 months of interest-only payments at a 3.25 percent interest rate and then a 25-year repayment term at a variable rate not to exceed 6 percent.[314] The 2011 Annual Loan Review of the NAHS loan found that the "30 months of interest-only payments exceeded the twelve month maximum in the Loan Policy."[315] The loan also provided $16 million in new monies on top of the $38 million sale price of the hospital.[316] The loan agreement did not require any equity contribution from NAHS or its owner-

---

[309] EX 37 (email chain including September 8, 2010 email from M. Magee to C. Brockman et al.); *see also* EX 38 (NAHS loan credit analysis dated August 12, 2010) ("NAHS Credit Analysis"); EPF ¶ 253.

[310] *See* EX 38 (NAHS Credit Analysis) at 2-4; EPF ¶ 274.

[311] EX 568 (Rogers Dep.) at 113:19-114:1.

[312] EX 48 (First National Bank 2011 Annual Loan Review) ("2011 NAHS loan review") at 13; *see also* JX 10 (2010 Loan Policy) at 97 (noting that for loans designated with the collateral code 394, "Credit score < 650" would be a "waiver/exception item" subject to L&D Committee approval); EX 31 (NAHS loan documentation) at 1 (indicating that the NAHS loan is given the collateral code 394); EPF ¶ 270.

[313] *See* EX 48 (2011 NAHS loan review) at 13.

[314] *See* EPF ¶ 275; EX 38 (NAHS Credit Analysis) at 1.

[315] EPF ¶ 276; *see* EX 48 (2011 NAHS loan review) at 13.

[316] *See* EPF ¶ 272.

guarantors and further provided that the two principal owner-guarantors would guarantee a total of only $3 million of the $54 million loan.[317]

A 2012 review by external loan consultants Alvarez & Marsal ("A&M") concluded that the NAHS loan was "[a]n accommodation loan to rid the bank of a large piece of OREO," among eleven reasons that the firm viewed the loan as substandard and nonaccrual.[318] In addition, the review found that the "[g]uarantors have no liquidity that can support operation," that "this loan is a huge exposure for the bank and is running up against the bank's full lending limit," and that "the bank is taking excessive risk and exposure on this loan" given the limited guarantees obtained from the owner-guarantors.[319]

*Repayment of the NAHS Loan*: The Bank also gave NAHS assistance with repayment during the life of the loan. In order to make its first year of interest-only payments, NAHS was permitted to overdraw its account at the Bank by over $3.6 million as of November 2011.[320] The Bank covered this overdraft by advancing to NAHS funds from a new $6.5 million loan approved in October 2011, effectively capitalizing the interest payments onto the balance of the loan.[321] The Bank's annual loan review of the $54 million NAHS loan completed in May 2013 stated that "[i]n essence, the borrower did not pay any scheduled/renewal interest only payments for any note since origination all the way to 11/17/11."[322] In addition, as discussed further *infra*, the Bank restructured the NAHS loan as of September 30, 2011 to increase the loan's interest rate from 3.25 percent to 5 percent while arranging that all interest payments over the original 3.25 percent would

---

[317] *See id.* ¶¶ 272-273.
[318] RX 74 (A&M Workpaper dated August 8, 2012) ("A&M Workpaper") at 871.
[319] *Id.* at 869, 871 (also noting the loan's "[v]ery liberal lending terms and conditions").
[320] *See* EPF ¶ 277; EX 50 (2012 NAHS loan review) at 16.
[321] *See* EPF ¶¶ 278-279; EX 40 (loan documentation for $6.5 million loan to NAHS); EX 50 (2012 NAHS loan review) at 16-17.
[322] EX 50 (2012 NAHS loan review); *see* EPF ¶ 281.

be effectively reimbursed to the borrower.[323] And loan consultants A&M noted that the hospital's property taxes were paid by the Bank in 2010 and that "[d]uring construction, interest was being paid from funds advanced!!"[324]

*Loss Attributable to the NAHS Loan*: Enforcement Counsel adduces evidence that following the closure of the Bank, the FDIC as receiver suffered a $35.15 million loss on the loan to NAHS.[325]

### 8.    Accounting for OREO Loans

Enforcement Counsel asserts, based on the testimony of its accounting expert, that "[b]ecause the Bank used below-market financing terms as an incentive for borrowers to purchase the Bank's OREO, [Generally Accepted Accounting Principles ("GAAP")] required the Bank to discount the value of those OREO loans to their fair market value using a market interest rate (by performing present value calculations)."[326] Failure to appropriately discount the value of a below-market loan in connection with the sale of OREO leads to "overstated gain or understated loss on the sale, which results in overstated earnings and capital."[327] The undersigned finds that Enforcement Counsel has met its burden and shown that the Bank improperly accounted for its OREO sales over the relevant period by failing to discount loans with below-market interest rates to their present value of future cash flows.

First, the OCC's 2009 Report of Examination "determined that the Bank had sold and financed $133 million of OREO with liberal underwriting terms without proper accounting."[328]

---

[323] *See* EX 363 (Salvato Report) ¶ 36(b).

[324] RX 74 (A&M Workpaper) at 872; *see* EPF ¶ 282.

[325] *See* EPF ¶ 284.

[326] *Id.* ¶ 453; *see* Salvato Tr. 1813:16-1814:19, 1815:7-1817:16, 1819:9-1824:11.

[327] EPF ¶ 456; *see* Salvato Tr. 1811:11-1812:11, 1818:17-1819:8; EX 353 (December 2008 Comptroller of the Currency Bank Accounting Advisory Series) ("December 2008 BAAS") at 116 (discounting to fair market value would "reduce both the effective sales price of the property and any gain (or increase the loss)").

[328] EPF ¶ 457; *see* JX 2 (2009 ROE) at 12.

Examiners therefore issued a Matter Requiring Attention ("MRA") item "requir[ing] the Bank to record discounts (losses) on OREO loans with below-market interest rates by using a present value of future cash flows analysis."[329] Enforcement Counsel offers evidence that, in response to this MRA, the Bank "took a series of superficially corrective measures, none of which addressed the fundamental problems identified [therein]."[330]

For example, the Bank engaged its external accounting firm, Burton McCumber & Cortez LLP ("BMC"), to perform an analysis of the Bank's OREO loans in December 2009, but did not direct the firm to "evaluate which loans had 'market' terms or calculate discounts on loans with below-market interest rates" as part of this analysis.[331] Moreover, although Respondent Ortega presented a memorandum to the Bank's Board in April 2010 ("the April 2010 memo") representing that "[t]he review disclosed satisfactory compliance with the Market Rate Matrix" for OREO loans established by the Bank as of December 12, 2009,[332] there is no evidence that BMC applied—or even knew about—the Market Rate Matrix in the course of its analysis, nor that Respondent Ortega conducted any independent evaluation of the Bank's OREO lending practices using the Market Rate Matrix as a guide.[333] The April 2010 memo also asserted "that the Bank would perform present value calculations for all future OREO loans with below-market interest rates" relative to the Market Rate Matrix.[334] In fact, however, "the Bank continued to originate OREO loans with below-market interest rates (in comparison with the rates established in the Market Rate Matrix)

---

[329] EPF ¶ 458; *see* JX 2 (2009 ROE) at 12.

[330] EPF ¶ 461.

[331] *Id.* ¶ 463; *see also id.* ¶¶ 462, 464; Pena Tr. 1129:9-20, 1133:22-1134:18; EX 343 (May 4, 2010 L&D Committee meeting minutes) at 9-15 (November 12, 2009 letter from BMC to S. Ortega).

[332] EX 343 (May 4, 2010 L&D Committee meeting minutes) at 7-8; *see also id.* at 16-20 (April 19, 2010 memorandum from M. Magee to Board of Directors).

[333] *See* EPF ¶¶ 465-472.

[334] *Id.* ¶ 475; *see* EX 343 (May 4, 2010 L&D Committee meeting minutes) at 8.

for two more years," without discounting either prior or future OREO loans using present value calculations.[335]

In another MRA, this time in connection with its 2011 Report of Examination, "the OCC determined that, between 2008 and June 30, 2011, the Bank [had] originated over $309 million in OREO loans with interest rates below the then-market rate of 5.5 percent" and "had failed to perform present value calculations and record discounts on OREO loans with below-market interest rates."[336] NBE Chansen testified that "[t]he examiners determined that 5.5 percent was the appropriate market rate after evaluating rates in the Bank's market (throughout Texas, due to the Bank's state-wide branches), including by calling other banks to find out what those banks were charging to finance non-OREO loans."[337]

The 2011 examiners' report also cited a violation of 12 U.S.C. § 161(a), asserting that the Bank's quarterly Call Report filings were inaccurate due to "[t]he Bank's failure to adhere to proper accounting guidelines regarding OREO sales, which were financed below a fair market rate."[338] Examiners sampled eight OREO loans with below-market interest rates and concluded that approximately $14.3 million of those loans' $93.3 million value should have been discounted (or written down) to reflect a present value calculation.[339] The examiners determined that the Bank had financed a total of $309 million in OREO loans with sub-5.5 percent interest rates from 2008 to November 2011, and thus directed the Bank to "review all OREO financings to assure proper

---

[335] EPF ¶ 477 (citing examples); *see id.* ¶¶ 473, 478-479.

[336] *Id.* ¶ 480; *see* JX 4 (2011 ROE) at 11-12, 47-48, 81.

[337] EPF ¶ 486; *see* Chansen Tr. 1416:11-20.

[338] JX 4 (2011 ROE) at 81; *see* EPF ¶ 484.

[339] *See* JX 4 (2011 ROE) at 47-48; *see also id.* at 81 (stating that "[t]hese transactions occurred over several Call Report reporting periods and appropriate losses should have been recognized").

accounting and income recognition," calculate the appropriate losses, and include that adjustment in the December 31, 2011 Call Report.[340]

More than $12.5 million of the $14.3 million write-down calculated by OCC examiners was attributable to the $54 million NAHS loan.[341] At the hearing, NBE Chansen testified that this $12.5 million discount was arrived at by calculating the cash flow of a 3.25 percent interest rate over the life of the loan and comparing that to a 5.5 percent market rate, even though the terms of the loan provided that the interest rate was 3.25 percent only for the first thirty months, and was variable based on the market with a ceiling of 6 percent thereafter for the next twenty-five years.[342] Respondents challenged the calculation on this basis, arguing that a $12.5 million adjustment to the NAHS loan based on a 3.25 percent interest rate was "plainly incorrect" and "not reliable" given that the actual interest rate "for nearly the entire life of the loan" would have exceeded 3.25 percent and might have approached or exceeded the 5.5 percent market rate established by the OCC.[343] In response to this critique, Enforcement Counsel's accounting expert testified that "GAAP does not allow for a present value calculation to predict future changes in the interest rate,"[344] and that as a result it was appropriate to use the introductory 3.25 percent rate to calculate the discount for the loan over the whole of its 27.5-year term.[345]

The undersigned agrees with Respondents that the discount calculation for the NAHS loan does not accurately reflect the loan's terms, given that the cash flow from the twenty-five year variable interest rate would almost certainly have been higher—and perhaps significantly so—than

[340] *Id.* at 48; *see* EPF ¶ 489.
[341] *See* JX 4 (2011 ROE) at 47; EPF ¶ 488.
[342] *See* Chansen Tr. 1648:1-1652:21.
[343] Resp. Br. at 41-42; *see also* Chansen Tr. 1653:4-1654:7 (agreeing that using the stated variable rate for the NAHS loan "would come up with a very different calculation than using a fixed rate for the entire length of the loan").
[344] Salvato Tr. 1944:17-19.
[345] *See id.* 1944:2-1946:15.

the cash flow from the 3.25 percent fixed rate utilized by the examiners, and the required discount thereof commensurately less. Even so, the undersigned credits Ms. Salvato's expert testimony that the appropriate accounting treatment, when making present value calculations for a loan with an introductory fixed rate followed by a much longer variable rate, is to use the fixed rate as the benchmark for the life of the loan. The undersigned further notes that it is at least somewhat unlikely that the NAHS loan would have paid out as predicted regardless, given the borrowers' apparent lack of creditworthiness and the Bank's willingness to accommodate the loan relationship through overdrafts and additional advancement of funds. And it is also true that the total discount of $14.3 million was calculated based on "less than one-third of the Bank's $309 million of OREO loans originated at below-market interest rates,"[346] and so the actual required write-down amount, had the entirety of the Bank's below-market OREO loans been reviewed rather than eight loans totaling $93 million, would be higher even if the NAHS calculation itself is in error.

In any event, the Bank recorded only a $4.8 million discount of its $309 million OREO portfolio in the December 31, 2011 Call Report.[347] Ms. Salvato testified that this amount is "lower than the OCC's adjustment of $14.3 million" for three primary reasons.[348] First, the Bank used a 5 percent interest rate as the market rate for its present value of future cash flow analysis, rather than the 5.5 percent rate used by examiners.[349] Second, the Bank excluded from its review and adjustment any below-market OREO loans that were originated prior to January 1, 2010, which totaled over $100 million.[350] Third, the Bank excluded the $54 million NAHS loan entirely from the loans that it discounted.[351]

---

[346] *See* EPF ¶ 487.
[347] *See id.* ¶ 492; EX 363 (Salvato Report) ¶ 36.
[348] Salvato Tr. 1846:4-9; *see also* EPF ¶ 493.
[349] *See* Salvato Tr. 1846:18-22; EX 363 (Salvato Report) ¶ 36(a).
[350] *See* Salvato Tr. 1847:1-4; EX 363 (Salvato Report) ¶ 36(b).
[351] *See* Salvato Tr. 1846:10-14, 1858:5-18; EX 363 (Salvato Report) ¶ 36(c).

According to Ms. Salvato, the Bank did not adequately justify any of these decisions, and each was inappropriate under GAAP.[352] With respect to the NAHS loan in particular, Ms. Salvato concluded that the loan's exclusion from the Bank's review was the result of that loan being restructured to increase the applicable interest rate from 3.25 percent to the Bank's ostensible market rate of 5 percent—but that the terms of that restructuring effectively reimbursed NAHS for the difference between the two rates, "such that there really wasn't any true restructuring" and the borrower continued to pay only 3.25 percent.[353] In the end, Ms. Salvato found that the December 31, 2011 Call Report and all subsequent Call Reports were misstated by at least $9.5 million of additional losses, which is the difference between the $4.8 million adjustment taken by the Bank on the entire OREO portfolio and the $14.3 million discount calculated by OCC examiners from their limited sample.[354] The undersigned credits NBE Chansen's testimony that "[f]ailing to accurately discount the Bank's OREO loans masked the true condition of the Bank by artificially inflating its earnings and, therefore, its capital."[355]

9.    Loss to the Bank

Respondents note that in a March 25, 2014 internal OCC email chain, OCC employee Hub Thompson represents that it was the OCC's position at that date that the "'OREO MRA Issue' had no impact on the type or timing of any enforcement action nor any impact on the eventual timing of the bank's close."[356] Notwithstanding this, and in addition to the $35.1 million loss apparently

---

[352] *See* Salvato Tr. 1853:12-1857:16 (lack of documentation for use of 5 percent as market rate), 1858:5-1860:13 (lack of justification for exclusion of NAHS loan), 1862:11-1863:25 (lack of documentation or justification for January 1, 2010 cutoff); *see also* EX 363 (Salvato Report) ¶ 45; EPF ¶¶ 494-503.

[353] Salvato Tr. 1859:22-1860:7; *see* EPF ¶¶ 504-515 (providing further details on the "remarkable restructuring maneuvers undertaken by the Bank" with respect to the NAHS loan).

[354] *See* Salvato Tr. 1863:10-1864:25; EX 363 (Salvato Report) ¶¶ 46-47.

[355] EPF ¶ 529; *see* Chansen Tr. 1424:13-1425:5.

[356] RX 52 (email chain including March 25, 2014 email from H. Thompson to R. Chansen et al.); *see also* Chansen Tr. 1659:17-1661:3; Rs Br. at 42.

suffered by the FDIC as receiver for the Bank with respect to the NAHS loan following the Bank's closure,[357] Enforcement Counsel presents evidence that the FDIC as receiver suffered approximately $61.4 million in losses related to other OREO loans that were part of the OREO lending scheme at issue in this action.[358]

### E.     Nonaccrual Loans Accounting (Article V)

Article V of the Notice alleges that Respondents artificially inflated the Bank's earnings and capital by improperly accruing interest income on nonaccrual loans using cash basis accounting, which resulted in the Bank filing materially inaccurate Call Reports from June 30, 2009 through March 31, 2013.[359]

In its October 5, 2021 Order on the Parties' summary disposition motions, this Tribunal identified certain questions of disputed material fact with respect to the extent of Respondents' involvement in the Bank's allegedly improper accounting treatment of nonaccrual loans during the relevant time period; and whether and to what extent Respondents took steps to address identified issues regarding the Bank's nonaccrual accounting once those issues were brought to their attention.[360]

Viewing the totality of the evidence, and as elaborated upon below, the undersigned now finds that **(1)** under Respondents' supervision, the Bank implemented a default policy of recognizing interest income on all nonaccrual loans on a cash basis without supporting documentation of the loans' collectability, in contravention of the Call Report Instructions and the OCC's Bank Accounting Advisory Series ("BAAS"); and **(2)** Respondents were among those individuals who did not take any steps to correct or improve the Bank's blanket recognition of

---

[357] *See* Part VI.D.7 *supra* at 70.
[358] *See* EPF ¶¶ 292 ($24.3 million in losses), 298 ($14.4 million), 310 ($21.4 million), 316 ($859k), 337 ($177k).
[359] *See* Notice ¶¶ 90, 105, 107.
[360] *See* MSD Order at 29, 48-50.

interest income on nonaccrual loans on a cash basis until 2013, despite being directed to do so by the OCC in 2009, 2011, and 2012.

### 1.    Nonaccrual Loans

In the normal course of events, interest on a loan accrues on a daily basis, and borrower payments are divided between the loan's principal and its interest in accordance with the loan terms.[361] The payment of principal reduces the balance of the loan receivable, while the lending institution ultimately records the interest payment as income.[362] If, however, there is reason for a bank to doubt the collectability of a loan in its portfolio, then the bank "must determine whether the loan should be placed on a nonaccrual status."[363] Under the Call Report Instructions, any loan "(1) which is maintained on a cash basis because of deterioration in the financial condition of the borrower, (2) for which payment in full of principal or interest is not expected, or (3) upon which principal or interest has been in default for a period of 90 days or more" must be classified as nonaccrual, and the bank cannot accrue interest on it unless the loan "is *both* well secured *and* in the process of collection."[364]

Nonaccrual loans are accounted for using either the cost recovery or cash basis method.[365] The cost recovery method means that a bank applies all payments to a loan's principal balance and does not recognize any interest income.[366] The undersigned credits Ms. Salvato's expert testimony and the plain language of the Call Report Instructions that the cost recovery method is used as the

---

[361] *See* EPF ¶¶ 534-536; Chansen Tr. 1435:21-1436:1; Salvato Tr. 1871:6-1872:3.

[362] *See* EPF ¶¶ 536-537; Salvato Tr. 1872:4-21.

[363] EPF ¶ 538; *see* Salvato Tr. 1872:22-1873:3, 1873:6-8 ("[N]onaccrual status is based on the presumption that there is doubt about the collectability of the loan.").

[364] EX 359 (June 2009 Call Report Instructions) at 453 (emphases in original); *see also*, *e.g.*, EX 354 (March 2012 Call Report Instructions); EPF ¶ 540.

[365] *See* EPF ¶ 542; Salvato Tr. 1874:19-1875:3.

[366] *See* EPF ¶ 544; Salvato Tr. 1874:1-24; Chansen Tr. 1436:10-1437:2.

"general rule" when there is any doubt regarding the collectability of a nonaccrual loan.[367] This is so because "[w]hen a bank does not expect to collect full principal and interest, it is appropriate for them to try and minimize the amount of loss on the asset that they are holding."[368] Applying payments on nonaccrual loans to principal and not the interest is therefore "presumably a better representation of the bank's financial condition with respect to that loan."[369]

The cash basis method for nonaccrual loans, by contrast, permits a bank to separate loan payments into principal and interest and to treat the interest portion as income, as it would for loans that are not classified as nonaccrual.[370] As Enforcement Counsel observes, the Call Report Instructions provide that cash basis accounting may only be used on nonaccrual loans "in a very limited situation"—namely, "when the bank determines, after analysis and with supporting documentation, that the remaining recorded asset is fully collectible."[371] The relevant portion of the June 2009 Call Report Instructions is representative:

> When an asset is in nonaccrual status, some or all of the cash interest payments received may be treated as interest income on a cash basis as long as the remaining recorded investment in the asset (i.e., after charge-off of identified losses, if any) is deemed to be fully collectible. A bank's determination as to the ultimate collectability of the asset's remaining recorded investment *must be supported by a current, well documented credit evaluation and prospects for repayment*, including consideration of the borrower's historical repayment performance and other relevant factors.[372]

---

[367] EX 359 (June 2009 Call Report Instructions) at 453; *see id.* at 454 ("When doubt exists as to the collectability of the remaining recorded investment in an asset in nonaccrual status, any payments received must be applied to reduce the recorded investment in the asset to the extent necessary to eliminate such doubt."); *see also* EPF ¶ 543; Salvato Tr. 1873:12-21.

[368] Salvato Tr. 1874:7-10.

[369] *Id.* 1874:16-18; *see* EPF ¶ 541.

[370] *See* EPF ¶ 545; Salvato Tr. 1875:13-19.

[371] EPF ¶ 546; *see* Salvato Tr. 1880:1-1881:16.

[372] EX 359 (June 2009 Call Report Instructions) at 455 (emphasis added); *see also* EX 354 (March 2012 Call Report Instructions) at 545; Salvato Tr. 1882:4-8 (stating that "there have been no substantive changes in the guidance" on this topic from 2009 to 2013).

The BAAS likewise provides that the cash basis method should not be used unless "the bank can demonstrate [that] doubt about the ultimate collectability of principal no longer exists," and that collateral values alone are insufficient to resolve the issue of collectability.[373] Ms. Salvato testified that the documentation required to support the use of cash basis for nonaccrual loans should include "some form of analysis" by the bank finding "that the borrower's financial condition on an updated basis to the current date reflects their continued ability to repay the debt," especially considering that any given loan is on nonaccrual status to begin with because there is some doubt about its collectability.[374] And NBE Chansen noted that when a bank improperly uses cash basis accounting on nonaccrual loans, "the risk is that the bank is overstating their earnings through their earned interest account, and by overstating earnings, it's increasing the capital account which is, again, a misrepresentation of the bank's financial condition."[375]

2.     The Bank's Nonaccrual Accounting Practices

Sometime around 2007, the Bank switched to a new loan accounting system called Jack Henry Silverlake.[376] In an April 2013 internal OCC email chain regarding the Bank's nonaccrual accounting, Supervisory Examiner Bruce Staley stated that the default setting of this system was to apply the cost recovery method on nonaccrual loans, "where all payments went to the principal balance" without recording any interest income.[377] Mr. Staley relayed that "senior management at the time wanted the default to be cash basis [nonaccrual ("NA")] where cash payments were going to principal and income [sic]," however, and "[t]hey had Jack Henry change the default" as a

---

[373] EX 353 (December 2008 BAAS) at 38; *see* Salvato Tr. 1882:9-24; EPF ¶ 549.

[374] Salvato Tr. 1881:1-24; *see also* Chansen Tr. 1457:24-1458:2 (stating that a cash basis determination for a nonaccrual loan must be supported by "current financial analysis"); EPF ¶ 547 ("This analysis is important so the bank fully considers the potential risk to the bank in treating a nonaccrual loan on a cash basis.").

[375] Chansen Tr. 1438:16-25.

[376] *See* EPF ¶ 550; Chansen Tr. 1444:4-17; EX 328 (email chain including April 3, 2013 email from R. Chansen to K. Alderson regarding Bank's use of Jack Henry Silverlake) at 3.

[377] EX 328 (email chain including April 3, 2013 email from B. Staley to K. Doyle and C. Neal) at 2.

result.[378] According to Mr. Staley, "[m]anagement apparently has been automatically placing loans designated as NA on a cash basis forever."[379] In the same email chain, NBE Chansen noted that Mr. Staley's information conflicted with the representations of "the president and COO"—that is, Respondent Ortega and Mr. Leal—who, when questioned in 2013 regarding the "highly unusual" practice of placing all nonaccrual loans on cash basis accounting, "indicated that the JH Silverlake system would not allow the bank to process NAs other than on a cash basis."[380]

In other words, Enforcement Counsel has presented credible and uncontroverted evidence that the Bank changed the default accounting treatment of nonaccrual loans in the Jack Henry system from the cost recovery method to the cash basis method to conform to management's preferred practice of automatically recording interest income on nonaccrual loans. This change caused the Bank to deviate, indiscriminately and on a blanket basis, from the "general rule" of the Call Report Instructions that cost recovery accounting be used on all nonaccrual loans unless and until it is determined, through "a current, well documented credit evaluation," that a specific loan is fully collectible.[381] The undersigned also credits NBE Chansen's testimony that Respondents, in their capacity as senior management of the Bank, would or should have been aware that such a change had been made, even if they did not authorize it.[382] This is especially true for Respondent Ortega, given his role overseeing the Bank's Information Technology department at this time.[383]

---

[378] *Id.* Mr. Staley does not indicate from whom he learned this information, nor does Enforcement Counsel adduce any further evidence on that question.

[379] *Id.*

[380] *Id.* at 3 (April 3, 2013 email from R. Chansen to K. Alderson); *see* Chansen Tr. 1444:10-22.

[381] EX 359 (June 2009 Call Report Instructions) at 545; *See* RX 68 (email chain including October 24, 2012 email from E. Leal to J. Garcia et al.) ("The system is automatically set up for cash basis...once a loan goes to N/A (usually 90 days past due) it goes to cash basis.").

[382] *See* Chansen Tr. 1445:18-1447:2; EPF ¶ 554.

[383] *See* Ortega Tr. 644:7-16; Chansen Tr. 1445:20-22; EPF ¶ 554.

Further, there is no evidence that the Bank undertook—or, logistically, could have undertaken—"the loan-by-loan investigation, analysis, and documentation of likely collectability mandated by the Call Report Instructions" with respect to the loans for which cash basis was used by default in this manner.[384] Indeed, COO/Comptroller Ryan Leal testified that instead of requiring documentation to treat a nonaccrual loan as cash basis and thus recognize interest income, the Bank's credit review department "would look at all the loans currently on the books and . . . if it was deemed that the credit was deteriorating" and that payment in full was no longer likely even with the sale of collateral, "then it would change method" to cost recovery—precisely the *opposite* approach of the one set forth in the Call Report Instructions and the BAAS.[385]

3.    The January 2009 MOU

In January 2009, the OCC entered into an MOU with the Bank that, among other things, required the Bank to "immediately reverse or charge off all interest that has been accrued contrary to the requirements contained in the [Call Report Instructions] governing nonaccrual loans."[386] The MOU also directed the Bank Board to "develop and implement a written policy governing the identification of and accounting treatment for nonaccrual loans . . . [that] shall be consistent with the accounting requirements contained in the Call Report Instructions."[387] Respondents were members of the Bank's MOU Compliance Committee ("MOU Committee") and were responsible, in that capacity, "for ensuring that the Bank complied with the requirements" of the January 2009 MOU,[388] although Mr. Magee and others within the lending department and elsewhere were the ones actually tasked with taking the necessary steps to achieve compliance.[389]

---

[384] EPF ¶ 559.
[385] Leal Tr. 2309:1-14.
[386] JX 11 (January 2009 MOU) at 6-7; *see* EPF ¶¶ 10, 556.
[387] JX 11 (January 2009 MOU) at 7.
[388] EPF ¶ 558.
[389] *See* RPF ¶ 85.

On January 22, 2009, in an email to Respondent Rogers and the rest of senior management regarding the MOU, Respondent Ortega expressed the view that the Bank's existing nonaccrual loan policy "seem[ed] adequate" and was in compliance with the Call Report Instructions.[390] Following this, Chief Audit Officer Joe Garcia pointed out to the MOU Committee that the BAAS "require[d] the bank to demonstrate that it no longer doubts the ultimate collectivity [sic] of principal" before treating a nonaccrual loan as cash basis.[391] Mr. Garcia then suggested "that the policy on cash-basis loans reflect the guidance from the accounting series."[392]

On March 3, 2009, Mr. Leal announced to the Board that the Bank's nonaccrual loan policy had "been modified to include the accounting requirements specified in the Call Report Instructions."[393] At that same meeting, Mr. Garcia also outlined proposed audit procedures with respect to nonaccrual loans that would enable the Audit department to "[i]dentify nonaccrual loans in compliance with call report instructions" and "[v]alidate the integrity of nonaccrual system coding to the supporting documentation."[394] Respondent Ortega testified that Mr. Leal's representations regarding the changes to the nonaccrual policy led him to believe that the OCC's concerns on the issue were being addressed.[395]

In fact, however, the new nonaccrual loan policy implemented in the spring of 2009 complied with the Call Report Instructions only superficially, if at all. As Enforcement Counsel observes, "nothing in the new policy required Bank employees to undertake, much less document,

---

[390] EX 317 (email chain including January 22, 2009 email from S. Ortega to D. Rogers, R. Gandy, and M. McCarthy) ("Non accruals – we just need to follow our own policy and follow call report instructions. Policy seems adequate."); *see also* Ortega Tr. 763:3-13 (agreeing that he had reviewed the nonaccrual policy and compared it to the Call Report Instructions).

[391] EX 318 (email chain including February 27, 2009 email from J. Garcia to MOU Committee).

[392] *Id.*

[393] EX 319 (March 3, 2009 Board meeting minutes) at 1.

[394] *Id.* at 8 (February 25, 2009 memorandum from J. Garcia to R. Gandy).

[395] *See* Ortega Tr. 1027:16-1029:2.

the required analysis to determine that collectability was no longer in doubt before applying the cash basis method . . . to account for a loan on nonaccrual status."[396] Nor did the revised policy address or even mention the fact that the Bank automatically applied cash basis accounting to all nonaccrual loans, something that both the Call Report Instructions *and the policy itself* did not permit where there was any doubt about a loan's collectability.[397] Instead, the new policy stated that "a bank is allowed to maintain a loan on a cash basis as long as the borrower is able to make regular payments," which is not the standard articulated by either the Call Report Instructions or the BAAS, and which would not in any case apply to loans placed on nonaccrual status for being 90 days or more past due, as was the Bank's practice.[398] The policy further underlined the Bank's commitment to recognizing interest income on nonaccrual loans, stating in no uncertain terms that "*[i]t is FNB's intent to utilize cash basis nonaccrual accounting whenever it is applicable*."[399]

The lack of documentation for cash basis accounting of nonaccrual loans did not go unnoticed by the Bank's Audit department. Following a quarterly review of the Bank's nonaccrual program as of June 30, 2009, Mr. Garcia informed Bank senior management that the "use of the cash basis of accounting on all nonaccrual loans" was unsatisfactory.[400] Specifically, Mr. Garcia stated that although the Call Report Instructions permit cash basis accounting only if a loan is deemed to be fully collectible after a well-documented credit evaluation, discussions with Bank management had revealed "that *all* nonaccrual loans are on the cash basis of income recognition;

---

[396] EPF ¶ 562 (emphasis omitted); *see* EX 319 (March 3, 2009 Board meeting minutes attaching 2009 nonaccrual policy) at 10-14.

[397] *See* EPF ¶ 563; EX 319 (2009 nonaccrual policy) at 12 (stating that "[w]hen doubt exists as to the collectability of the loan in nonaccrual status, *any payments received must be applied to reduce the recorded investment in the loan until the doubt is eliminated*") (emphasis added).

[398] EX 319 (2009 nonaccrual policy) at 11; *see* EPF ¶ 561; Ortega Tr. 767:9-12 ("Q: By definition, then, nonaccruals are on nonaccrual because they are unable to make regular payments, correct? A: For over 90 days, yes.").

[399] EX 319 (2009 nonaccrual policy) at 11 (emphasis added).

[400] EX 321 (MOU-related materials including June 30, 2009 memorandum from J. Garcia to R. Gandy) ("June 2009 nonaccrual review memo") at 4. As MOU Committee members, Respondents would have received and reviewed this memo no later than August 2009. *See* Ortega Tr. 778:20-779:18; EPF ¶ 569.

and, are not supported by documentation."[401] The Audit department therefore recommended "setting a dollar threshold at which [nonaccrual] loans are required to have credit evaluations" before being treated on a cash basis.[402] Despite this warning and recommendation, there is no indication that Respondents or anyone else in Bank management took any steps in response to bring the Bank's nonaccrual loan accounting into compliance with the Call Report Instructions.[403]

### 4.    The 2011 and 2012 Consent Orders

The February 2011 and January 2012 Consent Orders between the OCC and the Bank reiterated the directions from the 2009 MOU for the Bank to "reverse or charge off all interest that has been accrued contrary to the requirements contained in the [Call Report Instructions] governing nonaccrual loans" and to "ensure the Bank's adherence to written policies and procedures governing the supervision and control of nonaccrual loans . . . consistent with the accounting requirements contained in the Call Report Instructions."[404] Notwithstanding this, "[t]here is no evidence that Respondents caused the Bank's accounting system or its policy for accounting for nonaccrual loans to change to conform to Call Report Instructions in response to the Consent Orders."[405] Furthermore, "[n]either Respondent caused the Bank to reverse or charge off all interest accrued contrary to the Call Report Instructions—for Respondent Rogers, before he resigned from the Bank on November 1, 2011, or Respondent Ortega before the end of 2012."[406] Overall, the undersigned agrees with Enforcement Counsel that there is no evidence that either

---

[401] EX 321 (June 2009 nonaccrual review memo) at 5 (emphasis in original).

[402] *Id.*

[403] *See* EPF ¶ 574.

[404] JX 12 (February 2011 Consent Order) at 12; JX 13 (January 2012 Consent Order) at 16; *see* EPF ¶¶ 575, 578.

[405] EPF ¶ 581.

[406] *Id.* ¶ 582.

Respondent "took the necessary steps from 2009 through 2012 to ensure Bank compliance with proper accounting for nonaccrual loans pursuant to Call Report Instructions."[407]

Chief Audit Officer Garcia expressed renewed concerns in October 2012 and December 2012, including to Respondent Ortega, regarding the Bank's practice of nonaccrual loans being accounted for *en masse* using the cash basis method without supporting documentation.[408] As a result, the Credit Administration department "modified the Credit Review template to include a separate section" addressing whether a loan on nonaccrual status should be treated as cash basis.[409] Nevertheless, the Bank continued to use the cash basis method to recognize interest income on all nonaccrual loans as a default.[410]

### 5.    The 2013 Target ROE

The OCC's March 2013 targeted examination brought the issue of cash basis nonaccrual loan accounting to the forefront.[411] Examiners concluded that Bank management had "failed to

---

[407] *Id.* ¶ 588.

[408] *See* EX 323 (email chain including October 23, 2012 email from J. Garcia to M. Magee et al., forwarded to S. Ortega) ("What documentation will I find in the file to support the cash basis of accounting? . . . I was informed by Loan Administration that all nonaccrual loans that are paying are on the cash basis – is this correct?"); RX 68 (email chain including October 24, 2012 email from J. Garcia to M. Karst et al., forwarded to S. Ortega) ("I [am] looking for documentation support on the decisions."); EX 325 (December 17, 2012 Board and MOU Committee meeting minutes) at 1 ("Mr. Garcia noted that the Audit department found Loan Review, Credit Review, and Special Assets write-ups did not include documentation supporting for income recognition on a cash basis.").

[409] EX 325 (December 17, 2012 Board and MOU Committee meeting minutes) at 1; *see also* EX 324 (email chain including November 8, 2012 email from M. Magee to J. Garcia et al.).

[410] *See* RX 68 (email chain including October 24, 2012 email from E. Leal to J. Garcia et al.) ("The system is automatically set up for cash basis.").

[411] Respondents contend that "[p]rior bank examiners approved of and agreed with the Bank's approach" of applying cash basis accounting to nonaccrual loans in a blanket manner without documentation of collectability. RPF ¶ 90. The only evidence cited in support of this view is an August 20, 2009 email from the OCC's then-head accountant, Rusty Thompson, to a colleague regarding whether a specific Bank loan should be accounted as OREO. *See* RX 66 (August 2009 email chain between R. Thompson and J. King). During this colloquy, Mr. Thompson ultimately suggests that the loan be treated as "a cash basis nonaccrual loan from Day 1 since there is no evidence of the borrower's ability to generate sufficient cash flow to repay the debt." *Id.* at 1. The undersigned finds that this email does not support Respondents' current contention for several reasons. First, it is clear from the context of the exchange that Mr. Thompson is suggesting that the loan in question be placed on nonaccrual status upon origination, not that it be given cash basis treatment rather than cost recovery treatment—in other words, the focus of Mr. Thompson's suggestion was that the loan be nonaccrual "from Day 1" because the borrower had not demonstrated an ability to repay it; the use of the term "cash basis" was incidental. This is underscored by the fact that accounting for a loan on a cash basis when there is no ability to repay is directly and plainly contrary to

follow cost recovery treatment for nonaccrual loans and follow guidelines within the Call Report

Instructions," noting that the Bank's incorrect practice of automatically applying the cash basis

method to nonaccrual loans without the required supporting analysis had "been in place for many

years."[412] Of the approximately 400 nonaccrual loans on the Bank's portfolio at that time,

examiners determined that all but two were recognized on a cash basis.[413] Examiners further found

that fifteen of the sixteen nonaccrual loans sampled for review lacked any documentation to

support their treatment as cash basis, while the final sample loan "had some support based on loan

file information, but no supporting documentation by management was available or performed."[414]

NBE Chansen explained the sample review process at the hearing:

> [W]hat we were looking for was how the payments had been applied
> since the loan was placed on non-accrual. Then we were also
> looking for, in the credit files themselves, the documentation to
> support the decision to keep it on cash basis non-accrual. Those were
> the items we were looking for. And when we could not locate any
> such documentation, we documented information, again, based on
> the file review as to why the borrower could not support a cash basis
> status.
>
> ***
>
> [A]nd our review showed that there were significant well-defined
> weaknesses in each of the ones that we looked at raising questions
> about the ability of the borrower to support the debt and keep it on
> cash basis.[415]

---

accounting guidelines: it is therefore absurd to interpret Mr. Thompson's statement as Respondents would have
this Tribunal do. Finally, this is a single, internal OCC email, and Respondents have offered no indication that the
OCC ever communicated to the Bank that it was appropriate to recognize interest income on a cash basis on this
loan or any other nonaccrual loan for which the Bank lacked evidence of the borrower's ability to repay. Indeed,
the opposite is true, as examiners repeatedly directed the Bank to improve its nonaccrual loan accounting and
ensure compliance with the Call Report Instruction requirements, which state unequivocally that cash basis should
not be used if there is doubt about a loan's collectability. It is fair to say that a loan for which "there is no evidence
of the borrower's ability to generate sufficient cash flow to repay the debt" is dubiously collectible.

[412] JX 7 (2013 Target ROE) at 6 (noting that "the software supporting the Bank's financial records automatically
accounts for cash basis nonaccrual, not the standard cost recovery method").

[413] *Id.*

[414] *Id.*

[415] Chansen Tr. 1449:24-1450:9, 1451:13-18.

The Report of Examination stated that as a result of the improper recognition of interest income on nonaccrual loans, the Bank's capital and earnings were overstated "for 2011, 2012, and the first quarter of 2013 by $1.4 million, $9.8 million, and $3.6 million, respectively."[416] To correct this, the Bank refiled its December 31, 2012 Call Report to reduce its reported interest income for 2011 and 2012 by a total of $11.2 million, and likewise adjusted its March 31, 2013 Call Report before it was filed.[417] Examiners also cited the Bank for a violation of 12 U.S.C. § 161(a) based on the filing of the inaccurate Call Report for the period ending December 31, 2012, finding that the primary cause of the overstatement of income "was inappropriate recognition of interest income for nonaccrual loans."[418]

Finally, the 2013 report stated that "[m]anagement is now aware of the proper accounting treatment and the Call Report requirements for cash basis nonaccrual and indicated that all new nonaccrual loans will receive proper coding for the cost recovery accounting method."[419] It further noted that "CEO Ortega and [COO] Eddie Leal have now implemented the appropriate processes and procedures ensuring proper cost recovery accounting treatment for nonaccrual loans."[420] (To recall, Respondent Rogers stepped down from his position as Bank Chairman in November 2011 and was no longer affiliated with the Bank following that date.[421])

To sum up: Cash basis accounting may only be used if there is no doubt about the collectability of a loan. The Bank used cash basis on every nonaccrual loan by default, in essence taking the position—without any supporting documentation—that there was no doubt about the

---

[416] JX 7 (2013 Target ROE) at 2; *see* Chansen Tr. 1514:19-1515:2 (opining that "failure to properly account for the non-accruals overstated the bank's earnings and capital which masked the financial condition of the bank to regulators, depositors, and stockholders").

[417] *See* EPF ¶¶ 594-595; Salvato Tr. 1883:3-1887:10; JX 7 (2013 Target ROE) at 6.

[418] JX 7 (2013 Target ROE) at 22.

[419] *Id.* at 6.

[420] *Id.*

[421] *See* Notice ¶ 6.

collectability of any of those loans despite the fact that they were more than 90 days in default or had some other negative feature that had, after all, resulted in their nonaccrual status to begin with. This was consistent with the Bank's stated philosophy of "utiliz[ing] cash basis nonaccrual accounting whenever it is applicable" and recognizing as much interest income as possible, but plainly contrary to the requirements set forth in the Call Report Instructions and the BAAS. As a consequence of the Bank's practice, interest income was improperly recognized, over the course of many years, on hundreds of nonaccrual loans whose collectability remained very much in doubt. Put another way, once a loan is placed on nonaccrual status, the onus is on the Bank to show that it no longer has any doubt about the loan's collectability and may therefore apply cash basis accounting and recognize interest income. Not only did the Bank not do this for the overwhelming majority of its nonaccrual loans from 2007 through 2012 before recognizing interest income on them, but to all appearances it did not even try—and the undersigned credits the testimony of Enforcement Counsel's experts that "Respondents, as directors of the Bank, were ultimately responsible for the Bank's policies and ensuring the Bank's compliance with proper accounting principles, especially in response to supervisor communications from examiners and warnings from the Bank's internal auditor about its improper accounting for nonaccrual loans."[422]

6.    Materiality

Respondents cite to two internal OCC emails from March 2014 in which examiners represent that "the amount of overstated earnings [due to improper nonaccrual loan accounting] ultimately identified by the OCC was not material to FNB's failure"[423] and that "the 'Nonaccrual Issue' . . . had no impact on the type or timing of any enforcement action nor any impact on the

---

[422] EPF ¶ 586; *see* Brickman Tr. 83:15-84:13; Chansen Tr. 1417:12-1418:1.
[423] RX 41 (email chain including March 28, 2014 email from B. Paulson to R. Chansen et al.).

eventual timing of the bank's close."[424] These more contemporaneous representations conflict, to at least some degree, with the opinions of Deputy Comptroller Brickman and NBE Chansen at the hearing that the improperly recognized interest income was material because "[h]ad Respondents required the Bank to comply with Call Report Instructions and accurately account for nonaccrual loans over [prior] years," the Bank's losses in those years would have been higher, and "[h]igher losses in prior years may have accelerated or escalated examiners' supervisory actions."[425] The undersigned addresses this further *infra* in Part VII.C.4.

### F.    <u>Loans to Rogers III Entities (Article VI)</u>

Article VI alleges that Respondent Rogers "placed the interests of a member of his immediate family above those of the Bank" in connection with "one series of unsafe or unsound loans" taking place in or around April 2009 and January 2010 by concealing material information from the Bank's Board of Directors and L&D Committee.[426] Specifically and in pertinent part,[427] this Article alleges that Respondent Rogers's son, David Rogers III ("Rogers III"), contrived to protect his own financial interests in a manner detrimental to the Bank by effecting a scheme in which the Bank foreclosed on certain properties that were the subject of loans to a Rogers III-owned entity in which Rogers III had a personal guarantee, thereby releasing him from that guarantee, and then financed the sale of those same properties to new Rogers III-owned entities, this time without a personal guarantee. As developed further by Enforcement Counsel over the

---

[424] RX 52 (email chain including March 25, 2014 email from H. Thompson to R. Chansen et al.); *see* RPF ¶ 92.

[425] EPF ¶ 600; *see also* Brickman Tr. 174:10-175:8; Chansen Tr. 1454:16-1455:3.

[426] Notice ¶ 29; *see id.* ¶¶ 110-129.

[427] There are several allegations in Article VI that Enforcement Counsel no longer appears to be asserting, given the lack of any evidence or argument regarding those allegations at the hearing or in Enforcement Counsel's posthearing briefs. *See, e.g., id.* ¶¶ 124-126 (allegations regarding "Company Z" and "Bank A"). The undersigned accordingly confines her analysis to the allegations against Respondent Rogers for which evidence has been adduced by the Parties and on which judgment is now sought by Enforcement Counsel—namely, those involving Griqualand (Company X in the Notice), Petro Icon (Company Y in the Notice), and the 2009 allegations regarding Obra Homes (Company W in the Notice). *See* EPF ¶¶ 620-660.

course of this proceeding, the Article additionally alleges that Respondent Rogers had knowledge of this scheme, knew it was not in the Bank's best interests, and yet took no steps to inform others at the Bank, thus causing the Bank loss.

Enforcement Counsel focused its motion for summary disposition of this Article on the allegations regarding one particular transaction involving a company named Griqualand LLC ("Griqualand"), which is styled as Company X in the Notice (hereinafter "the Griqualand transaction" or "the Griqualand loan").[428] In its October 5, 2021 Order on the Parties' summary disposition motions, this Tribunal identified certain questions of disputed material fact regarding the Griqualand transaction and the allegations in Article VI more generally, including what information was available to the L&D Committee prior to its approval of the Griqualand loan; the extent to which Respondent Rogers could have influenced, or did influence, the L&D Committee's perception of the merits of the Griqualand loan by sharing information not previously known to it; whether, based on all information known to Respondent Rogers at that time, the loan can be said to have been in the Bank's best interests when it was approved; and whether the Bank or the receivership in fact suffered loss as a result of the loan's approval.[429]

Viewing the totality of the evidence, and as elaborated upon below, the undersigned now makes the following core findings: **(1)** Respondent Rogers believed that it would not be in the best interests of the Bank to foreclose on collateral for loans that were personally guaranteed and then refinance the purchase of that collateral by the same borrower without a personal guarantee; **(2)** Respondent Rogers was aware of information regarding his son's financial situation that was pertinent to the Bank's decision to approve loans to newly formed entities owned by his son, without personal guarantees, to repurchase assets that his son previously owned through another

---

[428] *See* OCC Mot. at 10 n.7; Notice ¶¶ 117-120, 129.
[429] *See* MSD Order at 36-37, 50-52.

entity; **(3)** Respondent Rogers did not ensure that L&D Committee members were fully apprised of this information before the Committee approved those loans; and **(4)** the Bank and the receivership ultimately incurred losses on the loans in question.

    1.    <u>Background</u>

Rogers III was a businessman with ownership interests in multiple companies, including Obra Homes, Inc. ("Obra Homes" or "Obra"), a homebuilding company, for which he also served as President.[430] At the beginning of the relevant period, Obra Homes had numerous outstanding loans from the Bank that Rogers III had personally guaranteed, most of which were also secured by collateral in the form of real property.[431] Rogers III had previously been a director at the Bank and was generally known by Bank management and Board members.[432] Respondent Rogers testified that he and his son kept their personal relationship entirely separate from his son's dealings at the Bank and did not involve themselves in each other's business affairs: "I stayed out of his business, and he stayed out of my business. . . . I've been in his Houston office once in this 20 or 30 years time gone by. I'm close to him, but I'm not involved in his business. I'd do anything within reason for him."[433]

    2.    <u>The Yollick Email</u>

On February 11, 2009, Rogers III forwarded an email to his father that had been sent from Rogers III's attorney, Erick Yollick, two days earlier.[434] The forwarded email discussed the

---

[430] *See* EPF ¶ 621.

[431] *See id.* ¶¶ 621-622; EX 268 (2007 Annual Review of Obra Homes loan relationship) at 1-3.

[432] *See* Rogers Tr. 394:1-395:17, 397:5-6, 412:11-12 ("Everybody knew my son. He'd served on the Board with them."); EX 569 (Ortega Dep.) at 216:12-16 ("Q: So the only reason to make this loan is that you knew that the borrower is related to Mr. Rogers? A: No, and knowing his history with the bank."); EC-PSD-12 (McCarthy Dep.) 238:13-17 ("David Rogers III always took care of his business, paid on time, and worked very well with whoever he was assigned to work with.").

[433] Rogers Tr. 397:17-19, 398:1-4; *see also id.* 405:19-22 ("I stayed so far away from my son's business. . . . I didn't lobby for him. I didn't lobby against him. I just stayed away from him.").

[434] *See* EPF ¶¶ 623-625; EX 269 (February 11, 2009 email from D. Rogers III to Respondent Rogers, forwarding February 9, 2009 email from E. Yollick to D. Rogers III) ("Yollick email").

increasing likelihood that Obra Homes would be placed into receivership in order to satisfy an impending judgment from one or more of the 18 lawsuits then being brought by creditors against the company, the majority of which the lawyer asserted were "suits on debts which Obra is unlikely to win."[435] Mr. Yollick stated that such an outcome "would result in your total loss of control of Obra and its assets," which would in turn frustrate Rogers III's efforts to "liquidate [Obra's] assets in an orderly manner to satisfy [his] obligations to" the Bank and an institution denoted "RBC."[436]

Mr. Yollick then proposed that Rogers III work with the Bank and RBC to empty Obra of "all of [its] assets" through foreclosure by those institutions, thus leaving nothing for Obra's other creditors and obviating any concern about possible judgments.[437] Mr. Yollick hypothesized that Rogers III could even come to an agreement with the Bank and RBC whereby he could form "another corporation" and reacquire the assets, this time without a personal guarantee:

> I strongly urge that you consider that option – of working with the banks to ensure swift foreclosure and an agreement between you and them to market the assets – and possible marketing agreements with RBC and FNB so that you may maintain control of Obra's assets, *maximize your chance of eliminating your personal liability to RNB and FNC*, and end your payment of personal assets into Obra's coffers. Remember, *you could even have an arrangement with the banks to repurchase the assets in another corporation after foreclosure* (or, with greater risk, at the foreclosure) in order to market them.[438]

In short, then, Mr. Yollick described a scenario in which (1) Obra Homes would default on certain loans to the Bank that were secured by collateral and backed by a personal guarantee;[439] (2) the Bank would foreclose on the collateral in lieu of pursuing Rogers III's own assets through

---

[435] EX 269 (Yollick email) at 1.

[436] *Id.* (also warning that "[a] receiver could conduct an investigation of Obra's assets to determine whether past transactions benefited the company or whether they could be deemed fraudulent transfers").

[437] *Id.* (stating that "[i]f Obra had nothing left, then there would be no reason for you to have to pay settlements in these lawsuits. Furthermore, there would not even be a need to file bankruptcy on behalf of Obra.").

[438] *Id.* (emphases added); *see* EPF ¶¶ 623-624.

[439] The Parties do not adduce evidence regarding the size of Rogers III's personal guarantees on the loans in question.

the personal guarantees; (3) Obra Homes would now lack any assets for other creditors, relieving Rogers III of the prospect of costly settlements without the need for Obra to file for bankruptcy; (4) the foreclosed collateral would be placed on the Bank's books as ORE; and (5) Rogers III would then assist the Bank in selling this ORE, whether by marketing the property to other borrowers or by forming a new corporation that, unlike Obra, was not mired in financial and legal troubles and repurchasing the collateral property himself through Bank-financed loans, ideally on repayment terms for which he was no longer personally liable.

It goes without saying that such a scheme relied on the consent of the Bank to succeed: Rogers III could not force the Bank to release him from his personal guarantee on the Obra loans, nor could he unilaterally dictate the terms by which he repurchased the collateral from the Bank under the guise of a new corporation. Rather, decision-makers at the Bank—from the credit department to the loan officer to the L&D Committee—would have to conclude, given sufficient information about the transactions, that it was in the Bank's interests to foreclose and remarket the Obra collateral, whether to Rogers III or someone else, if the alternative was the diminution or encumbrance of Obra's assets by other creditor claims and lawsuits and an only partial recoupment of the defaulted loan principal through Rogers III's existing personal guarantees.

Respondent Rogers agrees that he recognized at the time that the plan outlined by Mr. Yollick was not necessarily in the Bank's best interests.[440] According to Respondent Rogers, he contacted his son soon after receiving the Yollick email to express his worry:

> I remember this very well. I called my son when I got this email either the same day or the next morning. I was, at the time, very concerned about it. I told him whatever he did, he must protect the

---

[440] *See, e.g.*, Rogers Tr. 403:7-11 ("Q: In your experience, the proposed arrangement that Mr. Yollick advises your son about would not be in the bank's best interest, would it? A: I wouldn't think so.").

> bank. . . . I didn't discuss all the proposal. I just said son, whatever
> you do, please, you have to protect the bank.[441]

Respondent Rogers testified that he let his son assuage his concerns during this call and did not feel the need to tell anyone at the Bank about the email as a result.

> He assured me there was no problem. He was going to take care of
> everything, which he did. . . . He said, dad, I am going to protect the
> bank. Nothing will happen to the bank.[442]
>
> ***
>
> Q: To ensure that the bank was protected, did you then forward this
> email or this information on to the individuals that you mentioned
> that were responsible for the lending relationship of FNB with your
> son?
>
> A: I did not. I had all the confidence in the world in my son. When
> he told me he would take care of the bank, I relaxed and felt very,
> very comfortable.[443]

Respondent Rogers acknowledged that his son was no longer a bank director and therefore did not have any duty to protect the Bank, stating that "I would think that the duty would be to himself to protect himself."[444] There is also no evidence that Respondent Rogers ever raised the issue of the personal guarantee with his son or asked how the Bank could be protected if it was left with more exposure on its loans after the contemplated transactions.[445] Ultimately, Respondent Rogers opted to stay out of it entirely, even though he knew that the arrangement described by the Yollick email would not be good for the Bank:

---

[441] *Id.* 403:11-16, 404:23-25.

[442] *Id.* 404:11-13, 405:1-2; *see also id.* 406:22-407:2 ("I do remember distinctly telling him several times, son, you must protect the bank, and him telling me, I'm fine, I'm tight with liquidity for a little bit, I have plenty of assets, I will be fine. And he was. And he did pay the bank.").

[443] *Id.* 407:3-11; *see also id.* 408:10-12 ("When I told my son protect the bank and he told me he would protect the bank, no problem, I was very comfortable with that.").

[444] *Id.* 437:17-18; *see also id.* 436:3-437:16.

[445] *See* Chansen Tr. 1526:15-21 ("So again, it gets back to it's the same entity that the bank foreclosed on and then lent on. And when all of this happened, the Bank came out in a worse position than they were because [] now Mr. Rogers doesn't have any skin in the game. He's not personally liable for the debt."); Ortega Tr. 703:22-704:7 (agreeing that the lack of a personal guarantee had the potential to "put the Bank in a much worse condition").

94

Q: You testified earlier that this proposal would not be in the best interest of the bank, correct?

A: *I wouldn't think it would be good for the bank*, but I don't know what the circumstances were. I don't know why they would go through that process. I just left it alone.[446]

The undersigned credits NBE Chansen's expert testimony that the information in the Yollick email would have been "material to future lending decisions involving Mr. Rogers III."[447] As NBE Chansen stated, "the information contained in this email details the inability to support the current debt provided to Mr. Rogers III, which [] raises questions about his ability going forward to repay any debts or any loans that the bank would have made to him"[448] and would have been important for the Bank to know, particularly given the email's proposal for Rogers III to "release [his] personal guarantee or liability on the loans with the bank while retaining ownership of the same assets," putting the Bank in a potentially worse position than it was before.[449] Despite this, it is uncontroverted that Respondent Rogers never raised the topic of the email or its contents with "anyone within the Bank who had responsibility for maintaining the lending relationship between the Bank and Rogers III."[450]

3.    The Griqualand Loan

Rogers III appears to have acted consistently with his attorney's advice, forming Griqualand in March 2009 and using it over the following months as a vehicle for the repurchase

---

[446] Rogers Tr. 405:23-406:5 (emphasis added).

[447] Chansen Tr. 1525:21-22; *see* EPF ¶ 646.

[448] Chansen Tr. 1525:22-1526:4.

[449] *Id.* 1526:11-14.

[450] EPF ¶ 629; *see also* EX 568 (Rogers Dep.) 195:24-196:4; Ortega Tr. 710:21-711:2.

of Obra assets from the Bank.[451] It is undisputed that Rogers III had a 100 percent ownership interest in Griqualand at all times relevant to the instant allegations.[452]

On or around April 7, 2009, the Bank foreclosed on certain of its loans to Obra Homes and took ownership of the related collateral, placing those properties on its balance sheet as OREO.[453] In so doing, the Bank released Rogers III from his personal guarantee on the defaulted loans.[454] Consistent with the costly nature of OREO discussed *supra*, the Bank also paid thousands of dollars of outstanding property taxes on the foreclosed properties.[455]

On April 30, 2009, the L&D Committee approved a $3,234,688.90 loan to Griqualand by telephone tally.[456] On May 12, 2009, the L&D Committee ratified the loan, with Respondent Rogers abstaining.[457] Through Griqualand, Rogers III then repurchased the foreclosed-upon Obra properties from the Bank using the proceeds of this loan.[458] The materials provided to the L&D Committee during the approval and ratification process stated that the purpose of the loan was "to purchase [OREO] property from FNB to develop and resell."[459]

In effectuating the loan to Griqualand, "[t]he Bank did not require any equity contribution from Griqualand or Rogers III, financed 100 percent of the purchase price, and included $100,000

---

[451] *See* EPF ¶¶ 630-631; EX 282 (Griqualand formation materials) at 2 (March 26, 2009 Certificate of Formation).

[452] Documents proffered by Enforcement Counsel as the minutes of March 27, 2009 meetings of the "Members" of Griqualand and of the Griqualand Board of Managers appear to reflect that Mr. Drake, serving as the Board's sole Board Member, President, and Secretary, sold a 100 percent ownership interest in Griqualand to Rogers III, the sole Member of the company, who had appointed Mr. Drake to his position on the Board earlier that day. *See* EX 282 at 4-5 (March 27, 2009 meeting minutes of the Member of Griqualand), 8-11 (March 27, 2009 meeting minutes of Griqualand Board of Managers); *see also* EX 274 (balance sheet indicating that Rogers III had 100 percent ownership of Griqualand as of December 31, 2010 and December 31, 2011); Rogers III Tr. 2375:17-21.

[453] *See* EX 288 (Obra Homes case history); EPF ¶ 632.

[454] *See* EPF ¶ 632.

[455] *See, e.g.,* EX 288 at 1 (Obra Homes case history) (payment of $27,342.47 in property taxes owed), 2 (payment of $19,698.77 in outstanding 2008 property taxes); *see also* EPF ¶ 633.

[456] *See* EX 349 (Griqualand L&D ratification package) at 2.

[457] *See id.* at 1.

[458] *See* EPF ¶ 635 (citing exhibits).

[459] EX 349 (Griqualand L&D ratification package) at 5.

in new monies for development costs."[460] There was no appraisal completed and no financial information provided on Griqualand.[461] Unlike the previous loans to Obra Homes, the Griqualand loan also did not require a personal guarantee from the borrower, which the L&D Committee ratification package stated was done "to facilitate" the sale of the newly Bank-owned Obra properties to Griqualand.[462] NBE Chansen testified that, in her experience as a national bank examiner, she had never seen another transaction in which a bank foreclosed on a property as collateral for a defaulted loan and then proceeded to sell the property back to the same owner acting through a newly formed entity, let alone under more favorable loan terms than the original defaulted loan and after such a short span of time.[463]

Although loan officer Edna Martinez testified that she was aware at the time of the Griqualand loan that the foreclosed Obra properties were being repurchased by "the same individual . . . under the name of a new company,"[464] the loan package presented to the L&D Committee did not contain that information.[465] To the contrary, the package's loan officer recommendation appears to actively go out of its way to avoid making a connection to Rogers III. Instead of naming Rogers III, for example—who, again, was indisputably Griqualand's sole owner—in the section entitled "Background information on Borrower/Principal/Cosignor/Guarantor," the package states that Griqualand "was formed by Roland W. Drake and others," providing a lengthy paragraph of detailed biographical data on Mr. Drake and identifying him as

---

[460] EPF ¶ 637; *see* Rogers Tr. 409:24-410:2 (agreeing that the loan included new funds extended for working capital).

[461] *See* EX 349 (Griqualand L&D ratification package) at 5 (stating that Griqualand "is a start up company"); Rogers Tr. 409:4-23.

[462] EX 349 (Griqualand L&D ratification package) at 5.

[463] *See* Chansen Tr. 1519:24-1521:9.

[464] R-BIO-10 (excepts of sworn statement testimony of Edna Martinez) at 56:2-22.

[465] *See* EPF ¶ 641.

Griqualand's managing director and the one who "developed the concept for Griqualand."[466] That section then proceeds to offer information on Mr. Drake's son ("studying to be an anthropologist") and his three daughters ("two of whom are professional librarians and one of whom is a published historical novelist"), who had no involvement with Griqualand.[467] Finally, the section adds off-handedly that "Griqualand's investors include a prominent homebuilder and financier who have [sic] substantial experience as a developer and real estate investor," in what Enforcement Counsel asserts without dispute is the document's sole oblique reference to Rogers III.[468]

The undersigned agrees with Respondents that, to all appearances, "Rogers III went through normal channels to do business with the Bank," and Respondent Rogers was not involved in advancing the Griqualand loan or handling it in any way.[469] The Bank officers handling and ultimately recommending the loan for approval were Ms. Martinez and Curtis Brockman,[470] and there is no evidence that Respondent Rogers contacted either of those officers regarding the loan or actively attempted to influence the loan process. Further, there can be no argument that when the time came to vote on the Griqualand loan, Respondent Rogers abstained—in his own words, "I stayed away from discussing my son's business with the Board."[471]

At the summary disposition stage, the undersigned concluded that it was a disputed question of material fact whether the other Board members had all relevant information regarding Rogers III's ownership of Griqualand, including the financial difficulties experienced by Obra and his plan to reacquire the foreclosed assets without a personal guarantee, at the time that they

---

[466] EX 349 (Griqualand L&D ratification package) at 5 (among many other things unrelated to real estate, championing Mr. Drake's military service and his three decades' work "as a private investigator for many of the Greater Houston area's most prominent law firms").

[467] *Id.*

[468] *Id.*; *see* EPF ¶ 649.

[469] RPF ¶ 96; *see* Rogers Tr. 407:22-23 ("I stayed a million miles away from my son's loan.").

[470] *See* RPF ¶ 96.

[471] Rogers Tr. 409:13-15; *see* EX 349 (Griqualand L&D ratification package) at 1.

approved the loan.[472] The hearing did not do much to clarify matters—Respondents continue to assert that "the Bank and L&D Committee knew of Rogers III's involvement,"[473] and Enforcement Counsel did not adduce any further evidence to resolve the question. It is also possible that full knowledge of the circumstances might have made individuals on the L&D Committee *more* likely to approve the loan, if they viewed Rogers III as a reliable borrower and saw the transaction as a way to remove encumbrances from the assets.[474] Respondent Ortega, for instance, testified that a transaction in which "the bank foreclosed and then resold the same assets back to the borrower in a new entity but with no personal guarantee" would be risky and irrational if the Bank's management was not familiar with the borrower, but that in this case "we kind of knew [that] Mr. Rogers III was involved in this thing."[475]

In some sense, however, the L&D Committee's actual knowledge of who owned Griqualand is immaterial. What matters is that Respondent Rogers was aware of the circumstances surrounding the Griqualand loan and yet did not take steps to ensure that the rest of the Committee members were fully informed, despite believing that the arrangement described in the Yollick email—and in particular the lack of personal guarantee by a borrower currently experiencing financial difficulties and defaulted loans—would or could be harmful to the Bank. When Respondent Rogers saw that the purpose of the Griqualand loan was to purchase foreclosed Obra

---

[472] *See* MSD Order at 50-51.

[473] RPF ¶ 97; *see* Rogers Tr. 410:9-11 ("I could imagine everybody in that room knew who Griqualand was. Certainly the loan officer did, and I'm sure the Board did, too."), 412:7-9 ("[Y]our Board members knew who the Griqualand [owner] was. I don't think anybody will have any doubt.").

[474] *See, e.g.*, EC-PSD-12 (McCarthy Dep.) 238:13-17 ("David Rogers III always took care of his business, paid on time, and worked very well with whoever he was assigned to work with."); Ortega Tr. 712:14-21 ("I think if we find out that it's Mr. Rogers III making the loan, I mean, I think he's good to pay his debt.").

[475] Ortega Tr. 702:15-703:1. On the other hand, Respondent Ortega agreed that the L&D Committee "should have been informed of Mr. Rogers III's and Obra's financial condition before [they] had to decide on the loan to Griqualand." *Id.* 712:7-13 ("[I]f we're making a loan to him, maybe we should have had some financials."); *see also* EX 569 (Ortega Dep.) 227:13-25 (stating that the information about Rogers III's financial situation from the Yollick email "obviously" would have made a difference in whether he would have voted to approve the loan).

assets previously held and guaranteed by his son, that the terms of the loan contained no personal guarantee, and that his son was not identified in the loan documentation as Griqualand's sole owner—in other words, that the loan package obscured or withheld pertinent information that he happened to possess as a result of the Yollick email—he could have made certain that Committee members had this information at their disposal and that the recommendation of the loan officers was appropriately backed. Instead, Respondent Rogers abstained, accepting his son's assurances that the Bank would be protected and leaving his fellow directors unenlightened regarding the potential risk posed by the transaction.

Respondent Rogers knew or should have known that the fact that Rogers III's properties were entangled in so much litigation and that Obra Homes was in financial distress was material to a decision to offer an unguaranteed loan to repurchase foreclosed assets to the same borrower under a new name. True, L&D Committee members might have known this information independently and incorporated it into their determination of whether the Griqualand loan was in the Bank's best interest—but Respondent Rogers did not see fit to ask.

### 4.    The Petro Icon Loans

In January 2010, Rogers III purchased 100 percent ownership of an entity whose name he changed to Petro Icon, LLC ("Petro Icon").[476] On or around January 26, 2010, the L&D Committee approved loans of $421,437 and $20,229 to Petro Icon ("Petro Icon loans") by telephone tally.[477] Through Petro Icon, Rogers III then repurchased certain Obra properties that had been foreclosed upon in late 2009, and for which his personal guarantee on the defaulted loans had been released

---

[476] *See* EPF ¶¶ 652-653; EX 274 (balance sheet indicating that Rogers III had 100 percent ownership of Petro Icon as of December 31, 2010 and December 31, 2011).

[477] *See* EX 314 (Petro Icon L&D ratification package) at 1. Although Enforcement Counsel does not submit L&D Committee meeting minutes evidencing the loans' ratification, it is uncontested that they were ultimately ratified. *See* EX 271 (showing outstanding principal balance of $421,437.44 on loan to Petro Icon as of February 18, 2010).

by the foreclosures.[478] The terms of the new loans did not include any equity contribution from Petro Icon or Rogers III, did not contain any financial information on Petro Icon, and were not backed by a personal guarantee.[479]

As with Griqualand, the Petro Icon loan package did not mention Rogers III by name or identify him as the company's sole owner. Instead of Mr. Drake, the background information section of the loan officer recommendation this time focused on a lawyer named Chris Owens, providing biographical data for Mr. Owens, his wife, and his "three school-age children" and stating that Mr. Owens had "developed the concept for" Petro Icon, formed the company, and was now serving as its managing director.[480] Once again, the only glancing reference to Rogers III was a statement that "Petro Icon, LLC investors include a prominent homebuilder and financier who has substantial experience as a developer and real estate investor."[481]

Enforcement Counsel does not offer additional evidence regarding the ratification of the Petro Icon loans, including whether Respondent Rogers again abstained as he did for Griqualand. Nevertheless, the undersigned finds that Respondent Rogers was aware of his son's ownership of Petro Icon and, at least as of February 2010, was regularly monitoring the loan balances on Bank loans to Petro Icon, Griqualand, and Obra Homes.[482] The undersigned also finds that there is no

---

[478] *See* EPF ¶¶ 651, 655, 657 (stating that "[t]he Bank's loans to Petro Icon financed 100 percent of the purchase price of the foreclosed properties"); EX 316 (email chain including April 16, 2010 email from E. Martinez to J. Crabb) ("This documentation has to do with the foreclosure we did late last year on Obra. The lots were sold to Petro.").

[479] *See* EPF ¶¶ 657-658; EX 314 (Petro Icon L&D ratification package) at 3, 7 ("In order to facilitate the sell [sic] of the ORE at this time there will be no personal guarantee. There is no financial information since this is a start up company.").

[480] EX 314 (Petro Icon L&D ratification package) at 3, 7.

[481] *Id.* The undersigned notes in passing the arguably misleading nature of a statement that "investors include an" individual with 100 percent ownership interest in the company when there is no evidence that other investors exist, much as it would be deceptive to say, for example, that the actors who have portrayed the character Michael Scott on the television series *The Office* "include" Steve Carell, or that the fruits used to make 100 percent orange juice "include" the orange.

[482] *See* EX 271 (showing outstanding principal balances for loans to Obra Homes, Griqualand, and Petro Icon as of February 18, 2010); EX 270 (email chain including March 1, 2010 email from E. Martinez to C. Brockman

evidence that Respondent Rogers ever raised the matter of his son's ownership of Petro Icon with L&D Committee members or expressed any concerns that the Petro Icon loan package omitted information that was pertinent to the Committee's approval of the Petro Icon loans—namely, that the loans would permit Rogers III to reacquire property that had just been foreclosed upon, at more favorable terms to Rogers III and less favorable terms to the Bank.

### 5.     Loss to the Bank and Receivership

The Griqualand loan was renewed on June 7, 2011, still without a personal guarantee; Respondent Rogers abstained from the loan's ratification.[483] In connection with the renewal, Ms. Martinez provided a credit review package to L&D Committee members stating, among other things, that "David Rogers III owns Griqualand, LLC 100%" and that one weakness of the Griqualand loan was "[l]ack of guarantors."[484]

In a May 1, 2013 email regarding a subsequent renewal of the loan to Griqualand, which was on nonaccrual status, CCO Mark Magee noted that "[w]e are attaining the personal guarantee of David Rogers III for the Griqualand debt, which previously held no personal guarantee."[485] Mr. Magee went on to characterize the terms of the renewal as "concessionary and liberal with a fixed interest rate of 3.25% for five years on a considerably under-secured loan."[486] The record does not indicate whether the personal guarantee was ultimately obtained.

---

attaching document with principal balances and stating that "[t]his is the recap Janie sends [to Respondent Rogers] every other week. It will list the different relationships.").

[483] *See* EX 489 (Griqualand L&D renewal package) at 1 (showing Respondent Rogers's abstention), 5 ("There is no personal guarantee at this time. I would like approval to waive tax return for Griqualand. It is a single owner entity and as per CPA, Mr. Everhard, it is a 'disregarded company' and will be included in the personal tax return.").

[484] EX 489 (Griqualand L&D renewal package including April 19, 2011 memorandum re Griqualand) at 6, 9.

[485] EX 290 (May 1, 2013 email from M. Magee to S. Ortega et al.).

[486] *Id.*

Enforcement Counsel adduces evidence that both the Bank and the FDIC in its capacity as receiver for the Bank suffered losses related to the Griqualand loan.[487] Specifically, the Bank suffered a $432,000 loss on the Griqualand loan on September 13, 2012.[488] FDIC witness Mary Jane Locke testified that the Griqualand loan was then passed to Bank acquirer PlainsCapital Bank ("PlainsCapital") following the Bank's failure in September 2013, and $111,000 of the loan was ultimately charged off by PlainsCapital, leading the receivership to suffer an $88,000 loss as part of the loss-sharing agreement between the receiver and the acquiring institution.[489] Enforcement Counsel further states that the Bank did not suffer loss on the Petro Icon loans prior to its failure, but that the receivership incurred $170,978 in combined losses on those loans in a similar manner to the post-failure loss on the Griqualand loans.[490]

### G.   Additional Evidence Bearing On Culpability

Respondents offer various pieces of evidence in support of their argument that they have not demonstrated a requisitely culpable state of mind over the course of their alleged misconduct, and the undersigned marshals the most salient examples here. With respect to Respondent Rogers, for example, Respondents adduce evidence that he was well-regarded by OCC examiners, at least early in the relevant period.[491] In an internal OCC email chain in early August 2008, an examiner stated that "[Respondent] Rogers has historically been very up front with us, kept us informed, and has aggressively dealt with problems. He is already reducing credit risk by shutting down all lending activities, without us asking him to do it."[492] Another examiner on the same chain concurred, noting that "David has always done what we asked him to do, his cooperation with

---

[487] *See* EPF ¶¶ 649-650.

[488] *See id.* ¶ 649 (citing exhibit).

[489] *See* Locke Tr. 2028:1-22; EPF ¶ 650 (citing exhibit).

[490] *See* EPF ¶ 660 (citing exhibit).

[491] *See* RPF ¶ 7.

[492] RX 15 (email chain including August 6, 2008 email from N. Ward to R. Kuehn et al.).

[our] office has been honest, and he generally leans toward a conservative approach to correct problems."[493] And on a separate internal email around the same time, an examiner expressed reluctance to impose an IMCR on the Bank, expressing confidence in Respondent Rogers's ability to handle the situation: "I recall a message that [Chairman] Rogers sent to us some time ago about his concern with the market and his plan to SLOW way down. In the past when he has said that, he has taken a very aggressive stance in dealing with problem credits. . . . He has ALWAYS done what he said he would do."[494]

Respondent Ortega likewise has been praised by examiners.[495] In an internal OCC email chain in September 2011 regarding the Bank's many problems, examiner Rodney Edmondson stated that "the only officer that gets it and is trying to address the issues by putting together a plan is Sal Ortega."[496] The 2011 Report of Examination drafted in part by NBE Chansen echoed this sentiment, finding that "[t]he only member of the executive management team to demonstrate foresight, implement change where needed, and devise reasonable plans and solutions to address the numerous deficiencies has been CFO Ortega."[497] The 2012 and 2013 Reports of Examination similarly singled out Respondent Ortega's leadership and direction in "initiat[ing] a cultural change" and "[making] a significant and aggressive effort to reduce the level of problem assets, address impairments, enhance the real estate appraisal process, and reduce OREO volume."[498]

Others both inside and outside the Bank testified as to Respondents' character and integrity. Former Bank president Gandy stated:

---

[493] RX 16 (email chain including August 6, 2008 email from P. Lindsey to R. Kuehn et al.).

[494] RX 17 (email chain including August 7, 2008 email from G. Hagar to G. Barker and R. Kuehn).

[495] *See* RPF ¶ 8.

[496] RX 33 (email chain including September 21, 2011 email from R. Edmondson to P. Lindsey).

[497] JX 4 (2011 ROE) at 38; *see* Chansen Tr. 1563:6-15.

[498] JX 6 (2012 ROE) at 49; JX 7 (2013 Target ROE) at 3; *see also* JX 5 (2012 Target ROE) at 2 ("Your new management team, under the direction of President Ortega, is much improved. We noted significant progress toward complying with the Order and both the credit and operations culture is improving.").

> I worked with [Respondents] for 30 years, and I always found them to be supportive, upright, hard-working, always had the bank's best interest at heart. . . . We worked our tails off to make the bank successful, to grow the bank, to serve our communities, and they were supportive the whole time.
>
> ***
>
> And they're good people. We all worked ourselves to death on this thing, put everything we had in it, every ounce of energy. And, you know it was just – it was so unnecessary and just – it was tragic, really tragic.[499]

Joseph Quiroga, a director of the Federal Reserve Bank of Dallas, described his interactions with Respondent Ortega in connection with Respondent Ortega's recent leadership positions at Texas National Bank,[500] of which Mr. Quiroga is president:

> Mr. Ortega provides a lot of leadership for Texas National Bank. He's someone that I've worked with, you know, hand-in-hand since the day I stepped into this bank. He's provided a great amount of experience for us. He's always been a person of the utmost character that, you know, we've just – we've never had any issues. This bank has performed extremely well over the years and, you know, it's been a joy to work with him hand-in-hand.[501]

When asked about his interactions with OCC examiners regarding the performance of Texas National Bank under Respondent Ortega's leadership, Mr. Quiroga stated that "[w]e have never had any negative conversations. It's always been extremely positive about the job that the entire organization is doing and specifically what Saul has done for this organization."[502]

Finally, the undersigned credits Respondent Ortega's testimony regarding the emergency major heart surgery he required in early February 2013, which caused him to be out of the office

---

[499] Gandy Tr. 2237:6-15, 2238:5-10; *see* Leal Tr. 2282:7-10 ("I've known Saul for 30 years, you know, and he's always put on a strong front. He's always shown leadership even under duress.").

[500] The undersigned takes notice of Respondents' July 1, 2022 Rule 19.7 Notice and Enforcement Counsel's July 20, 2022 Response, in which the Parties contest the manner in which Respondent Ortega characterized the scope of his current role at Texas National Bank in his hearing testimony, and finds that it is unnecessary to address the matter further. The Parties do not dispute that Respondent Ortega currently serves as CEO of Texas National Bank and previously also served that bank as Chairman and a member of its Board of Directors.

[501] Quiroga Tr. 2390:7-17.

[502] *Id.* 2392:5-9.

for over two months.[503] Respondent Ortega recalled the period prior to the surgery as being one of enormous stress as he worked long hours in an attempt to make the improvements to Bank practices and the Bank's condition required by the OCC examiners.[504]

> [W]e have a lawsuit that we lost for $65 million. [The examiners] give me instruction to go and settle this deal. This is in December. I worked all through January. Spent a lot of time in Lubbock trying to settle this case. They tell me, you have no choice, you settle or we're going to close the Bank down. I go and I settle that loan. They tell me, you've got to settle it before January 31st. I think I settled it around the 24th of January. What is it? A week or two after I'm in the hospital having an eight bypass on February the 7th.[505]

Respondent Ortega testified that by the time he returned to the office after his surgery, FDIC examiners were "already in the Bank" making contingency preparations for the Bank's eventual closure.[506] The undersigned credits the testimony of Mr. Leal that, by the spring of 2013, the FDIC viewed the Bank's failure as likely inevitable and tasked Bank management with keeping the Bank afloat long enough for the agency to find an acquiring institution:

> It was pretty stressful. There were times where we didn't sleep for days. My wife begged me to quit. She's like, just leave. Just walk away. What's going to happen to you is what happened to Saul.
>
> So I decided that I had to stay. I had to see it through. I had to help transition. And I got a lot of help from the guys from the FDIC because they kept encouraging me. They kept saying, you're doing the right thing, just keep doing it. Keep it together. Give us enough time. You know, the best result would be [] that we find somebody

---

[503] *See* Ortega Tr. 694:15-18 ("I was out March and April, and I'm barely getting back in after being out for approximately 65 days."), 839:25-841:21; RX 34 (February 13, 2013 email from R. Edmondson to R. Chansen and P. Lindsey) ("Eddie relayed that Sal went into the hospital on Sunday and had a bypass performed on Monday. . . . Unfortunately, Sal will be out for the next couple of weeks and when he does return I would assume his time and activity will be limited.").

[504] *See* Ortega Tr. 840:1-6 ("I almost gave up my life trying to get to point A with the examiners' help. . . . And yeah, I get emotional because I almost died.").

[505] *Id.* 840:14-841:1.

[506] *Id.* 849:6-9; *see also* Leal Tr. 2281:11-18 ("He probably came back sooner than what the doctor had asked him to. I mean, he was really concerned about what was going on at the bank and, you know, wanted to make sure that everybody's work continued. When he came back or before he left, he was aware that the FDIC was in the bank. So he knew that the process had begun.").

> that buys the bank. You know, you don't want depositors to lose
> their money. I said no, no, I don't.
>
> So we muscled in. We did what it took to get to that point. *At that
> point, we knew we could not save the bank. It was just about giving
> the FDIC enough time.*[507]

In the end, multiple banks bid to acquire the Bank, with PlainsCapital emerging as the successful

bidder and executing a purchase and assumption agreement with the FDIC as receiver to take over

the Bank's operations in September 2013 without interruption to depositors.[508]

## VII.   Analysis

Having made its factual findings,[509] this Tribunal now addresses the questions of law

relevant to whether, and to what extent, Respondents have engaged in actionable misconduct,

triggered some applicable effect, and demonstrated a requisitely culpable state of mind sufficient

for the imposition of a prohibition order and the assessment of a second-tier civil money penalty

in the amount of $250,000 against each Respondent, as sought by the OCC under 12 U.S.C.

§§ 1818(e) and 1818(i), respectively. The undersigned also considers the appropriateness of this

civil money penalty amount in light of the mitigating factors set forth in 12 U.S.C. § 1818(i)(2)(G).

### A.   Capital Raise Loans

Enforcement Counsel argues that Respondents' involvement in the Bank's Capital Raise

Loans Scheme (Article III) constituted a breach of their fiduciary duties of care and an engagement

in actionably unsafe and unsound banking practices that caused loss to the Bank, prejudiced its

---

[507] Leal Tr. 2278:11-2279:4 (emphasis added); *see id.* 2280:3-10 ("We would have other banks that would come in and, you know, we would have nondisclosure agreements. . . . So we were actively trying to find somebody that wanted to buy the bank."), 2283:8-19 ("[A]t some point, I realized that the bank was not going to continue. And the guys with the FDIC are the ones that, you know, kept me cool. . . . [T]he goal is we want to find somebody. You can't run out of cash. You can't run out of capital. You have to continue to put this together.").

[508] *See* Locke Tr. 2015:14-24, 2035:3-10; Magee Tr. 2072:13-20; Leal Tr. 2281:22-2282:1.

[509] While the federal banking agencies "generally defer[] to an ALJ's factual findings, especially those based on the ALJ's judgments as to the credibility of the witnesses, the [agency] is not bound by them, and may reach different factual findings so long as there is substantial evidence in the record to support those findings." *In the Matter of Preston J. Brooks*, No. AA-EC-91-153,1993 WL 13966512, at *15 (June 17, 1993) (OCC final decision); *accord Patrick Adams*, 2014 WL 8735096, at *7.

depositors, and was undertaken with personal dishonesty or continuing or willful disregard for the Bank's safety and soundness.[510] For the reasons discussed below, the undersigned agrees that Enforcement Counsel has demonstrated misconduct and effect with respect to these allegations, but concludes that it has not met the burden of proving, by a preponderance of the evidence, that Respondents acted with a requisitely culpable state of mind.

### 1.     Unsafe or Unsound Practices

As discussed in Part III *supra*, an unsafe or unsound banking practice is defined as "any action or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds."[511] Enforcement Counsel argues that Respondents' conduct relating to the Capital Raise Loans was unsafe and unsound "because (1) the Capital Raise Loans Scheme raised sham capital using the Bank's existing funds; and (2) the Capital Raise Loans featured concessionary loan terms that, in aggregate, constituted an excessive and unwarranted increase in risky lending that was contrary to the Board-approved strategy to reduce its loan portfolio."[512] The undersigned agrees.

Actionably unsafe or unsound practices are those that pose "a reasonably foreseeable undue risk to the institution," which the Comptroller and the D.C. Circuit have interpreted to mean an "increased risk of some kind."[513] Furthermore, to support a determination that the conduct in

---

[510] *See* EC Br. at 19-33 (misconduct), 33-34 (loss), 34-40 (culpability). Enforcement Counsel's allegations regarding the accounting-related Capital Raise Loans misconduct are addressed along with the accounting-related OREO allegations in Part VII.D *infra*.

[511] *In the Matter of Steven J. Ellsworth*, Nos. AA-EC-11-41 & -42, 2016 WL 11597958, at *13 (Mar. 23, 2016) (OCC final decision) (internal quotation marks and citation omitted). The fulfillment of this aspect of the corresponding prong of Section 1818(i) requires not only a conclusion that Respondents have engaged in unsafe or unsound practices, but that they have done so *recklessly*. *See* 12 U.S.C. § 1818(i)(2)(B)(i); *Patrick Adams*, 2014 WL 8735096, at *49 (articulating recklessness standard).

[512] EC Br. at 22-23.

[513] *Patrick Adams*, 2014 WL 8735096, at *5; *accord Blanton*, 909 F.3d at 1172 (internal quotation marks and citation omitted).

question is contrary to accepted standards of prudent operation, the agency "must make some showing as to the relevant standards and the departure from those standards."[514] Enforcement Counsel's examiner experts identified multiple types of heightened risk, reasonably foreseeable to Respondents, resulting from the Bank's departure from standards of prudent operation with respect to the Capital Raise Loans, and it is worth examining them in some depth.[515]

First, by approving dozens of unsecured loans to potentially unqualified borrowers in the spring and summer of 2009 to finance the purchase of Holding Company stock, Respondents and the rest of the L&D Committee risked the Bank's existing capital at a time that the Bank urgently needed to increase its capital ratios.[516] Respondents agreed that reducing the number of new loans made was an important part of the Bank's strategy to achieve the minimum capital ratios imposed by the OCC following the Fannie and Freddie collapse[517]—and, indeed, Respondents represented to the agency on April 3, 2009 that "[i]n an effort to shrink the bank in order to comply with the IMCR," there was "virtually NO lending occurring."[518] Three weeks later, the Bank approved the first Capital Raise Loan, which was followed by 45 more such loans between that date and the

---

[514] *Patrick Adams*, 2014 WL 8735096, at *37.

[515] The Comptroller has held that the conclusions of OCC examiners regarding the extent to which "a particular practice poses a safety and soundness concern" are entitled to a significant measure of deference by the ALJ. *Ellsworth*, 2016 11597958, at *14; *see also Patrick Adams*, 2014 WL 8735096, at *36 (noting that "[t]he expression of expert judgment as to whether a given set of facts represents an unsafe or unsound practice is very much within the competence of the OCC's [examiners]"). Examiner judgments and conclusions on unsafe or unsound practices that are based on "objectively verifiable facts" may not be rejected by the ALJ "unless there is a finding that they are a) without an objective factual basis, or b) outside the zone of reasonableness or arbitrary and capricious." *Ellsworth*, 2016 11597958, at *14. Unless otherwise noted, then, the undersigned accords due deference to all expert opinions offered by Deputy Comptroller Brickman and NBE Chansen regarding the extent to which Respondents' conduct meets the standard for unsafe or unsound banking practices.

[516] *See* EC Br. at 24-25.

[517] *See*, *e.g.*, Rogers Tr. 323:9-10 ("We were trying to reduce our lending, trying to shrink the size of the bank."), 456:22-25 ("We took the $174 million [Fannie and Freddie loss], and that basically shut us down. We started cutting back. We needed to shrink the bank. We needed to cut back on the lending."); Ortega Tr. 504:4-5 ("[W]e were going to just hold the fort and try to keep new loans from coming on."), 618:4-6 ("At this time we were really trying to shrink the bank size, . . . trying to reduce our loan portfolio.").

[518] EX 548 (April 3, 2009 OCC meeting minutes) at 1.

second capital injection.[519] Regardless of whether the proceeds of those loans were then used to buy Holding Company stock or for some other purpose,[520] they jeopardized the Bank's overriding priority at that time, ran counter to the Bank's representations to the OCC, and generally placed the Bank in a more uncertain financial position than it would have been without the loans.[521]

The unsecured nature of the Capital Raise Loans posed a special risk. Unsecured loans are "a higher risk loan category that deserves . . . scrutiny and attention by the Board of Directors."[522] The fact that the majority of the loans were not only unsecured but had low interest rates and other concessionary terms should have been a red flag to Respondents as the Bank struggled to improve its financial condition in the midst of the crisis.[523] Deputy Comptroller Brickman opined that these loans, taken together, represented "a big risk to the Bank," and that he would expect Bank board members "to manage this portfolio by looking at it [both] from the individual loan relationship perspective" as well as with "an aggregate reporting on performance on the overall potential risk and exposure the Bank has to it."[524]

To control the risk of the Capital Raise Loans, NBE Chansen opined that Respondents should have required that they be secured by collateral wherever possible.[525] Failing that, "Respondents should have ensured the underwriting for the Capital Raise Loans was appropriate, including analyzing whether the borrower could repay the debt and whether the Bank could absorb

---

[519] *See* EX 374A (Capital Raise Loans Spreadsheet).

[520] *See* Rs Br. at 26 (arguing that "[b]orrowers were free to use the loan proceeds as they wished"); Ortega Tr. 910:1-5 ("[T]he borrower basically can do whatever they want with the funds. They can decide to buy something else. They can take their money. They can go to Vegas to gamble.").

[521] *See* Chansen Tr. 1258:9-13 ("When a decision is made to shrink a balance sheet, it's generally for a specific reason. And by turning around and making loans, that negates the purpose of shrinking a balance sheet.").

[522] Brickman Tr. 146:6-8.

[523] *See id.* 148:8-18 ("All things being equal, . . . [t]o make a loan to a borrower without any collateral at a 4 and a quarter percent rate at the peak of a financial crisis is an extremely low rate and does not offset the risk of that portfolio."); *see also* Chansen Tr. 1257:8-9 (stating that the fact that so many of the unsecured Capital Raise Loans were later renewed "exposed the Bank to additional risk").

[524] Brickman Tr. 147:18-148:3.

[525] *See* Chansen Tr. 1277:20-25.

the loss if the borrower defaulted."[526] There is no evidence that such an analysis was ever required or performed, and both Respondents "admitted to approving loans with misleading descriptions despite being aware that the loans were Capital Raise Loans."[527]

Lack of accurate documentation and loose underwriting standards also increased the risk that the Capital Raise Loans were being made to unqualified borrowers who were likely to default. Respondent Ortega testified that most of those loans were made to individuals who had a "high net worth" and "long-term relationships with the Bank with different types of businesses," and that all of the Capital Raise Loans borrowers were known to him as "pretty good customers of the Bank"[528]—suggesting, in short, that even the unsecured, concessionary loans were not risky, because the Bank had a strong basis to believe that they would be repaid.[529] While it is certainly reasonable to conclude that Bank directors had some level of familiarity with the individuals to whom they extended these loans, however,[530] the undersigned agrees with NBE Chansen that this is no substitute for following proper underwriting policy, particularly at a time when increased risk to the Bank could have compounded negative effects on its safety and soundness.[531]

Respondents further increased the risk to the Bank by failing to ensure that the unsecured Capital Raise Loan portfolio was tracked and monitored for risk and that the loan proceeds themselves were accounted for correctly, if not fully segregated from any funds to be

---

[526] EPF ¶ 161; *see* Chansen Tr. 1277:8-19.

[527] EC Br. at 37; *see* Rogers Tr. 345:2-5; Ortega Tr. 530:12-19.

[528] Ortega Tr. 907:10-908:5.

[529] *See also* Rs Br. at 30 (arguing that "Respondents were assured by the loan officers at the Bank that [the] loans were good risks, and as such believed that they were safe and sound").

[530] *See* Rogers Tr. 264:11-25 (stating that potential investors in Holding Company stock included Bank officers, directors, and employees as well as their family and friends).

[531] *See* Chansen Tr. 1260:2-15 (opining that "Respondents should have ensured that the individuals purchasing the stock . . . were qualified borrowers and they had the ability to absorb losses based on their financial statements. The fact that they were great customers of the Bank is not a sole basis for approving a loan.").

downstreamed from the Holding Company to the Bank as regulatory capital.[532] As Enforcement

Counsel stated based on the opinion of Deputy Comptroller Brickman:

> When a bank has a large portfolio of unsecured loans, like the Capital Raise Loans, directors should demand aggregate reporting to understand the risk, and the directors should monitor the unsecured loans. Unsecured lending should be included in a board package and analyzed on a regular basis. This monitoring would ultimately help the L&D Committee determine whether the Capital Raise Loans would pose undue risk to the capital position or to the financial performance of the financial institution.[533]

Instead, "the Bank, including the Respondents, did not maintain any sort of documentation to track

and monitor these types of loans for the stock purchase."[534] Deputy Comptroller Brickman aptly

summarized Respondents' failures in this regard:

> The pattern of behavior covering multiple borrowers who then turned around and invested the exact dollar amount of that loan into the capital raise was indicative of a strategy specifically designed for the bank to lend money to borrowers to participate in the capital raise, and *any reasonable person sitting on that board of directors would have known the connection between the lending strategy and the investment strategy and would have an obligation to make sure the accurate record existed of that transaction* including and not limited to copies of those purchase agreements being included within the loan file documentation as part of the decision package. . . . [I]ndependent of them reviewing these individual loan files, [Respondents] would certainly have an awareness and understanding of how this strategy was working its way through, you know, and impacting the bank's strategic plan.[535]

In addition, Respondents never disclosed to regulators, or ensured that the Bank disclosed,

that the Bank was financing the purchase of Holding Company stock.[536] The undersigned agrees

---

[532] *See id.* 1278:1-8 ("[A]ny loans made and associated with the capital raise that was done should have been tracked and monitored. And the amount raised via this method should have been disallowed or discounted from the capital calculations to ensure that it did not misstate the bank's books and records, specifically their capital position.").

[533] EPF ¶ 160; *see* Brickman Tr. 148:19-149:16.

[534] Chansen Tr. 1233:20-21.

[535] Brickman Tr. 153:20-155:6 (emphasis added).

[536] EC Br. at 25.

with Enforcement Counsel that "the OCC's ability to effectively supervise the Bank was impeded" as a result.[537] Enforcement Counsel's experts opined that the Capital Raise Loans Scheme should have been disclosed "to the OCC whenever the Bank discussed the sale of Holding Company stock to raise capital,"[538] and yet none of the Bank's communications with the agency from April through August 2009 (or beyond) ever stated that the Bank was loaning borrowers money for stock purchases associated with the capital raise.[539] The undersigned credits Deputy Comptroller Brickman's emphatic testimony on this point:

> It's incredibly surprising to me that there would be no record at all of that strategy being discussed, being approved, being decided particularly where there were, you know, dozens and dozens of loans being made relative to this capital raise loan strategy. The complete absence of information in the substantive documents provided to the OCC and in the substantive meetings held with the OCC, to me, is indicative of extreme lack of oversight.[540]

Mr. Brickman also explained that the failure to disclose the Capital Raise Loans added regulatory risk because the agency did not have an accurate understanding of how the Bank planned to raise capital, something that Respondents should reasonably have understood as experienced bankers:

> [I]f the bank is in a position where it has insufficient capital, we need to be able to assess the quality and accuracy of plans to raise capital in order to conclude whether those strategies are reasonable or whether we need to redirect the bank and take additional or different strategies that would lead to the end result of having more capital.[541]
>
> ***
>
> The sources of capital in any common stock or preferred stock capital raise are critically important. And information regarding the number of shareholders interested and able to invest it is critically important in understanding whether or not the bank is going to meet

---

[537] *Id.* at 26.

[538] EPF ¶ 174 (citing testimony).

[539] *See, e.g.*, EX 149 (April 28, 2009 Letter); EX 151 (May 12, 2009 Letter); EX 366 (August 18, 2009 Bank board minutes, attaching August 14, 2009 letter from Robert Gandy III to OCC) at 6.

[540] Brickman Tr. 142:8-17.

[541] *Id.* 116:6-14.

> its capital raising target. *So our understanding that there was a population of potential shareholders that would need financial assistance in order to invest would be a very specific and important piece of information relative to our assessment of the overall viability of this capital raise strategy.*[542]

The undersigned concurs with this assessment in all particulars.

Finally, while Enforcement Counsel did not meet its burden with respect to the assertion that *all* money raised through the Capital Raise Loans was ultimately downstreamed back to the Bank where it was improperly treated as Tier I regulatory capital,[543] the undersigned credits the testimony of Enforcement Counsel's experts that whatever portion of the loan proceeds *was* downstreamed—which is necessarily somewhere between $3 million and $17.3 million, as discussed *supra*—also created a reasonably foreseeable heightened risk to the Bank. As NBE Chansen states, using the Bank's existing funds to finance loans, the proceeds of which are then counted as new capital, would "mask[] the true financial condition of the Bank's balance sheet," thus "overstat[ing] the loan portfolio and the capital position" and misleading "regulators, potential investors or investors, shareholders, and depositors."[544] The undersigned comfortably concludes that making loans for the purpose of the proceeds of those loans being downstreamed back to the Bank as regulatory capital, to whatever extent it occurred in this case, is—like the other forms of misconduct discussed above—contrary to generally accepted standards of prudent banking operation and an actionably unsafe or unsound practice. Enforcement Counsel has therefore demonstrated this aspect of Section 1818(e)'s misconduct prong several times over.

Respondents' arguments to the contrary are not persuasive. To begin with, Respondents' contention (Rs Br. at 26) that the Holding Company had over $38 million in funds separate from

---

[542] *Id.* 129:13-130:1 (emphasis added).
[543] *See* Part VI.C.6 *supra* at 34-42.
[544] Chansen Tr. 1252:20-1253:2.

the Capital Raise Loan proceeds, and thus the amount downstreamed could have included no improperly reported regulatory capital at all, is contradicted by the record evidence and by Respondents' testimony itself.[545]

Second, Respondents' argument that the Capital Raise Loans were not unsafe or unsound because "[b]orrowers were free to use the loan proceeds as they wished" (*id.*) misunderstands the inquiry: as stated above, risking the Bank's capital by making dozens of unsecured, poorly underwritten loans—many with demonstrably *deceptive* stated loan purposes[546]—at a time when the Bank's need for capital was exigent, while representing to the OCC that the Bank had almost entirely curtailed its lending activity, would be unsafe and unsound if the loans were spent on jellybeans, lottery tickets, or anything else; this aspect of the Capital Raise Loans misconduct has very little to do with the actual capital raise.[547]

Third, Respondents argue that the Capital Raise Loans were not material and that the Bank would have achieved its IMCR even if the full amount calculated by Ms. Salvato was excluded from the Bank's reported capital (*see id.* at 27)—again, even if true, this does not alleviate the riskiness of the loan portfolio itself, let alone the Bank's failure to track and monitor the loans or to disclose to the OCC that Bank-financed stock purchases were a significant component of the capital plan.

Fourth, it is no escape from liability in this instance to contend (*id.* at 29-30) that Respondents did not make the loans themselves and merely followed the recommendations of the

---

[545] *See* Part VI.C.6 *supra* at 39 n. 174.

[546] *See* Part VI.C.5 *supra* at 30-31.

[547] In other words, the Bank should not have been making these unsecured loans in such volume at this time, period, given the Bank's undercapitalization and the overall turbulence of the economic climate. *See* Rogers Tr. 324:23-325:1 ("We were reducing everything, trying to reduce the loan, reducing the employees. We were trying to deleverage the bank.").

Bank's loan department when approving them.[548] Respondents had independent and affirmative responsibilities, both as L&D Committee members and in their capacities as officers and directors of the Bank, to ensure that the Bank's lending decisions were appropriate and did not improperly increase the Bank's risk exposure, rather than acting as rubber stamps for the decisions of subordinates.[549] Respondents also bore responsibility for developing, implementing, and overseeing the Bank's capital strategy in a manner that did not expose the Bank to inordinate risk.[550] The factual record makes it clear that they did not adequately fulfill these responsibilities.

## 2.    Breach of Fiduciary Duty

For the same reasons that Respondents' actions and inactions concerning the Capital Raise Loans constituted unsafe or unsound banking practices, they also represented a breach of Respondents' fiduciary duty of care.[551] This duty required Respondents at all times "to act in good faith and in a manner reasonably believed to be in the [B]ank's best interest,"[552] as well as requiring them to "act diligently, prudently, honestly, and carefully in carrying out their responsibilities."[553] The duty of care further demanded "the proper supervision of subordinates" and "constant concern of the safety and soundness of the bank" on Respondents' part.[554]

Here, the undersigned finds that Respondents breached their fiduciary duty by failing to act prudently, diligently, and carefully in the course of their own responsibilities, and by not

---

[548] Respondents' related argument that they acted in good faith with respect to the Capital Raise Loans and "used their best professional judgment during a very difficult time" (Rs Br. at 30) is addressed in the culpability section below.

[549] *See* Part VI.A *supra* at 13-14.

[550] *See* Part VI.C.1 *supra* at 21-22.

[551] *See* EC Br. at 29-33.

[552] *Ellsworth*, 2016 WL 11597958, at *15; *see also Michael v. FDIC*, 687 F.3d 337, 350-51 (7th Cir. 2012) (stating that bank directors and officers have a duty to act "with the care an ordinarily prudent person in a like position would exercise under similar circumstances") (internal quotation marks and citation omitted).

[553] *In the Matter of Tonya Williams*, No. 11-553e, 2015 WL 3644010, at *9 (Apr. 21, 2015) (FDIC final decision) (internal quotation marks and citation omitted).

[554] *In the Matter of Douglas V. Conover*, Nos. 13-214e & -217k, 2016 WL 10822038, at *19 (Dec. 14, 2016) (FDIC final decision) (internal quotation marks and citation omitted).

properly supervising the risky or imprudent decisions of subordinates.[555] The undersigned agrees with Enforcement Counsel, for example, that the Capital Raise Loans constituted "an excessive and unwarranted increase in risky lending" that a reasonably prudent director or officer would not have approved, especially in aggregate.[556] Respondents also breached their duty of care "by approving and/or ratifying loans with vague and/or misleading loan purposes," given that Respondents knew or should have known that the purpose of the Capital Raise Loans was to purchase Holding Company stock.[557] Instead of raising this issue and seeking that it be corrected, Respondents "stood by when they reviewed the loan packages and allowed these vague or misleading descriptions to support loan approvals and/or ratifications."[558] And Respondents certainly breached their fiduciary duty of care when they failed to ensure that the Bank disclose to the OCC or its own outside accountants that it was financing dozens of purchases of Holding Company stock at the time of the capital raise.[559] For these reasons and more—including failing to ensure that the proceeds of the Holding Company stock purchases were not downstreamed back to the Bank and improperly treated as new regulatory capital—the undersigned concludes that this aspect of the Section 1818 misconduct elements has been met as well.

3.    Effect

Enforcement Counsel adduced evidence that the Bank recorded combined losses of $387,240.63 on two of the Capital Raise Loans on June 12, 2013, a date that is within the five-

---

[555] As discussed in Part VII.A.4 *infra*, the undersigned concludes that there is substantial evidence that Respondents were generally acting in good faith and with the Bank's best interests in mind throughout their involvement with the Capital Raise Loans, and that their actions were in fact motivated by a concern for the Bank's safety and soundness.

[556] EC Br. at 32; *see* Brickman Tr.147:18-19 (opining that "the aggregate volume of unsecured capital raise loans increase[d] the risk to the Bank").

[557] EC Br. at 33.

[558] *Id.*; *see* Ortega Tr. 547:21-25 (agreeing that he "would want to know the purpose of [a] loan with specificity" when reviewing it as a member of the L&D Committee), 546:16-19 (stating that "over many, many years of being on the L&D Committee, I don't know that I ever really questioned the loan purpose").

[559] *See* EC Br. at 31.

117

year limitations period required for the agency's claims regarding the Capital Raise Loans to have been timely asserted.[560] Furthermore, there can be no serious disagreement that this loss occurred "by reason of" the alleged misconduct;[561] the loans would not have been made were it not for Bank management's decision to finance the purchase of Holding Company stock in this manner. The effect element of Section 1818(e) has thus been satisfied.

Respondents raise two arguments in response, both of which are unavailing. First, Respondents argue that the Bank "suffered no loss as a result of the Capital Raise Loans" because "these transactions were an accounting issue that resulted in neither a gain nor a loss to the Bank."[562] This is a mischaracterization of the nature of the misconduct alleged with respect to the downstreaming of inappropriately recycled capital, and is in any event irrelevant: the Bank made loans to borrowers to purchase Holding Company stock; those loans were improper for the reasons enumerated above; at least two of the loans defaulted, causing the Bank loss. Second, Respondents contend that, notwithstanding the loss that occurred in 2013, the Capital Raise Loan claims are time-barred because certain other triggers of the Section 1818(e) effect element that Enforcement Counsel does not plead[563] had previously occurred outside of the limitations period, thus ostensibly beginning the clock on the agency's claims.[564] It is settled law, however, that it is meaningless for limitations purposes that an agency could conceivably have brought its claim earlier based on a different effect (and thus a different cause of action) that it did not plead.[565]

---

[560] *See* Part VI.C.7 *supra* at 42 (indicating that the receivership recorded an additional $3.8 million in losses on Capital Raise Loans following the Bank's failure); *see also* Part IV *supra* (discussing applicable statute of limitations).

[561] 12 U.S.C. § 1818(e)(1)(B).

[562] Rs Br. at 33-34.

[563] Namely, the points at which Bank loss due to the Capital Raise Loans became probable and at which depositor prejudice became possible, each of which is an independently sufficient condition for satisfaction of this element. *See* 12 U.S.C. §§ 1818(e)(1)(B)(i), (ii); *see also* Part III *supra* at 6-8.

[564] *See* Rs Br. at 34-35.

[565] *See Blanton*, 909 F.3d at 1172 ("[E]ven though the OCC might well have brought an action earlier, its failure to do so does not make the claims it elected to bring untimely.") (internal quotation marks and citation omitted); *Proffitt*,

In addition to Bank loss, Enforcement Counsel argues that the effect element is satisfied because Respondents' Capital Raise Loan-related misconduct prejudiced the interests of depositors.[566] In this, the undersigned concludes that Enforcement Counsel has not met its burden. The crux of the argument is that "reporting the Capital Raise Loan proceeds as capital allowed the Bank to appear to be in better financial condition, thereby preventing depositors from making informed decisions about whether to maintain their deposits at the Bank."[567] But this formulation seeks to prove too much. Even if all Capital Raise Loan proceeds from the second and third quarters of 2009 were improperly downstreamed to the Bank, which Enforcement Counsel has not shown,[568] Ms. Salvato testified that excluding the resulting amount from the Bank's recorded capital would still have allowed the Bank to meet its 8 percent Tier 1 IMCR and thus be sufficiently well capitalized.[569] It is overly speculative to suggest that depositors would have based a decision "about whether to maintain their deposits at the Bank" on whether, for example, the Bank had reported a capital level of $309 million rather than $326 million for the third quarter of 2009,[570] especially if both levels would be adequate from a regulatory perspective.[571] The undersigned

---

200 F.3d at 864-65 (noting that Section 1818 was intended to provide enforcement agencies with some flexibility when determining when to bring actions).

[566] *See* EC Br. at 34.

[567] *Id.*

[568] *See* Part VI.C.6 *supra* at 34-42.

[569] *See* Salvato Tr. 1923:16-1925:1. This stands in contrast to the facts of the *Dodge* case cited by Enforcement Counsel (*see* EC Br. at 34), in which the D.C. Circuit found that the respondent's improperly recorded capital contributions had concealed his bank's true capital ratios of 1.6 percent and 3.1 percent, which were "levels low enough to make it 'critically undercapitalized' under [the applicable] regulations." *Dodge v. Comptroller of Currency*, 744 F.3d 148, 158 (D.C. Cir. 2014) (concluding that "[t]he potential liquidity crisis could have prejudiced depositors by compromising [that bank's] ability to meet its obligations to them"). While the Capital Raise Loans scheme certainly overstated the Bank's capital levels, as the undersigned has held, there is a marked qualitative difference between a bank that "appeared well-capitalized" (*id.*) and was in fact critically undercapitalized, as was the case in *Dodge*, and a bank with capital levels sufficient to satisfy the heightened minimum ratio imposed by the OCC even in its true financial condition, as Ms. Salvato has testified was the case here.

[570] *See* EX 368 (September 30, 2009 Call Report) at 8 (Schedule RI-A, Line 11).

[571] The undersigned also notes that the natural consequence of Enforcement Counsel's logic is that depositors were prejudiced because, had they known the true financial condition of the Bank, they might have withdrawn their money *en masse*—thereby putting the Bank in worse financial condition than before, and conceivably jeopardizing

therefore declines to adopt Enforcement Counsel's reasoning—and a showing of depositor prejudice is unnecessary in any event, as bank loss has already been proven.

        4.   <u>Culpability</u>

Before a federal banking agency "may impose the ultimate sanction of a prohibition order against a banker that forever bans him or her from working in the American banking industry, the [agency] must show a degree of culpability well beyond mere negligence."[572] For this reason, "[b]oth the personal dishonesty and willful or continuous disregard elements [of Section 1818(e)] require some showing of scienter"—that is, evidence not merely of the misconduct, but of an intentionality or recklessness to the charged individual's state of mind.[573]

Enforcement Counsel argues that the culpability element of Section 1818(e) is fulfilled as to the Capital Raise Loans because Respondents acted with personal dishonesty and continuing or willful disregard for the Bank's safety and soundness. The undersigned disagrees and concludes that, while actionable misconduct certainly occurred, there is substantial evidence—backed by credible testimony—that Respondents found themselves in a difficult and exigent situation with no good solutions and that their actions were motivated by a good faith concern for the Bank and its depositors during a time of crisis. The Bank had been given a mandate to improve its capital ratios urgently and by any means necessary, and was told that continued operation in its existing condition would be unsafe and unsound. It had no access to national capital markets. There were few options for the Bank's survival. Placed in this position, Respondents' decision to finance the capitalization of the Holding Company (and, at least to some extent, the Bank) through unsecured

---

the interests of *all* depositors had the Bank then failed more quickly as a result. It cannot be true that the Bank's depositors would have been better off if the Bank had failed in 2009 rather than 2013. *See also* Part VII.C.4 *infra*.

[572] *Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir. 1994) (collecting authority); *see also In the Matter of Larry B. Faigin and John J. Lannan*, Nos. 11-269e, -270k, -252e, & -254k, 2015 WL 9855325, at *83 (Dec. 15, 2015) (FDIC final decision).

[573] *See Dodge*, 744 F.3d at 160.

loans to local borrowers was a poor exercise of judgment, and it was reasonably foreseeable that doing so in the manner they did would ultimately increase rather than decrease the risk to the Bank, even if disaster could be averted in the short term through their actions. But the evidence suggests that to the extent Respondents understood this risk, they—perhaps rightly, in the circumstances— viewed it as a problem for a different day. The undersigned cannot conclude that choices made under fire that may credibly be attributed to a "sense of urgency" and a sincere desire to remedy "the recent rapid deterioration in the Bank's condition" are reflective of dishonesty or disregard for the Bank's safety and soundness as must be shown under this statutory scheme.[574]

### Personal Dishonesty

Personal dishonesty within the meaning of Section 1818(e) encompasses "a range of behavior, including a disposition to lie, cheat, or defraud; untrustworthiness; lack of integrity; misrepresentation of facts and deliberate deception by pretense and stealth; or want of fairness or straightforwardness."[575] The personal dishonesty standard is also "satisfied when a person disguises wrongdoing . . . or fails to disclose material information," but only if it can be shown that they have done so with the requisite knowledge of the wrongfulness of their actions.[576]

According to Enforcement Counsel, Respondents demonstrated personal dishonesty (1) when they failed to disclose to the OCC and others that the Bank was financing Capital Raise Loans; (2) through the Bank's lack of documentation of the Capital Raise Loans strategy in its own documents; and (3) by approving and ratifying loan packages "that disguised the true purpose of the loans."[577] The undersigned agrees with Enforcement Counsel that it is important for bank

---

[574] EX 147 (IMCR Letter) at 5.

[575] *Williams*, 2015 WL 3644010, at *10 (internal quotation marks and citation omitted).

[576] *Dodge*, 744 F.3d at 160; *accord, e.g.*, *In the Matter of Frank E. Smith and Mark A. Kiolbasa*, No. 18-036-E-I, 2021 WL 1590337, at *28 (Mar. 24, 2021) (FRB final decision).

[577] EC Br. at 35.

management to be open and transparent with OCC examiners, particularly in matters pertaining to bank capital.[578] It is also true that Respondents should have disclosed the Capital Raise Loans to the OCC or otherwise sought to ensure their disclosure. But Enforcement Counsel does not offer evidence that this failure to disclose was deliberate rather than mere negligence, carelessness, or inattention to detail. The OCC was indisputably aware that the Bank would be relying entirely on local investors for the Holding Company stock offering,[579] and it is at least plausible that Respondents (incorrectly) did not view the fact that the Bank would be financing some of those stock purchases from select individuals who they knew and believed to be creditworthy to be salient information.[580] In the absence of some evidence that Respondents intentionally contrived to keep the OCC from finding out about the Capital Raise Loans, then, Enforcement Counsel has not met its burden on personal dishonesty here.

Likewise, while the lack of Bank documentation of the Capital Raise Loans strategy may be "indicative of extreme lack of oversight," as Deputy Comptroller Brickman suggests, this is not evidence of malign motive.[581] And Respondents' approval of Capital Raise Loans with vague or misleading stated purposes must be measured against Respondent Ortega's admission that he *never* questioned the purpose of loans he reviewed "over many, many years of being on the L&D

---

[578] *See id.*

[579] *See* Ortega Tr. 914:3-4 ("At some point we let the examiners know that we're going to try to get investors from the area, right, customers or friends or family to invest."); EX 548 (April 3, 2009 OCC meeting minutes) at 1 ("They have made the decision that while [a national investment bank] will still be helping them with the stock offering, they will be selling it locally. Mr. Rogers and his family have committed for at least 10MM of the 20-40MM they want to raise."); EX 149 (April 28, 2009 Letter) at 1 ("We are very encouraged by the local reception to the offer, but the national capital markets, as you know, are essentially frozen for all community banks, and private capital is the only viable option for most of us. So we will have to go all local.").

[580] *See* Ortega Tr. 504:6-13 ("[W]e have customers that have been with us, . . . reputable customers that have a lot of deposits, that have good credit. So, of course, they're going to come to the bank."), 904:12-16 ("[M]y understanding is, you know, some of these individuals are very creditworthy and they're able to borrow money on an unsecured basis, and basically able to buy the stock as they please.").

[581] Brickman Tr. 142:17-18. Deputy Comptroller Brickman then conjectured that the failure of the Bank to document or disclose the Capital Raise Loans strategy also reflected "potentially the desire to hide the nature of that transaction and prevent the OCC from understanding the strategy," *id.* 142:19-21, a speculation that the undersigned accords due weight in light of the lack of supporting evidence.

Committee."[582] If there was some evidence that Respondents had directed that the loan purposes be obscured or otherwise had a hand in drafting them, then that would satisfy the personal dishonesty standard; in the face of this admitted habitual inattention, however, mere negligence is at least as likely an explanation for Respondents' conduct.

### *Willful Disregard*

Nor has Enforcement Counsel shown that Respondents acted with willful disregard for the Bank's safety and soundness in connection with the Capital Raise Loans. Here, context is crucial, and Enforcement Counsel generally does not take into account the specific challenges faced by Bank management during the spring and summer of 2009 as it draws conclusions regarding the culpability of Respondents' state of mind. The undersigned finds that Respondents and other Bank personnel offered consistently credible testimony that they acted with the Bank's best interests in mind as they sought to right the ship and comply with the OCC's capital directive following the $174 million Fannie and Freddie investment losses, and there is substantial evidence in the record to support their accounts.

Generally speaking, "[w]illful disregard is deliberate conduct that exposes the bank to abnormal risk of loss or harm contrary to prudent banking practices."[583] The latter half of this formulation is familiar as the Horne Standard for unsafe or unsound practices—"deliberate conduct" that is unsafe or unsound, then, constitutes willful disregard. Yet while it is true that conduct is "deliberate" merely if it is intentional rather than "technical or inadvertent"[584]—in other words, that the IAP need not have knowledge that his conduct in question is wrongful, only that

---

[582] Ortega Tr. 546:16-19; *see also* Rogers Tr. 340:20-25 ("Unless we knew something really bad about a borrower . . . then we went on with the loan.").

[583] *Ellsworth*, 2016 WL 11597958, at *17 (internal quotation marks and citation omitted).

[584] *Conover*, 2016 WL 10822038, at *28 (internal quotation marks and citation omitted).

he is engaging in that conduct[585]—it must also be the case that the Section 1818(e) culpability inquiry cannot end simply by determining that a bank officer has discharged her duties in an unsafe or unsound way; the statutory elements are distinct.[586] The undersigned thus finds it helpful, in evaluating whether Respondents acted with willful disregard for the safety and soundness of the Bank, to also employ Enforcement Counsel's further articulation of that standard: to wit, "[w]illful disregard exists when an IAP 'deliberately and consciously takes part in an action that evidences utter lack of attention to an institution's safety and soundness' or demonstrates 'a willingness to turn a blind eye to the institution's interests in the face of known risk.'"[587]

A review of the facts in evidence regarding the Bank's 2009 capital raise efforts does not reveal "utter lack of attention" to the Bank's safety or soundness or "a willingness to turn a blind eye to the [Bank's] interests" on the part of either Respondent. Rather, the record reflects that Respondents recognized the "immediate and ongoing need for the Bank to achieve and maintain adequate capital" and sought ways to meet the new minimum capital ratios with exigency,[588] including Respondent Rogers contributing $5 million of his own money to the Holding Company's coffers along with nearly $4 million from other members of his family.[589] The OCC stressed that

---

[585] *See Smith and Kiolbasa*, 2021 WL 1590337, at *29 ("An officer acts willfully when he is aware of his conduct; willfulness does not require a showing that Respondent was aware of the law").

[586] *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (it is a court's duty to "give effect, if possible, to every clause and word of a statute") (internal quotation marks omitted). In *Patrick Adams*, the Comptroller rejected an interpretation of the Horne Standard that required a threat to an institution's financial stability before unsafe or unsound practices could be found, reasoning that such a standard "conflicts with the fundamental structure of the FDI Act by introducing an effects element, textually reserved as a predicate for more severe remedies, into the definition of an element of misconduct." *Patrick Adams*, 2014 WL 8735096, at *16. So too here, interpreting willful disregard for the safety and soundness of an institution to definitionally encompass all unsafe or unsound practices engaged in in the course of a bank officer's duties would subsume the culpability element into the finding of misconduct in those instances, effectively writing out any separate inquiry into the respondent's state of mind.

[587] EC Br. at 13 (quoting *Cavallari v. OCC*, 57 F.3d 137, 145 (2d Cir. 1995) (bracketing omitted); *see also Michael*, 687 F.3d at 352 ("[An IAP] cannot claim ignorance by turning a blind eye to obvious violations of his statutory and fiduciary duties.").

[588] EX 147 (IMCR Letter) at 4.

[589] *See* EX 374A (Capital Raise Loans Spreadsheet) (reflecting, among other Rogers family contributions, share purchases of $1,995,000 and $1,827,450 by Michael J. Rogers and, through a company, David Rogers III, neither of which was financed by the Bank). As noted previously, Respondent Ortega also used personal funds to purchase

the Bank's capital plan "should reflect a sense of urgency and an awareness of the recent rapid deterioration in the Bank's condition."[590] The agency also repeatedly emphasized that there would be severe regulatory consequences should the Bank fail to achieve the IMCR, stating that the Bank therefore "***need[ed] to do everything possible*** to achieve and maintain the capital ratios established in the IMCR by the commitment date."[591] And the OCC warned the Bank that it could not continue to operate with its present level of capital, and that doing so was unsafe and unsound.[592]

It was imperative, then, from both the Bank's perspective and the OCC's, that the Bank do everything in its power to find new capital, and quickly; otherwise, it was possible that it would not survive the swirling financial crisis for long.[593] Moreover, the Bank could only rely on local investors for its capital raise efforts, as the crisis had rendered national capital markets inaccessible, yet it was located in one of the poorest regions of the country. To make matters worse, there was little chance that other banks could finance borrowers' purchases of Holding Company stock—as Mr. Gandy noted in his April 28, 2009 letter to the OCC, the circumstances had seen the "shutdown of lending by most Texas banks including, importantly, our biggest competitors in the Valley."[594] But some solution had to be found.

---

$1 million in Holding Company stock in April 2010, following the two capital injections, and therefore did not make a contribution during the initial capital raise efforts. *See id.*

[590] EX 147 (IMCR Letter) at 5.

[591] EX 336 (April 30, 2009 Letter) at 6; *see also* EX 147 (IMCR Letter) at 5 ("[I]f the Bank does not achieve and maintain the minimum capital ratio established herein, . . . it will be subject to such administrative action or sanctions as the OCC considers appropriate.").

[592] *See* EX 147 (IMCR Letter) at 3 ("[T]he Bank's senior management will need the assistance of a capital injection in order to safely restore the Bank to a safe and sound condition."), 4 ("[T]he Bank needs a higher level of capital in order to operate in a safe and sound manner."), 5 ("Failure of the Bank to maintain at least the minimum capital ratios established herein will be deemed to constitute an unsafe or unsound banking practice within the meaning of 12 U.S.C. § 1818.").

[593] *See id.* at 3 ("[T]he Bank is exposed to a higher degree of risk associated with exposure to a weakening real estate market. These circumstances have resulted in increasing risk to capital and significant deterioration in earnings."), 4 (noting "the severe and continuing deterioration in the Bank's asset portfolio" and stating that the Bank's declining capital ratios and "significant decline in capital" were "serious concerns given the deteriorating economy and the exigency of potential problems").

[594] EX 149 (April 28, 2009 Letter) at 1; *see also* Gandy Tr. 2227:15-16 ("There was no liquidity in the market. Nobody could go get a loan.").

In many ways, the Bank was placed in an impossible situation. The Bank needed to find as many investors as it could as quickly as possible for the capital raise in order to maximize its chances of achieving the IMCR. Failing to achieve the desired capital ratios, at a time of nearly unparalleled financial tumult, would leave the Bank in an unsafe and unsound condition and possibly lead to its outright failure. Achieving the capital ratios by financing some stock purchases itself with favorably-termed loans to borrowers it deemed creditworthy might save the Bank now, but would increase the Bank's risk in the longer term.[595] Ultimately, the Bank met the capital ratios and continued operations for another four years. It is difficult to conclude that Respondents acted with "utter lack of attention" or turned "a blind eye to the [Bank's] interests" if the alternative path presented its own set of risks, but on a shorter time frame.

Would it have been better if Bank management had not pursued the Capital Raise Loans scheme, if not doing so would have significantly increased the chances of the Bank failing in 2009? Enforcement Counsel does not answer this question, nor does it say what the Bank should or could otherwise have done in its position to raise capital and achieve the IMCR, at that time, in that financial climate, other than to find more qualified borrowers.[596] Not only is there no evidence that such a pool of willing borrowers existed, beyond the individuals who invested at the time, but the

---

[595] This is true whether or not the Capital Raise Loan proceeds were ultimately and improperly downstreamed to the Bank, given the fungibility of Holding Company funds and the fact that the Holding Company itself was undercapitalized and acting under an IMCR. *See* EX 143 (2009 Holding Company PPM) at 5 ("Because of losses in the Company's investment portfolio, the Company was required to institute new and revised policies for its investments and capital maintenance. . . . [A]ssuming all Shares are sold, the Offering will provide the Company with sufficient capital to be classified as well capitalized for regulatory purposes."). Setting aside the longer-term risk of unsecured loans, the Capital Raise Loans indisputably provided the Holding Company with at least some capital that it would not otherwise have had, which benefited the Bank even if that capital stayed entirely at the Holding Company level and went to improve the Holding Company's capital ratios and service Holding Company debt. *See* EX 548 (April 3, 2009 OCC meeting minutes) at 1 (noting that the Company had "[e]stimated debt service requirements" of $11-12 million per year).

[596] *See* Chansen Tr. 1260:7-12 (opining that "Respondents should have ensured that the individuals purchasing the stock, or the borrowers, were qualified borrowers and they had the ability to absorb losses based on their financial statements").

undersigned credits Respondents' testimony regarding their personal familiarity with the financial situations of many of the Capital Raise Loans borrowers.[597]

As an example, Bank director Jack McClelland received an unsecured $500,000 loan that he used to purchase Holding Company stock.[598] Enforcement Counsel has noted that this unsecured loan had a significantly lower interest rate than many of Mr. McClelland's other loans with the Bank.[599] When asked at the hearing, Respondent Ortega explained why he was comfortable extending Mr. McClelland a loan with those terms:

> Mr. McClelland obviously is a real estate developer. I don't have the loan request here, but he's got millions of dollars that we lended, that we lended him over the years. He's a director of the bank. I don't have all the information, but I'm pretty sure that his Empirica score is strong, plenty of liquidity. I'm pretty sure he had plenty of deposits at the bank. Solid individual. He's owned an electric company for years. He's done very well over the course of my 27 years there where we live in Edinburg, Texas. A really, really strong individual, plenty of loans that we've issued over time. I don't think – without looking at the detail, but I don't think he was ever past due on any loan. I don't think we ever foreclosed a property on him. Solid individual probably with a very high credit score and a high net worth.[600]

Respondent Ortega offered similar details regarding several other borrowers.[601]

Of course, personal familiarity with these borrowers does not absolve Respondents from approving risky loans or loans with incomplete underwriting, too-vague purposes, or without proper documentation—those are still unsafe or unsound banking practices, as the undersigned holds above. Nor does it change the impropriety of treating some or all of the loan proceeds as

---

[597] *See, e.g.*, Ortega Tr. 907:23-908:5 ("[M]ost of those loans, they were individuals that had either a lot of history with the Bank, they were high net worth, they – most of them had long-term relationships with the Bank with different types of businesses. And to me they were – all of them were pretty good customers of the Bank.").

[598] *See* EX 374A (Capital Raise Loans Spreadsheet), row 30.

[599] *See supra* n. 142.

[600] Ortega Tr. 920:23-921:19.

[601] *See id.* 917:6-919:3, 922:7-927:19.

recycled capital, however creditworthy the borrowers may have been.[602] But it is a relevant consideration when determining whether Respondents had a good faith belief that they were acting in the Bank's best interests, all things considered, in approving the loan.

Respondents were faced with a choice between extending potentially risky loans to borrowers who were known to the Bank, thus giving the Holding Company more money and increasing the chances that both the Bank and the Holding Company would be adequately capitalized when the dust settled, or issuing fewer Capital Raise Loans and lowering the risk to the Bank long term, which would result in fewer Holding Company investors and make it more difficult for the Bank and the Holding Company to achieve their respective IMCRs. There is no way to know what would have happened had Respondents pursued the other approach, and it is easy to second-guess—most likely the Bank would have still emerged unscathed, given Ms. Salvato's testimony that its Tier 1 capital ratio would have exceeded 8 percent even without the Capital Raise Loans. What cannot be said, however, is that Respondents lacked concern about the Bank's safety and soundness, when their actions at the time belie that characterization.

Finally, Enforcement Counsel argues that the D.C. Circuit's *Dodge* decision supports a finding of willful disregard here.[603] It does not. The respondent in *Dodge* misled regulators about his bank's financial condition by improperly reporting capital contributions that made it seem as though the bank was well-capitalized when in fact it was "critically undercapitalized" with ratios of 1.6 percent and 3.1 percent.[604] The Comptroller there found, and the Circuit affirmed, that the respondent "directed the Bank to report contributions as capital that were unlikely to produce cash for the Bank, knowing that the OTS would have no reason to doubt that the Bank was well-

---

[602] *See* Chansen Tr. 1253:11-16.

[603] *See* EC Br. at 39-40.

[604] *See Dodge*, 744 F.3d at 158 ("Absent the challenged capital contributions, the Bank would not have appeared well-capitalized in the months before August 2008, when regulators could have required corrective action.").

capitalized and take corrective action," thus "knowingly expos[ing] the Bank and its depositors to substantial risk."[605] Here, by contrast, the Bank would have been well-capitalized with or without any downstreaming of Capital Raise Loan proceeds, and there is no evidence that Respondents knowingly misled regulators or knowingly exposed the Bank to risk. At most, the evidence shows that Respondents sought to trade immediate and profound short-term risk to the Bank—deficient capital levels causing it to operate in an unsafe and unsound condition at the height of the financial crisis, at a time that it was experiencing "significant deterioration in earnings" and "severe and continuing deterioration in the Bank's asset portfolio"[606]—for more speculative long-term risk, and while the way in which they did so may have been misguided and imprudent, it does not constitute willful disregard for the Bank's safety and soundness.

### Continuing Disregard

Enforcement Counsel also argues that Respondents' conduct meets the standard for continuing disregard, which need not rise to the level of willfulness, but instead requires evidence of "a mental state akin to recklessness."[607] Continuing disregard is conduct that has been "voluntarily engaged in over a period of time *with heedless indifference to the prospective consequences*."[608] It may manifest through, for example, the "voluntary and repeated inattention to" unsafe and unsound practices, or the "knowledge of and failure to correct clearly imprudent and abnormal practices that have been ongoing."[609]

For purposes of continuing disregard, Respondents' Capital Raise Loans-related conduct may be divided into two periods: April 2009 through the second and final capital injection in mid-

---

[605] *Id.* at 161.

[606] EX 147 (IMCR Letter) at 3, 4.

[607] *Smith and Kiolbasa*, 2021 WL 1590337, at *29 (internal quotation marks and citation omitted); *see* EC Br. at 40.

[608] *Ellsworth*, 2016 WL 11597958, at *17 (internal quotation marks and citation omitted) (emphasis added).

[609] *In the Matter of Lawrence A. Swanson, Jr.*, No. AP-ATL-93-7, 1995 WL 329616, at *5 (Apr. 4, 1995) (OTS final decision on reconsideration).

August 2009, during which time Capital Raise Loan proceeds were downstreamed to the Bank, and the autumn of 2009 through March 2011, when the final Capital Raise Loan was made.[610] There is no evidence that Respondents acted with recklessness or heedless indifference regarding the Capital Raise Loans in either period. In the initial period, Respondents' actions evinced good faith concern for the Bank for the reasons detailed above; they were taking steps, in the moment, to improve the capital conditions of the Bank and the Holding Company at a time when the Bank's deficient capital levels were unsafe and unsound. Likewise in the latter period, Enforcement Counsel offers no basis to conclude that the Bank loans to purchase Holding Company stock were extended recklessly or "with heedless indifference to the prospective consequences," given Respondent Ortega's uncontroverted testimony that most Capital Raise Loans borrowers were customers with a high net worth and a previously established loan history with the Bank.[611] The undersigned therefore finds that Enforcement Counsel has not met its burden here.

With respect to the downstreaming of Capital Raise Loan proceeds in particular, the undersigned finds that there is some basis to question whether conduct taking place twice at most over a three month period—that is, during the May 11, 2009 and August 12, 2009 capital injections—can constitute continuing disregard even if the standard had otherwise been met. Although there is no minimum length that an IAP must be heedlessly indifferent in order for their disregard to be "continuing" for purposes of culpability, the undersigned's review of previous matters in which that threshold has been met reveals periods of misconduct generally longer than the three months at issue here. [612] The undersigned need not decide this issue, however.

---

[610] *See* EX 374A (Capital Raise Loans Spreadsheet).

[611] *See, e.g.*, Ortega Tr. 907:23-908:5.

[612] *See, e.g.*, *Ellsworth*, 2016 WL 11597958, at *17 (continuing disregard where misconduct "involved repeated acts over more than a year"); *In the Matter of Donald V. Watkins, Sr.*, Nos. 17-154e & -155k, 2019 WL 6700075, at *9 (Oct. 15, 2019) (FDIC final decision) (continuing disregard where misconduct took place "repeatedly . . . between July 2010 and November 2012"); *In the Matter of Charles F. Watts*, Nos. 98-046e & -044k, 2002 WL 31259465,

5.    Section 1818(i)

Both elements of the OCC's claim for an assessment of a second-tier civil money penalty under 12 U.S.C. § 1818(i) in connection with the Capital Raise Loans have been satisfied.[613] First, the undersigned has held that Respondents breached their fiduciary duty of care with respect to this claim. This constitutes actionable misconduct.[614] The undersigned has also held that the Bank suffered loss as a result of the Capital Raise Loans, and she now makes the further finding that the loss was "more than minimal."[615] This constitutes actionable effect. In addition, Enforcement Counsel has argued that the misconduct and effect prongs of a second-tier civil money penalty claim have been satisfied, respectively, by Respondents' *reckless* engagement in unsafe or unsound practices and by the fact that the misconduct was "part of a pattern of misconduct."[616] Because Enforcement Counsel has already met its burden here on fiduciary duty and bank loss, however, it is unnecessary to resolve these additional claims.

**B.    OREO Lending Strategy**

Enforcement Counsel argues that Respondents' actions in connection with the Bank's OREO Lending Strategy (Article IV) breached their fiduciary duties of care and constituted actionably unsafe or unsound banking practices, caused loss to the Bank, and were undertaken with continuing or willful disregard for the Bank's safety and soundness. As with the Capital Raise

---

at *8 (Aug. 6, 2002) (FDIC final decision) (continuing disregard where misconduct amounted to "at least 80 incidents occurring over a period of nearly two years"); *In the Matter of Charles R. Vickery, Jr.*, No. AA-EC-96-95, 1997 WL 269105, at *8 (Apr. 14, 1997) (OCC final decision) (finding that "conduct reflecting recklessness or indifference with respect to an institution's safety" was continuing disregard when "made over a period of some months"); *Dodge*, 744 F.3d at 161 (continuing disregard where conduct took place "on multiple occasions over six reporting periods").

[613] *See* Part III *supra* at 7 (elements of Section 1818(i) claim). Beyond "recklessness" as a requisite component before the engagement in unsafe or unsound practices can merit a second-tier civil money penalty, Section 1818(i) contains no culpability element.

[614] *See* 12 U.S.C. § 1818(i)(2)(B)(i)(III).

[615] *Id.* § 1818(i)(2)(B)(ii)(II).

[616] *See* EC Br. at 40-42; *see also* 12 U.S.C. §§ 1818(i)(2)(B)(i)(II), 1818(i)(2)(B)(ii)(I).

Loans claims *supra*, and for the reasons discussed below, the undersigned concludes that Enforcement Counsel has demonstrated misconduct and effect, but not culpability.

1.     Unsafe or Unsound Practices

To begin with, Enforcement Counsel makes a more than sufficient showing that Respondents engaged in unsafe or unsound practices with respect to the Bank's OREO lending during the relevant time period. In their capacities as members of the L&D Committee and Bank officers and directors, Respondents had independent responsibilities to evaluate the risk associated with all loans presented to them for approval on the strength of comprehensive loan packages, as well as ensuring that the Bank's overall strategy for managing its OREO portfolio complied with Bank policy and did not pose undue risk to the Bank's financial performance or capital position.[617] Instead, Respondents effectively abdicated these responsibilities, habitually relying solely on the recommendations of loan officers to approve loans with incomplete documentation, inadequate underwriting, and concessionary terms that foreseeably and unduly increased the Bank's risk.

Enforcement Counsel argues that Respondents engaged in unsafe or unsound banking practices when financing the sale of OREO by approving and ratifying loans "(1) without a credit analysis to determine the borrowers' ability to repay the loans; and (2) with concessionary and below-market terms to unqualified borrowers."[618] The undersigned concurs. The evidence supporting this conclusion as to each category of misconduct is set forth in great detail in the factual findings in Part VI.D *supra* at 58-75, but in brief:

***Approval without Credit Review***

Respondents frequently approved loans greater than $500,000—including the $56 million combined NAHS loan—even if the loan packages did not contain a detailed credit review and

---

[617] *See* Brickman Tr. 101:4-24.
[618] EC Br. at 43.

other financial spreads pertaining to the borrowers' repayment ability, notwithstanding the increased risk on OREO loan defaults and the Bank's policy that such an analysis must always accompany loans of that size.[619] In an internal 2010 email, CCO Magee stated that due to the Bank's aggressive OREO strategy, the credit review department "rarely" had the opportunity to view the financial information for borrowers on OREO loans before the loans were funded.[620] Furthermore, Respondent Ortega testified that even when a loan package was accompanied by a credit review, he generally would not read it, making his decision on the package's first two pages, which were far less detailed.[621]

The undersigned credits NBE Chansen's testimony that Respondents should never have approved loans without a credit review and related financial data, because they are unable to make a fully informed decision regarding the borrower's ability to repay.[622] This is particularly true for large loans, for loans financing the sale of OREO, and for loans with little or no down payment, little or no guaranty, and other liberal terms, all of which carry a foreseeably heightened risk to the Bank in the event of default.[623] Yet Respondents approved loans with some or all of these qualities and no credit review with relative regularity; the NAHS loan is an exemplar.[624] NBE Chansen offered the well-supported expert opinion that approving OREO loans of substantial size without "all the relevant and required information to support a credit decision" is an unsafe and unsound

---

[619] *See* EPF ¶ 201 (identifying fourteen OREO loans of amounts between $3 million and $56 million that one or both of the Respondents approved or ratified without a credit review from April 2009 through October 2012); EC Br. at 43-48.

[620] EX 8 (email chain including April 28, 2010 email from M. Magee to R. Gandy et al.) (adding that "those financials that we do receive typically provide little if any actual support for the proposed ORE purchase on the larger deals that we've been doing").

[621] *See* Ortega Tr. 646:3-20.

[622] *See* Chansen Tr. 1315:5-20.

[623] *See, e.g.*, Brickman Tr. 105:17-24, 111:16-112:4.

[624] *See* Part VI.D.7 *supra* at 65-70; Magee Tr. 2135:22-2136:13 (expressing concern that the NAHS loan would be approved without giving the credit review department "the opportunity to run it through the appropriate process," analyze the financial and appraisal information, and communicate their analysis to the L&D Committee, who otherwise "don't have the information they need to make an informed decision").

practice that exposes banks to foreseeable additional risk.[625] As it happens, Respondents agree.[626] So too does the undersigned.

Respondents' current rationale for their conduct is unpersuasive. First, it is Respondents' contention that they share no blame for approving risky OREO loans because they were simply relying on "trusted and experienced loan officers" and other Bank management, secure in the knowledge that CCO Magee would "ensure that [the] credit administration was being done correctly, including all proper documentation," and trusting that the loan department had already "conducted detailed reviews and analysis of borrowers" before recommending the loans.[627] As with the Capital Raise Loans, this defense ignores Respondents' independent responsibilities to understand a loan's details, confirm that "all of the required information is provided to support the credit decision," and ensure that they are sufficiently able to "evaluate the risk associated with [each] particular request" before making their approval decision.[628] Moreover, as Enforcement Counsel points out, Respondents' assertion that they relied on CCO Magee to compile "all proper documentation" makes little sense when Respondents were happily approving large OREO loans *without* the proper documentation (which was required to be included in the loan packages), and

---

[625] Chansen Tr. 1348:9-16; *see also In the Matter of Steven D. Haynes*, Nos. 11-370e & -371k, 2014 WL 4640797, at *8 (July 15, 2014) (FDIC final decision), *aff'd sub nom. Haynes v. FDIC*, 664 Fed. Appx. 635 (9th Cir. 2016) (holding that "[a]pproving loans without determining the borrower's ability to repay constitutes an unsafe and unsound practice").

[626] *See* EX 568 (Rogers Dep.) 101:3-9 ("Q: [W]ould you agree that it's not consistent with safety and soundness for the bank to lend money to – on large loans – loans to commercial real estate loans without a credit review? A: Yes. I would agree."); EX 569 (Ortega Dep.) 130:4-12 ("Q: [I]s it ever appropriate to lend, let's say well over $1 million, without credit review getting the financials on the borrower? A: That's not appropriate. Q: [W]ould you say it's not safe and sound, as well? A: Yeah, it shouldn't happen. It shouldn't happen.").

[627] Rs Br. at 35-36.

[628] Chansen Tr. 1290:6-15; *see* Brickman Tr. 102:4-9 ("A loan committee member has an obligation if there's insufficient information to make a decision to follow up with the loan underwriter or the person responsible for providing the information to gather the necessary information to make the decision.").

when CCO Magee's department was not being given the time to complete credit reviews "or even look at financials before the ORE has been sold, booked, and funded."[629]

Respondents also state that "they thoroughly reviewed the materials provided to them."[630] But this is plainly untrue, given Respondent Ortega's testimony that he would only read the first two pages of loan packages and the statement by Respondent Rogers that the L&D Committee would default to approving all loans recommended to them "[u]nless we knew something really bad about a borrower."[631]

Last, Respondents attempt to shift responsibility to OCC examiners, professing that they "reasonably expected and believed, with all the coordination going on between examiners and the loan department, that the OREO lending practices occurred with the knowledge and concurrence of the OCC."[632] According to Respondents, "[w]hen concerns were raised, examiners assured Respondents that these concerns had been corrected to the examiners' satisfaction."[633] The only evidence provided for this assertion is selected quotes from reports of examination purporting to show that examiners recognized some positive developments and improvements with the Bank's OREO practices in 2011 and 2012.[634] Even if examiners noted improvement in OREO lending, however, this is a far cry from "assur[ing] Respondents that these concerns had been corrected to the examiners' satisfaction"—and in any event would not give Respondents license to approve large OREO loans without a credit review, in contravention of Bank policy and safe and sound

---

[629] EX 8 (email chain including April 28, 2010 email from M. Magee to R. Gandy et al.) (attributing this to "a press to move the ORE before the end of the month in which [it] is acquired"); *see* EC Reply at 7-8.

[630] Rs Br. at 36.

[631] Rogers Tr. 340:10-25; *see* Ortega Tr. 643:21-644:19, 645:60-646:6 (stating that he did not tend to read credit reviews when they were provided or "dive into the numbers" on a borrower's repayment ability).

[632] Rs Br. at 36-37.

[633] *Id.* at 37.

[634] *See id.* (citing RX 31 (2012 ROE) at 14 (stating that "[u]nderwriting for OREO improved and the accounting treatment on OREO sales have been addressed")). The undersigned notes that RX 31 is the same document as JX 6, except that RX 31 contains highlighting by Respondents' counsel on passages deemed pertinent by Respondents.

banking practices. Furthermore, Respondents' citation to 2011 and 2012 reports of examination elides the fact that the bulk of the challenged practices occurred in 2009 and 2010,[635] and Respondents fail to mention that the 2011 and 2012 consent orders between the OCC and the Bank underscored that the Bank should only approve loans "after obtaining and validating credit information on the borrower and any guarantor sufficient to fully assess and analyze the borrower's and guarantor's cash flow, debt service requirements, contingent liabilities, and global liquidity condition, *and only after the credit officer prepared a documented credit analysis*."[636]

### *Loan Quality*

The evidence also shows, as examiners concluded in 2011, that the Bank's aggressive strategy of financing the sale of its own OREO—for which Respondents shared responsibility with others in Bank senior management—often resulted in loans "with little or no down payment, on liberal terms, with below-market interest rates, and to individuals who did not demonstrate the ability to service the debt."[637] Ms. Rodriguez and Mr. Magee were troubled by the Bank's willingness to extend OREO loans to "brand new entities without any financial information" during this period without requiring any equity,[638] while Respondents agreed that "the Bank made loans that it normally would not have made" and was "more lenient on loan terms" in order to move OREO from the Bank's books.[639] Other common features of concessionary OREO loans made by the Bank under Respondents' leadership include new monies provided to borrowers over

---

[635] *See* EPF ¶ 201 (twelve of fourteen large OREO loans approved by Respondents without credit review made in 2009 and 2010).

[636] JX 12 (February 2011 Consent Order) at 10 (emphasis added); *see* JX 13 (January 2012 Consent Order) at 13.

[637] JX 4 (2011 ROE) at 46.

[638] Rodriguez Tr. 1486:1-2; *see also id.* 1486:4-5 ("[T]he quality of the loan was not what I would have liked to see."); Magee Tr. 2083:19-2084:6 ("[T]he sale of OREO and the financing thereof was done at terms which were not necessarily the same terms that you would want to see in a more typical environment, . . . i.e., requiring down payments and things of that nature.").

[639] Ortega Tr. 618:1-12; Rogers Tr. 377:1-3.

and above the OREO purchase price; inadequate or nonexistent personal guarantees from individuals with little liquidity and cash flow; and the advancement of property tax or the payment of OREO borrowers' past due loans.[640] Again, the NAHS loan is a typical, if uncommonly large, example of an OREO loan with these concessionary features,[641] and external consultants in 2012 concluded among other things that the loan was "[a]n accommodation loan to rid the bank of a large piece of OREO," that the guarantors had "no liquidity that can support operation," and that the Bank was "taking excessive risk and exposure on this loan."[642]

Each of these practices foreseeably increased the risk to the Bank and, especially taken together, were actionably unsafe or unsound. OCC examiners found as much in their 2011 report of examination, and NBE Chansen and Deputy Comptroller Brickman reiterated those conclusions at the hearing.[643] Loaning to new entities without financial data, requiring no down payment, extending loans to borrowers with inadequate repayment prospects and no personal guarantee—all of these things make it more likely that a loan will default, which increases the risk to the Bank for reasons that should be apparent. Offering interest rates not commensurate with a borrower's creditworthiness or repayment ability or including new monies on a loan to an unqualified borrower likewise fails to balance the Bank's gain on a loan relationship against the default risk. Adding property tax payments to the loan balance and allowing borrowers to pay past due OREO loans with the proceeds of new loans serves to "distort[] the borrowers' true performance capabilities as well as the Bank's level of past due and nonaccrual loans," masking the Bank's

---

[640] *See* Part VI.D.6 *supra* at 60-65; *see* JX 4 (2011 ROE) at 46 ("Management has masked problems with OREO financing on liberal terms and payment of property taxes and/or allowing customers to maintain loans current through advances on other loans. Our sample noted nine instances where management advanced proceeds to pay property taxes and one instance where it advanced funds to make note payments.").

[641] *See* Part VI.D.7 *supra* at 65-70.

[642] RX 74 (A&M Workpaper) at 869-871.

[643] *See* EPF ¶¶ 228-232; EC Br. at 49-56.

financial condition.[644] And all of this is compounded, for loans financing OREO sales, by the danger of the OREO collateral returning to the Bank's balance sheet if the loan defaults, increasing the Bank's risk and losses through the properties' significant holding costs and making it even more difficult for the Bank to find a new borrower given the deterioration in value of OREO over time.[645] In short, providing concessionary loan terms to borrowers without demonstrated repayment ability who can "default on the loans and walk away from the properties without meaningful consequences" is risky;[646] doing so on loans that will place millions of dollars of nonperforming assets back on the Bank's balance sheet if the loan defaults is riskier still.[647] There is no doubt, as Enforcement Counsel asserts, that the way in which the Bank implemented its aggressive OREO lending strategy "posed an unwarranted and abnormal risk to the Bank."[648]

Respondents make two principal arguments in response.[649] First, Respondents assert that the OREO loans benefited the Bank, both in an absolute sense ("by generating cash from a money losing asset, where the alternative was to hold the asset and lose money every month") and relative to any other options that the Bank had at the time.[650] While it is true that holding ORE has "an adverse effect on [a] bank's financial condition" and that it can be beneficial to sell it as quickly as possible to avoid the substantial monthly holding costs,[651] Respondents do not acknowledge the

---

[644] JX 4 (2011 ROE) at 46.

[645] *See id.* at 5 ("Often, the Bank made loans to borrowers or guarantors with little financial repayment capacity. Many of the financed properties subsequently return to the Bank's OREO portfolio, which is an unsafe or unsound practice."); Chansen Tr. 1542:13-24 (describing OREO merry-go-round); Brickman Tr. 111:16-112:4 ("The risk of financial loss mounts over time relative to a portfolio like this. . . . [A]s the values in those properties deteriorate, the scrutiny and the sensitivity and the heightened attention that a board should pay to it is critically important.").

[646] EC Br. at 49; *see* Rodriguez Tr. 1487:1-4 ("There was no equity injection. So really there was no – the borrower had no skin in the game. They had nothing to lose.").

[647] *See* Rogers Tr. 378:15-21 (stating that a loan to purchase ORE is "higher risk than your average normal loan").

[648] EC Br. at 50.

[649] *See* Rs Br. at 37-39; Rs Reply at 19-22.

[650] Rs Reply at 19; *see* Rs Br. at 39 (asserting that "OCC witnesses presented no evidence of any reasonable alternative that would have benefited the Bank more").

[651] Chansen Tr. 1293:13-14; *see also* Part VI.D.1 *supra* at 44-46.

reasonably foreseeable deleterious effect of the OREO merry-go-round—that is, while it may be better in the short term to finance quick OREO sales to even unqualified borrowers in order to remove the cost of the ORE from the Bank's balance sheets, such an indiscriminate approach can hurt the Bank in the future if the foreclosed property returns to the Bank at diminished value, making it more difficult to sell without significant write-offs and costing the Bank money in the interim while presenting an overly rosy impression of the Bank's financial condition during the time the OREO is temporarily off its books.[652] As for the argument that there were no better alternatives available to Bank management at the time, this is relevant to Respondents' state of mind when overseeing the Bank's OREO lending practices, and as such is addressed in the appropriate section below.

Second, Respondents argue that Enforcement Counsel has presented no evidence that the OREO loans in question were made at below-market terms,[653] particularly considering the extreme volatility of the market during this period and the presumption that the loan terms all legitimately arose from an arm's length negotiation "between a willing borrower and a willing lender."[654] Respondents assert that "[i]n the difficult times of the financial crisis, there was no evidence that the loan terms observed at the Bank were not appropriate given the unusual period, market volatility, geographic region, industry, and other specialized factors affecting each loan."[655] Respondents further focus on the 5.5 percent interest rate applied by examiners in 2011 in their analysis of whether OREO loans were being made at below-market rates, arguing that it was not

---

[652] *See* JX 4 (2011 ROE) at 56 ("To promote OREO sales, the Bank also offers liberal in-house financing including zero down payments and non-recourse terms. These offerings have improved OREO sales, but most are to unqualified borrowers who cannot service the debt. This has resulted in repeat foreclosures and has contributed to the overall misleading appearance of improvement at the Bank.").

[653] *See* Rs Reply at 22 (contending that "[t]he assertions that the loan terms were below market are simply not supported by any studies by experts of comparable loans at the time or analysis of the market").

[654] Rs Br. at 38.

[655] Rs Reply at 22.

consistent with GAAP.[656] And Respondents argue that they had every reason to believe that the terms of the NAHS loan and the Bank's other sales of hospital OREO were appropriate and reasonable at the time they were made.[657]

None of Respondents' arguments change the conclusion that the Bank's OREO lending practices, driven by an effort by the Bank's management to sell OREO as quickly as possible, foreseeably increased the risk to the Bank by offering consistently liberal loan terms to borrowers who had not demonstrated the ability to service the debt. Respondents invoke the volatility of the market as a reason why loan terms might be "highly variable from loan to loan"[658]—the concern here, however, is not that the terms of the Bank's OREO loans varied too widely, but that they were too similar to one another in ways that foreseeably increased the Bank's risk individually and compounded that risk in aggregate.[659]

By averring that the loans were made between a willing borrower and a willing lender, Respondents also mistake the purpose of this analysis: a finding of unsafe or unsound practices under Section 1818 here does not depend on whether, for example, the interest rates on an OREO loan were lower than some market rate baseline, but on whether the terms of the loan overall posed "a reasonably foreseeable undue risk to the institution."[660] The Bank could have offered a 5.5 percent interest rate on every one of the challenged OREO loans, and yet the loans (and the Bank's OREO lending strategy writ large) would still be unsafe or unsound if that 5.5 percent interest rate

---

[656] *See* Rs Br. at 38.

[657] *See id.* at 39-40; Rs Reply at 23-26.

[658] Rs. Br. at 38.

[659] *See* JX 4 (2011 ROE) at 46 ("The most dominant finding in our loan sample was the financing of OREO with little or no down payment, on liberal terms, with below-market interest rates, and to individuals who did not demonstrate the ability to service the debt."), 47 ("The review of [OREO financing] found liberal underwriting and non-conformance to Bank policy including: 100 percent financing; below market interest rates; interest only financing terms; new loans to borrowers with little support toward the repayment of the debt; and built in interest reserves.").

[660] *Patrick Adams*, 2014 WL 8735096, at *5.

was accompanied by overly liberal terms such as no down payment requirement, an inadequate personal guaranty, the provision of new monies, and the advancement of property taxes to a brand new entity with no financial information or an unqualified borrower "with little financial repayment capacity."[661] Those terms foreseeably increase the risk that the loans will default and otherwise increase the Bank's risk, interest rate notwithstanding, and the willingness of the parties to conduct an arm's length transaction is immaterial to that determination. Indeed, if the Bank is willingly offering concessionary terms that unduly increase its future risk, that is more an indictment of Bank management than a defense of the practice.

With respect to the safety and soundness of the NAHS loan, the undersigned finds that Respondents' arguments largely repackage their reliance arguments discussed *supra*—namely, that they approved the loan because it "had been graded satisfactory by expert credit staff" and because "a trusted and experienced lender, Curtis Brockman, had evaluated multiple possible borrowers and settled on NAHS because it had the best likelihood of success and was in the best interests of the Bank."[662] But regardless of the basis for Respondents' approval and ratification of the NAHS loan,[663] the terms of that loan—from the lack of financial information on the borrower and the $16 million in new monies to the lack of equity contribution and the minuscule personal guarantee from guarantors with poor credit and inadequate liquidity, not to mention the capitalization of interest payments and the lack of credit review or current appraisal at the time the loan was approved[664]—foreseeably and unduly increased the Bank's risk. Respondents may have

---

[661] JX 4 (2011 ROE) at 5.

[662] Rs Br. at 40; *see* Rs Reply at 23 ("The non-lenders in the Bank reasonably relied on the loan grades, appraisals, and negotiated loan terms of the lending experts.").

[663] Enforcement Counsel notes that although Respondent Ortega now suggests that his approval of the loan was based in part on the satisfactory loan grade it had received, in fact "the NAHS loan grade was not documented until two weeks *after* he approved the loan." EC Reply at 11 (citing EPF ¶¶ 249, 259) (emphasis in original).

[664] *See* Part VI.D.7 *supra* at 65-70.

made a good faith judgment that the loan was the Bank's best option, concessionary terms and all, from among the alternatives, but this goes to culpability rather than misconduct. The loan itself was actionably unsafe or unsound.

### 2.     Breach of Fiduciary Duty

The undersigned likewise concludes that Respondents' approval of risky loans to finance the sale of Bank OREO without any credit analysis to assess the borrower's repayment ability constitutes a breach of their fiduciary duty of care.[665] In its *Haynes* decision, the FDIC Board of Directors held that the respondent had a "duty to ascertain [a] borrower's ability to repay prior to approving a loan," which he breached by approving loans "without verifying borrowers' financial information—and, in some cases, without obtaining any such information at all."[666] The undersigned also credits Deputy Comptroller Brickman's testimony that it was Respondents' "duty to independently evaluate every loan presented to them for approval or ratification against the bank's loan policy."[667] As noted previously, Respondents routinely approved large OREO loans during this period without a credit review, and Respondent Ortega testified that he typically would read only the first two pages of a loan package in any event. The undersigned therefore finds that Respondents have breached their fiduciary duty of care in this regard.

Similarly, Respondents breached their duty of care by approving numerous loans containing terms that did not comply with the standards set forth in the Bank's loan policy, which Respondents and the rest of the Board approved annually as "principles that are fundamental to sound lending."[668] For example, the loan policy required that loans financing the sale of OREO

---

[665] *See* EC Br. at 69-70.

[666] *Haynes*, 2014 WL 4640797, at *11.

[667] Brickman 104:10-14.

[668] JX 10 (2010 Loan Policy) at 10; *see id.* at 8 (noting that "[t]his policy contains <u>minimum</u> acceptable guidelines and should not preclude individual lending officers from applying more stringent lending guidelines as circumstances and situations dictate"), 45 (stating that "the Bank's [] lending policies reflect the level of risk that is acceptable to

contain an equity contribution requirement of between 15 and 25 percent, depending on the nature of the OREO property.[669] But, as has already been established, Respondents regularly approved and ratified large OREO loans that did not require the borrower to make any equity contribution.[670] The undersigned agrees with Enforcement Counsel that "[t]here is no evidence that Respondents (or the Board) ever meaningfully deliberated, either on a loan-by-loan basis or more generally, whether it was prudent to disregard the Board-approved Loan Policy with respect to so many loans."[671] This is therefore a breach of Respondents' fiduciary duty as well.[672]

> 3.    Effect

Enforcement Counsel adduced evidence that the FDIC as receiver for the Bank recorded a loss of $35,152,664.68 on the NAHS loan sometime following the Bank's closure on September 13, 2013, a date that is within the five-year limitations period required for the agency's claims regarding the Capital Raise Loans to have been timely asserted.[673] In addition to the loss on the NAHS loan, the Bank recorded a combined loss of $7,330,502 on six OREO loans between September 27, 2012 and March 5, 2013—all of which losses are also within the five-year limitations period—and the receivership recorded another $71,285,874.32 in post-closure losses on thirteen non-NAHS OREO loans.[674]

Respondents make several arguments as to why these losses do not suffice to fulfill the effect elements of Sections 1818(e) and 1818(i) with respect to the OREO lending claims. First,

---

the Board of Directors and Senior Management to ensure lending personnel adhere to clear and measurable underwriting standards to evaluate all relevant credit factors").

[669] *See* EPF ¶ 220; *see also*, *e.g.*, JX 10 (2010 Loan Policy) at 54, 75, 137.

[670] *See* EPF ¶ 221 (citing exhibits).

[671] EC Br. at 70.

[672] The undersigned notes that neither Respondents' posthearing brief nor their reply specifically addressed the issue of fiduciary duty with respect to Respondents' role in the Bank's OREO lending practices.

[673] *See* EPF ¶ 284.

[674] *See* EC Br. at 71.

Respondents argue that the action is untimely because the agency could have pled earlier actionable effects that occurred outside of the limitations period;[675] the undersigned rejects this argument just as it was rejected *supra* in connection with the Capital Raise Loans claims. Second, Respondents take issue with the post-closure losses recorded by the FDIC as receiver, arguing that the government can effectively "choose[] the date of the loss" in a way that, under some interpretations of the applicable statute of limitations, could toll the limitations period indefinitely as long as the receivership was open and there were loans for which losses had not yet been recorded.[676] Putting aside the fact that the FDIC and the FDIC as receiver are separate entities,[677] and that the OCC and the FDIC as receiver are more separate still, the undersigned agrees that the Comptroller's current construction of 28 U.S.C. § 2462, in which the "first" accrual of a Section 1818 cause of action could occur upon the second, third, or fifteenth instance of the same actionable effect,[678] may result in circumstances in which the limitations period is held in abeyance for as long as a receivership is open (or, for that matter, as long as an institution has a loan on its

---

[675] *See* Rs Br. at 48. Respondents further argue that the first-tier civil money penalty claims against Respondents related to OREO lending practices are necessarily untimely because there is no effect element for such claims, meaning that they accrue at the point of misconduct, which was more than five years prior to the filing of the Notice. *See id.* at 48-49. While Respondents are correct that a claim for a first-tier civil money penalty lacks an effect element and therefore "first accrues" for purposes of 28 U.S.C. § 2462 when the misconduct occurs, their argument nevertheless fails in this instance because Enforcement Counsel seeks only a second-tier civil money penalty on the OREO claims. *See* EC Br. at 75-77.

[676] *See* Rs Br. 49 (citing FDIC fact witness Mary Jane Locke for the proposition that until a receivership closes, which can be years, "there are still transactions that could take place in the future that would cause a loss to the receivership"); Rs Reply at 26 (asserting that "the OCC continues to argue that its claims are not time-barred despite the fact that under its rubric the government ***chooses*** when the statute of limitations begins to run") (emphasis in original).

[677] *See* 12 U.S.C. § 1821(d)(2)(A) (stating that FDIC as receiver for a failed insured depository institution succeeds to "all rights, titles, powers, and privileges of the insured depository institution"); *FDIC ex rel. Co-op. Bank v. Rippy*, 799 F.3d 301, 307 n.1 (4th Cir. 2015) ("The FDIC in its corporate capacity is an insurer and federal regulator, and it performs a separate function from the FDIC in its capacity as receiver of failed banks."); *Miller v. FDIC*, 738 F.3d 836, 838 n.1 (7th Cir. 2013) ("[I]t is well-settled that the FDIC operates in two separate and legally distinct capacities, each with very different responsibilities.").

[678] *See* December 18, 2020 Order Granting Cross-Motions for Interlocutory Review and Vacating and Reversing in Part April 9 Order, *In the Matter of Saul Ortega and David Rogers, Jr.*, OCC Nos. AA-EC-2017-44 and -45, at 14 (holding that a claim can "first" accrue for purposes of starting the Section 2462 limitations clock "based on a subsequent occurrence of the same type of effect" that earlier could have completed the agency's cause of action).

books related to the alleged misconduct that could someday be written off) and, for this reason, remains hopeful that this ruling will be revisited.[679] In this instance, however, the question is moot, because there is no dispute that the Bank itself, pre-closure, recorded losses on multiple OREO loans. Thus, even if the post-closure losses were disregarded entirely as "subjective government decisions about whether to write down a loan,"[680] the agency's claims on the OREO lending issue would still have been timely asserted.

Respondents' last argument is that Enforcement Counsel has not met its burden of demonstrating loss to the Bank because it has not shown that the Bank lost more as a result of the OREO loans than it would have if it had simply "held on to the OREO, or engaged in some alternative transaction."[681] In some sense, it is certainly unknowable whether a different path would have yielded better results across the board—as the undersigned notes *infra*, the Bank's ever-growing and ever more costly OREO portfolio during this period may have made significant losses inevitable no matter what strategy the Bank employed. But the undersigned can comfortably conclude, given the foreseeable and undue risk engendered by each of the many concessionary features of the loans originated under the Bank's aggressive OREO lending strategy, that the Bank suffered greater losses with respect to the loans that it made than it would have if the underwriting had been even slightly sounder or if the loan terms had been a little less liberal. Put another way, the question here is not whether self-financing OREO loans was a comparable option, in terms of likely loss, to selling the properties to "speculators" and "scavengers" at greatly discounted value. Rather, the relevant comparison is between the loans as made—no equity contribution, no credit

---

[679] *See Gabelli*, 568 U.S. at 448, 452 (emphasizing the importance of "set[ting] a fixed date when exposure to . . . [g]overnment efforts ends" and noting "the basic objective of repose underlying the very notion of a limitations period").

[680] Rs Reply at 26. The undersigned also separately concludes that losses to the receivership must constitute losses to the Bank for purposes of Section 1818 for the reasons provided in Part VII.E.2 *infra* at 180-181.

[681] Rs Reply at 27.

analysis, illiquid guarantors, new monies, other liberal terms—and the less risky loans that might have resulted, in a world where the Bank still determined that the best way forward was to finance its own OREO sales, had Respondents exercised some greater modicum of oversight over the Bank's lending. There can be no question that, in the latter case, the Bank would have been in a better position, that the risk to the Bank would have been lower, and that the losses ultimately suffered on the loans would have been by some measure less severe. The undersigned therefore finds that Enforcement Counsel has adequately demonstrated Bank loss on this claim.

### 4.    Culpability

Enforcement Counsel contends that Respondents' actions in connection with the Bank's OREO lending were "part of a deliberate and concerted effort to mask the Bank's deteriorating financial condition" and as such constituted willful disregard for the safety and soundness of the Bank.[682] The undersigned cannot agree. Once again, there is credible testimony and substantial record evidence that, in aggressively financing the sale of OREO to remove it from the Bank's balance sheet, Respondents believed they were acting in the Bank's best interests in the face of an unprecedented crisis. Both the OCC and the Bank recognized that the sharply rising level of OREO in the Bank's portfolio had an adverse effect on the Bank's financial condition and risk exposure that would severely worsen over time.[683] Holding onto existing ORE for a sustained period was not an option, given the substantial monthly costs of maintaining the properties,[684] the deterioration of the value of the properties due to market conditions,[685] and the fact that more new ORE was

---

[682] EC Br. at 72.

[683] *See, e.g.*, JX 4 (2011 ROE) at 6 ("[T]he growing OREO portfolio combined with increasing loan losses, OREO write-downs, and increased OREO holding costs will continue to negatively impact earnings."); Chansen Tr. 1293:6-1294:5 (OREO is a "nonperforming asset[]" that results in "a hit to the bank's earnings and [its] capital"); *see also* Part VI.D.1 at 44-46.

[684] *See* Part VI.D.1 at 44 n.195.

[685] *See, e.g.*, Ortega Tr. 953:19-24 ("You've got to get appraisals once a year. In the meantime, [the] real estate market is not doing well. So the longer you hold it, the more the chances the value goes down.").

continuing to flood the Bank's books each month.[686] It is no overstatement to say that taking measures to constantly sell existing OREO quickly was potentially a matter of life and death for the Bank from the fall of 2008 onward.[687]

Moreover, it is uncontroverted that the OCC repeatedly imparted a sense of urgency to the Bank regarding its need to sell its OREO,[688] and at first approved of the Bank's aggressive efforts to do so through self-financing.[689] Enforcement Counsel now asserts that the Bank should simply have lowered the asking price on its properties or found qualified buyers who were financed by other banks rather than finance the OREO sales itself,[690] but both the record and the weight of the testimony suggest that, at the time, the choice would not have been so easy or clear-cut. Respondents and other Bank personnel offered credible, detailed rationales for not pursuing those alternate paths that were not refuted by Enforcement Counsel witnesses.[691]

---

[686] *See* JX 6 (2012 ROE) at 5 ("OREO sales are behind the inflow of new OREO. During this examination the net OREO balance increased $22 million. The holding costs, write-downs, and loss on sales weigh heavy on the negative earnings."); Leal Tr. 2287:8-25 (stating that the bank was repossessing more and more properties "as the economy continued to suffer" and adding that "we were like drinking out of a firehose. It was coming hard and we were tasked to try to get these sold. You know, you had to sell them. You had to get them back out because we were just going to drown.").

[687] *See* JX 6 (2012 ROE) at 4 ("The stagnation of the loan portfolio and growing OREO portfolio has crippled earnings, threatens remaining capital, and threatens the near term viability of the Bank.").

[688] *See* JX 2 (2009 ROE) at 12 ("Management recognizes that holding OREO is not in the best interest of the bank or its shareholders."); JX 3 (2010 ROE) at 6 ("[U]ntil the level of OREO is reduced, earnings will be exposed to declines in market values of OREO."); JX 6 (2012 ROE) at 4 ("OREO volume must be reduced."); Ortega Tr. 938:21-23 (stating that examiners "were very involved and really just encouraging us to sell this ORE" because they understood that the Bank holding OREO is "not a good thing. It's not earning for us. It's costing us money. So they're really encouraging us to get it to somebody else, get it earning."), 952:24-25 ("[T]hey're telling us to sell the ORE.").

[689] *See* Part VI.D.2 at 53-54; *see also, e.g.*, JX 2 (2009 ROE) at 12 ("Management aggressively sells OREO to those they identify as having the best chance for success in holding the OREO and repaying the bank."); JX 3 (2010 ROE) at 10 ("Management has sold a tremendous amount of OREO. . . . Many OREO sales result in additional funds advanced to finish projects. This workout strategy increases the level of criticized assets but is generally appropriate because of the need to complete the projects.").

[690] *See* EC Br. at 70 ("The prudent course of action for the Bank with respect to its growing OREO portfolio would have been to lower its asking prices to attract more qualified borrowers who were willing to invest equity and accept personal liability."); Chansen Tr. 1295:15-22, 1543:6-21.

[691] *See* Part VI.D.2 *supra* at 47-51.

With respect to the OREO asking prices, for example, the undersigned credits the testimony of Mr. Gandy and Respondent Ortega that they were motivated by a good faith belief that the properties were more valuable long-term than what "speculators" and "scavengers" would have offered in the depressed and volatile real estate market of the day.[692] The undersigned also notes that lowering the asking prices on its OREO would have ensured that the Bank recognized losses on the sale of those properties, something that would have had a negative impact on its earnings.[693] In other words, Enforcement Counsel's preferred path would have adversely affected the Bank in the moment by forcing it to write down its property values in line with whatever a purchaser was willing to pay in the midst of an extraordinarily turbulent financial climate. Of course, this is preferable to carrying the OREO at an inflated value if in fact the appraisals were inaccurate—and it is certainly preferable to financing an OREO sale with a loan that subsequently defaults, placing the OREO back on the Bank's books at diminished value—but it shows that Respondents' decision to prioritize a strategy of self-financing OREO sales at the appraised value (in which the Bank recognizes no losses now, but takes on additional risk in the future) over discounting the property until it can be sold without financing (which minimizes future risk at the expense of present losses) could plausibly have been made with the Bank's interests in mind, as they profess.

---

[692] *See* Gandy Tr. 2227:24-2228:5 ("[W]e didn't want to sell our valuable real estate at 50 cents on the dollar. We'd rather make a loan to somebody who would take it at the value that it was appraised and put it to work and develop it. . . . And so that's what we did."); Ortega Tr. 947:12-16 ("I could always have taken the idea that I'm going to sell these properties for 60, 70 percent of the appraised value. I don't know that my duty to the bank would have been correct."); *see also* Chansen Tr. 1617:5-11 ("Q: And you're not expressing any opinion as to what – as you're not an appraiser – what real estate values were in 2008 to 2013, correct? A: Other than my comments that the market was fluctuating and decreasing rapidly during those time frames, no.").

[693] *See* Chansen Tr. 1294:25-1295:7 ("Q: What happens if a bank lowers the asking price or the sale price of its OREO properties? A: So generally when that happens, they're going to take a loss relative to the value of what they have it on their books at. So they're going to recognize the loss when they do the sale.").

There is a passage from the OCC's 2012 report of examination that succinctly expresses why the Bank's OREO dilemma was not as easily resolved as Enforcement Counsel suggests. In the section entitled "Key Supervisory Concerns and Risks," examiners write:

> The level of OREO continues to grow. Holding costs and losses on sales are severely impacting earnings. OREO volume must be reduced.[694]

This shows the multiple prongs of the problem facing the Bank throughout this period. The cost of holding OREO on its portfolio is severely impacting the Bank's earnings, and the volume of the portfolio "must be reduced." As the OREO level grows, so too will the holding costs and the earnings impact, until the point where it will "threaten[] the near term viability of the Bank."[695] Yet simply selling the properties at a discounted price is not an ideal solution, because the losses that the Bank records on those sales *also* severely impact its earnings. If the Bank is somehow able to move the OREO at its appraised value, this reduces OREO volume without a corresponding earnings hit. But it must do it rapidly, because—as the report of examination goes on to observe— if "OREO sales are behind the inflow of new OREO,"[696] then the net OREO balance (and corresponding risk to the Bank) will increase even if the Bank is able to sell some of what it currently has. Speed is of the essence.

The Bank's solution, as the evidence reflects, was to turn to its lending officers—who were familiar with the properties—to find potential borrowers in their communities who the officers believed could take on the ORE and turn it into a performing asset.[697] L&D Committee members, including Respondents, likewise based their lending decisions in part on their personal knowledge

---

[694] JX 6 (2012 ROE) at 4.

[695] *Id.*

[696] *Id.* at 5 (stating that "[t]he holding costs, write-downs, and loss on sales weigh heavy on the negative earnings)".

[697] *See* Part VI.D.2 *supra* at 51-52.

of the prospective borrowers.[698] Recognizing that the Bank was not well-suited to manage and operate OREO properties,[699] Bank management sought borrowers "who could bring their expertise and their energy to [the] properties" while simultaneously allowing the Bank to push the ORE from its books and into the hands of someone who could pay its monthly costs.[700] Moreover, even if some of the properties ultimately returned to the Bank's balance sheet through foreclosure, the Bank would benefit (in their eyes) from the cost savings in the interim, and the property could be sold again.[701] Irrespective of the wisdom of this approach relative to other options the Bank may have had, the undersigned credits the testimony of Respondents, Mr. Gandy, and others that it was their thought process at the time.[702] Bank management, in other words, offered articulable and plausible reasons for choosing to self-finance that demonstrate something other than the "utter lack of attention to [the Bank's] safety and soundness" that the willful disregard standard requires.[703]

---

[698] *See id.* at 52-53; *see also*, *e.g.*, Rogers Tr. 386:9-14 (noting that he "had no problem voting for" a particular OREO loan because he was familiar with the borrower, who had done "a good job" with other properties); Ortega Tr. 619:13-18 (stating that an ORE loan was approved without financial projections because "we know that these guys know how to develop").

[699] *See* Ortega Tr. 954:15-955:2; *see also* Part VI.D.1 *supra* at 45.

[700] Gandy Tr. 2227:11-12; *see also*, *e.g.*, Leal Tr. 2288:1-4; Ortega Tr. 935:14-19; Rogers Tr. 370:21-24 ("It was important for us to get it out of the bank and have somebody else maintaining it, paying the insurance, paying the taxes."). Enforcement Counsel argues that the Bank's advancement of property taxes on some of the OREO loans "runs contrary to Respondents' claims that they were hurriedly getting OREO off the Bank's books to avoid paying property taxes," EC Br. at 63; *see also* EC Reply at 9 (claiming that "the OREO Lending Strategy was worse for the Bank than holding the properties" because "[t]he Bank regularly paid property taxes on behalf of the borrower"), but this ignores the uncontested testimony, including by Enforcement Counsel's own expert, that the monthly holding costs for OREO property would include not just payment of property taxes, but maintenance, insurance, appraisal costs, operating costs, and other costs, all of which expenses would be alleviated even if the Bank was still paying property tax under the terms of the loan. *See* Chansen Tr. 1293:15-1294:5 (noting that a bank must pay regular property tax, maintenance, insurance, and other costs on an OREO property, all of which "are a hit to the bank's earnings and [its] capital"); Ortega Tr. 960:12-21 (recalling that "at one point we were spending probably a million dollars a month to be able to pay for [hospital] supplies").

[701] *See* Pena Tr. 1184:22-1186:1 (agreeing that putting ORE "in the hands of a borrower who can make even, say, one payment" would "generate a better situation for the bank than just sitting there and holding it and losing money each month"); Chansen Tr. 1665:23-1666:13 (agreeing that it benefits a bank to remove OREO from its books even if it ends up foreclosing on the property again some months later).

[702] *See* Rogers Tr. 376:9-22 (stating that "many, many, many of these ORE loans ended up paying off in full. . . . [S]ome of them we foreclosed on again. But dollars and cents wise, common sense wise, I still, to this day, believe we were much better off doing this.").

[703] EC Br. at 13 (internal quotation marks and citation omitted).

Would the Bank have preferred that its OREO sales be financed by a different institution, as Ms. Chansen stated should have been done?[704] Almost certainly. All of the evidence presented suggests, however, that this was not a feasible option—there was no "bank down the street" willing to relieve the Bank of its OREO burden.[705] Enforcement Counsel does not acknowledge the circumstances that led OCC examiners at the time to view self-financing as an acceptable, even necessary part of the Bank's efforts to reduce its OREO volume.[706]

The undersigned agrees entirely with NBE Chansen that the Bank should have tightened its underwriting standards when financing the sale of OREO, rather than loosened them, as the properties "already carrie[d] a significant amount of risk" that would be compounded by risky loans.[707] But this goes to misconduct (which has already been established) more than culpability, and there is some force to the perspective that—in the specific climate faced by the Bank at the time—reducing the Bank's OREO was important and urgent enough that considerations of future risk of default and foreclosure mattered somewhat less when taking steps to achieve that aim.[708] The undersigned need not share this perspective to recognize it as broadly reasonable. As with the Capital Raise Loans, one may conclude that Respondents genuinely believed they were acting in the Bank's interests, rather than with willful disregard for its safety and soundness, in pursuing a

---

[704] *See* Chansen Tr. 1295:15-22.

[705] *See* Part VI.D.2 *supra* at 50-51; *see also*, *e.g.*, Leal Tr. 2286:12-17 ("[A]t that point in time, nobody—and I mean no banks out there were providing financing for other banks' repossessions. We had no choice. We had to finance our own repossessions because nobody—no other bank was doing that.").

[706] *See* Part VI.D.2 *supra* at 53-54; *see also* JX 2 (2009 ROE) at 24 ("To combat the effects of OREO holding costs, management is aggressively marketing OREO through innovative lending programs."); JX 3 (2010 ROE) at 33 ("Management has been able to sell OREO properties, but has had to finance these sales.").

[707] Chansen Tr. 1297:3-4; *see id.* at 1297:14-18 ("In fact, there should be more scrutiny to these types of loans. Again, because it's a nonperforming asset so it carries a higher degree of risk by putting it back on the books.").

[708] *See* Ortega Tr. 616:1-617:25 (stating that the Bank was "more flexible" with its OREO underwriting in 2010 because there were "no banks that [were] willing to finance another bank's ORE" and the Bank "needed to take this big piece of property and get it in somebody else's hands versus us carrying it and paying for taxes and paying for expenses to maintain it").

goal that was necessary for the Bank's short-term and long-term health, but did so in a manner that was imprudent and that foreseeably increased risk to the Bank. Such is the case here.

Nor, for the same reasons, does Respondents' conduct constitute continuing disregard. Enforcement Counsel argues that Respondents "demonstrated a heedless indifference to the prospective consequences" of "their aggressive efforts to sell OREO without recognizing losses on the sales,"[709] but there is substantial evidence that the OREO lending strategy was undertaken, even if misguidedly in the details, with the Bank's well-being firmly in mind. Overall, Enforcement Counsel has not proven that Respondents showed "a degree of culpability well beyond mere negligence" in their actions relating to the sale of OREO during the relevant period,[710] and the culpability element of Section 1818(e) has therefore not been satisfied.

### 5.     Section 1818(i)

The undersigned has concluded that Respondents breached their fiduciary duty of care and caused more than minimal loss to the Bank in connection with the OREO lending claims. As a result, the elements for the assessment of a second-tier civil money penalty under 12 U.S.C. § 1818(i) have been met, and it is not necessary to further resolve whether Respondents' actions meet the standard for reckless engagement of unsafe or unsound practices or whether their misconduct constituted a pattern of misconduct, as Enforcement Counsel also contends.[711]

### C.     Nonaccrual Loan Accounting

Enforcement Counsel argues that Respondents' failure to correct the Bank's improper blanket recognition of interest income on nonaccrual loans (Article V) resulted in the Bank filing materially inaccurate Call Reports that overstated the Bank's regulatory capital and masked its

---

[709] EC Br. at 74.

[710] *Faigin and Lannan*, 2015 WL 9855325, at *83 (internal quotation marks and citation omitted).

[711] *See* EC Br. at 75-77.

financial condition, thereby violating 12 U.S.C. § 161(a), breaching Respondents' fiduciary duties of care, and constituting actionably unsafe or unsound banking practices.[712] Enforcement Counsel also contends that this misconduct prejudiced the interests of Bank depositors and involved a willful or continuing disregard for the Bank's safety and soundness on the part of Respondents.[713] Finally, Enforcement Counsel asserts that the elements for a first- and second-tier civil money penalty have been met as to Respondent Ortega in connection with the nonaccrual loan accounting claims.[714] The undersigned concludes that Enforcement Counsel has not met its burden regarding depositor prejudice, but agrees in all other respects.

1.    <u>Violation of 12 U.S.C. § 161(a)</u>

Under the National Bank Act, banks are required "to file periodic call reports with the OCC that describe the bank's financial condition, including the value of its assets and liabilities."[715] These call reports "must accurately reflect the capital of the bank," among other things, and any "bank officer who signs off on the report must attest that the report is true and correct to the best of his knowledge and belief."[716] Call reports must be prepared in accordance with GAAP and the Call Report Instructions,[717] and it is well-settled that the filing of materially inaccurate call reports can give rise to a violation of 12 U.S.C. § 161(a).[718] The statute, however, does not impose strict

---

[712] *See* EC Br. at 78-80, 92-103.

[713] *See id.* at 103-109.

[714] *See id.* at 109-112.

[715] *Blanton*, 909 F.3d at 1174.

[716] *Id.* (internal quotation marks and citations omitted); *see also* 12 U.S.C. § 161(a); 12 C.F.R. § 304.3(a) ("All assets and liabilities, including contingent assets and liabilities, must be reported in, or otherwise taken into account in the preparation of, the Call Report.").

[717] *See* 12 U.S.C. § 1831n(2)(A) (providing that "the accounting principles applicable to reports or statements required to be filed with Federal banking agencies by all insured depository institutions shall be uniform and consistent with generally accepted accounting principles"); 12 C.F.R. § 304.3(a) (call reports must be filed in accordance with call report instructions).

[718] *See Blanton*, 909 F.3d at 1174; *Yates v. Jones Nat'l Bank*, 206 U.S. 158, 176-77 (1907).

liability on the signing officials, and a signatory "does not violate the law if she reasonably believes in the reports' accuracy, even if the reports later prove inaccurate."[719]

Enforcement Counsel asserts that the Bank filed materially inaccurate Call Reports from June 30, 2009 through December 31, 2012 as a result of its inappropriate recognition of interest income on nonaccrual loans on a blanket basis without documentation or justification, thus improperly overstating the Bank's earnings and capital for those periods.[720] Enforcement Counsel further argues that Respondents, who signed several of the Call Reports in question,[721] did not have a reasonable basis to believe in the accuracy of the Bank's nonaccrual loan accounting, given repeated warnings from the OCC and the Bank's internal auditor that treating all nonaccrual loans on a cash basis as a general rule did not comply with the Call Report Instructions, thus violating 12 U.S.C. § 161(a).[722] The undersigned agrees with Enforcement Counsel.

### *Inaccuracy*

It is beyond dispute that the Bank's practice of automatically recognizing interest income on loans that have been placed on nonaccrual status—without a determination of full collectability supported by "a current, well documented credit evaluation"—is contrary to the Call Report

---

[719] *Blanton*, 909 F.3d at 1174 (internal quotation marks and citation omitted).

[720] *See* EC Br. at 99 ("The Bank offered no corrections to its earlier-filed Call Reports until it filed the amended Call Report for the period ending December 30, 2012—and even that was only a partial correction to eliminate the improper accounting for nonaccrual loans.").

[721] *See* EPF ¶¶ 604, 607-608. Specifically, Respondent Rogers signed the June 30, 2009 Call Report (EX 367), Respondent Ortega signed the September 30, 2011 and June 30, 2012 Call Reports (EX 370, EX 371), and both Respondents signed the Call Reports for the periods ending September 30, 2009 and September 30, 2010 (EX 368, EX 369), attesting to the truth and accuracy of the Call Reports' disclosures in each instance. Enforcement Counsel also argues that Respondents brought about the Bank's violation of 12 U.S.C. § 161(a) as to other Call Reports during this period even when they were not signatories, given that "the final responsibility for ensuring the accuracy of the Bank's accounting rested squarely with them as directors and officers of the Bank." EC Reply at 20; *see* EC Br. at 80. Because the undersigned concludes that Respondents violated 12 U.S.C. § 161(a) with respect to the Call Reports that bear their signature, it is unnecessary to address the extent to which a bank official who has not attested to the truth and accuracy of a Call Report can violate the statute.

[722] *See* EC Br. at 79-80, 92-95.

Instructions and to GAAP.[723] Cost recovery accounting is the "general rule" for nonaccrual loans, but the Bank employed a default setting in which all nonaccrual loans were accounted for on a cash basis, thus allowing the Bank to recognize interest income on them, regardless of whether the Bank had performed the required analysis to determine that the loans were fully collectible.[724] Any Call Reports that reflected this practice in their reported interest income, as Enforcement Counsel uncontestedly claims that all of the Bank Call Reports did during the relevant period, are therefore inarguably inaccurate.[725]

Respondents' arguments to the contrary are largely smokescreens.[726] First, Respondents contend that the Bank's nonaccrual loan accounting was not improper because the Bank took the "sound, conservative approach" of placing all loans on nonaccrual status once they became 90 days delinquent, then leaving it to the loan department "to further downgrade the loan if necessary, based on their expertise."[727] As Enforcement Counsel notes, however, "the question of *whether* a loan should be placed on nonaccrual status in the first place is separate from the question of, once a loan is *on* nonaccrual status, how a bank must account for interest on that loan and what a bank must do to support its accounting choice."[728]

Second, Respondents assert that the Bank was entitled to use cash basis accounting on nonaccrual loans when the loans are "fully secured with solid appraisals," as Respondents aver that the loans were here.[729] But putting aside the fact that Respondents never offered evidence of

---

[723] EX 359 (June 2009 Call Report Instructions) at 455; *see* Part VI.E.1 *supra* at 77-79.

[724] EX 359 (June 2009 Call Report Instructions) at 453; *see id.* at 454 ("When doubt exists as to the collectability of the remaining recorded investment in an asset in nonaccrual status, any payments received must be applied to reduce the recorded investment in the asset to the extent necessary to eliminate such doubt.").

[725] *See* EC Br. at 94-95.

[726] *See* Rs Br. at 49-51; Rs Reply at 32-33.

[727] Rs Br. at 50.

[728] EC Reply at 18 (emphases in original).

[729] Rs Br. at 51.

these appraisals, they misstate the standard: banks may not accrue interest on loans in nonaccrual status unless the loans are "*both* well secured *and* in the process of collection,"[730] and Respondents offer no reason why loans that are ***by definition*** delinquent for 90 days or more when first placed on nonaccrual status should be considered to fit these categories by default.[731] An appraisal may well be "documentation that could support a loan's repayment," as Respondents claim,[732] but it does not constitute a "current, well documented credit evaluation," whether or not the loan is fully secured, and it is insufficient to justify the use of cash basis accounting on loans that have been placed on nonaccrual.[733]

Finally, Respondents argue that Enforcement Counsel "failed to present evidence at trial that the loans were not fully secured or that the appraisals were flawed."[734] This too is wrong. To the extent that it was Enforcement Counsel's burden to show that interest income was being improperly recognized on specific loans, it met this burden comfortably with the evidence that (1) the Bank automatically treated nonaccrual loans using cash basis accounting, contrary to GAAP and the Call Report Instructions; (2) "[n]either the Bank's accounting system, nor Bank policy or practice, required Bank personnel to undertake the steps required by the Call Report Instructions" before a nonaccrual loan could be treated as cash basis;[735] and (3) fifteen of the sixteen nonaccrual loans sampled for review during the OCC's March 2013 targeted examination of the Bank lacked any documentation at all to support their cash basis accounting treatment, while the final sample loan "had some support based on loan file information, but no supporting

---

[730] EX 359 (June 2009 Call Report Instructions) at 453 (emphases in original).
[731] *See id.* (stating that "[a]n asset is 'in the process of collection' if collection of the asset is proceeding in due course" through legal action or other collection efforts "which are reasonably expected to result in repayment of the debt or in its restoration to a current status in the near future").
[732] Rs Br. at 51.
[733] EX 359 (June 2009 Call Report Instructions) at 455.
[734] Rs Br. at 51.
[735] EC Br. at 92.

documentation by management was available or performed."[736] The undersigned agrees with Enforcement Counsel that "[w]ithout the documented analysis for each nonaccrual loan, the Bank improperly accrued interest, and recognized interest income, on nonaccrual loans from 2009 through early 2013."[737]

### *Materiality*

The undersigned also concludes that the inaccuracies in the Call Reports regarding improper interest income recognition on nonaccrual loans were material. The Call Report Instructions at the time defined materiality as "the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement."[738] The Instructions further noted that "[g]uidance on the consideration of all relevant factors when assessing the materiality of misstatements" could be found in SEC Accounting Bulletin No. 99, *Materiality* ("SAB 99").[739]

Among other things, SAB 99 provides that materiality assessments are matters of both "quantitative and qualitative considerations," and that the interaction between the two may make even "misstatements of relatively small amounts" material in certain circumstances.[740] Such qualitative considerations that "may well render material a quantitatively small misstatement of a financial statement item" include "whether the misstatement masks a change in earnings or other trends"; "whether the misstatement changes a loss into income or vice versa"; and "whether the

---

[736] JX 7 (2013 Target ROE) at 6 (noting that of the 400 nonaccrual loans on the Bank's books at that time, all but two were being accounted for using the cash basis method).

[737] EC Br. at 93.

[738] EX 359 (June 2009 Call Report Instructions) at 12 (quoting Financial Accounting Standards Board ("FASB") Concepts No. 2); *see also* EX 363 (Salvato Report) ¶ 59 n.3).

[739] EX 359 (June 2009 Call Report Instructions) at 380; *see also* SAB 99, 1999 WL 1123073 (Aug. 12, 1999).

[740] SAB 99, 1999 WL 1123073, at *3; *see also* EX 363 (Salvato Report) ¶ 60.

misstatement affects [] compliance with regulatory requirements."[741] The guidance also states that "[i]n determining whether multiple misstatements cause the financial statements to be materially misstated, registrants and the auditors of their financial statements should consider each misstatement separately and the aggregate effect of all misstatements."[742] It notes that "[e]ven though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless, when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading."[743]

Here, Enforcement Counsel's accounting expert opined that the combined effect of the accounting errors alleged in the Notice—that is, the Bank's accounting practices with respect to nonaccrual loans, the Capital Raise Loans, and OREO lending—caused the Call Reports during this period to materially overstate the Bank's capital.[744] This opinion, however, is based on facts that Enforcement Counsel has not proven—namely, that the Capital Raise Loans caused the Bank's capital to be overstated by $17.3 million, and not $3 million or some figure in-between.[745] Enforcement Counsel states that "[e]ach overstatement [from September 30, 2012 through June 30, 2013] was quantitatively material because it overstated the Bank's capital by more than 10 percent,"[746] but this calculation depends on that $17.3 million figure being accurate. Ms. Salvato's

---

[741] SAB 99, 1999 WL 1123073, at **3-4.

[742] *Id.* at *5.

[743] *Id.*

[744] *See* EX 363 (Salvato Report) ¶ 64 ("The nature and magnitude of the Bank's capital overstatement from the combined accounting errors is material because Call Report users may formulate decisions on the basis of that information. These material inaccuracies misrepresented the true financial condition of the Bank."); *see also* EC Br. at 97 (stating that "[t]he combined effect of the improper accounting practices . . . caused a material overstatement of the Bank's capital").

[745] *See* Part VI.C.6 *supra* at 34-42. This means that the totals used by Ms. Salvato as the amounts by which the Bank's capital was overstated at different periods, which form the basis of her materiality determinations, are not reliable. *See* EX 363 (Salvato Report) ¶¶ 61 (stating that the Bank's capital was overstated "by at least $42 million" as of April 2013), 62 (stating that "[t]he December 31, 2012 Call Report as originally filed overstated capital by $38.4 million"), 63 (stating that the June 30, 2013 Call Report reflected an overstatement of capital of "at least $26.8 million" related to the Capital Raise Loans and OREO lending).

[746] EC Br. at 97.

conclusion that the Bank would have been "critically undercapitalized" in December 2012 had its capital levels been reported accurately is likewise premised on that assumption.[747]

Further, Ms. Salvato never opines on the materiality of the misstatements attributable to the improper nonaccrual loan accounting standing alone.[748] Nor does Enforcement Counsel present any evidence on the amount by which the Bank's capital was overstated due to interest income recognition on nonaccrual loans in 2009 and 2010; there is evidence that nonaccrual loan accounting caused an overstatement of $1.4 million in 2011, $9.8 million in 2012, and $3.6 million in the first quarter of 2013 before the issue was corrected, but nothing from prior years.[749] For these reasons, the undersigned cannot make a determination of materiality as to the nonaccrual loan accounting based on a purely quantitative assessment.

Nevertheless, the undersigned finds that the overstatement of interest income due to improper nonaccrual loan accounting was material in a qualitative sense.[750] The nature of the misstatement is such that it implicates multiple of the considerations identified in SAB 99, including whether the misstatement affects compliance with regulatory requirements (it does) and whether it "masks a change in earnings" or "changes a loss into income."[751] For years, the Bank was recognizing interest income on all of its nonaccrual loans despite not being permitted to do so by the applicable guidance. A reasonable person relying on the Bank's Call Reports over this time

---

[747] EX 363 (Salvato Report) ¶ 65.

[748] *See id.* ¶¶ 48-65.

[749] *See id.* ¶ 53.

[750] Respondents argue that the nonaccrual loan accounting was immaterial "[b]y the OCC's own admission," Rs Br. at 53, citing a March 2014 internal OCC email stating that "the 'Nonaccrual Issue' . . . had no impact on the type or timing of any enforcement action nor any impact on the eventual timing of the bank's close." RX 52 (email chain including March 25, 2014 email from H. Thompson to R. Chansen et al.). This argument fails because, as Enforcement Counsel states, "a Call Report violation may be material for financial reporting purposes even if it would not have had a significant impact on a bank's ratings or enforcement actions." EC Reply at 20.

[751] SAB 99, 1999 WL 1123073, at **3-4. Certain of the other considerations listed, such as "whether the misstatement arises from an item capable of precise measurement" and whether it "concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability," are also pertinent. *Id.* at *3.

would have had a misleadingly high impression of how many loans in the Bank's portfolio it deemed to be fully collectible, in a financial climate where loan defaults and delinquencies were causing banks to fail. This, in turn, could reasonably create a misleading impression of the Bank's financial condition. There is a material difference between the way in which the Bank recognized its interest income and the way it would have done had it adhered to GAAP and the Call Report Instructions and applied cost recovery for all nonaccrual loans as a default.

### *Reasonable Belief*

Respondents were repeatedly put on notice that the Bank's method of accounting for nonaccrual loans was inappropriate; therefore, they could not have reasonably believed in the accuracy of the interest income recognized in the Call Reports.[752] Respondents argue that "[w]hen cash basis accounting was brought up in 2009, the documents and testimony showed that the Bank addressed the matter and there was no reason for Mr. Ortega, Mr. Rogers, or any board member to believe otherwise."[753] Even if this were true in March 2009, however, when Mr. Leal (incorrectly) represented to the Board that the Bank's nonaccrual loan policy "had been modified to include the accounting requirements specified in the Call Report Instructions,"[754] it was no longer true as soon as the Bank's Chief Audit Officer warned Bank management that summer that the "use of the cash basis of accounting on all nonaccrual loans" was unsatisfactory and that the Bank was improperly recognizing interest income without the required supporting documentation.[755] Yet Respondents attested to the truth and accuracy of Call Reports for the periods ending September 30, 2009 and September 30, 2010 that continued to use cash basis for nonaccrual loans.

---

[752] *See* EC Br. at 92-95.

[753] Rs Br. at 51.

[754] EX 319 (March 3, 2009 Board meeting minutes) at 1; *see* Part VI.E.3 *supra* at 81-82.

[755] EX 321 (June 2009 nonaccrual review memo) at 4; *see also id.* at 5 ("Through discussion with management, we note that *all* non-accrual loans are on the cash basis of income recognition; and, are not supported by documentation.") (emphasis in original).

Similarly, the OCC made it clear in 2011 and 2012 that the Bank needed to "reverse or charge off all interest that has been accrued contrary to the requirements contained in the [Call Report Instructions] governing nonaccrual loans" and to "ensure the Bank's adherence to written policies and procedures governing the supervision and control of nonaccrual loans . . . consistent with the accounting requirements contained in the Call Report Instructions"—the very same issues that the agency had flagged several years earlier in its 2009 MOU.[756] Again Respondents took no steps to ensure that the Bank addressed these concerns,[757] and again Respondent Ortega signed multiple Call Reports attesting to the accuracy of the Bank's nonaccrual loan accounting before the Bank finally changed its accounting system settings in the spring of 2013.[758]

All in all, the nonaccrual loan accounting issue was raised with Bank senior management three times by the Bank's Chief Audit Officer (in June 2009, October 2012, and December 2012) and three times by the OCC (in January 2009, February 2011, and January 2012). Mr. Garcia in particular sounded the alarm to Respondents on multiple occasions that the Call Report Instructions required supporting documentation before interest income could be recognized on nonaccrual loans and that the Bank was not in compliance.[759] As a result, Respondents "cannot have had a reasonable belief in the accuracy of the Bank's Call Reports with respect to the Bank's use of cash basis income recognition for nonaccrual loans,"[760] and the undersigned finds that Enforcement Counsel has proven that Respondents violated 12 U.S.C. § 161(a).

---

[756] JX 12 (February 2011 Consent Order) at 12; JX 13 (January 2012 Consent Order) at 16.

[757] *See* Part VI.E.4 *supra* at 84-85.

[758] *See* EX 370 (September 30, 2011 Call Report); EX 371 (June 30, 2012 Call Report).

[759] *See* EX 321 (June 2009 nonaccrual review memo) at 5; EX 323 (email chain including October 23, 2012 email from J. Garcia to M. Magee et al., forwarded to S. Ortega) ("What documentation will I find in the file to support the cash basis of accounting? . . . I was informed by Loan Administration that all nonaccrual loans that are paying are on the cash basis – is this correct?"); EX 325 (December 17, 2012 Board and MOU Committee meeting minutes) at 1 ("Mr. Garcia noted that the Audit department found Loan Review, Credit Review, and Special Assets write-ups did not include documentation supporting for income recognition on a cash basis.").

[760] EC Br. at 95.

2.    Breach of Fiduciary Duty

Respondents' failure to address the Bank's improper nonaccrual loan accounting from 2009 through 2012[761] also breached their fiduciary duty of care. As bank officers and directors, Respondents had the duty to ensure that the Bank complied with applicable statutory and regulatory requirements, including ensuring that the Bank's Call Reports were prepared in accordance with GAAP.[762] The undersigned agrees with Enforcement Counsel that Respondents further had the duty "to promptly address regulator and internal audit warnings about improper accounting practices."[763] As shown above, Respondents did not do so, instead permitting the Bank—over the course of several years—to apply a default accounting method to its nonaccrual loans that they knew or should have known would result in improperly recognized interest income and misstated Call Reports. This did not demonstrate "constant concern for the safety and soundness of the Bank,"[764] and it is not what an ordinarily prudent person, acting diligently and carefully, would have done in those circumstances.[765]

3.    Unsafe or Unsound Practices

The federal banking agencies have held that "[f]iduciary duties define standards of prudent operation[,] and thus an act in violation of such duties is by its nature imprudent and unsafe."[766] To whatever extent those standards are not coextensive here, the undersigned finds it unnecessary to determine whether Respondents' failure to ensure that the Bank corrected its improper

---

[761] Or, in Respondent Rogers's case, through his departure from the Bank in November 2011.

[762] *See Ellsworth*, 2016 WL 11597958, at *15.

[763] EC Br. at 101; *see Brickner v. FDIC*, 747 F.2d 1198, 1202 (8th Cir. 1984) (finding that regulator warnings "should have led to greatly increased vigilance by [bank officer] petitioners over the Bank's lending practices").

[764] *Conover*, 2016 WL 10822038, at *19 (internal quotation marks and citation omitted).

[765] *See Watkins*, 2019 WL 6700075, at *7; *Michael*, 687 F.3d at 350-51.

[766] *Smith and Kiolbasa*, 2021 WL 1590337, at *24; *see also In the Matter of Michael D. Landry and Alton B. Lewis*, No. FDIC-95-65e, 1999 WL 440608, at *15 (May 25, 1999) (FDIC final decision) (holding that "[a] breach of fiduciary duty by a director or officer to the Bank is *per se* unsafe and unsound"), *aff'd on other grounds sub nom. Landry v. FDIC*, 204 F.3d 1125, 1138 (D.C. Cir. 2000).

nonaccrual loan accounting practices caused "a reasonably foreseeable undue risk to the institution,"[767] given the clear evidence that Respondents' conduct constituted a violation of 12 U.S.C. § 161(a) and a breach of their fiduciary duty, as detailed above.

4.     Effect

Enforcement Counsel argues that Respondents' misconduct with respect to the Bank's nonaccrual loan accounting prejudiced the interests of the Bank's depositors, thus satisfying the effect element of 12 U.S.C. § 1818(e).[768] The undersigned concludes that Enforcement Counsel has not met its burden in this regard.

First, Enforcement Counsel contends that "Respondents' failure to cause the Bank to file materially accurate Call Reports, over time, delayed statutorily required prompt corrective action."[769] According to Enforcement Counsel, "[b]ecause this material overstatement of the Bank's regulatory capital masked the true financial condition of the Bank, examiners did not have critical information that would otherwise have led them to escalate or accelerate enforcement action with respect to the Bank's capital to protect the Deposit Insurance Fund"[770]—thus, in some way, prejudicing the Bank's depositors.[771] This contention, however, is directly contradicted by the internal OCC email on March 25, 2014 stating unequivocally that "the 'Nonaccrual Issue' and 'OREO MRA Issue' *had no impact on the type or timing of any enforcement action* nor any impact

---

[767] *Patrick Adams*, 2014 WL 8735096, at *5.

[768] *See* EC Br. at 106-109. Enforcement Counsel makes this same argument as to the allegedly improper accounting practices relating to the Capital Raise Loans and the Bank's OREO lending, which are discussed in the appropriate sections below.

[769] *Id.* at 108.

[770] EPF ¶ 605; *see* EC Br. at 107 (asserting that "Respondents avoided alerting the OCC that the Bank lacked sufficient capital to survive a potential liquidity crisis") (internal quotation marks and citation omitted).

[771] The undersigned notes that to the extent that Enforcement Counsel uses loss to the Deposit Insurance Fund as a proxy for depositor prejudice, *see also* EC Br. at 108-109, it offers no reason for this, nor does it explain its assertion that the Bank failing in September 2013 rather than six months earlier "increased the long-term losses to the Deposit Insurance Fund." *Id.* at 109.

on the eventual timing of the bank's close."[772] By March 2014, the agency understood the full scope of the Bank's misconduct with regard to nonaccrual loan accounting, having discovered that virtually all of the Bank's nonaccrual loans were being treated on a cash basis without justification a year earlier and directed the Bank to reverse the improperly accrued interest and change its practices;[773] there is no allegation that additional nonaccrual-related misconduct only came to light after the date of this email. The undersigned therefore credits the representation made in this email and finds that, although the nonaccrual loan accounting issue was material for Call Report purposes,[774] it "had no impact on the type or timing of any enforcement action"—and thus any argument that the OCC would have acted more quickly had it known sooner that the Bank was improperly recognizing interest income on nonaccrual loans must fail.

Nor does Enforcement Counsel's citation to the D.C. Circuit's *Dodge* decision change matters.[775] In that case, the D.C. Circuit held that the respondent had overstated the bank's capital to make it appear well-capitalized when it was actually critically undercapitalized, and that "[t]he potential liquidity crisis" caused by the Bank's deceptively low capital levels "could have prejudiced depositors by compromising the Bank's ability to meet its obligations to them."[776] But Enforcement Counsel has not presented evidence that the improperly recognized interest income masked a potential liquidity crisis—which makes sense, given the OCC's internal conclusion that the nonaccrual accounting issue would not have led to enforcement action.[777] While Ms. Salvato

---

[772] RX 52 (email chain including March 25, 2014 email from H. Thompson to R. Chansen et al.) (emphasis added).

[773] *See* JX 7 (2013 Target ROE) at 6 (noting that "the software supporting the Bank's financial records automatically accounts for cash basis nonaccrual, not the standard cost recovery method" and finding that all but two of the 400 nonaccrual loans then on the Bank's books were being accounted for using cash basis); EX 328 (email chain including April 3, 2013 email from B. Staley to K. Doyle and C. Neal) at 2 ("Management apparently has been automatically placing loans designated as NA on a cash basis forever.").

[774] *See* Part VII.C.1 *supra* at 157-160.

[775] *See* EC Br. at 107.

[776] *Dodge*, 744 F.3d at 158.

[777] *See* RX 52 (email chain including March 25, 2014 email from H. Thompson to R. Chansen et al.).

does opine that the Bank would have been "critically undercapitalized" as of December 31, 2012 had the overstatement of capital from the nonaccrual loan accounting, Capital Raise Loans, and OREO lending all been corrected, this calculation is based on a $17.3 million overstatement relating to the Capital Raise Loans that Enforcement Counsel simply has not shown.[778]

Second, it is Enforcement Counsel's position that the improper recognition of interest income on nonaccrual loans, and the overstatement of Bank capital due to improper accounting generally, prejudiced depositors by "preventing [them] from making an informed decision about where to maintain their deposits."[779] In support of this argument, Enforcement Counsel cites to a decision by the Office of Thrift Supervision for the proposition that it is prejudicial to depositors to avoid providing them "with information that might 'persuade a depositor that his or her funds were subject to a substantial risk.'"[780] But the *Cousin* decision cited by Enforcement Counsel says the opposite, if anything: it holds that "conduct that injures the reputation of the institution or *otherwise would persuade a depositor that his or her funds were subject to a substantial risk*" is prejudicial to depositors.[781] The Second Circuit's affirmance in that case underlined this reasoning, finding depositor prejudice where the respondent's "illegality could potentially injure depositor confidence in [the bank] and lead to an exodus of depositors."[782]

Here, by contrast, loss of depositor confidence and an "exodus of depositors" appear to be what Enforcement Counsel believes should have happened, given its claim that depositors were prejudiced by not having information that would make them want to withdraw their funds.

---

[778] *See* Part VI.C.6 *supra* at 34-42; *see also* RX 41 (email chain including March 28, 2014 email from B. Paulson to R. Chansen et al.) (internal OCC email stating that "we have not proven that the source of funds for the holding company capital injection was in fact loans from FNB").

[779] EC Br. at 106.

[780] *Id.* at 107 (quoting *In the Matter of Michael Cousin* ("*Michael Cousin*"), No. AP-94-48, 1994 WL 621240, at *15 (Oct. 11, 1994) (OTS final decision), *aff'd sub nom. Cousin v. OTS*, 73 F.3d 1242 (2d Cir. 1996)).

[781] *Michael Cousin*, 1994 WL 621240, at *15 (emphasis added).

[782] *Cousin*, 73 F.3d at 1252.

Enforcement Counsel offers no support for the novel theory that the interests of Bank depositors would have been better served had the Bank failed sooner than it did.[783] Indeed, although it in no way justifies Respondents' misconduct, there is some uncontroverted evidence that depositors benefited by the Bank staying open long enough for the FDIC to find an acquiring institution and ensure that Bank services continued to operate without interruption.[784]

Not every misstatement within a bank's accounting will prejudice its depositors, even if it is qualitatively material. Rather, the scale of the improper accounting must meet some threshold past which bank depositors are detrimentally being deprived of information or the bank itself and its deposits are being put at risk. The undersigned cannot conclude that this threshold has been met when the agency's own conclusion was that the nonaccrual accounting issue "had no impact on the type or timing of any enforcement action"—surely any overstatement of interest income serious enough to influence depositors to believe that their money was no longer safe at the Bank would also be sufficient impetus for prompt action by the OCC, and yet no such action was apparently warranted. The undersigned therefore concludes that Enforcement Counsel has not demonstrated that the Bank's improper recognition of interest income on nonaccrual loans prejudiced the Bank's depositors, and the effect element of Section 1818(e) in connection with Article V of the Notice has consequently not been satisfied.

5.     Culpability

Enforcement Counsel argues that Respondents' conduct in connection with the nonaccrual loan accounting issue evinced willful or continuing disregard for the Bank's safety and

---

[783] *See* EC Br. at 108-109 (arguing that the Bank should have been placed into receivership six months sooner).

[784] *See* Part VI.G *supra* at 106-107; *see also* Leal Tr. 2278:16-25 (recalling FDIC examiners telling him in the spring of 2013, "[Y]ou're doing the right thing, just keep doing it. Keep it together. Give us enough time. You know, the best result would be [] that we find somebody that buys the bank. You know, you don't want depositors to lose their money."), 2279:2-4 ("At that point, we knew we could not save the bank. It was just about giving the FDIC enough time.").

soundness.[785] The undersigned agrees.

Respondents' failure to correct the Bank's improper blanket use of cash basis accounting without justification on nonaccrual loans, over the course of years and despite multiple warnings from OCC examiners and the Bank's internal auditor, represents, at minimum, continuing disregard for the safety and soundness of the Bank. Respondents were on notice that, under the Call Report Instructions, interest income could only be recognized on nonaccrual loans if there was no longer any doubt about the loans' full collectability—a finding that must be made on a loan by loan basis and "supported by a current, well documented credit evaluation" in each case.[786] Respondents also knew or should have known that the default setting of the Bank's accounting system had been changed to automatically recognize interest income on all loans that were placed on nonaccrual, without any requirement for documentation.[787] Yet Respondents took no steps to remedy this situation or bring the Bank's nonaccrual accounting practices into compliance with the Call Report Instructions from 2009 through late 2012,[788] during which time they signed multiple Call Reports attesting to the accuracy of the interest income recognized by the Bank in that period. This shows, at the very least, that Respondents knew about and failed to correct ongoing practices that were clearly imprudent, over a lengthy period of time, and "with heedless indifference to the prospective consequences," all hallmarks of continuing disregard. The culpability element of Section 1818(e) is therefore satisfied as to the agency's nonaccrual accounting claims.[789]

---

[785] *See* EC Br. at 103-106.

[786] EX 359 (June 2009 Call Report Instructions) at 455; *see also*, *e.g.*, EX 354 (March 2012 Call Report Instructions) at 545 (same).

[787] *See* Part VI.E.2 *supra* at 79-80.

[788] *See* EPF ¶ 25 (noting that "[a]s CFO, Respondent Ortega was responsible for financial reporting, accounting, the Bank's books and records, and computer information systems").

[789] Because it is unnecessary to determine whether Respondents' conduct in connection with the nonaccrual loan accounting constituted unsafe or unsound banking practices, *see supra* at 162-163, and because the culpability

Respondents make several arguments in response, the bulk of which have been addressed in the misconduct analysis *supra*—it is demonstrably untrue, for example, that "[e]xtensive evidence showed that Respondents were reassured that [the nonaccrual accounting] issue was being handled."[790] Nor does it matter that Respondents were not the ones responsible for grading the nonaccrual loans;[791] they knew that the Bank's nonaccrual accounting practices did not comply with the Call Report Instructions, they were in a position to seek to remedy that noncompliance at any point over a long period of time, and they did not do so. Further, while Respondent Ortega did eventually take remedial steps to address the concerns of the OCC and his Chief Audit Officer,[792] this does not make up for his failure to do so from 2009 through sometime in 2012.

Respondents also invoke the financial crisis in contesting their culpability, arguing that their "state of mind was not characterized by culpable intent but by the untenable position reactive to the extraordinary and unprecedented situation created by the Fannie Mae debacle."[793] This argument holds no water. Unlike with the Capital Raise Loans and the Bank's self-financed OREO sales, there was no exigent circumstance here that Respondents were seeking to navigate as best they could in the interests of the Bank. Rather, the Bank had a longstanding practice of recognizing interest income on all nonaccrual loans by default that Respondents knew or should have known contradicted the BAAS and the Call Report Instructions.[794] They could have changed it, but they did not—by all accounts because it was the Bank's policy to recognize as much nonaccrual interest

---

element has been satisfied here in any event, the undersigned finds that it is similarly unnecessary to decide whether Respondents acted with willful disregard for the Bank's safety and soundness, which incorporates a determination of unsafe or unsound conduct into its own standard.

[790] Rs Br. at 54.

[791] *See id.*; Rs Reply at 34.

[792] *See* Rs Br. at 52-53; Rs Reply at 35.

[793] Rs Br. at 54 (also asserting that "[t]he only motive or intent by the Respondents was to try and cope with the banking crisis – not to engage in misconduct").

[794] *See* Part VI.E.2 *supra* at 79-81.

income as possible.[795] This has nothing to do with the stresses and pressures and difficult choices engendered by the global financial crisis. Moreover, although Enforcement Counsel does not allege personal dishonesty in connection with the nonaccrual loan accounting, there is some evidence that Respondent Ortega sought to mislead NBE Chansen on the issue in 2013 by telling her "that the JH Silverlake system would not allow the bank to process [nonaccruals] other than on a cash basis," something he should have known was inaccurate.[796] In short, while the impact of the financial crisis and the Fannie and Freddie losses on the Bank is context that must be considered with respect to certain other claims against Respondents (and their state of mind), Respondents have made no showing that it is relevant here.

### 6.    Section 1818(i)

Enforcement Counsel asserts that Respondent Ortega should be assessed a first- and second-tier civil money penalty on the basis of his misconduct relating to the nonaccrual loan accounting.[797] The undersigned agrees that the statutory elements have been met. Respondent Ortega violated 12 U.S.C. § 161(a) by causing the Bank to file materially misstated Call Reports, which satisfies the requirement for a first-tier civil money penalty and the misconduct element of a second-tier civil money penalty.[798] Respondent Ortega's breach of his fiduciary duty of care in

---

[795] See EX 319 (2009 nonaccrual policy) at 11 ("It is FNB's intent to utilize cash basis nonaccrual accounting whenever it is applicable."); EX 328 (email chain including April 3, 2013 email from B. Staley to K. Doyle and C. Neal) ("Found out that when they converted to Jack Henry from ITI four or five years ago, Jack Henry's default was NA where all payments went to the principal balance. However, senior management at the time wanted the default to be cash basis NA where cash payments were going to principal and income. They had Jack Henry change the default.").

[796] EX 328 (email chain including April 3, 2013 email from R. Chansen to K. Alderson) at 3.

[797] See EC Br. at 109-112.

[798] See 12 U.S.C. §§ 1818(i)(2)(A)(i), 1818(i)(2)(B)(i)(I). Although the last Call Report alleged to have been signed by Respondent Ortega was submitted on July 30, 2012, see EX 371 (June 30, 2012 Call Report) at 1, more than five years prior to the commencement of this action, the undersigned agrees with Enforcement Counsel that "a capital overstatement in one Call Report carries through and continues in all subsequent Call Reports unless corrected," EC Br. at 110. Here, the Call Reports were not corrected, and the nonaccrual loan accounting practices were not addressed, until within the applicable limitations period, and the agency's 12 U.S.C. § 161(a) and breach of fiduciary duty claims were therefore timely asserted.

connection with this claim also suffices to justify a second-tier penalty.[799] In addition, the undersigned finds that Respondent Ortega's failure to address the Bank's improper nonaccrual loan accounting practices from 2009 through 2012, and his signing of multiple Call Reports during that time that he knew or should have known improperly recognized interest income on nonaccrual loans, constitutes a pattern of misconduct for purposes of Section 1818(i)'s second-tier "effect" element.[800] The undersigned will therefore recommend the assessment of first- and second-tier civil money penalties against Respondent Ortega with respect to Article V of the Notice.[801]

### D.     Other Accounting-Related Claims

Enforcement Counsel argues that the Bank's improper accounting in connection with the Capital Raise Loans and the sale of OREO during the relevant period also contributed to the material overstatement of capital on the Bank's Call Reports.[802] According to Enforcement Counsel, Respondents' failure to correct these practices, and their attestations as to the truth and accuracy of the materially misstated Call Reports, constituted violations of 12 U.S.C. § 161(a), breaches of their fiduciary duty of care, and unsafe or unsound banking practices that prejudiced depositors and for which Respondents demonstrated actionable culpability.[803] As with the nonaccrual loan accounting, Enforcement Counsel asserts that Respondent Ortega's misconduct in this regard merits the assessment of first- and second-tier civil money penalties.[804] The undersigned considers each aspect of these claims in turn, drawing upon the nonaccrual accounting

---

[799] *See* 12 U.S.C. § 1818(i)(2)(B)(i)(III).

[800] *See id.* § 1818(i)(2)(B)(ii)(I); *see also* Part VI.E *supra* at 76-88.

[801] It is unnecessary to determine whether Respondent Ortega recklessly engaged in unsafe or unsound banking practices or violated the January 2012 Consent Order in connection with the Bank's nonaccrual loan accounting, as the misconduct element of Section 1818(i) has already been satisfied. *See* EC Br. at 109, 111-112.

[802] *See* EC Br. at 96-98.

[803] *See id.* at 80-92, 100-109.

[804] *See id.* at 109-112.

analysis above and the prior sections on the Capital Raise Loans and the Bank's OREO lending practices where appropriate.

1.    Violation of 12 U.S.C. § 161(a)

It is Enforcement Counsel's position that the Bank's Call Reports from 2009 through 2013 were materially misstated as a result of improper accounting for the Capital Raise Loans and the sale of OREO and that Respondents would not have reasonably believed in the Call Reports' accuracy in this regard at the times they acted as signatories.[805]

With respect to the Capital Raise Loans, the undersigned agrees that the Call Reports overstated the Bank's regulatory capital to whatever extent proceeds of the Capital Raise Loans were downstreamed from the Holding Company during the two capital injections in 2009—an amount that the undersigned has found to be at least $3 million.[806] The undersigned also agrees that the overstatement of the Bank's Tier 1 regulatory capital on the Call Reports was qualitatively material for largely the same reasons as the overstatement of nonaccrual-related interest income discussed *supra*. And the undersigned finds that Respondents did not have a reasonable belief that Capital Raise Loan proceeds could properly be treated as "new" capital for the Bank, something both Respondents knew had happened to at least some degree.[807] Taken together, this is grounds for a finding that Respondents violated 12 U.S.C. § 161(a).

With respect to the OREO lending practices, it is not quite as straightforward, but the conclusion is the same. The undersigned has already credited the testimony of Enforcement

---

[805] *See id.* at 80-85 (Capital Raise Loans), 85-92 (OREO).

[806] *See* Part VI.C.6 *supra* at 41-42.

[807] *See* Rogers Tr. 328:13-20 ("Q: You have indicated that the Board of Directors approved the plan to extend bank loans to investors to buy FNBG stock and then downstream those same funds back to the bank as Tier 1 capital, correct? A: [T]hat's basically what happened, yes, ma'am."); Ortega Tr. 493:15-17 ("I would say that some of the stock, some of those loans actually came back to the Bank."); EX 569 (Ortega Dep.) at 34:24-35:4 (agreeing that the Bank "[made] loans that the borrower would then use the proceeds of the loan to purchase stock in the bank holding company and the bank holding company would then downstream the funds back to [the Bank]").

171

Counsel's accounting expert and found that the Bank improperly accounted for its OREO sales over the relevant period by failing to discount loans with below-market interest rates to their present value of future cash flows, something that artificially overstated the Bank's earnings and its capital.[808] As with the nonaccrual loan accounting and the treatment of Capital Raise Loan proceeds as regulatory capital, this artificial overstatement was qualitatively material.

And while it is a closer call whether Respondents could have had a reasonable belief that the accounting for OREO sales was correct at the time they signed the Call Reports, given the volatility of the market and the subjectivity of market rates, the undersigned finds that the MRAs in 2009 and 2011,[809] in conjunction with the Bank's own Market Rate Matrix, should have alerted Respondents that the Bank was not sufficiently discounting its OREO loans based on present value calculations even after the "superficially corrective measures" taken by the Bank.[810] Thus, Respondent Ortega, at least, should have known that the Bank was still not accounting for below-market interest rates on OREO loans correctly when he attested to the opposite in the June 30, 2012 Call Report—and Enforcement Counsel amply describes why both Respondents should have known the OREO accounting was not correct during this period.[811]

### 2.  Breach of Fiduciary Duty and Unsafe or Unsound Practices

Because the undersigned finds that Respondents violated 12 U.S.C. § 161(a) with respect to the Bank's Capital Raise Loan and OREO accounting practices, it is unnecessary to also decide

---

[808] *See* Part VI.D.8 *supra* at 70-75.

[809] *See* JX 2 (2009 ROE) at 12 (finding that the Bank had failed "to properly account for OREO financing" and directing the Bank "to review each sale of OREO and determine if proper accounting has been applied," and then take appropriate discounts); JX 4 (2011 ROE) at 47-48 (finding that the Bank had financed $309 million in OREO loans with below-market rates from 2008 to November 2011); *see also id.* at 81 (stating that "[t]hese transactions occurred over several Call Report reporting periods and appropriate losses should have been recognized"); *see also* Part VI.D.8 *supra* at 70-73.

[810] EPF ¶ 461; *see also* Part VI.D.8 *supra* at 71-72 (describing limits to corrective measures taken after 2009 ROE); Salvato Tr. 1853:12-1863:25 (explaining why the $4.8 million adjustment taken by the Bank following the 2011 ROE was inadequate and unjustified).

[811] *See* EC Br. at 85-91.

whether Respondents' conduct as to the accounting in particular constituted a breach of their fiduciary duties of care or actionably unsafe or unsound banking practices.

### 3.     Effect

Enforcement Counsel maintains that the overstatement of Bank capital as a result of the improper Capital Raise Loan and OREO accounting practices prejudiced the interests of the Bank's depositors for the same reasons that they were prejudiced by the improper interest income recognition on nonaccrual loans.[812] The undersigned's conclusions here mirror her conclusions on that issue—Enforcement Counsel has not met its burden on the effect element because it has not demonstrated that depositors were prejudiced in the ways that it asserts.[813]

### 4.     Culpability

Enforcement Counsel's arguments for why Respondents' Capital Raise Loan and OREO accounting-related misconduct constituted willful and continuing disregard for the Bank's safety and soundness—and, as to the Capital Raise Loan accounting, personal dishonesty—are premised on the same foundations as its culpability arguments on the underlying lending-related claims.[814] It contends, for example, that the Bank's failure to account for these items correctly was an "important part[] of Respondents', and the other members of senior management's, efforts to mask the Bank's deteriorating financial condition."[815] But, as the undersigned has already concluded,

---

[812] *See* EC Br. at 106-108.

[813] *See* Part VII.C.4 *supra* at 163-166; *see also* RX 52 (email chain including March 25, 2014 email from H. Thompson to R. Chansen et al.) (stating that "the 'Nonaccrual Issue' and *'OREO MRA Issue'* had no impact on the type or timing of any enforcement action nor any impact on the eventual timing of the bank's close") (emphasis added); RX 37 (April 17, 2014 Material Loss Review of First National Bank conducted by the Office of the Inspector General of the Department of the Treasury) at 12 (discussing the treatment of Capital Raise Loan proceeds as Tier 1 regulatory capital and stating that even if $26 million—more than the $17 million calculated by NBE Chansen—had been improperly downstreamed and had to be excluded from the Bank's capital levels, "[a]ccording to OCC officials, . . . this exclusion from Tier 1 capital would not have had a significant impact on First National's ratings or the OCC's enforcement actions at that time").

[814] *See* EC Br. at 103-106.

[815] *Id.* at 103-104.

there is substantial evidence that Respondents did not engage in the underlying misconduct with a culpable state of mind.[816] As the similarity of Enforcement Counsel's arguments in each case suggests, this conclusion applies with equal force to the associated accounting claims.

###### 5.    Section 1818(i)

It verges on overkill, at this point, to find that the elements for the assessment of first- and second-tier civil money penalties against Respondent Ortega have been satisfied with respect to these claims, as they have been for nonaccrual loan accounting and (albeit for second-tier only) for the Capital Raise Loans and OREO lending-related misconduct. Nevertheless, Respondent Ortega's violation of 12 U.S.C. § 161(a) over the course of several Call Reports, the effect of which continued into the five-year limitations period window, was a pattern of misconduct sufficient to meet the standard for first- and second-tier civil money penalty assessments under Section 1818(i) here as well.

#### E.    Loans to Rogers III Entities

Enforcement Counsel argues that Respondent Rogers breached his fiduciary duty of loyalty to the Bank by failing to ensure that the Bank Board and L&D Committee were aware of all material information regarding the loans approved in April 2009 and January 2010 to Griqualand and Petro Icon, newly formed entities owned by his son.[817] The undersigned agrees that the statutory elements for a prohibition order and the assessment of a second-tier civil money penalty against Respondent Rogers have been satisfied here.

###### 1.    Misconduct

The circumstances surrounding the Griqualand and Petro Icon loans have been described in detail in Part VI.F *supra*, but to sum up: Respondent Rogers received information that his son

---

[816] *See* Parts VII.A.4 and VII.B.4 *supra* at 120-131, 146-152.
[817] *See* EC Br. at 113-116.

was arranging to resolve financial and legal difficulties facing his company Obra Homes by defaulting on loans to the Bank that he had personally guaranteed, having the Bank foreclose on the properties securing those loans, and then repurchasing those properties via Bank loans to new entities that he owned, this time without a personal guarantee. Respondent Rogers understood that such an arrangement would or could be harmful to the Bank, because it would leave the Bank more exposed in the event of the loans' default. Respondent Rogers also knew or should have known that the loan packages recommending the loans to the newly formed entities did not mention Obra Homes or its financial difficulties and went out of the way to avoid identifying his son as the owner of those entities. Yet despite this knowledge, Respondent Rogers did not take any steps to ensure that the other L&D Committee members understood that the properties were being resold to the same individual from whom they had just been foreclosed, but on less favorable loan terms. Instead, Respondent Rogers was silent as the Committee approved the loans.

As a director and officer, Respondent Rogers owed the Bank a fiduciary duty of loyalty that required him "to avoid conflicts of interests and to act solely for the [Bank's] benefit."[818] Furthermore, "[a] crucial component of the duty of loyalty is the duty of candor,"[819] which requires these individuals "to disclose all material relevant to [bank] decisions from which they may derive a personal benefit."[820] Indeed, "[o]missions are sufficient to trigger a violation of this duty"[821]— the duty of candor obliges fiduciaries to disclose to the bank everything they know about

---

[818] *Ellsworth*, 2016 WL 11597958, at *15; *see also Smith and Kiolbasa*, 2021 WL 1590337, at *27 (duty of loyalty requires IAPs "to put the interests of the bank before their own").

[819] *Smith and Kiolbasa* at *27 (internal quotation marks and citation omitted).

[820] *Williams*, 2015 WL 3644010, at **8-9 (internal quotation marks and citation omitted); *accord Ellsworth*, 2016 WL 11597958, at *15.

[821] *Smith and Kiolbasa* at *27.

transactions in which they hold a personal financial (or familial) interest, "even if not asked."[822] Simply abstaining from voting on the transaction in question is not enough.[823]

Here, Respondent Rogers failed to put the Bank's interests above the interests of his son when he allowed the L&D Committee to approve the Griqualand and Petro Icon loans without disclosing his son's involvement and the circumstances of the Obra Homes defaults, or at least making sure that Committee members were suitably apprised. The email forwarded to Respondent Rogers by his son—which he indisputably received, read, and understood—described a company in disarray. Obra was the subject of eighteen pending lawsuits, most of them over debts on which it was "unlikely to win."[824] The prospect of large judgments against the company was increasingly imminent. Rogers III's attorney expressed concern that Obra would be placed into receivership to satisfy its legal obligations, which in turn might prompt "an investigation of Obra's assets to determine whether past transactions benefitted the company or whether they could be deemed fraudulent transfers."[825] Rogers III was at risk of a "total loss of control of Obra and its assets."[826] It is with this backdrop that his attorney proposed the scheme to strip the company of anything of value to evade its creditors, with the goal of repurchasing the foreclosed assets from the Bank under a new company name and under more favorable terms to Rogers III.[827]

---

[822] *In the Matter of Michael Sapp*, Nos. 13-477e & 13-478k, 2019 WL 5823871, at *14 (Sept. 17, 2019) (FDIC final decision) (internal quotation marks and citation omitted).

[823] *See In the Matter of Neil M. Bush*, No. AP-91-16, 1991 WL 540753, at *7 (Apr. 18, 1991) (OTS final decision) ("The director's recusal must be accompanied by disclosure of the nature and extent of the conflicting interest and the facts known to the director as to the matter under consideration by the board.").

[824] EX 269 (Yollick email) at 1.

[825] *Id.*

[826] *Id.*

[827] *See id.* ("strongly" urging Rogers III to consider the option "of working with the banks to ensure swift foreclosure . . . and possible marketing agreements with RBC and FNB so that you may maintain control of Obra's assets, maximize your chance of eliminating your personal liability to RBC and FNB, and end your payment of personal assets into Obra's coffers"); *see also id.* (adding that Rogers III "could even have an arrangement with the banks to repurchase the assets in another corporation after foreclosure . . . in order to market them").

The picture painted by the email was serious enough that Respondent Rogers—who testified that he stayed entirely away from his son's business dealings[828]—contacted his son after receiving it to exhort him repeatedly to "protect the Bank."[829] And although Rogers III gave his father assurances that the Bank would be protected, Respondent Rogers should have been vigilant when, two months later, the Bank foreclosed on the Obra Homes collateral, thereby releasing Rogers III from his personal guarantee and signaling that the scheme outlined in the email had been set into motion.[830] Even if he did not deem it essential to act before this, the fact that the L&D Committee was then presented with a loan package for purchasing that collateral that contrived to give the misleading impression that a different individual was the driving force behind Griqualand should have alerted Respondent Rogers to the possibility that Committee members did not have all of the necessary information to evaluate the proposed transaction.[831] There can be no question that Respondent Rogers understood that his son owned Griqualand; he would not have abstained otherwise. But mere abstention was not sufficient to discharge his fiduciary duty—at the very least, as Enforcement Counsel notes, "[t]he fact that Rogers III and Obra Homes were encountering numerous lawsuits and possible bankruptcy calls into question . . . his ability as a real estate developer" as well as his creditworthiness,[832] considerations that would be pertinent to the L&D Committee's decision whether to extend a $3.2 million loan to him collateralized with OREO property and with no personal guarantee.

---

[828] *See* Rogers Tr. 405:19-22 ("I stayed so far away from my son's business. . . . I didn't lobby for him. I didn't lobby against him. I just stayed away from him.").

[829] *See id.* 403:14-16 ("I was, at the time, very concerned about it. I told him whatever he did, he must protect the bank."), 406:22-23 ("I do remember distinctly telling him several times, son, you must protect the bank.").

[830] *See* EX 288 (Obra Homes case history).

[831] *See* EX 349 (Griqualand L&D ratification package) at 5 (identifying Roland Drake as the person who "developed the concept for Griqualand," formed the company, and served as its managing director).

[832] EC Br. at 115; *see also* Chansen Tr. 1525:21-22 (opining that the information in the Yollick email would have been "material to future lending decisions involving Mr. Rogers III").

Moreover, the information in the email remained relevant even after the Griqualand loan was approved, and Respondent Rogers had multiple other opportunities to ensure that Committee members were fully apprised. The January 2010 loan package for Petro Icon again obscured Rogers III's identity as that company's sole owner, something that Respondent Rogers should have noticed and addressed.[833] As before, there is no doubt that Respondent Rogers was aware of his son's ownership of Petro Icon, because he was receiving bi-weekly updates on the status of Bank loans to Petro Icon, Griqualand, and Obra Homes.[834] And while the loan package for the Griqualand loan's renewal in June 2011 did state that Rogers III owned "100%" of that company, the fact that the terms of the renewal still did not include a personal guarantee should have prompted Respondent Rogers to speak up and disclose the information that he possessed regarding his son and the defaulted Obra Homes loans, rather than simply abstaining again.[835]

Respondents argue that the Bank ultimately received a personal guarantee from Rogers III on the Griqualand loan and that "the loan performed in the interim,"[836] but this misses the point in several respects. First, there is no evidence that a personal guarantee was indeed obtained, however belatedly; the record reflects that the Bank was in the process of securing a guarantee in May 2013, but does not confirm its consummation.[837] Second, Respondents do not assert that a personal guarantee was ever made in connection with the Petro Icon loans, and so those loans presented

---

[833] *See* EX 314 (Petro Icon L&D ratification package) at 3 ("Petro Icon, L.L.C. is a Texas limited liability company that was formed by Chris Owens, Managing Director and others as a means for experienced real estate investors to pool their knowledge into investments in the Texas economy and in Texas real estate. . . . Through business contacts he developed in Montgomery County – and through his experience as a businessman – Chris developed the concept for Petro Icon, L.L.C.").

[834] *See* EX 270 (email chain including March 1, 2010 email from E. Martinez to C. Brockman attaching document with principal balances and stating that "[t]his is the recap Janie sends [to Respondent Rogers] every other week. It will list the different relationships."); EX 271 (showing outstanding principal balances for loans to Obra Homes, Griqualand, and Petro Icon as of February 18, 2010).

[835] EX 489 (Griqualand L& D renewal package including April 19, 2011 memorandum re Griqualand) at 6; *see also id.* at 9 (noting that one weakness of the loan was "[l]ack of guarantors").

[836] Rs Reply at 7 (emphasis omitted).

[837] *See* Part VI.F.5 *supra* at 102; *see also* EX 290 (May 1, 2013 email from M. Magee to S. Ortega et al.).

increased risk to the Bank in any event.[838] Third, any personal guarantee that the Bank may have received on the Griqualand loan in 2013 would not relieve Respondent Rogers of the obligation, in 2009 and 2011, to disclose information material to that loan's approval and renewal. Nor is it particularly relevant, for purposes of determining that Respondent Rogers breached his fiduciary duty of loyalty, whether or not the Griqualand loan performed and for how long—Respondent Rogers testified that the arrangement proposed in the February 2009 email would not be in the Bank's best interests, and yet he chose to elevate his son's interests over those of the Bank.[839] Respondent Rogers did not ensure that Bank management was aware of information regarding a transaction in which he had a personal interest that would foreseeably increase the risk to the Bank, and this constitutes a breach of his fiduciary duty.

2.    Effect

Enforcement Counsel has offered evidence that the Bank recorded a $432,000 loss on the Griqualand loan on September 13, 2012, and that the receivership also suffered an $88,000 loss on the loan through a loss-sharing agreement with PlainsCapital following the Bank's failure.[840] Additionally, the receivership recorded a combined post-failure loss of $170,978 with respect to the Petro Icon loans under the same loss-sharing agreement.[841] For the reasons below, these losses occurred "by reason of" Respondent Rogers's breach of his fiduciary duty of care.[842] The effect element of 12 U.S.C. § 1818(e) as to this claim is therefore satisfied.

---

[838] *See* EPF ¶¶ 657-658.

[839] *See* Rogers Tr. 405:23-406:5 ("Q: You testified earlier that this proposal would not be in the best interest of the bank, correct? A: I wouldn't think it would be good for the bank, but I don't know what the circumstances were. I don't know why they would go through that process. I just left it alone."); *see also* Ortega Tr. 703:22-704:7 (agreeing that the lack of a personal guarantee had the potential to "put the Bank in a much worse condition").

[840] *See* EPF ¶¶ 649-650; Locke Tr. 2028:1-22.

[841] *See* EPF ¶ 660.

[842] 12 U.S.C. § 1818(e)(1)(B).

Respondents make several arguments in response. To begin with, they argue that the September 2012 loss on the Griqualand loan occurred more than five years prior to the commencement of this action and thus cannot serve as the basis for a timely asserted claim.[843] They then contend that the loans otherwise performed the entire time they were on the Bank's books, meaning that the lack of a personal guarantee was ultimately immaterial and could not have caused loss to the Bank.[844] Finally, Respondents assert that losses that occurred post-closure were "taken by the FDIC not the Bank" and simply represent the agency's "unilateral decisions to book losses" on dates that it chose rather than any actual loss incurred by these specific loans.[845]

These arguments fall short. While Respondents are correct that a claim predicated on the loss recorded on September 13, 2012 would not be timely, the post-closure losses occurred within five years of the Notice. Even if one were to disregard the Griqualand losses under the reasoning that a claim on that loan first accrued outside the limitations period—a conclusion that would likely be contrary to the Comptroller's interpretation of 12 U.S.C. § 2462, as discussed *supra*—there was no loss recorded on the Petro Icon loans until after the Bank's failure, and Respondent Rogers's failure to disclose material information regarding his son's business dealings in advance of those loans' approval is a separate, and separately accruing, breach of fiduciary duty than for the Griqualand loan, rendering the Article VI claim timely regardless.

This is so because financial loss suffered by the FDIC as receiver for a failed institution must constitute loss to that institution for purposes of Section 1818's effect prongs, as long as that loss is caused by misconduct occurring prior to the institution's failure. Any other result would, as Enforcement Counsel asserts, "allow an IAP to commit flagrant violations of the law yet be

---

[843] *See* Rs Br. at 59.
[844] *See* Rs Reply at 36-37.
[845] *Id.* at 37.

immune from consequences if his or her misconduct is sufficiently bad to render the bank into receivership before a regulator could act."[846] Further, Respondents' broad statement that it is "the FDIC" as an agency that records post-failure losses to the receivership is incorrect as a matter of law—as stated earlier,[847] the FDIC as receiver is a separate and legally distinct entity from the FDIC in its corporate capacity, and one that is empowered to take over the rights, assets, and obligations of the failed institution, perform its functions, and wind up its affairs in an orderly fashion while maximizing recovery for the receivership and its creditors (including the Deposit Insurance Fund).[848] Ms. Locke's testimony indicates that loss sharing agreements are one tool used by the FDIC as receiver to induce an acquiring institution to assume the failed institution's assets, including its loan portfolio, and ensure minimal disruption for the failed institution's depositors and borrowers.[849] Respondents' argument that the loans in question performed up until a loss was booked by the receivership is therefore largely beside the point: losses recorded by the receiver are no less "real" than losses recorded by the Bank, and the receiver was legally obligated under the loss sharing agreement to take a loss on these (and other) loans when, and to the extent that, PlainsCapital determined that a writeoff was appropriate.[850]

### 3.    Culpability

The undersigned also finds that, by failing to disclose information that would have been material to the Bank's lending decisions regarding his son, Respondent Rogers acted with willful

---

[846] EC Br. at 10.

[847] See Part VII.B.3 supra at 144 n. 677.

[848] See 12 U.S.C. § 1821(d).

[849] See Locke Tr. 2017:7-14 ("[W]hen a purchase [and] assumption agreement includes a shared loss agreement, the shared loss agreement will provide for the FDIC to share losses that the assuming institution may ultimately experience during a defined period of time as well as any upsides or recovery of losses that the assuming institution experiences.").

[850] See id. 2018:6-10 ("[T]he shared loss agreement that was executed as part of the purchase and assumption agreement required the FDIC to share in losses less recoveries of 80 percent of the amount.").

disregard for the safety and soundness of the Bank. Respondent Rogers understood that the scheme described in the February 2009 email would expose the Bank to risk by removing Rogers III's personal guarantee, and he had reason to believe that the L&D Committee did not have all the details about the circumstances surrounding the proposed loans to Griqualand and Petro Icon. Respondent Rogers was aware that the L&D Committee was considering lending to newly formed companies owned by an individual whose previous company had been the subject of eighteen lawsuits and who chose to default on Bank loans in order to empty that company of its assets. He was further aware that the loan packages did not identify his son as the sole owner of the new companies or provide any information or context about his financial condition. He knew that the new loans would place the same collateral back in his son's hands while removing any personal guarantee. Rather than ensure that Committee members were fully informed about the risks of these loans, however, Respondent Rogers was willing to turn a blind eye to the Bank's interests and say nothing. This is the quintessence of willful disregard.

Respondents argue that the Griqualand and Petro Icon loans, like the Bank's other OREO loans, were simply "the result of lenders and the lending department . . . making the best decisions they could to deal with the growing OREO of the Bank during the global financial crisis."[851] But the difference between these loans and other Bank loans to finance the sale of OREO is clear— there is undisputed evidence here that Respondent Rogers believed that the specific arrangement proposed in the email to his son would not be in the Bank's best interests, and yet he took no substantive steps to prevent the arrangement from occurring or otherwise act upon that belief. It may be, as Respondents contend, that Respondent Rogers felt "that by abstaining from the vote on the L&D Committee, staying out of it, and allowing lenders Brockman and Martinez to handle the

---

[851] Rs Reply at 35.

loans without influence from him," he was doing "what he thought was right."[852] This is no defense, however. It was a clear and improper abdication of responsibility for Respondent Rogers to rely on his son's assurances that the Bank would not be harmed by the scheme, when he recognized that—unlike he himself—his son had no duty to the Bank at all.[853] If Respondent Rogers truly believed that staying silent in the face of a known risk to the Bank was the right thing to do, then he is just as culpable as if his silence was complicit.[854]

### 4.    Section 1818(i)

Respondent Rogers breached his fiduciary duty of loyalty in a way that caused more than minimal loss to the Bank, thus satisfying the elements for a second-tier civil money penalty assessment under 12 U.S.C. § 1818(i).[855] The undersigned need not decide additionally whether Respondent Rogers's conduct with respect to the Griqualand and Petro Icon loans constitutes an actionable pattern of misconduct for purposes of the statute.

### F.    Civil Money Penalties

Before assessing a civil money penalty, the federal banking agencies are bound to consider the appropriateness of the amount being assessed in light of five mitigating factors: (1) the size of the respondent's financial resources; (2) the respondent's good faith; (3) the gravity of the respondent's violation; (4) the history of any previous violations; and (5) "such other matters as justice may require."[856] With respect to the $250,000 civil money penalty sought by the OCC

---

[852] *Id.*

[853] *See* Rogers Tr. 437:17-18 ("I would think that the duty would be to himself to protect himself."); *see also* Part VI.F.2 *supra* at 94.

[854] Because the undersigned has concluded that Respondent Rogers acted with willful disregard for the Bank's safety and soundness in connection with the Griqualand and Petro Icon loans, it is unnecessary to also determine whether he acted with continuing disregard or personal dishonesty within the meaning of 12 U.S.C. § 1818(e). *See* EC Br. at 116-118.

[855] *See id.* at 118-119.

[856] 12 U.S.C. § 1818(i)(2)(G).

against each Respondent in this matter, Enforcement Counsel has made a submission adverting to these factors and to the thirteen interagency factors that financial institution regulatory agencies must also weigh in conjunction when determining a civil money penalty amount.[857] Considering Enforcement Counsel's submission, assessing the relevant factors, and for the reasons given below, this Tribunal recommends to the Comptroller that $250,000 is an appropriate monetary penalty for each Respondents' misconduct in this case.

The purpose of a civil money penalty "is to deprive the violators of any financial benefit derived as a result of the violations, provide a sufficient degree of punishment, and [act as] an adequate deterrent to the respondents and others from future violations of banking laws and regulations."[858] The interagency guidance regarding the assessment of civil money penalties further states that "in cases where the violation, practice, or breach causes quantifiable, economic benefit or loss," a civil money penalty amount that merely recompenses the loss or strips the violator of their benefit will be insufficient "to promote compliance with statutory and regulatory requirements."[859] Rather, "[t]he penalty amount should reflect a remedial purpose and should provide a deterrent to future misconduct."[860] The undersigned will address each of the five mitigating factors in turn, bearing in mind the punitive, deterrent, and remedial goals that civil money penalties are intended to achieve.

---

[857] *See* EC Br. at 119-123 (in support of the $250,000 CMP assessments). Respondents did not directly address the statutory mitigating factors or the appropriateness of the civil money penalty amount in their posthearing briefing, beyond taking the broad position that no civil money penalty in any amount was appropriate. *See* Rs Reply at 38 (stating that this Tribunal "should decline to impose either a civil money penalty or a prohibition").

[858] *In the Matter of Richard D. Donohoo and Craig R. Mathies*, Nos. 92-249c & b *et seq.*, 1995 WL 618673, at *27 (FDIC final decision); *see also Long v. Bd. of Gov. of the Fed. Res. Sys.*, 117 F.3d 1145, 1154 (10th Cir. 1997) (civil money penalties provide banking agencies with "the flexibility [they] need[] to secure compliance" with the relevant banking laws and to "serve as deterrents to violations of laws, rules, regulations, and orders of the agencies") (internal quotation marks and citation omitted).

[859] Civil Money Penalties Interagency Statement, OCC Bulletin No. 98-32, 1998 WL 434432, at *2 (adopting Federal Financial Institutions Examination Council's Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies (June 3, 1998)) ("Interagency CMP Policy").

[860] *Id.*

1.    <u>Respondents' Financial Resources</u>

The Parties have jointly stipulated that "Respondents each individually possess the financial resources and ability to pay the proposed $250,000 civil money penalties."[861] This factor therefore does not warrant mitigation of the penalty amounts sought in this matter.

2.    <u>Respondents' Good Faith</u>

The mitigating factor of good faith, in the undersigned's view, encompasses both good faith shown (or not shown) in the course of a respondent's misconduct as well as any showing of good faith made by a respondent, for example through willing cooperation or genuinely expressed regret and responsibility for their actions, during the agency's investigation and the enforcement proceedings themselves. Such an interpretation provides an incentive for respondents to be forthcoming and cooperative through the investigative and enforcement process. That interpretation also lessens the duplicative effect that a finding of personal dishonesty or willfulness or a conscious engagement in misconduct might otherwise have on this mitigating factor— otherwise, no showing of good faith sufficient to mitigate an assessed penalty could ever be made in most cases before this Tribunal.

Here, the undersigned has found that there is substantial evidence and credible testimony that Respondents were acting in good faith with respect to the Capital Raise Loans and OREO lending strategy issues, but not with respect to nonaccrual loan accounting and the loans to the entities owned by Respondent Rogers's son. As for good faith during the enforcement process, the undersigned finds that Respondents have been reasonably candid and cooperative in the course of these proceedings, except to the extent that they have sought to minimize their misconduct in connection with the nonaccrual loan accounting and (for Respondent Rogers) the Griqualand and

---

[861] Joint Stip. ¶ 10.

Petro Icons loans. In particular, the undersigned notes that Respondent Ortega's testimony on the Bank's accounting for nonaccrual loans repeatedly and misleadingly framed this issue in terms of when it was proper for the Bank to place loans on nonaccrual status, the determination of which the agency is not contesting here, rather than whether loans that had been placed on nonaccrual should be accounted for by default using cash basis to recognize interest income.[862] Thus, on balance, Respondents' good faith is not a significant mitigating factor.

### 3.     Gravity of the Violation

Enforcement Counsel argues that the gravity of Respondents' misconduct was substantial, given "[t]he duration and the frequency of the misconduct" and the fact that the violations caused losses to the Bank, the receivership, and—through the unjustified provision of new monies in loans financing the sale of OREO—the Deposit Insurance Fund.[863] Enforcement Counsel highlights the approval and ratification of the NAHS loan and other large OREO loans without adequate documentation of the borrowers' finances and repayment ability as especially egregious.[864] The undersigned agrees that the gravity of the violations is significant, most notably Respondents' ongoing failure to correct the Bank's blanket practice of improper nonaccrual loan accounting despite being directed again and again to do so by examiners and the Bank's internal auditor over the course of years.[865] The undersigned accordingly finds that there is nothing about the gravity of the proven violations that would warrant mitigation of the civil money penalty amount.

---

[862] *See, e.g.*, Ortega Tr. 775:2-8 ("Q: I'm specifically asking about your system. It was set up so that nonaccrual loans would be treated as cash basis, correct? A: It was set up if there was – once they go to the – where they're past due more than 90 days, it will go to nonaccrual automatically, yes.").

[863] EC Br. at 121. Enforcement Counsel notes that these considerations apply to interagency factors 2 (duration and frequency of misconduct) and 6 (degree of loss to the institution) as well. *See id.*; *see also* Interagency CMP Policy, 1998 WL 434432, at *2.

[864] *See* EC Br. at 121-122. The undersigned does not credit Enforcement Counsel's additional assertion that "the gravity of the Call Report violations were significant because they enabled the Bank to avoid 'critically undercapitalized' status for at least two quarters," in light of her earlier finding that Enforcement Counsel had not met her burden in that regard. *Id.* at 122.

[865] *See* Part VI.E *supra* at 76-89.

4.     History of Violations

Enforcement Counsel states that "there is no evidence of a history of previous violations and no evidence that Respondents were previously criticized for similar actions by the OCC."[866] This criterion thus serves as a potential mitigating factor for the civil money penalty amount.

5.     Such Other Matters as Justice May Require

Enforcement Counsel acknowledges that "Respondents made significant personal investments into the Bank during the 2009 capital raise, which demonstrates some effort to legitimately rehabilitate the Bank."[867] To this the undersigned would add the substantial evidence and credible testimony that, in connection with both the capital raise and the Bank's efforts to divest itself of a growing flood of OREO, Respondents were acting in good faith and with the best interests of the Bank in mind, at the height of the financial crisis, in a difficult position without any clear solutions.[868] The undersigned also credits the testimony of Respondent Ortega and Mr. Leal regarding the efforts made by Respondent Ortega, at great personal cost to his own health, to address issues raised by regulators in late 2012 and early 2013.[869] Nevertheless, the undersigned finds that the sustained nature of the nonaccrual loan accounting violations in the face of years of regulator warnings, as well as the negligence displayed with the Capital Raise Loans and the approval of too-risky concessionary OREO financing, outweighs these considerations, making a $250,000 civil money penalty appropriate as to each Respondent.

## VIII.  **Conclusion and Recommended Orders**

For all of the reasons above, the undersigned finds that the statutory elements of 12 U.S.C. § 1818(e) have been met in this action as to certain of the claims set forth in the Notice, but not as

---

[866] EC Br. at 122.

[867] *Id.* (emphasis omitted).

[868] *See* Parts VII.A.4 and VII.B.4 *supra* at 120-131, 146-152.

[869] *See* Part VI.G *supra* at 105-106.

to others. Specifically, a preponderance of the evidence reflects that (1) Respondents' actions in connection with the Capital Raise Loans (Article III) and the OREO Lending Strategy (Article IV) constituted unsafe or unsound practices and a breach of their fiduciary duty of care that caused loss to the Bank, but that Respondents did not demonstrate actionably culpable states of mind;[870] (2) Respondents' actions in connection with the Nonaccrual Loan Accounting (Article V) violated 12 U.S.C. § 161(a) and breached Respondents' fiduciary duty of care in a way that demonstrated continuing disregard for the safety and soundness of the Bank, but that Enforcement Counsel did not meet its burden on showing that this misconduct caused depositor prejudice; and (3) Respondent Rogers's actions in connection with the Griqualand and Petro Icon loans (Article VI) constituted a breach of his fiduciary duty of loyalty which caused loss to the Bank, and which Respondent Rogers undertook with willful disregard for the Bank's safety and soundness. Furthermore, for purposes of 12 U.S.C. § 1818(i), the undersigned finds that the statutory elements have been met as to all claims. In accordance with 12 C.F.R. § 19.38, the undersigned therefore recommends that the Comptroller enter a prohibition order against Respondent Rogers and assess a second-tier civil money penalty in the amount of $250,000 against each Respondent in consequence of their misconduct. The record of this proceeding will be transmitted to the Comptroller in conjunction with this Recommended Decision, as well as a certified index of the administrative record and an index of exhibits.

**SO ORDERED.**

September 30, 2022

*Jennifer Whang*

_____
Jennifer Whang, Administrative Law Judge
Office of Financial Institution Adjudication

---

[870] For the accounting-related claims of Articles III and IV, Enforcement Counsel demonstrated a violation of 12 U.S.C. § 161(a) for the misconduct element, but not effect or culpability.

**CERTIFICATE OF SERVICE**

On September 30, 2022, I served a copy of the foregoing **Order** upon the following individuals via email:

Hearing Clerk
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC 20219
hearingclerk@occ.treas.gov

Enforcement Counsel:

Susan C. Bowman
Lawrence J. Keen, III
Christopher D'Alessio
Nathan Taran
Erin Healy Gallagher
Michael Laurino
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC 20219
susan.bowman@occ.treas.gov
larry.keen@occ.treas.gov
christopher.dalessio@occ.treas.gov
nathan.taran@occ.treas.gov
erin.healygallagher@occ.treas.gov
michael.laurino@occ.treas.gov

Respondents' Counsel:

Frank C. Brame
The Brame Law Firm P.C.
4514 Cole Avenue, Suite 600
Dallas, TX 75205
(214) 665-9464
frank@bramelawfirm.com

Bill Sims
4234 Shorecrest Drive
Dallas, TX 75209
(214) 458-6970
bsims1119@gmail.com

_____
Jason Cohen, Esq.
Office of Financial Institution Adjudication
3501 N. Fairfax Drive, Room D-8111
Arlington, VA 22226-3500
jcohen@fdic.gov
(571) 216-5308

# EXHIBIT C

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
|   President, Chief Executive Officer, and | ) | |
|   Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

## RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT

Under 12 C.F.R. 19.39 and 19.40, Respondents Saul Ortega and David Rogers, Jr. ("Respondents") file these Exceptions to the Administrative Law Judge's Recommended Decision, Supporting Brief, and Request for Oral Argument.

## EXCEPTIONS

Respondents bring the following exceptions to the Recommended Decision of the Administrative Law Judge ("ALJ") dated September 30, 2022, and the ALJ's findings, conclusions, proposed order, the admission or exclusion of evidence, and the failure of the ALJ to make a ruling proposed by a party. These exceptions are based on the accompanying brief, the record in the proceeding, and any other written or oral argument that may be presented to the Comptroller.

1.    The charges against Respondents are barred by the statute of limitations contained in 28 U.S.C. § 2462.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S**
**RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL**
**ARGUMENT – Page 1**

2.      This proceeding was conducted in violation of the Respondents' right to a trial by jury.

3.      This proceeding was conducted in violation of the Appointments Clause of the United States Constitution, as well as the Due Process Clause, Separation of Powers, the Take Care Clause, and applicable statutes governing ALJs.

4.      ALJ McNeil, who was an unauthorized actor and not appointed consistent with the Constitution, made rulings striking Respondents' pleadings and evidence – including evidence that McNeil's own department head, Treasury, took over Fannie Mae and Freddie Mac and destroyed their preferred stock (after having encouraged the investment) causing a $174 million loss to the Bank from which it could not recover.  At trial, ALJ Whang felt bound by these unconstitutional rulings and prohibited Respondents from presenting a full and complete defense, which violated the Appointments Clause, the Due Process Clause, the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

5.      The ALJ's pretrial orders contain errors of fact and law and violated the Administrative Procedure Act and the Uniform Rules of Practice and Procedure.

6.      The ALJ prohibited Respondents from testifying as experts even though they were designated timely and submitted reports.

7.      Meanwhile, the ALJ allowed the OCC's surprise witness, Michael Brickman, to testify as an expert even though he was not designated timely, did not provide a report, and was not disclosed on the witness list.  Mr. Brickman was also permitted to opine on market interest rates despite having no expertise in the area and not having conducted any analysis on the topic or providing any reports or other analyses in advance

of trial.  In addition, OCC witnesses were permitted to testify as to fiduciary duty with no legal training and no legal expertise in such matters.

8.     The ALJ denied Respondents' Motion to Exclude Mary Jane Locke as a trial witness even though she was not disclosed timely.

9.     The ALJ granted the OCC's pretrial motion to exclude relevant evidence at the hearing, including presentation of the Fannie Mae/Freddie Mac preferred stock issue.

10.     The ALJ prohibited Respondents from calling Andrew Moss, an OCC employee, as a witness.

11.     The ALJ admitted and considered certain OCC exhibits that were improper and inadmissible.  The ALJ admitted and considered exhibits that were hearsay and/or were used solely for impeachment or refreshing recollection, contrary to applicable law.  This included transcripts for depositions where the Respondents were not notified and allowed to attend and cross-examine.  This violated the Due Process Clause, the right to confront witnesses against the accused, the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

12.     The ALJ excluded certain exhibits of Respondents that were highly relevant.

13.     The ALJ refused to allow offers of proof for evidence that was excluded from the record at trial, depriving the Respondents and the reviewing court the opportunity for meaningful judicial review.  This violated the Due Process Clause, the Separation of Powers, the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 3**

14. The parties were ordered to give advance disclosure of exhibits and page numbers for each witness. While Respondents painstakingly complied with this order, the OCC grossly over-designated its exhibits and page cites thus obscuring and denying Respondents a meaningful disclosure. The ALJ overruled Respondents' objections in this regard.

15. With respect to the Capital Raise Loans, the finding and conclusion that Respondents should not be banned from banking should be affirmed. However, insofar as the ALJ ruled against Respondents, any finding and conclusion that the Capital Raise Loans were an unsafe or unsound practice for which Respondents were responsible, were not accounted for correctly, were breach of fiduciary duty, or otherwise met the misconduct prong of the statute, was not supported by the evidence or applicable law.

16. With respect to the Capital Raise Loans, the finding and conclusion that Respondents should not be banned from banking should be affirmed. However, insofar as the ALJ ruled against Respondents, the ALJ's finding and conclusion that the Bank suffered a loss (or otherwise triggered the "effects prong") by reason of the Capital Raise Loans was not supported by the evidence or applicable law.

17. With respect to the OREO Loans, the finding and conclusion that Respondents should not be banned from banking should be affirmed. However, insofar as the ALJ ruled against Respondents, the ALJ's finding and conclusion that the OREO Loans were an unsafe or unsound practice of Respondents, were accounted for incorrectly, were a breach of fiduciary duty or otherwise met the misconduct prong of the statute, was not supported by the evidence or applicable law.

18.    With respect to the OREO Loans, the finding and conclusion that Respondents should not be banned from banking should be affirmed.  However, insofar as the ALJ ruled against Respondents, the ALJ's finding and conclusion that the Bank suffered a loss (or effect) by reason of the OREO Loans was not supported by the evidence or applicable law.

19.    With respect to the Nonaccrual Accounting issue, the finding and conclusion that Respondents should not be banned from banking should be affirmed. However, insofar as the ALJ ruled against Respondents, the ALJ's finding and conclusion that the nonaccrual loan accounting was an unsafe or unsound practice, the loans were not accounted for correctly, or otherwise met the misconduct prong of the statute, was not supported by the evidence or applicable law.

20.    With respect to the Nonaccrual Accounting issue, the finding and conclusion that Respondents should not be banned from banking should be affirmed. However, insofar as the ALJ ruled against Respondents, the ALJ's finding and conclusion that the Respondents exhibited willful or continuing disregard, or any culpability, or a pattern of misconduct with respect to the Nonaccrual Accounting issue was not supported by the evidence; and the party with the burden of proof failed to satisfy the culpability prong required under 12 U.S.C. § 1818(e) and § 1818(i).

21.    The ALJ's finding and conclusion that Ortega engaged in a "pattern of misconduct" with respect to accounting claims was without support and a legal basis.

22.    The finding and conclusion that the loans to companies controlled by David Rogers III were a breach of fiduciary duty was not supported by the evidence and the ALJ misapplied the law.

23.    The finding and conclusion that the Bank suffered a loss by reason of the loans to companies controlled by David Rogers III was not supported by the evidence and misapplied the law.  Furthermore, the Bank is not even alleged by the OCC to have suffered any losses while Respondent Rogers was at the Bank – there was no evidence whatsoever that any of these loans failed to perform while Respondent Rogers had a role at the Bank.

24.    The finding and conclusion that the David Rogers, Jr. exhibited willful or continuing disregard with respect to loans to companies controlled by David Rogers III was not supported by the evidence; and the party with the burden of proof failed to satisfy the culpability prong required under 12 U.S.C. § 1818(e).

25.    The ALJ applied the wrong definition of "unsafe or unsound practice."

26.    The ALJ failed to consider the law of causation as part of the "effects" analysis.

27.    Applicable law required application of a higher standard or proof where the sanction or hardship imposed was particularly severe, thus the ALJ should have applied a "clear and convincing" evidence standard as the burden of proof.

Respondents except and object to the proceeding as set forth in the accompanying brief, including the citations to the specific portions of the Recommended Decision and the record, as noted therein.[1]  Respondents pray that the Comptroller grant these exceptions and dismiss the case in its entirety; a failure to correct these exceptions would result in an order that is arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to Respondents' constitutional rights, in excess of the Comptroller's jurisdiction, authority, and limitations, a failure to observe procedure required by law, and unsupported

---

[1] Capitalized terms not otherwise defined have the definitions ascribed in the Notice of Charges.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 6**

by substantial evidence.   As further described below, Respondents also request oral

argument and a stay for the reasons set forth herein.

# TABLE OF CONTENTS

I.     SUMMARY ......................................................................... 12

II.    FACTUAL BACKGROUND ................................................ 17

III.   THE LEGAL STANDARD ................................................. 29

IV.    ARGUMENT & AUTHORITIES ........................................ 30

   A.    **Statute of Limitations (Exception 1)** ............................ 30

      1.   Brief Summary ....................................................... 30

      2.   Procedural Background. .......................................... 32

      3.   The Five-Year Statute of Limitations in 28 U.S.C. § 2462 Applies In This Case and Should be Strictly Enforced Against the Government ............... 33

      4.   The Legal Framework. ............................................ 34

      5.   The Claims Attacking the Capital Raise Loans Are Time-Barred. ............ 43

      6.   The OREO Claims Are Time-Barred. ....................... 48

      7.   The Claims Attacking Non-Accrual Accounting Are Time-Barred........... 54

      8.   The Claims Attacking Loans to Rogers III Entities Are Time-Barred....... 57

   B.    **Respondents Were Denied a Trial By Jury (Exception 2).** ......................... 61

      1.   The Seventh Amendment Right to a Jury Trial and *Jarkesy*. ..................... 62

      2.   This Proceeding Violates Respondents' Constitutional Rights. ................ 65

   C.    **The Appointments Clause (Exceptions 3 & 4)** ............................................. 68

      1.   Background of the Appointments Clause Issue ......................................... 70

      2.   Administrative Law Judges Are Officers of the United States. ................ 74

      3.   Judge McNeil and Judge Miserendino Were Not Appointed Consistent with the Constitution. ...................................................... 75

      4.   Applicable Law Requires that This Unconstitutional Proceeding be Dismissed and Recommenced, if at all, Before a Properly Appointed Tribunal ............................................................ 78

      5.   In any Event, Respondents Were Prejudiced by the Unauthorized ALJ's Rulings............................................................. 82

      6.   Respondents Were Also Denied the Opportunity to Challenge ALJ Whang's Appointment. ................................................ 86

      7.   The Appointment of ALJ Whang Violated the Appointments Clause....... 87

      8.   ALJ Whang Does Not Serve at the Pleasure of the Department Head ...... 87

   D.    **The ALJ's Pretrial Rulings Should Be Reversed (Exceptions 4, 5, 6, 7, 8, 9, and 10).** ...................................................... 88

1.      Fannie Mae & Freddie Mac.......................................................... 88

2.      Respondents Were Struck As Experts While the OCC's Michael Brickman Was Allowed to Testify............................................................ 91

3.      The ALJ Allowed Mary Jane Locke to Testify, But Not Andrew Moss.... 92

4.      The ALJ Granted Pretrial Motions to Exclude Other Relevant Evidence. 93

**E.    The Rulings During the Trial Prejudiced the Respondents (Exceptions 11, 12, 13, & 14) ............................................................................... 93**

1.      Admission and Consideration of OCC "Exhibits" and Other Evidence. ... 93

2.      Exclusion of Respondents' Exhibits........................................... 94

3.      Exclusion of Testimony and Prohibition of Offers of Proof. ................ 95

4.      Overdesignation of Exhibits. ................................................... 96

**F.    Capital Raise Loans (Exceptions 15 & 16) ................................... 96**

**G.    OREO Loans (Exceptions 17 & 18). ......................................... 104**

**H.    Nonaccrual Accounting (Exceptions 19 & 20) ........................... 113**

**I.    Other Accounting Issues (Civil Money Penalty) (Exception 21)............. 121**

**J.    Bank Loans to Companies Controlled By David Rogers III (Exceptions 22, 23, & 24) ................................................................................... 121**

**K.    The ALJ Applied The Wrong Legal Standard for "Unsafe or Sound Practice" (Exception 25) ............................................................ 127**

**L.    The ALJ Applied The Wrong Legal Standard for Causation (Exception 26)......................................................................................... 127**

**M.    The ALJ Should Have Applied a "Clear and Convincing" Standard of Proof for the Prohibition Claims. (Exception 27)...................................... 128**

**V.   REQUEST FOR ORAL ARGUMENT .............................................. 129**

**VI. REQUEST FOR STAY ................................................................... 129**

**VII. CONCLUSION ............................................................................ 129**

## TABLE OF AUTHORITIES

### Cases

*Adams v. Woods*, 6 U.S. 336 (1805) ............................................................ 34, 55

*AKM, LLC v. Sec'y of Labor*, 675 F.3d. 752 (D.C. Cir. 2012) ................................... 47, 53

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442 (1977) 63

*Boren Swindell & Assoc. v. Friedman*, 2006 U.S. Dist. Lexis 12305 (N.D. Tex. 2006).. 75

*Burgess v. FDIC*, 2022 U.S. Dist. LEXIS 213050 (N.D. Tex. Nov. 6, 2022) ........... 61, 68

*Burgess v. FDIC*, 2022 U.S. Dist. LEXIS 223387 (N.D. Tex. Dec. 1, 2022) ........... 62, 68

*Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017) ........................................................ 30, 75

*Burrage v. U.S.*, 571 U.S. 204 (2014)............................................................................ 128

*Cano v. Everest Minerals Corp.*, 2004 U.S. Dist. LEXIS 3963 (W.D. Tex. 2004).......... 39

*Davis v. Ruby Foods*, 269 F.3d 818 (7th Cir. 2001) ......................................................... 85

*De La Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2002) ............................................ passim

*Delek Ref., Ltd. v. OSHRC*, 845 F.3d 170 (5th Cir. 2016).................................... 38, 47, 53

*Doolittle v. NCUA*, 992 F.2d 1531 (11th Cir. 1993)................................................ 14, 119

*Edmond v. U.S.*, 520 U.S. 651 (1997)................................................................... 69, 78

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ............................... 127

*Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016)........................................................... 79, 81

*Free Enterprise Fund v. Public Co. Acctg. Oversight Bd.*, 561 U.S. 477 (2010)............. 88

*Freytag v. Commissioner*, 501 U.S. 868 (1991) .................................................. 69, 76-79

*Gabelli v. SEC*, 568 U.S. 442 (2013).......................................................................... passim

*Gideon v. Johns-Mansville Sales Corp.*, 761 F.2d 1129 (5th Cir. 1985).......................... 39

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) .................................................. 63

*Gulf Fed. Sav. & Loan Ass'n of Jefferson Parish*, 651 F.2d 259 (5th Cir. 1981).......... 127

*In re Hooper*, 112 B.R. 1009 (B.A.P. 9th Cir. 1990)....................................................... 65

*In re Thrall*, 196 B.R. 959 (Bankr. D. Colo. 1996) ....................................................... 66

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ............................................................ 61-67

*Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996)............................................................... 33

*Kim v. Office of Thrift Supervision*, 40 F.3d 1050 (9th Cir. 1994) ...... 13, 15, 118, 125, 126

*Lewis v. FDIC*, 2001 U.S. App. LEXIS 32333 (5th Cir. 2001).............................. 119, 125

*Lucia v. SEC*, 138 S. Ct. 2044 (2018)..................................................................... passim

*Maghareh v. Azar*, 2020 U.S. Dist. LEXIS 97349 (S.D. Tex. 2020) ............................ 83

*McCoy v. Louisiana*, 138 S. Ct. 1500 (2018)......................................................... 80, 82

*Mitchell v. Maurer*, 293 U.S. 237 (1934) ..................................................................... 75

*Murray v. San Jacinto*, 800 S.W.2d 826, 828 (Tex. 1990)............................................ 39

*New York v. Niagara Mohawk Power Corp.*, 263 F.Supp. 650 (N.D.N.Y. 2003)............ 55

*Nguyen v. U.S.*, 539 U.S. 69 (2003)....................................................................... 75, 79, 81

*Ortega v. United States Dep't of the Treasury*, 2019 U.S. Dist. LEXIS 225231 (S.D. Tex. 2019) ........................................................................................................................... 73

*Proffitt v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000) ..................................... 33, 37-38, 41, 60

*Proffitt v. FDIC*, 208 F.3d 1066 (D.C. Cir. 2000) ....................................... 38, 41, 51, 59

*Reid v. Covert*, 354 U.S. 1 (1957)............................................................................. 62

*Ryder v. U.S.*, 515 U.S. 177 (1995)............................................................................... 79

*SEC v. Jones*, 2006 U.S. Dist. LEXIS 22800 (S.D.N.Y. 2006)................................... 55

*Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059 (8th Cir 2000)........................................... 85

*Tull v. United States*, 481 U.S. 412 (1987) ................................................................. 63, 65

*Tumey v. Ohio*, 273 U.S. 510 (1927) ........................................................................... 79

*U.S. v. Core Laboratories, Inc.*, 759 F.2d 480 (5th Cir. 1985) ................................... 40

*U.S. v. Leeper*, 2006 U.S. Dist. LEXIS 32147 (W.D. N.Y. 2006) ......................... 81, 82

*Vasquez v. Hillery*, 474 U.S. 254 (1986) .............................................................. 69, 79, 81

*Ward v. Monroeville*, 409 U.S. 57 (1972) ................................................................. 81

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) .............................................. 69, 79-81

*Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016) .............................................. 69, 79-81

## Statutes

U.S. CONST. Art. II, §2, cl. 2 ......................................................... 68, 74, 75, 87

5 U.S.C. § 1104(a)(2) ........................................................................... 75

5 U.S.C. § 3105 .................................................................................... 87

5 U.S.C. § 3317(a) ............................................................................... 75

5 U.S.C § 3318(a) ................................................................................ 75

5 U.S.C. § 7521(a) ............................................................................... 88

12 U.S.C § 1(a) .................................................................................... 77

12 U.S.C. § 1813(v) .............................................................................. 43

12 U.S.C. § 1818(e) ........................................................................ passim

12 U.S.C. § 1818(i) ......................................................................... passim

28 U.S.C. § 2462 ............................................................................ passim

## Rules and Regulations

5 C.F.R. 332.401-332.402 ..................................................................... 75

5 C.F.R. 930.201 ................................................................................. 75

12 C.F.R. § 19.7(b)(2) ......................................................................... 85

12 C.F.R. § 19.36(d)(2) ....................................................................... 95

12 C.F.R. § 19.39(a) ........................................................................... 30

12 C.F.R. § 19.41 .............................................................................. 129

12 C.F.R. § 19.40 ............................................................................... 30

12 C.F.R. § 19.101 .............................................................................. 76

## Treatises and Other Materials

MOORE'S FEDERAL CIVIL PRACTICE § 12.37 ....................................................... 85

*Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1011, 1013-16
(2011) ............................................................................................. 66

Are the SEC's Administrative Law Judges Biased? An Empirical Investigation, WASH. L.
REV. 315, 331 (2017) ............................................................................ 71

Insider Trading: The Problem with the SEC's In-House ALJs, 67 EMORY L.J. 123 (2017)
.................................................................................................... 71

Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in The Papers of Thomas
Jefferson* 267 (Julian P. Boyd ed., 1958) ................................................... 62

*The Revolutionary Writings of John Adams* 55 (C. Bradley Thompson ed., 2000) ......... 62

## I.     SUMMARY

The Recommended Decision penalized both Respondents with civil money penalties and banned Respondent Rogers from banking.  Respondents take exception to these rulings and request that they be reversed with directions to dismiss this proceeding.

The hearing in this case showed that Respondents, who were not in the lending side of the Bank, spent their entire careers as safe and sound bankers with reputations for compliance, safety, and conservatism in bank management.  Then, the U.S. economy underwent the worst catastrophe since the Great Depression.  During this catastrophe, community banks bore the brunt of the downturn because they were invested in Fannie Mae and Freddie Mac (at the encouragement of regulators and the federal government) and they lacked political connections necessary to secure the bailouts obtained by others.  The Treasury Department failed to support Fannie and Freddie during the disaster causing a $174 million loss to the Bank, plus monthly income losses together amounting to an approximately $325 million capital deficit, which ultimately broke the Bank and caused its failure.  While Respondents did everything in their power to try and rescue the Bank, including investing their own money and, in Ortega's case, working himself nearly to death, the OCC blamed them for having invested in Fannie and Freddie.  Then, when the verdict of history became clear – that Fannie and Freddie were an exogenous shock, and not the fault of Respondents – the OCC spent the next eight years trying to find lending irregularities and attacking non-lenders Ortega and Rogers for them.   Meanwhile, Rogers was retired all those years and Ortega accumulated a lengthy record of further safe and sound banking at Texas National Bank, an exemplary Minority Depository Institution.  This is what the record showed, and Respondents file these exceptions because the

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 12**

Comptroller should not impose the draconian penalty of a ban from banking or impose a civil monetary penalty on these Respondents.

To begin with, this case is barred by the statute of limitations. Although a five-year statute of limitations applies, the claims in this case are addressed to loans made, approved, and booked more than five years before this case was commenced. In fact, one of the Respondents resigned from the Bank in 2011, more than five years before this case was filed on September 25, 2017. The claims are clearly time-barred, and the OCC resorts to extreme and absurd self-serving accrual theories to save its untimely claims.

This case also violates the Appointments Clause and the Seventh Amendment of the United States Constitution. Because Respondents were not afforded a trial by jury and because this case was initially presided over and governed by an unauthorized judge whose rulings drove the trial evidence and proceedings in this case, this case should have been dismissed under applicable constitutional law.

Respondents are also entitled to a dismissal of the claims in this case on the substantive merits and because of the procedural errors identified in this brief. The claims here utterly failed to meet the government's burden to prove the elements of the offense. Enforcement Counsel presented this case as if it were a strict liability or negligence case. They believe that by introducing a loan, suggesting it is unsafe and unsound via self-serving advocate-witnesses, and then showing that Respondents were among of the officers and directors on the board committees of the Bank, that they have somehow proven their case. But this is not in accordance with the law: the statute requires culpable conduct well beyond "mere negligence."[2] It requires proof of personal dishonesty – or disregard which arises

---

[2] *Kim v. Office of Thrift Supervision*, 40 F.3d 1050, 1054 (9th Cir. 1994).
**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 13**

to the same magnitude as personal dishonesty.[3]  It is not sufficient to merely be an officer or director; nor is it sufficient to be on the loan committee.  While the OCC has the burden of proof, Respondents in this case proved:

- Neither Respondent made a single penny off any of the transactions at issue in this case;

- Both Respondents contributed their own money to try and save the Bank;

- The OCC examiners *at the time* knew that Rogers "ALWAYS" did what he promised, was honest, forthright and genuinely cautious and conservative in his business decisions regarding the Bank;[4]

- OCC examiners at the time admitted that Ortega was the positive influence on the culture of regulatory compliance at the Bank, implementing change when needed, and devising reasonable solutions to the Bank's problems;[5]

- Witness after witness testified to Respondents' good faith, goodwill and genuineness in working for the Bank's best interests;

- Both Ortega and Rogers exuded credibility in explaining their roles and objectives to assist and support the Bank.

Meanwhile, the OCC failed in their efforts to blame Respondents for the lending decisions of the Bank.  The record was unequivocal that Respondents were non-lenders who did not grade loans and did not have expertise in extending credit.  Relying on the lending expertise of the Bank and following their recommendations simply does not come close to the

---

[3] *Doolittle v. NCUA*, 992 F.2d 1531, 1539 (11th Cir. 1993).
[4] Respondents' Trial Exhibits ("R.Ex.") 16, 17, 18.
[5] *E.g.,* Joint Exhibits ("Jt. Ex.") 4 at 38; R. Ex. 30 at 2; R. Ex. 31 at 49; R. Ex. 33 (Page cites to all trial exhibits herein are to bates numbers on each exhibit page in the record).
**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 14**

"magnitude" of personal dishonesty.  The "draconian" measure of prohibition is not designed to ban non-lenders for having trusted their lending colleagues who had decades of experience.[6]

This failure by the OCC to carry its burden is even more compelling when you consider conduct within the limitations period, i.e. from September 25, 2012 forward.  The OCC failed to show any culpable conduct by Rogers (who was no longer with the Bank) or Ortega (who by that time either was in the hospital, or, by every witness's testimony, working in an untenable situation with great ardor, honor, and good faith to save the Bank at the FDIC's direction).

Moreover, the OCC failed to carry its burden elsewhere.  For example, the argument that Capital Raise Loans and OREO Loans were unsafe or unsound based on below-market terms failed as a matter of law because the OCC had no expert witness designated to testify as to market.  The ALJ erred by allowing Michael Brickman to testify vaguely as to interest rates: he had no expertise in the area, was not timely designated and never filed a report.   Not one expert report analyzed market prices or rates, no analysis was done of comparables or market data, and not one comparable transaction was offered into evidence.  There is no record on which to suggest that any loan differed from market levels.  The Recommended Decision improperly overlooked this deficiency of proof.

The attacks on accounting for loans similarly fail.  The OCC witnesses conceded that the Capital Raise Loans did not violate GAAP unless the Holding Company's transactions were required to be consolidated with the Bank's for call report purposes.   But

---

[6] *Kim v. Office of Thrift Supervision*, 40 F.3d at 1055.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 15**

everyone conceded that the call report instructions prohibited such consolidation. Thus, there was no accounting violation after all.

The OREO Loan accounting attacks were shown to be defective for several reasons, not least because (i) CPA Ben Pena stood behind his firm's work in approving the accounting, (ii) lending department officials, and not Respondents, were responsible for making market determinations, and (iii) most importantly, the OCC failed to carry its burden to show any loans were below market in the first place because it had no expert testimony, its examiners used a blanket 5.5% rate which it conceded was not GAAP, and the OCC admittedly miscalculated even that analysis by using a fixed rate on a variable loan for the largest loan in the portfolio.

The finding of misconduct on nonaccrual loan accounting challenges also did not hold water. The evidence showed that the Bank moved loans into nonaccrual status and placed them on a cash basis automatically when a loan fell behind more than 90 days, while the loan staff was charged with making grading determinations manually, including further downgrades. There was nothing untoward about this process. And when examiners decided this process was not to their liking, Ortega changed it to their satisfaction. The issue was shown to be devoid of improper or culpable conduct.

The David Rogers III loans also failed to show misconduct by Respondent Rogers. He abstained from voting on the loans and the ALJ found that the loans went through normal channels to be approved by lending staff. It was conceded by the ALJ that Rogers III received no special treatment. Enforcement Counsel also failed to meet its burden on the "effects prong" of the statute. As further described in this brief, these loans performed

and the OCC failed to show that any of these loans failed to perform while Respondent was with the Bank.

In sum, and as further described below, the recommendation not to ban Mr. Ortega should be affirmed. The civil monetary penalties against Respondents and the prohibition against Mr. Rogers should be reversed and the claims against all parties dismissed.

## II.    FACTUAL BACKGROUND

Prior to the Great Recession and Financial Crisis in 2008-09, the management of the Bank decided to become more conservative in light of the exuberant market at that time.[7] They reduced lending and put a substantial investment in Government Sponsored Enterprises ("GSEs"), which were known to be safe, conservative and implicitly backed by the U.S. government.[8] Regulators explained that unlike most securities, there was no legal limit on the amount the Bank could acquire.[9] The regulators did a presentation on the securities and suggested that bankers take a good look at them because they were a good deal for banks.[10]

In the fall of 2008, the Bank incurred a $174 million loss on the preferred stock of the GSEs, following the U.S. government's failure to support Fannie Mae and Freddie Mac during the financial crisis.[11] This was the darkest economic crisis since the 1930's, and larger banks received massive bailouts (TARP) from the United States government in order

---

[7] Transcript ("Tr.") 455:1-456:14; 815:19-818:2; 2220:21-2221:4; 2260:10-2262:1.

[8] *Id*.

[9] *Id*.

[10] Tr. 2221:19-2222:3. One witness recalled having a conversation with OCC regulators Gary May and Trish Lindsey who favored the securities. Tr. 2262:9-17.

[11] Tr. 456:15-20; 2262:19-2263:11; 1571:5-10; 2262:19-2264:10.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 17**

to survive the turmoil, while small, community banks in ethnic minority areas received nothing.[12]

First National Bank – just like scores of other community banks in this country – were damaged by the United States Government as a result of its misguided failure to support the preferred stock of GSEs during the 2008-2009 financial crisis.[13]  Although GSEs like Fannie Mae and Freddie Mac were supposedly backed by the government, the Treasury Secretary at the time placed them in conservatorship and caused their stock to go to zero.[14]  This came after community banks across the country were encouraged to invest heavily in GSEs by regulators and other government actors.[15]

139 banks failed in 2008-09, several of which were directly attributed to the Fannie/Freddie collapse.[16]  Investments in GSEs were extensive, due to their attractive terms and perceived safety.[17]  The collapse caused capital shocks to community banks from which they could not recover.[18]  Regulators' favorable treatment of GSE securities was pervasive.[19]  The law also favored holding these securities.[20]  The GSEs massively increased their sale of such stock in the period leading up to the collapse.[21]  The GSE holdings were exogenous to the banks' pre-existing condition.[22]

---

[12] Tr. 2229:6-24; 1569:3-18; 2381:2-10; 2171:20-24;  R. Ex. 8 at 4-5, 8; R. Ex. 12.
[13] *E.g.*, R. Ex. 4, 6, 8-11; Tr. 2262:19-2264:10.
[14] *Id.*
[15] R. Ex. 4, 5, 6, 7.
[16] R. Ex. 4.
[17] *Id.*; R. Ex. 5.
[18] R. Ex. 4 at 6.
[19] *Id.* at 9-10.
[20] *Id.*
[21] *Id.* 36-37
[22] *Id.* at 13.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 18**

The Bank not only suffered a $174 million capital loss, but also $3.5 to $4 million in pretax income per month driven by that capital.[23]  Over the next 3-4 years, the Bank's capital would be reduced by another $150 million as a result.[24]  The hit to capital was, therefore, more like $325 million, which broke the Bank and caused its ultimate failure.[25] Had the government stood behind Fannie and Freddie, the Bank would not have failed and this case would never have been filed.[26]  Simply put, the Bank was put in an untenable situation by external factors.[27]  Or in the words of government witness Mark Magee, the Bank had the rug pulled out from under them by the United States government.[28]

When the banks struggled, those with political protection and Washington connections were bailed out – and were provided flexible treatment by regulators.[29] Others, such as those in the poorest region of the United States with a largely Hispanic and Spanish-speaking customer base, were treated harshly.[30]   Publicly, regulators acknowledged the issues and vowed to work with banks affected by the crisis.[31]  OCC official Gerry Hegar told David Rogers that Washington was going to help the banks hit by this.[32]  No help came.  In fact, the OCC came down hard on the Bank and put strict controls – and stringent examiners – in place designed to suffocate the Bank.[33]  Despite universal agreement that the Fannie Mae disaster was an exogenous shock the banking

---

[23] Tr. 456:21-457:7.
[24] *Id*.
[25] Tr. 456:12-14.
[26] Tr. 459:13-16.
[27] Tr. 2179:9-19
[28] Tr. 2179:25-2181:1.
[29] *E.g.*, R. Ex. 12.
[30] R. Ex. 3 at 2.
[31] *E.g.*, R. Ex. 13, 14.
[32] Tr. 458:16-23.
[33] R.Ex. 3 at 2; R. Ex. 85.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 19**

system,[34] the OCC blamed the officers and directors of the Bank for having invested in the GSEs.[35]  Remarkably, and contrary to all reasonable understandings of the crisis, this effort to blame Respondents for the investments continued even at the trial.[36]

When the Bank failed, the OCC continued to blame the bank for having invested in Fannie Mae and Freddie Mac while minimizing the lending issues now challenged by the OCC in this case.[37]  The evidence at trial showed that the OCC exhibited significant influence on the drafting of the so called "independent" OIG report on the Bank's failure.[38] After the OIG report was completed, the OCC shifted to blaming the Respondents for the lending issues in this case which it had previously told the OIG were immaterial.  The evidence at trial showed a continuous purpose on the part of OCC employees to shift the blame of the Bank's failures away from the U.S. government and onto the officers of the directors.  This calls into question the credibility of the OCC witnesses and documents authored by them, which were obviously biased and self-serving.  The OCC testimony attempting to avoid the admissions in Respondents' Exhibits 37-012, 41 and 52 was not very credible.

David Rogers, Jr. became Chairman of the Board of the Bank, largely because he was the largest shareholder of the Bank, during the 1980s.[39]  Rogers resigned from the Bank on November 1, 2011 and retired from banking.[40]  From that time on, he had no

---

[34] R.Ex. 4 at 2.
[35] R. Ex. 3 at 2; *see also* R. Ex. 37.
[36] Tr. 1573:5-7; 1605:21-24.
[37] *Compare* R. Ex. 37 at 4, 12 *with* R.Ex. 41 and 52.
[38] *Id.*; *see also* Tr. 177:17-25.
[39] Tr. 238:25-239:12; 240:8-11.
[40] Tr. 239:13-15; 451:2-453:9.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 20**

further role at Bank.[41]   His current work involves oil and gas investments and other activities outside the banking business.[42]

None of the conduct alleged against Mr. Rogers in this case occurred after September 25, 2012, within the five-year statute of limitations.  Rogers was retired from banking during the entire five-year period before the commencement of this case.[43]

Rogers' background is in the produce business.[44]   Rogers hired an experienced and excellent team of bankers and loan officers to run the Bank day-to-day.[45]   As part of a complex institution, Rogers relied on highly qualified executives and banking officers with decades of experience.[46]   Here, Rogers relied on his team and acted in good faith and in the best interests of the Bank.[47]   This is not surprising given that he was the majority shareholder of the Bank and therefore had every reason to act in the best interests of the Bank.

David Rogers' good faith, honesty and fair dealing were beyond reproach.   The OCC had a "strong history" with Rogers.[48]   Examiners praised him for always being honest, up front, and aggressively dealing with problems.[49]   Examiners also acknowledged him for being conservative and that he "has always done what we asked him to do."[50]

---

[41] *Id*.; Tr. 417:3-9; 419:18-22.
[42] Tr. 438:14-21; 439:12-17.
[43] Tr. 239:13-15; 451:2-453:9.
[44] Tr. 440:11-442:19.
[45] Tr. 445:14-447:8.
[46] *Id*.
[47] *Id*.; 453:10-12.
[48] R. Ex. 16.
[49] R. Ex. 15, 16, 17.
[50] R. Ex. 16.

Another examiner remarked emphatically: "He has ALWAYS done what he said he would do."[51]

David Rogers' testimony on the witness stand exuded credibility, honesty, and a lifetime of hard, faithful work in the business world. It is readily apparent that Rogers did not and could not have acted with willful or continuing disregard as to the allegations in this case. Indeed, the Recommended Decision concurred on three of the four claims against him.

Saul Ortega currently leads one of the few Hispanic-run banks in America, providing much-needed banking services to an area of the country that needs them.[52] A recipient of excellent ratings from the OCC and multiple grants from the Department of the Treasury, Ortega's Texas National Bank ("TNB") is a key member of the south Texas community, actively supporting underserved areas in the Rio Grande Valley.[53] Mr. Ortega has a record of integrity, community involvement, and positive relationships with regulators.[54]

Saul Ortega grew up working on his father's farm in the Rio Grande Valley.[55] He was fortunate enough to attend college and obtain a degree that allowed him to work in the banking industry.[56] He joined the Bank in 1987 and by 2000 became the CFO. As CFO of the Bank, he was responsible for the back-office operations including responsibility for branch operations (63 branches) as well as deposits, handling over $1.6 billion in

---

[51] R. Ex. 17.
[52] Tr. 799:18-800:24; 853:4-854:25; Resp. Ex. 23.
[53] *Id.*; Resp. Ex. 91.
[54] *Id.*; Tr. 853:18-878.25; 2390:18-2392:9.
[55] Tr. 804:25-805:11.
[56] Tr. 804:10-19.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 22**

deposits.[57] This included human resources, branch operations, facilities, investments, and the remaining operations of the Bank.[58] At no time was he a loan officer.[59]

In November 2011, Ortega became the CEO of the Bank after David Rogers departed.[60] This was at the encouragement of OCC examiners including Rodney Edmondson.[61] Although OCC witnesses denied having required management changes at the Bank during 2011, and, indeed, often denied that the OCC ever required management to do anything, Ms. Chansen's subsequent testimony showed that she did in fact concede to directing the management of the Bank, at least when it benefitted enforcement counsel's position to concede as much.[62]

Ortega remained in that position until the Bank closed in September of 2013.[63] As CEO for less than two years, Ortega brought a culture of compliance and improvement to the Bank. Examiners and regulators recognized that Ortega was not the problem.

---

[57] Tr. 808:17-809:9; 811:16-815:4.
[58] *Id*.; R. Ex. 36; OCC Ex. 542.
[59] Tr. 808:11-16.
[60] Tr. 825:24-826:3.
[61] Tr. 830:9-831:5
[62] *E.g.,* Tr. 1680:3-15.

| *Compare* Tr. 1663 | *With* Tr. 1680 |
|---|---|
| **Q. Well, examiners tell the bank, hey, if** 7 **this stuff is hurting your bank, you need to** 8 **get rid of that; you tell them that, right?** 9 A. That is an incorrect statement. We do 10 not tell a bank how to run the bank. That is 11 not our job. We are regulators. We look at 12 the safety and soundness of a bank, but we're 13 not going to go to a banker and say you must 14 get rid of this OREO. That is not what we do. | **Isn't it true, ma'am, that** 5 **Mr. Ortega, when he became CEO of the bank, he** 6 **went out and got the Alvarez & Marsal report,** 7 **and he took massive write-downs in the third** 8 **quarter and did exactly what you testified that** 9 **he should have done yesterday, which is should** 10 **have gone out and gotten appraisals and written** 11 **down the ORE to the level of the appraisal;** 12 **isn't that true?** 13 A. I will agree that is what he did, and 14 that was what we directed him to do via the 15 report of exam, I believe. |

[63] Tr. 848:25-849:19.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 23**

Examiners noted that Ortega was the only officer that "***gets it***" and was trying to put together a plan to address the issues at the Bank.[64]  Ramah Chansen indicated in 2011 that Mr. Ortega demonstrated foresight, implemented change when needed, and devised reasonable plans and solutions to address deficiencies at the Bank.[65]  Indeed, the records of OCC officials at the time show that Ortega, like today at TNB, received positive reviews and firm backing from regulators.  In 2012, the OCC commented, "Your new management team, under the direction of President Ortega is much improved. … [B]oth the credit and operations culture is improving."[66] "The underlying culture for both loans and operations is changing for the positive."[67]

Ortega, with the approval of examiners, often brought in outside experts at great expense to ensure compliance.  For example, with respect to the OREO loans attacked in this case, Ortega retained Alvarez & Marsal and the CPA firm of Burton McCumber.[68]  The OCC observed that "[Ortega's] management has taken appropriate corrective action … These findings were validated by A & M [Alvarez & Marsal]."[69]  "Accounting procedures for OREO sales are established and our review of new loans made for the purchase of Bank OREO did not identify any exceptions."[70]  Ms. Chansen conceded that when Ortega became CEO, he went out, got appraisals and took writedowns on OREO exactly has she believed he should have.[71]  The OCC further observed, "All violations identified in the 2011 Report were corrected and training provided where necessary to

---

[64] R. Ex. 33.
[65] Tr. 1563:6-15; Jt. Ex. 4 at 38.
[66] R. Ex. 30 at 2.
[67] *Id*. at 3.
[68] *Id*. at 11; Tr. 834:2-836:21.
[69] *Id*.; Tr. 834:2-836:21.
[70] *Id*. at 19; Tr. 834:2-836:21.
[71] Tr. 1680:3-15.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 24**

prevent a recurrence."[72]   Far from being a problem banker, the evidence at the hearing showed that Ortega was a conscientious officer who made a positive influence on the Bank and its culture of compliance.[73]

As the OCC noted, "***under the direction of CEO Ortega [the Bank] has initiated a cultural change, set forth proper underwriting parameters for OREO financing, engaged outside firms for capital procurement and comprehensive loan review, and combined with heightened internal loan review*** …"[74]   And these written reports were consistent with examiners words and conduct at the Bank at the time: examiners worked closely with Mr. Ortega and blessed his decisions.[75]   Mr. Ortega was transparent with the examiners, from whom Mr. Ortega sought and received their approval for every step along the way.[76]   The Bank's steadfast improvements and excellent management under Mr. Ortega were identified and documented in the reports of exams.[77]   Examiners at the time further exonerated Mr. Ortega's management of the Bank as CEO: "The management team inherited an unsafe and unsound bank from the former management team" and "This new management team is not responsible for past poor credit risk selection, excessive real estate concentrations …"[78]

The last year of the Bank's operation was a period of great stress and difficulty for Ortega, Eddie Leal, Mark Magee, and the others running the Bank at that time.[79]

---

[72] R.Ex. 31 at 50.
[73] Tr. 2268:20-2271:17.
[74] R. Ex. 31 at 49 (emphasis added).
[75] Tr. 831:6-834:1; 843:5-14.
[76] *Id.;* 837:20-839:20.
[77] R. Ex. 30, 31, 32.
[78] R. Ex. 31 at 49; Tr.1715:24-1717:13.
[79] Tr. 2277:25-2279:4.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 25**

Experienced bankers described the management's situation as untenable.[80]  Mr. Ortega became sick, left the Bank for a time, and a lot fell on Mr. Leal.[81]  The FDIC entered the Bank and pressed the management to keep the Bank afloat so that the FDIC could find a buyer.[82]  They succeeded in this regard, finding a buyer – Plains Capital.[83]

During Ortega's period as CEO, Ortega devoted his life to improving the Bank, ensuring compliance, and attempting to comply with OCC directives.[84]  This work-ethic and stress almost cost him his life.[85]  Ortega and his team did their very best and what they thought was right.[86] It was readily apparent from the testimony that Mr. Ortega not only acted with the best of good faith, but went above and beyond the call of duty to aid this struggling and ultimately failed bank.[87]  And, despite the OCC's current spin on Mr. Ortega, it was also readily apparent that the OCC examiners at the time knew quite well that Ortega was a banker of the highest quality.



---

[80] Tr. 2179:7-11.
[81] *Id.*
[82] Tr. 2278:16-2280:16; 2283:3-20.
[83] *Id.*
[84] Tr. 839:21-843:4; 2268:20-2271:17; 2281:6-2286:22.
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88]

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 26**







Despite giving lip service in support of minorities in banking, the OCC seeks to prohibit this highly respected banker from practicing his profession, even when he did not make the loans in question, the examiners at the time acknowledged his good faith and support of compliance, and he has established a lengthy record of compliance and success at TNB. White directors of the Bank who, like Ortega, were not in lending roles received lesser charges. Some white officers who were in senior lending roles – like Mark Magee,[104] whose actual job it was to ensure loans were documented and satisfied requirements – received no charges whatsoever. It is troubling to see the OCC target and attack Ortega, especially after so many bankers in other regions of the country, and of other ethnic backgrounds, escaped scrutiny following the 2008 banking crisis.

---

[101] *See also* Tr. 2329:17-2331:14.
[102] *See* R. Ex. 22.
[103] Tr. 2400:7-2401:4.
[104] Senior Credit Administration Officer, Senior Vice-President—Commercial Lending, and Chief Credit Officer.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 28**

The Bank closed in September 2013.   Ortega's role at the Bank concluded at that time.

From September 25, 2012, until the Bank closed nearly one year later, Ortega was not at the Bank for a significant portion of that time, having suffered a heart attack and missing multiple months of work during that time.  During the remainder of that time, the FDIC and the OCC were in the Bank, controlling its decision-making and requesting that Ortega and the leadership of the Bank keep it afloat long enough to find a buyer, which they did.  Witnesses all acknowledged that the Bank's situation was untenable during that period, and that Ortega was simply doing his best to manage an impossible situation. The regulators acknowledged Ortega was not responsible for the Bank's plight.[105] Indeed, as a factual matter, during the five years preceding the commencement of this case, Ortega did not engage in any wrongful conduct, and by all accounts worked extremely hard in the Bank's best interests.

Most importantly, following hundreds of exhibits and over two thousand pages of testimony, there was no evidence admitted of any kind from any source that either Respondent represented a going-forward danger to banks or the banking system.  Indeed, Rogers retired from banking in 2011 and Ortega has been succeeding at Texas National Bank until the present day.

## III.     THE LEGAL STANDARD

Respondents may take "written exceptions to the administrative law judge's recommended decision, findings, conclusions or proposed order, to the admission or

---

[105] "The management team inherited an unsafe and unsound bank from the former management team" and "This new management team is not responsible for past poor credit risk selection, excessive real estate concentrations …"  R. Ex. 31; Tr.1715:24-1717:13.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 29**

exclusion of evidence, or to the failure of the administrative law judge to make a ruling proposed by a party." 12 C.F.R. § 19.39(a).  The Comptroller reviews all challenged decisions of the administrative law judge *de novo* based on its review of the "entire record." *See Burgess v. FDIC*, 871 F.3d 297, 303 (5th Cir. 2017); 12 C.F.R.§ 19.40.

## IV.    ARGUMENT & AUTHORITIES

### A.  Statute of Limitations (Exception 1)

The claims in this case are barred by the statute of limitations contained in 28 U.S.C. § 2462.  The ALJ erred by reaching merits of this case since it was brought more than five years after the claims in the Notice of Charges accrued, and the case should have been dismissed on limitations grounds.

### 1.  Brief Summary

This case was commenced on September 25, 2017.  ***Rogers was retired from banking during the entire five-year period before the commencement of this case***.[106] None of the conduct alleged against Mr. Rogers in this case occurred after September 25, 2012, within the five-year statute of limitations.  This is undisputed.  Similarly, Mr. Ortega is being attacked for conduct taking place in 2008 through 2011, more than five years before this case was filed.  While Ortega was still employed by the Bank until September 2013, the claims against him accrued outside the limitations period.  In fact, from September 25, 2012, until the Bank closed nearly one year later, Ortega was not at the Bank for a significant portion of that time, having suffered a heart attack and missing multiple months of work.  Witnesses acknowledged that the Bank's situation was untenable during that period, and that Ortega was simply doing his best to manage an impossible situation.

---

[106] Tr. 239:13-15; 451:2-453:9.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 30**

The Recommended Decision does not support any culpable conduct by Ortega during the limitations period, despite the OCC's efforts to artificially shoehorn its claims into that later period. Thus, under a plain reading of 28 U.S.C. § 2462, the OCC does not have a timely claim against either Respondent.

The OCC, for its part, denies that it is required to bring its claims within five years of a banker's misconduct. The express language of 28 U.S.C. § 2462 states that a claim must be brought within five of years of when it "first accrues," but the OCC contends that it can delay accrual for years and even decades after the conduct at issue by focusing on the date of any losses to the Bank or FDIC, including those losses booked by the government. For the OCC, a claim for an unsafe or unsound loan accrues each time a bank suffers a loss: each time a borrower fails to pay – five, ten, fifteen years after a loan was made – a new cause of action accrues and limitations begins to run. What's more, the OCC contends that even if a loss occurs and a claim "first accrues," limitations does not start to run even then – the OCC's Enforcement Counsel can simply pick another loss, or *plead* another "effect" of the challenged conduct, and elect to have the statute run from that date. Thus, a claim can "first accrue" twice or ten times, or fifty times depending on the number of "effects" the Bank suffers and which effect the OCC chooses to pursue.

This is wrong for at least two reasons: first, the statutory framework and case law demonstrate that limitations runs from the conduct at issue. It cannot be the law, and it was not Congress's intent, that one must wait to find out whether a loan gets paid back before the statute of limitations for an unsafe and unsound loan starts running. Second, even if accrual is deferred, as the government argues, a claim can only "*first accrue*"[107]

---

[107] 28 U.S.C. § 2462

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 31**

once and does not accrue over and over again restarting the limitations period *ad infinitum*. This is just classic claim-splitting, prohibited at common law and unsupported by any statutory text. Ultimately, no party in this case contends that the OCC could not have brought these claims at the time the loans were made – this simple reality proves the claims are time-barred.

The OCC's legal position that an accrual under the statute may be deferred indefinitely as each loss is booked was rendered absurd by witness Mary Jane Locke of the FDIC who testified that the FDIC actually chooses the date of the loss,[108] and to this day, 14 years on, could still book a loss under the receivership.[109] In this vision of the statute, the United States government chooses when the statute begins to run – and because the receivership is still open, Respondents still – to this day – do not have repose under the five year statute of limitations for events 14 years ago.

The OCC's strained position is just self-serving and unsupportable by a reasoned view of applicable legal principles. Therefore, as further described in the sections below, the ALJ's Recommended Decision failed to correctly apply 28 U.S.C. § 2462 to this case.

2.  <u>Procedural Background</u>.

On December 18, 2020, the Comptroller entered an Order Granting Cross-Motions for Interlocutory Review and Vacating and Reversing in Part April 9 Order ("December 18 Order").[110] In that order, the Comptroller reversed the ALJ's summary disposition of claims in the Notice of Charges and determined that the claims in the Notice of Charges

---

[108] Tr. 2044:11-25.
[109] Tr. 2047:22-2048:13.
[110] *See* December 18, 2020 Order Granting Cross-Motions for Interlocutory Review and Vacating and Reversing in Part April 9 Order.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S**
**RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL**
**ARGUMENT – Page 32**

were not time-barred. As such, the claims in the Notice of Charges were allowed to go forward. And, as if emphasize its arbitrary and capricious nature, the December 18 Order even reinstated the Tier 1 civil monetary penalty claims that everyone conceded were time-barred.

Further factual development in the case proceeded, including the hearing which commenced on January 31, 2022. These facts further showed that the claims in this case were indeed time-barred. However, in its Recommended Decision the ALJ attempted to follow the flawed legal parameters set forth in the December 18 Order, and ruled that the claims in the Notice of Charges were timely. Thus, the Recommended Decision addressed and ruled on Bank conduct from nearly ten years before this case was commenced.

3. The Five-Year Statute of Limitations in 28 U.S.C. § 2462 Applies In This Case and Should be Strictly Enforced Against the Government.

There is no dispute that the claims asserted in this case are subject to a five-year statute of limitations. The applicable federal statute provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim ***first accrued*** if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462 (emphasis added). This proceeding involves two types of claims: claims for prohibition and claims for civil monetary penalties. Section 2462 applies to claims for prohibition. *De La Fuente v. FDIC*, 332 F.3d 1208, 1219 (9th Cir. 2002) (citing *Proffitt v. FDIC*, 200 F.3d 855, 862 (D.C. Cir. 2000)); *Johnson v. SEC*, 87 F.3d 484, 491-92 (D.C. Cir. 1996). It also applies to claims for civil monetary penalties. *Gabelli v. SEC*, 568 U.S. 442, 445 (2013). Such claims "shall not be entertained" unless they first accrued on or

after September 25, 2012, five years before this proceeding was commenced.  28 U.S.C. §

2462; *De La Fuente v. FDIC*, 332 F.3d at 1219.

Statutes of limitations set a fixed date when exposure to the specified Government

enforcement efforts ends.  *Gabelli v. SEC*, 568 U.S. at 448.  "Such limits are vital to the

welfare of society" and "provide security and stability to human affairs."  *Id.* (internal

citations omitted).  Section 2462 finds its roots in a law enacted nearly two centuries ago.

"Chief Justice Marshall used particularly forceful language in emphasizing the importance

of time limits on penalty actions, stating that it "would be utterly repugnant to the genius

of our laws" if actions for penalties could "be brought at any distance of time." *Gabelli v.*

*SEC*, 568 U.S.at 452 (quoting *Adams v. Woods*, 6 U.S. 336 (1805)).

And because government enforcement agencies have a role of ongoing supervision,

a mission of investigating violations, and legal tools at their disposal to root them out, the

government is not entitled to rely on more flexible accrual rules the way a civil plaintiff

would.  *See Gabelli v. SEC*, 568 U.S. at 451.  Thus, a unanimous Supreme Court rejected

the argument that defendants could be "exposed to Government enforcement action not

only for five years after their misdeeds, but for an uncertain time into the future."  *Id.*[111]

Instead, the court determined that the "five year clock begins to tick" when defendants'

allegedly wrongful conduct occurred.  *Id*. at 448.

4. The Legal Framework.

The OCC rejects the application of *Gabelli* and Section 2462.  Its position is

threefold: (i) accrual occurs upon actionable "effects," i.e., bank losses, *not* defendant

---

[111] *Compare Gabelli v. SEC*, 568 U.S. at 451-52 *with* the December 18 Order at 15-16 (rejecting a "strict construction of Section 2462").

misconduct, (ii) a claim can "first accrue" a second time, or a third or fourth time, each time a bank loss occurs, even if, by its own admission, the claim first accrued outside the limitations period (thus, a banker who makes a bad loan in 1988 which is payable over 30 years is subject to a claim for five years after the last payment is missed, in the year 2023, or 35 years after the wrongful conduct), and (iii) the OCC can pick which effect it wants to rely on to start the limitations clock and delay accrual by *pleading* a later "effect." The problem with this approach is that there is no textual support for it.

Thus, the OCC seeks to delete the words "first accrued" in 28 U.S.C. § 2462. The OCC is not bashful about its point of view: it has summarized its position explicitly in bold "**THE OCC IS NOT REQUIRED TO BRING ITS CLAIM WITHIN FIVE YEARS FROM THE FIRST LOSS**."[112] One must begin by contrasting this statement with the express directive of Congress which provides that this action "**shall not be entertained unless commenced within five years from the date when the claim first accrued** . . ." 28 U.S.C. § 2462 (emphasis added). The OCC is openly at odds with Section 2462. And if a loss constitutes an accrual, as the OCC says it does, then the OCC's stance is grammatically opposite to the will of Congress. The OCC's approach is just self-serving, claim-splitting nonsense and should be rejected.

    *(a) The Limitations Clock Begins To Run When the Alleged Misconduct Occurs; the Recommended Decision and December 18 Order were Both in Error.*

The *Gabelli* decision settled that accrual under § 2462 is triggered at the time of the "misdeeds" of Respondents, i.e. when the "wrongful conduct occurred." *Gabelli v. SEC*, 568 U.S. at 448, 451-52 (finding that "that is the most natural reading of the statute").

---

[112] May 6, 2020 OCC's Response to Respondents' Motion for Interlocutory Review (Statute of Limitations).

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 35**

This is supported by the *De La Fuente* decision under 12 U.S.C. § 1818. *See De La Fuente v. FDIC*, 332 F.3d at 1219-20 (applying Section 2462 to an FDIC proceeding under 12 U.S.C. § 1818(e)). In the *De La Fuente* case, the FDIC had sought to prohibit a bank director from participating in the banking industry under 12 U.S.C. § 1818(e). *Id*. at 1215. The case centered around 12 loans and two related transactions that occurred in the seven years leading up to the commencement of the case by the FDIC. *Id*. The administrative law judge ruled in favor of the FDIC, including with respect to four of the loans made more than five years before the proceeding commenced. The Ninth Circuit reversed, holding that "[t]he FDIC commenced this action on June 11, 1997. Therefore, the agency should not have prosecuted him for transactions that occurred before June 11, 1992 (i.e. the May 17, 1990 Fuente Alexander Trust Loan, the October 8, 1990 Fuente/IIP Loan, and the December 26, 1990 and January 24, 1993 RVDM loans)." *Id*. at 1219. The court in *De La Fuente* determined that it was error to rely on a loan made more than five years before commencement of the action. *Id*.

These decisions are consistent with how the text of Section 1818(e) and (i) is set up to work. The hurdle in section 12 U.S.C. § 1818 is set so that the government's claim matures not upon a loss, but right away – when, for example, a loan is made that where the Bank "will *probably* suffer financial loss or other damage" or "depositors . . . *could* be prejudiced" or when conduct is "*likely* to cause more than a minimal loss." 12 U.S.C. § 1818(e); 12 U.S.C. § 1818(i)(2)(B)(ii) (emphasis added). Further, the Tier 1 civil money penalty has no "effect" provision at all and accrues in the absence of any legal injury. 12 U.S.C. § 1818(i)(2)(A). Section 1818 doesn't require a "loss" to the Bank – they are drafted so that the OCC can bring a claim on the date the loans were made. For this reason,

no party disputes that the OCC could have brought an action immediately upon the supposedly unsafe and unsound loans being made.

Respondents are alleged to have made unsafe or unsound loans that put the Bank and its depositors at risk – and that Respondents knew or should have known they were doing so.   Here, Enforcement Counsel alleges that the loans were "unsafe and unsound" at the time they were made (*E.g.*, Notice of Charges ¶ 31, 55), that they were undersecured at the time they were made (¶ 37), had below market interest rates at the time they were made (¶ 37, 57), had balloon repayment terms (¶ 37), required no equity contribution (¶ 57), and the Bank "should not have originated them" (¶ 64).   The OCC cannot possibly argue that Respondents made loans that, at the time, were known to be unsafe and unsound, but, at the time, did not rise to a level that would allow the OCC to bring a claim.   This is what the case law recognizes.  *Gabelli v. SEC*, 568 U.S. at 448, 551 (a unanimous Supreme Court rejected the argument that defendants could be "exposed to Government enforcement action not only for five years after their misdeeds, but for an uncertain time into the future" and noting that the "five year clock begins to tick" when defendants' allegedly wrongful conduct occurred).

In response, the OCC relies on the D.C. Circuit's earlier, split decision in *Proffitt* to suggest a much different approach to accrual than that supported by § 2462, *Gabelli*, and *De La Fuente.  See Proffitt v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000).  In *Proffitt*, two judges found no limitations bar for six-year old misconduct, because the FDIC alleged a loss to the bank that occurred within the limitations period.  Ignoring the words "first accrued" in Section 2462, *Proffitt* reasoned that the FDIC could have brought a claim under 12 U.S.C. § 1818(e) either when the institution "will probably suffer financial loss" or when it "has

suffered" such loss, but that the clock on latter would not commence on accrual of the former.

The *Proffitt* decision is not persuasive, however. First, the more flexible approach to limitations in *Proffitt* is no longer good law after *Gabelli*, at least insofar as 28 U.S.C. § 2462 is concerned. This was an outcome anticipated by the dissent in *Proffitt*, which contains the best discussion of the statute of limitations issue found in either case law or scholarship and which rejected the OCC's approach. *Proffitt*, 200 F.3d at 866 (Silberman, J., dissenting); *compare Proffitt v. FDIC*, 208 F.3d 1066, 1067 (D.C. Cir. 2000) ("I think that the panel majority's construction is incorrect and gives those agencies virtually unlimited discretion as to when they initiate proceedings.") *with Gabelli v. SEC*, 568 U.S. at 452 (rejecting an interpretation of § 2462 that would leave "defendant exposed not only for five years after their misdeeds, but for an additional uncertain period into the future."); *Delek Ref., Ltd. v. OSHRC*, 845 F.3d 170, 177 (5th Cir. 2016) (citing *Gabelli* and rejecting OSHA's argument that for violations for failure to address finding and recommendations, "the statute of limitations never began to run because they were never abated. We cannot accept this argument."). The court in *Proffitt* set forth a rule where, under Section 1818(e), a banker's misconduct did not start the clock running – instead, the statute "begins to run when the agency decides it should begin to run." *Proffitt*, 200 F.3d at 866 (Silberman, J., dissenting). *Gabelli* rejects this view. *Gabelli v. SEC*, 568 U.S. at 448 (§ 2462 "sets a fixed date when exposure to specified Government enforcement efforts ends"). Reflecting on the powers and authority at the government's disposal and the history of Section 2462, the Supreme Court interprets the statute not to allow limitations to be prolonged from the fixed date of the misconduct alleged. *Gabelli v. SEC*, 568 U.S. at 451-52.

In addition, this kind of claim-splitting is prohibited at law and there is nothing in the statutory language that evinces an intent by Congress to allow claim-splitting and abrogate the common law rule. "Traditionally, the 'single action rule' provides a plaintiff one indivisible cause of action for all damages arising from a defendant's single breach of a legal duty. This rule applies in both res judicata and limitations contexts." *Cano v. Everest Minerals Corp.*, 2004 U.S. Dist. LEXIS 3963, *5 (W.D. Tex. 2004) (citations omitted). Thus, a party may not split a cause of action for each of the various injuries suffered. *Gideon v. Johns-Mansville Sales Corp.*, 761 F.2d 1129, 1136 (5th Cir. 1985) ("The cause of action thus created is for all the damage caused by the single legal wrong, and a plaintiff may not split this cause of action by seeking damages for some of his injuries in one suit and for later developing injuries in another") (citing Restatement (Second) of Judgments § 25 comm. c). "The fact that plaintiff's actual damages may not be fully known until much later does not affect the determination of the accrual date …" *Cano*, *6; *see also Murray v. San Jacinto*, 800 S.W.2d 826, 828 (Tex. 1990) ("The fact that damage may continue to occur for an extended period after denial does not prevent limitations from starting to run."). The OCC's argument equates to saying that in an ordinary car wreck case, a claim re-accrues every time the plaintiff feels back pain. And, as explained in the Recommended Decision, the plaintiff could plead around certain effects.[113] So in the civil tort context, a car-wreck plaintiff could ignore certain back pain in order to defer accrual. A plaintiff can wait years, and then bring a case on his elbow pain which arose later. In many commercial litigation cases, the plaintiff articulates a lost profits model that goes indefinitely into the future. No such case would ever be barred by limitations as the effects

---

[113] R.D. at 118.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 39**

of the defendant's breach are interminable. While these outcomes would be considered laughable in the civil litigation context, all one has to do in this case is review the applicable statutes and apply their plain meaning. Here, there is no statutory language that indicates claim-splitting is permitted or that deferred accrual theories are appropriate. Instead, what we do have is the decision in *Gabelli* which holds the exact opposite – the government is not entitled to special accrual rules in Section 2462 cases.[114]

The OCC position was also rendered absurd at trial when Locke testified that the FDIC actually chooses the date of the loss;[115] and to this day, 14 years on, could still book a loss under the receivership.[116] Thus, the government's in-house adjudication system has set forth a framework where the government sets its own accrual date. It defies logic – and applicable precedent – to suggest that the OCC and its in-house judges and prosecutors may defer accrual to its own advantage in this way.

The better view is that the cause of action accrues on the date of the violation and that is also more consistent with the law in this Circuit. *See U.S. v. Core Laboratories, Inc.*, 759 F.2d 480, 482 (5th Cir. 1985) (holding that Congress intended the first accrual language in Section 2462 to mean the date of the underlying violation). As Judge Silberman noted,

> It seems to me that it is the "three prong" characterization of the elements of a removal cause of action which leads my colleagues astray. Section 8(e) actually contemplates only one act on the part of the wrongdoer, the misconduct which amounts to a violation of a banking law or regulation. See 12 U.S.C. § 1818(e)(1)(A). To be sure, that act must also have certain characteristics. Section

---

[114] *See Gabelli v. SEC*, 568 U.S. at 451 (Because government enforcement agencies have a role of ongoing supervision, a mission of investigating violations, and legal tools at their disposal to root them out, the government is not entitled to rely on more flexible accrual rules the way a civil plaintiff would.)

[115] Tr. 2044:11-25.

[116] Tr. 2047:22-2048:13.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 40**

> 8(e)(1)(C) requires that this act involve personal dishonesty on the part of the target; innocent mistakes are not grounds for removal. And the requirement of section 8(e)(1)(B) must be satisfied, which means that some consequences must flow from the act. But it does not follow that the so-called "culpability" and "effect" prongs constitute separate temporal events, as the majority concludes. I think it makes far more sense to think of them as characteristics of a banker's misconduct, which must be present at the time of the wrongful act.

*Proffitt*, 200 F.3d at 866 (Silberman, J., dissenting); *see De La Fuente v. FDIC*, 332 F.3d at 1219-20.  It simply ignores the plain language of Section 2462 to suggest that a claim can "first accrue" over and over again for each loss, now and indefinitely into the future. Thus, "the early running of the statute of limitations seems to me the inevitable price of section 8(e)'s low threshold; the agencies have to take the 'bitter with the sweet.'" *Proffitt v. FDIC*, 200 F.3d 855, 866 (D.C. Cir. 2000) (Silberman, J., dissenting); *see De La Fuente v. FDIC*, 332 F.3d at 1219-20.

For accounting malfeasance, Enforcement Counsel's position is even more aggressive.  They argue that accounting errors can first accrue again and again, as long as the accounting records are left uncorrected.  For the OCC, a bank can misbook an asset purchased in 1929, and – if left uncorrected – the claim can first accrue again ninety more times, each time accounting records are issued, up to and including in 2019.  This approach effectively deletes the word "first" from Section 2462 to allow the OCC to get the result it wants.  As discussed in the subsequent sections, this approach lacks legal support.

Thus, the December 18 Order and the Recommended Decision run headlong into 28 U.S.C. § 2462 and Supreme Court precedent.  Both rulings should be reversed.  Section 2462 of Title 28 provides that a claim must be brought within five years of when it "first accrued."  It is contrary to statute, then, to defer accrual based on subsequent losses to the

Bank after the claim has already first accrued. The December 18 Order accidently confesses this truth by explicitly arguing against a "strict construction" of 28 U.S.C. § 2462.[117] It is also inconsistent with the Supreme Court's analysis in *Gabelli*.  *Gabelli v. SEC*, 568 U.S. at 451 (noting that government enforcement agencies have a role of ongoing supervision, a mission of investigating violations, and legal tools at their disposal to root them out, the government is not entitled to rely on more flexible accrual rules the way a civil plaintiff would).  A unanimous Supreme Court rejected the argument that defendants could be "exposed to Government enforcement action not only for five years after their misdeeds, but for an uncertain time into the future." *Id*.  Instead, the court determined that the "five year clock begins to tick" when defendants' allegedly wrongful conduct occurred. *Id*. at 448.  As Judge Silberman wrote, "a new and distinct FDIC removal action should not arise at every point that evidence of new consequences flowing from that misconduct is uncovered."  *Proffitt v. FDIC*, 200 F.3d at 866 (Silberman, J., dissenting).  And most importantly, one cannot discern or glean that Congress intended anywhere in 18 U.S.C. § 1818(e) and (i) to authorize the OCC's bizarre and unfair accrual philosophy.  The OCC's approach is without basis in law and should be rejected.

(b) *Civil Monetary Penalties in 12 U.S.C. § 1818(i).*

The limitations analysis for civil money penalties is the same.  It bears repeating, though, that the statute for Tier 1 civil monetary penalties contains no "effects" prong. 12 U.S.C. § 1818(i)(2)(A).  Any relief under Tier 1 would be clearly time-barred, and any alleged violation thereunder would start the accrual clock running for any basis of relief.

---

[117] December 18 Order at 15.

For the Tier 2 civil monetary penalties, the OCC apparently contends that these penalties have completely different accrual rules than Tier 1 violations.  12 U.S.C. § 1818(i)(2)(B)(ii) (for Tier 2 civil money penalty, "effect" triggered when conduct is "*likely* to cause more than a minimal loss") (emphasis added).  The OCC is asking for a deferred or a delayed accrual simply because the statute contains aggravating factors that increase the penalty to a higher tier.  But according to the relevant statute, a "violation" is an "action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding and abetting a violation." 12 U.S.C. § 1813(v).  Thus, a violation is triggered by a Respondent's own "action" that allows the OCC to bring a claim, not by aggravating factors that allow for greater punishment.  Moreover, as discussed above, the statute is set up so that a claim accrues not upon a loss but at the time of the violation where it is "likely" to result in a loss.  Thus, the statutory language for civil money penalties supports the immediate accrual of these claims.

### 5.  The Claims Attacking the Capital Raise Loans[118] Are Time-Barred.

This case was commenced on September 25, 2017.[119]  The ALJ found that the last date on which a Capital Raise Loan could have been made was August 12, 2009.[120]  This was more than eight years before this case was brought and three years too late.  Indeed, there is no dispute that the challenged loans (and Respondents' purported decisions to approve them) all took place outside the limitations period and are plainly time-barred.

---

[118] *See* Article III of the Notice of Charges.
[119] R.D. at 4.
[120] R.D. at 21, 34 (noting that any loans after this date would not have been relevant in light of the record of capital injections).  Even the last *alleged* Capital Raise Loan was made in March 2011 – also outside the limitations period.  OCC Ex. 374A; Tr. 2048:1-13.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 43**

*Gabelli v. SEC*, 568 U.S. at 448, 451 (the "five year clock begins to tick" when defendants' allegedly wrongful conduct occurred).

To evade this obvious conclusion, the OCC offered evidence and the ALJ found that the "effects" prong of the statute was met on June 12, 2013 when the Bank suffered a loss on one of the loans, and when the FDIC suffered losses many years later on other Capital Raise Loans.[121]  This, somehow, makes the claims timely.  This argument fails because the statutory text simply does not support such a theory.

As discussed above, the most well-reasoned reading of Section 1818(e), 1818(i), and 28 U.S.C. § 2462 is that a claim accrues upon the alleged misconduct.  *Gabelli v. SEC*, 568 U.S. at 448 (§ 2462 "sets a fixed date when exposure to specified Government enforcement efforts ends"); *De La Fuente v. FDIC*, 332 F.3d at 1219-20.

Moreover, the statutory text is worded so that a Tier 1 penalty may be brought upon an improper loan, and prohibition/Tier 2 penalty when such loan is "likely to cause more than a minimal loss" or "will probably suffer financial loss or other damage" or "depositors . . . could be prejudiced."  12 U.S.C. § 1818(e); 12 U.S.C. § 1818(i)(2)(B)(ii); 12 U.S.C. § 1818(i)(2)(A).   Thus, the statute itself contemplates accrual before any actual loss to the Bank.  Meanwhile, the OCC witness testimony confirmed this, stating that at the time of the loans were made, they would "probably cause a loss" (12 U.S.C. § 1818(e)(1)(B)(i)) and "could have prejudiced the depositors" (12 U.S.C. § 1818(e)(1)(B)(ii)).[122]  Thus, the OCC conceded it could have brought these claims at the time the loans were made.  Further, the ALJ and enforcement counsel defined unsafe and unsound practices as those which

---

[121] R.D. at 42, 117-18.
[122] Tr. 1593:13-1594:3.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 44**

involve "an abnormal risk of loss" at the time, which is virtually identical to the "will probably suffer a financial loss or other damage" contained in the statute. 12 U.S.C. § 1818(e)(1)(B)(i)-(ii). Thus, the latest a claim could have "first accrued" was in 2009, eight years before this claim was brought.

The ALJ discounted this argument on the ground that the government asserted its claims with "a different effect (and thus a different cause of action)."[123, 124] This implicitly concedes that the claims were in fact time-barred, if accrual is determined based on the when the claim *first accrued,* and not based on a second, third, or fourth accrual. There is no question these claims first accrued outside the limitations period, but using mental gymnastics, they somehow first accrued again later when the government chose which "effects" started the clock. Under the OCC's rubric, not only is accrual deferred until the bank suffers an effect, the OCC gets to *choose* which effect starts the clock. Put another way, the only way these claims survive is if you allow claim-splitting – each monthly loss on each loan is indeed its own separate cause of action. And the government chooses which loss starts the statute running. This is just absurd and is no more than a government agency deciding to overrule Congress and to delete the word "first accrued" from 28 U.S.C.§ 2462.

Mary Jane Locke also explained that the FDIC's receivership is still open, and could book a loss at any time, in its own discretion. The government actually chooses the date of the loss;[125] and to this day, 13 years on, could still book a loss under the

---

[123] R.D. at 118.

[124] The ALJ failed to analyze this issue correctly solely because she was following the misguided legal analysis contained in the Comptroller's December 18 Order. Had she been given the correct legal framework, she would have found these claims to be time-barred in light of the evidence adduced at trial. R.D. at 118. Both the Recommended Decision and the December 18 Order were in error and should be revisited.

[125] Tr. 2044:11-25.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 45**

receivership.[126]  In this vision of the statute, the United States government chooses when the statute begins to run – and because the receivership is still open, Respondents still – to this day – do not have repose under the five-year statute of limitations for events 13 or more years ago.    This is exactly what judges, including ALJ Whang, warned about when discussing this issue. *Proffitt v. FDIC*, 208 F.3d at 1067 (Silberman, J., dissenting) ("I think that the panel majority's construction is incorrect and gives those agencies virtually unlimited discretion as to when they initiate proceedings."); *Gabelli v. SEC*, 568 U.S. at 452 (rejecting an interpretation of § 2462 that would leave "defendant exposed not only for five years after their misdeeds, but for an additional uncertain period into the future."); R.D. at 144-45 ("the undersigned … remains hopeful that this ruling will be revisited."). The OCC's view is an unworkable and unreasonable approach, and it is utterly contrary to the law and policy set forth in *Gabelli*.  The Capital Raise Loans claims are time-barred.

 Accounting Issues.    With respect to the attacks on the accounting for the Capital Raise Loans, the Recommended Decision ultimately determined that there was no "effect" – the effect prong was not satisfied.  This ruling should be affirmed.  Thus, there was no need to decide whether the prohibition claim was timely.  However, as an alternative grounds to affirm, the Comptroller may also affirm dismissal of these charges on limitations grounds.

 The Recommended Decision appeared to accept the argument (as it was required to do under the December 18 Order) that attacks on the accounting for the Capital Raise Loans could have been timely because financial statements issued by the Bank after

---

[126] Tr. 2047:22-2048:13.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 46**

September 2012 had not corrected the loans booked in 2009 – this was based on the December 18 Order. This is simply unsupported by the facts and the law.

To begin with, David Rogers was not even with the Bank after November of 2011, so he had nothing to do with those financial statements.[127] Ortega, meanwhile, was with the Bank, but the ALJ made no findings of fact – and there was insufficient evidence to show – that he engaged in culpable conduct during that period with regard to those specific financial statements.

More importantly, the law simply does not authorize "continuing violations" accrual theories of this nature. Merely leaving the Capital Raise Loans unaddressed or unremedied does not allow the government to extend limitations "*ad infinitum*." *Delek Ref., Ltd v. OSHRC*, 845 F.3d at 176-77 (statute of limitations could not be extended where company continued to fail to address PHA recommendations; strictly enforcing six month statute of limitations from date of violation). Such an approach would render Section 2462 meaningless, allowing stale conduct to be actionable more or less forever. *Id*. "The lingering effect of an unlawful act is not itself an unlawful act." *AKM, LLC v. Sec'y of Labor*, 675 F.3d. 752, 757 (D.C. Cir. 2012). The "mere failure to right a wrong … cannot be a continuing wrong which tolls the statute of limitations." *Id*. The government's view would allow a banker to be banned from banking for an accounting error 100 years ago, provided it was not corrected before the last five years. In the instant case, there was no finding, no evidence, and no allegation that these subsequent Call Reports contained anything more than a carry-through of balances affected by accounting transactions booked

---

[127] For this reason, it has been uncontroverted that David Rogers did not and could not have participated in any accounting violations during the limitations period.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 47**

in 2009.  There was no independent decision on these transactions made in 2012-2013, and certainly no knowing conduct during this period which would rise to the level of scienter required by Section 1818(e).  Rather, this is simply another effort on the part of the OCC and its in-house court system to give itself more than five years to bring a case.

Finally, even without this case law, the OCC's approach on accounting issues contravenes the "first accrual" language of the statute. 28 U.S.C. § 2462.  The last Capital Raise Loan at issue was booked in 2009.  It is not a first accrual of a claim to leave subsequent records "uncorrected" or to have improperly accounted for transactions continue to turn up in Call Reports and other records of the company.  The OCC may argue that it is an accrual, but it is certainly not the first accrual.

### 6.  The OREO Claims[128] Are Time-Barred.

Although Respondents prevailed on the prohibition claims challenging the OREO Lending claims, the ALJ should have also rejected these claims on the grounds that they were time-barred.[129]   And the ALJ's Recommendation on the civil penalties should be reversed.  Again, David Rogers was not even with the Bank during the limitations period. Meanwhile, the Recommended Decision did not make any findings of misconduct on Mr. Ortega's part from September 2012 until the Bank closed.  Nor could the ALJ have done so – substantial evidence showed that by September 2012, (i) Ortega had become CEO and had long since cleaned up the OREO lending department,[130] and (ii) Ortega did not engage

---

[128] *See* Article IV of the Notice of Charges.

[129] The Notice of Charges pleads that the OREO Lending Strategy took place "from 2008 through at least September 2011."  Notice ¶ 55.  2008-2011 is undisputedly outside the limitations period.

[130] R.D. at 104; Respondent's Posthearing Brief 13-16 (marshaling the uncontroverted evidence showing that Ortega, as CEO in 2012 and after, was a conscientious officer who brought a culture of compliance to the Bank).  Per the examiners, "This new management team is not responsible for past poor credit risk selection, excessive real estate concentrations …" R. Ex. 31; Tr. 1715:24-1717:13.

in any culpable conduct during that period, having minimal practical possibility of doing so since he was out with health problems and the FDIC was already in the Bank.[131]  Thus, the conduct at issue was outside the limitations period.  Under the Recommended Decision, Respondents were not found to have originated, approved, or ratified any unsafe or unsound loans in the five years before this case was brought.  Under the statute, a proceeding challenging these loans may not be entertained.  28 U.S.C. § 2462; *De La Fuente v. FDIC*, 332 F.3d at 1219.

To evade this conclusion, the ALJ followed the legally incorrect December 18 Order and found the claims were timely because the Bank suffered subsequent "effects" in the form of "losses" incurred within the limitations period.[132]  The ALJ was clearly uncomfortable with the December 18 Order, in light of the absurd conclusions compelled by the OCC's reasoning:

> [T]he Comptroller's current construction of 28 U.S.C. § 2462, in which the "first" accrual of a Section 1818 cause of action could occur upon the second, third, or fifteenth instance of the same actionable effect, may result in circumstances in which the limitations period is held in abeyance as long as the receivership is open (or, for that matter, as long as an institution has a loan on its books related to the alleged misconduct that could someday be written off) and, for this reason, remains hopeful that this ruling will be revisited.

*See* R.D. at 144-45.  The ALJ then went on to find that the Bank did, indeed, suffer losses during the limitations period.   The ALJ's conclusion fails and should be reversed.

As discussed above, the most well-reasoned reading of Section 1818(e) and 28 U.S.C. § 2462 is that a claim accrues upon the alleged misconduct.  *Gabelli v. SEC*, 568

---

[131] R.D. at 105-07; Respondent's Posthearing Brief 13-16.
[132] R.D. 143-145.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 49**

U.S. at 448 (§ 2462 "sets a fixed date when exposure to specified Government enforcement efforts ends"); *De La Fuente v. FDIC*, 332 F.3d at 1219-20.

Moreover, the statutory text is worded so that a Tier 1 penalty is available upon an improper loan, and a prohibition/Tier 2 penalty when such loan is "likely to cause more than a minimal loss" or "will probably suffer financial loss or other damage" or "depositors . . . could be prejudiced." 12 U.S.C. § 1818(e); 12 U.S.C. § 1818(i)(2)(B)(ii); 12 U.S.C. § 1818(i)(2)(A). Thus, the statute itself contemplates accrual before any actual loss to the Bank. Meanwhile, the OCC witness testimony confirmed this, stating that at the time of the loans were made, they would "probably cause a loss" (12 U.S.C. § 1818(e)(1)(B)(i)) and "could have prejudiced the depositors" (12 U.S.C. § 1818(e)(1)(B)(ii)).[133] Thus, the OCC conceded it could have brought loan claims at the time the loans were made. Further, the ALJ and enforcement counsel defined unsafe and unsound practices as those which involve "an abnormal risk of loss" at the time, which is virtually identical to the "will probably suffer a financial loss or other damage" contained in the statute. 12 U.S.C. § 1818(e)(1)(B)(i)-(ii). Thus, the latest a claim could have "first accrued" was when the loans were made, well-before the five year limitations period.

The ALJ discounted this argument on the ground that the government only pleaded certain "effects", thus earlier "effects" that would have triggered accrual did not do so.[134] This implicitly concedes that the claims were in fact time barred, if accrual is factually determined based on the when the claim **first accrued,** and not based on a second, third, or fourth accrual chosen by the government. There is no question these claims first accrued

---

[133] Tr. 1593:13-1594:3.
[134] R.D. at 144.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 50**

outside the limitations period, and did not first accrue again later when the government chose which "effects" started the clock. Under the OCC's rubric, not only is accrual deferred until the bank suffers an effect, the OCC gets to *choose* which statutory effect starts the clock. Put another way, the only way these claims survive is if you allow claim-splitting – each monthly loss on each loan is indeed its own separate cause of action. And the government chooses which loss starts the statute running. This is just absurd and is no more than a government agency deciding to overrule Congress and to delete the word "first accrued" from 28 U.S.C.§ 2462.

As previously discussed, the FDIC's receivership is still open and it actually chooses the date of the loss;[135] and to this day, 13 years on, could still book a loss under the receivership.[136] Thus, under the December 18 Order and the Recommended Decision, the United States government chooses when the statute begins to run. This is exactly what judges, including ALJ Whang, warned about when discussing this issue. *Proffitt v. FDIC*, 208 F.3d 1066, 1067 (D.C. Cir. 2000) ("I think that the panel majority's construction is incorrect and gives those agencies virtually unlimited discretion as to when they initiate proceedings."); *Gabelli v. SEC*, 568 U.S. at 452 (rejecting an interpretation of § 2462 that would leave "defendant exposed not only for five years after their misdeeds, but for an additional uncertain period into the future."); R.D. at 144-45 ("the undersigned … remains hopeful that this ruling will be revisited."). The OCC's view is an unworkable and unreasonable approach, and it is utterly contrary to the law and policy set forth in *Gabelli*. For these reasons, the OREO claims are time-barred.

---

[135] Tr. 2044:11-25.

[136] Tr. 2047:22-2048:13.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 51**

Accounting Issues.  With respect to the attacks on the accounting for OREO, the Recommended Decision ultimately determined that there was no "effect" – the effect prong was not satisfied.  This ruling should be affirmed.  Thus, there is no need to decide whether the prohibition claim was timely.  However, as an alternative grounds to affirm, the Comptroller may also affirm dismissal of these charges on limitations grounds.

The claims are barred because the OCC's attacks on accounting for OREO were based on the 2011 Report of Exam and accounting transactions which took place before that report.[137]  These accounting transactions were outside the statute of limitations.  Accordingly, the ALJ made no findings of fact that any loans were misbooked or incorrectly accounted for on or after September 25, 2012.  Thus, the OREO loans were booked more than five years before this case was brought, and, therefore, are barred by limitations.

 The ALJ appeared to accept the argument (as it was required to do under the December 18 Order) that attacks on the OREO accounting *could* have been timely because financial statements issued by the Bank after September 2012 had not corrected the loans booked in 2009-11 – and she was compelled by the December 18 Order to reach this conclusion.  This is simply unsupported by the facts and the law.

To begin with, David Rogers was not even with the Bank after November of 2011, so he had nothing to do with those financial statements.[138]  Ortega, meanwhile, was with the Bank, but the ALJ made no findings of fact – and there was insufficient evidence to

---

[137] R.D. at 72-73, 75.  This issue was based on the expert report of Christine Salvato which attacked solely the 2009-2011 accounting decisions of the Bank.  To stay within the statute of limitations, the ALJ found that these financial statements were left uncorrected and therefore "all subsequent Call Reports were misstated" as well.  *Id*. at 75.

[138] For this reason, it has been uncontroverted that David Rogers did not and could not have participated in any accounting violations during the limitations period.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 52**

show – that he engaged in culpable conduct during that period with regard to those specific financial statements.

More importantly, the law simply does not authorize "continuing violations" accrual theories of this nature. Merely leaving the financial statements unaddressed or unremedied does not allow the government to extend limitations "*ad infinitum*." *Delek Ref., Ltd v. OSHRC*, 845 F.3d at 176-77 (statute of limitations could not be extended where company continued to fail to address PHA recommendations; strictly enforcing six month statute of limitations from date of violation). Such an approach would render Section 2462 meaningless, allowing stale conduct to be actionable more or less forever. *Id*. "The lingering effect of an unlawful act is not itself an unlawful act." *AKM, LLC v. Sec'y of Labor*, 675 F.3d. at 757. The "mere failure to right a wrong … cannot be a continuing wrong which tolls the statute of limitations." *Id*. The government's view would allow a banker to be banned from banking for an accounting error 100 years ago, provided it was not corrected in the last five years. In the instant case, there was no finding, no evidence, and no allegation that these subsequent Call Reports contained anything more than a carry-through of balances affected by accounting transactions booked in 2009 through 2011. There were no findings of transactions booked in 2012-2013, and certainly no knowing conduct during this period which would rise to the level of scienter required by Section 1818(e). Rather, this is simply another effort on the part of the OCC to extend its statute of limitations well beyond five years.

Most importantly, the OCC's approach on accounting issues contravenes the "first accrual" language of the statute. 28 U.S.C. § 2462. It is not a first accrual of a claim to leave records "uncorrected" or to have improperly accounted for transactions continue to

turn up in Call Reports and other records of the company. The OCC may argue that it is an accrual, but it is certainly not the first accrual.

### 7. The Claims Attacking Non-Accrual Accounting[139] Are Time-Barred.

The ALJ also reached the merits on the claims relating to non-accrual accounting, even though those claims were time barred. Here, the OCC challenges the Bank's alleged practice of improper cash-basis accounting on nonaccrual loans. As the OCC pleaded and the ALJ found, this accounting practice was instituted in 2007, well outside the limitations period, and supposedly continued on into early 2013, within the limitations period. Thus, this claim raises two statute of limitations questions: first, whether this claim "first accrued" under 28 U.S.C. § 2462 in 2007 – and is now barred – or whether claims accrue indefinitely as long as such accounting practice is in place, and second, even if such claim accrue continually as the OCC claims, whether actionable misconduct actually took place during the limitations period.[140]

First, the claims against Respondents first accrued in 2007 when the practice began.[141] Although Respondents disputed this, the ALJ found that in 2007 Bank management set up improper cash-basis accounting in its new accounting software, Jack Henry Silverlake.[142] Indeed, the OCC knew about this issue as early as 2008 and issued orders to the Bank as early as 2009.[143] The OCC could have brought a claim on this software issue as early as 2007 and certainly by 2008. While the OCC claims that this accounting policy continued into the limitations period, the case law suggests that a

---

[139] See Article V of the Notice of Charges.
[140] Again, Mr. Rogers was not even with the Bank during the limitations period and every claim against him is time-barred.
[141] R.D. at 79-80.
[142] Id.
[143] Notice of Charges ¶ 94.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 54**

"continual accrual" theory which would allow the OCC to bring this claim is not appropriate here.  *See SEC v. Jones*, 2006 U.S. Dist. LEXIS 22800, *12 (S.D.N.Y. 2006). Continual ill effects from a violation does not give rise to a continuing violation.  *Id*. (continuing to collect excessive fees within the limitations period, following a failure to disclose relevant information before the limitations period did not allow the SEC to circumvent limitations).  The OCC suggests that every day the Bank failed to have the proper accounting policy in place, the limitations period begins anew.  Such a conclusion would mean a "*de facto* elimination of any statute of limitation, for the limitation period would never begin to accrue as long as the facility remained in operation."  *New York v. Niagara Mohawk Power Corp*., 263 F.Supp. 650, 661 (N.D.N.Y. 2003) (rejecting continuing violation theory on failure to obtain preconstruction permit).  Similar to *Niagara Mohawk*, as long as the Bank stayed open, the limitations period could never run.  This is what *Gabelli* meant when it rejected an open-ended approach to limitations in cases under 28 U.S.C. § 2462.  *Gabelli v. SEC*, 568 U.S.at 452; *Adams v. Woods*, 6 U.S. at 342 ("In a country where not even treason can be prosecuted after a lapse of three years, it could scarcely be supposed that an individual would remain forever liable to a pecuniary forfeiture.").  Here the alleged misconduct took place in 2007 and the claims against Respondents are untimely.

Second, there was no substantial evidence to suggest that either Respondent engaged in any misconduct during the limitations period.  The ALJ expressly found that Rogers left the Bank in 2011 and was no longer affiliated with the Bank.[144]  He did not sign any Call Reports during the limitations period.

---

[144] R.D. at 87.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 55**

Meanwhile, the evidence at trial did not support that Mr. Ortega was involved in booking non-accrual loans on a cash basis or engaged in culpable misconduct after September 25, 2012. Following Ortega's promotion to CEO in early 2012, Ortega brought in third party financial analysts to review every nonaccrual loan and ensured they were being accounted for correctly.[145] Thus, in 2012, before the limitations period, Ortega hired Alvarez and Marsal to analyze the loans and ensure compliance.[146] The Bank always followed the advice and direction of A&M and made all recommended corrections.[147] It was apparent that such accounting decisions were not simple and required a certain level of expertise and judgment,[148] which is why Mr. Ortega brought in Alvarez and Marsal to review the loan grades and documentation.[149] Far from engaging in misconduct with respect to loans, Ortega took steps to ensure compliance on nonaccrual loans. Later on, when the OCC continued to take issue with the accounting for nonaccrual loans, Respondent Ortega precisely followed the examiners directions in every respect and took writedowns exactly as directed.[150] By September 21, 2012, the Bank had taken remedial steps to address the OCC concerns.[151] The evidence showed that Respondent Ortega led the improvements in nonaccrual accounting and was given credit for doing so by the OCC examiners.[152] The preponderance of the evidence showed that during the limitations period, Respondent Rogers was already retired from banking and Respondent Ortega

---

[145] R. Ex. 74; 1035:14-1039:23.

[146] *Id*.

[147] Tr. 1039:20-23.

[148] Tr. 2320:17-23.

[149] Tr. 1035:14-1038:9.

[150] Tr. 1956:10-1957:7; 2322:2-2323:25.

[151] R. Ex. 67-003; *see also* R.D. at 168 (finding that conduct continued sometime into 2012).

[152] R. Ex. 32-006.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 56**

responded immediately to regulator concerns and did everything he was asked to do.[153]
Neither can be determined to have engaged in misconduct during the limitations period.

For these reasons, the claims against Respondents are time-barred.

### 8. The Claims Attacking Loans to Rogers III Entities[154] Are Time-Barred.

In considering Article VI of the Notice Charges, the ALJ found that Respondent
Rogers breached his fiduciary duty to the Bank in 2009 and 2010 when the Bank made
loans to his son's companies.[155]  Because these claims were barred by the statute of
limitations, the ALJ erred by considering these claims.

First, it is undisputed that Rogers was not with the Bank after November 2011, and
this case was brought in September 2017.[156]  Rogers did not, and could not have, committed
a breach of his fiduciary duty during the five years before this case was brought.  Indeed,
he had no fiduciary duty to the Bank during the five years before this case was brought.

Second, the ALJ expressly found that Rogers breached his fiduciary duty in the
spring of 2009, with respect to the Griqualand loan, and in January of 2010, with respect
to the Petro Icon loan.[157]  These loans were approved by the L&D Committee in 2009 and
2010, respectively, and the ALJ found that Rogers breached his duty to "speak up" and
disclose what he knew at those specific meetings.[158]  The ALJ made no finding that Rogers
engaged in any misconduct during the limitations period.  Thus, there can be no dispute
that these claims arose more than five years before this case was commenced – indeed, it
is undisputed that the conduct occurred in 2009 and 2010.  *Gabelli v. SEC*, 568 U.S. at 452

---

[153] R. Ex. 32-006; 2322:2-2323:25.
[154] *See* Article VI of the Notice of Charges.
[155] R.D. at 174-79.
[156] R.D. at 12.
[157] R.D. at 95-102, 174-79.
[158] *Id*.; R.D. at 178.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S
RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL
ARGUMENT – Page 57**

(rejecting an interpretation of § 2462 that would leave "defendant exposed not only for five years after their misdeeds, but for an additional uncertain period into the future."). This claim closely tracks the *De La Fuente* decision, which dealt with the same type of transaction. *De La Fuente v. FDIC*, 332 F.3d at 1219 (insider/family loans predating limitations period were time-barred). As the court in *De La Fuente* determined, it was error for the ALJ to rely on a loan made to a family trust more than five years before the proceeding commenced. *Id*.

Third, even under the "loss" rubric applied by the ALJ under the December 18 Order, these claims should still be barred. The legal conclusions advanced by the ALJ are seriously flawed:

To begin with, the ALJ explicitly found that the Bank ***first*** suffered a loss on the Griqualand loan on September 13, 2012.[159] This was more than five years before this case was commenced on September 25, 2017. Thus, even if one defers accrual – potentially for years or even decades – until the Bank suffers a loss, here the Bank was found to suffer a loss, and a claim "*first accrued*" more than five years before the case was brought. In order to dodge this conclusion, one would have to delete the word "first" from 28 U.S.C. § 2462 and ignore the first accrual of the claim.

Even ignoring this, the claim should still be time-barred because the ALJ did not determine that the Bank suffered any other losses. In the Recommended Decision, the only other "effects" found by the ALJ were losses incurred by the FDIC, not the Bank.[160] While the statute requires a loss to an "***insured depository institution***," the Recommended

---

[159] R.D. at 103, 179.
[160] R.D. at 179.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 58**

Decision only found losses to the ***insurer***, i.e., the FDIC. *Compare* R.D. at 179 *with* 12

U.S.C. § 1818(e)(1)(B)(i) (loss to an "insured depository institution"). The insurer is not

the same as the Bank and does not fall under the statute.

In any event, the scenario proposed by the OCC is simply absurd: David Rogers

joined the Bank in 1982; if Mr. Rogers had made an unsound mortgage home loan in 1988

that defaulted in 2018, and the FDIC then booked a loss, it is the OCC's view that a

proceeding could be entertained against him in 2023, even though Rogers left the Bank in

2011 and the Bank failed in 2013. As witness Mary Jane Locke explained, the FDIC's

receivership is still open, and could book a loss at any time, in its own discretion. The

government actually chooses the date of the loss,[161] and to this day, 14 years on, could still

book a loss under the receivership.[162] In this vision of the statute, the United States

government chooses when the statute begins to run – and because the receivership is still

open, Respondents still – to this day – do not have repose under the five-year statute of

limitations for events 14 or more years ago. This is exactly what judges, including ALJ

Whang, warned about when discussing this issue. *Proffitt v. FDIC*, 208 F.3d at 1067

(Silberman, J., dissenting) ("I think that the panel majority's construction is incorrect and

gives those agencies virtually unlimited discretion as to when they initiate proceedings.");

*Gabelli v. SEC*, 568 U.S. at 452 (rejecting an interpretation of § 2462 that would leave

"defendant exposed not only for five years after their misdeeds, but for an additional

uncertain period into the future."); R.D. at 144-45 ("the undersigned … remains hopeful

---

[161] Tr. 2044:11-25.
[162] Tr. 2047:22-2048:13.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S
RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL
ARGUMENT – Page 59**

that this ruling will be revisited.").   The OCC's view is an unworkable and unreasonable approach, and it is utterly contrary to the law and policy set forth in *Gabelli*.

Most importantly, one simply cannot glean the OCC's reading from the statutory language.   No one disputes that this claim could have been brought when the challenged loans were made and therefore "first accrued" in 2009 or 2010, more than five years before this claim was brought.   The statutory text is worded so that a Tier 1 penalty is available upon an improper loan, and a Tier 2 penalty and prohibition when such loan is "likely to cause more than a minimal loss" or "will probably suffer financial loss or other damage" or "depositors . . . could be prejudiced."  12 U.S.C. § 1818(e); 12 U.S.C. § 1818(i)(2)(B)(ii); 12 U.S.C. § 1818(i)(2)(A).  The ALJ failed to consider this language in her determination of limitations.[163]   Under the OCC's rubric, the government not only gets to defer accrual, but it gets to decide *which* "effect" causes the statute to start running.   This is just wrongheaded and is no more than a government agency deciding to overrule Congress and to delete the word "first" from 28 U.S.C.§ 2462.   The better view is that claims accrue under 12 U.S.C. § 1818(e) when a cause of action may be brought – the "early running of the statute of limitations seems to me the inevitable price of section 8(e)'s low threshold; the agencies have to take the bitter with the sweet." *Proffitt*, 200 F.3d at 866 (Silberman, J., dissenting).

Finally, by relying on losses suffered by the FDIC, the Recommended Decision runs into another problem:  there was no evidence presented supporting these "losses."

---

[163]  The ALJ failed to analyze this issue correctly solely because she was following the misguided legal analysis contained in the Comptroller's December 18 Order.  Had she been given the correct legal framework, she would have found these claims to be time-barred in light of the evidence adduced at trial.  R.D. at 118.

There was no evidence offered that these loans did not perform.  It is unknown whether the FDIC recorded losses because of some horse-trade it made with Plains Capital, because of some global write-down unrelated to these specific loans, or for some other reason.  The OCC never attempted to prove that the loans failed to perform (because they performed).  All that is known is that the losses were taken in an amount and at a time chosen by the government.  This is no basis for a timely claim under 28 U.S.C. § 2462.

**B. Respondents Were Denied a Trial By Jury (Exception 2).**

In light of the recent decision in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), Respondents were entitled to have this case submitted to a jury under the Seventh Amendment of the United States Constitution.  The OCC's in-house adjudication of this matter violates Respondents' constitutional rights.  *Id*. at 451-59.  This proceeding seeks recovery of civil penalties, a type of claim that *Jarkesy* squarely holds is entitled to a jury.  *Id*.  Further, the Seventh Amendment applies to "mixed" proceedings – thus, all facts relevant to the civil penalty claims should be decided by a jury "even if those facts relate to equitable claims too."  *Id*. at 454.  Moreover, each claim in this case involves a claim for breach of fiduciary duty for which there can be no dispute is a type of claim that originally arose at common law.  And as *Jarkesy* notes, Congress cannot eliminate a party's Seventh Amendment rights by merely relabeling a cause of action as a statutory one and placing exclusive jurisdiction in an administrative agency.  *Id*. at 457.  Accordingly, it was error to deny Respondents the opportunity to a trial by jury.  *Id*. at 451 ("civil juries in particular have long served as a critical check on government power."); *see also Burgess v. FDIC*, 2022 U.S. Dist. LEXIS 213050, *27-32 (N.D. Tex. November 6, 2022) (preliminary injunction granted against FDIC proceeding for failing to guarantee Seventh Amendment

jury trial); *Burgess v. FDIC*, 2022 U.S. Dist. LEXIS 223387, *5-6 (N.D. Tex. December 1, 2022).

### 1. The Seventh Amendment Right to a Jury Trial and *Jarkesy*.

The Founders described the right to a trial by jury as "the heart and lungs of liberty"[164] and as "the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution."[165] The Supreme Court has aptly described jury trials as "fundamental" to the American legal system and as "one of our most vital barriers to governmental arbitrariness." *Reid v. Covert*, 354 U.S. 1, 9-10 (1957). "Civil juries in particular have long served as a critical check on government power. So precious were civil juries at the time of the Founding that the Constitution likely would not have been ratified absent assurance that the institution would be protected expressly by amendment." *Jarkesy*, 34 F.4th at 451-52. The Supreme Court has repeatedly confirmed that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence" that "any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

The Seventh Amendment to the United States Constitution provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S.

---

[164] *The Revolutionary Writings of John Adams* 55 (C. Bradley Thompson ed., 2000).

[165] Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in The Papers of Thomas Jefferson* 267 (Julian P. Boyd ed., 1958).

Const. amend. VII.   In *Tull v. United States*, the Supreme Court construed the Seventh Amendment "to require a jury trial on the merits in those actions that are analogous to 'Suits at common law'" because, "[p]rior to the Amendment's adoption, a jury trial was customary in suits brought in the English law courts." 481 U.S. 412, 417-18 (1987).  *Tull* confirmed that the fact that the cause of action giving rise to the dispute was "created by congressional enactment" does not mean that no jury trial is required; instead, the operative question is whether the "statutory action is . . . ***similar to*** cases that were tried in courts of law." *Id.* (emphasis added); *see Jarkesy*, 34 F.4th at 452 (noting that the term "Suits at common law" can "include suits brought under a statute as long as the suit seeks common-law-like legal remedies").  And *Tull* instructed that, in determining whether a statutory action is "similar to cases that were tried in courts of law," a court should "examine both the nature of the action and of the remedy sought." 481 U.S. at 417.

All of that said, the Supreme Court has held that Congress may assign the adjudication of certain disputes to agencies instead of juries in a limited set of cases that implicate "public rights." "[I]n cases in which 'public rights' are being litigated"—for example, in "cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact"—the "Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible." *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977). The Supreme Court "refined" the concept of "public rights" in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), where it held that "Congress cannot circumvent the Seventh Amendment jury-trial right simply by passing a statute that assigns 'traditional legal

claims' to an administrative tribunal." *Jarkesy*, 34 F.4th at 453 (quoting *Granfinanciera*, 492 U.S. at 52).

The Fifth Circuit's recent decision in *Jarkesy* clarified that the inquiry to determine whether an adjudication must be handled by a jury moves in "two stages":

> First, a court must determine whether an action's claims arise "at common law" under the Seventh Amendment. Second, if the action involves common-law claims, a court must determine whether the Supreme Court's public rights cases nonetheless permit Congress to assign it to agency adjudication without a jury trial. . . . [T]he relevant considerations include: (1) whether Congress created a new cause of action, and remedies therefor, unknown to the common law, because traditional rights and remedies were inadequate to cope with a manifest public problem; and (2) whether jury trials would go far to dismantle the statutory scheme or impede swift resolution of the claims created by statute.

*Jarkesy*, 34 F.4th at 453 (citations omitted). The Petitioner in *Jarkesy* had been the target of an SEC enforcement proceeding in which the agency alleged that the Petitioner had committed securities fraud and sought various remedies against him, including substantial civil penalties. *Jarkesy*, 34 F.4th at 449-50. The *Jarkesy* court held that the cause of action against Mr. Jarkesy did arise at common law because a "civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Id.* at 453-54. As to the second question—i.e., whether the Supreme Court's "public rights" cases permitted the SEC to proceed with an adjudication that did not include a jury—the *Jarkesy* panel held that they did not. The panel concluded that (1) "[s]ecurities fraud actions are not new actions unknown to the common law" and that (2) "[j]ury trial in securities fraud suits would not dismantle the statutory scheme" or "impede swift resolution of the SEC's fraud prosecutions." *Id.* at 455. Because Mr. Jarkesy was entitled to a trial by jury, the Fifth

Circuit ordered the entirety of the SEC's enforcement proceeding against him to be "vacated." *Id.* at 459.

### 2.  This Proceeding Violates Respondents' Constitutional Rights.

This case is on all fours with *Jarkesy*. Respondents were entitled to a jury trial on the OCC's allegations against them, and therefore this proceeding is unconstitutional. The first question under the *Jarkesy* test is whether "an action's claims arise 'at common law' under the Seventh Amendment." *Id.* at 453. The OCC's claims against Respondents, while nominally statutory, do arise at common law.  That is so because the OCC is seeking a civil monetary penalty. *Jarkesy* clearly held that the "Seventh Amendment jury-trial right applies to suits brought under a statute seeking civil penalties." 34 F.4th at 452. *Jarkesy* reached that holding based on the fact that *Tull* had established a bright-line rule that actions for civil penalties under a statute are actions "at common law" for Seventh Amendment purposes, given that such actions are analogous to common-law actions for debt.  *See Tull*, 481 U.S. at 422 ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law. Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity."); *Jarkesy*, 34 F.4th at 454 (noting that "actions seeking civil penalties are akin to special types of actions in debt from early in our nation's history which were distinctly legal claims" that "could only be enforced in courts of law" (internal quotation marks omitted)).  Moreover, claims for breaches of fiduciary duties are among the types of claims that would have been adjudicated in an eighteenth-century English court of law.  *See, e.g.*, *In re Hooper*, 112 B.R. 1009, 1012 (B.A.P. 9th Cir. 1990) ("[A]n action to recover money damages for . . . breach of fiduciary duty . . . was

the type of action that would have been brought in a court of law in the courts of England prior to the merger of law and equity."); *accord In re Thrall*, 196 B.R. 959, 970 (Bankr. D. Colo. 1996).

The second question under the *Jarkesy* test is whether the Supreme Court's public-rights cases "permit Congress to assign" the proceeding "to agency adjudication without a jury trial." *Id.* at 453. The relevant subsidiary "considerations include: (1) whether Congress 'created a new cause of action, and remedies therefor, unknown to the common law,' because traditional rights and remedies were inadequate to cope with a manifest public problem;" and "(2) whether jury trials would 'go far to dismantle the statutory scheme' or 'impede swift resolution' of the claims created by statute." *Id.* One of the OCC's chief allegations in this case, and chief issues addressed by the ALJ, is that Respondents breached their fiduciary duties. Indeed, the statute invoked by the OCC provides that prohibition and/or removal may be appropriate when a banker "has, directly or indirectly . . . committed or engaged in any act, omission, or practice which constitutes a ***breach of such party's fiduciary duty***." 12 U.S.C. § 1818(e)(1)(A) (emphasis added). Actions seeking remedies for breaches of fiduciary duties were not invented by the American Congress, but rather have been known at common law for centuries. *See* David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1011, 1013-16 (2011). And, as explained above, the remedy of civil money damages was clearly known at common law. *Jarkesy*, 34 F.4th at 454.

The use of jury trials to adjudicate claims of the type that the OCC is pursuing against Respondents would not "dismantle the statutory scheme." *Jarkesy*, 34 F.4th at 453. When applying this factor, one critical consideration for the court's attention is whether

the claims at issue are of "the sort . . . uniquely suited for agency adjudication." *Id.* at 456. Claims alleging entitlement to money damages for breaches of common-law duties do not fit that bill because, just as with the securities-law claims at issue in *Jarkesy*, "federal courts have dealt with actions" of this type "for many decades." *Id.* Indeed, claims involving requests for civil monetary penalties and breaches of fiduciary duties are heard every day by federal courts sitting in diversity and by federal courts adjudicating liability under various state and federal statutory schemes. Also, there is nothing "dismantling" about allowing a jury to be a finder-of-fact in such cases. The Comptroller already utilizes an ALJ to handle these proceedings as a bench trial, and it would not alter the statutory purpose at all to have the same ALJ preside over a jury trial. Judges handle both bench and jury trials all the time, and it would be appropriate for ALJs to do so as well.[166]

The use of jury trials to adjudicate claims of the type that the OCC is pursuing also would not "impede swift resolution of the claims created by statute." *Jarkesy*, 34 F.4th at 453. In *Jarkesy*, the Court found that there was "no evidence that jury trials would impede swift resolution" of SEC enforcement proceedings and noted that, in the particular case of Mr. Jarkesy, the "SEC took seven years to dispose of" the case. *Id.* at 456. Here, this proceeding was initiated many years ago and the events at issue occurred more than a decade ago. Certainly, a jury trial would not have impeded "swift resolution" since there was no swift resolution without one.

---

[166] Moreover, the fact that routing some OCC enforcement proceedings to jury trials might potentially pose disruption does not, without more, save an otherwise unconstitutional scheme from judicial scrutiny. *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.").

In sum, Respondents were entitled to a jury trial. The deprivation of a jury in cases where one is required by the Seventh Amendment is a fundamental structural error that requires vacatur of the entire proceeding. *Id.* at 459; *Burgess v. FDIC*, 2022 U.S. Dist. LEXIS 213050, *27-32 (N.D. Tex. November 6, 2022) (preliminary injunction granted against FDIC proceeding for failing to guarantee Seventh Amendment jury trial); *Burgess v. FDIC*, 2022 U.S. Dist. LEXIS 223387, *5-6 (N.D. Tex. December 1, 2022).

## C.  The Appointments Clause (Exceptions 3 & 4)

Two Administrative Law Judges ("ALJs"), ALJs McNeil and Miserendino, handled this case from 2017 to 2019.  They were not appointed by the President, with the advice and consent of the Senate, nor, with the permission of Congress, by the President alone, the Courts of Law, or the Head of a Department.  U.S. CONST. Art. II, §2, cl. 2.  As such, this proceeding runs afoul of the Appointments Clause of the United States Constitution. *Lucia v. SEC*, 138 S. Ct. 2044, 2053 (2018).  As a result, this case is a nullity and should be dismissed.

The current ALJ has ruled that the OCC may continue forward with this proceeding under a "reassignment and ratification" approach, where it assigns a new ALJ to the case who then ratifies the prior void rulings by the unauthorized and illegal ALJs.[167]  This approach, however, goes against all of the applicable case law and treats the unlawful appointments as something less than a structural error.

---

[167] *See* March 17, 2020 Order Denying Respondents' Motion for Summary Disposition on the Appointments Clause; Order Reviewing Prior ALJ's Actions.  On June 18, 2020, the Comptroller denied interlocutory review of the Appointments Clause issue.  As a result, review of this matter is now ripe following the ALJ Decision on September 30, 2022.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 68**

Appointments Clause violations constitute a structural and fundamental error. The Appointments Clause is "more than a matter of etiquette or protocol." *Edmond v. U.S.*, 520 U.S. 651, 659 (1997). Rather, "it is among the significant structural safeguards of the constitutional scheme." *Id.* The defect in the appointment of the ALJ "goes to the validity" of the entire proceeding. *Freytag v. Commissioner*, 501 U.S. 868, 879 (1991). Thus, an improper adjudicator's participation "affects the … whole adjudicatory framework." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1910 (2016). It undermines the proceeding so fundamentally that "the effects of the error are simply too hard to measure." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017).

When such fundamental, structural violations occur, the Supreme Court has ruled that the appropriate remedy is to dismiss the entire proceeding and require that the proceeding be commenced afresh. *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986). Just as a proper trial jury cannot convict a defendant following the involvement of an unconstitutionally appointed grand jury, a proper ALJ cannot sit in judgment of these Respondents following the involvement of unconstitutional ALJs in this proceeding. *Id.* Pretrial activity handled by an improperly appointed tribunal, even when the ultimate decision is taken by a different tribunal, undermines the structural integrity of the entire proceeding and requires dismissal. *Id.*

Furthermore, because the ALJs lacked authority to conduct the proceeding and made multiple procedural and substantive rulings prejudicing the Respondents and materially affecting the outcome of this case, this case should be dismissed whether it is considered structural or not. Under any remedial legal standard, these unauthorized rulings tainted the proceeding and require reversal.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 69**

The new ALJ also denied Respondents the ability to challenge the new ALJ on Appointments Clause issues by denying them discovery on the matter and the ALJ also rejected their arguments under 5 U.S.C § 3105.   These rulings should be reversed.

### 1.  Background of the Appointments Clause Issue

This case was commenced on September 25, 2017 before the Honorable Christopher B. McNeil, Administrative Law Judge of the Office of Financial Institution Adjudication.[168]   ALJ McNeil was designated to handle this case by another ALJ, C. Richard Miserendino.[169]   ALJ McNeil issued multiple orders at the outset of the case governing the schedule, discovery, and pleadings.[170]

The ALJ struck Respondents' pleadings.[171]   Respondents made allegations that the 2008 financial crisis was responsible for the failure of the bank at issue in this case.[172]   The ALJ struck those allegations from the case, deeming them "not relevant."[173]   The Respondents also averred that the Bank lost 60% of its capital, or $174 million, when, during the crisis, the United States government decided not to support the preferred stock of Fannie Mae and Freddie Mac.[174]   The ALJ struck this allegation for the same reason.[175] While Respondents view these averments as appropriate and reasonable arguments to explore in discovery – and essential to the story of why the Bank suffered losses for which

---

[168] *See* Notice of Charges For Orders of Prohibition and Notice of Assessments of a Civil Monetary Penalty (September 25, 2017).
[169] *See* Notice of Designation and Order Requiring Electronic Filing (September 26, 2017).
[170] Orders Regarding Discovery Planning, to Attend Scheduling Conference, and to Show Cause Regarding Certain Affirmative Defenses (October 16, 2017); Scheduling Order (November 8, 2017); Protective Order (October 18, 2017).
[171] *See* Order Regarding OCC's Motion to Strike Respondents' First, Second, Third, and Sixth Affirmative Defenses (December 13, 2017).
[172] *Id*.
[173] *Id*.
[174] *Id*.
[175] *Id*.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 70**

the OCC is attempting to blame Respondents – the unconstitutional ALJ here took the unusual step of striking these pleadings entirely from the case. These rulings narrowed the scope of the case and limited discovery.

The unconstitutional ALJ made orders related to document subpoenas, some denying and some permitting the relief requested. The ALJ also declined to order the parties to mediation, or submit the matter to any alternative dispute resolution procedures, following requests by Respondents to do so.[176] Throughout 2018, the parties exchanged discovery and documents, took depositions, and exchanged witness lists and expert reports, all under the direction of ALJ McNeil and pursuant to his orders regarding the scope and timing of discovery.

Commentators – including ALJ McNeil – have raised concerns that ALJs are not impartial, are too close to the prosecutors and agencies they represent, and are biased in favor of the government.[177] Because of these concerns, parties to administrative proceedings have increasingly raised the Appointments Clause and sought to put the government to its proof that the ALJ is properly authorized to proceed.

In June 2018, the Supreme Court decided the *Lucia* case, following case law from the Fifth Circuit and elsewhere. That ruling confirmed Respondents' legal challenge to ALJ McNeil that he lacked authority to proceed under the United States Constitution. *Lucia v. SEC*, 138 S. Ct. at 2053.

---

[176] *See* January 30, 2018, Status Conference Order.

[177] Are the SEC's Administrative Law Judges Biased? An Empirical Investigation, 92 WASH. L. REV. 315, 331 (2017) ("Perceptions that administrative proceedings may be biased for either procedural or subjective reasons have been circulating for some time."); Insider Trading: The Problem with the SEC's In-House ALJs, 67 EMORY L.J. 123 (2017); ADMINISTRATIVE AGENCY LITIGATION, Christopher B. McNeil, at 16 ("[Y]ou might expect that the judge is going to decide your case impartially, based on the evidence presented, without favoring the government's side of the case . . . But it would be a mistake to believe that the black robe, the raised dais, and the courtroom environment have created an independent adjudicator.")

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 71**

The Head of the Department over this proceeding, the Secretary of the Treasury, could not produce any evidence to show that he appointed ALJ McNeil to his position. On July 24, 2018, the Treasury Department provided a letter stating that it had no documents showing the appointment of Christopher McNeil as an ALJ, no documents showing the identity of who appointed him, and no documents signed by the Secretary of the Treasury (or the Comptroller) authorizing the ALJ to conduct any activities.[178]

On August 24, 2018, the ALJ who originally assigned this case to ALJ McNeil issued a Notice notifying Respondents that the case was being reassigned to himself – that is, Judge Miserendino.[179] Attached to the Notice was an order issued by the Comptroller of the Currency entitled Order in Pending Enforcement Cases in Response to *Lucia v. SEC*.[180] The Order reassigned this case to Judge Miserendino from Judge McNeil. The Order appears to concede that the Secretary of the Treasury did not appoint either ALJ McNeil or Miserendino.[181] The Order relies on the FDIC's activities to justify the appointment and does not claim that either Treasury or the OCC appointed either ALJ.

On August 30, 2018, Respondents filed a Motion For Summary Disposition on the basis of the Appointments Clause problems identified in *Lucia*.[182]

On September 11, 2018, Judge Miserendino issued subpoenas to two witnesses to appear and give testimony as part of the discovery process in the case, despite the Treasury

---

[178] *See* March 27, 2020 Respondents' Motion for Interlocutory Review at Exhibit A (Letter from Cawana Pearson to Frank C. Brame).
[179] *See* August 24, 2018 Notice of Case Reassignment and Opportunity to File Objection and Response.
[180] *Id*.
[181] *Id*.
[182] August 30, 2018 Respondents' Motion for Summary Disposition on the Appointments Clause and Brief in Support. On March 17, 2020, the Motion was denied, as discussed *infra*.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 72**

Department having not appointed him as an ALJ for OCC matters in accordance with the Constitution.[183]

On October 5, 2018, Respondents filed Objections to Orders Issued by the ALJ, challenging the rulings made by ALJ McNeil in the case.[184]

On October 23, 2018, ALJ Miserendino stayed this proceeding pending further orders.[185]

On November 11, 2018, OCC Enforcement Counsel provided Respondents with a copy of "Ratification of Administrative Law Judge Appointments" signed by the Secretary of the Treasury.  It was labeled "Attachment 1" but no attachments or cover documents were provided.   Respondents, through FOIA, sought a complete set of the documents and were ignored for months.  Finally, the Treasury Department produced a set of heavily redacted materials requiring Respondents to bring suit in federal court before it would disclose the basis for the redactions or respond to Respondents in any meaningful way.

Finally, in June 2019, the government provided the basis for the redactions.  A federal judge reviewed the documents *in camera* and determined that unredacted documents were unnecessary, as it was already "undeniably clear from the October Memorandum that [Secretary of the Treasury] Mnuchin did not select the OCC ALJs." *Ortega v. United States Dep't of the Treasury*, 2019 U.S. Dist. LEXIS 225231, *11, 14-15 (S.D. Tex. 2019) (noting that the "Federal Banking Agencies" and not the Treasury Department chose the ALJs).

---

[183] September 11, 2018 Order Granting Leave to Take 3 Discovery Depositions Out of Time.
[184] On March 17, 2020, the Objections were overruled, as discussed *infra*.
[185] *See* Order Staying Scheduling Order (October 23, 2018).

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 73**

On January 8, 2020, the current ALJ entered a Notice of Reassignment and Order Regarding the Comptroller of the Currency's Order in Pending Enforcement Cases.

On January 14, 2020, Respondents sent another FOIA request to the Department of the Treasury requesting documents related to the appointment of ALJ Jennifer Whang.  No documents were provided.

On February 28, 2020, Respondents filed their renewed Motion for Summary Disposition on the Appointments Clause and Objections to ALJ Orders.   On March 17, 2020, the ALJ denied the Motion and Objection in every respect.[186]

### 2. Administrative Law Judges Are Officers of the United States.

The Constitution of the United States provides as follows:

> [The President] shall nominate, and by and with the advice and consent of the Senate, shall appoint Ambassadors, other public ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by law vest the appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. Art. II, §2, cl. 2 (the "Appointments Clause").

Therefore, if the ALJ in this case is an Officer, he or she must either (i) be appointed by the President with the advice and consent of the Senate, or (ii) if an Inferior Officer, and if Congress authorizes it, be appointed by the President alone, the Courts, or the Head of a Department.

The United States Supreme Court has determined that ALJs are in fact Officers who must be appointed consistent with the Appointments Clause.  *Lucia v. SEC*, 138 S. Ct. at

---

[186] *See* March 17, 2020 Order Denying Respondents' Motion for Summary Disposition on the Appointments Clause; Order Reviewing Prior ALJ's Actions.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 74**

2051-52.  The Fifth Circuit had previously ruled in accord with this conclusion.  *Burgess v. FDIC*, 871 F.3d 297, 299 (5th Cir. 2017).

### 3. Judge McNeil and Judge Miserendino Were Not Appointed Consistent with the Constitution.

It is not the burden of Respondents to show that the ALJ lacks authority to proceed. Indeed, even if the parties "*expressly* stipulated" that the ALJ was properly appointed, this would not cure a constitutional defect.  *Nguyen v. U.S.*, 539 U.S. 69, 80-81 (2003).  Instead, a court has a special obligation to satisfy itself of its authority to proceed.  *E.g., Boren Swindell & Assoc. v. Friedman*, 2006 U.S. Dist. Lexis 12305, *8 (N.D. Tex. 2006) (citing *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

### a. Neither of the Permissible Methods of Appointment Occurred Here.

Under the Appointments Clause, there are two ways that an Officer may be appointed.  First, the President may appoint Officers, with the advice and consent of the Senate.  U.S. CONST. Art. II, §2, cl. 2.  Second, if Congress so authorizes, an Officer may be appointed by the President alone, the Courts of Law, or Heads of a Department.  *Id*.

In this case, both ALJs were hired not by any of these methods, but by competitive examination through the Office of Personnel Management ("OPM").  5 U.S.C. § 1104(a)(2); 5 C.F.R. 930.201.[187]  The OPM scored examinations, ranked the candidates, and selected a list of ALJs.  5 C.F.R. 332.401-332.402.  Agencies then may select from the list provided by the OPM.  5 U.S.C. § 3317(a), § 3318(a).  In this case, the OCC delegated

---

[187] In selecting the ALJs, the OPM has the authority to "Ensure the independence of the administrative law judge," among a myriad of other authorities alongside the OCC.  5 C.F.R. 930.201(e) – (f).  This approach creates the "diffusion" of responsibility found so pernicious by the Framers and which the Appointments Clause is designed to prevent.

selection of the ALJ to another bureaucracy, the Office of Financial Institution Adjudication ("OFIA"). 12 C.F.R. 19.101. According to the OPM, the OFIA employs two ALJs, but the OCC and Treasury have none.[188] Not surprisingly, the applicable Head of Department, Treasury, originally had no idea who appointed ALJ McNeil and no documents to show how he was selected.[189] As the whole purpose of the Appointments Clause is "to maintain clear lines of accountability – encouraging good appointments and giving the public someone to blame for bad ones," this confusing and diffuse appointment process goes directly to the policy concerns of the Framers of the Constitution. *Lucia v. SEC*, 138 S. Ct. at 2056 (Thomas, J., concurring) (citing The Federalist No. 76).

This method failed to satisfy the Appointments Clause. The President did not appoint the ALJs and the Senate did not consent. Furthermore, the ALJ's selection was not made by the President alone, a Court of Law, or the Secretary of Treasury, and Congress did not authorize the President, a Court of Law, or the Secretary of the Treasury to do so.

### b. The Secretary of the Treasury is the Head of the Department, and He Did Not Appoint the original ALJs to this Case.

The OCC is part of the Treasury Department, and as explained in *Freytag*, the Appointments Clause power of the Head of a Department is limited to actual heads of government departments, i.e. cabinet members. *Freytag*, 501 U.S. at 886 ("Department refers only to a part or division of the executive government, as the Department of State, or of the Treasury, expressly created or given the name of a department by Congress …

---

[188] https://www.opm.gov/services-for-agencies/administrative-law-judges/#url=By-Agency
[189] March 27, 2020 Respondents' Motion for Interlocutory Review at Exhibit A (Letter from Cawana Pearson to Frank C. Brame).

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 76**

[and] does not embrace inferior commissioners and bureau officers" and finding that confining departments to cabinet level is consistent with the meaning of the Appointments Clause because "Cabinet level departments are limited in number and easily identified. Their heads are subject to the exercise of political oversight and share the President's accountability to the people.")  Thus, the only member of the executive branch that could have appointed this ALJ – other than the President – is the Secretary of the Treasury.  The Comptroller is the head of a "bureau," which is not embraced by the Appointments Clause. 12 U.S.C § 1(a); *Freytag*, 501 U.S. at 886 (bureaus not embraced).[190]  It was undisputed that the Secretary of the Treasury did not appoint ALJ McNeil, and Treasury confirmed that it had no documents to support that it did so.[191]

The OCC's initial strategy to deal with this problem was to piggyback off the ALJ appointments of the FDIC.  As described in the Order, Judge Miserendino was appointed as an ALJ by the FDIC for FDIC matters on July 19, 2018.  The OCC's reliance on the FDIC to appoint its judges is a fatal flaw, however.  The FDIC Resolution does not even cover OCC proceedings.  The FDIC Resolution by its own terms is only an appointment "for the FDIC."  ("The Board hereby appoints Administrative Law Judge C. Richard Miserendino and Administrative Law Judge Christopher B. McNeil as administrative law judges *for the FDIC* . . .") (emphasis added).  Thus, the FDIC Resolution by its own terms is a limited one and does not appoint the judges to hear this case.

---

[190] Similarly, the OFIA and OPM are mere "offices."
[191] March 27, 2020 Respondents' Motion for Interlocutory Review at Exhibit A (Letter from Cawana Pearson to Frank C. Brame).

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 77**

Next, the OCC attempted to have its appointments ratified by Treasury.[192]   In doing

so, Treasury did not appoint the ALJs under the Constitution but rather engaged in an effort,

inconsistent with *Freytag,* to paper over appointments that had already been made.[193]

Throughout this process, it was "undeniably clear from the October Memorandum that

[Secretary of the Treasury] Mnuchin did not select the OCC ALJs." *Ortega,* *11, 14-15.

Thus, this case was handled by two ALJs that lacked authority to proceed and who were

not appointed by the Treasury Department.   In sum, the involvement of these ALJs in the

case was unconstitutional and must be remedied using the methods identified in federal

decisions dealing with such structural errors.

### 4.  Applicable Law Requires that This Unconstitutional Proceeding be Dismissed and Recommenced, if at all, Before a Properly Appointed Tribunal.

#### a.  An Appointments Clause Violation Is A Structural Error That Taints the Entire Proceeding.

The Appointments Clause is "more than a matter of etiquette or protocol." *Edmond*

*v. U.S.*, 520 U.S. at 659.   Rather, "it is among the significant structural safeguards of the

constitutional scheme."   *Id*.   A constitutional challenge to the appointment of the judge

presiding is "neither frivolous nor disingenuous." *Freytag v. Commissioner*, 501 U.S. at

879.   The manipulation of appointments is one of the greatest grievances against executive

power. *Id*. at 883 (referring to such violations as "insidious" and "despotic").   The Framers

of the Constitution addressed these grievances through the Appointments Clause. *Id*.   "The

Clause is a bulwark against one branch aggrandizing its power at the expense of another

---

[192] This may be found attached as an exhibit to the OCC's November 20, 2018 Unopposed Motion for Leave to Amend OCC's Response to Respondents' Objections to Order Issued by ALJ.
[193] *Id*.

RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 78

branch, but it is more: it preserves another aspect of the Constitution's structural integrity by preventing diffusion of the appointment power." *Ryder v. U.S.*, 515 U.S. 177, 182 (1995). As a result, this grave constitutional violation cannot be ignored or papered over. The defect in the appointment of the ALJ "goes to the validity" of the entire proceeding. *Freytag v. Commissioner*, 501 U.S. at 879.

Longstanding federal case law establishes that the participation of an improper judge constitutes "structural error." As Judge Easterbrook has observed, the Supreme Court treats "the participation of a disqualified judge as a form of structural error . . ." *Fowler v. Butts*, 829 F.3d 788, 794 (7th Cir. 2016) (citing *Nguyen v. U.S.*, 539 U.S. 69 and *Williams v. Pennsylvania*, 136 S. Ct. at 1910). Indeed, the Supreme Court reverses such judgments "even though [the decisions] likely would have come out the same way with a different complement of judges." *Id.* That a judge's improper involvement is "structural" error goes back at least as far back as *Tumey v. Ohio*, 273 U.S. 510, 525 (1927). An unconstitutional judge equates to "structural error even if the judge in question did not cast a deciding vote." *Williams*, 136 S. Ct. at 1909. This principle is true not only with respect to the participation of judges, but also any improper tribunal that participates in a proceeding. *Vasquez v. Hillery*, 474 U.S. at 263 (holding that participation of improper grand jury was structural error, even where the trial jury acted properly in convicting defendant).

### b. Structural Error Is Per Se Harmful and Would Entitle Respondents to Automatic Reversal on Appeal.

Structural errors are treated differently under constitutional law. "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees . . ." *Weaver v. Massachusetts*, 137 S. Ct. at 1907. As a result, it "defies analysis

by harmless error standards." *Id*. Thus, the existence of a structural error requires automatic reversal of any decision reached in such a case. *Id*. at 1910. ("Thus, in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant is generally entitled to 'automatic reversal' ***regardless of the error's actual 'effect on the outcome.'***") (emphasis added).

Where a structural error is present, reviewing courts do not get into the business of evaluating whether the error prejudiced the defendant. Instead, harm is presumed and the case must be reversed. A constitutional error is either structural or it is not. *Neder v. U.S.*, 527 U.S. 1, 8 (1999). If it is structural, the only result is an automatic reversal of the lower court decision by the appellate court. *Weaver v. Massachusetts*, 137 S. Ct. at 1910; *McCoy v. Louisiana*, 138 S. Ct. 1500, 1512 (2018). An improper adjudicator's participation "affects the … whole adjudicatory framework." *Williams v. Pennsylvania*, 136 S. Ct. at 1910. It undermines the proceeding so fundamentally that "the effects of the error are simply too hard to measure." *Weaver v. Massachusetts*, 137 S. Ct. at 1908. Thus, the Constitution requires "fresh consideration" by a properly appointed judge. *Nguyen v. U.S.*, 539 U.S. at 83.

Because structural errors are *per se* harmful, no showing of prejudice is required. However, in this case, the unconstitutional ALJ struck Respondents' pleadings and entered complex orders regarding depositions and exhibits. These decisions affected every aspect of Respondents' strategy and approach to discovery. *See, infra*., Part IV.C.5.

### c. Respondents Are Entitled to Dismissal and a New Proceeding.

Thus, it is simply no answer to suggest that the instant proceeding may continue on with a new judge. A litigant is entitled to a proper judge "in the first instance." *Ward v.*

*Monroeville*, 409 U.S. 57, 62 (1972). The Supreme Court has determined that pretrial decisions by an unconstitutionally selected tribunal taint the entire proceeding and require that the proceeding be commenced afresh. *Vasquez v. Hillery*, 474 U.S. at 263 (unconstitutional appointment of grand jury required entirely new proceeding despite subsequent conviction by petit jury). In *Vasquez*, the Court found that an unconstitutionally appointed grand jury, just as the ALJ in this case, makes pretrial decisions that "infect . . . the nature or very existence of the proceedings to come." *Id.* Thus, pretrial activity handled by an improperly appointed tribunal, even when the ultimate decision is taken by a different official, undermines the structural integrity of the entire proceeding. *Id.*; *see also U.S. v. Leeper*, 2006 U.S. Dist. LEXIS 32147, *11 (W.D. N.Y. 2006) (second grand jury could not review and ratify indictment issued by a previous grand jury, but had to begin anew).

Similarly, in *Fowler v. Butts*, *Nguyen*, and *Williams* the participation of an improper judge, even one who was not the deciding factor in the case, entitled the defendants to automatic reversal of the judgment rendered against them. *See Fowler v. Butts*, 829 F.3d at 794; *Nguyen v. U.S.*, 539 U.S. at 83; *Williams v. Pennsylvania*, 136 S. Ct. at 1910.

The ALJ ruled that the OCC could continue the existing proceeding without dismissing the case and beginning anew, relying on the Supreme Court's decision in *Lucia* which only required a new judge – rather than explicitly calling for an entirely new proceeding. *Lucia*, however, expressly avoided reaching these kinds of details. In *Lucia*, the Court did not address a situation where an unconstitutional judge made pretrial rulings that struck arguments, narrowed the scope of discovery and harmed the Respondents' ability to defend themselves. The effect of such rulings are simply too difficult to measure. *Weaver v. Massachusetts*, 137 S. Ct. at 1908. The new ALJ should not be presented with

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 81**

unconstitutional rulings and asked to approve them – rather she should be presented with these issues *tabula rasa*. *U.S. v. Leeper*, 2006 U.S. Dist. LEXIS 32147, *11. Indeed, this is what is required in all cases involving structural error. *Weaver v. Massachusetts*, 137 S. Ct. at 1910; *McCoy v. Louisiana*, 138 S. Ct. at 1512.

This outcome is consistent with – and required by – *Lucia* which detailed the remedy for Appointments Clause violations for ALJs. The appropriate remedy is a new hearing before a properly appointed official. *Lucia v. SEC*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 183, 188). And the officer must be a new one. *Id*. "To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled." *Id*. Respondents are denied a new hearing when they must proceed under ALJ McNeil's orders striking their defenses, preventing them from being heard at the hearing.

Therefore, because the Appointments Clause violation goes to the validity of the proceeding and Respondents are entitled to an entirely "fresh consideration" of this matter, this proceeding must be dismissed and a new one commenced before a new judge.

## 5. In any Event, Respondents Were Prejudiced by the Unauthorized ALJ's Rulings.

The government's sole response to this constitutional violation is that the Supreme Court's ruling in *Lucia* does not require a new adjudicative proceeding, only a new hearing. *Lucia v. SEC*, 138 S. Ct. at 2055. *Lucia*, however, did not reach the issue raised here because it does not address the question of prejudice arising from the pretrial actions of an unauthorized judge. At least one subsequent court decision has determined that where an adjudication is tainted with an Appointments Clause violation, where the unauthorized judge made pretrial rulings on admissibility and other material issues in the case – even if

RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S
RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL
ARGUMENT – Page 82

such appointments and proceedings were later *ratified* – and where such rulings impacted the remaining administrative proceeding, reversal is appropriate. *Maghareh v. Azar,* 2020 U.S. Dist. LEXIS 97349, *15-16 (S.D. Tex. 2020) ("I find no language in *Lucia* that purports to define adjudication to mean only the administrative hearing and subsequent decision"). In *Azar*, the fact that the Department of Health and Human Services later ratified the ALJ was insufficient – the key fact was that the unauthorized judge made rulings on material issues in this case, and as a result the proceeding was tainted. *Id*. Thus, even if the error was not structural, Respondents are still entitled to a reversal because they were prejudiced by the unauthorized ALJ's conduct.

In this case, the original unconstitutional ALJ struck Respondents' pleadings and deemed central issues to be irrelevant.[194] Respondents made allegations that the 2008 financial crisis contributed significantly to the failure of the bank at issue in this case. The ALJ struck those allegations, deeming them "not relevant."[195] The Respondents also averred that the Bank lost 60% of its capital, or $174 million, when, during the crisis, the United States government decided not to support the preferred stock of Fannie Mae and Freddie Mac.[196] (In fact, the OCC itself is the one who acquiesced and even encouraged the Bank to make these investments in preferred stock of Fannie and Freddie). The ALJ struck this allegation for the same reason.[197] These matters are essential to the story of why the Bank suffered losses for which the OCC is attempting to blame Respondents. However, the unconstitutional ALJ here took the unusual step of striking these pleadings.

---

[194] *See* Order Regarding OCC's Motion to Strike Respondents' First, Second, Third, and Sixth Affirmative Defenses.
[195] *Id*.
[196] *Id*.
[197] *Id*.

These rulings narrowed the scope of the case, limited discovery, and deprived Respondents of an opportunity to be heard.[198]

While the ALJ may have disagreed with Respondents' defenses, and while the ALJ may suspect – without having heard a shred of evidence – that after hearing the evidence he would not give it much weight, the decision to strike them from the record without hearing evidence was truly remarkable.  Striking pleadings – as if they had never been made – and depriving Respondents the opportunity to even argue their case, especially in a proceeding whose entire *raison d'etre* is to give the Respondents an opportunity to be heard and a full and fair hearing, is the very definition of prejudice, harm, and the denial of due process.

Respondents were prejudiced by these rulings, which occurred before any discovery took place, because they narrowed the scope of discovery and limited the tactical and strategic options of the defense going forward.  This included:

- The types and scope of document requests to the OCC;

- Not sending third-party discovery to Fannie Mae and Freddie Mac, among others;

- The decision to review (or not review), and incur expense of reviewing (or not incur the expense), and the manner of reviewing, huge swathes of the **millions** of pages of documents produced in this action, knowing that the unconstitutional ALJ would not allow Respondents to address certain issues even if they reviewed them.

---

[198] *Compare* R.D. at 169 (noting the Fannie Mae issue was "context that must be considered")

This error is confirmed after reviewing the procedural Rules and comparable federal case law. It is a mistake to strike pleadings without the benefit of discovery and a full record. First, motions to strike pleadings are not even authorized by the Rules contained in 12 C.F.R. 19, except where a party fails to sign a pleading (*see* 12 C.F.R. § 19.7(b)(2)). Here, there is no allegation that Respondents failed to sign a pleading. Second, even under the federal rules, motions to strike are highly disfavored. *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir 2000) (striking pleadings is an extreme measure, viewed with disfavor and infrequently granted). A court does not strike pleadings just because it disagrees with them. That is what summary disposition and trial are for. Motions for summary judgment more thoroughly test the sufficiency of a defense and provide a fuller record for dealing with defenses. MOORE'S FEDERAL CIVIL PRACTICE § 12.37; *Davis v. Ruby Foods*, 269 F.3d 818, 821 (7th Cir. 2001). Most fundamentally, the ALJ erred by limiting and eliminating arguments without a full and fair hearing. These rulings denied Respondents the very due process that this proceeding is supposed to provide.

Striking the Sixth Defense, which raises the fact that Respondents did not profit but rather lost as a result of the events described in the Notice of Charges, is truly remarkable given the fact that the very statute under which the Notice of Charges was brought is based on whether "such party has received financial gain or other benefit by reason of such violation, practice, or breach." *See* 12 U.S.C. § 1818(e)(1)(B)(iii); *see also Davis v. Ruby Foods*, 269 F.3d at 821 (Posner, J.) (reversing trial court and advising parties not to file motions to strike unless actually prejudiced by the pleading. "Such Motions are what give 'motion practice' a bad name.").

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 85**

It is these kinds of rulings that are why litigants often make appointments clause challenges to ALJs in administrative proceedings: they do not appear to be fair in any way, shape or form.  Even ALJ McNeil has observed:

> For many of us, this relationship between the adjudicator, investigator, and the prosecutor is just too close for comfort.

ADMINISTRATIVE AGENCY LITIGATION, Christopher B. McNeil, at 7.[199]  These concerns are only multiplied when the ALJ strikes the respondents' defenses as irrelevant at the outset of the case.

For the reasons stated above, this proceeding not only violated the Appointments Clause, but also the Due Process Clause, Separation of Powers, and Administrative Procedure Act, as well as the Uniform Rules of Practice and Procedure.

### 6. Respondents Were Also Denied the Opportunity to Challenge ALJ Whang's Appointment.

The new ALJ denied Respondents' request for discovery regarding her appointment as an ALJ, thereby denying Respondents the opportunity to make challenges under the Appointments Clause.[200]  If Respondents are to challenge the appointment, they must be able to obtain the materials showing compliance with the Appointments Clause.  *E.g., Lucia v. SEC*, 138 S.Ct. at 2049 (Justice Kagan relying on discovery materials attached to the petition for certiorari to determine the constitutionality of the appointments).[201]  It only

---

[199] *See also* McNeil at 16 ("[Y]ou might expect that the judge is going to decide your case impartially, based on the evidence presented, without favoring the government's side of the case . . . **But it would be a mistake to believe that the black robe, the raised dais, and the courtroom environment have created an independent adjudicator**.") (emphasis added).

[200] March 17, 2020 Order Denying Respondents' Motion for Summary Disposition on the Appointments Clause at 5.

[201] ("The SEC currently has five ALJs.  Other staff members, rather than the Commission proper, selected them all. *See* App. to Pet. for Cert. 295a-297a.")   Thus, documents and records attached to the petition for certiorari in *Lucia* made the challenge possible.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 86**

makes sense that Respondents are entitled to take the same discovery that enabled the challenge in *Lucia* to be made. This was error.[202]

### 7. The Appointment of ALJ Whang Violated the Appointments Clause.

The ALJ also denied Respondents relief on their objection to the ALJ appointments based on the constitutionality of 5 U.S.C. § 3105. Any officer of the United States must go through either a Senate confirmation hearing, or satisfy the requirement that ***Congress authorize*** the appointment by the President alone, Courts of Law, or the Department Head. U.S. CONST. Art. II, §2, cl. 2. Here, no Senate confirmation hearing has occurred, and the congressional authorization is based on 5 U.S.C. § 3105 which does not authorize the Department Head to make appointments for the OCC. It provides that "each agency shall appoint as many administrative law judges as are necessary. . .", which is not consistent with the Appointments Clause. 5 U.S.C. § 3105.

*Lucia* effectively rendered this statute unconstitutional. Because Congress did not delegate the authority to the President, Courts of Law, or the Head of a Department, it violates the Appointments Clause. This statute fails to require cabinet level appointments, but instead sets appointments at a lower "agency" level of government. This is something Congress cannot do.

### 8. ALJ Whang Does Not Serve at the Pleasure of the Department Head

Finally, ALJs are insulated from removal in violation of the Appointments Clause, the Take Care Clause, and separation of powers principles. ALJs enjoy double for-cause removal protection: first, all four of the OCC, FDIC, Federal Reserve, and NCUA would need to unanimously concur, in writing, to the initiation of removal proceedings. *See* July

---

[202] Respondents sought the same information via FOIA. No information was provided.

2011 Amended and Restated Administrative Law Judge Agreement at 3 ¶ 3; *id.* at 8; Administrative Law Judge Agreement of 2018 at 3 ¶ 2; *see id.* at 7. This would require separate sign-offs from at least 9 different people—the Comptroller, 3 of the 5 members of the FDIC Board, 4 of the 7 members of the FRB, and 2 of the 3 members of NCUA. Even then, the ALJ enjoys a second level of protection which would require at least 2 of the 3 members of the Merit Systems Protection Board also to find that there was cause for removal. *See* 5 U.S.C. § 7521(a) (ALJs can be removed only for "good cause established and determined by the Merit Systems Protection Board"); *see also Lucia*, 138 S. Ct. at 2060 (Breyer, J., concurring) ("Congress seems to have provided administrative law judges with two levels of protection from removal without cause—just what [*PCAOB*] interpreted the Constitution to forbid.") And under applicable decisions, any arrangement where an inferior officer enjoys double for-cause removal protections is unconstitutional. *Free Enterprise Fund v. Public Co. Acctg. Oversight Bd.*, 561 U.S. 477, 498 (2010); *Jarkesy v. SEC*, 34 F.4th 446, 464-65 (5th Cir. 2022). This, in conjunction with the errors discussed above, inflicted structural harm on Respondents.

### D. The ALJ's Pretrial Rulings Should Be Reversed (Exceptions 4, 5, 6, 7, 8, 9, and 10).

The ALJ made pretrial rulings which were not authorized by law and violated the Administrative Procedure Act and the Uniform Rules of Practice and Procedure.

#### 1. Fannie Mae & Freddie Mac.

On January 5, 2022, the ALJ granted a motion preventing Respondents from offering, and refusing to consider, evidence at trial regarding the Bank's investments in GSEs, regulators' conduct in encouraging the investments in GSEs, the government's role in bringing about the failure of the Bank, and attacks on OCC credibility in light of their

actions (they encouraged investment in GSEs and then after the crisis blamed the Bank for having invested).[203]   This information was highly relevant, important, and the rulings largely stemmed from the ALJ staying in lock-step with the unconstitutional ALJ McNeil's rulings, rather than her considered view.[204]   Respondents incorporate herein Section IV.C, above, which discussed the background and basis for Respondents exceptions with respect to the Fannie Mae issue.

The details of the Bank's investment in GSEs like Fannie and Freddie were highly relevant to show (i) context and surrounding circumstances that explain the reasonableness of Respondents' actions, (ii) the OCC's own lack of credibility by revealing its duplicity and/or motive in bringing this enforcement action, and (iii) Respondents' lack of culpability.

In this case, the U.S. government – according to the Federal Reserve and members of Congress, among others – imposed an "***exogenous capital shock***"[205] on the banking system by its handling of Fannie Mae and Freddie Mac during the crisis.  The government supported, incentivized, and encouraged purchases of preferred stock in GSEs and simultaneously promoted the implied promise that such investments were backed by the full faith and credit of the United States.  This led to the Bank's investment and subsequent staggering losses attributable to GSEs.[206]   The OCC, while publicly accepting it was an exogenous shock and offering flexibility and support to certain banks, actually took the

---

[203] *See* January 5, 2022 Order Granting in Part and Denying in Part Enforcement Counsel's Motion in Limine to Exclude Respondents' Irrelevant Evidence at 5.
[204] *Compare* R.D. at 169 (noting the Fannie Mae issue was "context that must be considered") with January 5, 2022 Order Granting in Part and Denying in Part Enforcement Counsel's Motion in Limine to Exclude Respondents' Irrelevant Evidence at 5.
[205] *See* Resp. Ex. 4 at 2, 6.
[206] *See, e.g.*, Exhibits 1-20 on Respondents' Exhibit List.  These exhibits were nearly all excluded following objections from Enforcement Counsel. *See* IV.D.2, *infra*.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 89**

opposite position against the Bank and blamed the Bank and Respondent Rogers for the Fannie and Freddie Losses.[207]  This evidence shows the OCC's lack of credibility in its enforcement and supervision of the Bank – and since the central role of the finder of fact is to determine credibility, nothing could be more relevant.

By the same token, this evidence is relevant to the issues of both culpability and good faith on the part of Respondents because it shows that their efforts to support and assist the Bank during and following the financial crisis were a good faith attempt to rescue the Bank from an exogenous shock caused by the very people now attacking them for wrongdoing.  This is at the very heart of the culpability inquiry, enabling the ALJ to separate good faith and reasonableness from willfulness and reckless disregard in assessing intent.

What's more, the OCC got to use the Fannie Mae/Freddie Mac disaster for its own purposes and, when it did so, conceded the relevance of the topic to the case: "the Bank's $174 million loss represents context for the impairment of the Bank's capital in 2008 and later,"[208] and that "facts related to Respondent Rogers' decision to invest heavily in Fannie Mae and Freddie Mac and the Bank's subsequent loss are relevant . . . [to] the Bank's impaired capital position . . . and certain other matters" and attacking Rogers over the investments.[209]  Enforcement Counsel also freely acknowledged that relevance—the

---

[207] *See* R. Ex. 3-002 (blaming Respondents for investments the OCC had previously encouraged and later acknowledged was an exogenous shock).

[208] *See* December 17, 2022 OCC Motion in Limine to Exclude Respondents' Irrelevant Evidence at 9; *see also id*. at 1 "[i]t is undisputed that First National Bank . . . suffered losses, including its loss of $174 million from its investment in Fannie Mae and Freddie Mac"); December 10, 2022 Enforcement Counsel's Prehearing Brief at 67 (alleging that "Respondent Rogers exerted 'undue influence' over the Bank's decision to invest in stock in the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation ('Fannie and Freddie'), an investment which ultimately resulted in a $174 million loss to the Bank"); *see also id.* at 7, 69.

[209] *See* December 10, 2021 Jt. Statement of Disputed Issues at 8, ¶37, n.6.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 90**

touchstone for all admissibility rulings—is viewed broadly in this Tribunal, where evidentiary standards are even more liberal than those that govern proceedings in federal district courts.[210]  Thus, it was hypocritical and ironic, in addition to manifest error, that the evidence was excluded.

### 2.  Respondents Were Struck As Experts While the OCC's Michael Brickman Was Allowed to Testify.

The deadline to designate expert witnesses in this case was on October 22, 2018.[211] The deadline to submit fact witness lists was September 3, 2018.[212]  Michael Brickman did not appear on either of these lists.   Expert reports were due on October 29, 2018.[213] Michael Brickman did not file a report by this deadline – indeed, he never filed a report. Michael Brickman was first disclosed on December 10, 2021 on the OCC's final trial witness list (along with other surprise witnesses) less than 60 days before trial.  He never filed a report and his deposition was never taken.

Respondents objected to his being allowed to testify via a pretrial motion to exclude.[214]  This was denied on the incorrect ground that Respondents had somehow agreed not to depose Mr. Brickman.[215]  No such agreement ever occurred.  When the parties negotiated depositions in 2018, Respondents had not even heard of Mr. Brickman as a witness.  Regardless, any agreement regarding depositions does not allow a witness to show up at the last second and testify as an expert witness without a report.

---

[210] *See* December 17, 2022 OCC Motion in Limine to Exclude Respondents' Irrelevant Evidence at 4 (conceding that "[a]gency evidentiary rules . . . [are] less stringent than the Federal Rules of Evidence").
[211] *See* November 8, 2017 Scheduling Order.
[212] *Id*.
[213] *Id*.
[214] *See* December 17, 2022 Respondents' Motion to Exclude Witnesses.
[215] *See* January 11, 2022 Order Granting In Part Enforcement Counsel's Motion for Denial of Third-Party-Subpoena Applications and Granting in Part Respondents' Motion to Exclude Witnesses at 4-5.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 91**

At trial, Mr. Brickman testified as an expert and offered testimony on interest rates, as one might expect from a Phd. expert economist with years of experience.  Mr. Brickman is not an economist, he is a regulator with a bachelor's degree and had no expertise in determining market rates.  At the very least, Respondents were entitled to a report in order to have advance notice of the opinions, the documents supporting them, and to be in a position to contradict them.  This was error and a violation of the Scheduling Order as well.

In addition, OCC witnesses were allowed to testify on fiduciary duty issues despite having no legal training and no expertise on which to opine that any such breach had occurred.

Meanwhile, Respondents, who were timely designated and did file reports, were stricken.[216]  Ironically, the OCC holds that Respondents, as trial witnesses, lack expertise on safety and soundness and must be stricken, **but**, at the same time, Respondents, as board members, knew or should have known that these loans were unsafe or unsound and voted against them.  Obviously, if Respondents can be held liable for knowing that a loan was unsafe and unsound, one might think their opinion was also relevant.  In fact, it was error to conclude otherwise.

### 3. The ALJ allowed Mary Jane Locke to Testify, But Not Andrew Moss.

Both sides also designated a fact witness that was not on the original lists.  The government named Mary Jane Locke of the FDIC, and Respondents responded by naming Andrew Moss of the OCC.   The deadline to submit fact witness lists was September 3, 2018.[217]  These witnesses weren't disclosed until December 10, 2021.  Siding with the

---

[216] January 5, 2022 Order Granting Enforcement Counsel's Motion in Limine to Exclude Proposed Expert Testimony By Respondents.
[217] *See* November 8, 2017 Scheduling Order.

OCC, the ALJ decided that the government could add multiple witnesses late, but that Respondents could not add Andrew Moss.[218]  Respondents take exception to these rulings.

### 4.  The ALJ Granted Pretrial Motions to Exclude Other Relevant Evidence.

The ALJ also made rulings preventing Respondents from asking OCC witnesses about OCC policies on minority banks and minority bankers and disparities in treatment.[219] This was error because it prevented Respondents from being able to attack OCC credibility, given its lip service in favor of minority bankers compared with its harsh enforcement on Saul Ortega and non-enforcement against white bankers (such as Mark Magee who were actually in the lending department and responsible for the activities at issue in this case). In violation of the Uniform Rules, the ALJ also denied the Respondents the right to make offers of proof including direct witness interrogation.[220]

### E.  The Rulings During the Trial Prejudiced the Respondents (Exceptions 11, 12, 13, & 14)

### 1.  Admission and Consideration of OCC "Exhibits" and Other Evidence.

The ALJ admitted, and the Recommended Decision relies, on the hearsay "sworn statements" of various witnesses.[221]  The admission and consideration of these were error.

- Some of these "sworn statements" were not even offered into evidence at trial.[222]

---

[218] *See* January 11, 2022 Order Granting In Part Enforcement Counsel's Motion for Denial of Third-Party-Subpoena Applications and Granting in Part Respondents' Motion to Exclude Witnesses at 2, 5.

[219] *See* January 5, 2022 Order Granting in Part and Denying in Part Enforcement Counsel's Motion in Limine to Exclude Respondents' Irrelevant Evidence at 6.

[220] *Id*. at 7.  *See also, infra*. IV.E.3.

[221] OCC Ex. 568, 569, 571, 590; *see also* September 30, 2022 Certified Index of Exhibits; *see* R.D. at 13 n.38; R.D. at 57 n. 242; R.D. at 97 n. 464.

[222] R.D. at 13 n.38 (McCarthy); R.D. at 97 n. 464 (Martinez).

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 93**

- In some cases, the statements were taken without Respondents' counsel present and without any opportunity to cross-examine.[223]  This was a violation of the Due Process Clause, the confrontation clause, the Seventh Amendment, and Respondents' right to fair proceeding under the APA and the Uniform Rules.

- Many of the statements were admitted in their entirety despite only having been offered as snippets solely for impeachment or refreshing recollection.[224]  This is not permissible under any rules of evidence, including the Federal Rules.

- All of the above statements are hearsay under the Federal Rules of Evidence.

- In one extraordinary exchange, the ALJ also admitted rank hearsay and doublehearsay from the OCC examiner who was simply asked to describe the content of certain "sworn statements" the witness had previously reviewed but had not been offered into evidence.[225] This happened again later.[226]  Again, Respondents had no opportunity to cross-examine.

**2.  Exclusion of Respondents' Exhibits.**

The ALJ excluded, and refused to consider, certain of the Respondents proposed exhibits, including Exhibits 4-6, 8-14, 18, and 85.  The exclusion of these exhibits was in error.

---

[223] OCC Ex. 571; R.D. at 57 n. 242 (witness testified at trial); R.D. at 97 n. 464 (witness did not testify at trial).
[224] OCC Ex. 568, 569, 571, 590.
[225] Tr. 1269:21-1271:13.
[226] Tr. 1374:7-1375:5; 1395:16-1396:4.
**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 94**

These exhibits were related to the Fannie Mae/Freddie Mac issue discussed elsewhere. *See* IV.C. and IV.D.1; *see also* February 14, 2022 Respondents' Additional Offer of Proof.[227] These exhibits were relevant for the same reasons and should not have been excluded. These showed, among other things, the effect of the crisis and Fannie Mae collapse on community banks, disparate treatment received by community banks, that Treasury's decisions were what caused the problem including the failure of many community banks, and the unavailability of TARP to community banks. For the same reasons discussed in Sections IV.C and IV.D.1, these exhibits were relevant and should not have been excluded.

### 3. Exclusion of Testimony and Prohibition of Offers of Proof.

The ALJ also prohibited the questioning of witnesses on various topics, including the Fannie Mae/Freddie Mac issue.[228] This testimony was obviously relevant for the same reasons discussed elsewhere. *See* IV.C., IV.D.1, and IV.E.2. This testimony was relevant for the same reasons and should not have been excluded. *See also* February 14, 2022 Respondents' Additional Offer of Proof at 12-13.[229]

In addition, the ALJ also prohibited the taking of offers of proof in violation of the Uniform Rules.[230] *See* 12 CFR 19.36(d)(2). This prevents the Comptroller and any reviewing court from knowing what the witness would have said and makes it impossible to provide proper judicial review. There is no way to know now what that evidence would have shown. This was error.

---

[227] Respondents incorporate its Additional Offer Proof as if fully set forth herein.
[228] Tr. 223:4-16; 228:2-229:19; 820:11-824:13; 1573:9-1576:17.
[229] Respondents incorporate its Additional Offer Proof as if fully set forth herein.
[230] Tr. 219:18-220:20; 228:11-229:19; 822:18-824:13; 1573:9-1576:17.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 95**

A question about Saul Ortega's splendid and highly successful management of Texas National Bank[231] over the last ten years were also objected to and sustained. Therefore, the record is missing evidence of Mr. Ortega's extraordinary ability and character.

### 4. Overdesignation of Exhibits.

In the Scheduling Order, the OCC was ordered to disclose its witnesses with a list of exhibits and page designations it planned to use with each witness.[232] The OCC listed Ms. Chansen and Mr. Ortega with literally hundreds of exhibits and thousands of page designations.[233] Needless to say, most of the designations were not used at trial. This overdesignation made it impossible to know which actual exhibits and page numbers would be used and essentially deprived Respondents of the notice they were entitled to, prejudicing Respondents.

### F. Capital Raise Loans (Exceptions 15 and 16)

The Recommended Decision found against the Respondents on the civil money penalty issue (§1818(i)) and in favor of the Respondents on the prohibition issue (§1818(e)). The Comptroller should affirm the ALJ's ruling on the prohibition issue. Respondents take exception to the ALJ's ruling on the civil penalty issue, and, in the argument that follows, such exceptions apply equally with respect to those certain elements that the ALJ found against Respondents on the prohibition issue.

---

[231] Tr. 219:18-220:20.
[232] *See* November 8, 2017 Scheduling Order at 5-6.
[233] See December 10, 2021 Enforcement Counsel's Hearing Witness List at Ex. B; Tr. 1223:17-1224:19.

In 2008, the Bank was forced to raise capital. In fact, it was ordered by the OCC to increase its capital during a time when the capital markets were frozen.[234] Legal work for this capital raise was handled by Stormy Greef at Hunton & Williams.[235] Multiple third-party financial advisors were also involved.[236]

With traditional modes unavailable, the Holding Company of the Bank turned to its existing investors and customers. It raised $5 million from David Rogers, Jr. and $1 million from Saul Ortega, among others.[237] Ultimately, the Holding Company raised over $52 million in cash[238] – and had additional cash on hand from what it had prior to the crisis.[239]

It was undisputed that when the Holding Company issued stock, each investor paid cash in exchange for shares of the Holding Company.[240] No notes were given to the Holding Company in exchange for the shares.[241] It was also undisputed that the Bank issued no stock and that at no time did the Bank exchange stock for a note.[242]

The OCC bank examiner witnesses did not challenge and had no objection to the money raised from sources other than the Capital Raise Loans.[243] Nor did the OCC's accountant.[244] Nor did those witnesses have any objection or attack on the Capital Raise

---

[234] R. Ex. 3. The environment at the time was extremely challenging. Tr. 893:17-894:6; 895:1-16.
[235] Tr. 894:7-15; 895:17-896:3; 897:6-19.
[236] *Id.*
[237] OCC. Ex. 374A
[238] *Id.*; Tr. 901:4-22; 1594:23-24.
[239] R. Ex. 87 at 5.
[240] Tr. 899:24-900:20; 1912:20-1913:4.
[241] Tr. 899:24-900:20; 1592:2-5; 1912:20-1913:14.
[242] Tr. 899:24-900:20; 909:14-19; 1590:13-1591:3; 1912:13-19.
[243] Tr. 1567:1-1569:2; 1597:21-1598:12.
[244] Tr. 1900:21-1902:15; 1903:18-1904:18.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 97**

Loans, insofar as the proceeds were used for Holding Company expenses and not downstreamed to the Bank.[245]

<u>The Downstreaming Allegation Was Not Proven.</u>

The ALJ found that Enforcement Counsel "did not meet its burden" with respect the OCC's downstreaming allegations,[246] but the ALJ found that at least some money was in fact downstreamed.[247]  The Respondents take exception to this finding because the government had the burden of proof and did not prove their case.  The record did not show that the Capital Raise Loans were actually downstreamed to the Bank, an essential factual step in the OCC's claim.  The OCC's accounting expert testified that the Bank made $17 million in loans to finance the capital raise, and then also had the Holding Company invest $35 million in the Bank.  The OCC witnesses, however, did not connect the $17 million raised by the Holding Company to the $35 million that was invested in the Bank.  The evidence showed that the Holding Company already had $8,848,000 in cash and marketable securities available to downstream to the Bank – this was on hand before any so-called capital raise loans were ever made.[248]  In addition, it was undisputed that during the capital raise the Holding Company raised well over $30 million from sources *other* than the so-called capital raise loans.[249]  Thus, the Holding Company had at least $38,848,000 million available to downstream to the Bank, none which had anything to do with the so-called capital raise loans.

---

[245] Tr. 1598:3-13; 1905:16-23.
[246] R.D. at 114.
[247] R.D. at 40-41, 114.
[248] R. Ex. 87 at 5; Tr. 902:2-903:11.
[249] OCC Ex. 374A; Tr. 902:2-903:11; 1595:18-1596:7 (noting that the OCC had no concerns about these funds or how they were raised).

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 98**

The evidence also showed that the Holding Company did not segregate its cash by source of funds.[250]   In addition, the Holding Company had other expenses other than the Bank, which included things like interest expense, insurance, and professional fees.[251]   It was undisputed that money raised from the capital raise loans may have been subsequently used for the Holding Company's other expenses and not used for the Bank.[252]   There were no facts in evidence supporting the allegation that the money raised from bank loans was actually among those dollars downstreamed to the Bank by the Holding Company.[253]   It was incumbent upon the OCC to show that the actual dollars from the loans were the same dollars that were downstreamed the Bank.   The evidentiary record simply fails in this element of proof and therefore the OCC's attacks on the loans must fail.

<u>The Loan Purpose Was Not Proven.</u>

The ALJ rejected the Respondents argument that the Capital Raise Loans were not required to be used for stock.[254]   Respondents take exception because the so-called Capital Raise Loans contained no requirement that they be used to buy stock – the borrower's notes contained no such restrictions.[255]   Borrowers were free to use the loan proceeds as they wished.[256]   This is a crucial fact because the OCC's safety and soundness expert testified under oath that loan proceeds invested in the same bank's stock issuance would ***not*** be an unsafe or unsound practice, as long as the borrower had the "***right to use the funds the way***

---

[250] Tr. 899:6-23.

[251] Tr. 898:19-899:5.

[252] *E.g.,* Tr. 1905:10-23.

[253] Tr.1597:6-16 (noting that the OCC did not track specific dollars invested in the Bank by the Holding Company); 1900:21-1901:24 (noting that the OCC expert assumed but did not independently analyze which dollars were provided to the Bank); 1906:23-1907:18 (OCC did not attempt to calculate the amount unrelated to the loans).

[254] R.D. at 115.

[255] Tr. 909:22-910:7; 1614:15-1615:1.

[256] *Id.*

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 99**

*they want to*."[257] The specific terms of the promissory notes in this case give the borrower such rights, and therefore would not be unsafe or unsound.  For this reason, the OCC's attacks also fail.

### Materiality Was Not Credibly Shown.

Respondents also take exception to the ALJ's ruling rejecting Respondents materiality arguments.[258]  The challenged capital raise loans were not material, would not have had a significant impact on the Bank's ratings, and would not have resulted in any enforcement actions at the time.[259]  The OCC's position at the time, when memories were fresher and before the OCC examiners were being directed by litigation counsel, was that the capital raise loans were not material.[260]  This was highly credible due to who said it and when.  Further, the OCC accountant conceded that if the adjustments were immaterial, the call reports would be allowed to be considered valid and accurate.[261]  The OCC accountant calculated that by excluding the capital raise loans from capital, the Tier 1 capital ratio would have still remained above 8% and not fallen below the IMCR imposed by the OCC.[262]  Based on this evidence, the ALJ should have concluded that the loans were immaterial and could not be the basis of an enforcement action against Respondents.

### The OCC Attacks on the Loans' Accounting Were Without Merit.

The ALJ ruled that the Capital Raise Loan accounting was done incorrectly.[263]  Respondents take exception because this was not proven.  It was agreed that the Capital

---

[257] Tr. 1624:9-1625:22.
[258] R.D. at 115.
[259] R. Ex. 37 at 12; R. Ex. 41.
[260] *Id*.
[261] Tr. 1921:19-1922:16.
[262] Tr. 1923:20-1925:1.
[263] R.D. at 171.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 100**

Raise Loans were not illegal.[264]  The real question is how they should be accounted for.[265]
The accounting rules cited by the OCC only applied where notes were transacted for shares.
It was shown that each investor paid cash in exchange for shares of the Holding
Company,[266] no notes were given to the Holding Company in exchange for the shares,[267]
and the Bank issued no stock and that at no time did the Bank exchange stock for a note.[268]
For this reason, these accounting rules relied upon by the OCC are irrelevant.

The OCC attempts to avoid this outcome by arguing that the Bank and Holding
Company were required to *consolidate* their financial transactions for call report purposes.
In this way, the OCC was able to argue that from a consolidated perspective a note was
exchanged for stock, therefore bringing their irrelevant accounting rules into play.  In other
words, the only way the OCC could claim a note was exchanged for stock is if the holding
company's transactions had been consolidated into Bank call reports.[269]  This stratagem
failed, however, because, as the OCC witness conceded, the call report instructions
prohibited consolidation of the Bank and holding company financials.[270]  No witness had
ever seen bank and holding company financials consolidated for any reason and witnesses
noted that such consolidation was prohibited by call report instructions.[271]  Thus, the call
report instructions do not adhere to GAAP when it comes to consolidation, and for this
reason the OCC's consolidation argument is without merit.   It would have been an
accounting error for the Bank to report consolidated numbers on its call reports.  The Bank

---

[264] R. Ex. 42, 43; Tr. 1599:5-8; 1603:2-13; 1604:7-13; 1608:21-1609:8.
[265] *Id*.
[266] Tr. 899:24-900:20; 1912:20-1913:4.
[267] Tr. 899:24-900:20; 1592:2-5; 1912:20-1913:14.
[268] Tr. 899:24-900:20; 909:14-19; 1590:13-1591:3; 1912:13-19.
[269] Tr. 1916:10-1917.6.
[270] Tr. 1920:3-7.
[271] *Id*.; 1614:4-8; 1920:3-11.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S
RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL
ARGUMENT – Page 101**

did not violate accounting rules by failing to consolidate financials – indeed, it complied with them.

### Respondents Did Not Conceive or Make the Loans.

The ALJ found that Respondents were responsible even though they were not lenders and did not make the loans.[272] This ruling should be reversed because the evidence failed to show that these Respondents engaged in any improper conduct. Respondents were not loan officers and did not make the Capital Raise Loans.[273] Indeed, Respondents did not make any loans in their roles at the Bank.[274] Instead, Ortega and Rogers both invested millions of their own money in the Bank at this time, showing that they personally acted to capitalize the Bank and protect its depositors.[275]

These loans were created and promoted by CLO McCarthy and those who ran and operated the loan department of the Bank. McCarthy approved many of the loans without going to the L&D Committee and without notice to Respondents.[276] The Bank's Loan Policy notes that the ultimate responsibility for the loan portfolio lies with the Chief Loan Officer and his staff.[277] Ortega and Rogers relied on the expertise of the loan department.[278] Their confidence in the lenders recommending these loans was very high.[279]

Respondents, who were not attorneys or CPAs, understood from colleagues that the approach on these loans was legally permissible, as long as the loans were not made on the

---

[272] R.D. 115-16.
[273] Tr. 905:17-25; 913:22-914:15
[274] Tr. 905:17-25.
[275] OCC Ex. 374A.
[276] Tr. 906:8-907:6.
[277] Jt. Ex. 9 at 9.
[278] Tr. 927:20-929:11.
[279] *Id*.; 915:8-916:12.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 102**

security of the shares.[280]  It was undisputed that the loans were not made on the security of any shares.[281]  The Bank retained accountants to ensure that call report instructions were being followed with respect to bank transactions.[282]

Furthermore, there was no evidence that Respondents were the ones responsible for how the loans were characterized in the Bank's records.  There was no suggestion that Respondents characterized any of the loans as "investments," nor were they involved in the day-to-day lending department who did so.

<u>The Loans Were Not Proven to Be Unsafe and Unsound or a Breach of Fiduciary Duty</u>.

The ALJ found that the loans were a breach of fiduciary duty and unsafe and unsound.[283]  For the reasons explained below, Respondents take exception as follows:

The Capital Raise loans did not constitute an unsafe or unsound practice or a breach of fiduciary duty.  *See* 12 U.S.C. § 1818(e)(1)(A)(ii), (iii); 1818(i)(2)(B)(i)(II-III)).  The evidence showed that the Capital Raise Loans were safe and sound given the borrowers, the loans, and the circumstances in the economy at the time.[284]  Respondents were assured by the loan officers at the Bank that loans were good risks, and as such believed they were safe and sound.[285]

The OCC alleged that the Capital Raise Loans were unsafe or unsound because they were made at below market terms, but there was no evidence offered of market rates or terms.  Witnesses in the case specifically disclaimed expertise on interest rates, collateral

---

[280] Tr. 904:1-905-16.
[281] *Id*.; Tr. 1599:5-8.
[282] Tr. 915:8-14.
[283] R.D. 108, 116-17.
[284] Tr. 534:18-535:2; 917:6-927:19.
[285] Tr. 904:12-16; 905:17-25; 906:18-908:5.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 103**

valuations, real estate, and other market terms, and no expert reports were submitted which provided an analysis and conclusions on market rates, prices or terms.[286] There was no expert report submitted in the case where market levels were analyzed, comparables were established, and an opinion offered on what was "market." Therefore, there was no record on which the ALJ could conclude that any specific loan was made at above or below market terms.

<u>The OCC Failed to Satisfy the "Effect" Prong</u>.

The ALJ found in Respondents favor with respect to the accounting issues. This should be affirmed.[287] However, the ALJ also found that the "effect prong" was satisfied with respect to the loans themselves.[288] The problem with this is that the OCC's position was that these transactions that resulted in neither a gain nor a loss to the Bank.[289] It was the OCC's testimony that the Capital Raise Loans involved no change in the Bank's cash position, but the Bank received a note, which is an asset to the Bank.[290] Thus, the practices attacked by the OCC involved no cash loss to the Bank.

**G. OREO Loans (Exceptions 17 and 18).**

With respect to the OREO Loans, the Recommended Decision found against the Respondents on the civil money penalty issue (§1818(i)) and in favor of the Respondents on the prohibition issue (§1818(e)). The Comptroller should affirm the ALJ's ruling on the prohibition issue. Respondents take exception to the ALJ's ruling on the civil penalty

---

[286] Tr. 1615:6-1617:11; 936:21-937:21; 1150:22-25; 1190:16-1191:15; 1659:9-16; 1932:20-1935:15.
[287] R.D. at 119, 173.
[288] R.D. at 117-18.
[289] Tr.1627:22-1628:25; 1927:8-12.
[290] *Id*.

RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 104

issue, and, in the argument that follows, such exceptions apply equally with respect to those specific elements that the ALJ found against Respondents on the prohibition issue.

<u>Respondents Were Not Lenders and Did Not Engage in Wrongdoing on Loans</u>.

Respondents take exception to the Recommendation of the ALJ that Respondents were personally responsible for the lending practices.[291] It was undisputed that Ortega and Rogers did not make the OREO Loans. Respondents had other roles in the management of the Bank unrelated to OREO Loans.[292] OREO Loans were negotiated, approved, graded, and documented by the experts in the loan department.[293] Each loan was recommended by trusted and experienced loan officers, as well as CLO McCarthy and President Gandy – the persons responsible for OREO Loans at the Bank.[294] They relied on Chief Credit Officer Magee to ensure that that credit administration was being done correctly, including all proper documentation.[295] Respondents knew that the loan department conducted detailed reviews and analyses of borrowers and Respondents trusted their judgment.[296] These ratings carried weight with Respondents.[297]

Respondents' only knowledge of these loans would be through the information provided to them as part of the L&D Committee of the Bank.[298] But participation in the L&D Committee does not make them responsible for every loan at the Bank. Both Respondents had to rely on the expertise of the professionals within the Bank whose skillset

[291] R.D. at 132, 134.
[292] Tr. 450:18-23; 644:4-19; 981:13-25.
[293] Tr. 927:20-929:11; 2203:6-10.
[294] Tr. 933:25-934:9; 2224:20-2225:24; 2228:9-2229:5; 2232:21-2233:23.
[295] Tr. 2203:6-10; 941:19-942:20; 971:22-972:20; 983:1-11.
[296] Tr. 644:4-19; Tr. 927:20-929:11; 982:1-983:11; 2203:6-10.
[297] Tr. 927:20-929:11.
[298] Tr. 934:10-17; 982:1-983:11; 2205:14-2206:6.
**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 105**

was in the lending area.[299]  Magee presented the loans to the committee on behalf of the lending department.[300]  The Bank's loan policy, approved by the OCC, provided that: "The ultimate responsibility for the loan portfolio rests with the Bank's Chief Lending Officer, shared by all of the bankers involved in lending and credit administration."[301]  Thus, it was reasonable for Respondents to rely on McCarthy and his lenders and credit staff. Respondents thoroughly reviewed the materials provided to them and discharged their duties as officers of the Bank with great care and careful judgment.[302]  They necessarily relied on the information provided to them by the subject matter experts within the Bank.[303]

Moreover, examiners from the OCC were closely monitoring the Bank and working in conjunction with Magee, McCarthy, and others within the loan department.[304]  Both Respondents reasonably expected and believed, with all the coordination going on between examiners and the loan department, that the OREO lending practices occurred with the knowledge and concurrence of the OCC.[305]  When concerns were raised, examiners assured Respondents that these concerns had been corrected to the examiners satisfaction.[306]  Non-lenders who were not involved in the day to day of OREO transactions were given assurances by regulators, such as "Underwriting for OREO improved and the accounting treatment on OREO sales have been addressed."[307]

---

[299] Tr. 604:22-605:6; 644:4-19; 927:20-929:11; 936:21-937:21; 982:1-983:11; 2203:6-10.
[300] Tr. 2198:25-2199:15; 2205:14-2206:6.
[301] Jt. Ex. 9 at 9.
[302] Tr. 934:10-17; 982:1-983:11; 2205:14-2206:6.
[303] Tr. 927:20-929:11; 998:3-8.
[304] Tr. 938:18-940:3; 1006:11-24.
[305] Id; 952:6-953:10; 1006:11-24; 2272:10-2273:11.
[306] R. Ex. 30 at 2-4, 11-12, 19; R. Ex. 31 at 14, 49, 51; R. Ex. 56 at 12.
[307] R. Ex. 31 at 14; Tr. 2274:7-2275:7.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 106**

This record is hardly evidence of wrongdoing by Respondents. All the OCC showed at trial is that Respondents were, like all members of the Board, members of the L&D Committee. Being on a committee and relying on your trusted experts on that committee is not a violation of the statute.

<u>The OREO Loans Were Not Proven to Be Unsafe or Unsound</u>.

In addition, the OREO Loans were not, in fact, unsafe or unsound. *See* 12 U.S.C. § 1818(e)(1)(A)(ii), (iii); 1818(i)(2)(B)(i)(II-III)). Respondents take exception to the ALJs ruling in this regard.[308] The OCC accuses the loans of being "below market" and the prices above market, but there was no evidence presented of market prices or market interest rates. Witnesses in the case specifically disclaimed expertise on interest rates, collateral valuations, real estate, and other loan terms, and no expert reports were submitted which provided an analysis and conclusions on market rates, prices or terms.[309] Not one comparable was offered into evidence. For these reasons, there is no record on which the Court can conclude that any specific loan was made at above or below market terms. Furthermore, essentially every witness conceded that the market at the time was weak and extraordinarily volatile such that market terms might be unusual and/or highly variable from loan to loan.[310] The OCC failed in a critical element of their proof.

Further, examiners' attempt in 2011 to impose a global 5.5% interest rate on all transactions was not consistent with GAAP, and this mistaken assumption was repeated by the OCC's CPA who did no independent analysis of rates.[311] The OCC's expert conceded

[308] R.D. at 132-35.
[309] Tr. 1615:6-1617:11; 936:21-937:21; *see also* Tr. 1150:22-25; 1190:16-1191:15; 1659:9-16; 1932:20-1935:15.
[310] Tr. 369:8-370:24; 938:9-17; 990:3-991:3; 1183:10-1184:11.
[311] Tr. 1188:16-1190:4; 1932:20-1935:15.
**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 107**

that this was not an appropriate approach under accounting rules: "Q: It's not appropriate to use 5.5% blanket on every single transaction, right? That's not what GAAP allows? A: That's correct."[312, 313]

In addition, there was no evidence that the loans were not the result of arms-length transactions between a willing borrower and a willing lender.  It is apparent that the loan terms arose by negotiation, which is, by definition, a market rate.[314]

Finally, the evidence presented showed that appraisals supported the sales prices of the OREO.[315]  Again, the OCC offered no appraisals of their own to refute these.  In sum, the idea that the OREO loans were below or above some notional "market" level was simply not proven by the preponderance of the evidence.

OCC witnesses testified by rote that OREO Loans were unsafe or unsound but the evidence actually showed that the OREO loans created a benefit to the Bank by generating cash from a money losing asset, where the alternative was to hold the asset and lose money every month.[316]  ORE assets resulted in negative cash flow to the Bank, reducing capital and increasing costs, because of taxes, insurance, maintenance and the like.[317]  The evidence suggested that the Bank did the very best it could do to reduce the strain of ORE on the Bank's cashflow.[318]  OCC witnesses concurred that it was not in the Bank's interest to hold onto ORE,[319] and OCC witnesses presented no evidence of any reasonable alternative that would have benefitted the Bank more.  ***In 12 days of trial, the party with***

---

[312] Tr. 1940:25-1941:3.
[313] *See, e.g,* APB 21, R. Ex. 53 at 3 (¶ 13).
[314] Tr. 990:3-991:3.
[315] R. Ex. 89; Tr. 943:2-944:17.
[316] Tr. 376:6-22; 379:13-22; 616:25-617:15; 953:14-955-17; 1184:12-1186:1.
[317] Tr. 376:6-22; 447:20-448:17; 616:25-617:15; 953:14-955-17; 1184:12-1186:1; 1664:7-1666:18.
[318] Tr. 369:8-371:6; 382:23-383-5; 447:20-448:17; 616:25-617:15; 953:14-955-17; 2083:3-18.
[319] Tr. 1673:15-23.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 108**

*the burden of proof did not offer one shred of evidence of an actual alternative borrower or real-life alternative transaction that would have made the Bank better off than the OREO Loans entered by the Bank.*   And Respondents, who were non-lenders, had every reason to believe that internal experts Gandy, McCarthy, and Magee were promoting transactions that would benefit the Bank by reducing ORE.[320]

Regulators also allowed for flexibility on OREO loans, which makes perfect sense in light of the economic realities of ORE [321] The OCC's bank examiner at trial, however, said that OREO loans should be given *less* flexibility and have more strict underwriting requirements than an ordinary loan.[322] This was contrary to OCC Exhibit 596 and common sense, and should lead the Comptroller to conclude that the OCC examiner was merely an advocate and not a credible witness.

<u>The NAHS Loan Relationship</u>

The ALJ ruled that the NAHS loan satisfied the misconduct prong of the statute.[323] Respondents take exception to this ruling.  The NAHS Real Estate loan showed how the OCC is trying to shift responsibility from the Bank's lending department to the non-lenders on the Board.  The loan recommendation presented to Respondents by senior lending executives Magee, McCarthy and Gandy showed a loan that had been *graded satisfactory* by expert credit staff.[324] It further showed a loan with appraised collateral well in excess of the loan amount.[325]  It further showed, despite efforts by OCC witnesses to claim

---

[320] Tr. 644:4-19; 927:20-929:11; 933:25-934:9; 941:19-942:20; 971:22-972:20; 982:1-983:11; 2203:6-10; 2224:20-2225:24; 2228:9-2229:5; 2232:21-2233:23.
[321] OCC Ex. 596; Tr. 955:23-958:12; 1672:2-23.
[322] Tr. 1297:14-15.
[323] R.D. at 65-70,132-135.
[324] R. Ex. 57 at 1; 983:21-987:23; 1647:17-21.
[325] *Id*.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 109**

otherwise, that the borrower agreed to a variable interest rate tied to market fluctuations so that the Bank would be protected with a market interest rate.[326] It further showed that a trusted and experienced lender, Curtis Brockman, had evaluated multiple possible borrowers and settled on NAHS because it had the best likelihood of success and was in the best interests of the Bank.[327]  Notably, no witness discussed or offered any alternative that it believed was superior to the option proposed and recommended by Mr. Brockman, Mr. Voss, Mr. Magee, Mr. McCarthy and Mr. Gandy.  And in light of the expenses of holding ORE – especially hospitals – no evidence supported that the idea that the Bank was worse off by making this loan.  Ultimately, the evidence was that Respondents used the information they had to make the best decision they could in the best interests of the Bank, and they had no motive to act otherwise.  This cannot amount to a statutory violation.

        No Accounting Violations Were Proven.

        The ALJ also ruled that the OREO loans were not accounted for properly.[328] Respondents take exception because the law and evidence showed that the Bank's accounting for the OREO Loans was compliant with GAAP.[329]  Generally accepted accounting principles hold that there is a general presumption that the stated interest rate is fair and adequate.[330]  The OCC lacked evidence of market rates necessary to overcome this presumption.[331]  Outside CPAs approved the accounting for the ORE Loans, and the Respondents relied on these representations.[332]  The 2009 Burton McCumber report

---

[326] *Id.*; R Ex. 57 at 7; Tr. 1648:5-1649:16.
[327] R. Ex. 57-006; 983:21-987:23.
[328] R.D. at 171-72 (citing R.D. at 70-75).
[329] R. Ex. 51 at 5, 7, 8, 14.
[330] R. Ex. 53 at 3; Tr. 1886:21-1188:12.
[331] *See* IV.D.2, IV.F & IV.G, *supra*.
[332] R. Ex. 51; Tr. 992:18-993:18;

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 110**

addressed the accounting issues and corrected any concerns.[333]   BMC workpapers showed

that that "sales are being recorded in accordance with FAS 66 appropriately" – a conclusion

that Burton McCumber re-avowed at the hearing in 2022.[334]   The 2011 Burton McCumber

report further analyzed this issue and made appropriate adjustments.[335]   At all times, the

Respondents acted appropriately and responsibly, and when accounting issues were raised

such matters were immediately addressed by appropriate action.[336]

As discussed above, witnesses in the case specifically disclaimed expertise on

interest rates, collateral valuations, real estate, and other loan terms, and no expert reports

were submitted which provided an analysis and conclusions on market rates, prices or

terms.[337]   Therefore, the Court cannot conclude that any specific loan was made at above

or below market terms, which would be necessary to prove any accounting adjustment was

needed.

Further, the OCC's attacks on the accounting for OREO lacked merit.   The

adjustments the OCC recommended were based on a global 5.5% rate that was not

consistent with GAAP and was not supported by the OCC expert, who simply accepted

that rate as an assumption.[338]   Also, the vast majority of the adjustment calculated was

based on the NAHS loan where the OCC used a fixed rate for the life of the loan when in

---

[333] R. Ex. 51 at 5, 7, 8, 14; R. Ex. 61; the OCC CPA expert did not conduct an analysis of BMC's work and offered no criticisms of it.  Tr. 1936:10-19.

[334] R. Ex. 62 at 1; Tr. 994:12-996:18; OCC. Ex. 340 at 1; Tr. 1190:16-1191:15.

[335] R. Ex. 55; 1007:21-1012:1; 1196:11-23; 2304:12-2305:6.

[336] Tr. 994:20-995:16; 996:19-997:6; 999:23-1000:15; 1001:18-1002:13; 1012:13-1013:1; 1014:25-1015:13; 1657:7-24; 2290:19-2294:18; 2296:21-2297:10.

[337] Tr. 1615:6-1617:11; 936:21-937:21; *see also* Tr. 1150:22-25; 1190:16-1191:15; 1659:9-16; 1932:20-1935:15.

[338] Tr. 1188:16-1190:4; 1932:20-1935:15; 1938:16-1940:4; 1940:25-1941:3 ("**Q: It's not appropriate to use 5.5% blanket on every single transaction, right? That's not what GAAP allows? A: That's correct.**").

RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S
RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL
ARGUMENT – Page 111

actuality the loan called for a variable rate for nearly the entire life of the loan.[339]  This was plainly incorrect and the OCC conceded as much.[340]  These calculations were not reliable.

Most importantly, loan department officers represented to Respondents that they were using an FAS 66 Memo for each loan to ensure accounting compliance.[341]   For the accounting to be correct, loan department officers had to carry out their tasks and comply with Bank policy regarding FAS 66.[342] It was lending staff, not Respondents, who knew the collateral and the loans, and were in position to know what loans were at, above, or below market rates.  Respondents relied on these officials to get the loans accounted for correctly.[343]  And, again, Magee worked closely with examiners during this time on this issue and were believed to be driving this process within the loan department – there could be no doubt in Respondents' minds that the examiners were deeply involved in controlling how these loans were accounted for.[344]  Respondents believed and trusted that the lending experts at the Bank ensured that loans had been graded and adjusted accordingly.[345]

<u>No Loss Was Proven</u>.

The ALJ found that the effects prong was satisfied by loan losses on OREO loans.[346]  Respondents take exception because the OREO Loans did not result in any loss for the Bank.  The OCC concedes that the impact overall to the Bank was not material.[347]

---

[339] Tr. 1648:11-1652:21; 1942:13-1946:14.
[340] Tr. 1653:7-11; 1654:3-7.  However, the OCC CPA argued, incredibly, that a 0% percent rate should be used to discount a 30-year loan with a term of LIBOR+40 for 29 years of the term. Tr. 1942:13-1946:14. This was irrational.
[341] R. Ex. 51 at 8; Tr. 719:20-720:16; 723:21-724:5; 731:11-22.
[342] Tr. 719:20-720:16; 723:21-724:5; 731:11-22; 936:21-937:21; 941:19-25; 1002:14-19; 2089:2-12; 2298:1-2300:13; 2301:19-2303:8.
[343] Tr. 719:20-720:16723:21-724:5; 731:11-22; 1002:14-1003:6; 1005:10-1006:8; 2298:1-2300:13.
[344] Tr. 1006:11-1007:17.
[345] Tr. 1002:14-1003:6; 2198:25-2199:15; 2298:1-2300:13; 2301:19-2303:8.
[346] R.D. at 143-45.
[347] R. Ex. 52 at 1.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 112**

Moreover, an OREO Loan is a benefit, not a loss, to the Bank – by selling real estate in exchange for a note, the Bank generates principal and interest payments where it was not receiving them before.[348]  These loans are by definition a net gain to a bank who is holding OREO which generates no revenue at some monthly expense, as long as the borrower makes at least one monthly payment.[349]

Importantly, the real measure of any loss to the Bank would be the outcome of a loan compared to the next best alternative.  But the OCC never bothered to prove what the alternative was, which in most cases was holding ORE and losing money every single month.[350]  Having to foreclose on a property a second time is not a loss – it simply puts the Bank right back where it was to begin with, plus with the benefit of whatever payments it has received (and costs avoided) in the interim.

## H.  Nonaccrual Accounting (Exceptions 19 and 20)

With respect to the Nonaccrual Accounting issue, the Recommended Decision found against Ortega[351] on the civil money penalty issue (§1818(i)) and in favor of both Respondents on the prohibition issue (§1818(e)).  The Comptroller should affirm the ALJ's ruling on the prohibition issue.  Respondents take exception to the ALJ's ruling on the civil penalty issue, and, in the argument that follows, such exceptions apply equally with respect to those certain elements that the ALJ found against Respondents on the prohibition issue.

---

[348] Tr. 1664:24-1666:18; 376:6-22; 379:13-22; 616:25-617:15; 953:14-955:17; 1184:12-1186:1.

[349] *Id*.

[350] Again, the OCC brought no expert witness or analysis that allows the court to determine that the OREO loans actually resulted in a net loss to the Bank relative to the cost of keeping the OREO.  To meet its burden, it needed to provide evidence of the loss incurred by keeping the OREO and the revenue it gained.  By failing to do so, it failed to prove a real loss and failed to meet its burden.

[351] Enforcement Counsel did not seek a CMP against Rogers for this claim at trial.  R.D. at 10 n. 23.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 113**

The accounting for nonaccrual loans did not constitute an unsafe or unsound practice or a breach of fiduciary duty by Respondents. *See* 12 U.S.C. § 1818(e)(1)(A)(ii), (iii); 1818(i)(2)(B)(i)(II-III)). Nor was it a violation of law by Respondents. 12 U.SC. §§ 1818(e)(1)(A)(i)(I)); 1818(i)(2)(A)(i)). The evidence at trial showed that there was nothing improper about the Bank's cash basis treatment of nonaccrual loans, and that, even if there was, Respondents were not culpable. If anything, the evidence showed that Respondent Ortega and Mr. Leal led the improvements in nonaccrual accounting and were given credit for doing so by the OCC examiners.[352]

<u>Nonaccrual Loans Were Handled by the Lending Department</u>.

The ALJ ruled that the Respondents were somehow responsible for loan grade decisions made within the lending department.[353] This was error since neither Respondent was a lender or had supervision over loan grading. The policy of the Bank was to automatically move loans into non-accrual/cash basis accounting after the loan fell behind more than 90 days.[354] Then it was the responsibility of credit/lending employees within the Bank to further downgrade the loan if necessary, based on their expertise.[355] From a policy standpoint, this was a sound, conservative approach that complied with GAAP and was not improper.[356]

This policy of coding and documenting loans for downgrade if necessary was carried out by the loan department of the Bank.[357] Neither Respondent was involved in

---

[352] R. Ex. 32 at 6.
[353] R.D. at 76-77, 154-56;
[354] Tr. 1019:2-16.
[355] R. Ex. 68 at 3; Tr. 1021:6-8.
[356] Tr. 1018:17-1021:5; 2307:13-2307:19.
[357] R. Ex. 68 at 3; R.Ex. 69 at 1; Tr. 1021:6-8; 2309:1-2311:17.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 114**

this process.[358]   Both Respondents were assured by the loan department that nonaccrual loans had been reviewed and graded in accordance with call report instructions.[359]  Magee, Rodriguez and others within the lending department were tasked with handling these loan grades appropriately and they reported to the Board (and examiners) that the loans were all in compliance.[360]   The OCC took the position at the hearing that Respondent Ortega was directly responsible because the accounting department was under him; however, the evidence at trial showed that non-accrual coding fell under the loan department.[361]   This made sense because it was the lenders who had knowledge of the loans, borrowers, and documentation and were in the best position to grade loans.[362]   It is apparent that the examiners at the time, who blamed lenders and not Ortega for the nonaccrual issue, were well aware that Ortega was not responsible for grading loans.[363]   Indeed, the OCC witnesses' efforts to blame Ortega at trial showed a lack of credibility on their part and revealed them to be self-serving advocates rather than witnesses, as it was contrary to their own view at the time and the facts on the ground.

When cash basis accounting was brought up in 2009, the documents and testimony showed that the Bank addressed the matter and there was no reason for Mr. Ortega, Mr. Rogers or any board member to believe otherwise.[364]

---

[358] Tr. 1025:2-20; 2309:1-2311:17.
[359] R. Ex. 67 at 3; R.Ex. 69 at 1; R. Ex. 70; Tr. 1023:15-1024:21.
[360] R. Ex. 67; R.Ex. 69 at 1; R.Ex. 70; Tr. 1023:15-1024:21; 1025:25-1028:5; 1033:9-1034:14; 1034:23-1035:8.
[361] *Id*.; R. Ex. 68 at 3; R.Ex. 69 at 1; R.Ex. 70; 1020:10-1022:3; 2309:1-2311:17; 2312:16-2313:24; 2316:11-2318:3.
[362] *Id*.
[363] R. Ex. 32 at 4, R. Ex. 32 at 6; Tr. 2309:1-2311:17.
[364] Tr. 1028:6-1032:6; OCC Ex. 319 at 6-8.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 115**

In addition, there was evidence adduced that accounting on a cash basis is appropriate where the appraisal shows the loan is fully secured – indeed, there is a strong argument that such loans should not be on nonaccrual status at all.[365] It was a conservative and cautious policy of the Bank to treat such loans as non-accrual on a cash basis,[366] and the examiner witness acknowledged it was permissible.[367] Appraisals were, in fact, documentation that could support a loan's repayment.[368] The Bank ensured that troubled loans were written down such that they were fully secured.[369] In such an instance, there would be no reason to account for the loan on anything other than a full accrual or non-accrual/cash basis accounting method. The OCC's position on nonaccrual loans is based on the faulty premise that the loans were not fully secured with solid appraisals. The OCC failed to present any evidence at trial that the loans were not fully secured or that the appraisals were flawed. For this reason, the OCC failed to meet their burden.

Prior bank examiners approved of and agreed with the Bank's approach.[370] As shown in Respondents' Exhibit 66, Rusty Thompson, the head accountant at the OCC, suggested using cash basis accounting where there was "no evidence of the borrower's ability to generate sufficient cash flow to repay the debt."[371] In stark contrast, the OCC examiner Ramah Chansen took the position at trial that where such evidence was lacking, cash basis accounting was unsafe and unsound and required Respondents to be banned from banking. This was incredible testimony which contradicted the head accountant at

---

[365] Tr. 2306:16-2307:5; 1685:13-20; 1689:15-23.
[366] Tr. 1018:17-1021:5.
[367] Tr. 1685:13-20; 1689:15-23.
[368] Tr. 1694:11-14.
[369] Tr: 2306:16-2307:5; *see also* Tr. 1954:24-1955:13.
[370] *E.g.,* R. Ex. 66.
[371] *Id*.; *see also* Tr. 1042:2-1043:13.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 116**

the OCC. The evidence showed that the OCC's approach on nonaccrual loans was inconsistent, to say the least.[372] It is apparent that the OCC took extreme positions at trial that were not consistent with the OCC approach at the time. It is also apparent that neither Respondent was involved in grading nonaccrual loans in the first place.

<u>The Bank Made Substantial Efforts to Ensure Compliance.</u>

Respondents take exception the ALJs ruling that Respondents did not act to resolve issues with nonaccrual accounting from their positions on the board.[373] Third party financial analysts reviewed every nonaccrual loan and ensured they were being accounted for correctly.[374] In 2012, Ortega hired Alvarez and Marsal to analyze the loans and ensure compliance.[375] The Bank always followed the advice and direction of A&M and made all recommended corrections.[376] It was apparent that such accounting decisions were not simple and required a certain level of expertise and judgment,[377] which is why Mr. Ortega brought in Alvarez and Marsal to review the loan grades and documentation.[378] Far from showing "continuing disregard" as alleged by the OCC, this showed that Ortega acted with great regard to compliance on nonaccrual loans.

Later on, when the OCC took issue with the accounting for nonaccrual loans, Respondent Ortega precisely followed the examiners directions in every respect and took writedowns exactly as directed.[379] As shown in Respondents' Exhibit 67, by September

---

[372] Tr. 1043:1-1044:6.
[373] R.D. at 76, 160-62, 166-69.
[374] R. Ex. 74; 1035:14-1039:23.
[375] *Id*.
[376] Tr. 1039:20-23.
[377] Tr. 2320:17-23.
[378] Tr. 1035:14-1038:9.
[379] Tr. 1956:10-1957:7; 2322:2-2323:25.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 117**

21, 2012, the Bank had taken remedial steps to address the OCC concerns.[380]  When these issues were raised by regulators, Respondent Rogers was already retired from banking and Respondent Ortega responded immediately and did everything he was asked to do.[381]

<u>The OCC Failed to Establish Culpability and a Pattern of Misconduct</u>.

The ALJ's finding of culpability and a pattern of misconduct was also in error.[382] The nonaccrual loan accounting did not involve willfulness, continuing disregard, or a pattern of misconduct on the part of Respondents.  12 U.S.C. § 1818(e)(1)(C); 12 U.S.C. § 1818(i)(2)(B)(i)(II));  §  1818(i)(2)(B)(ii)(I).   For the reasons described above, the nonaccrual loan accounting was neither illegal, unsafe, unsound, nor a breach of Respondents' fiduciary duty, and therefore did not involve personal dishonesty, willfulness, continuing disregard, recklessness, or a pattern of misconduct.  Furthermore, even if they did involve some kind of violation, these Respondents were not culpable.

First, simply being on the Board of the Bank does not establish the state of mind necessary to establish culpability under the statute.  *Kim v. Office of Thrift Supervision*, 40 F.3d 1050, 1054-55 (9th Cir. 1994).  These Respondents were not responsible for grading loans.  Respondents were simply among the non-lenders and non-experts on the Board who were assured that the loans were being graded properly by those in lending.  Extensive evidence showed that Respondents were reassured that this issue was being handled.[383] This is simply not enough to meet the statutory requirements.  Negligence is not enough to

---

[380] R. Ex. 67 at 3.

[381] R. Ex. 32 at 6; 2322:2-2323:25.

[382] R.D. at 166-70.

[383] R.Ex. 67 at 3; R.Ex. 69 at 1; R. Ex. 70; R. Ex. 71; Tr. 1023:15-1024:21; 1028:6-1032:6; 1025:25-1028:5; 1033:9-1034:14; 1034:23-1035:8; OCC Ex. 319 at 6-8; *see also* R. Ex. 66, 68.

satisfy the culpability prong of the statute.  *Lewis v. FDIC*, 2001 U.S. App. LEXIS 32333, *7 (5th Cir. 2001).

Second, there is simply no basis to conclude that these Respondents were being dishonest or wrongful.  The evidence at trial showed that these Respondents were more than willing to take substantial losses to capital – $174 million in 2008 on Fannie – and, in 2012, approximately $60 million on ORE.  It makes no sense that they would willfully or dishonestly try to misstate capital amounts that dwarf in comparison.

It was clear, instead, that Respondent Ortega brought in third parties to ensure compliance. (*See* discussion above).  It was also clear from the reports of examination that Respondent Ortega corrected the OCC's concerns in this regard.  This conduct is the polar opposite of what is needed to show culpability under 12 U.S.C. § 1818.

Third, as described in detail above, the Respondents' state of mind was not characterized by culpable intent but by the untenable position reactive to the extraordinary and unprecedented situation created by the Fannie Mae debacle.[384]  The only motive or intent by the Respondents was to try and cope with the banking crisis – not to engage in misconduct.  *Doolittle v. NCUA*, 992 F.2d 1531, 1539 (11th Cir. 1993) (law requires culpability of the same magnitude as personal dishonesty).  As the evidence showed, by 2012, this involved on Ortega's part, significant writedowns, illness, extensive third party and examiner reviews, and legions of additional evidence showing – not culpability – but real striving on his part for compliance.

Fourth, Respondents were simply not bad actors.  David Rogers' good faith, honesty and fair dealing was beyond reproach.  The OCC had a "strong history" with

[384] Much of this evidence was excluded.  *See* IV.C, IV.D.1, IV.E.2 & IV.E.3, *supra*.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 119**

Rogers.[385]   Examiners praised him for always being honest, up front, and aggressively dealing with problems.[386]   Examiners also acknowledged him for being conservative and that he "has always done what we asked him to do."[387]   Another examiner remarked emphatically: "He has ALWAYS done what he said he would do."[388]   Likewise, Saul Ortega's strong record at Texas National Bank, along with his outstanding record at the Bank require the conclusion that Ortega's state of mind, philosophy, and character as a banker is to act in good faith and in the best interests of the Bank.   Examiners noted that Ortega was the only officer that "gets it" and was trying to put together a plan to address the issues at the Bank.[389]   Ramah Chansen indicated in 2011 that Mr. Ortega demonstrated foresight, implemented change when needed, and devised reasonable plans and solutions to address deficiencies at the Bank.[390]   His willingness to bring in outside vendors to correct problems further showed this good faith and absence of any ill-motives.   His total willingness to take writedowns – huge hits to capital – bely the government's allegation that Ortega tried to manipulate the accounting in some way.   Each of the witnesses, including Mr. Leal and Mr. Quiroga, reflected Ortega's extraordinary performance and unimpeachable reputation.   Cast against this evidence, there was nothing to show that Respondents had engaged in – or were capable of – culpable misconduct.

In sum, the record was devoid of evidence which satisfied the requirements of 12 U.S.C. § 1818(e)(1)(C), and § 1818(i)(2)(B) and full of evidence of the Respondents hard work, good will, good faith and business judgment.

---

[385] R. Ex. 16.
[386] R. Ex. 15, 16, 17.
[387] R. Ex. 16.
[388] R. Ex. 17.
[389] R. Ex. 33.
[390] Tr. 1563:6-15; Jt. Ex. 4 at 38.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 120**

**I.   Other Accounting Issues (Civil Money Penalty) (Exception 21)**.

The ALJ also found that a civil monetary penalty was appropriate against Ortega for accounting issues arising from the Capital Raise Loans and OREO Loans.[391] Respondents take exception to the ALJ's finding and conclusion that Ortega engaged in a "pattern of misconduct" with respect to accounting claims, which was without support and a legal basis.[392]   There was no evidence presented of a "pattern of misconduct" on these issues and, indeed, as shown in IV.F & G, supra., there was no accounting misconduct at all.

**J.   Bank Loans to Companies Controlled By David Rogers III (Exceptions 22, 23, and 24)**

In the Recommended Decision, the ALJ ruled against Respondent Rogers on Article VI of the Notice of Charges.   Respondent Rogers takes exception to this ruling on the following grounds:

David Rogers Did Not Breach His Fiduciary Duty.

The Recommended Decision found that Respondent breached his fiduciary duty.[393] Respondent takes exception because the loans involving David Rogers III did not constitute a breach of fiduciary duty by David Rogers, Jr.   *See* 12 U.S.C. § 1818(e)(1)(A)(ii), (iii); 1818(i)(2)(B)(i)(II-III)).   The ALJ agreed that Rogers did not try to influence the Bank to do business or not do business with David Rogers III.[394]   There was no evidence to suggest that Respondent Rogers used his position at the Bank to promote or assist Rogers III.[395]

---

[391] R.D. at 174
[392] *Id*.
[393] R.D. at 174, 179.
[394] R.D. at 98; Tr. 453:16-20; 1016:19-1017:7.
[395] *Id*.; 1703:11-15.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 121**

Respondent abstained from voting on Rogers III's loans when they came before the L&D committee.[396]  Respondent Rogers was uninvolved in the making of loans to David Rogers III's entities.[397]  The ALJ agreed that Rogers III went through normal channels to do business with the Bank.[398]  Edna Martinez and Curtis Brockman handled the loans and got them approved and funded.[399]  This was not a breach of duty by Respondent.

Furthermore, no party in this case contends, and the ALJ did not determine, that the loans at issue failed to perform during the time that Respondent was with the Bank.  It is not a breach of duty where the Bank takes on loans that actually performed.  As long as Rogers was Chairman, the loans did well.[400]

Instead, the ALJ focused on Rogers having "stayed out of it" and having abstained from voting on the loans at the L&D Committee when, in her view, he should not have remained silent.[401]  But this fails for two reasons: It was apparent from the testimony that the Bank and L&D Committee knew of Rogers III's involvement in these loans – they did not need any disclosure from Respondent to obtain that information and, by abstaining, that fact was made obvious.[402]  Second, there was no evidence that Respondent intentionally or willfully withheld any information from the Bank in any way, shape, or form.  No evidence was adduced that Rogers intentionally withheld information – in fact, the evidence showed he believed he was doing the right thing.  Rogers did not have the legally requisite state of mind necessary for the tort of breach of fiduciary duty.[403]

---

[396] Tr. 405:16-22; 409:13-15; 1703:23-1704:3; OCC Ex. 279 at 2.
[397] Tr. 405:16-22; 406:6-15; 407:18-408:4.
[398] R.D. at 98; Tr. 405:16-22; 406:6-15; 407:18-408:4.
[399] *Id*.; OCC Ex. 276, 278, 279.
[400] Tr. 408:2-3; 405:5-7; 1017:8-15; *See also discussion, infra*., regarding the "effects prong."
[401] R.D. 174-79.
[402] Tr. 410:4-11; 412:3-12; OCC Ex. 282.
[403] This also prevents a finding of culpability, as discussed further below.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 122**

The OCC argued that Respondent Rogers should have disclosed Rogers III's attorneys' email to Rogers III to the L&D Committee. In fact, however, the Bank conducted its own analysis of the transactions through proper channels, and the loans, according to the bankers who made them, were in the best interests of the Bank and beneficial to the Bank.[404] The loans were made by the loan department of the Bank after the credit department put together the documentation and analysis.[405] It was rated satisfactory by the credit officers who recommended the loans.[406]

The OCC did not carry its burden to show that Respondent intentionally or willfully withheld any information from the Bank.

<u>This Claim Fails to Meet the "Effects" Prong.</u>

The ALJ found a loss to the Bank because the Bank or FDIC booked losses on these loans at some point in time.[407] Respondent Rogers takes exception to this. The ALJ found that the Bank took an impairment on the Griqualand loan in the amount of $432,000 on September 13, 2012.[408] However, this impairment was more than five years before this case was commenced. *See* discussion, Section IV.A.8. And the OCC never showed that the loans did not perform. There was no loss to the Bank on these loans because the loans performed.[409] Just because a bank records a gain or loss (or as Mary Jane Locke testified, could record one in the future) this does not necessarily show whether the loan performed. Furthermore, the OCC does not even contend that the loans failed to perform while

---

[404] OCC Exs. 276, 279
[405] R. Ex. 79 at 2; OCC Ex. 278, 283.
[406] OCC Ex. 278 at 1.
[407] R.D. at 179.
[408] R.D. at 179.
[409] Tr. 408:2-3; 405:5-7; 1017:8-15.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 123**

Respondent was with the Bank, i.e., before November 2011.  There is no dispute that while

Rogers was involved these loans performed well.[410]

Instead, the ALJ relies on losses that occurred post-closure.[411]  In other words, those

were losses taken by the FDIC not the Bank.  Respondents take exception to this ruling.

First, these so-called losses are not explained by any document or witness.  Again, there is

no evidence that these loans did not perform – only that the FDIC sold off the loans to

PlainsCapital (who made a fortune) and made some unilateral decisions to book losses.  It

is unknown whether the alleged FDIC losses were the result of some horse-trading

transaction with Plains (which should have no bearing on Respondent), the result of some

deal between Plains and Rogers III, or some global write-down that had nothing to do with

this specific loan.  In short, no evidence was offered that the loan did not perform, and this

should be dispositive.  Second, the losses were taken by the FDIC, not the Bank and not

the depositors.  While the statute requires a loss to an "***insured depository institution***," the

Recommended Decision only found losses to the ***insurer***, i.e., the FDIC.  *Compare* R.D.

at 179 *with* 12 U.S.C. § 1818(e)(1)(B)(i) (loss to an "insured depository institution").  The

insurer is not the same as the Bank and does not fall under the statute.  Third, these losses

were on occasions chosen by the government, which means that under the OCC's rubric,

the government decides when to create a claim and chooses its own accrual date for

limitations purposes.  This is further support for the time-barred nature of these claims.[412]

Finally, the OCC offered no evidence of what would have happened had the Bank

not made the loans, i.e., what losses the Bank have would have suffered without these

---

[410] *Id*.

[411] R.D. at 103, 179; OCC Posthearing Brief at 116.

[412] *See* discussion, *supra*. at IV.A.8.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S
RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL
ARGUMENT – Page 124**

loans. The evidence showed that the Bank suffered crushing losses when holding OREO properties (something the ALJ wrote about at length in the Recommended Decision), and these particular loans put the properties in the hands of a party who actually paid monthly principal and interest. All the evidence showed was that respected lenders Edna Martinez and Curtis Brockman worked these loans and made the best decision they could for the Bank without influence from Respondent. This does not show a harm to the Bank, but rather that the lenders believed this was the best refinancing option for the Bank given the circumstances. For there to be a real "effect" under the statute, the OCC would have had to show that the losses on the loans exceeded the losses that the Bank would have otherwise suffered – they failed to even try to make such a showing.

<u>This Claim Fails to Meet the Culpability Prong</u>.

The Recommended Decision found that Article VI of the Notice of Charges met the culpability prong under the statute, finding "willful disregard."[413] Respondents take exception because the loans involving David Rogers III did not involve willful disregard on the part of Respondent. 12 U.S.C. § 1818(e)(1)(C); 12 U.S.C. § 1818(i)(2)(B)(i)(II)); § 1818(i)(2)(B)(ii)(I).

Negligence is not sufficient to carry the government's burden. *Kim v. Office of Thrift Supervision*, 40 F.3d at 1054. The "ultimate sanction of a prohibition order" requires scienter "well beyond mere negligence." *Lewis v. FDIC*, 2001 U.S. App. LEXIS 32333, *7. Indeed, conduct sufficient to satisfy the culpability prong must have the same magnitude as personal dishonesty. *Doolittle v. NCUA*, 992 F.2d at 1539. Prohibition from

---

[413] R.D. at 181-82.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 125**

banking is "draconian" and requires an ***extraordinary*** showing, not just approving some "questionable" loans. *Kim v. Office of Thrift Supervision*, 40 F.3d at 1055.

Thus, the culpability prong requires more than negligence. *Kim v. Office of Thrift Supervision*, 40 F.3d at 1054-55; *Lewis,* 2001 U.S. App. LEXIS 32333, *7. It was clear that Rogers believed that by abstaining from the vote on the L&D Committee and allowing lenders Brockman and Martinez to handle the loans without influence from him was the right and correct way to go about these kinds of loans.[414] This was uncontroverted. Rogers clearly tried to do what he thought was right. If he was negligent in carrying out his duty, this is insufficient to meet the legal standard.

Moreover, the weight of the evidence shows that Rogers was not a bad actor. David Rogers' good faith, honesty and fair dealing was beyond reproach. The OCC had a "strong history" with Rogers.[415] Examiners praised him for always being honest, up front, and aggressively dealing with problems.[416] Examiners also acknowledged him for being conservative and that he "has always done what we asked him to do."[417] Another examiner remarked emphatically: "He has ALWAYS done what he said he would do."[418] In thirty years of banking, Rogers had never had any issues. It strains credulity that he would suddenly become a wrongdoer at this age and stage of life.

There was no evidence that Rogers acted with willful disregard for the Bank or any other culpable conduct. Again, both Respondents demonstrated good faith, care, loyalty,

---

[414] Tr. 405:16-22; 407:18-408:4; 453:16-20
[415] R. Ex. 16.
[416] R. Ex. 15, 16, 17.
[417] R. Ex. 16.
[418] R. Ex. 17.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 126**

and a fervent intention to act in the best interests of the Bank. The OCC must show conduct that rises to the level of willfulness, which was simply not shown in this case.

**K. The ALJ Applied The Wrong Legal Standard for "Unsafe or Sound Practice" (Exception 25)**

The applicable statutory regime does not define "unsafe or unsound practice." The Recommended Decision applies the Horne Standard, taken from the legislative history of the statute, which considers whether the transaction posed an "abnormal risk of loss or damage …" to the institution.[419] The ALJ did not consider the ordinary meaning of "unsafe or unsound practice," but rather relied on legislative history lifted from government employees' memoranda. Respondents take exception to this because this analysis violated the most basic canons of statutory construction – these require the Court to simply identify the ordinary meaning of Congress's words as read against their context and structure. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019).

For example, the Fifth Circuit (and other circuits) have offered different interpretations of "unsafe and unsound" based the ordinary meaning of the statute. These were ignored by the ALJ. In *Gulf Federal*, the Fifth Circuit explained a different materiality threshold. *Gulf Fed. Sav. & Loan Ass'n of Jefferson Parish*, 651 F.2d 259, 264 (5th Cir. 1981). Because the ALJ analyzed the statute incorrectly, she applied the wrong law.

**L. The ALJ Applied The Wrong Legal Standard for Causation (Exception 26)**

The "effects prong" of the statute incorporates concepts of causation. This is found in the language "by reason of" contained in the statute. *E.g.,* 12 U.S.C. § 1818(e)(1)(B).

---

[419] R.D. at 7-8.

**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 127**

This includes both "but for" and "proximate" causation. The ALJ did not evaluate these common law concepts in any of the reasoning that led her to conclude a loss (or effect) took place, and did not analyze causation. *Burrage v. U.S.*, 571 U.S. 204, 213-14 (2014) (statutes incorporate common law causation concepts when they use language like "because of" or "results from"). For this reason, Respondents take exception to the "effects prong" law applied by the ALJ. For example, all of the loans at issue in this case had enough votes on the L&D Committee to be approved, with or without the Respondents. Respondents were in no real sense, therefore, the "but for" or "proximate cause" of the loan "losses" alleged by the OCC. Similarly, the ALJ's failure to consider the Bank's alternatives when discussing loan "losses" derives from this failure to consider causation: a loss to the Bank on some OREO loans left the Bank a good deal better off than it would have been had the Bank engaged in the next best alternative. Neither the OCC nor the ALJ considered these causation and effect issues. A failure to consider common law causation standards and legal precedent was error.

### M. The ALJ Should Have Applied a "Clear and Convincing" Standard of Proof for the Prohibition Claims. (Exception 27)

The draconian penalty of prohibition, permanently disallowing someone from practicing their chosen profession, is an extraordinarily harsh penalty. Application of a preponderance standard in such a case was inappropriate.[420] The ALJ should have required the government to meet a "beyond a reasonable doubt" or at least a "clear and convincing" standard before trying to ban someone from making a living.

---

[420] R.D. at 5-6.

## V.    REQUEST FOR ORAL ARGUMENT

Respondents believe that oral argument on these matters will aid the Comptroller in making a decision.

## VI.    REQUEST FOR STAY

Insofar as the Comptroller enters a final order adverse to Respondents, Respondents request that such order be accompanied by a stay under 12 C.F.R. § 19.41 pending judicial review.   The Comptroller has the discretion to stay any orders pending judicial review.  12 C.F.R. § 19.41.

## VII.    CONCLUSION

For the foregoing reasons, Respondents take exception to certain of the rulings contained in the Recommended Decision.  Respondents pray that the Comptroller grant these exceptions and dismiss the case in its entirety; a failure to correct these exceptions would result in a final agency order that is arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to Respondents' constitutional rights, in excess of the Comptroller's jurisdiction, authority, and limitations, a failure to observe procedure required by law, and unsupported by substantial evidence.  Therefore, with respect to the prohibition claims, Respondents pray that the Comptroller affirm the rulings that Respondents should be not banned from banking under Articles III, IV, and V of the Notice of Charges, and that the Comptroller reverse and render judgment on the ALJ's rulings on Article VI of the Notice of Charges, denying all relief sought by Enforcement Counsel. With respect to the civil money penalties, Respondents pray that the Comptroller reverse these rulings and dismiss the claims against them.

Dated:  March 16, 2023

Respectfully submitted,

By:  _/s/ Frank Brame_____
Bill Sims
4234 Shorecrest Drive
Dallas, TX 75209
Phone: 214.458.6970
bsims1119@gmail.com

Frank C. Brame
Texas Bar No. 24031874
The Brame Law Firm PLLC
4514 Cole Ave., Suite 600
Dallas, Texas 75205
Telephone: (214) 665-9464
Fax: (214) 665-9590
frank@bramelawfirm.com

**COUNSEL FOR RESPONDENTS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the attached Respondents' Exceptions to the Administrative Law Judge's Recommended Decision, Supporting Brief, and Request for Oral Argument has been served upon the following by electronic mail on this 16th day of March 2023:

Office of Financial Institutions Adjudication
3501 North Fairfax Drive, Suite D8115A
Arlington, VA 22226-3500
ofia@fdic.gov

Hearing Clerk
Office of the Controller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219
hearingclerk@occ.treas.gov

Lawrence J. Keen, III
Christopher D'Alessio
Nathan Taran
Michael Laurino
Susan Bowman
Erin Healy Gallagher
Office of the Controller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219
Larry.keen@occ.treas.gov
Christopher.dalessio@occ.treas.gov
Nathan.taran@occ.treas.gov
Michael.Laurino@occ.treas.gov
Susan.Bowman@occ.treas.gov
Erin.HealyGallagher@occ.treas.gov


By:  */s/ Frank Brame*
       Frank C. Brame

**COUNSEL FOR RESPONDENTS**


**RESPONDENTS' EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION, SUPPORTING BRIEF, AND REQUEST FOR ORAL ARGUMENT – Page 131**

# EXHIBIT D

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Saul Ortega ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, ) | |
| President, Chief Executive Officer, and ) | |
| Chairman of the Board ) | |
| ) | |
| David Rogers, Jr. ) | AA-EC-2017-45 |
| Former Chairman of the Board ) | |
| ) | |
| First National Bank ) | |
| Edinburg, Texas ) | |

**FINAL DECISION OF THE COMPTROLLER OF THE CURRENCY**

I.    STATEMENT OF JURISDICTION ................................................................. 6

II.   PROCEDURAL HISTORY ........................................................................... 6

 A.  Proceedings Under Judge McNeil and Judge Miserendino ................................. 6

 B.  Reassignment to Judge Whang ......................................................................... 7

 C.  Respondents' Request for Interlocutory Review of Rulings Regarding the Appointments Clause ................................................................................................................. 8

 D.  Statute-of-Limitations Orders ........................................................................... 9

 E.  Hearing and Post-Hearing Procedures ............................................................ 10

III.  SCOPE OF REVIEW ............................................................................... 11

 A.  Waiver by Enforcement Counsel .................................................................... 12

 B.  Waiver by Respondents .................................................................................. 13

IV.   APPLICABLE LEGAL STANDARDS ...................................................... 19

 A.  Section 1818(e) Prohibitions .......................................................................... 20

 B.  Section 1818(i) Civil Money Penalties ........................................................... 20

V.    RESPONDENTS' EXCEPTION REGARDING TIMELINESS ..................... 21

 A.  Interlocutory Rulings Regarding the Statute of Limitations ............................ 22

 B.  Respondents' Exception 1 Is Deemed Moot in Part and Rejected in Part ........ 24

VI.   RESPONDENTS' EXCEPTION REGARDING THE SEVENTH AMENDMENT ....... 26

VII.  RESPONDENTS' EXCEPTIONS REGARDING THE APPOINTMENTS CLAUSE ... 27

 A.  Judge Whang Was Properly Appointed ........................................................... 28

B.   Respondents Received the Remedy Required by *Lucia* ................................ 28

C.   Respondents' Arguments Are Unavailing ................................................ 30

VIII.    RESPONDENTS' EXCEPTIONS REGARDING RULINGS ON CERTAIN AFFIRMATIVE DEFENSES AND EVIDENTIARY MATTERS ............... 32

IX.    FINDINGS OF FACT .................................................................... 36

A.   The Bank's Failure ................................................................... 36

B.   Respondents' Roles at the Bank ..................................................... 38

C.   Capital Raise Strategy ............................................................... 40

   1.   Communications with OCC Following Fannie Mae and Freddie Mac Investment Loss 40

   2.   Private Placement Memorandum and Everhard Loan .......................... 42

   3.   Implementation of Capital Raise Strategy .................................... 43

   4.   Ongoing Communications with OCC and Capital Injections ................ 44

   5.   "Downstreaming" of Loan Proceeds ......................................... 46

   6.   Features of Capital Raise Loans ............................................. 47

   7.   Misleading Loan Purposes ................................................... 49

   8.   Efforts to Conceal Capital Raise Strategy ................................... 50

   9.   Losses Associated with the Capital Raise Strategy .......................... 51

D.   OREO Strategy ..................................................................... 51

   1.   Respondents' Involvement in OREO Strategy ............................... 51

   2.   OCC Communications Regarding OREO Strategy .......................... 52

   3.   Features of OREO Loans ..................................................... 53

   4.   NAHS Loan and OREO Loan Losses ........................................ 55

   5.   OREO Strategy Alternatives .................................................. 57

   6.   OREO Strategy Accounting-Related Misconduct ........................... 58

E.   Nonaccrual Loan Accounting Practices ............................................ 59

   1.   Cash-Basis and Cost-Recovery Accounting ................................. 59

   2.   The Bank's Accounting System ............................................. 60

   3.   Warnings About the Bank's Accounting Practices .......................... 61

F.   Loans to Rogers III Entities ......................................................... 63

   1.   February 2009 Email from Rogers III's Attorney ............................ 63

   2.   Griqualand Loans ............................................................. 65

   3.   Petro Icon Loans .............................................................. 66

4. Financial Losses ................................................................................. 67

G. Other Factual Findings ........................................................................... 67

X. CONCLUSIONS OF LAW ...................................................................... 68

A. Capital Raise Strategy ............................................................................ 69

1. Misconduct ....................................................................................... 69

2. Effect ................................................................................................. 77

3. Culpability ......................................................................................... 82

B. OREO Strategy ........................................................................................ 85

1. Misconduct ....................................................................................... 87

2. Culpability ......................................................................................... 95

3. Section 1818(i) .................................................................................. 98

4. Respondents' Exception 18 ............................................................... 99

C. Nonaccrual Loan Accounting Practices ................................................... 99

1. Misconduct ....................................................................................... 99

2. Effect ................................................................................................. 103

D. Loans to Rogers III Entities ..................................................................... 103

1. Misconduct ....................................................................................... 104

2. Effect ................................................................................................. 105

E. The Civil Money Penalty Assessment is Appropriate .............................. 107

XI. REQUEST FOR ORAL ARGUMENT ...................................................... 109

XII. REQUEST FOR STAY ............................................................................. 109

XIII. CONCLUSION ......................................................................................... 109

This is a Final Decision in an enforcement action brought by Enforcement Counsel of the Office of the Comptroller of the Currency ("OCC") against Saul Ortega ("Respondent Ortega") and David Rogers, Jr. ("Respondent Rogers") (together, "Respondents"), former directors and officers of First National Bank, Edinburg, Texas ("Bank"). Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty ("Notice") against Respondents. The Notice's charges arise from four distinct series of events. First, the Notice charges that Respondents engaged in lending-related misconduct and accounting-related misconduct in connection with a strategy to raise capital (hereinafter, "Capital Raise Strategy") following the Bank's $174 million loss on its investments in the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"). Second, the Notice charges that Respondents engaged in lending-related misconduct and accounting-related misconduct in connection with a strategy to reduce the Bank's Other Real Estate Owned ("OREO" or "ORE") portfolio (hereinafter, "OREO Strategy"). Third, the Notice charges that Respondents engaged in misconduct in connection with the Bank's accounting treatment of nonaccrual loans (hereinafter, "Nonaccrual Loan Accounting Practices"). Fourth, the Notice charges that Respondent Rogers engaged in misconduct in connection with a series of loans made to entities affiliated with his son, David Rogers III (hereinafter, "Loans to Rogers III Entities").

A twelve-day virtual hearing before Administrative Law Judge ("ALJ" or "Judge") Jennifer Whang was held between January 31, 2022, and February 15, 2022. On September 30, 2022, the ALJ issued a decision ("Recommended Decision" or "RD") recommending that the Acting Comptroller of the Currency ("Comptroller") enter an order of prohibition against Respondent

Rogers in connection with the charge arising from Loans to Rogers III Entities. The ALJ concluded that Enforcement Counsel had not established all elements of proof required to support orders of prohibition against Respondents based on charges arising from the Capital Raise Strategy, OREO Strategy, or Nonaccrual Loan Accounting Practices. The ALJ also recommended that civil money penalties of $250,000 be assessed against each Respondent. With respect to Respondent Ortega, the ALJ recommended civil money penalties in connection with charges arising from the Capital Raise Strategy, OREO Strategy, and Nonaccrual Loan Accounting Practices. With respect to Respondent Rogers, the ALJ recommended civil money penalties in connection with charges arising from lending-related misconduct associated with the Capital Raise Strategy and OREO Strategy, as well as the charge arising from Loans to Rogers III Entities.

Enforcement Counsel and Respondents timely filed exceptions to the Recommended Decision. Enforcement Counsel argues that the ALJ erred in concluding that certain elements of proof had not been established and urges the Comptroller to enter orders of prohibition against both Respondents based on charges arising from their lending-related misconduct in connection with the Capital Raise Strategy and OREO Strategy. Respondents argue that the action should be dismissed because, *inter alia*, all charges are time-barred by the statute of limitations, Enforcement Counsel did not establish any of the charges against them, and these proceedings violate various rights guaranteed to them under the United States Constitution.

On April 3, 2023, the Comptroller certified that the record of the proceeding was complete, and the parties were notified that the matter had been submitted to the Comptroller for final decision. Upon careful review of the full administrative record, including the Recommended Decision and the parties' exceptions thereto, and for the reasons set forth in this decision, the Comptroller adopts in part and rejects in part the ALJ's recommendations. As explained herein,

the Comptroller enters orders of prohibition against both Respondents based on charges arising from their lending-related misconduct associated with the Capital Raise Strategy; assesses a second-tier civil money penalty of $250,000 against Respondent Rogers based on charges arising from his lending-related misconduct associated with the Capital Raise Strategy; assesses first-tier and second-tier civil money penalties totaling $250,000 against Respondent Ortega based on charges arising from his lending-related misconduct associated with the Capital Raise Strategy (second-tier), accounting-related misconduct associated with the Capital Raise Strategy (first-tier and second-tier), accounting-related misconduct associated with the OREO Strategy (first-tier and second-tier), and Nonaccrual Loan Accounting Practices (first-tier and second-tier). The Comptroller dismisses all other charges.

## I.    STATEMENT OF JURISDICTION

At all times relevant to the facts alleged in the Notice, the Bank was an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2), and Respondents were "institution-affiliated parties" ("IAPs") as defined in § 1813(u). *See* Joint Stipulation of Facts and Law ("Joint Stip.") ¶¶ 1-2. The Bank was also a national banking association within the meaning of § 1813(q)(1)(A) and was chartered and examined by the OCC. *See id.* ¶ 3. Pursuant to § 1813(q), the OCC is the "appropriate Federal banking agency" with jurisdiction over the Bank and its IAPs, and the OCC is authorized to initiate and maintain this prohibition and civil money penalty action against Respondents. *See id.* ¶ 3-4.

## II.    PROCEDURAL HISTORY

### A.  Proceedings Under Judge McNeil and Judge Miserendino

The Notice charges that Respondents engaged in unsafe or unsound practices, breached their fiduciary duties, violated 12 U.S.C. § 161, and violated final orders. *See* Notice, Arts. III-VI.

Respondents raised various affirmative defenses, asserting, as relevant, that the charges against them were time-barred; that the ALJ presiding over the proceedings held his position in violation of the Appointments Clause; that Respondents lost money in connection with the Bank's failure (hereinafter, "Sixth Affirmative Defense"); and that because the Federal government did not "support the preferred stock of Fannie Mae and Fredd[ie] Mac," the Bank suffered a "loss of over $176,000,000 or 60% of the Bank's capital" from which it could not recover (hereinafter, "Fannie Mae and Freddie Mac Defense"). *See* Resp'ts' Answer and Affirmative Defenses to Notice ("Answer") at 8-9. Enforcement Counsel moved to strike, *inter alia*, the Sixth Affirmative Defense and the Fannie Mae and Freddie Mac Defense. *See* OCC's Mot. to Strike Resp'ts' First, Second, Third, and Sixth Affirmative Defenses ("Motion to Strike") at 2. The ALJ initially assigned to this matter, Judge Christopher B. McNeil, granted the motion, reasoning, *inter alia*, that these were not properly pled affirmative defenses and that the Fannie Mae and Freddie Mac Defense was irrelevant. *See* Order Regarding OCC's Mot. to Strike Resp'ts' First, Second, Third, and Sixth Affirmative Defenses ("Order Granting Motion to Strike") at 4.

In August 2018, in response to the Supreme Court's decision in *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018), the Comptroller reassigned Judge C. Richard Miserendino to this matter and directed him to provide the parties an opportunity to file objections to any actions taken by the prior ALJ. *See* Order in Pending Enforcement Cases in Resp. to *Lucia v. SEC*. Thereafter, Respondents filed objections to orders entered by Judge McNeil. *See* Resp'ts' Obj. to Orders Issued by ALJ.

### B. Reassignment to Judge Whang

While Respondents' written objections to the orders entered by Judge McNeil remained pending, Judge Miserendino retired, and the Comptroller reassigned the matter to Judge Whang.

The Comptroller directed Judge Whang to provide the parties an opportunity to file objections to any actions taken by a prior ALJ; to review all such actions; and, for each action reviewed, to "adopt or revise the action as [the ALJ] deem[ed] appropriate." *See* Order in Pending Enforcement Cases at 2. In January 2020, Judge Whang issued an order directing the parties to file any objections to her assignment to the case or to any actions taken by the previously assigned ALJs. *See* Notice of Reassignment and Order Regarding the Comptroller's Order in Pending Enforcement Cases at 2. In response, Respondents moved for summary disposition based on purported violations of the Appointments Clause, specifically objected to the Order Granting Motion to Strike, and generally objected to all orders entered by Judge McNeil and Judge Miserendino. *See* Resp'ts' Mot. for Summ. Disposition on the Appointments Clause and Obj. to Orders Issued by ALJ at 2-3.

### C. Respondents' Request for Interlocutory Review of Rulings Regarding the Appointments Clause

On March 17, 2020, Judge Whang adopted the prehearing actions taken by the previously assigned ALJs and concluded that *Lucia* did not support Respondents' contention that the appropriate remedy for an Appointments Clause violation should be nullification of the entire action. *See* Order Den. Resp'ts' Mot. for Summ. Disposition on the Appointments Clause at 4-5; Order Reviewing Prior ALJs' Prehearing Actions. Respondents thereafter moved for the Comptroller to conduct interlocutory review of these rulings. *See* Resp'ts' Mot. for Interlocutory Review. The Comptroller denied the motion, reasoning that none of the criteria supporting interlocutory review had been satisfied. *See* Order Den. Resp'ts' Mot. for Interlocutory Review; *see also* 12 C.F.R. § 19.28(b) (setting forth criteria supporting interlocutory review). Respondents then petitioned in the United States Court of Appeals for the Fifth Circuit for review of the ALJ's rulings and Comptroller's order denying interlocutory review thereof. The OCC moved to dismiss

the petition for lack of jurisdiction, and the Fifth Circuit granted the OCC's motion. *See Ortega v. OCC*, 20-60590, *per curiam* (5th Cir. Sept. 3, 2020).

### D. Statute-of-Limitations Orders

Respondents and Enforcement Counsel filed cross-motions for summary disposition on the issue of whether the Notice was timely filed under the governing five-year statute of limitations set forth at 28 U.S.C. § 2462. *See* Resp'ts' Mot. for Summ. Disposition on the Statute of Limitations and Br. in Support; OCC's Mot. for Partial Summ. Disposition on Resp'ts' Seventh and Ninth Affirmative Defenses; Br. in Support of OCC's Mot. for Partial Summ. Disposition on Resp'ts' Seventh and Ninth Affirmative Defenses. In an April 9, 2020 order, the ALJ recommended the partial entry of summary disposition in favor of Respondents, concluding that "when a particular statutory 'effect' is alleged . . . then the cause of action for a given claim against Respondents is complete, and the limitations period begins to run, upon the *first instance* of the alleged effect with respect to the misconduct at issue." *See* Order Den. Enforcement Counsel's Mot. for Partial Summ. Disposition and Granting in Part and Den. in Part Resp'ts' Mot. for Summ. Disposition on the Statute of Limitations (hereinafter, "ALJ's SOL Order") at 31-32. The parties then filed cross-motions requesting that the Comptroller conduct interlocutory review of the ALJ's SOL Order. *See* Order Referring Parties' Cross-Mots. for Interlocutory Review. The Comptroller granted interlocutory review; concluded that, because separate occurrences of effects give rise to separate accruals, an action is timely if it is commenced within five years of the date of the last "effect" resulting from the charged underlying misconduct; and remanded the matter for further proceedings consistent with the Order. *See* Order Granting Cross-Mots. for Interlocutory Review

and Vacating and Reversing in Part April 9 Order (hereinafter, "Comptroller's Interlocutory SOL Order").

### E. Hearing and Post-Hearing Procedures

The parties filed various prehearing submissions, and on Enforcement Counsel's motion, the ALJ excluded Respondents' evidence and testimony on various topics, including the Fannie Mae and Freddie Mac Defense. *See* Order Granting in Part and Den. in Part Enforcement Counsel's Mot. in Lim. to Exclude Resp'ts' Irrelevant Evid. The matter proceeded to a hearing, during which the ALJ heard testimony from ten fact witnesses, including Respondents, and three expert or hybrid fact/expert witnesses. Four hundred seventeen exhibits were introduced and admitted in connection with witness testimony, and the parties presented eighteen demonstrative exhibits. *See* RD at 4-5.

Following the hearing, Respondents submitted an offer of proof regarding various topics excluded from the hearing and the proposed interrogation of certain witnesses. *See* Resp'ts' Additional Offer of Proof. In June 2022, approximately four months after the hearing had concluded, Respondents submitted to the ALJ a demand for a jury trial or, in the alternative, dismissal of the proceedings based on purported violations of their rights under the Seventh Amendment to the United States Constitution. *See* Resp'ts' Demand for Jury Trial. The ALJ denied the requested relief on substantive and procedural grounds. *See* Order Den. Resp'ts' Demand for Jury Trial and Mot. to Dismiss.

On September 30, 2022, the ALJ issued the 188-page Recommended Decision. On Respondents' motion, the Comptroller extended the time for the parties to file exceptions to the Recommended Decision to March 16, 2023. *See* Order Regarding Resp't' Mot. to Stay or Extend Exceptions Deadline. Respondents timely submitted to the Comptroller twenty-seven exceptions

and supporting briefing, totaling 130 pages. *See* Resp'ts' Exceptions to the ALJ's RD, Supporting Br., and Request for Oral Argument (hereinafter, "Resp'ts' Exceptions"). Enforcement Counsel timely submitted six exceptions, including numerous subparts; fifteen proposed findings of fact; and three proposed conclusions of law, including subparts, which are accompanied by a separate briefing document and together total 78 pages. *See* Enforcement Counsel's Exceptions to the ALJ's RD (hereinafter, "EC's Exceptions"); Br. in Support of Enforcement Counsel's Exceptions to the ALJ's RD (hereinafter, "EC's Exceptions Br."). Pursuant to 12 C.F.R. § 19.13, upon finding that the complexity of this matter and the volume of the administrative record presented good cause, the Comptroller *sua sponte* extended the time to issue a final decision.

## III.     SCOPE OF REVIEW

The Comptroller is the final agency decisionmaker in this enforcement action. *See* 12 C.F.R. § 19.40(c)(1). The final decision is based on review of the entire record, *see id.*, and "[t]he Comptroller is free to accept or reject the ALJ's recommendations," *see In the Matter of Adams*, OCC AA-EC-11-50, 2014 WL 8735096, at *7 (OCC Sept. 30, 2014).

A party's failure to file written exceptions to the ALJ's recommended decision, findings, conclusions, admission or exclusion of evidence, or failure to make a ruling proposed by a party is deemed a waiver of objection thereto. *See* 12 C.F.R. § 19.39(a), (b)(1). Furthermore, "[n]o exception need be considered by the Comptroller if the party taking exception had an opportunity to raise the same objection, issue, or argument before the [ALJ] and failed to do so." *See id.* § 19.39(b)(2). All exceptions must, *inter alia*, set forth "page or paragraph references to the specific parts of the [ALJ's] recommendations to which exception is taken" and "the legal authority relied upon to support each exception." *See id.* § 19.39(c)(2). In reaching a final decision,

11

"the Comptroller may limit the issues to be reviewed to those findings and conclusions to which opposing arguments or exceptions have been filed by the parties." *See id.* § 19.40(c)(1).

### A. Waiver by Enforcement Counsel

Enforcement Counsel did not take exception to the ALJ's conclusions that the "effect" prong of § 1818(e)[1] was not established as to charges arising from Respondents' accounting-related misconduct in connection with the Capital Raise Strategy or OREO Strategy, or as to charges arising from Nonaccrual Loan Accounting Practices. *See* EC's Exceptions Br. at 5, n.6 ("Enforcement Counsel has chosen not to take exception to the ALJ's factual findings and legal conclusions regarding the Bank's accounting practices."); *see also* RD at 163, 173. Therefore, based on this waiver, the Comptroller adopts the ALJ's conclusions and dismisses the § 1818(e) prohibition charges against Respondents arising from accounting-related misconduct associated with the Capital Raise Strategy, OREO Strategy, and Nonaccrual Loan Accounting Practices.

Enforcement Counsel also did not take exception to the ALJ's conclusions that the "personal dishonesty" and "willful disregard" predicates of the "culpability" prong of § 1818(e)[2] were not established as to charges arising from Respondents' lending-related misconduct associated with the Capital Raise Strategy or OREO Strategy. *See* EC's Exceptions Br. at 10, n.11 ("Herein, we argue solely that Respondents' misconduct demonstrated their continuing disregard for the Bank's

---

[1] The "effect" prong is one of three elements that must be established to support an order of prohibition. *See infra* Part IV.A.

[2] The "culpability" prong is one of three elements that must be established to support an order of prohibition. *See infra* Part IV.A.

safety or soundness"); *see also* RD at 120-21, 123, 146. Therefore, the Comptroller adopts the ALJ's conclusions that these culpability predicates were not established.

Finally, for purposes of assessing civil money penalties pursuant to § 1818(i),[3] Enforcement Counsel did not take exception to the ALJ's declarations that she was not reaching conclusions as to the following: whether Respondent Ortega (1) breached his fiduciary duty in connection with accounting-related misconduct associated with the Capital Raise Strategy or the OREO Strategy, *see* RD at 172-73; (2) *recklessly* engaged in unsafe or unsound practices in connection with the Capital Raise Strategy, OREO Strategy, or Nonaccrual Loan Accounting Practices, *see id.* at 131; 152; 170, n.801; or (3) engaged in a pattern of misconduct in connection with lending-related misconduct associated with the Capital Raise Strategy or OREO Strategy, *see id.* at 131, 152. Nor did Enforcement Counsel take exception to the ALJ's declarations that she was not reaching conclusions as to whether Respondent Rogers (1) *recklessly* engaged in unsafe or unsound practices in connection with lending-related misconduct associated with the Capital Raise Strategy or OREO Strategy, *see id.* at 131, 152; or (2) engaged in a pattern of misconduct in connection with lending-related misconduct associated with the Capital Raise Strategy or OREO Strategy, or in connection with Loans to Rogers III Entities, *see id.* at 131, 152, 183. The Comptroller declines to consider these issues in the first instance based on Enforcement Counsel's waiver.[4]

### B. Waiver by Respondents

In numerous instances throughout Respondents' exceptions briefing, Respondents present exceptions in a perfunctory manner, without any citation to supporting legal authority. Under the

---

[3] The elements that must be established to support the assessment of a civil money penalty pursuant to § 1818(i) are set forth at *infra* Part IV.B.

[4] Enforcement Counsel did not take exception to various other issues as to which the ALJ declined to reach a conclusion. The Comptroller declines to consider these issues in the first instance and

applicable rules of procedure, such exceptions are fatally underdeveloped. *See* 12 C.F.R. § 19.39(c)(2) (requiring, *inter alia*, citations to supporting legal authorities). The Comptroller is unable to evaluate vague assertions with no accompanying analysis or citation to legal authority, and he will not guess the bases of Respondents' inadequately presented arguments. *See Carr v. Saul*, 141 S. Ct. 1352, 1358 (2021) (observing that, in an adversarial proceeding, "claimants bear the responsibility to develop issues for adjudicators' consideration"). Additionally, the Comptroller declines to consider exceptions that Respondents did not first raise to the ALJ if they were afforded such an opportunity. *See* 12 C.F.R. § 19.39(b)(2).

As discussed more fully below, because Respondents did not raise the following exceptions in the manner prescribed by 12 C.F.R. § 19.39, the Comptroller deems them waived and declines to consider them, in full or in part as specified: **Respondents' Exception 3** (in part), **Respondents' Exception 5** (in part), **Respondents' Exception 6** (in full), **Respondents' Exception 7** (in full), **Respondents' Exception 8** (in full), **Respondents' Exception 9** (in part), **Respondents' Exception 10** (in full), and **Respondents' Exception 11** (in full).

**Respondents' Exception 3** asserts, in relevant part, "This proceeding was conducted in violation of the . . . Take Care Clause, and applicable statutes governing ALJs." *See* Resp'ts' Exceptions at 2. As far as Respondents' briefing indicates, Respondents raise these challenges for the first time in their exceptions despite having had opportunities to raise them to the ALJ. Respondents do not reference any ruling regarding the Take Care Clause or ALJ removals to which an exception is taken. Nor do they otherwise indicate that these challenges were raised

---

does not deem it necessary to exhaustively list all such issues, particularly where some concern charges that are dismissed herein.

below. Therefore, to the extent that Respondents' Exception 3 raises these challenges,[5] it is

deemed waived.[6] *See Smith v. Bd. of Governors of Fed. Rsrv. Sys.*, 73 F.4th 815, 822-23 (10th

Cir. 2023) (concluding that Appointments Clause challenge was forfeited where respondents in

§ 1818(e) enforcement action failed to raise issue before the ALJ or Federal Reserve Board and

nothing had barred them from doing so; observing that "structural challenges have no special

entitlement to review" (internal quotation marks and citation omitted)).

**Respondents' Exception 5** asserts, "The ALJ's pretrial orders contain errors of fact and law

and violated the Administrative Procedure Act and the Uniform Rules of Practice and Procedure."

*See* Resp'ts' Exceptions at 2. The corresponding section of Respondents' Exceptions contains

citations to the administrative record, but notably lacks any citation to supporting legal authority

beyond incorporating by reference a section discussing the Fannie Mae and Freddie Mac Defense.

*See id.* at 88-89. The Comptroller addresses the merits of Respondents' various exceptions

regarding the Fannie Mae and Freddie Mac defense at *infra* Part VIII. To whatever extent

Respondents' Exception 5 intended to assert a distinct challenge that is not coextensive with their

exceptions discussed at *infra* Part VIII, Respondents' Exception 5 is deemed waived.

**Respondents' Exception 6** asserts: "The ALJ prohibited Respondents from testifying as

experts even though they were designated timely and submitted reports." *See* Resp'ts' Exceptions

---

[5] Respondents' discussion of ALJ removals is tagged on the end of their discussion of their properly preserved exception regarding the Appointments Clause. *See* Resp'ts' Exceptions at 87-88. The constitutionality of the removability of ALJs is a separate issue from the constitutionality of the manner of ALJ appointments, and Respondents cannot breathe life into their forfeited ALJ-removals challenge by shoehorning it into their Appointments Clause discussion.

[6] Respondents do not assert that raising such a challenge to the ALJ would have been futile. Rightfully so—such an assertion would be unavailing. Because these proceedings are adversarial and the applicable procedural regulations impose an issue exhaustion requirement, the Comptroller does not accept futility as an excuse. *See Carr*, 141 S. Ct. at 1359. Additionally, the Comptroller observes that any perception of futility did not deter Respondents from raising their Appointments Clause challenge initially to the ALJ.

at 2. The corresponding discussion consists of four sentences, including a reiteration of the exception and the following: "Obviously, if Respondents can be held liable for knowing that a loan was unsafe and unsound, one might think their opinion was also relevant. In fact, it was error to conclude otherwise." *See id.* at 92. Legal authority supporting the proposition that it was error to prohibit Respondents from testifying as experts in the very administrative enforcement action pending against them is far from "obvious," and because none is cited, Respondents' Exception 6 is deemed waived in full. In any event, the Comptroller concurs with the ALJ's analysis of this issue in her Order Granting Enforcement Counsel's Motion in Limine to Exclude Proposed Expert Testimony by Respondents.

**Respondents' Exception 7** asserts the following:

> . . . [T]he ALJ allowed the OCC's surprise witness, Michael Brickman, to testify as an expert even though he was not designated timely, did not provide a report, and was not disclosed on the witness list. Mr. Brickman was also permitted to opine on market interest rates despite having no expertise in the area and not having conducted any analysis on the topic or providing any reports or other analyses in advance of trial. In addition, OCC witnesses were permitted to testify as to fiduciary duty with no legal training and no legal expertise in such matters.

*See* Resp'ts' Exceptions at 2-3. In their discussion of this exception, Respondents again fail to cite supporting legal authority. Respondents' Exception 7 is therefore deemed waived in full. Moreover, the Comptroller observes that in the discussion corresponding with this exception, Respondents cite their December 17, 2021 Motion to Exclude Witnesses and the ALJ's January 11, 2022 Order Granting in Part Enforcement Counsel's Motion for Denial of Third-Party Subpoena Application and Granting in Part Respondents' Motion to Exclude Witnesses. *See id.* at 91. The cited motion raises (and the cited order addresses) the argument that Mr. Brickman had not been timely identified and disclosed as a hybrid fact/expert witness. To the extent that Respondents' Exception 7 challenges the lack of an expert report by Mr. Brickman, the

16

appropriateness of Mr. Brickman's testimony on market interest rates, or the appropriateness of the testimony of other OCC witnesses (who Respondents did not see fit to identify), such challenges are deemed doubly waived because Respondents did not cite to any corresponding conclusions by the ALJ and Respondents do not indicate that they ever raised such objections to the ALJ despite having the opportunity to do so. *See* 12 C.F.R. § 19.39(b), (c)(2).[7]

**Respondents' Exception 8** asserts, "The ALJ denied Respondents' Motion to Exclude Mary Jane Locke as a trial witness even though she was not disclosed timely." *See* Resp'ts' Exceptions at 3. **Respondents' Exception 10** provides, "The ALJ prohibited Respondents from calling Andrew Moss, an OCC employee, as a witness." *See id.* In their discussion of these exceptions, Respondents assert, without meaningful argument, the following: "Siding with the OCC, the ALJ decided that the government could add multiple witnesses late, but that Respondents could not add Andrew Moss. Respondents take exception to these rulings." *See id.* at 92-93. Mere mentioning of facts in the absence of argument or citation to relevant legal authority is insufficient to effectively raise an issue to the Comptroller. Respondents' Exceptions 8 and 10 are therefore deemed waived in full.

**Respondents' Exception 9** asserts, "The ALJ granted the OCC's pretrial motion to exclude relevant evidence at the hearing, including the presentation of the Fannie Mae/Freddie Mac preferred stock issue." *See* Resp'ts' Exceptions at 3. As best as the Comptroller can tell, Respondents' discussion of this exception appears in the three sentences appearing beneath the

---

[7] In any event, the Comptroller notes that the ALJ was not bound by the Federal Rules of Evidence; that she found the testimony to be relevant, *see* Order Granting in Part Enforcement Counsel's Mot. for Den. of Third-Party Subpoena Application and Granting in Part Resp'ts' Mot. to Exclude Witnesses at 4-5; and that "relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law," *see* 12 C.F.R. § 19.36(a).

heading, "The ALJ Granted Pretrial Motions to Exclude Other Relevant Evidence," on page ninety-three of Respondents' Exceptions. There is no mention here of the "Fannie Mae/Freddie Mac preferred stock issue," which is addressed in various other exceptions that the Comptroller does not deem waived. Rather, the relevant discussion consists of two sentences related to rulings preventing Respondents' questioning of witnesses "about OCC policies on minority banks and minority bankers" and a third sentence stating, "In violation of the Uniform Rules, the ALJ also denied the Respondents the right to make offers of proof including direct witness interrogation." *See id.* at 93. Again, there is no citation to supporting legal authority and the Comptroller cannot piece together any cognizable argument from these four sentences, which seemingly address three distinct issues. Respondents' Exception 9 is deemed waived, except to the extent that it concerns the striking of the Fannie Mae & Freddie Mac Defense, which the Comptroller deems properly (if duplicatively) raised in various other exceptions discussed at *infra* Part VIII.

**Respondents' Exception 11** asserts:

> The ALJ admitted and considered certain OCC exhibits that were improper and inadmissible. The ALJ admitted and considered exhibits that were hearsay and/or were used solely for impeachment or refreshing recollection, contrary to applicable law. This included transcripts for depositions where the Respondents were not notified and allowed to attend and cross-examine. This violated the Due Process Clause, the right to confront witnesses against the accused, the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

*See* Resp'ts' Exceptions at 3. Respondents' discussion of this exception largely consists of conclusory bullet points with no meaningful analysis or citation to supporting authority. *See id.* at 93-94. For example, Respondents assert, "In some cases, [sworn] statements were taken without Respondents' counsel present and without any opportunity to cross-examine. This was a violation of the Due Process Clause, the confrontation clause, the Seventh Amendment, and Respondents' right to fair proceeding under the APA and the Uniform Rules." *See id.* at 94. Without more precise

18

argumentation or citation to supporting legal authority, these sweeping assertions of constitutional, statutory, and regulatory violations do not satisfy the requirements of 12 C.F.R. § 19.39. The Comptroller's role is not to flesh out skeletal arguments, particularly where controversial extensions of or changes to settled law are seemingly implicated. *See Dutton v. Evans*, 400 U.S. 74, 97 n.4 (1970) (J. Harlan, concurring) ("the Confrontation Clause, which applies only to criminal prosecutions, was never intended as a constitutional standard for testing rules of evidence"); *see also United States v. Cunningham*, 679 F.3d 355, 383 (6th Cir. 2012) (explaining that Federal Rule of Evidence 801(d)(2)(A) allows "a party's own statement to be offered as evidence against that party even where the statement would otherwise be inadmissible as hearsay"); 12 C.F.R. § 19.36(a)(2) (permitting admission of evidence that would be admissible under Federal Rules of Evidence). Respondents' Exception 11 is thus waived in full.

## IV.    APPLICABLE LEGAL STANDARDS

When reviewing the record, the Comptroller "determine[s] whether, in his judgment, Enforcement Counsel has met its burden of supporting its allegations by a preponderance of the evidence in the record." *See Adams*, 2014 WL 8735096, at *7 (citing 5 U.S.C. § 556(d); *Steadman v. Sec. & Exch. Comm'n*, 450 U.S. 91 (1981)); *see also In the Matter of Ellsworth*, OCC AA-EC-11-41, OCC AA-EC-11-42, 2016 WL 11597958, at *8, n.10 (OCC Mar. 23, 2016).[8] Under this standard, Enforcement Counsel must adduce evidence that the existence of a fact is more probable

---

[8] **Respondents' Exception 27** asserts, "Applicable law required application of a higher standard or proof where the sanction or hardship imposed was particularly severe, thus the ALJ should have applied a 'clear and convincing' evidence standard as the burden of proof." *See* Resp'ts' Exceptions at 6. Respondents cite no legal authority in support of this assertion. Respondents' Exception 27 is rejected.

than its nonexistence. *See Concrete Pipe & Prods. of Calif. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993).

### A.  Section 1818(e) Prohibitions

For the Comptroller to enter an order of prohibition against an IAP pursuant to § 1818(e), Enforcement Counsel must establish the separate elements of misconduct, effect, and culpability. *See* 12 U.S.C. § 1818(e)(1)(A), (B), & (C); *Kim v. Off. of Thrift Supervision*, 40 F.3d 1050, 1054 (9th Cir. 1994) (labeling the three elements). The misconduct element may be satisfied by, among other means, showing that the IAP has "directly or indirectly" violated any law or regulation; "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution . . ."; or "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty." *See* 12 U.S.C. § 1818(e)(1)(A). The effect element may be satisfied by showing that, "by reason of" the misconduct, the institution at issue "has suffered or will probably suffer financial loss or other damage," that the institution's depositors' interests "have been or could be prejudiced," or that the charged party "has received financial gain or other benefit." *Id.* § 1818(e)(1)(B). Finally, the culpability element may be satisfied when the alleged misconduct "involves personal dishonesty" or "demonstrates willful or continuing disregard by [an IAP] for the safety or soundness of such insured depository institution . . .." *Id.* § 1818(e)(1)(C).

### B.  Section 1818(i) Civil Money Penalties

Pursuant to § 1818(i)(2), the Comptroller may assess civil money penalties, categorized by escalating "tiers," including first-tier penalties of up to $5,000 per day of continued misconduct and second-tier penalties of up to $25,000 per day of continued misconduct. Here, Enforcement

Counsel seeks a first-tier civil money penalty against Respondent Ortega and second-tier civil money penalties against both Respondents. *See* RD at 6, n.6.

For the Comptroller to assess a first-tier civil money penalty against an IAP, Enforcement Counsel must establish one element: misconduct, which, as relevant to the instant proceeding, can take the form of a violation of any law. *See* 12 U.S.C. § 1818(i)(2)(A). To assess a second-tier civil money penalty against an IAP, Enforcement Counsel must establish two elements: misconduct and effect. As relevant to the instant proceeding, misconduct can take the form of a violation of law, breach of fiduciary duty, or the reckless engagement in an unsafe or unsound practice in conducting the affairs of the institution in question. *See id.* § 1818(i)(2)(B)(i). To satisfy the "effect" prong, Enforcement Counsel must also establish that the misconduct "is part of a pattern of misconduct"' that it "causes or is likely to cause more than a minimal loss to such depository institution"; or that it "results in pecuniary gain or other benefit to such party." *Id.* § 1818(i)(2)(B)(ii); *see also In the Matter of Blanton*, OCC-AA-EC-2015-24, 2017 WL 4510840, at *16 (OCC July 10, 2017) (referring to § 1818(i)(2)(B)(ii) as the statute's "effect" prong).

## V.    RESPONDENTS' EXCEPTION REGARDING TIMELINESS

Respondents dedicate a substantial portion of their exceptions briefing to arguing that the charges against them are untimely. In this briefing, Respondents appear to misapprehend the ways in which certain interlocutory rulings interpreting the statute of limitations relate to the charges in this matter. The Comptroller thus takes this opportunity to clarify these prior rulings and their

relationship to the charges at issue here. As explained more fully below, the charges against Respondents are timely.

### A. Interlocutory Rulings Regarding the Statute of Limitations

Under the applicable statute of limitations, the agency has "five years from the date when the claim first accrued" in which to commence proceedings. *See* 28 U.S.C. § 2462. The Notice initiating the instant action was filed on September 25, 2017. Therefore, any claim that first accrued on or after September 25, 2012, is timely for present purposes.

An interlocutory review by the Comptroller pursuant to 12 C.F.R. § 19.28 centered on the parties' contrasting views as to when the claims against Respondents "first accrued" within the meaning of § 2462. As the ALJ correctly stated, "the standard rule is that a claim accrues when the plaintiff has a complete and present cause of action—that is, when all elements of an actionable claim have been met and can be pled." *See* ALJ's SOL Order at 13 (internal quotation marks omitted). "[A]ny discussion of the accrual of claims under a given statute—in this case, Section 1818(e) for the agency's prohibition claims and Section 1818(i) for its civil money penalty claims—must begin with the statutory elements." *See id*. To reiterate, the three elements of a § 1818(e) prohibition are misconduct, effect, and culpability, *see* 12 U.S.C. § 1818(e)(1)(A), (B), & (C); the two elements of a second-tier civil money penalty are misconduct and effect, *see id.* § 1818(i)(2)(B); and each of these elements may be established through a showing of any one of multiple alternative predicates, *see supra* Part IV.

In the ALJ's SOL Order, the ALJ rejected Respondents' argument that the five-year limitations period for prohibition and second-tier civil money penalty charges begins to run at the time of the alleged misconduct, reasoning that "Respondents pay too little heed to the elements necessary for a claim to accrue under Sections 1818(e) and 1818(i)" and that, in many instances, Respondents'

interpretation "would start the limitations period before the OCC could even bring suit." *See* ALJ's SOL Order at 12-13. The ALJ also rejected Enforcement Counsel's argument that an action is timely if commenced within five years of an effect resulting from the alleged misconduct. *See id.* at 31. Instead, the ALJ concluded that "when a particular statutory 'effect' is alleged . . . then the cause of action for a given claim against Respondents is complete, and the limitations period begins to run, upon the *first instance* of the alleged effect with respect to the misconduct at issue." *See id.* at 31-32. Thus, under the ALJ's interpretation, "the OCC cannot use actual loss that occurred during the five-year period prior to the commencement of enforcement proceedings as the point at which its claims against Respondents 'first accrued' if, in fact, actual loss also had occurred prior to that period." *See id.* at 25.

In connection with the interlocutory review of the ALJ's SOL Order, the Comptroller issued the following relevant rulings. First, the Comptroller agreed with the ALJ and reaffirmed that the statute of limitations does not begin to run until *all* factual and legal prerequisites for filing a notice of charges are in place ("Interlocutory Ruling 1"). *See* Comptroller's Interlocutory SOL Order at 14 & n.6; ALJ's SOL Order at 13; *see also Blanton v. OCC*, 909 F.3d 1162, 1171 (D.C. Cir. 2018) ("A claim generally accrues 'when the factual and legal prerequisites for filing suit are in place.'" (quoting *Proffitt v. Fed. Deposit Ins. Corp.*, 200 F.3d 855, 862 (D.C. Cir. 2000))); *Proffitt*, 200 F.3d. at 863 ("Because misconduct and effect are separate prongs, the underlying conduct may not always immediately effect a [§ 1818(e)] violation and thus the accrual of the claim"). Second, the Comptroller reaffirmed that occurrences of alternative statutory effect predicates trigger accruals of separate claims ("Interlocutory Ruling 2"). *See* Comptroller's Interlocutory SOL Order at 13-14, 16; *see also Proffitt*, 200 F.3d at 864 ("Separate accrual for each alternative effect gives meaning to all of the statutory language."). For example, a § 1818(e) prohibition charge predicated

on the statutory effect of financial loss to a depository institution is a separate claim from (and may accrue at a different time than) a § 1818(e) prohibition charge predicated on the statutory effect of prejudice to depositors. *Cf.* ALJ's SOL Order at 25 ("an agency can perhaps choose whether to take action based on the first occurrence of actual loss or the first occurrence of actual depositor prejudice"). However, the Comptroller disagreed with the ALJ that an action must be commenced within five years of the first occurrence of the type of statutory effect on which the action is predicated. Instead, the Comptroller clarified that, because separate occurrences of effects (for example, separately occurring financial losses to the depository institution) trigger separate claim accruals, an action is timely if it is commenced within five years of the date of an effect resulting from the charged misconduct, even if there were an earlier occurrence of a statutory effect of the type on which the action is predicated ("Interlocutory Ruling 2a"). *See* Comptroller's Interlocutory SOL Order at 13-16.[9] The matter was remanded to the ALJ for further proceedings consistent with the Comptroller's Interlocutory SOL Order.

In the Recommended Decision, the ALJ expressed that she disagreed with Interlocutory Ruling 2a and "remains hopeful that this ruling will be revisited." *See* RD at 144-45.

### B. Respondents' Exception 1 Is Deemed Moot in Part and Rejected in Part

**Respondents' Exception 1** asserts that "The charges against Respondents are barred by the statute of limitations contained in 28 U.S.C. § 2462." *See* Resp'ts' Exceptions at 1. As a basis to support this exception, Respondents repeatedly emphasize the ALJ's stated disagreement with Interlocutory Ruling 2a. *See* Resp'ts' Exceptions at 46 (quoting RD at 144-45), 49 (same), 51 (same), 59-60 (same). Yet Respondents invoke the ALJ's disagreement with Interlocutory Ruling

---

[9] The Comptroller's Interlocutory SOL Order did not use the terms "Interlocutory Ruling 1," "Interlocutory Ruling 2," or "Interlocutory Ruling 2a." The Comptroller uses those terms here in the interest of clarity.

2a (charge is timely if brought within five years of occurrence of effect) in connection with charges that would not be deemed timely *solely* through application of this ruling. The charges that Respondents discuss in connection with Interlocutory Ruling 2a can instead be deemed timely through Interlocutory Ruling 1 (charge is timely if brought within five years of date when all elements have been met and can be pled) and Interlocutory Ruling 2 (charge is timely if brought within five years of date when last alternative predicate underlying effect prong has been met and can be pled),[10] both longstanding interpretations of which the ALJ and Comptroller are—at least on the present facts—seemingly in agreement. In any event, for reasons unrelated to the statute of limitations and discussed more fully herein, charges that *might* be deemed timely solely through application of Interlocutory Ruling 2a are herein dismissed.[11] Therefore, the Comptroller declines

---

[10] For example, Respondents invoke the ALJ's disagreement with Interlocutory Ruling 2a in connection with the timeliness of lending-related charges arising from the Capital Raise Strategy. *See* Resp'ts' Exceptions at 46. Such charges do not require application of this ruling to be deemed timely. As the ALJ explained, Enforcement Counsel adduced evidence that the Bank recorded losses on loans associated with the Capital Raise Strategy within the five-year limitations period. *See* RD at 117-18. The ALJ then rejected Respondents' arguments that, notwithstanding those losses, the underlying charges were untimely because certain *alternative* § 1818(e) effect predicates—namely, the onset of *probable* financial loss, *see* § 1818(e)(1)(B)(i)—had previously occurred outside of the limitations period. *See* RD at 118. The ALJ correctly reasoned that "it is settled law . . . that it is meaningless for limitations purposes that an agency could conceivably have brought its claim earlier based on a different effect (and thus a different cause of action) that it did not plead." *See id.* This analysis is consistent with Interlocutory Ruling 1 and Interlocutory Ruling 2. Respondents thus miss the mark by invoking the ALJ's disagreement with Interlocutory Ruling 2a to argue that charges arising from the Capital Raise Strategy are untimely.

[11] Upon review on the full record, the Comptroller questions whether *any* charges in this matter would require application of Interlocutory Ruling 2a to be deemed timely. *See, e.g.,* RD at 180 (discussing timeliness of charges arising from Loans to Rogers III Entities and concluding that, even if certain factual predicates were excluded based on the statute-of-limitations interpretation supported by the ALJ, other factual predicates underlying the charge give rise to "a separate and separately accruing, breach of fiduciary duty . . . , rendering the Article VI claim timely regardless."); RD at 144-45 (discussing timeliness of charges arising from lending-related misconduct associated with OREO Strategy and concluding that even if the post-closure losses to FDIC were disregarded, "there is no dispute that the Bank itself, pre-closure, recorded losses on multiple OREO loans" and thus "the agency's claims on the OREO lending issue would still have been timely asserted."); *infra* Part X.A.2.b (discussing timeliness of accounting-related charges

the ALJ's invitation to revisit Interlocutory Ruling 2a, and to the extent that Respondents' Exception 1 challenges Interlocutory Ruling 2a, it is deemed moot.

Respondents also reiterate various arguments that have already been presented to and rejected by the Comptroller in connection with the interlocutory review. The Comptroller will not restate or reexamine these arguments here. However, to the extent that Respondents' arguments specifically concern charges arising from the Capital Raise Strategy and are further elucidated by the full record, the Comptroller addresses the timeliness of the Capital Raise Strategy charges at *infra* Part X.A.2.b. For the reasons stated here and at Part X.A.2.b, Respondents' Exception 1 is, to the extent not deemed moot, rejected.

## VI.    RESPONDENTS' EXCEPTION REGARDING THE SEVENTH AMENDMENT

**Respondents' Exception 2** asserts, "This proceeding was conducted in violation of the Respondents' right to a trial by jury." *See* Resp'ts' Exceptions at 2. In their exceptions, Respondents argue that, in light of *Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023), they "were entitled to have this case submitted to a jury under the Seventh Amendment [to] the United States Constitution." *See* Resp'ts' Exceptions at 61. Respondents further assert the following:

> The Comptroller already utilizes an ALJ to handle these proceedings as a bench trial, and it would not alter the statutory purpose at all to have the same ALJ preside over a jury trial. Judges handle both bench trials and jury trials all the time, and it would be appropriate for ALJs to do so as well.

*See* Resp'ts' Exceptions at 67.

---

arising from Capital Raise Strategy). The Comptroller need not address this point further because the charges arising from Loans to Rogers III Entities and lending-related misconduct associated with the OREO Strategy are dismissed for reasons unrelated to the statute of limitations. *See infra* Part X.B, Part X.D.

Notably, Respondents raised the Seventh Amendment issue for the first time in a June 13, 2022 filing, in which they requested that the ALJ "summon a jury of Respondents' peers to hear this case" or, in the alternative, that the action be dismissed. *See* Resp'ts' Demand for Jury Trial at 2. The ALJ denied the motion on both procedural and substantive grounds, reasoning that it was procedurally improper because it was submitted more than one year after the deadline for dispositive motions and *four months after* the administrative hearing in this matter had been held; that neither the governing rules of practice and procedure nor the statutory scheme authorize the empanelment of juries; and that Respondents are not entitled to a jury trial in connection with these proceedings. *See* Order Den. Resp'ts' Demand for Jury Trial and Mot. to Dismiss.

The Comptroller rejects Respondents' Exception 2 and adopts the ALJ's recommendation as to this issue. The Comptroller agrees with the ALJ that Respondents' demand for a jury trial was procedurally improper and untimely; that the governing statute and regulations do not authorize the empanelment of a jury; and that, in any event, Respondents are not entitled to a jury trial in connection with proceedings pursuant to § 1818(e) or (i).

## VII.    RESPONDENTS' EXCEPTIONS REGARDING THE APPOINTMENTS CLAUSE

**Respondents' Exception 3** asserts, to the extent not deemed waived, *see supra* Part III.B, that "This proceeding was conducted in violation of the Appointments Clause of the United States Constitution, as well as the Due Process Clause, [and] Separation of Powers . . . ." *See* Resp'ts' Exceptions at 2. **Respondents' Exception 4** asserts, in pertinent part:

> ALJ McNeil, who was an unauthorized actor and not appointed consistent with the Constitution, made rulings striking Respondents' pleadings and evidence . . . At trial, ALJ Whang felt bound by these unconstitutional rulings and prohibited Respondents from presenting a full and complete defense, which violated the Appointments Clause [and] the Due Process Clause . . . .

27

*See id.*[12]

Respondents brief the Appointments Clause issue at considerable length. *See id.* at 68-88. The Comptroller finds that this briefing largely concerns immaterial or undisputed issues. The core inquiry relevant to Respondents' Appointments Clause challenge is whether Respondents were afforded the relief required by *Lucia*: a new hearing before a properly appointed ALJ. Ample record evidence demonstrates that they were. To the extent that Respondents' Exceptions 3 and 4 raise challenges under the Appointments Clause, these exceptions are rejected.

### A.  Judge Whang Was Properly Appointed

As an initial matter, record evidence establishes that Judge Whang was properly appointed, *see* OCC's Opp. to Resp'ts' Mot. for Summ. Disposition on the Appointments Clause and Resp. to Obj. to Orders Issued by ALJ, Exs. 1-3, and the Comptroller finds that there was no error in denying Respondents discovery regarding her appointment. With respect to whether Respondents received a new hearing within the meaning of *Lucia*, Respondents assert that Judge Whang "felt bound" by or merely ratified pre-hearing rulings issued by previously assigned ALJs. *See* Resp'ts' Exceptions at 2. Such assertions are flatly contradicted by various orders (including the ones cited by Respondents), and Respondents have adduced no evidence that these orders mean anything other than what they say.

### B.  Respondents Received the Remedy Required by *Lucia*

Turning to the relevant orders, in January 2020, the Comptroller issued an Order in Pending Enforcement Cases, reassigning the matter to Judge Whang and stating, as relevant, the following:

> . . . [I]n *Lucia v. SEC*, 138 S. Ct. 2044 (2018), the Supreme Court determined that [ALJs] performing adjudicative duties for the federal government are inherently

---

[12] In this part, the Comptroller discusses Respondents' Exception 4 to the extent that it asserts violations of the Appointments Clause and Due Process Clause. Other challenges asserted in connection with Respondents' Exception 4 are discussed at *infra* Part VIII.

inferior officers of the United States and therefore must be appointed as provided in the Appointments Clause . . ..

. . . [T]he Secretary of the Treasury, by order dated November 14, 2019, appointed Jennifer Whang as an [ALJ] for the OCC pursuant to the appointment power granted to him as the Head of a Department by Article II of the United States Constitution, and by 31 U.S.C. § 301(b) and 5 U.S.C. § 3105 . . ..

. . .

Promptly after reassignment, the newly assigned ALJ shall issue a Notice . . . providing each party an opportunity to file an Objection . . . to any of the actions taken by the prior ALJ. . .. The ALJ should thereafter issue a decision on reconsideration of the actions to which an Objection was filed . . . With respect to actions to which no Objection is filed the ALJ shall review the action and adopt or revise the action as the ALJ deems appropriate. . ..

. . . This order is issued in light of the Supreme Court's decision in *Lucia*. Accordingly, an [ALJ] may . . . reach the same recommendations as the previously assigned [ALJ], but the [ALJ] is also free to reach different recommendations from those of the initial [ALJ].

*See* Order in Pending Enforcement Cases at 1-2 (internal quotation marks omitted). Pursuant to the order, Judge Whang subsequently directed the parties, *inter alia*, to file objections to any of the previous actions taken by prior ALJs. *See* Notice of Reassignment and Order Regarding the Comptroller's Order in Pending Enforcement Cases.

In response, Respondents moved for summary disposition, arguing that, under *Lucia*, the proceedings against them were commenced and continued to proceed in violation of the Appointments Clause. *See* Resp'ts' Mot. for Summ. Disposition on the Appointments Clause and Obj. to Orders Issued by ALJ at 2-3. Respondents also specifically objected to the Order Granting Motion to Strike and generally objected to all orders entered by Judge McNeil and Judge Miserendino, arguing that these orders should be "vacated and voided" because those ALJs lacked authority to proceed under the Appointments Clause. *See id.* at 3.

On March 17, 2020, Judge Whang issued an Order Reviewing Prior Administrative Law Judges' Prehearing Actions ("Order Reviewing Prior Actions") and an Order Denying Respondents' Motion for Summary Disposition on the Appointments Clause ("Order Regarding the Appointments Clause") (together, "March 2020 Orders"). In the Order Reviewing Prior Actions, Judge Whang expressed agreement with Judge McNeil's determination that the Fannie Mae and Freddie Mac Defense was an irrelevant or improper affirmative defense; explained that she had examined the prehearing actions taken by the previously-assigned ALJs, had found that the actions were "consistent with the OCC's Uniform Rules, 12 U.S.C. § 1818[], and with the provisions of the Administrative Procedure Act; and "[u]pon finding that cause to revise [previously-entered] orders has not been shown," adopted them. *See* Order Reviewing Prior Actions at 3-5. In the Order Regarding the Appointments Clause, Judge Whang concluded that *Lucia* did not support Petitioners' contention that the appropriate remedy for an Appointments Clause violation should be nullification of the entire action; rather "it is enough for the case to be heard anew by an ALJ who has been properly appointed." *See* Order Regarding the Appointments Clause at 4-5.

### C. Respondents' Arguments Are Unavailing

Notably, Respondents cite the March 2020 Orders for the following proposition: "The current ALJ has ruled that the OCC may continue forward with this proceeding under a 'reassignment and ratification' approach, where it assigns a new ALJ to the case who then ratifies the prior void rulings by the unauthorized and illegal ALJs." *See* Resp'ts' Exceptions at 68 & n.167. Neither of the March 2020 Orders uses any variation of the term "ratification," and Respondents' characterization of Judge Whang's March 2020 Orders is refuted by orders issued by Judge Whang and the Comptroller in January 2020. The Comptroller's order made clear that Judge Whang was

free to dispose of issues differently than the ALJs previously assigned to this case had. Following the parties' briefing on the previously entered orders, Judge Whang ruled that the prior orders were correctly decided for the same reasons stated by the previously assigned ALJs. There is no indication that Judge Whang failed to review these orders *de novo* or that, in the words of Respondents, she was not presented with the issues "*tabula rasa*." *See id.* at 81-82 ("The new ALJ should not be presented with unconstitutional rulings and asked to approve them—rather she should be presented with these issues *tabula rasa*."). Respondents apparently suggest that a "new hearing" must consist of an entirely new-from-scratch proceeding rather than an independent review of the record by a newly and properly appointed adjudicator. *See id.* at 78. But the Comptroller agrees with Judge Whang that "[a]t no point did the [*Lucia*] Court appear to entertain the possibility that the action itself was invalid and should be brought from scratch, or that respondents before an unconstitutionally appointed tribunal are entitled to have the proceedings dismissed in full." *See* Order Den. Resp'ts' Mot. for Summ. Disposition on the Appointments Clause at 4 (citing *Lucia*, 138 S.Ct. at 2055, n.5); *see also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 124 (D.C. Cir. 2015) (explaining that "not every possible kind of taint is fatal because, if it were, there would be no way to remedy an Appointments Clause violation"). Respondents had an opportunity to specify alleged defects in pre-hearing rulings issued by prior ALJs. They did so, and thereafter, Judge Whang independently considered the merits of the prior rulings. In short, Respondents were afforded all that *Lucia* required.

Respondents' Due Process Clause challenge is fully subsumed by their Appointments Clause challenge and addressed above.[13] To the extent Respondents intended to assert a distinct Due

---

[13] The Comptroller observes that Respondents asserted the following as their ninth affirmative defense: "Respondents object to this proceeding insofar as the administrative procedures in place violate the Due Process Clause of the United States Constitution, fail to comply with the

Process Clause challenge, such challenge is deemed waived for failure to cite relevant legal authority. *See supra* Part III.

## VIII.  RESPONDENTS' EXCEPTIONS REGARDING RULINGS ON CERTAIN AFFIRMATIVE DEFENSES AND EVIDENTIARY MATTERS

**Respondents' Exception 4** asserts, in pertinent part, the following:

> ALJ McNeil . . . made rulings striking Respondents' pleadings and evidence— including evidence that McNeil's own department head, Treasury, took over Fannie Mae and Freddie Mac and destroyed their preferred stock (after having encouraged the investment) causing a $174 million loss to the Bank from which it could not recover. At trial, ALJ Whang felt bound by these . . . rulings and prohibited Respondents from presenting a full and complete defense, which violated . . . the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

*See* Resp'ts' Exceptions at 2. **Respondents' Exception 9** asserts, "The ALJ granted the OCC's pretrial motion to exclude relevant evidence at hearing, including presentation of the Fannie Mae/Freddie Mac preferred stock issue." *See id.* at 3. **Respondents' Exception 12** asserts, "The ALJ excluded certain exhibits of Respondents that were highly relevant." *See id.* **Respondents' Exception 13** asserts:

> The ALJ refused to allow offers of proof for evidence that was excluded from the record at trial, depriving the Respondents and the reviewing court the opportunity for meaningful judicial review. This violated the Due Process Clause, the Separation of Powers, the Administrative Procedure Act, and the Uniform Rules of Practice and Procedure.

*See id.* **Respondents' Exception 14** asserts:

> The parties were ordered to give advance disclosure of exhibits and page numbers for each witness. While Respondents painstakingly complied with this order, the OCC grossly over-designated its exhibits and page cites thus obscuring and denying

---

Administrative Procedures Act, and/or deny the Respondents a meaningful opportunity to be heard." *See* Resp'ts' Answer and Affirmative Defenses to Notice of Charges at 9. And in a status report regarding this defense, Respondents stated, "Respondents view this issue as having already been briefed and addressed in the prior Appointments Clause briefing before the Court and do not request additional briefing on the Ninth Defense." *See* Resp'ts' Status Report on its Ninth Affirmative Defense. The Comptroller takes this as an indication that Respondents' Due Process Clause and Appointments Clause challenges fully overlap.

> Respondents a meaningful disclosure. The ALJ overruled Respondents' objections in this regard.

*See id.* at 4.

In their briefing on Exceptions 4, 9, 12, 13, and 14, Respondents argue, *inter alia*, that the ALJs erred in striking the Fannie Mae and Freddie Mac Defense because it was "highly relevant" to the reasonableness of Respondents' actions, "the OCC's own lack of credibility . . . in bringing this enforcement action," and Respondents' lack of culpability. *See* Resp'ts' Exceptions at 89. They further argue that this ruling violated Respondents' due process rights by depriving them of a full and fair hearing, and that motions to strike are disfavored under the Federal Rules of Civil Procedure and not authorized by 12 C.F.R. Part 19, except where a party fails to sign a pleading. *See id.* at 83-85, 89. Respondents also argue that Judge Whang erred (1) by striking their Sixth Affirmative Defense, "which raises the fact that Respondents did not profit but rather lost as a result of the events described in the Notice of Charges"; (2) by prohibiting questioning of witnesses on topics related to the Fannie Mae and Freddie Mac Defense and Respondent Ortega's experience at another national bank; (3) by admitting sworn statements and hearsay testimony; and (4) by excluding certain exhibits, which "showed, among other things, the effect of the crisis and Fannie Mae Collapse on community banks, disparate treatment received by community banks, that Treasury's decisions were what caused the problem including the failure of many community banks, and the unavailability of [the Troubled Assets Relief Program] to community banks." *See id.* at 85, 95-96. Respondents also argue that Judge Whang erred by prohibiting offers of proof at various points throughout the hearing and that Respondents were prejudiced by Enforcement Counsel's over-designation of exhibits in connection with a witness disclosure list. *See id.* at 95-96.

The Comptroller has reviewed Respondents' additional offer of proof, which was submitted after the hearing and in which Respondents assert that, if permitted, they would offer evidence that "the actions and inactions of the United States government . . . during and in the wake of the 2008-09 financial crisis caused [the Bank] to suffer staggering financial losses which le[d] to the series of events giving rise to this case and ultimately the Bank's failure." *See* Resp'ts' Additional Offer of Proof at 2. Respondents further assert that "[t]his evidence is relevant to issues of causation and materiality of financial loss, the OCC witnesses' credibility, and also to the issue of Respondents' culpability . . ." *Id.* at 3. Respondents conclude that, "In short, the Fannie Mae/Freddie Mac disaster is the elephant in the room as the central cause of the Bank's decline and fall and should be thoroughly developed in the record to be evaluated in this case." *See id.* at 13.

Under the applicable rules of practice and procedure, ALJs may exercise discretion to determine the scope of the proceedings. *See* 12 C.F.R. § 19.5 (authorizing ALJs, *inter alia*, to conduct proceedings to "avoid unnecessary delay," "receive relevant evidence," "regulate the course of the hearing," "consider and rule upon all procedural and other motions appropriate in an adjudicatory proceeding," and "do all other things necessary and appropriate to discharge the duties of a presiding officer"). The regulations also provide that evidence that would be admissible under the Federal Rules of Evidence is admissible in adjudicatory proceedings, *id.* § 19.36(a)(2), and that except as otherwise provided, "relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law," *id.* § 19.36(a)(1). If evidence meets this latter standard but would be inadmissible under the Federal Rules of Evidence, the ALJ may not deem the evidence inadmissible. *Id.* § 19.36(a)(3).

The Comptroller adopts the undisputed factual findings that, in September 2008, the Bank suffered a $174 million investment loss in connection with the failure of Fannie Mae and Freddie Mac and that this loss created an "exigent" need for the Bank to raise capital. *See infra* Part IV.A, To the extent that the Fannie Mae and Freddie Mac Defense rebuts evidence presented by Enforcement Counsel, the Comptroller considers the Bank's substantial investment loss and the subsequent exigencies faced by Respondents at relevant points herein. *See e.g., infra* Parts X.A.2-3, X.B.2. The Comptroller concludes that further development of the record relating to the Fannie Mae and Freddie Mac Defense would be unduly repetitive and, for this reason, any error in the ALJ's analysis or recommendations regarding the striking of this defense is harmless. *See* 12 C.F.R. § 19.4 (authorizing Comptroller to perform any act which could be done or ordered by ALJ); *id.* § 19.5 (authorizing ALJ to exercise all powers necessary to avoid unnecessary delay); *see also Heller Fin., Inc. v. Midwhey Powder Co., Inc.* 883 F.2d 1286, 1294 (7th Cir. 1989) (noting that motions to strike are generally disfavored but may be used to expedite a case and "remove unnecessary clutter").

The Comptroller finds no error in the other challenged rulings regarding the scope of the proceedings[14] or the admissibility of evidence and further finds that Respondents' hearsay objections, to the extent not previously deemed waived, *see supra* Part III.B, are not well taken. *See, e.g., Cunningham*, 679 F.3d at 383 (noting that under Federal Rules of Evidence, a party's

---

[14] Respondents challenge the striking of their Sixth Affirmative Defense, which purportedly "raises the fact that Respondents did not profit but rather lost as a result of the events described in the [Notice]," on the ground that "the very statute under which the [Notice] was brought is based on whether 'such party has received financial gain or other benefit by reason of such violation, practice, or breach.'" *See* Resp'ts' Exceptions at 85 (citing § 1818(e)(1)(B)(iii)). While Respondents are correct that financial gain is one of several *alternative* predicates through which the effect prong may be established, Enforcement Counsel did not seek to prove this predicate in this action. *See* RD at 11. Accordingly, the Sixth Affirmative Defense was properly stricken as immaterial.

own statement may be offered as evidence against that party even where the statement would otherwise be inadmissible as hearsay); 12 C.F.R. § 19.36(a)(2) (permitting admission of evidence that would be admissible under Federal Rules of Evidence). If the ALJ erred with respect to Enforcement Counsel's alleged over-designation of exhibits or the exclusion of proffers, such errors were harmless due to the abundance of unchallenged evidence in the record, including Respondents' own testimony supporting the established charges, and the Comptroller's consideration of Respondents' written proffers.[15] Respondents' Exceptions 4, 9, 12, 13, and 14, to the extent not deemed waived, are rejected.

## IX.    FINDINGS OF FACT

To the extent consistent with the findings stated herein, the Comptroller adopts the findings of fact contained in the Recommended Decision.

### A. The Bank's Failure

The Bank, which was a community bank headquartered in Edinburg, Texas, had approximately $3.1 billion in total assets and $2.3 billion in total deposits as of June 30, 2013. *See* Joint Stip. ¶ 5. The Bank was a wholly owned subsidiary of First National Bank Group, Inc. ("Holding Company"), a bank holding company. *Id.* ¶ 6. During the financial crisis of the late 2000s, the Bank faced severe challenges to its operations. *See* RD at 15. Beginning in 2008, the Bank's OREO assets—*i.e.*, (in the context of the present action) real estate acquired in satisfaction of a debt—

---

[15] Alternatively, the Comptroller concludes that Respondents' Exception 14, which concerns Enforcement Counsel's alleged over-designation of exhibits, was untimely raised to the ALJ and thus waived. Enforcement Counsel filed the witness list at issue on December 10, 2021. Despite filing a Motion to Exclude Witnesses on December 17, 2021, *see* Resp'ts' Mot. to Exclude Witnesses, Respondents apparently did not raise this objection until February 7, 2022, during the hearing, *see* Resp'ts' Exceptions at 96 (citing Enforcement Counsel's Dec. 10, 2021 Hearing Witness List at Ex. B and Hr'g Tr. 1223:17-1224:19 ("Before we get started, I would just like to make an objection on the record that I mentioned this morning. We'd like to object to the calling of this witness at this time."; identifying over-designation of exhibits as basis of objection)). Respondents should have raised this issue in their December 17 motion.

began to grow significantly. *See id.* at 15-16, 44. Such assets are nonperforming and their associated costs (which might include operational, maintenance, or repair costs and payment of taxes and insurance) can significantly strain a bank's financial condition. *See id.* at 16; Hr'g Tr. 370:19-24 (examination of Respondent Rogers), 953:14-954:11 (examination of Respondent Ortega), 1293:9-22 (examination of Ramah Chansen).

The Bank's condition further deteriorated when, in September 2008, government-sponsored enterprises Fannie Mae and Freddie Mac were placed under the conservatorship of the Federal Housing Finance Agency. As a result, the Bank's preferred stock in these entities was rendered "virtually worthless" and the Bank realized a $174 million loss upon selling the stock. *See* RD at 22 (quoting OCC Ex. 148 at 3). This loss caused the Bank to fall from "well capitalized" to "adequately capitalized" within the meaning of 12 U.S.C. § 1831*o*, which sets forth requirements for Federal banking agencies to take prompt corrective action "to resolve the problems of insured depository institutions at the least possible long-term loss to the Deposit Insurance Fund." *See* 12 U.S.C. § 1831*o*(a), (b)(1); RD at 16-17. In early 2009, the OCC described the Bank's need for higher capital levels as "exigent" and instituted measures requiring that the Bank, *inter alia*, achieve and maintain higher capital levels and minimum capital ratios and improve accounting for nonaccrual loans. *See* RD at 17; OCC Ex. 147 at 2. The OCC advised the Bank that failure to achieve the capital ratios would be considered an unsafe or unsound banking practice and that failure to submit an acceptable capital plan would result in further action by the OCC. *See* RD at 17; OCC Ex. 147 at 5.

By mid-August 2009, the Holding Company had injected $35 million into the Bank. *See* RD at 18. Nevertheless, over the following years, the Bank continued to experience significant challenges. In February 2011, the OCC issued a consent order that again required the Bank to

increase its minimum capital ratios and to correct unsafe or unsound practices related to loan portfolio management and the treatment of nonaccrual loans. *See id.*; *see also* Joint Ex. 12. Following a June 2011 OCC examination, the Bank's executive management team changed significantly, with Respondent Rogers resigning and Respondent Ortega assuming new roles, among other changes. *See* RD at 18. The OCC's 2012 Report of Examination found, *inter alia*, that while new management, under the direction of Respondent Ortega, had "made some positive strides in changing the corporate culture," the Bank's "problems continue[d] to grow," supervision by management and the Board "remain[ed] critically deficient," and the new team "to-date ha[d] been ineffective overall in reversing the Bank's negative course." *See* Joint Ex. 6 at 1-2, 38; *see also* RD at 19. The OCC described the Bank's capital position as "critically deficient" and identified the Bank's OREO portfolio as a significant problem, stating that it was "at an extremely high unsafe and unsound level . . . due primarily to a credit culture that fostered poor credit risk selection and lax underwriting standards." *See* Joint Ex. 6 at 2, 47; RD at 19. By June 2013, the Bank had become "critically undercapitalized." *See* RD at 19. On September 13, 2013, the OCC closed the Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. *See* RD at 19, 42; Joint Stip. ¶ 9.

### B. Respondents' Roles at the Bank

Respondent Rogers served as Chairman of the Bank from 1981 to November 2011. *See* RD at 12; Joint Stip. ¶ 2. As Chairman, Respondent Rogers was responsible for ensuring senior executive management followed the Bank's policies and procedures.[16] *See* OCC Ex. 373 at 1. He was also responsible for participating in reviews of the Bank's strategic plan and raising capital funds "as

---

[16] This factual finding is submitted as **<u>Enforcement Counsel's Exception 5n</u>**. *See* EC's Exceptions at 5. This finding is supported by the record. Enforcement Counsel's Exception 5n is thus adopted.

needed to maintain required capitalization at terms and conditions most advantageous to the Bank." *See id.*; *see also* Hr'g Tr. 76:18-77:18 (examination of Michael Brickman); RD at 21.

Respondent Ortega served as the Bank's Chief Financial Officer from 1994 through October 2011. *See* RD at 12; Joint Stip. ¶ 2. In this capacity, Respondent Ortega was responsible for financial reporting, accounting, and maintaining the Bank's books and records. *See* RD at 13. With assistance from attorneys and accountants, he was also responsible for drafting the Bank's capital plans. *See* RD at 21-22; Hr'g Tr. 499:6-14 (examination of Respondent Ortega). In November 2011, Respondent Ortega replaced Respondent Rogers as Chairman; Respondent Ortega served in this capacity until the Bank's failure in 2013. *See* RD at 12; Joint Stip. ¶ 2. Beginning in January 2012, Respondent Ortega also served as the Bank's President and Chief Executive Officer. *See* RD at 12; Joint Stip. ¶ 2.

Respondents were members of the Bank's Board of Directors ("Board") and served as officers and directors of the Holding Company from at least January 2008 until November 2011. *See* RD at 12; Joint Stip. ¶ 6. As directors, Respondents swore an oath that, *inter alia*, they had a "legal responsibility and a fiduciary duty . . . to administer the [Bank's] affairs faithfully and to oversee its management"; they would "exercise reasonable care and place the interests of the [Bank] before [their] own interests"; they would "diligently and honestly administer" the affairs of the Bank; and they would "participate fully on all committees" to which they were appointed. *See* OCC Ex. 446 at 3-4. As members of the Board, Respondents were responsible for overseeing the Bank's risk profile, including the types of lending in which the Bank engaged. *See* Hr'g Tr. 83:24-84:4 (examination of Michael Brickman).[17] Additionally, between 2008 and 2011, Respondents served

---

[17] This factual finding is submitted as **_Enforcement Counsel's Exception 5a_**. *See* EC's Exceptions at 3. This finding is supported by the record. Enforcement Counsel's Exception 5a is thus adopted.

as voting members of the Bank's Loan and Discount Committee ("L&D Committee"), which was charged with approving all loans of more than $1 million, overseeing all lending activities within the Bank, ensuring that loans complied with the Bank's policies and procedures, and maintaining a broad perspective of the Bank's overall concentration risk and capital position. *See* RD at 13-14; *see also* Joint Exs. 8-10. The Bank's loan policy informed L&D Committee members, including Respondents, that "[o]bjective, prudent and conscientious voting [was] the sacred right and serious responsibility assigned to each member of the committee." *See* Joint Ex. 8 at 29; Joint Ex. 9 at 32; Joint Ex. 10 at 34.[18]

### C. Capital Raise Strategy

#### 1. Communications with OCC Following Fannie Mae and Freddie Mac Investment Loss

During the OCC's September 2008 examination of the Bank and in the immediate aftermath of the Bank's Fannie Mae and Freddie Mac investment loss, the Bank received a $24 million injection of capital from the Holding Company, and Respondent Rogers and Bank management committed to raising an additional $35 million in capital by March 31, 2009. *See* RD at 22; Joint Ex. 1 at 3. Respondent Rogers represented to the OCC that capital would be raised through selling common stock of the Holding Company. *See* RD at 22; Joint Ex.1 at 3, 7. On February 18, 2009, pursuant to 12 U.S.C. § 3907(a)(2) and 12 C.F.R. Part 3, Subpart C, the OCC formally imposed an individual minimum capital ratio ("IMCR"), requiring the Bank, by May 10, 2009, to have a Tier 1 Leverage Ratio at least equal to eight percent of adjusted total assets and a Total Risk-Based Capital Ratio at least equal to twelve percent, as defined in 12 C.F.R. Part 3. *See* OCC Ex 147; *see also* RD at 23. To achieve these ratios, the Bank would need to raise between $50 million and $75

---

[18] This factual finding is submitted as **Enforcement Counsel's Exception 5b**. *See* EC's Exceptions at 3. This finding is supported by the record. Enforcement Counsel's Exception 5b is thus adopted.

million in additional capital. *See* OCC Ex. 147 at 1; *see also* RD at 23. The OCC stated that "there remains an exigent need for the Bank to increase capital due to weak supervision by the Board and management, the deterioration in the quality of the Bank's assets, negative earnings, concentration risk, and weaknesses in credit administration" and that the Bank "needs a higher level of capital in order to operate in a safe and sound manner." *See* OCC Ex. 147 at 4; *see also* RD at 17, 23. The OCC required the Bank to develop and submit a capital plan to achieve the IMCR. *See* OCC Ex. 147 at 4; RD at 23. The OCC stated that it would only accept a plan that "is based on realistic assumptions, is likely to succeed in restoring the Bank's capital[,] and will not increase the risk to the Bank." *See* OCC Ex. 147 at 4-5; RD at 23.

In late February 2009, the Bank submitted its capital plan, which was signed by Respondent Ortega. *See* OCC Ex. 148. The plan stated that the Holding Company was "actively pursuing an offering of shares of its common stock to raise capital" and that "any portion" of the proceeds from this offering that were "injected into the Bank would count as Tier 1 capital." *See* OCC Ex. 148 at 3; RD at 24. In the plan, the Bank did not disclose any intent to finance purchases of Holding Company stock. *See* Hr'g Tr. 124:14-17 (examination of Michael Brickman). On April 3, 2009, Respondents attended a meeting with OCC officials. *See* RD at 24; OCC Ex. 548. An OCC official's notes from this meeting reflect that Bank management discussed the Bank's upcoming offering of Holding Company stock and efforts "to shrink the Bank in order to comply with the IMCR," noting that these efforts included reducing lending activity such that there was "virtually NO lending occurring." *See* OCC Ex. 548; *see also* RD at 24; Hr'g Tr. 324:17-325:1 (examination of Respondent Rogers). The notes also reflect that Respondent Rogers and his family had committed to contributing at least $10 million to the capital raise. *See* OCC Ex. 548; *see also* RD at 24. Again, Bank management did not disclose to the OCC any intent to finance purchases of

Holding Company stock. *See* RD at 25; Hr'g Tr. 328:8-12 (examination of Respondent Rogers), 129:2-6 (examination of Michael Brickman).

## 2. Private Placement Memorandum and Everhard Loan

On April 14, 2009, eleven days after the meeting with OCC officials, two key events occurred. First, the Holding Company issued a Private Placement Memorandum, which offered up to 650,000 shares of its common stock, with a minimum subscription requirement equivalent to $75,000, and stated, *inter alia*, that a portion of the proceeds of the offering would be used to inject capital into the Bank; that remaining proceeds would be used for other purposes and possible future capital injections; and that any questions about the memorandum should be directed to Respondent Ortega. *See* OCC Ex. 143 at 2, 8, 23, 31, 75; *see also* RD at 24-25.

The second key event of April 14, 2009 was the L&D Committee's approval of a $500,000 unsecured loan to Kenneth Everhard, a friend of Respondent Rogers. *See* OCC Ex. 196 at 1; Hr'g Tr. 342:9-24 (examination of Respondent Rogers); RD at 29. According to the L&D Committee's meeting minutes, the loan proceeds were "to be used as a revolving line of credit for working capital." *See* OCC Ex. 196 at 1; RD at 29; Hr'g Tr. 342: 9-24 (examination of Respondent Rogers). Thereafter, on April 29, 2009, Mr. Everhard purchased $500,025 in Holding Company stock. *See* OCC Ex. 158 at 3, 9, 12; RD at 29. The stock certificate associated with this purchase was delivered to Respondent Rogers. *See* OCC Ex. 158 at 9. Respondent Rogers affirmed that he was contemporaneously aware, despite the loan purpose reflected in the Bank's records, that Mr. Everhard had "borrowed money from the Bank to invest in holding company stock." *See* Hr'g Tr. 345:2-5 (examination of Respondent Rogers); RD at 29. Respondent Rogers also affirmed that if the loan purpose reflected in Bank records was inaccurate based on his knowledge, he should have ensured that it was corrected. *See* Hr'g Tr. 341:15-18 (examination of Respondent Rogers).

### 3. Implementation of Capital Raise Strategy

The Everhard loan and subsequent stock purchase are the first in a series of Board-approved transactions (referred to here as the "Capital Raise Strategy") wherein the Bank extended loans ("Capital Raise Loans"),[19] of which the proceeds were used for the purchase of Holding Company stock; meanwhile, the Holding Company reinjected or "downstreamed" between $3 million and $17.3 million in Bank-financed stock purchases into the Bank as putative capital. *See* RD at 21, 29, 41-42; Hr'g Tr. 328:13-329:6 (examination of Respondent Rogers). The ALJ aptly compared the downstreaming aspect of the strategy to "someone transferring a twenty[-]dollar bill from their left pocket to the kitchen table to their right pocket and then claiming to be twenty dollars richer when they then switch the bill again to the pocket from which it started." *See* RD 29.

As the ALJ observed, "[i]t is incontrovertible that the Bank made loans to investors in order for those investors to purchase Holding Company stock; the evidence strongly reflects this, and Respondents have acknowledged as much." *See id.* at 30; *see also* Hr'g Tr. 330:16-19 (examination of Respondent Rogers; agreeing that he "approved loans to investors to buy holding company stock"), 491:20-492:1 (examination of Respondent Ortega; agreeing that he was "aware that the Bank was making loans to purchase holding company stock"). In connection with the Capital Raise Strategy, Respondents solicited investments from family and friends as well as Bank officers, directors, and lower-level employees. *See* RD at 33; *see also* Hr'g Tr. 264: 11-16, 278:10-16

---

[19] **Enforcement Counsel's Exception 6** asserts that the ALJ made a "factual error" in noting that the Bank approved the first Capital Raise Loan "three weeks after" the April 3, 2009 meeting with OCC officials. *See* EC's Exceptions Br. at 22, n. 18; *see also* EC's Exceptions at 5. Enforcement Counsel explains that the Everhard loan was approved less than two weeks after that meeting and asks the Comptroller to find the correct fact. *See* EC's Exceptions Br. at 22, n. 18. Enforcement Counsel's Exception 6 is adopted, and the Comptroller finds that the first Capital Raise Loan was approved less than two weeks after Respondents' April 3, 2009 meeting with OCC officials. *See* OCC Ex. 548 at 1; OCC Ex. 196 at 1; Hr'g Tr. 342:9-12 (examination of Respondent Rogers regarding OCC Ex. 196).

(examination of Respondent Rogers). To the extent that such individuals could not afford or did not wish to expend funds on the investments, the Bank lent them money. *See* RD at 33; *see also* Hr'g Tr. 278:10-16 (examination of Respondent Rogers).

The following are included among the "flurry of rapid-fire Bank loans and corresponding stock purchases" made in April and May 2009. *See* RD at 30 (citing OCC Ex. 374A, rows 29-34, 36-37, 43, 52-53, 55, 58-60). On April 28, the Bank issued to Margaret Scott a loan of $75,000; the following day, she purchased $75,000 in Holding Company stock. *See* RD at 30. On May 4, the L&D Committee approved a $112,500 loan to Curtis Brockman; on May 8, Mr. Brockman purchased $112,500 in Holding Company stock. *See* OCC Ex. 169; OCC Ex. 158 at 1; Hr'g Tr. 347:9-349:18 (examination of Respondent Rogers). Also on May 8, the L&D Committee approved a $250,000 loan to Blanca Gonzalez; on May 11, she purchased $250,050 in Holding Company stock. *See* RD at 30; OCC Ex. 226; OCC Ex. 228; OCC Ex. 237 at 4; OCC Ex. 374A, row 48; Hr'g Tr. 558:9-559-13 (examination of Respondent Ortega).

### 4. Ongoing Communications with OCC and Capital Injections

Meanwhile, on April 28, 2009, the Bank's then-President and CEO, Robert Gandy, sent an OCC official a letter stating that the Bank had "communicated with 231 prospective stock purchasers so far," had received $15 million in purchases, and had "firm commitments" of an additional $12 million in purchases. *See* OCC Ex. 149 at 1; RD at 26. The letter predicted that the Bank would achieve the required Tier 1 capital ratio by the established May 10, 2009 deadline but would fall short of achieving the required risk-based ratio. *See* OCC Ex. 149 at 2; RD at 26. Again, the letter did not disclose that the Bank was offering loans to finance the purchase of Holding Company stock. *See* RD at 26. On April 30, the OCC responded by, *inter alia*, requiring that the

Bank submit a new capital plan as soon as possible since it did not expect to meet the risk-based capital ratio by the established deadline. *See* OCC Ex. 336 at 6; RD at 26-27.

On May 11, 2009, the Holding Company injected $30 million into the Bank. *See* OCC Ex. 151 at 1; RD at 27. Prior to the capital raise efforts that began in April, the Holding Company had approximately $8.8 million in cash and equity securities. *See* RD at 27. As of May 11, the Holding Company had raised approximately $30.38 million, including $9 million from Respondent Rogers and his family. *See id.* On May 12, Respondent Ortega reported at a Board meeting that the Bank had achieved the required Tier 1 capital ratio and would submit a revised capital plan to the OCC. *See* OCC Ex. 336 at 1; RD at 27. The revised plan, submitted to the OCC the same day, noted that the Holding Company "is actively pursuing an offering of shares of its common stock to raise capital" and that "proceeds from such an offering . . . injected into the Bank would count as Tier 1 capital." *See* OCC Ex. 151 at 1, 4. Again, the revised plan did not disclose to the OCC that the Bank was actively financing purchases of Holding Company stock. *See* Hr'g Tr. 132:18-133:24 (examination of Michael Brickman).

On August 12, the Holding Company injected another $5 million into the Bank. *See* OCC Ex. 366 at 6; RD at 28. From the date of the offering through August 12, the Holding Company raised a total of $38.16 million from stock sales. *See* RD at 28, 34-35. In an August 14 letter to the OCC, the Bank's then-President and CEO represented that the Bank had achieved the required minimum capital ratios. *See* OCC Ex. 366 at 6; RD at 28. As with all previous communications about capital raise efforts, the letter did not mention that the Bank had been and continued to be actively financing purchases of Holding Company stock. *See* RD at 28.

### 5. "Downstreaming" of Loan Proceeds

Enforcement Counsel's expert identified sixty-three Capital Raise Loans, which were issued between April 2009 and March 2011 and the proceeds of which were used to purchase approximately $22 million in Holding Company stock. *See* RD at 30; Hr'g Tr. 1233:6-1234:10 (examination of Ramah Chansen). The Comptroller accepts the ALJ's finding that somewhere between $3 million and $17.3 million in proceeds from Holding Company stock purchases financed by Capital Raise Loans were reinjected into the Bank as putative capital. *See* RD at 21, 41-42. Respondents themselves acknowledge that at least some of the proceeds of Holding Company stock purchases financed by Capital Raise Loans were downstreamed in this manner. *See id.* at 21, 41 (citing Hr'g Tr. 328:13-20 (examination of Respondent Rogers; "Q: You have indicated that the board of directors approved the plan to extend bank loans to investors to buy FNBG stock and then downstream those same funds back to the bank as Tier 1 capital, correct? A: Basically, that's what happened . . . yes, ma'am."), 493:15-17 (examination of Respondent Ortega; "So I mean, I would say that some of the stock, some of those loans actually came back to the bank."); OCC Ex. 569 (Respondent Ortega Dep.) at 34:24-35:4 (agreeing that the Bank "[made] loans that the borrower would then use the proceeds of the loan to purchase stock in the bank holding company and the bank holding company would then downstream the funds back to [the Bank]")).

As Enforcement Counsel's expert explained, "For regulatory purposes, a bank can't create capital on its own by creating a loan and extending that money. You know, you're essentially making money out of thin air by orchestrating a scheme like this. So it is not permissible to treat it as regulatory capital." *See* Hr'g Tr. 135:14-25 (examination of Michael Brickman). Nevertheless, the Bank reported the total $35 million in capital injections as regulatory capital on

its balance sheet and on all subsequent Call Reports until the Bank's failure. *See* RD at 34, 41. The Bank's capital levels from the second and third quarters of 2009 through the remainder of its operations were thus overstated by the amount that Capital Raise Loan proceeds were reinjected into the Bank. *See id.* at 41-42; *see also* Hr'g Tr. 1783:10-16 (examination of Christine Salvato; "Q: For 2009 through 2013, and under [Generally Accepted Accounting Principles], call report instructions, and other guidance . . . was it permissible for the bank to treat proceeds from capital raise loans as new capital? A: In my opinion, no."). Respondent Ortega testified that the OCC's ability to perform its regulatory duties would be impeded if the Bank misstated its capital. *See* OCC Ex. 569 at 28:6-22 (Respondent Ortega Statement Trans.).[20] Additionally, both Respondents knew that they had an obligation to ensure that the Bank accurately reported its capital and income. *See* OCC Ex. 568 at 30:8-31:10 (Respondent Rogers Statement Trans.); OCC Ex. 569 at 27:20-28:22 (Respondent Ortega Statement Trans.).[21]

### 6. Features of Capital Raise Loans

Capital Raise Loans were issued on concessionary terms. Most were unsecured and offered at a low interest rate of 4.25 percent. *See* RD at 32 (citing Hr'g Tr. 146:11-14 (examination of Michael Brickman; noting that because unsecured loans are riskier, "the bank typically will charge a higher rate of interest in order to recover costs across the entire portfolio . . .."), 147:12-15 (examination of Michael Brickman; opining that a 4.25 percent interest rate is "incredibly low . . . for an unsecured loan portfolio."), 1256:5-9 (examination of Ramah Chansen; opining that it would

---

[20] This factual finding is submitted as **Enforcement Counsel's Exception 5g**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5g is thus adopted.

[21] This factual finding is submitted as **Enforcement Counsel's Exception 5h**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5h is thus adopted.

have been "very unlikely [in 2009] that borrowers would have been able to obtain an unsecured loan especially at a 4.25 percent interest rate")); *see also* Hr'g Tr. 549:15-18 (examination of Respondent Ortega; "Q: The [Bank's] policy notes that unsecured loans by their nature can be the highest risk credit the bank will extend, correct? A: Right."). Some provided for interest-only payments for the life of the loan before a balloon payment at maturity. *See* RD at 32. Most were renewed at least once, which according to Enforcement Counsel's expert, "calls into question [the borrower's] ability to repay the debt as originally structured . . .." *See* Hr'g Tr. 1256:20-1257:9 (examination of Ramah Chansen); *see also* RD at 32. Furthermore, for certain borrowers, the Bank offered better terms on the unsecured Capital Raise Loans than on any secured loans issued to those same borrowers, which again signals that individual borrowers' ability to repay was not a primary consideration when it came to Capital Raise Loans. *See* RD at 32. Respondent Rogers testified that obtaining reasonable assurance a borrower is willing and able to pay a loan back according to its terms protects a bank's capital and that lending without reasonable assurance would increase risk to the Bank. *See* OCC Ex. 568 at 69:23-70:12 (Rogers Statement Trans.).[22] Respondent Rogers admitted that the quality of a Bank's loan portfolio has a significant influence on the amount of capital a bank requires; the more problems in the portfolio, the more capital the bank needs. *See* OCC Ex. 568 at 49:14-50:3 (Rogers Statement Trans.).[23] Both Respondents testified that it would be unsafe or unsound to approve a loan without reasonable assurances from the borrower that the borrower is willing and able to pay a loan back according to its terms. *See* OCC Ex. 568 at 24:4-21 (Respondent Rogers Statement Trans.); OCC Ex. 569 at 23:24-24:16

---

[22] This factual finding is submitted as **Enforcement Counsel's Exception 5e**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5e is thus adopted.
[23] This factual finding is submitted as **Enforcement Counsel's Exception 5d**. *See* EC's Exceptions at 3. This finding is supported by the record. Enforcement Counsel's Exception 5d is thus adopted.

(Respondent Ortega Statement Trans.); *see also* OCC Ex. 568 at 31:2-10 (Respondent Rogers Statement Trans.) (confirming he held these views on safety and soundness during the entire period he was Chairman).[24]

### 7. Misleading Loan Purposes

Despite Bank policy requiring that the purpose of all unsecured loans be clearly stated in Bank records, the stated purposes of Capital Raise Loans were *in all instances* deceptive and misleading. *See* RD at 30-31; *see also* Hr'g Tr. 152:9-20 (examination of Michael Brickman; "In my view every single one of them is inaccurate and false relative to the actual purpose of purchasing capital in the holding company."; ". . . none of them expressly states they are used to purchase capital in the holding company."). Respondent Ortega testified that running the Bank in a safe and sound manner meant following policies and procedures in a sound manner "[m]ost of the time." *See* Hr'g Tr. 581:14-583:23 (examination of Respondent Ortega).[25]

Bank records reflected that the proceeds of a $500,000 loan to Bank director Jack McClelland were "to be used as a revolving line for working capital for personal ventures," even through Respondent Ortega knew, at the time of the loan's approval, that the proceeds would be used to purchase Holding Company stock. *See* OCC Ex. 247 at 2; OCC Ex. 143 at 35; OCC Ex. 158 at 9; Hr'g Tr. 530:12-19 (examination of Respondent Ortega); RD at 31; *see also* OCC Ex. 246 at 1. Similarly, Bank records reflected that an unsecured $200,000 loan to Bank director Oscar Garza was "for rodeo riding arena event costs and promotions and other business purposes," but the loan was linked to a contemporaneous purchase of Holding Company stock in the amount of $200,025.

---

[24] This factual finding is submitted as **Enforcement Counsel's Exception 5f**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5f is thus adopted.
[25] This factual finding is submitted as **Enforcement Counsel's Exception 5m**. *See* EC's Exceptions at 5. This finding is supported by the record. Enforcement Counsel's Exception 5m is thus adopted.

*See* RD at 31 (citing OCC Ex. 237 at 4; OCC Ex. 374A, row 88). And the purpose of the aforementioned Capital Raise Loan to Ms. Gonzalez is described in a Bank record as a "business investment," while *in the very same record*, the purpose of a secured loan to another individual is plainly stated as for the purchase of "6,250 shares of Lone Star National Bank stock." *See* OCC Ex. 237 at 4; RD at 31.[26] As this contrast amply shows, the stated loan purposes of Capital Raise Loans were "demonstrably deceptive." *See* RD at 115.

### 8.  Efforts to Conceal Capital Raise Strategy

Although it was imperative for the Bank to disclose the Capital Raise Strategy to the OCC at its inception, the strategy was never described in Bank books or records or revealed in communications with the OCC. *See* Hr'g Tr. 155:22-157:14 (examination of Michael Brickman). As Enforcement Counsel's expert explained, "A bank's books and records are critically important. It's the basis by which [the OCC] make[s] decisions about whether the bank is in safe and sound condition or whether there are any necessary corrective actions that the bank needs to undertake." *See* Hr'g Tr. 85:11-16 (examination of Michael Brickman). Respondents admitted they had never heard of another bank financing its own capital raise with bank loans. *See* OCC Ex. 568 at 37:3-23 (Respondent Rogers Statement Trans.); Hr'g Tr. 494:22-496:9 (examination of Respondent Ortega; comparing hearing testimony to sworn statement testimony).[27] And Enforcement Counsel's expert testified that if the Bank had disclosed the Capital Raise Strategy to the OCC, the OCC would have informed the Bank that "the capital raised through loans from the bank would

---

[26] Further demonstrating the concessionary terms of Capital Raise Loans, the loan to Ms. Gonzalez was unsecured and had a 4.25 percent interest rate, while the loan to the other individual to purchase shares in Lone Star National Bank was secured and had a five percent floor interest rate. *See* OCC Ex. 237 at 4; RD at 31, n. 136.

[27] This factual finding is submitted as **Enforcement Counsel's Exception 5c**. *See* EC's Exceptions at 3. This finding is supported by the record. Enforcement Counsel's Exception 5c is thus adopted.

not qualify as Tier 1 capital and would not meet the requirements of the IMCR." *See* Hr'g Tr. 158:15-25 (examination of Michael Brickman).

### 9.  Losses Associated with the Capital Raise Strategy

On June 12, 2013, the Bank recorded combined losses of $387,240.63 on Capital Raise Loans that it had made to Ms. Gonzalez and Jose Rodriguez. *See* RD at 42 (citing OCC Ex. 389 (Bank Loan Losses and Recoveries, 1994 to 7/12/2013), rows 24107, 24108). These loans and their corresponding purchases of Holding Company stock were made in early to mid-2009; the loan proceeds were thus commingled with other Holding Company funds at the time of the capital injections. *See* RD at 42. At the time of the Bank's failure in September 2013, numerous other Capital Raise Loans had not been paid off. *See id.* (citing Hr'g Tr. 1242:13-1243:11 (examination of Ramah Chansen)). The FDIC, in its capacity as receiver following the Bank's failure, suffered $3,808,058.28 in losses when certain outstanding Capital Raise Loans were charged off as part of the receiver's efforts to maximize recovery on Bank assets for the receivership. *Id.* at 42 (citing Hr'g Tr. 1994:24-2006:3 (examination of Mary Jane Locke)).

### D.  OREO Strategy

### 1.  Respondents' Involvement in OREO Strategy

Beginning in 2008, as the Bank's OREO portfolio began increasing significantly, OCC examiners and Bank management recognized an urgent need for the Bank to reduce its OREO portfolio. *See* RD at 44-45. Around this time, Bank management adopted an aggressive approach to selling its OREO properties at appraised values and on lenient loan terms. *See id.* at 43, 46-47; *see also* Hr'g Tr. 377:1-3 (examination of Respondent Rogers; agreeing that the Bank was "more lenient on loan terms after the crisis trying to turn ORE assets into earning assets"), 617:3-4 (examination of Respondent Ortega; "I'm going to say we were more flexible with the conditions back then."), 618:1-12 (examination of Respondent Ortega; "A: . . . We were mainly

accommodating loans for our ORE and our better customers. Q: But the bank made loans that it normally would not have made had the purchase not been to purchase Bank ORE, correct? A: Yeah, I agree. It's our ORE, yeah.").

As members of the L&D Committee, Respondents regularly approved or ratified OREO Strategy loans without having first obtained financial spreads and a credit analysis (or "credit review"), as required by Bank policy, and in the case of Respondent Ortega, without having read the credit review if it were obtained. *See* Hr'g Tr. 379:3-12 (examination of Respondent Rogers), 622:6-22 (examination of Respondent Ortega), 646:3-20 (examination of Respondent Ortega); RD at 44, 58-59, 133. Enforcement Counsel identified fourteen OREO Strategy loans—issued between April 2009 and October 2012 and ranging from $3 million to $56 million—which one or both Respondents approved without having obtained a credit review. *See* RD at 59.

However, the ALJ noted that, when "discussing specific OREO loans during the hearing," Respondents and other Bank management "repeatedly referenced the fact that the borrowers were known to the Bank." *See* RD at 52; *see also e.g.,* Hr'g Tr. 386:9-14 (examination of Respondent Rogers; noting that he "had no problem voting for" a particular OREO loan because he was familiar with the borrower, who had done "a good job" with other properties), 619:13-18 (examination of Respondent Ortega; stating that an OREO loan was approved without financial projections because "we know that these guys know how to develop").

## 2.  OCC Communications Regarding OREO Strategy

Reports of Examination reflect that, as early as 2009, OCC examiners had at least a general awareness of the OREO Strategy and had initially expressed approval of the strategy. *See* RD at 53. The 2009 Report of Examination noted that "management has aggressively managed OREO . . . Most parcels have equity and management has been able to sell the parcels to individuals they

believe have the ability to manage the project or repay the debt. These actions minimize the risk of write-downs due to fair market value declines . . ..” *See* Joint Ex. 2 at 40; *see also* RD at 53. And the 2010 Report of Examination noted that “Management has developed a comprehensive and dynamic approach to OREO resolutions . . . and the Bank plans to continue with this approach. . . To date, the results have shown low losses when compared with other bank OREO processes.” *See* Joint Ex. 3 at 11-12; *see also* RD at 53-54. This report further observed that “[n]ew loans to finance sales of OREO . . . are underwritten more liberally than set forth in the loan policy,” these “lending practices are liberal because most [are] related to the financing and often improvement of OREO or problem loan workouts.” *See* Joint Ex.3 at 24; *see also* RD at 54.

However, by 2011, OCC examiners observed a worrying pattern: the Bank was making “loans to borrowers or guarantors with little financial repayment capacity” to finance OREO purchases; as a result, many OREO properties were returning to the Bank’s portfolio after they had been sold. *See* Joint Ex. 4 at 5; *see also* RD at 55. OCC examiners also began to note that the Bank’s practices surrounding the OREO Strategy resulted in “the financing of OREO with little or no down payment, on liberal terms, with below-market interest rates, and to individuals who did not demonstrate the ability to service the debt” and further noted that “[t]he Bank’s strategy to reduce criticized assets through the financing of OREO was not appropriate and has resulted in additional asset quality concerns and accounting issues.” *See* Joint Ex. 4 at 46.

### 3. Features of OREO Loans

Many of the OREO Strategy loans violated the Bank’s loan policy in that the loans lacked equity contributions from borrowers, lent additional money over and above the property’s purchase price, were issued to newly-formed entities with no financial history, lacked guarantees, or provided funding for payment of property taxes or past-due loans. *See* RD at 61-64. Respondent

Rogers admitted that OREO Strategy loans with one hundred percent financing (*i.e.*, no equity contribution) should be graded substandard and that it would be unsafe or unsound to approve a loan graded substandard at origination. *See* Hr'g Tr. 390:8-13 (examination of Respondent Rogers), 381:13-21 (examination of Respondent Rogers).[28] Similarly, Respondent Ortega admitted that the very definition of an unsafe or unsound practice was providing one hundred percent financing without having financial information on the borrower. *See* Hr'g Tr. 610:23-611:14 (examination of Respondent Ortega); OCC Ex. 569 at 172:15-23 (Respondent Ortega Statement Trans.).[29] Moreover, the interest rates for many OREO Strategy loans were lower than rates established in the Bank's Market Rate Matrix, which Board members, including Respondents, approved in December 2009 as an indicator of Bank management's views on what constituted a market rate for OREO loans; Respondents thus knew what the Bank deemed to be a market rate for OREO loans. *See* RD at 63; *see also* OCC Ex. 338; OCC Ex. 339; OCC Ex. 343 at 5 ("The bank has established a Market Rate Matrix to ensure compliance with term and pricing of these loans."), 8 ("The Market Rate Matrix will be used for all ORE financing loans."), 20 (Market Rate Matrix).[30] Quoting at length and crediting the testimony of Enforcement Counsel's experts, the ALJ found that "the Bank's OREO lending strategy increased risk to the Bank to the extent that it increased the likelihood of OREO properties returning to the Bank's books through, *inter alia*, looser underwriting standards, approval of loans without proper documentation of borrower credit and finances, and overly liberal loan terms." *See* RD at 55-56.

---

[28] This factual finding is submitted as **Enforcement Counsel's Exception 5i**. *See* EC's Exceptions at 4. This finding is supported by the record. Enforcement Counsel's Exception 5i is thus adopted.
[29] This factual finding is submitted as **Enforcement Counsel's Exception 5j**. *See* EC's Exceptions at 5. This finding is supported by the record. Enforcement Counsel's Exception 5j is thus adopted.
[30] Aspects of this factual finding are submitted as **Enforcement Counsel's Exception 5k**, *see* EC's Exceptions at 5, and are supported by the record. Enforcement Counsel's Exception 5k is thus adopted.

#### 4. NAHS Loan and OREO Loan Losses

The details surrounding a $54 million loan to NAHS Real Estate, L.P. ("NAHS") are representative of the OREO Strategy. *See* RD at 65. NAHS was formed on or around June 17, 2010, for the purpose of purchasing a hospital that was part of the Bank's OREO portfolio. *See id*. At a June 8, 2010 L&D Committee meeting, Respondent Ortega and other committee members (not including Respondent Rogers) verbally approved, "subject to formal loan presentation," *inter alia*, a $54 million loan to NAHS, which included $38 million to purchase the unfinished hospital and $16 million in additional money for construction. *See* OCC Ex. 30 at 6; RD at 65. Prior to this verbal approval, the L&D Committee had not been presented with any loan package. *See* RD at 66. Respondent Ortega testified that he relied on the loan officers' recommendations and did not focus on the borrowers' creditworthiness, repayment ability, or projected cash flow. *See* Hr'g Tr. 586:1-2, 607:12-18, 985:3-22, 986:5-11, 987:8-23 (examination of Respondent Ortega); *see also* RD at 66.

On June 10, the loan department prepared a one-page memorandum providing minimal additional details about the prospective loan. *See* RD at 66; *see also* OCC Ex. 31 at 6. The Bank formally entered the loan agreement with NAHS on June 22. *See* RD at 65-66. On June 23, a two-page loan-officer recommendation was completed. *See id.* at 67. Among other features, this document did not include any projections of the hospital's cash flow, graded the proposed loan as "satisfactory," determined that "financials will be waived" for NAHS initially because it was a new entity, and stated that "credit review will be performed at the end of the fiscal year." *See* OCC Ex. 31 at 4-5; *see also* RD at 67.

The NAHS loan was ratified by Respondents and others at an August 2010 L&D Committee meeting. *See* RD at 65-66; OCC Ex. 35 at 3. The loan enabled the Bank to sell the hospital at cost

basis on its books for $37,811,851 and avoid recognizing a loss on the sale. *See* RD at 66. The loan terms included thirty months of interest-only payments at a 3.25 percent interest rate, followed by a twenty-five year repayment term at a variable rate not to exceed six percent. *Id.* at 68. The loan terms also did not require any equity contribution from NAHS or its owner-guarantors and provided that the two principal owner-guarantors would guarantee only $3 million of the $54 million loan. *Id.* at 68-69. There is evidence that a credit analysis of the NAHS loan was finalized in September 2010 in anticipation of an upcoming OCC examination. *See id.* at 67-68. This analysis showed that the NAHS owner-guarantors had approximately $150,000 in combined liquidity and that one owner-guarantor had a Fair Isaac Corporation (or "FICO") score of less than five hundred. *Id.* at 68; *see also* Joint Ex. 10 (2010 Loan Policy) at 97 (noting that for loans designated with the collateral code 394, "Credit score < 650" would be a "waiver/exception item" subject to L&D Committee approval); OCC Ex. 31 at 1 (indicating that the NAHS loan is given the collateral code 394). The NAHS loan violated the Bank's loan policy in multiple ways. *See* OCC Ex. 48 at 1, 13; *see also* RD at 67-68.[31] The Bank gave NAHS substantial repayment assistance during the life of the loan. *See* RD at 69-70.

The Bank recorded losses of approximately $7.3 million on six OREO loans between September 27, 2012 and March 5, 2013. *See id.* at 143. Following the Bank's failure on September 13, 2013, the FDIC as receiver suffered a $35.15 million loss on the loan to NAHS. *See id.* at 75-

---

[31] For example, among the "prohibited loans" identified in the Bank's loan policy were "loans to companies or individuals who lack evidence of repayment ability, even if the loan is to be fully secured"; NAHS did not exhibit evidence of repayment ability. *See* Joint Ex.10 at 20; Hr'g Tr. 1356:2-6 (examination of Ramah Chansen). This factual finding is submitted as **Enforcement Counsel's Exception 5l**. *See* EC's Exceptions at 5. This finding is supported by the record. Enforcement Counsel's Exception 5l is thus adopted.

76, 143. The FDIC as receiver also suffered approximately $61.4 million in losses related to other loans associated with the OREO Strategy. *Id.* at 76.

### 5. OREO Strategy Alternatives

Enforcement Counsel asserts that it would have been prudent for the Bank to have sold its OREO properties below appraised values or to have avoided in-house financing of purchases of OREO rather than to have implemented the OREO Strategy. *See* Enforcement Counsel's Proposed Findings ("ECPF") ¶¶ 188, 211; *see also* RD at 47. However, the ALJ "credit[ed] the weight of the testimony by Respondents and others in Bank management that they viewed those other options as either undesirable or infeasible at the time . . . and f[ound] that there is an element of hindsight in [Enforcement Counsel's] current position." *See* RD at 47. Quoting extensively from the hearing transcript, the ALJ found as follows.

> In detailed and credible testimony, Respondent Ortega and [the Bank official charged with implementing the OREO Strategy] acknowledge that it would have been possible for the Bank to sell its OREO at a reduced price rather than financing purchases itself at the appraised value, but state that the motivations for not doing so stemmed, at least in part, from a good faith belief that the properties were worth more in the long run than the 'speculators' and 'scavengers' of the time were willing to pay.

*See id.* at 47-48. The ALJ further credited the testimony of the Bank official charged with implementing the OREO strategy as providing a "plausible explanation for Bank management's reluctance to lower the asking price on the Bank's OREO properties in order to get them sold": "management felt that doing so would not reflect the properties' true value over time" and "believed that other avenues were available that would enable the Bank to reduce its OREO holdings by selling them at their appraised value." *See id.* at 49. The ALJ also noted that Respondents and other witnesses offered unrebutted testimony that the Bank had no choice but to

finance purchases of its own OREO because, during the relevant timeframe, no banks were amenable to financing the purchases of another bank's OREO. *See id.* at 50.

### 6. OREO Strategy Accounting-Related Misconduct

Turning to the charged accounting-related misconduct associated with the OREO Strategy, the OCC's 2009 Report of Examination determined that the Bank had sold and financed $133 million of OREO with liberal underwriting terms and without ensuring proper accounting. *See* RD at 70; *see also* Joint Ex. 2 at 12. The OCC issued a Matter Requiring Attention ("MRA") requiring that the Bank record losses on OREO loans with below-market interest rates by using a present-value-of-future-cash-flows analysis. *See* RD at 70; *see also* Joint Ex. 2 at 12. In another MRA issued in connection with the 2011 Report of Examination, the OCC determined that, between 2008 and June 30, 2011, the Bank had originated over $309 million in OREO loans with interest rates below the then-market rate of 5.5 percent and had failed to perform present-value calculations and record discounts on OREO loans with below-market interest rates. *See* RD at 72; *see also* Joint Ex. 4 at 11-12, 47-48, 81. The 2011 Report of Examination also cited a violation of 12 U.S.C. § 161(a) on grounds that the Bank's quarterly Call Report filings were inaccurate due to "[t]he Bank's failure to adhere to proper accounting guidelines regarding OREO sales, which were financed below a fair market rate . . .." *See* Joint Ex. 4 at 81; *see also* RD at 72. The OCC directed the Bank to "review all OREO financings to assure proper accounting and income recognition," calculate the appropriate losses, and include the adjustment in the December 31, 2011 Call Report. *See* Joint Ex. 4 at 48; *see also* RD at 72-73.

The Bank recorded only a $4.8 million discount of its $309 million OREO portfolio in the December 31, 2011 Call Report. *See* OCC Ex. 363 ¶ 36; *see also* RD at 74. According to Enforcement Counsel's expert, the Bank's underlying decisions leading to its $4.8 million discount

were inappropriate under Generally Accepted Accounting Principles ("GAAP"), and the Bank's improper accounting of OREO loans caused the Bank's assets and capital to be overstated by at least $9.5 million beginning with the December 31, 2011 Call Report[32] and continuing through the Bank's failure. *See* OCC Ex. 363 ¶¶ 46-47; *see also* RD at 44, 74-75.

### E. Nonaccrual Loan Accounting Practices

#### 1. Cash-Basis and Cost-Recovery Accounting

When a bank expects to fully collect on a loan, interest accrues on the loan daily, and the bank reports the interest as income earned even though payment for that interest has not yet been received. *See* RD at 77; ECPF ¶ 534. Loan payments are typically recorded in two parts: principal and interest. *See* RD at 77-78; ECPF ¶ 536. The principal payment reduces the balance of the loan receivable, and the bank records the cash proceeds to settle the interest receivable. *See* RD at 77-78; ECPF ¶ 536. If, however, there is doubt as to the ultimate collectability of a loan, the bank must determine whether the loan should be placed on nonaccrual status, which would mean that the bank would not accrue interest on the loan. *See* RD at 77-78; ECPF ¶¶ 538-39.

Nonaccrual loans are accounted for using either the cost-recovery method or cash-basis method. *See* RD at 77. Under the cost-recovery method, a bank applies all payments to a loan's principal balance and does not recognize any interest income. *Id*. The cash-basis method permits a bank to separate loan payments into principal and interest and treat the interest portion as income (although an interest receivable is not accrued). *See* RD at 78; ECPF ¶ 545.

At all relevant times, the cost-recovery method was the "general rule" for accounting purposes when a bank had any doubt as to the ultimate collectability of a nonaccrual loan. *See* RD at 77-78;

---

[32] Banks are required to periodically file with the OCC a "Call Report" describing the bank's financial condition. *See infra* Part X.A.1.c.

*see also* OCC Ex. 359 (June 2009 Instructions for Preparation of Consolidated Reports of Condition and Income) at 453-54 ("When doubt exists as to the collectability of the remaining recorded investment in an asset in nonaccrual status, any payments received must be applied to reduce the recorded investment in the asset to the extent necessary to eliminate such doubt."). The Instructions for Preparation of Consolidated Reports of Condition and Income ("Call Report Instructions") provide that cash-basis accounting may only be used on nonaccrual loans when "the bank determines, after analysis and with supporting documentation, that the remaining recorded asset is fully collectible." *See* RD at 78 (quoting ECPF ¶ 546). Specifically, both the June 2009 and March 2012 Call Report Instructions provided that "[a] bank's determination as to the ultimate collectability of the asset's remaining recorded investment must be supported by a current, well documented credit evaluation of the borrower's financial condition and prospects for repayment, including consideration of the borrower's historical repayment performance and other relevant factors." *See* OCC Ex. 359 (June 2009 Call Report Instructions) at 455; OCC Ex. 354 (March 2012 Call Report Instructions) at 545. The OCC's Bank Accounting Advisory Series ("BAAS") likewise provided that cash-basis accounting should not be used unless "the bank can demonstrate [that] doubt about the ultimate collectability of principal no longer exists," and that collateral values alone are insufficient to resolve the issue of collectability. *See* OCC Ex. 353 (December 2008 BAAS) at 38; *see also* RD at 79.

## 2. The Bank's Accounting System

Around 2007, the Bank transitioned to a new loan accounting system. *See* RD at 79. The default setting of this system was to apply cost-recovery accounting to nonaccrual loans, but "Enforcement Counsel has presented credible and uncontroverted evidence that the Bank changed the default accounting treatment of nonaccrual loans in the [vendor's] system from the cost recovery method

to the cash basis method to conform to [Bank] management's preferred practice of automatically recording interest income on nonaccrual loans." *See id.* at 79-80. As members of senior management of the Bank, Respondents (particularly Respondent Ortega, who oversaw the Bank's accounting and information technology departments) were aware or should have been aware that this inappropriate system change had been made, even if they were not the ones who authorized it. *See id.* at 80. "This change caused the Bank to deviate, indiscriminately and on a blanket basis, from the 'general rule' of the Call Report Instructions that cost recovery accounting be used on all nonaccrual loans unless and until it is determined, through 'a current, well documented credit evaluation,' that a specific loan is fully collectible.'" *See id.* (quoting OCC Ex. 359 (June 2009 Call Report Instructions) at 545).

### 3.   Warnings About the Bank's Accounting Practices

In January 2009, the OCC and the Bank entered a Memorandum of Understanding ("MOU"), requiring, *inter alia*, that the Bank "immediately reverse or charge off all interest that has been accrued contrary to the requirements contained in the Instructions for Preparation of Consolidated Reports of Condition and Income ("Call Report Instructions") governing nonaccrual loans" and directing the Board to "develop and implement a written policy governing the identification of and accounting treatment for nonaccrual loans [that] shall be consistent with the accounting requirements contained in the Call Report Instructions." *See* Joint Ex. 11 at 6-7; *see also* RD at 81. Respondents were members of the Bank's MOU Compliance Committee and were thus responsible for ensuring compliance with the January 2009 MOU. *See* RD at 81.

By March 2009, the Bank's policy regarding nonaccrual loans had purportedly "been modified to include the accounting requirements specified in the Call Report Instructions." *See* OCC Ex. 319 at 1; *see also* RD at 82. But the revised policy fell short of its goal. It did not require Bank

employees to undertake or document the required analysis to determine that collectability was no longer in doubt before applying cash-basis accounting. *See* RD at 82-83. Nor did it address or even mention the Bank's practice of automatically applying cash-basis accounting to all nonaccrual loans. *See id*. Rather, the new policy stated that "a bank is allowed to maintain a loan on a cash basis as long as the borrower is able to make regular payments," which is not the standard articulated by the Call Report Instructions or the OCC's BAAS. *See* OCC Ex. 319 at 11; *see also* RD at 83. The policy further stated that it "is [the Bank's] intent to utilize cash basis nonaccrual accounting whenever it is applicable." *See* OCC Ex. 319 at 11; *see also* RD at 83.

In June 2009, the Bank's audit department informed senior Bank management that the "use of cash basis of accounting on all nonaccrual loans" was unsatisfactory and recommended that the Bank set a dollar threshold at which all nonaccrual loans would be required to have a credit evaluation. *See* OCC Ex. 321 at 5; *see also* RD at 83-84. There is no indication that Respondents or other Bank management responded to the audit department's concerns or recommendations. *See* RD at 84.

Consent orders entered between the Bank and OCC in February 2011 and January 2012 reiterated the 2009 MOU's requirement that the Bank reverse or charge off interest that had been accrued contrary to requirements contained in the Call Report Instructions and that the Bank ensure compliance with policies and procedures consistent with the Call Report Instructions. *See* Joint Ex. 12 at 12; Joint Ex. 13 at 16; RD at 84. However, there is no evidence that Respondents caused the Bank's policies or accounting systems to comply with Call Report Instructions or caused the Bank to make the required charge-offs. *See* RD at 83-84.

In October and December 2012, the Bank's chief audit officer reiterated, including to Respondent Ortega, his concerns about the Bank's practice of using cash-basis accounting for

nonaccrual loans *en masse* and without supporting documentation. *See* RD at 85; *see also* OCC Ex. 323; Resp'ts' Ex. 68; OCC Ex. 325. Nevertheless, the Bank continued to use cash-basis as the default method of accounting for nonaccrual loans. *See* RD at 85; *see also* Resp'ts' Ex. 68.

Following a March 2013 examination, the OCC concluded that Bank management had "failed to follow cost recovery treatment for non-accrual loans and follow guidelines within the Call Report Instructions," noting that the Bank's incorrect practices had "been in place for many years." *See* Joint Ex. 7 at 6; *see also* RD at 85-86. As a result, the Bank's capital and earnings were overstated "for 2011, 2012, and the first quarter of 2013 by $1.4 million, $9.8 million, and $3.6 million, respectively." *See* Joint Ex. 7 at 2; *see also* RD at 87. The Bank refiled its December 2012 Call Report to reduce its reported interest income for 2011 and 2012 and adjusted its March 2013 Call Report before it was filed. *See* RD at 87. The Report of Examination cited the Bank for a violation of § 161(a) based on the inaccurate December 2012 Call Report, finding that the primary cause of the overstatement of income "was inappropriate recognition of interest income for non-accrual loans." *See* Joint Ex. 7 at 22; *see also* RD at 87.

### F.  Loans to Rogers III Entities

#### 1.  February 2009 Email from Rogers III's Attorney

Respondent Rogers's son, David Rogers III ("Rogers III"), had ownership interests in multiple companies, including a homebuilding company called Obra Homes, Inc. ("Obra"), of which he also served as President. *See* RD at 91. In or around early 2009, Obra had numerous outstanding loans with the Bank that were personally guaranteed by Rogers III and secured by real property.

*Id*. Rogers III had previously been a Bank director and was generally known by Bank management and the Board. *Id*.

On February 11, 2009, Rogers III forwarded to Respondent Rogers an email that Rogers III had received from his attorney two days earlier. *See* OCC Ex. 269; RD at 91-92. The attorney explained that Obra likely would be placed into receivership as a result of an adverse judgment in one or more of the eighteen pending lawsuits against the company. *See* OCC Ex. 269; *see also* RD at 91. He further stated that such an outcome "would result in [Rogers III's] total loss of control of Obra and its assets" and would frustrate efforts to liquidate such assets "to satisfy obligations to [the Bank and another institution]." *See* OCC Ex. 269; *see also* RD at 92. The attorney proposed that Rogers III work with the Bank to empty Obra of all assets through foreclosure, thus leaving nothing for Obra's other creditors and obviating any concern about possible judgments. He also suggested that Rogers III form "another corporation" and reacquire the foreclosed-upon assets. *See* OCC Ex. 269; *see also* RD at 92.

Rogers III seemingly acted on his attorney's advice, securing releases of his personal guarantees and foreclosures, and then repurchasing the foreclosed-upon collateral through newly formed or acquired entities. *See* RD at 93, 95-96. Respondent Rogers testified that he believed that the arrangement proposed by his son's attorney would not be in the Bank's best interest. *See* Hr'g Tr. 403:7-11 (examination of Respondent Rogers; "Q: In your experience, the proposed arrangement that [Rogers III's attorney] advises your son about would not be in the bank's best interest, would it? A: I wouldn't think so."); RD at 90. Despite this, it is uncontroverted that, although Respondent Rogers abstained from participating in decisions related to loans to his son's entities, Respondent Rogers never raised the information contained in the February 11, 2009 email

with anyone at the Bank responsible for managing the lending relationship with Rogers III. *See* RD at 91, 95, 98.

## 2. Griqualand Loans

In April 2009, the L&D Committee approved a $3,234,688.90 loan to Griqualand, LLC ("Griqualand"), a newly-formed entity in which Rogers III had a one hundred percent ownership interest, for the purchase of foreclosed-upon Obra properties. *See* RD at 95-96. As reflected in Bank records, the stated purpose of the loan was to purchase OREO property to develop and resell. *See* OCC Ex. 349; *see also* RD at 96. The Bank did not require any equity contribution from Griqualand or Rogers III, and it financed one hundred percent of the purchase price and an additional $100,000 for development expenses. *See* RD at 96-97. Additionally, no appraisal was conducted, no financial information on Griqualand was obtained or reviewed by the L&D Committee, and "to facilitate" the sale, no personal guarantee was required by the Bank from the borrower. *See* RD at 97; OCC Ex. 349 at 5. Although the assigned loan officer testified that she was contemporaneously aware that foreclosed Obra properties were effectively being repurchased by Rogers III through Griqualand, the loan package presented to the L&D Committee did not disclose this information. *See* RD at 97; OCC Ex. 349 at 5. Rather, the package "appears to actively go out of its way to avoid making a connection to Rogers III," making only a single, oblique reference to him, *see* RD at 97-98: "Griqualand's investors include a prominent homebuilder and financier who have [sic] substantial experience as a developer and real estate investor," *see* OCC Ex. 349 at 5.

Regarding the L&D Committee's knowledge of Rogers III's involvement with Griqualand and Obra's financial difficulties, the ALJ found the evidence to be inconclusive, stating the following.

> At the summary disposition stage, the undersigned concluded that it was a disputed question of material fact whether the other Board members had all relevant

information regarding Rogers III's ownership of Griqualand, including the financial difficulties experienced by Obra and his plan to reacquire the foreclosed assets without a personal guarantee, at the time that they approved the loan. The hearing did not do much to clarify matters—Respondents continue to assert that "the Bank and L&D Committee knew of Rogers III's involvement," and Enforcement Counsel did not adduce any further evidence to resolve the question. It is also possible that full knowledge of the circumstances might have made individuals on the L&D Committee *more* likely to approve the loan, if they viewed Rogers III as a reliable borrower and saw the transaction as a way to remove encumbrances from the assets. Respondent Ortega, for instance, testified that a transaction in which "the bank foreclosed and then resold the same assets back to the borrower in a new entity but with no personal guarantee" would be risky and irrational if the Bank's management was not familiar with the borrower, but that in this case "we kind of knew [that] Mr. Rogers III was involved in this thing."

*See* RD at 98-99 (internal citations omitted) (emphasis in original) (alterations in original). The

ALJ focused primarily on Respondent Rogers's inaction, stating the following.

In some sense, however, the L&D Committee's actual knowledge of who owned Griqualand is immaterial. What matters is that Respondent Rogers was aware of the circumstances surrounding the Griqualand loan and yet did not take steps to ensure that the rest of the Committee members were fully informed, despite believing that the arrangement described in [Rogers III's attorney's] email—and in particular the lack of personal guarantee by a borrower currently experiencing financial difficulties and defaulted loans—would or could be harmful to the Bank.

*See id.* at 99. Finally, with respect to the matter of the L&D Committee's general knowledge of

the information contained in the email, the ALJ found that "L&D Committee members might have

known this information independently and incorporated it into their determination of whether the

Griqualand loan was in the Bank's best interest—but Respondent Rogers did not see fit to ask."

*See id.* at 100.

### 3. Petro Icon Loans

In or around January 2010, the L&D Committee approved loans of $421,437 and $20,229 to

Petro Icon, LLC ("Petro Icon"), of which Rogers III had recently purchased one hundred percent

ownership. *See* RD at 100. Through Petro Icon, Rogers III repurchased foreclosed-upon Obra

properties. *See id.* Prior to foreclosure, loans on the Obra properties had been backed by the

personal guarantee of Rogers III. *Id.* at 100-01. However, the terms of the new loans to Petro Icon were not backed by a personal guarantee and did not require any equity contribution from Petro Icon or Rogers III. *Id.* at 101. Additionally, the loan packages did not contain any financial information on Petro Icon, did not mention Rogers III by name or identify him as the company's sole owner. *Id.* at 100-01; OCC Ex. 314 at 3, 7. Although Enforcement Counsel did "not offer additional evidence regarding the ratification of the Petro Icon loans," the ALJ found as follows:

> . . . there is no evidence that Respondent Rogers ever raised the matter of his son's ownership of Petro Icon with the L&D Committee members or expressed any concerns that the Petro Icon loan package omitted information that was pertinent to the Committee's approval of the Petro Icon loans—namely that the loans would permit Rogers III to reacquire property that had just been foreclosed upon, at more favorable terms to Rogers III and less favorable terms to the Bank.

*See* RD 101-02.

### 4. Financial Losses

The Bank suffered a $432,000 loss on the Griqualand loan on September 13, 2012. *See* RD at 103. Following the Bank's failure in September 2013, the Griqualand loan was acquired by PlainsCapital Bank ("PlainsCapital"), which ultimately charged off $110,000 of the loan, resulting in an $88,000 loss to the FDIC as receiver pursuant to its loss-sharing agreement with PlainsCapital. *See id*. Prior to the Bank's failure, the Bank did not suffer a loss on the Petro Icon loans, but pursuant to a loss-sharing agreement, the FDIC as receiver incurred $170,978 in combined losses on the Petro Icon loans. *Id.*

### G. Other Factual Findings

Included as part of the ALJ's factual findings is a section titled, "Additional Evidence Bearing on Culpability," wherein the ALJ "marshals the most salient examples" of "various pieces of evidence in support of [Respondents'] argument that they have not demonstrated a requisitely culpable state of mind over the course of their alleged misconduct." *See* RD at 103. These examples

include Respondents' purported reputation among OCC examiners and Respondent Ortega's health in February 2013. *Id.* at 103-05. It is unclear how much weight the ALJ assigned to any one of these factual findings in connection with her culpability-prong analyses. *See generally id.* at 120-30, 146-52, 166-69, 173-74, 181-83.

**Enforcement Counsel's Exception 4** asserts that "The ALJ erred as a matter of law to whatever extent she considered the factors discussed in the 'Additional Evidence Bearing on Culpability' section." *See* EC's Exceptions at 3. Enforcement Counsel argues that the culpability-prong analysis "requires an objective look at the misconduct, and what Respondents knew or should have known at the time they engaged in it"; that "Respondents' reputations before, during, or after they engaged in misconduct are irrelevant"; and that "none of Respondent Ortega's Capital Raise Loans or OREO lending misconduct at issue . . . occurred during or after his health suffered, so that too, is irrelevant." *See* EC's Exceptions Br. at 61. The Comptroller agrees with Enforcement Counsel that such factors are immaterial and should not have been assigned any weight pursuant to the relevant legal standards stated at *infra* Part X.A.3. Enforcement Counsel's Exception 4 is adopted.[33]

## X.    CONCLUSIONS OF LAW

In the Comptroller's assessment, the ALJ correctly stated the applicable legal standards. In certain instances, however, the Comptroller concludes that the ALJ either misapplied those standards to the facts or, despite having stated the correct standard, effectively applied some other incorrect standard in the course of her analysis. In this part, the Comptroller reaches his

---

[33] The Comptroller nonetheless considers certain of these factors, including Respondent Ortega's health concerns, in connection with assessing the appropriateness of the civil money penalties assessed. *See infra* Part X.E.

independent conclusions of law and explains the extent to which his analysis either parallels or diverges from the ALJ's analysis.

### A. Capital Raise Strategy

In connection with the Capital Raise Strategy, the ALJ concluded that Enforcement Counsel had established the misconduct and effect prongs by a preponderance of the evidence but had not so established the culpability prong. *See* RD at 108. The parties take various exceptions to these conclusions. As discussed more fully below, the Comptroller disagrees, in part, with the ALJ's analysis and concludes that, in addition to establishing the misconduct and effect prongs, Enforcement Counsel has amply established the culpability prong. The Comptroller therefore issues orders of prohibition and assesses civil money penalties against both Respondents based on charges arising from lending-related misconduct associated with the Capital Raise Strategy. The Comptroller also assesses a civil money penalty against Respondent Ortega based on accounting-related misconduct associated with the Capital Raise Strategy. The Comptroller adopts the ALJ's conclusions regarding the Capital Raise Strategy only to the extent consistent with the analysis set forth herein.

#### 1. Misconduct

##### a. Unsafe or Unsound Practices

The ALJ concluded that, in connection with the lending-related misconduct associated with the Capital Raise Strategy, Respondents engaged in unsafe or unsound practices, which include "any action or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." *See*

RD at 108; *see also Adams*, 2014 WL 8735096, at *11.[34] In applying this standard, the ALJ reasoned, *inter alia*, as follows. Respondents risked the Bank's existing capital by approving dozens of concessionary loans to potentially unqualified borrowers at a time when the Bank urgently needed to increase its capital ratios and had represented to the OCC that virtually no lending was occurring. *See* RD at 109. This "jeopardized the Bank's overriding priority" to raise new regulatory capital and "generally placed the Bank in a more uncertain financial position than it would have been without the loans." *See id.* at 110. Furthermore, the "[l]ack of accurate documentation and loose underwriting standards . . . increased the risk that the Capital Raise Loans were being made to unqualified borrowers who were likely to default." *See id.* at 111. Respondents also "increased the risk to the Bank by failing to ensure that the unsecured Capital Raise Loan portfolio was tracked and monitored for risk and that the loan proceeds themselves were accounted for correctly, if not fully segregated from any funds to be downstreamed from the Holding Company to the Bank as regulatory capital." *See id.* at 111-12. To make matters worse, the OCC's ability to effectively supervise the Bank was impeded by Respondents' failure to disclose the Capital Raise Strategy. *See id.* at 112-13. Additionally, the $3 million to $17.3 million in Capital

---

[34] **Respondents' Exception 25** asserts, "The ALJ applied the wrong definition of 'unsafe or unsound practice.'" *See* Resp'ts' Exceptions at 6. Some courts have required that an unsafe or unsound banking practice have a "reasonably direct effect on an institution's financial soundness," *see, e.g., Frontier State Bank v. FDIC,* 702 F.3d 588, 604 (10th Cir. 2012); *De La Fuente v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003), while others have declined to impose that requirement, *see, e.g., Greene County Bank v. FDIC*, 92 F.3d 633, 636 (8th Cir. 1996); *Doolittle v. Nat'l Credit Union Assoc.,* 992 F.2d 1531, 1538 (11th Cir. 1993). The ALJ correctly applied the legal standard that the Comptroller analyzed extensively and reaffirmed in *Adams*, 2014 WL 8735096, and Respondents offer no reason to depart from this precedent. In any event, in all instances in which the Comptroller concludes that unsafe or unsound practices are established in connection with this matter, the facts support such a conclusion under either standard. Respondents' Exception 25 is thus rejected.

Raise Loan proceeds downstreamed to the Bank created reasonably foreseeable heightened risk to the Bank by masking its true financial condition, by overstating its loan portfolio and capital position, and by misleading regulators, investors, potential investors, shareholders, and depositors. *See id.* at 114.

The Comptroller concurs with the ALJ and adopts the conclusion that Respondents engaged in unsafe or unsound practices in connection with the lending-related misconduct associated with the Capital Raise Strategy.[35] *See In the Matter of Conover*, 2016 WL 10822038, at *16 (FDIC Dec. 14, 2016) ("Failure to properly underwrite a loan by accurately evaluating the borrower's ability to repay constitutes an unsafe and unsound practice."); *see also First State Bank of Wayne County v. FDIC*, 770 F.2d 81, 82 (6th Cir. 1985) (accord); *In the Matter of Haynes,* 2014 WL 4640797, at *8 (FDIC July 15, 2014) (accord); *In the Matter of Grubb,* 1992 WL 813163, at *29 (FDIC Aug. 25,1992) (accord); *In the Matter of the Stephens Security Bank*, 1991 WL 789326, at *1 (FDIC Aug. 9, 1991) (accord); *In the Matter of Clark*, 1991 WL 757819, at *2 (FDIC Jan. 29,1991) (accord).

**Enforcement Counsel's Exception 3a** asserts that the ALJ committed legal error by not concluding that Respondents' failure to correct inaccurate loan purposes as documented in loan packages constituted an unsafe or unsound practice. *See* EC's Exceptions at 2. **Enforcement Counsel's Exception 3b** asserts that the ALJ committed legal error when she did not conclude that Respondents' failure to disclose the Capital Raise Strategy to the OCC constituted an unsafe or unsound practice. *See id.* at 2. The Comptroller agrees with Enforcement Counsel that these

---

[35] The ALJ did not reach a conclusion as to whether Respondents' accounting-related misconduct associated with the Capital Raise Strategy constituted unsafe or unsound practices. *See* RD at 172-173. Enforcement Counsel did not take exception to this and the Comptroller declines to consider this issue in the first instance.

conclusions are supported by ample record evidence and the ALJ's own factual findings. *See* RD 15, 25-26, 29-31, 112-17; Hr'g Tr. 128:22-129:6, 150:15-151:4, 152:21-153:11 (examination of Michael Brickman); Hr'g Tr. 341:4-18, 336:13-339:8, 360:17-21, 328:8-20 (examination of Respondent Rogers); Hr'g Tr. 546:10-19, 547:1-3, 565:5-566:25 (examination of Respondent Ortega); OCC Ex. 143; OCC Ex. 144; OCC Ex. 149 at 1-2; OCC Ex. 151 at 1-11; OCC Ex. 363 at 8-9; OCC Ex. 366 at 6; OCC Ex. 374 at 1; OCC Ex. 548 at 1. To the extent these conclusions were not reached by the ALJ (they arguably were), the Comptroller readily concludes that Respondents' failures to correct inaccurate loan purposes as documented in Bank records and their failure to disclose the Capital Raise Strategy to the OCC constituted unsafe or unsound practices. *See Dodge v. OCC*, 744 F.3d 148, 151, 156-57 (D.C. Cir. 2014) (misrepresenting bank's financial condition to regulators is an unsafe or unsound practice); *De La Fuente*, 332 F.3d at 1224 (failing to disclose relevant information to regulator can constitute an unsafe or unsound practice). Enforcement Counsel's Exceptions 3a and 3b are adopted.

### b. Breach of Fiduciary Duty

The ALJ concluded that Respondents breached their fiduciary duty of care in connection with lending-related misconduct associated with the Capital Raise Strategy. *See* RD at 116. The duty of care requires that bank officers and employees act with the care that an ordinarily prudent and diligent person would exercise under similar circumstances. *See In the Matter of Watkins*, 2019 WL 6700075, at *7 (FDIC Oct. 15, 2019). Furthermore, as Bank directors and officers, Respondents were required "to act in good faith and in a manner reasonably believed to be in the bank's best interests," *see Ellsworth*, 2016 WL 11597958, at *15, and "to act diligently, prudently, honestly, and carefully in carrying out their responsibilities," *see Grubb*, 1992 WL 813163, at *28. This duty also demanded "proper supervision of subordinates" and "constant concern for the safety

and soundness of the bank." *See* RD at 116 (quoting *Conover*, 2016 WL 10822038, at *19). The ALJ reasoned that Respondents "fail[ed] to act prudently, diligently, and carefully in the course of their own responsibilities"; failed to "properly supervis[e] the risky or imprudent decisions of subordinates"; "approv[ed] and/or ratif[ied] loans with vague and/or misleading loan purposes, given that Respondents knew or should have known that the purpose of the Capital Raise Loans was to purchase Holding Company stock"; "failed to ensure that the Bank disclosed to the OCC or its own outside accountants that it was financing dozens of purchases of Holding Company stock at the time of the capital raise"; and "fail[ed] to ensure that the proceeds of the Holding Company stock purchases were not downstreamed back to the Bank and improperly treated as new regulatory capital." *See* RD at 116-17 (internal quotation marks omitted); *see also Conover*, 2016 WL 10822038, at *20 ("Extending credit without adequate assurances of repayment constitutes a breach of fiduciary duty."); *Grubb*, 1992 WL 813163, at *28 (stating that bank directors' and officers' fiduciary duty requires a "duty to investigate, verify, clarify, and explain"). The Comptroller concurs and adopts the conclusion that Respondents breached their fiduciary duty of care in connection with lending-related misconduct associated with the Capital Raise Strategy.[36]

### c. Section 161(a)

Banks are required to file with the OCC periodic Call Reports describing the bank's financial condition. *See* 12 U.S.C. § 161(a); *see also Blanton*, 909 F.3d at 1174. Call Reports must, *inter alia*, "accurately reflect the capital" of the bank, *see* 12 U.S.C. § 1831n(a)(1)(A); *see also Blanton*, 909 F.3d at 1174, and the bank officer who signs the report must attest that it is "true and correct

---

[36] The ALJ did not reach a conclusion as to whether Respondents' accounting-related misconduct associated with the Capital Raise Strategy constituted a breach of fiduciary duty. *See* RD at 172-73. Enforcement Counsel did not take exception to this, and the Comptroller declines to consider this issue in the first instance.

to the best of his knowledge and belief," *see* 12 U.S.C. § 161(a). Call Reports must be prepared in accordance with GAAP and the Call Report Instructions. *See* 12 U.S.C. § 1831n(a)(2)(A) (providing that "the accounting principles applicable to reports or statements required to be filed with Federal banking agencies by all insured depository institutions shall be uniform and consistent with generally accepted accounting principles"); 12 C.F.R. § 304.3(a) (requiring that Call Reports be filed in accordance with Call Report Instructions). Filing of materially inaccurate Call Reports can give rise to a violation of § 161(a). *See Blanton*, 909 F.3d at 1174; *Yates v. Jones Nat'l Bank*, 206 U.S. 158, 176-77 (1907).

The ALJ concluded that Respondents violated § 161(a), reasoning that Call Reports filed between 2009 and 2013 overstated the Bank's regulatory capital to whatever extent proceeds of Capital Raise Loans were downstreamed from the Holding Company to the Bank, *i.e.*, an amount somewhere between $3 million and $17.3 million, and that Respondents did not have a reasonable belief that Capital Raise Loan proceeds could be treated as new capital. *See* RD at 171. For the same reasons stated by the ALJ, the Comptroller adopts the ALJ's conclusion that Respondents violated § 161(a). Again, as a result of Enforcement Counsel's waiver of arguments as to certain effect-prong predicates, this conclusion ultimately matters only as to Respondent Ortega and only as to the assessment of civil money penalties against him. *See* Part III.A (discussing waiver of charges by Enforcement Counsel).

### d.  Respondents' Exception 15

The Comptroller now turns to **Respondents' Exception 15**, which asserts:

> With respect to the Capital Raise Loans, the finding and conclusion that Respondents should not be banned from banking should be affirmed. However, insofar as the ALJ ruled against Respondents, any finding and conclusion that the Capital Raise Loans were an unsafe or unsound practice for which Respondents were responsible, were not accounted for correctly, were [a] breach of fiduciary

duty, or otherwise met the misconduct prong of the statute, was not supported by
the evidence or applicable law.

*See* Resp'ts' Exceptions at 4.

In support of this exception, Respondents reiterate several arguments that were rejected by the ALJ as unpersuasive. First, Respondents argue that the "[d]ownstreaming [a]llegation" was not proven. *See* Resp'ts' Exceptions at 98. The Comptroller agrees with the ALJ that this argument is contradicted by record evidence and by Respondents' own testimony. *See* RD at 114-15; *see also supra* Part IX.C.5. Second, Respondents argue that "the Capital Raise Loans were not required to be used for stock" and were not unsafe or unsound because "[b]orrowers were free to use the loan proceeds as they wished." *See* Resp'ts' Exceptions at 99. The Comptroller agrees with the ALJ that this argument "misunderstands the inquiry" and concurs with her further assessment of this argument:

> [A]s stated above, risking the Bank's capital by making dozens of unsecured, poorly underwritten loans—many with demonstrably *deceptive* stated loan purposes—at a time when the Bank's need for capital was exigent, while representing to the OCC that the Bank had almost entirely curtailed its lending activity, would be unsafe and unsound if the loans were spent on jellybeans, lottery tickets, or anything else; this aspect of the Capital Raise Loans misconduct has very little to do with the actual capital raise.

*See* RD at 115 (emphasis original). Third, Respondents argue that the Capital Raise Loans "were not material" and "would not have had a significant impact on the Bank's ratings," noting that Enforcement Counsel's expert accountant determined that, even if the full amount of Capital Raise Loans were excluded from the Bank's reported capital, the Bank would have achieved its IMCR. *See* Resp'ts' Exceptions at 100. Again, the Comptroller agrees with the ALJ that "this does not alleviate the riskiness of the loan portfolio itself, let alone the Bank's failure to track and monitor the loans or to disclose to the OCC that Bank-financed stock purchases were a significant component of the capital plan." *See* RD at 115. Fourth, Respondents argue that they should be

excused from liability because they "did not make the Capital Raise Loans" but "relied on the expertise of the loan department" and were not "the ones responsible for how the loans were characterized in the Bank's records." *See* Resp'ts' Exceptions at 102-03. The Comptroller agrees with the ALJ that Respondents did not fulfill their "independent and affirmative responsibilities," in their capacities as officers and directors of the Bank and members of the L&D Committee, "to ensure that the Bank's lending decisions were appropriate and did not improperly increase the Bank's risk exposure." *See* RD at 116. Nor did Respondents fulfill their responsibilities to develop, implement, and oversee the Bank's capital strategy "in a manner that did not expose the Bank to inordinate risk." *Id.* Shifting blame to subordinates is not a colorable defense. *See, e.g.*, *In the Matter of Leuthe*, 1998 WL 438324, at *39 (FDIC Feb. 13, 1998) (noting that "abdication of duty by directors to officers is not a defense," and that "Respondent's duty as a board member, and particularly as Chairman of the Board, was to monitor the activities of bank management, to ensure compliance with laws, regulations, cease and desist orders and the Bank's own loan policy."); *Rankin v. Cooper*, 149 F. 1010, 1013 (C.C.E.D. Ark. 1907) ("Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them."). And Respondents' misconduct is no less actionable because others contributed to the Capital Raise Strategy. *See Landry v. FDIC*, 204 F.3d 1125, 1139 (D.C. Cir. 2000) (concluding that the fact that others may have been "more guilty" does not absolve respondent from responsibility for his actions).

Respondents also assert that the "Capital Raise [L]oans did not constitute an unsafe or unsound practice or a breach of fiduciary duty." *See* Resp'ts' Exceptions at 103. They argue that these loans were safe and sound "given the borrowers . . . and the circumstances in the economy at the time" and that Respondents had been assured by loan officers that the loans presented "good risks." *See id.* at 103. Respondents further argue that there was no evidence that the loans were offered at

below-market terms. *Id.* The Comptroller concludes that these arguments are strongly refuted by ample record evidence, including numerous Bank records demonstrating that Capital Raise Loans were frequently unsecured and offered at a uniformly low rate of 4.25 percent, while secured loans were contemporaneously extended to the same borrowers at higher interest rates. *See supra* Part IX.C.6. This strongly indicates that Capital Raise Loans were issued pursuant to a coordinated effort to artificially inflate the Bank's capital positions rather than on the strength of individual credit determinations or assessments of borrowers' ability to repay. *Id.*

Finally, Respondents argue that Enforcement Counsel did not establish the accounting-related misconduct associated with the Capital Raise Strategy. *See* Resp'ts' Exceptions at 100. Because Enforcement Counsel has waived prosecution of certain charges and predicates thereof, *see supra* Part III.A, this argument is only relevant as to Respondent Ortega and only with respect to the assessment of civil money penalties based on a violation of § 161(a). The Comptroller concurs with the ALJ's determination that Enforcement Counsel's experts offered credible testimony supporting the conclusion that Respondents violated § 161(a). The Comptroller thus adopts the ALJ's conclusion that a violation of law is established as to Respondent Ortega in connection with the Capital Raise Strategy.

For these reasons, Respondents' Exception 15 is rejected.

## 2. Effect

The ALJ concluded that the effect prong had been satisfied as to lending-related misconduct associated with the Capital Raise Strategy. *See* RD at 117-18. The ALJ reasoned that on June 12, 2013 (a date that is less than five years prior to the issuance of the September 25, 2017 Notice), the Bank recorded combined losses of $387,240.63 on two of the Capital Raise Loans and "there can be no serious disagreement that this loss occurred by reason of the alleged misconduct" as "the

loans would not have been made were it not for Bank management's decision to finance the purchase of Holding Company stock in this manner." *See id.* (internal quotation marks omitted); *see also* 12 U.S.C. § 1818(e)(1)(B). Additionally, with respect to § 1818(i) charges against Respondent Ortega based on accounting-related misconduct associated with the Capital Raise Strategy, the ALJ concluded that "Respondent Ortega's violation of 12 U.S.C. § 161(a) over the course of several Call Reports, the effect of which continued into the five-year limitations period window, was a pattern of misconduct sufficient to meet the standard for first- and second-tier civil money penalty assessments under Section 1818(i) . . .." *See* RD at 174.[37] The Comptroller adopts these conclusions for the reasons set forth in the Recommended Decision. The Comptroller also adds that the financial losses sustained by the Bank and the FDIC in its capacity as receiver for the failed Bank, *see supra* Part IX.C.9 (finding that the FDIC as receiver suffered $3,808,058.28 in losses when certain outstanding Capital Raise Loans were charged off), were wholly foreseeable consequences of Respondents' lending-related misconduct associated with the Capital Raise Strategy, *see supra* Part IX.C.6-8. Nonetheless, Respondents' Exceptions regarding effects associated with the Capital Raise Strategy are addressed below.

### a. Respondents' Exceptions Regarding Showing of Effects

**Respondents' Exception 16** asserts the following, as relevant, "the ALJ's finding and conclusion that the Bank suffered a loss (or otherwise triggered the "effects prong") by reason of the Capital Raise Loans was not supported by the evidence or applicable law." *See* Resp'ts' Exceptions at 4. Dedicating only a few sentences to this assertion, Respondents argue that "[t]he problem" with the ALJ's conclusion that the effect prong was satisfied as to the lending-related

---

[37] The Comptroller's discussion of charges based on accounting-related misconduct associated with the Capital Raise Strategy is limited to first- and second-tier civil money penalties against Respondent Ortega. *See supra* Part III.A (discussing waiver of various charges).

misconduct associated with the Capital Raise Strategy is that the underlying transactions "involved no cash loss to the Bank," purportedly because "the Bank received a note, which is an asset to the Bank." *See id.* at 104. Respondents' assertion is invalid. The Notice charged that the Bank suffered financial loss by reason of Respondents' misconduct, and Enforcement Counsel adduced evidence establishing as much. *See supra* Part IX.C.9. Respondents' Exception 16 is thus rejected.

**Respondents' Exception 21** asserts that the "ALJ's finding and conclusion that Ortega engaged in a pattern of misconduct with respect to accounting claims was without support and a legal basis." *See* Resp'ts' Exceptions at 5 (internal quotation marks omitted). In support of this exception, Respondents state, without further explanation, that there was no evidence presented of a pattern of misconduct. *See id.* at 121. The Comptroller finds ample evidence establishing a pattern of accounting-related misconduct spanning multiple years. *See supra* Part IX.C.5. Respondents' Exception 21 is rejected to the extent that it concerns the Capital Raise Strategy.

**Respondents' Exception 26** asserts, "The ALJ failed to consider the law of causation as part of the 'effects' analysis"; Respondents further assert that the effects analysis incorporates "both 'but for' and 'proximate' causation." *See* Resp'ts' Exceptions at 6, 127-28. Although the ALJ did not expressly state what causation standard was applied, as far as the Comptroller can tell, the ALJ did not expressly reject the standards advanced by Respondents (*i.e.,* actual and proximate causation). Furthermore, the ALJ's analysis of the effect prong as it relates to the lending-related charges associated with the Capital Raise Strategy appears consistent with an actual and proximate causation analysis. *See, e.g.*, RD at 118. Assuming for purposes of the instant analysis that the effect prong incorporates actual and proximate causation, the Comptroller concludes that it is satisfied as to the lending-related charges associated with the Capital Raise Strategy. Respondents' argument that they did not legally cause loan losses since "all of the loans at issue in this case had

enough votes on the L&D Committee to be approved, with or without the Respondents," *see* Resp'ts' Exceptions at 128, is unpersuasive, *see e.g.,* Restatement (Second) of Torts § 439, cmt. b ("If the harm is brought about by the substantially simultaneous and active operation of the effects of . . . the actor's negligent conduct and [the] [wrongful] act of a third person . . . the conduct of each is a cause of the harm, and both . . . are liable."). Respondents' Exception 26, as applied to the lending-related charges associated with the Capital Raise Strategy, is rejected.[38]

### b. Respondents' Exception 1 as Applied to Capital Raise Strategy Charges

Although rejected at *supra* Part V.B, the Comptroller here revisits **<u>Respondents' Exception 1</u>** and Respondents' statute-of-limitations arguments as they relate specifically to the Capital Raise Strategy. To recap the discussion at Part V.A, in a prior order entered in this matter, the Comptroller issued the following: Interlocutory Ruling 1, which reaffirmed that the five-year statute of limitations set forth at § 2462 does not begin to run until all factual and legal prerequisites for filing a notice of charges are in place; Interlocutory Ruling 2, which reaffirmed that occurrences of alternative effect predicates trigger accruals of separate claims; and Interlocutory Ruling 2a, which clarified that because separate occurrences of effects trigger accruals of separate claims, an action is timely if it is commenced within five years of the date of the last effect resulting from the charged misconduct, even if there were an earlier occurrence of an effect of the type on which the action is predicated.

Respondents argue that "the last date on which a Capital Raise Loan could have been made was August 12, 2009." *See* Resp'ts' Exceptions at 43.[39] According to Respondents, because

---

[38] As applied to all other relevant charges, Respondents' Exception 26 is deemed moot. *See infra* Parts X.B.4, D.2.

[39] Although the Comptroller agrees that this is the last date on which the proceeds of a Capital Raise Loan could have been downstreamed to the Bank, the Comptroller agrees with the ALJ's characterization of a "Capital Raise Loan" as a Bank loan used to purchase Holding Company

Enforcement Counsel may seek a prohibition or civil money penalty when a loan is "likely to cause more than a minimal loss," or "will probably suffer financial loss or other damage" or when "depositors . . . could be prejudiced," "the latest a claim could have 'first accrued' was in 2009"—*i.e.,* at the time the "last" Capital Raise Loan was issued. *See id.* at 44-45. This argument is unpersuasive. As frequently stated in these proceedings, "[i]t is settled law . . . that it is meaningless for limitations purposes that an agency could conceivably have brought its claim earlier based on a different effect (and thus a different cause of action) that it did not plead." *See* RD at 118; *see also Blanton*, 909 F.3d at 1172 ("[E]ven though the OCC might well have brought an action earlier, its failure to do so does not make the claims it elected to bring untimely." (internal quotation marks omitted)); *Proffitt*, 200 F.3d at 863 ("The same misconduct can produce different effects at different times, resulting in separate section [1818(e)] claims and separate accruals."); *id.* at 864 (noting that § 1818 was intended to provide enforcement agencies with some flexibility when determining when to bring actions). The charges arising from the Capital Raise Strategy are timely pursuant to Interlocutory Ruling 1 and Interlocutory Ruling 2.

Neither the lending-related charges against Respondents nor the accounting-related charges against Respondent Ortega based on the Capital Raise Strategy require the application of Interlocutory Ruling 2a to be deemed timely. With respect to the lending-related charges, it is undisputed that the date of the earliest alleged financial loss associated with the Capital Raise Strategy is June 12, 2013. *See, e.g.*, Resp'ts' Exceptions at 44 ("the OCC offered evidence and the ALJ found that the 'effects' prong of the statute was met on June 12, 2013, when the Bank suffered a loss on one of the loans and when the FDIC suffered losses many years later on other Capital

---

stock, and thus finds record evidence showing that Capital Raise Loans were issued through March 2011. *See* RD at 30, 129-30.

Raise Loans.") (citing RD at 42, 117-18). Because the record is devoid of evidence or allegations concerning financial losses associated with the Capital Raise Strategy occurring prior to June 12, 2013, Interlocutory Ruling 2a is not at issue when it comes to assessing the timeliness of the Capital Raise Strategy lending-related charges against Respondents. With respect to the accounting-related charges against Respondent Ortega, Interlocutory Ruling 2a (which, again, contemplates separate claims arising from separate occurrences of the same types of effects) is essentially built into the statutory "effect" provided for at § 1818(i)(2)(B)(ii)(I) (requiring that misconduct be "part of a pattern") in that this effect is characterized by repeated occurrences of misconduct. In other words, a claim accrued "each time" Respondent Ortega violated § 161(a) as part of a pattern of misconduct. *See Blanton*, 909 F.3d at 1171. Thus, the accounting-related civil money penalty charges against Respondent Ortega are not deemed timely through application of Interlocutory Ruling 2a. For these reasons, and the reasons stated at *infra* Part V.B, Respondents' Exception 1 is rejected.[40]

### 3. Culpability

For the Comptroller to impose an order of prohibition, Enforcement Counsel must establish "a degree of culpability well beyond mere negligence." *See* RD at 120 (quoting *Kim*, 40 F.3d at 1054). The requisite culpability may be shown by evidence of "continuing disregard" for a bank's safety or soundness. *See* 12 U.S.C. § 1818(e)(1)(C). Continuing disregard is conduct that has been "voluntarily engaged in over a period of time with heedless indifference to the prospective consequences." *See Grubb v. FDIC*, 34 F.3d 956, 962 (10th Cir. 1994). It is a mental state "akin

---

[40] Respondents assert that "because the [FDIC] receivership is still open" and "could book a loss at any time," they still "do not have repose." *See* Resp'ts' Exceptions at 45-46. However, the Comptroller notes that the OCC cannot initiate an action against an IAP unless the notice of charges is "served before the end of the 6-year period beginning on the date such party ceased to be such a party with respect to such depository institution." *See* 12 U.S.C. § 1818(i)(3).

to recklessness." *See Kim*, 40 F.3d at 1054; *Brickner v. FDIC,* 747 F.2d 1198, 1203, n.6 (8th Cir. 1984). "Recklessness is established by acts committed 'in disregard of[] and evidencing conscious indifference to a known or obvious risk of a substantial harm.'" *See Conover*, 2016 WL 10822038, at *27 (quoting *Cavallari v. OCC*, 57 F.3d 137, 142 (2d Cir. 1995)). It may also be demonstrated through "voluntary and repeated inattention to" unsafe and unsound practices, or the "knowledge of and failure to correct clearly imprudent and abnormal practices that have been ongoing." *See In the Matter of Swanson,* 1995 WL 329616, at *5 (OTS Apr. 4, 1995). The "continuing" aspect of "continuing disregard" requires repetition of the misconduct, *see id.*, "over a period of time," *see Grubb*, 34 F.3d at 962.

The ALJ concluded that Enforcement Counsel had not carried its burden, reasoning, *inter alia*, that "while actionable misconduct certainly occurred, there is substantial evidence—backed by credible testimony—that Respondents found themselves in a difficult and exigent situation with no good solutions and that their actions were motivated by a good faith concern for the Bank and its depositors during a time of crisis." *See* RD at 120. The ALJ further stated that "[t]here is no evidence that Respondents acted with recklessness or heedless indifference" because "Respondents' actions evinced good faith concern for the Bank . . . [and] they were taking steps, in the moment, to improve the capital conditions of the Bank and the Holding Company at a time when the Bank's deficient capital levels were unsafe and unsound." *See id.* at 130.[41]

Enforcement Counsel objects to the ALJ's conclusion regarding Respondents' culpability for the Capital Raise Strategy. **Enforcement Counsel's Exception 1** asserts the following.

---

[41] The ALJ considered whether Respondents demonstrated continuing disregard by evaluating their conduct over the "two periods" before and after the Holding Company's second capital injection. *See* RD at 129-30. The Comptroller does not deem such a bifurcation material to the analysis here.

The ALJ committed legal error when she concluded that Enforcement Counsel did not meet its burden of showing that Respondents acted with necessary culpability to warrant a prohibition—namely, that Respondents' lending-related misconduct pursuant to the Capital Raise Loans scheme did not demonstrate their continuing disregard for the safety or soundness of [the Bank].

*See* EC's Exceptions at 2-3. Enforcement Counsel argues, *inter alia*, the following. In connection with the Capital Raise Strategy, Respondents voluntarily engaged in repeated lending-related misconduct by approving dozens of Capital Raise Loans despite being aware that the purposes of such loans, as stated in loan packages presented to the L&D Committee, were misleading. Respondents' misconduct demonstrated heedless indifference in that it risked the Bank's existing capital by means of extending liberal and concessionary loans. Such loans were issued at a time when the Bank urgently needed to increase its capital ratios and had represented to the OCC that virtually no lending was occurring. Respondents further demonstrated their heedless indifference by implementing a strategy that did not generate new capital and by failing to disclose the Capital Raise Strategy to the OCC or to correct misleading Bank records regarding Capital Raise Loans. *See* EC's Exceptions Br. at 27-41.

The Comptroller finds merit in Enforcement Counsel's arguments and concludes that the Recommended Decision is internally inconsistent when it comes to Respondents' culpability in connection with the Capital Raise Strategy. The ALJ's own findings and analysis—including that Respondents engaged in "demonstrably *deceptive*" practices, *see* RD at 115 (emphasis in original); "admitted habitual inattention," *see id.* at 123; and that the Capital Raise Strategy "raised sham capital using the Bank's existing funds," *see id.* at 108—conflict with and undermine her conclusions elsewhere that Respondents acted in "good faith" or took steps "to improve the capital conditions of the Bank," *see id.* at 120, 130. Enforcement Counsel need not show that Respondents *intended* to harm the Bank, *see Conover*, 2016 WL 10822038, at *26, as portions of the ALJ's

analysis seem to suggest. Respondents' conduct was plainly deliberate and they knew or should have known—as demonstrated by their contacts with the OCC regarding capital-raise efforts and the Bank's own policies—that such conduct presented grave risks to the Bank. *See supra* Part IX.C.6-7.

To highlight what is perhaps the plainest demonstration of Respondents' culpability, ample record evidence, including Respondents' own testimony, shows that despite being in virtually continuous contact with the OCC and under an obligation to be fully transparent about the Bank's capital-raise efforts, Respondents participated in concerted efforts to conceal or misrepresent the Capital Raise Strategy to the OCC and in Bank records. *See supra* Part IX.C.1, 4, 7; *cf. Ellsworth*, 2016 WL 11597958, at *17 (holding that respondents demonstrated continuing disregard by, *inter alia*, "withholding material information from . . . the OCC [and] . . . directing false Bank documents to be created . . ."); *Conover*, 2016 WL 10822038, at *26 ("Respondent's lack of candor with the Bank . . . reflects . . . continuing disregard."); *In the Matter of Shaffer*, 2009 WL 1677055, at *6 (FDIC Apr. 23, 2009) ("misrepresenting or failing to disclose facts to the Bank" constitutes willful and continuing disregard); *In the Matter of De La Fuente II*, 2004 WL 614659, at *5 (FDIC Feb. 27, 2004) ("deliberate steps—including knowingly misrepresenting facts to the Bank's board and to FDIC examiners . . ." indicated willful and continuing disregard), *aff'd*, 156 F. App'x 44 (9th Cir. 2005). No degree of exigency can justify this dishonesty. Enforcement Counsel's Exception 1 is therefore adopted.

### B. OREO Strategy

In connection with the § 1818(e) prohibition charges arising from the lending-related misconduct associated with the OREO Strategy, the ALJ concluded that Enforcement Counsel had established the misconduct and effect prongs by a preponderance of the evidence but had not so

established the culpability prong. *See* RD at 131-32. With respect to the assessment of § 1818(i) civil money penalties based on lending-related misconduct associated with the OREO Strategy, the ALJ concluded that the statutory predicates supporting penalties had been met because—as she concluded in connection with her § 1818(e) analysis—Respondents breached their fiduciary duties and caused more than minimal loss to the Bank. *See id.* at 152. The ALJ did not find it "necessary to further resolve" whether the charged alternative predicates supporting civil money penalties based on lending-related misconduct associated with the OREO Strategy[42] had been established. *See id.* Enforcement Counsel does not take exception to this aspect of the ALJ's analysis. Finally, the ALJ concluded that all elements required to support assessment of a civil money penalty against Respondent Ortega for accounting-related misconduct associated with the OREO Strategy had been satisfied. *See id*. at 174.

As discussed more fully in the paragraphs below, the Comptroller adopts in part and rejects in part the ALJ's analysis regarding the OREO Strategy. As a result, the Comptroller dismisses the lending-related charges against Respondents arising from the OREO Strategy but assesses a civil money penalty against Respondent Ortega for accounting-related misconduct associated with the OREO Strategy. The Comptroller concludes this subsection by addressing the merits of the parties'

---

[42] Namely, the charged alternative predicates are, for purposes of the misconduct prong, whether Respondents *recklessly* engaged in unsafe or unsound practices and, for purposes of the effect prong, whether Respondents' misconduct constituted a pattern of misconduct.

exceptions to the ALJ's conclusions concerning the OREO Strategy to the extent those exceptions are not deemed moot.

### 1. Misconduct

#### a. Unsafe or Unsound Practices

The ALJ concluded that "Enforcement Counsel makes a more than sufficient showing that Respondents engaged in unsafe or unsound practices with respect to the Bank's OREO lending during the relevant time period." *See* RD at 132. The ALJ reasoned that Respondents abdicated their responsibilities as members of the L&D Committee and as Bank officers and directors by, *inter alia*, failing to adequately review loan packages[43] and "habitually relying solely on the recommendations of loan officers to approve loans with incomplete documentation, inadequate underwriting, and concessionary terms that foreseeably and unduly increased the Bank's risk." *See id*. More specifically, Respondents frequently approved loans greater than $500,000, including the $56 million loan to NAHS, even when the loan packages did not contain detailed financial documents regarding borrowers' ability to repay, as required by the Bank's loan policy, and the terms of the loans were liberal or concessionary in that they, *inter alia*, required little to no down payment or guarantees. *See id*. at 132-36. The Comptroller agrees with the ALJ's analysis and

---

[43] **Enforcement Counsel's Exception 3c** asserts that the ALJ committed legal error when she failed to find that Respondents' failure to adequately review loan packages constituted an unsafe or unsound practice. *See* EC's Exceptions at 2. The Recommended Decision arguably reaches this conclusion. *See, e.g.,* RD at 132-36 (discussing Respondents' failure to adequately review loan documentation in connection with OREO Strategy analysis under heading, "Approval without Credit Review"). In any event, the Comptroller finds ample evidence in support thereof. *See id.* at 14-15, 59, 132-35; Hr'g Tr. 101:1-102:13 (examination of Michael Brickman), 646:1-12, 665:15-666:1 (examination of Respondent Ortega), 1288:13-1289:8, 1314:3-14 (examination of Ramah Chansen). Enforcement Counsel's Exception 3c is thus adopted.

adopts the conclusion that Respondents engaged in unsafe or unsound practices in connection with lending-related misconduct associated with the OREO Strategy.[44]

### b. Breach of Fiduciary Duty

The ALJ concluded that Respondents breached their fiduciary duty of care when they: (1) approved "risky loans to finance the sale of Bank OREO without any credit analysis to assess the borrower's repayment ability"; and (2) approved "numerous [OREO] loans containing terms that did not comply with the standards set forth in the Bank's loan policy, which Respondents and the rest of the Board approved annually as 'principles that are fundamental to sound lending.'" *See* RD at 142 (quoting Joint Ex. 10 (2010 Loan Policy)). Although a close question is presented, the Comptroller concludes that Enforcement Counsel did not satisfy its burden of proof as to this issue.

It may often be the case that the outcomes of analyses of breach of fiduciary duty and unsafe or unsound practices are parallel. However, having concluded at *supra* Part X.B.1.a that Respondents' lending-related misconduct associated with the OREO Strategy constituted unsafe or unsound practices, the instant facts present the unique opportunity to highlight two important points. First, breach of fiduciary duty and unsafe or unsound practices are separate tools that Congress authorized the Federal banking agencies to utilize in prosecuting administrative enforcement actions. Second, there are key differences between the standards underlying these two predicates that can, as here, drive diverging outcomes. As previously discussed, an unsafe or unsound practice is any action or omission "which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or

---

[44] The ALJ did not reach a conclusion as to whether Respondents' accounting-related misconduct associated with the OREO Strategy constituted unsafe or unsound practices. *See* RD at 172-173. Enforcement Counsel did not take exception to this and the Comptroller declines to consider this issue in the first instance.

loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." *See Adams*, 2014 WL 8735096, at *11. By comparison, an IAP breaches their fiduciary duty when they fail to exercise the level of care that an ordinarily prudent and diligent person "would exercise *under similar circumstances*." *See Watkins*, 2019 WL 6700075, at *7 (emphasis added). Thus, unlike the standard for unsafe or unsound practices, the standard of care relevant to assessing breach of fiduciary duty is, on a case-by-case basis (at least to a certain extent[45]), tailored to the IAP's particular situation and that of the institution.

Bearing this in mind, the Comptroller concludes that the ALJ committed legal error by failing to fully consider and give sufficient weight to the specific circumstances faced by Respondents at the time relevant to the OREO Strategy.[46] The ALJ's analysis with respect to the culpability prong did, however, discuss these circumstances in depth and that discussion highlights the lack of comprehensiveness in the Recommended Decision's analysis of breach of fiduciary duty. The Comptroller therefore views the culpability prong and breach of fiduciary duty analyses as internally inconsistent and in need of reconciliation and correction. To that end, as explained below, the Comptroller considers the relevant portions of the ALJ's culpability-prong analysis and applies this reasoning to the standard for breach of fiduciary duty. In doing so, the Comptroller concludes that Enforcement Counsel did not carry its burden.

---

[45] The Comptroller is cognizant that this standard of care applies to individuals whose roles ultimately affect the safety and soundness of the banking system. Accordingly, there are limits on the extent to which this standard can be permitted to account for specific circumstances. It is not necessary to further explore such limitations here.

[46] It is somewhat less clear that the ALJ committed a similar error in connection with the charges associated with the Capital Raise Strategy because it is readily apparent that Respondents' deceptive and misleading conduct in connection with those charges is beyond the pale of ordinarily prudent behavior, even under exigent circumstances. *See supra* Part IX.C.1, 4, 7.

In support of the conclusion that Respondents did not demonstrate the requisite culpability, the ALJ cited, as relevant, the following. It is uncontroverted that the OCC expressed to the Bank the urgent need to sell its OREO and that the OCC initially approved of the Bank's aggressive efforts to do so through self-financing. *See* RD at 147. In light of the "substantial monthly costs of maintaining [OREO] properties, the deterioration of the value of the properties due to market conditions, and the fact that more new ORE was continuing to flood the Bank's books each month," holding existing OREO for a sustained period was not an option. *See id.* at 146-47. In short, "taking measures to constantly sell existing OREO quickly was potentially a matter of life and death for the Bank from the fall of 2008 onward." *See id.* at 147. With respect to the possibility of lowering the asking price of the properties or finding qualified buyers with financing from other banks, "both the record and the weight of the testimony" suggest that, at the time, these would not have been easy or clear-cut choices, and "Respondents and other Bank personnel offered credible, detailed rationales for not pursuing those alternate paths that were not refuted by Enforcement Counsel witnesses." *See id*. The OCC's 2012 Report of Examination also acknowledged the Bank's difficult position, stating "The level of OREO continues to grow. Holding costs and losses on sales are severely impacting earnings. OREO volume must be reduced." *See id.* at 149 (quoting Joint Ex. 6 at 4). And even though Respondents approved loans without first obtaining adequate documentation, *see supra* Part IX.D.1, they "based their lending decisions in part on their personal knowledge of the prospective borrowers," *see* RD at 149-50. Finally, without necessarily sharing the perspective, the ALJ recognized as "broadly reasonable" the view that "*in the specific climate faced by the Bank at the time*[,] reducing the Bank's OREO was important and urgent enough that considerations of future risk of default and foreclosure mattered somewhat less when taking steps to achieve that aim." *See id.* at 151 (emphasis added).

To reiterate, the record reflects that Respondents violated Bank policies in approving concessionary loans in connection with the OREO Strategy; failed to obtain adequate documentation demonstrating borrowers' repayment abilities; and failed to adequately review loan packages. *See supra* Part IX.D.1, 3. These findings are sufficient to establish unsafe or unsound practices and, in many instances, would be sufficient to establish breach of fiduciary duty. However, the Comptroller finds no error in or basis to depart from the ALJ's characterization of the circumstances facing Respondents at the time relevant to the OREO Strategy, and it is against this backdrop that Respondents' acts or omissions must be evaluated. As probative of the issue of whether Respondents exercised ordinary prudence *under the circumstances*, the Comptroller considers the following. The OCC was contemporaneously aware that the loans associated with the OREO Strategy violated the Bank's loan policy and nonetheless initially described the Bank's OREO Strategy as achieving favorable results. *See supra* Part IX.D.2. There was detailed and credible testimony to the effect that the OREO Strategy, considered as a whole,[47] reflected Respondents' considered—if ultimately imprudent—selection among various undesirable options. *See e.g.,* RD at 147.[48] In view of these findings and, importantly, the ALJ's recognition that Respondents' efforts in connection with the OREO Strategy were "broadly reasonable" under the circumstances, the Comptroller concludes that, although a close question is presented, on balance,

---

[47] Except for the NAHS loan, the parties' arguments surrounding the lending-related charges associated with the OREO Strategy generally treat alleged features of the strategy and associated losses in the aggregate. Although the Comptroller is entitled to conduct a *de novo* review, considering the volume and complexity of the record in this matter, the Comptroller declines to examine individual loans underlying the OREO Strategy to determine whether a prohibition would be warranted against either Respondent in connection with individual loans. Instead, mirroring the parties' presentation of arguments and ALJ's analysis, the Comptroller examines the OREO Strategy overall, using the NAHS loan as an exemplar.

[48] By contrast, Respondents' misconduct in connection with the Capital Raise Strategy involved calculated and covert efforts to raise sham capital through the proceeds of uniformly lenient loans. *See supra* Part IX.C.

Enforcement Counsel has not established by a preponderance of the evidence that Respondents' lending-related conduct in connection with the OREO Strategy rose to the level of breach of fiduciary duty.

This analysis does not diminish the gravity of Respondents' OREO Strategy misconduct. As previously stated, the Comptroller has no difficulty concluding that Respondents' acts and omissions in connection with the OREO Strategy constituted unsafe or unsound practices. When evaluated against the body of generally accepted standards of prudent operation, Respondents' conduct clearly does not measure up and presented abnormal risk of loss. Rather, as warranted in this particular matter, the Comptroller's analysis recognizes and gives meaningful effect to different statutory predicates underlying the misconduct prong. To put a finer point on it, because the breach-of-fiduciary-duty inquiry involves measurement against the level of care of an ordinarily prudent and diligent person under similar circumstances, efforts that may be validly characterized as "broadly reasonable" under the circumstances cannot, as a matter of law, constitute a breach of fiduciary duty. Finding no basis to depart from the ALJ's factual findings supporting such a characterization, the Comptroller concludes that Respondents' lending-related misconduct associated with the OREO Strategy does not constitute a breach of fiduciary duty based on the record here and the credibility determinations made at the hearing.[49]

### c. Section 161(a)

The ALJ concluded that Respondents violated § 161(a) in connection with accounting-related misconduct associated with the OREO Strategy. *See* RD at 171-72. The ALJ credited the finding

---

[49] The ALJ did not reach a conclusion as to whether Respondents' accounting-related misconduct associated with the OREO Strategy constituted a breach of fiduciary duty. *See* RD at 172-173. Enforcement Counsel did not take exception to this and the Comptroller declines to consider this issue in the first instance.

of Enforcement Counsel's accounting expert that the Bank had "improperly accounted for its OREO sales . . . by failing to discount loans with below-market interest rates to their present value of future cash flows" and that this materially overstated the Bank's earnings and capital. *See id*. The ALJ reasoned that the MRAs issued by the OCC in 2009 and 2011 and the Bank's own Market Rate Matrix should have alerted Respondents that the Bank was not correctly accounting for loans associated with the OREO Strategy. *See id.* at 172. The Comptroller agrees and adopts the ALJ's conclusion.[50]

### d. Respondents' Exception 17

Respondents object to the ALJ's conclusions regarding misconduct associated with the OREO Strategy. **Respondents' Exception 17** asserts the following: "the ALJ's finding and conclusion that the OREO Loans were an unsafe or unsound practice . . . were accounted for incorrectly, were a breach of fiduciary duty or otherwise met the misconduct prong . . . was not supported by the evidence or applicable law." *See* Resp'ts' Exceptions at 4. In support of this exception, Respondents reiterate various arguments raised below: Respondents were not loan officers and appropriately relied on the expertise of lenders and credit staff; Respondents reasonably believed that OCC examiners knew of and concurred with the Bank's OREO Strategy; and loans associated with the OREO Strategy were not proven to be unsafe or unsound because the evidence did not establish that such loans were offered at "below market" interest rates and because "OREO loans created a benefit to the Bank by generating cash from a money losing asset." *See* Resp'ts' Exceptions at 105-08. Respondents also argue that because Enforcement Counsel did not adduce sufficient evidence showing that loans associated with the OREO Strategy were offered at "below

---

[50] Again, due to Enforcement Counsel's waiver of certain effect-prong predicates, this conclusion ultimately matters only as to Respondent Ortega and only as to the assessment of civil money penalties against him. *See supra* Part III.A.

market" terms, the ALJ erred by concluding that accounting-related misconduct was established. *See* RD at 110-12.

The Comptroller agrees with the ALJ that "[n]one of Respondents' arguments change the conclusion that the Bank's OREO lending practices . . . foreseeably increased the risk to the Bank by offering consistently liberal loan terms to borrowers who had not demonstrated the ability to service the debt." *See id.* at 140. Moreover, "a finding of unsafe or unsound practices . . . does not depend on whether, for example, the interest rates on an OREO loan were lower than some market rate baseline, but on whether the terms of the loan overall posed a reasonably foreseeable undue risk to the institution." *See id.* (internal quotation marks omitted). The Comptroller has already rejected Respondents' argument grounded in their reliance on loan officers and does so again here. *See supra* Part X.A.1.d. With respect to accounting-related misconduct associated with the OREO Strategy, the Comptroller finds ample evidence—including the Bank's own Market Rate Matrix and contemporaneous OCC Reports of Examination—establishing that loans associated with the OREO Strategy were offered on below-market terms. *See* RD at 172; *see also* Joint Ex. 2 at 12; Joint Ex. 4 at 47-48, 81; OCC EX 343 at 5, 8, 20. Accordingly, to the extent Respondents' Exception 17 objects to the ALJ's conclusions regarding unsafe or unsound practices or violations of § 161(a), it is rejected. And to the extent Respondents' Exception 17 objects to the ALJ's conclusions regarding breach of fiduciary duty in connection with OREO Strategy lending-related misconduct, it is deemed moot in light of the Comptroller's independent analysis and conclusion that Enforcement Counsel has not satisfied its burden of establishing breach of fiduciary duty. *See supra* Part X.B.1.b.

### 2.  Culpability

Once actionable misconduct has been established, the Comptroller may proceed to consideration of either the effect prong or the culpability prong, as each course inquires as to features of the underlying misconduct. *See* 12 U.S.C. § 1818(e)(1)(B)-(C). In the interest of administrative economy, the Comptroller now takes up the culpability prong. Again, for purposes of the instant matter, the relevant inquiry asks whether Respondents' lending-related misconduct demonstrated "continuing disregard" for the safety or soundness of the Bank. *See supra* Part III.A (discussing waiver of certain culpability predicates). The ALJ concluded that Enforcement Counsel had not met its burden in this regard. *See* RD at 146. She reasoned that "there is credible testimony and substantial record evidence that, in aggressively financing the sale of OREO to remove it from the Bank's balance sheet, Respondents believed they were acting in the Bank's best interest in the face of an unprecedented crisis." *See id.* She further reasoned that "there is substantial evidence that the OREO lending strategy was undertaken, even if misguidedly in the details, with the Bank's well-being firmly in mind" and that "[o]verall, Enforcement Counsel has not proven that Respondents showed a degree of culpability well beyond mere negligence in their actions relating to the sale of OREO during the relevant period." *See id.* at 152 (internal quotation marks omitted).[51]

Enforcement Counsel objects to this conclusion. **Enforcement Counsel's Exception 2** asserts that "[t]he ALJ committed legal error when she concluded that . . . Respondents' lending-related misconduct pursuant to the [OREO Strategy] did not demonstrate their continuing disregard for the safety or soundness of the Bank." *See* EC's Exceptions at 2. In support of this exception,

---

[51] Additional reasons supporting the ALJ's conclusion regarding the culpability prong are quoted at length at Part X.B.1.b and will not be repeated here.

Enforcement Counsel argues, *inter alia*, the following. It was improper for the ALJ to consider whether Respondents "believed they were acting in the Bank's best interests, or that they did not intend to harm the Bank" and to measure Respondents' culpability "against the backdrop of the difficult and exigent economic circumstances." *See* EC's Exceptions Br. at 55-56 (internal quotation marks omitted). Additionally, Enforcement Counsel contends that the ALJ's conclusion "allow[s] the bar for bankers' conduct to fluctuate with the overall state of the economy" and that "during economic crises, bankers could engage in all manner of unsafe or unsound practices, secure in the knowledge that their conduct would not meet the culpability requirement due to the exigent economic circumstances." *See id.* at 56.

To an extent, the Comptroller agrees with Enforcement Counsel's arguments. Enforcement Counsel is correct that the continuing-disregard inquiry has little to do with what Respondents subjectively believed but more appropriately examines whether Respondents "knew or should have known" that their conduct "exposed the Bank to an abnormal risk of loss" and, if so, whether they "proceeded anyway." *See Conover*, 2016 WL 10822038, at *24. Enforcement Counsel is also correct that neither economic crisis nor exigency may shield IAPs from the panoply of actions available to Federal banking agencies. That said, the existence of crisis or exigency can be probative of what Respondents *knew or should have known* about their lending-related OREO Strategy misconduct when it occurred.

The Comptroller agrees with Enforcement Counsel that there can be no serious doubt that Respondents' lending-related misconduct constituted unsafe or unsound practices and was repeatedly and voluntarily engaged in over a period of time. This, however, is insufficient to meet the *scienter* requirement of continuing disregard. To reiterate, Enforcement Counsel needed to establish that Respondents' conduct rose above the level of ordinary negligence and amounted to

something "akin to recklessness." *See Kim*, 40 F.3d at 1054. For largely the same reasons that led the Comptroller to conclude that Enforcement Counsel did not establish that Respondents' conduct constituted breach of fiduciary duty, the Comptroller now concludes that Enforcement Counsel did not establish that Respondents acted with the requisite *scienter* for continuing disregard. As previously stated, the Comptroller finds significant the following. The ALJ characterized Respondents' approaches, at least in theory, as "broadly reasonable," *see* RD at 151; the OCC was contemporaneously and broadly aware of the OREO Strategy and, at least in its early years, described the strategy in approving terms, *see supra* Part IX.D.2; and there is evidence to the effect that the OREO Strategy reflected Respondents' considered—if ultimately imprudent—selection among various undesirable or infeasible options, *see e.g.,* RD at 147; *see also Haynes*, 2014 WL 4640797, at *13 ("violations must be more than technical or inadvertent to satisfy the culpability standard" (internal quotation marks omitted)). On balance, the Comptroller concludes that Enforcement Counsel did not carry its burden of proving by a preponderance of the evidence that Respondents *knew or should have known* that their misconduct exposed the Bank to an abnormal risk of loss.

As a final note on this issue, while the ALJ in some respects treats the Capital Raise Strategy and OREO Strategy culpability-prong analyses as adjoined, the Comptroller observes material distinctions between the mental states underlying these separate sets of misconduct. Most obviously, Respondents' misconduct in connection with the Capital Raise Strategy is grounded in deliberate falsity—both in the efforts to raise "sham" capital and in the efforts to conceal or misrepresent the strategy in communications with the OCC and in Bank records. *See supra* Part IX.C.3-5, 7-8. Such falsity, which is a strong indicator of continuing disregard for the Bank's safety or soundness, is not present in the record in connection with the OREO Strategy.

For these reasons, Enforcement Counsel's Exception 2 is rejected.

### 3.  Section 1818(i)

With respect to Respondents' lending-related misconduct in connection with the OREO Strategy, the ALJ recommended the assessment of civil money penalties based, in part, on her conclusion that the misconduct prong of § 1818(i) was satisfied because Respondents had breached their fiduciary duties of care; she then concluded that it was "not necessary to further resolve whether Respondents' actions meet the standard for reckless engagement [in] unsafe or unsound practices . . .." *See* RD at 152. The Comptroller disagrees with the ALJ's conclusion regarding the establishment of breach of fiduciary duty in connection with the lending-related misconduct associated with the OREO Strategy, *see supra* Part X.B.1.b, and declines to consider in the first instance whether Respondents recklessly engaged in unsafe or unsound practices. Because the misconduct-prong underlying § 1818(i) lending-related charges against Respondents in connection with the OREO Strategy has not been satisfied, the Comptroller dismisses such charges.

With respect to the accounting-related misconduct underlying the OREO Strategy, the ALJ recommended assessing a civil money penalty against Respondent Ortega based on conclusions that he violated § 161(a) and that such misconduct was part of a pattern that continued into the five-year statute-of-limitations window. *See* RD 174. The Comptroller adopts these conclusions. To the extent that **Respondents' Exception 21** challenges that Respondent Ortega engaged in a pattern of accounting-related misconduct in connection with the OREO Strategy, this exception is rejected. To the extent that **Respondents' Exception 1** challenges the timeliness of the accounting-related OREO Strategy charges, this exception is rejected for the same reasons discussed in connection with the accounting-related Capital Raise Strategy charges. *See supra* Part X.A.2.b.

The Comptroller thus assesses first- and second-tier civil money penalties against Respondent Ortega based on his accounting-related misconduct in connection with the OREO Strategy.

### 4. Respondents' Exception 18

The Comptroller dismisses the § 1818(e) prohibition charges and § 1818(i) civil-money-penalty charges against Respondents based on lending-related misconduct associated with the OREO Strategy because certain necessary elements have not been satisfied. Thus, **Respondents' Exception 18**, which asserts that "the ALJ's finding and conclusion that the Bank suffered a loss (or effect) by reason of the OREO Loans was not supported by the evidence or applicable law," *see* Resp'ts' Exceptions at 5, is deemed moot.

### C. Nonaccrual Loan Accounting Practices

The ALJ recommended that the Comptroller assess first- and second-tier civil money penalties against Respondent Ortega in connection with the accounting treatment of nonaccrual loans based on her conclusions that Respondent Ortega violated § 161(a) and breached his fiduciary duty of care, and that such misconduct was part of a pattern. *See* RD at 152-53, 168-69. For the reasons discussed below, the Comptroller adopts these conclusions and assesses first- and second-tier civil money penalties against Respondent Ortega.

### 1. Misconduct

### a. Section 161(a)

The ALJ concluded that the Bank filed materially inaccurate Call Reports from June 30, 2009 through December 31, 2012. *See* RD at 154. She reasoned that the reports "inappropriate[ly] recogni[zed] interest income on nonaccrual loans on a blanket basis without documentation or justification," and thus "improperly overstat[ed] the Bank's earnings and capital for those periods." *See id.* "It is beyond dispute that the Bank's practice of automatically recognizing interest income

on loans that have been placed on nonaccrual status—without a determination of full collectability supported by a current, well documented credit evaluation—is contrary to the Call Report Instructions and to GAAP." *See id.* at 154-55 (internal quotation marks omitted). All Call Reports filed during the relevant timeframe reflected this practice and are thus "inarguably inaccurate." *See id.* at 155. These inaccuracies were qualitatively material because, *inter alia*, they implicated considerations—including compliance with regulatory requirements, masking changes in earnings, and changing loss into income—found in SEC Accounting Bulletin No. 99, *Materiality* ("SAB 99") and because the applicable Call Report Instructions noted that "[g]uidance on the consideration of all relevant facts when assessing the materiality of misstatements" could be found in SAB 99. *See id.* at 157-59 (quoting OCC Ex. 359 at 380).

Respondent Ortega signed multiple Call Reports in question even though he "did not have a reasonable basis to believe in the accuracy of the Bank's nonaccrual loan accounting" due to "repeated warnings from the OCC and the Bank's internal auditor that treating all nonaccrual loans on a cash basis as a general rule did not comply with the Call Report Instructions." *See* RD at 154; *see also id.* at 161. More specifically, "the nonaccrual loan accounting issue was raised with Bank senior management three times by the Bank's Chief Audit Officer (in June 2009, October 2012, and December 2012) and three times by the OCC (in January 2009, February 2011, and January 2012)." *See id.* at 161.

The Comptroller agrees with the ALJ and adopts the conclusion that Respondent Ortega violated § 161(a) in connection with Nonaccrual Loan Accounting Practices.

### b. Breach of Fiduciary Duty

The ALJ reasoned that Respondent Ortega breached his fiduciary duty of care by failing to address the Bank's improper nonaccrual loan accounting from 2009 through 2012 and instead

permitting the Bank to apply a default method that he knew or should have known would result in improperly recognized interest income and inaccurate Call Reports. *See* RD at 162. She further reasoned that this did not demonstrate "constant concern for the safety and soundness of the bank, and is not what an ordinarily prudent person, acting diligently and carefully, would have done in those circumstances." *See* RD at 162 (internal quotation marks omitted); *see also Conover*, 2016 WL 10822038, at *19; *Watkins*, 2019 WL 6700075, at *7; *Michael v. FDIC*, 687 F.3d 337, 350-51 (7th Cir. 2012). The Comptroller concurs and adopts the ALJ's conclusion.

### c.   Unsafe or Unsound Practices

The ALJ also concluded that Respondent Ortega engaged in unsafe or unsound practices in connection with Nonaccrual Loan Accounting Practices, reasoning as follows.

> The federal banking agencies have held that fiduciary duties define standards of prudent operation[,] and thus an act in violation of such duties is by its nature imprudent and unsafe. To whatever extent those standards are not coextensive here, the undersigned finds it unnecessary to determine whether Respondents' failure to ensure that the Bank corrected its improper nonaccrual loan accounting practices caused a reasonably foreseeable undue risk to the institution, given the clear evidence that Respondents' conduct constituted a violation of 12 U.S.C. § 161(a) and a breach of their fiduciary duty, as detailed above.

*See* RD at 162 (internal quotation marks and citations omitted; alteration in original).

The Comptroller declines to adopt this analysis. The Comptroller did not issue any of the administrative decisions cited for the proposition that misconduct constituting breach of fiduciary duty necessarily constitutes unsafe or unsound practices. Having highlighted the distinctions between the two standards at *supra* Part X.B.1, the Comptroller hesitates to conclude, as a matter of law, that misconduct constituting a breach of fiduciary duty is, *in every instance*, also an unsafe or unsound practice. While this might often hold true in some (if not most) situations, the Comptroller sees no reason to rule out the possibility of a scenario in which, for example, an IAP possesses such special knowledge, skills, or expertise that a higher degree of care than generally

accepted standards of prudent operation would be required under the breach-of-fiduciary-duty standard. Rather, the Comptroller declines to accept the ALJ's recommended conclusion for failure to apply the correct unsafe-or-unsound-practices standard and declines to conduct the requisite analysis in the first instance.

### d. **Respondents' Exception 19**

Respondents object to the ALJ's conclusions that the misconduct prong is established in connection with Nonaccrual Loan Accounting Practices. **Respondents' Exception 19** asserts, as relevant that "the ALJ's finding and conclusion that the nonaccrual loan accounting was an unsafe or unsound practice, the loans were not accounted for correctly, or otherwise met the misconduct prong of the statute, was not supported by the evidence or applicable law." *See* Resp'ts' Exceptions at 5. In support of this exception, Respondents, *inter alia*, reiterate the following arguments, which were first presented to and rejected by the ALJ. First, the Bank took "a sound, conservative approach" of "automatically mov[ing] loans into non-accrual/cash basis accounting after the loan fell behind more than 90 days" and that "it was the responsibility of credit/lending employees," rather than Respondent Ortega, "to further downgrade the loan if necessary." *See* Resp'ts' Exceptions at 114. The Comptroller agrees with the ALJ and Enforcement Counsel that "the question of *whether* a loan should be placed on nonaccrual status in the first place is separate from the question of, once a loan is *on* nonaccrual status, how a bank must account for interest on that loan and what a bank must do to support its accounting choice." *See* RD at 155 (quoting Enforcement Counsel's Post-Hr'g Reply Br. at 18 (emphasis original)). Second, Respondents assert that the loans at issue were "fully secured with solid appraisals" and, thus, the Bank was entitled to use cash-basis accounting. *See* Resp'ts' Exceptions at 116. The Comptroller again agrees with the ALJ that Respondents never offered evidence of appraisals and, in any event, "they

misstate the standard: banks may not accrue interest on loans in nonaccrual status unless the loans are *both* well secured *and* in the process of collection." *See* RD at 155-56 (quotation marks omitted) (emphasis original). Respondents' Exception 19 is rejected.

### 2.   Effect

In connection with recommending the assessment of a second-tier civil money penalty against Respondent Ortega, the ALJ concluded that "Respondent Ortega's failure to address the Bank's improper nonaccrual loan accounting practices from 2009 through 2012, and his signing of multiple Call Reports during that time that he knew or should have known improperly recognized interest income on nonaccrual loans, constitutes a pattern of misconduct." *See* RD at 170. As relevant, **Respondents' Exception 20** and **Respondents' Exception 21** challenge the conclusion that Respondent Ortega engaged in a pattern of misconduct with respect to Nonaccrual Loan Accounting Practices. In support of these exceptions, Respondents present arguments that have already been addressed and dismissed by the Comptroller. To the extent they challenge the existence of a pattern of misconduct, Respondents' Exception 20 and Respondents' Exception 21 are rejected. The Comptroller concurs with the ALJ's reasoning and adopts her conclusion as to this issue.[52]

### D.  Loans to Rogers III Entities

The ALJ recommended that the Comptroller impose an order of prohibition and assess a second-tier civil money penalty against Respondent Rogers based on her conclusions that he breached his fiduciary duty to the Bank, thereby satisfying the misconduct prong; that, by reason

---

[52] To the extent that **Respondents' Exception 19** and **Respondents' Exception 20** challenge the ALJ's conclusions, in connection with Nonaccrual Loan Accounting Practices, that the misconduct prong was established as to Respondent Rogers; that unsafe or unsound practices were established as to Respondent Ortega; or that the culpability prong was established as to Respondents, these exceptions are deemed moot. *See supra* Part III.A, X.C.1.c.

of this misconduct, the receivership recorded financial losses, thereby satisfying the effect prong; and that, for purposes of recommending an order of prohibition, Respondent Rogers acted with the requisite culpability. *See* RD at 174-83. As explained more fully below, the Comptroller agrees with the ALJ that that Respondent Rogers's conduct constituted a breach of fiduciary duty but disagrees with the conclusion that Enforcement Counsel carried its burden of establishing the effect prong. Accordingly, the Comptroller dismisses the charges against Respondent Rogers based on Loans to Rogers III Entities.

### 1. Misconduct

The ALJ correctly stated that Respondent Rogers "owed the Bank a fiduciary duty of loyalty that required him 'to avoid conflicts of interests and to act solely for the [Bank's] benefit.'" *See* RD at 175 (alteration in original) (quoting *Ellsworth*, 2016 WL 11597958, at *15). The duty of candor is a crucial component of the duty of loyalty and requires fiduciaries "to disclose to the bank everything they know about transactions in which they hold a personal financial (or familial) interest, even if not asked." *See* RD at 175 (internal quotation marks omitted); *see also De La Fuente,* 332 F.3d at 1222 (recognizing that the duty of candor requires a corporate fiduciary to disclose "everything he knew relating to the transaction," even "if not asked"); *In the Matter of Sapp*, 2019 WL 5823871, at *14 (FDIC Sept. 17, 2019); *Conover*, 2016 WL 10822038, at *19; *In the Matter of Williams*, 2015 WL 3644010, at **8-9 (FDIC Apr. 21, 2015). "Omissions are sufficient to trigger a violation of this duty," *see In the Matter of Smith and Kiolbasa,* 2021 WL 1590337, at *15 (FRB Mar. 24, 2021), and "[s]imply abstaining from voting on the transaction in question is not enough," *see* RD at 176.

The ALJ reasoned that Respondent Rogers "failed to put the Bank's interests above the interests of his son when he allowed the L&D Committee to approve the Griqualand and Petro

Icon loans without disclosing his son's involvement and the circumstances of the Obra Homes defaults, or at least making sure that Committee members were suitably apprised." *See* RD at 176. Respondents' arguments to the contrary are unavailing. **Respondents' Exception 22** asserts that "The finding and conclusion that the loans to companies controlled by David Rogers III were a breach of fiduciary duty was not supported by the evidence and the ALJ misapplied the law." *See* Resp'ts' Exceptions at 5. Respondents argue that because Respondent Rogers abstained from voting on the loans at issue and Rogers III went "through normal channels to do business with the Bank," Respondent Rogers did not breach his fiduciary duties. *See* Resp'ts' Exceptions at 121-22. However, as the ALJ correctly reasoned, Respondent Rogers had a duty to disclose all that he knew about the transaction, even if not asked. Respondents' Exception 22 is rejected, and the Comptroller adopts the ALJ's conclusion that Respondent Rogers breached his fiduciary duty to the Bank. *See Conover*, 2016 WL 10822038, at *20 ("Respondent's failure to candidly disclose the nature of the Bank's extensions of credit breached his duty of care."); *Haynes*, 2014 WL 4640797, at *12 ("lack of candor" with loan committee breached duty of care); *In the Matter of Friese*, 2012 WL 7186316, at *1 (FDIC July 20, 2012) (concealment of conduct from bank board breached fiduciary duty); *In the Matter of Landry*, 1999 WL 440608, at *12 (FDIC May 25, 1999) (officers' failure to disclose personal interests in transactions breached fiduciary duties), *aff'd*, 204 F.3d 1125 (D.C. Cir. 2000).

## 2. Effect

The ALJ concluded that the effect prong was satisfied because various losses to the receivership associated with Loans to Rogers III Entities occurred "by reason of" Respondent Rogers's breach of fiduciary duty. *See* RD at 179 (quoting 12 U.S.C. § 1818(e)(1)(B)), 183

(reaching conclusion as to § 1818(i) effect prong).[53] The ALJ's reasoning as to this issue focuses primarily on whether a "financial loss suffered by the FDIC as receiver for a failed institution must constitute loss to that institution for purposes of Section 1818's effect prongs . . .." *See* RD at 180. She concluded that it must, and the Comptroller concurs. The Comptroller will not further address this point, however, because the Comptroller's independent analysis regarding causation leads to the conclusion that Enforcement Counsel did not carry its burden of establishing the effect prong.

To reiterate, as part of her factual findings regarding Loans to Rogers III Entities, the ALJ stated the following.

> Respondents . . . assert that the Bank and L&D Committee knew of Rogers III's involvement, and Enforcement Counsel did not adduce . . . evidence to resolve the question. It is also possible that full knowledge of the circumstances might have made individuals on the L&D Committee *more* likely to approve the loan, if they viewed Rogers III as a reliable borrower and saw the transaction as a way to remove encumbrances from the assets. . . .
>
> In some sense, however, the L&D Committee's actual knowledge of who owned Griqualand is immaterial. . . .

*See* RD at 98-99 (internal quotation marks and citations omitted). Additionally, with respect to the matter of the L&D Committee's knowledge of the information contained in the email from Rogers III's attorney, the ALJ found that "L&D Committee members *might have known this information independently and incorporated it into their determination of whether the Griqualand loan was in the Bank's best interest . . .*" *See* RD at 100 (emphasis added).

Simply put, this suggests that the failed loans would have been approved *even without* Respondent Rogers's misconduct. Of key importance, the ALJ incorrectly concluded that the L&D Committee's actual knowledge of Rogers III's involvement with the entities at issue was

---

[53] The ALJ did not decide whether Respondent Rogers's misconduct constituted a pattern of misconduct for purposes of satisfying the effect prong of § 1818(i), *see* RD at 183, and the Comptroller declines to consider this issue in the first instance.

"immaterial," and found that the L&D Committee might have had independent knowledge of Rogers III's involvement and that, if they did, such knowledge might have made them *more likely* to approve the loans at issue. If the L&D Committee did have independent knowledge of information regarding Rogers III's involvement in the entities at issue, the L&D Committee's approval of loans to those entities would be a superseding cause, sufficient to break the causal connection between Respondent Rogers's failure to disclose such information to the committee and the financial losses sustained by the receivership. *Cf.* Restatement (Second) of Torts § 440 ("A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."). Because the ALJ's findings go as far as to suggest the existence of such a superseding cause, Enforcement Counsel has not established by a preponderance of the evidence that losses arising from Loans to Rogers III Entities occurred "by reason of" Respondent Rogers's failure to disclose material information to the L&D Committee.[54]

### E. The Civil Money Penalty Assessment is Appropriate

In determining the amount of any civil money penalty, the Comptroller must consider the appropriateness of the penalty with respect to the financial resources and good faith of Respondents, the gravity of the violations, the history of previous violations, and "such other matters as justice may require." *See* 12 U.S.C. § 1818(i)(2)(G). Upon consideration of these factors

---

[54] In light of the Comptroller's foregoing, independent analysis, **Respondents' Exception 23**, which objects to the ALJ's conclusion that the effect prong is satisfied as to charges based on Loans to Rogers III Entities, is deemed moot. Because the effect prong has not been satisfied in connection with charges against Respondent Rogers based on Loans to Rogers III Entities, such charges are dismissed. **Respondents' Exception 24**, which objects to the ALJ's conclusion that the culpability prong was satisfied in connection with the prohibition charge arising from this misconduct, is also deemed moot.

and Enforcement Counsel's relevant submissions,[55] the ALJ recommended civil money penalties against each Respondent in the amount of $250,000. Although the Comptroller dismisses certain charges that the ALJ deemed established, the Comptroller nevertheless concludes that civil money penalties in the amount of $250,000 are appropriate as to each Respondent.

The parties jointly stipulated that Respondents possess the resources and ability to pay $250,000 civil money penalties. *See* RD at 185 (citing Joint Stip. ¶ 10). Contrary to the ALJ's conclusion, the Comptroller concludes that Respondents' conduct in connection with the Capital Raise Strategy did not reflect that they were "acting in good faith." *Compare* RD at 185, *with supra* Part X.A.3. The Comptroller credits the ALJ's assessment that "Respondents have been reasonably candid and cooperative in the course of these proceedings," with the exception of certain instances, including Respondent Ortega's testimony with respect to Nonaccrual Loan Accounting Practices and his repeated and misleading framing of various related issues. *See* RD at 185-86. The Comptroller reaches the same conclusion as the ALJ that "on balance, Respondents' good faith is not a significant mitigating factor." *See id*. at 186. The Comptroller also agrees that, even upon finding fewer violations than the ALJ, "there is nothing about the gravity of the proven violations that would warrant mitigation of the civil money penalty amount." *See id*. The Comptroller agrees with the ALJ that because Enforcement Counsel represented that "there is no evidence of a history of previous violations and no evidence that Respondents were previously criticized for similar actions by the OCC," this consideration stands as a potential mitigating factor. *See id.* at 187. Enforcement Counsel also acknowledges that Respondents made significant financial investments in connection with the Bank's efforts to raise capital. *See id*. And, as the ALJ did, the Comptroller

---

[55] Respondents have not directly addressed the statutory mitigating factors or the appropriateness of the civil money penalty amount in their briefing before the ALJ or in their exceptions.

credits testimony "regarding the efforts made by Respondent Ortega, at great personal cost to his own health, to address issued raise by regulators in late 2012 and early 2013." *See* RD at 187. Upon consideration of these factors, the Comptroller concurs with the ALJ's conclusion that a $250,000 civil money penalty is appropriate as to each of the Respondents.

## XI.    REQUEST FOR ORAL ARGUMENT

After considering Respondents' request for oral argument, *see* Resp'ts' Exceptions at 129, and the entire record in this matter, the Comptroller finds that no benefit would be derived from oral argument and Respondents will not be prejudiced by the lack of oral argument. Therefore, pursuant to 12 C.F.R. § 19.40(b), the Comptroller denies Respondents' request for oral argument.

## XII.    REQUEST FOR STAY

Respondents request that, "[i]nsofar as the Comptroller enters a final order adverse to Respondents," that "such order be accompanied by a stay under 12 C.F.R. § 19.41 pending judicial review." *See* Resp'ts' Exceptions at 129. Section 19.41 provides the following:

> The commencement of proceedings for judicial review of a final decision and order of the Comptroller may not, unless specifically ordered by the Comptroller or a reviewing court, operate as a stay of any order issued by the Comptroller. The Comptroller may, in his or her discretion, and on such terms as he or she finds just, stay the effectiveness of all or any part of an order pending a final decision on a petition for review of that order.

*See* 12 C.F.R. § 19.41. The Comptroller deems Respondents' request premature. If Respondents petition for judicial review of the instant decision, the Comptroller will consider a request to stay the proceedings.

## XIII.    CONCLUSION

After a thorough review of the record in this proceeding, and for the reasons set forth herein, the Comptroller concludes that an Order of Removal and Prohibition and Assessment of a Civil Money Penalty is warranted against each Respondent. In addition, and also in light of the record,

the Comptroller concludes that the $250,000 civil money penalties imposed are appropriate as to each Respondent.

IT IS SO ORDERED.

_____
MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
|    President, Chief Executive Officer, and | ) | |
|    Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

**ORDER TO SEAL CERTAIN PARTS OF EXCEPTIONS**

Pages twenty-six through twenty-eight of *Respondents' Exceptions to the Administrative Law Judge's Recommended Decision, Supporting Brief, and Request for Oral Argument* discuss in inappropriate detail the condition of an open institution that is supervised by the Office of the Comptroller of the Currency and summarize testimony from portions of the administrative hearing that were closed to the public. The Comptroller *sua sponte* orders that this section—beginning with the last paragraph appearing on page twenty-six and continuing through the first paragraph appearing on page twenty-eight—be sealed.

IT IS SO ORDERED.

_____
MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Saul Ortega ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, ) | |
|   President, Chief Executive Officer, and ) | |
|   Chairman of the Board ) | |
| ) | |
| David Rogers, Jr. ) | AA-EC-2017-45 |
| Former Chairman of the Board ) | |
| ) | |
| First National Bank ) | |
| Edinburg, Texas ) | |

**ORDER OF PROHIBITION**

Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel for the Office of the Comptroller

of the Currency initiated this action on September 25, 2017, by filing a Notice of Charges for

Orders of Prohibition and Notice of Assessments of a Civil Money Penalty against Respondent

Saul Ortega ("Respondent"), former Chief Financial Officer, Director, President, Chief Executive

Officer, and Chairman of the Board of First National Bank, Edinburg, Texas. A twelve-day hearing

before an administrative law judge was held between January 31, 2022, and February 15, 2022.

Respondent appeared at the hearing, was represented by counsel, and was afforded an opportunity

to be heard.

Having considered the entire record in this matter, including the evidence presented at hearing,

the administrative law judge's recommended decision, and the parties' exceptions thereto,

pursuant to 12 U.S.C. § 1818(e):

1. Respondent shall not participate in any manner in the conduct of the affairs of any insured

depository institution, agency, or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without

the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D); and

2. Respondent shall not solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights in any institution described in 12 U.S.C. § 1818(e)(7)(A) without the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D); and

3. Respondent shall not violate any voting agreement previously approved by the appropriate Federal banking agency, as that term is defined in 12 U.S.C. § 1813(q); and

4. Respondent shall not vote for a director, or serve or act as an institution-affiliated party, as that term is defined in 12 U.S.C. § 1813(u), of any insured depository institution, agency, or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D).

This ORDER will become effective thirty (30) days from the date of its issuance.

The provisions of this ORDER will remain effective and in force except in the event that, and until such time as, any provision of this ORDER shall have been modified, terminated, suspended, or set aside by the Office of the Comptroller of the Currency.

IT IS SO ORDERED.

_____
MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
|    President, Chief Executive Officer, and | ) | |
|    Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

**ORDER ASSESSING CIVIL MONEY PENALTY**

Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel for the Office of the Comptroller of the Currency initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty ("Notice") against Respondent Saul Ortega ("Respondent"), former Chief Financial Officer, Director, President, Chief Executive Officer, and Chairman of the Board of First National Bank, Edinburg, Texas. The Notice sought a civil money penalty of $250,000 pursuant to 12 U.S.C. § 1818(i)(2)(A) and (B). A twelve-day hearing before an administrative law judge was held between January 31, 2022, and February 15, 2022. Respondent appeared at the hearing, was represented by counsel, and was afforded an opportunity to be heard.

Having considered the entire record in this matter, including the evidence presented at hearing, the administrative law judge's recommended decision, and the parties' exceptions thereto, pursuant to 12 U.S.C. § 1818(i)(2)(A) and (B):

IT IS HEREBY ORDERED that Respondent be assessed a civil money penalty in the amount of two-hundred-fifty thousand dollars ($250,000).

Remittance of the civil money penalty shall be payable to the Treasury of the United States and delivered to the Office of the Comptroller of the Currency, Washington, D.C.

The provisions of this ORDER will remain in effect and in force except in the event that, and until such time as, any provision of this Order shall have been modified, terminated, suspended, or set aside by the Office of the Comptroller of the Currency or any other governing authority.

IT IS SO ORDERED.

_____
MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
| President, Chief Executive Officer, and | ) | |
| Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

**ORDER OF PROHIBITION**

Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel for the Office of the Comptroller of the Currency initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty against Respondent David Rogers, Jr. ("Respondent"), former Chairman of the Board of First National Bank, Edinburg, Texas. A twelve-day hearing before an administrative law judge was held between January 31, 2022, and February 15, 2022. Respondent appeared at the hearing, was represented by counsel, and was afforded an opportunity to be heard.

Having considered the entire record in this matter, including the evidence presented at hearing, the administrative law judge's recommended decision, and the parties' exceptions thereto, pursuant to 12 U.S.C. § 1818(e):

1. Respondent shall not participate in any manner in the conduct of the affairs of any insured depository institution, agency, or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without

116

the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D); and

2. Respondent shall not solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights in any institution described in 12 U.S.C. § 1818(e)(7)(A) without the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D); and

3. Respondent shall not violate any voting agreement previously approved by the appropriate Federal banking agency, as that term is defined in 12 U.S.C. § 1813(q); and

4. Respondent shall not vote for a director, or serve or act as an institution-affiliated party, as that term is defined in 12 U.S.C. § 1813(u), of any insured depository institution, agency, or organization enumerated in 12 U.S.C. § 1818(e)(7)(A) without the prior written consent of the appropriate Federal financial institutions regulatory agency, as that term is defined in 12 U.S.C. § 1818(e)(7)(D).

This ORDER will become effective thirty (30) days from the date of its issuance.

The provisions of this ORDER will remain effective and in force except in the event that, and until such time as, any provision of this ORDER shall have been modified, terminated, suspended, or set aside by the Office of the Comptroller of the Currency.

IT IS SO ORDERED.

_____
MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
|    President, Chief Executive Officer, and | ) | |
|    Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

**ORDER ASSESSING CIVIL MONEY PENALTY**

Pursuant to 12 U.S.C. § 1818(e) and (i), Enforcement Counsel for the Office of the Comptroller of the Currency initiated this action on September 25, 2017, by filing a Notice of Charges for Orders of Prohibition and Notice of Assessments of a Civil Money Penalty ("Notice") against Respondent David Rogers, Jr. ("Respondent"), former Chairman of the Board of First National Bank, Edinburg, Texas. The Notice sought a civil money penalty of $250,000 pursuant to 12 U.S.C. § 1818(i)(2)(B). A twelve-day hearing before an administrative law judge was held between January 31, 2022, and February 15, 2022. Respondent appeared at the hearing, was represented by counsel, and was afforded an opportunity to be heard.

Having considered the entire record in this matter, including the evidence presented at hearing, the administrative law judge's recommended decision, and the parties' exceptions thereto, pursuant to 12 U.S.C. § 1818(i)(2)(B):

IT IS HEREBY ORDERED that Respondent be assessed a civil money penalty in the amount of two-hundred-fifty thousand dollars ($250,000).

118

Remittance of the civil money penalty shall be payable to the Treasury of the United States and delivered to the Office of the Comptroller of the Currency, Washington, D.C.

The provisions of this ORDER will remain in effect and in force except in the event that, and until such time as, any provision of this Order shall have been modified, terminated, suspended, or set aside by the Office of the Comptroller of the Currency or any other governing authority.

IT IS SO ORDERED.

_____
MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

# EXHIBIT E

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Saul Ortega | ) | AA-EC-2017-44 |
| Former Chief Financial Officer, Director, | ) | |
| President, Chief Executive Officer, and | ) | |
| Chairman of the Board | ) | |
| | ) | |
| David Rogers, Jr. | ) | AA-EC-2017-45 |
| Former Chairman of the Board | ) | |
| | ) | |
| First National Bank | ) | |
| Edinburg, Texas | ) | |

## <u>RESPONDENTS' DEMAND FOR JURY TRIAL</u>

Respondents Saul Ortega and David Rogers, Jr. ("Respondents") file this pleading with the Comptroller of the Currency ("Comptroller") and the Office of Financial Institution Adjudication ("OFIA"), as follows:

## I.    DEMAND FOR JURY TRIAL

In light of the recent decision in *Jarkesy v. SEC*, 2022 U.S. App. LEXIS 13460, __ F.4th___ (5th Cir. May 18, 2022), Respondents are entitled to have this case submitted to a jury under the Seventh Amendment of the United States Constitution. The OCC's effort to engage in an in-house adjudication of this matter violates Respondents' constitutional rights. *Id*. at *6-24.[1] Respondents, therefore, demand a jury.

---

[1] This proceeding seeks recovery of civil penalties, a type of claim that *Jarkesy* squarely holds is entitled to a jury. *Id*. at *12. Further, the Seventh Amendment applies to "mixed" proceedings – thus, all facts relevant to the civil penalty claims should be decided by a jury "even if those facts relate to equitable claims too." *Id*. at *14. Moreover, each claim in this case involves a claim for breach of fiduciary duty for which there can be no dispute is a type of claim that originally arose at common law. And as *Jarkesy* notes, Congress cannot eliminate a party's Seventh Amendment rights by merely relabeling a cause of action as a statutory one and placing exclusive jurisdiction in an administrative agency. *Id*. at *20-21.

**RESPONDENTS' DEMAND FOR JURY TRIAL – Page 1**

Accordingly, the Administrative Law Judge ("ALJ") should enter an order submitting the evidence in this case to a properly empaneled jury for factual findings, and OFIA should summon a jury of Respondents' peers to hear this case. Relatedly, Respondents request that the ALJ enter a scheduling order so that the parties may submit proposed questions for the voir dire of the prospective jury members, proposed questions and instructions to be submitted to the jury for determination, and proposed further procedures.

## II.    ALTERNATIVE MOTION TO DISMISS

Respondents believe that this case may, consistent with the statutory framework, be submitted to a jury for factual determinations, and those factual determinations may then be used by the ALJ to prepare its report. However, in the alternative, should the ALJ decide for any reason not to empanel a jury, Respondents are entitled to dismissal of this case because it violates their Seventh Amendment rights under the ruling in *Jarkesy*. *Id*. at *7 ("civil juries in particular have long served as a critical check on government power."). Therefore, Respondents request that this case be dismissed.

## III.    RESPONDENTS ADDITIONAL PLEADING

Respondents incorporate this pleading into their pleading, their proposed findings of fact and conclusions of law.

## IV.    CONCLUSION

For the foregoing reasons, Respondents demand a jury.

Dated:  June 13, 2022

Respectfully submitted,


By:  /s/ *Frank Brame*
Bill Sims
4234 Shorecrest Drive
Dallas, TX 75209
Phone: 214.458.6970
bsims1119@gmail.com

Frank C. Brame
Texas Bar No. 24031874
The Brame Law Firm PLLC
4514 Cole Ave., Suite 600
Dallas, Texas 75205
Telephone: (214) 665-9464
Fax: (214) 665-9590
frank@bramelawfirm.com

**COUNSEL FOR RESPONDENTS**



## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that I have conferred with Enforcement Counsel regarding Respondents' Demand for Jury Trial and Enforcement Counsel is opposed to the relief sought herein.

By:  /s/ *Frank Brame*
Frank C. Brame

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the attached Respondents' Demand for Jury Trial has been served upon the following by electronic mail on this 13th day of June 2022:

Office of Financial Institutions Adjudication
3501 North Fairfax Drive, Suite D8115A
Arlington, VA 22226-3500
ofia@fdic.gov

Hearing Clerk
Office of the Controller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219
hearingclerk@occ.treas.gov

Lawrence J. Keen, III
Christopher D'Alessio
Nathan Taran
Michael Laurino
Susan Bowman
Erin Healy Gallagher
Office of the Controller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219
Larry.keen@occ.treas.gov
Christopher.dalessio@occ.treas.gov
Nathan.taran@occ.treas.gov
Michael.Laurino@occ.treas.gov
Susan.Bowman@occ.treas.gov
Erin.HealyGallagher@occ.treas.gov

By:   /s/ *Frank Brame*
      Frank C. Brame

**COUNSEL FOR RESPONDENTS**