# No. 23-60617

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

SAUL ORTEGA AND DAVID ROGERS, JR.

*Petitioners*,

v.

OFFICE OF THE COMPTROLLER OF THE
CURRENCY

*Respondent.*

On Petition for Review of Final Decision of the Comptroller of the Currency
Entered on December 1, 2023 by the Office of the
Comptroller of the Currency
Case Nos. AA-EC-2017-44 and AA-EC-2017-45

**PETITIONERS' BRIEF**

Bill Sims
4234 Shorecrest Drive
Dallas, Texas 75209
Telephone: (214) 458-6970

Frank C. Brame
The Brame Law Firm PLLC
4514 Cole Ave., Suite 600
Dallas, Texas 75205
(214) 665-9464

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 213-5004

**COUNSEL FOR PETITIONERS**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>Petitioners and affiliated entities:</u>

Saul Ortega
David Rogers, Jr.
Texas National Bank, owned by a non-public holding company TNB Bancshares Inc., which has no parent company
First National Bank Edinburg, owned by non-public holding company First National Bank Group, Inc., which has no parent company
No public company owns 10% or more of either Texas National Bank, TNB Bancshares Inc., First National Bank Edinburg, or First National Bank Group, Inc.

<u>Counsel</u>:

Thomas S. Leatherbury
William D. Sims
Frank Brame

<u>Respondent</u>:
The Office of the Comptroller of the Currency
The Comptroller of the Currency, Michael Hsu

<u>Counsel</u>:
Hannah Hicks
Peter Koch
Lawrence J. Keen, III
Christopher D'Alessio
Nathan Taran
Michael Laurino
Susan Bowman

Erin Healy Gallagher
Grant Swanson
Frank Salamone
Office of the Comptroller of the Currency

<u>Administrative Law Judges</u>
Jennifer Whang
Christopher McNeil
Office of Financial Institution Adjudication

Dated:   November 5, 2024

Respectfully submitted,

*/s/Frank C. Brame*
*Counsel for Petitioners*

**STATEMENT REGARDING ORAL ARGUMENT**

Petitioners believe that oral argument would aid the Court in its decision-making process, especially due to the complexity of the constitutional and statutory issues and the extensive record in this agency proceeding.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ............................................ 2

STATEMENT REGARDING ORAL ARGUMENT ................................... 4

TABLE OF CONTENTS.................................................................. 5

TABLE OF AUTHORITIES .......................................................... 7

GLOSSARY.................................................................................. 10

RECORD REFERENCES ............................................................. 11

INTRODUCTION ........................................................................ 12

JURISDICTIONAL STATEMENT ............................................... 14

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................... 15

STATEMENT OF THE CASE..................................................... 15

SUMMARY OF ARGUMENT .................................................... 26

STANDARD OF REVIEW ........................................................ 27

ARGUMENT ............................................................................. 28

I.     The Comptroller's Decision Should Be Vacated Because Petitioners Were Deprived of Their Right to Trial by Jury............ 28

    A.    Under *Jarkesy*, the Seventh Amendment Entitles Petitioners to a Jury................................................................... 28

    B.    The Seventh Amendment Guarantees a Jury. ........................... 28

    C.    This Case Implicates the Seventh Amendment........................ 30

    D.    This Case Does Not Fall Under A "Public Rights" Exception. 31

    E.    The Comptroller's Arguments Are Flawed.............................. 35

    F.    A Juryless Adjudication at the OCC Violates Other Provisions of the Constitution. .................................................... 36

II.    The Comptroller's Claims Are Barred By The Statute of Limitations. ................................................................. 37

    A.    The Comptroller's Ban on Banking Was Time-Barred (12 U.S.C. § 1818(e))........................................................... 40

    B.    For the Same Reasons, the Civil Money Penalty Claim for the Capital Raise Loans Was Also Time-Barred. ........................... 45

    C.    The Civil Money Penalty Against Ortega For Accounting Conduct Was Also Time-Barred. ............................................ 46

1.   Capital Raise Loan Accounting ............................................ 46

2.   OREO Loan Accounting. ...................................................... 48

3.   Nonaccrual Loan Accounting. ............................................. 49

III.   This Proceeding Was Conducted in Violation of the
         Appointments Clause. .................................................... 50

A.   ALJ McNeil Was Not Constitutionally Appointed. ................. 50

B.   Ortega and Rogers Were Prejudiced by the Unconstitutional
         ALJ's Participation. .................................................... 51

C.   Petitioners Were Also Denied the Opportunity to Challenge
         ALJ Whang's Appointment. ........................................ 56

IV.   Manifest Trial Errors Require Reversal. ........................................ 56

A.   Exclusion of Fannie Mae & Freddie Mac Issues at Trial. ......... 57

B.   Prohibition of Offers of Proof. ................................................ 58

C.   The ALJ Admitted "Sworn Statements" (i.e. Depositions) of
         Witnesses Who Were Never Cross-Examined. ........................ 59

V.   The Decision to Ban Petitioners For the Capital Raise Loans
         Was Contrary to Law. ................................................... 60

VI.   The Comptroller Should Have Applied a "Clear and
         Convincing" Standard of Proof for the Prohibition Claims. .......... 64

CONCLUSION ........................................................................... 66

CERTIFICATE OF SERVICE ...................................................... 68

CERTIFICATIONS OF ECF FILING STANDARDS ............................ 69

CERTIFICATE OF COMPLIANCE ............................................... 70

ADDENDUM ............................................................................ 71

28 U.S.C. § 2462 ...................................................... 72

12 U.S.C. § 1818(e) .................................................. 71

12 U.S.C. § 1818(i) .................................................. 79

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Woods*, 6 U.S. 336 (1805) ......................................................................38

*Addington v. Texas*, 441 U.S. 418 (1979) ............................................................65

*Akin v. Office of Thrift Supervision Dep't of Treasury*, 950 F.2d 1180 (5th Cir. 1992) ......................................................................................................................30

*AKM, LLC v. Sec'y of Labor*, 675 F.3d. 752 (D.C. Cir. 2012) ..............................47

*Bowsher v. Synar*, 478 U.S. 714 (1986) ................................................................35

*Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017) ..................................................50

*Calcutt v. FDIC*, 37 F.4th 293 (6th Cir. 2022) ....................................................35

*Cano v. Everest Minerals Corp.*, 2004 U.S. Dist. LEXIS 3963 (W.D. Tex. 2004) 45

*Carr v. Saul*, 141 S. Ct. 1352 (2021) ....................................................................35

*Corner Post, Inc. v. Bd. of Governors Fed. Res. Sys.*, 144 S. Ct. 2440 (2024) 38, 40

*De La Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2002) ........................ 31, 37, 40-43

*Delek Ref., Ltd. v. OSHRC*, 845 F.3d 170 (5th Cir. 2016)....................................47

*Doolittle v. NCUA*, 992 F.2d 1531 (11th Cir. 1993)....................................... 33, 61

*Edmond v. U.S.*, 520 U.S. 651 (1997)....................................................................55

*Emplr. Solutions Staffing Grp. II, LLC v. Office of the Chief Admin. Hearing Officer*, 833 F.3d 480 (5th Cir. 2016)....................................................................27

*Freytag v. Commissioner*, 501 U.S. 868 (1991) ..................................................55

*Full Spectrum Software, Inc. v. Forte Automation Sys.*, 858 F.3d 666 (1st Cir. 2017) ......................................................................................................................33

*Gabelli v. SEC*, 568 U.S. 442 (2013)..............................................37-39, 42-45, 50

*Granfinanciera S.A. v. Nordberg*, 492 U.S. 33 (1989)........................................28

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *aff'd*, 144 S. Ct. 2117 (2024)... 27, 36

*Kim v. Office of Thrift Supervision*, 40 F.3d 1050 (9th Cir. 1994).................. 61, 62

*Ledisco Fin. Svcs. v. Viracola*, 533 S.W.2d 951 (Tex. Civ. App.—Texarkana 1976, no writ)..................................................................................................................59

*Lewis v. FDIC*, 2001 U.S. App. LEXIS 32333 (5th Cir. 2001) ..............................61

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ....................................28

*Lucia v. SEC*, 585 U.S. 237 (2018).................................................. 24, 50, 51, 53, 56

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272 (1856).......32

*New York v. Niagara Mohawk Power Corp.*, 263 F.Supp. 650 (N.D.N.Y. 2003) ..50

*Parsons v. Bedford*, 3 Pet. 433 (1830) ....................................................................29

*Proffitt v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000) ........................................ 41, 43, 44

*Proffitt v. FDIC*, 208 F.3d 1066 (D.C. Cir. 2000) ....................................................43

*St. Eng'g Marine, Ltd. v. Thompson, Maccoll & Bass, LLC, P.A.*, 88 F.4th 27 (1st Cir. 2023)............................................................................................................... 34

*SEC v. Jones*, 2006 U.S. Dist. LEXIS 22800 (S.D.N.Y. 2006)..............................49

*SEC v. Jarkesy*, 144 S. Ct. 2117 (2024)................................................. 13, 26, 28-36

*Steadman v. SEC*, 450 U.S. 91 (1980) .....................................................................65

*Total Gas & Power N. Am., Inc.*, 2024 FERC LEXIS 1222 (FERC, Sept. 19, 2024) ...............................................................................................................................33

*U.S. v. Core Laboratories, Inc.*, 759 F.2d 480 (5th Cir. 1985) ..............................42

*Vasquez v. Hillery*, 474 U.S. 254 (1986) ................................................................55

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) .................................................55

*Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016) ................................................55

**Statutes and Regulations**

U.S. Const. art. II, §2, cl. 2 ............................................................. 13, 50-51, 55, 56

U.S. Const. art. III  ................................................................................................. 36

U.S. Const. amend. V.......................................................................................... 36, 65

U.S. Const. amend. VII.................................................................................. 13, 28-36

5 U.S.C.

§§ 551-559 ...........................................................................................................10

§ 566 .................................................................................................................... 65

§ 706 ............................................................................................. 10, 28, 56

§ 1104(a)(2) .........................................................................................................51

§ 3317(a) ..............................................................................................................51

§ 3318(a) ............................................................................................51

12 U.S.C.

§ 24 ....................................................................................................17

§ 1718(d) ...........................................................................................17

§ 1818(b) ...........................................................................................30

§ 1818(e) ..............................................................33, 39-43, 57, 61, 64

§ 1818(h) .................................................................................. 14, 27

§ 1818(i) ................................................... 30-31, 33, 39-40, 45-46

§ 1828(v) .................................................................................. 18, 62

28 U.S.C. § 2462 ...............................................37-39, 42-45, 48, 50

5 C.F.R.

332.401-332.402 ...............................................................................51

930.201 ..............................................................................................51

12 C.F.R.

19.101 ................................................................................................51

19.7(b)(2) ..........................................................................................52

19.36(d)(2) .........................................................................................58

## Other Authorities

H.R. Rep. 101-54(I), Title IX (1989) ...................................................33

The Declaration of Independence (1776) ...........................................28

The Federalist No. 76 ..........................................................................51

The Federalist No. 78 ..........................................................................36

# **GLOSSARY**

**ALJ** – Administrative Law Judge

**APA** – Administrative Procedure Act, 5 U.S.C. §§ 551-559, 706

**The Bank** – First National Bank of Edinburg, Texas

**Fannie Mae** – Federal National Mortgage Association

**Freddie Mac** – Federal Home Loan Mortgage Corporation

**Final Decision** – Final Decision of the Comptroller of the Currency, December 1, 2023

**Holding Company** – First National Bank Group, Inc.

**OCC, Comptroller or Respondent** – Office of the Comptroller of the Currency

**OIG Report** – Audit Report of Office of Inspector General ("OIG"), Department of the Treasury, *Material Loss Review of First National Bank*, April 17, 2014.

**Petitioners –** Saul Ortega and David Rogers, Jr.

## **RECORD REFERENCES**

On January 16, 2024, the OCC filed a Certified List ("CL") of the administrative record under Federal Rule of Appellate Procedure 17(b)(1)(B). Citations to the record in this brief refer to the docket entry on the CL along with the page number of the document (i.e. CL1 at 1).  Citations to Trial Exhibits found on the CL contain a letter "R" or "O" for the party offering the exhibit (i.e. CLR.Exh1 for Ortega and Rogers's Exhibit 1 and CLO.Exh1 for OCC's Exhibit 1).

## **INTRODUCTION**

In 2017, the Comptroller sought to ban two non-lenders from the banking industry because of a bank's lending practices during the financial crisis in 2008-2011. The ALJ who heard the testimony live, and as fact-finder weighed the culpability of Saul Ortega and David Rogers, ruled that neither one should be banned from banking as a result of the Capital Raise Loans. Now, the Comptroller has decided to ban them anyway, overruling the ALJ, ignoring the five-year statute of limitations, denying them a trial by jury, and committing other manifest errors. On December 1, 2023, the Comptroller issued a Final Decision prohibiting them from working in banking and assessing a civil money penalty of $250,000 each. Ortega and Rogers filed this Petition for Review.

Ortega and Rogers spent their entire careers as safe and sound bankers with reputations for compliance, safety, and conservatism in bank management. Then, the economy underwent the worst catastrophe since the Great Depression. Community banks bore the brunt of the downturn because they were invested in Fannie Mae and Freddie Mac (at the encouragement of regulators) and they were unable to secure the bailouts obtained by others. The Treasury Department, of which the Comptroller is part, failed to support Fannie and Freddie during the disaster, causing a $174 million loss to the Bank and, ultimately, its failure. Petitioners did everything in their power to try and rescue the Bank, including investing their own

money and, in Ortega's case, working himself to the point of a heart-attack. For the next ten years, the OCC investigated and then proceeded against them. Meanwhile, Rogers was retired from banking, and Ortega accumulated a lengthy record of exceptional banking at Texas National Bank.

This in-house agency adjudication violates Petitioners' Seventh Amendment right to a jury trial. *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024). For this reason alone, the Comptroller's decision must be set aside.

This case is also barred by the statute of limitations. A five-year statute applies, and the claims here attack loans made more than five years before this case was commenced. In fact, Rogers retired from the Bank in 2011, more than five years before this case was filed on September 25, 2017. To overcome this, the Comptroller resorts to ungrounded, self-serving accrual theories in which the agency decides when the statute begins to run.

This case was also tainted by violations of the Appointments Clause. The first ALJ appointed to this case, who was not appointed consistent with the Constitution, made rulings striking Petitioners' pleadings on Fannie Mae and Freddie Mac, preventing them from showing regulators' responsibility for the Bank's failure. These unconstitutional rulings limited discovery and limited Petitioners' ability to receive a fair trial.

Other points of error require vacatur.  Not least is the Comptroller's reversal of the ALJ's ruling that Petitioners lacked the requisite culpability necessary to ban them for the Capital Raise Loans.  The Comptroller's decision was not in accordance with the law which requires the highest levels of scienter to impose such draconian measures.  It is undisputed that Ortega and Rogers were not on the lending side of the Bank and merely sat on the large committee that approved loans recommended by the lending experts.

This was a case where the Comptroller was both prosecutor and judge, misapplying the law to shift the blame for a community bank failure from Treasury onto Petitioners.  The Comptroller's orders of prohibition and civil money penalties should be set aside.

## **JURISDICTIONAL STATEMENT**

This Court has jurisdiction over this proceeding under 12 U.S.C. § 1818(h).  The Comptroller issued its Final Decision – a final decision within the meaning of 12 U.S.C. § 1818(h) – on December 1, 2023, and Petitioners timely filed this proceeding on the same day.  This Court has jurisdiction over this case because the depository institution was located in Edinburg, Texas, within the Fifth Circuit Court of Appeals.  12 U.S.C. § 1818(h)(2).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issues presented in this petition for review are:

1. Whether this agency proceeding was conducted in violation of the Seventh Amendment of the United States Constitution.

2. Whether the Comptroller's claims were barred by the five-year statute of limitations.

3. Whether this agency proceeding should be vacated because the ALJ who presided over it was unconstitutionally appointed.

4. Whether the agency's pretrial and trial evidentiary and procedural rulings violated the APA.

5. Whether the Comptroller's decision to impose a prohibition for the Capital Raise Loans was not in accordance with law, was unsupported by substantial evidence, or otherwise violated the APA.

6. Whether a higher burden of proof should be required to carry out the draconian penalty of a prohibition from banking.

## STATEMENT OF THE CASE

Prior to the Financial Crisis, the Bank's management decided to become more conservative in light of the exuberant market at that time.[1]  They reduced lending

---

[1] *See* Trial Transcript ("Tr.") 454:25-456:14 (CL135); 815:16-818:12 (CL139); 2260:9-2261:15 (CL153).

and made a substantial investment in Fannie Mae and Freddie Mac (Government Sponsored Enterprises or "GSEs"), which were known to be safe, conservative, and implicitly backed by the U.S. government.[2]   Regulators explained that, unlike most securities, there was no legal limit on the amount the Bank could acquire.[3]   The regulators made a presentation on the securities and suggested that bankers take a good look at them because they were a good deal for banks.[4]

In the fall of 2008, the Bank incurred a $174 million loss on the preferred stock of GSEs, following the U.S. government's failure to support Fannie and Freddie during the crisis.[5]   The Bank not only suffered a $174 million capital loss, but also lost $3.5 to $4 million in pretax income per month.[6]   Over the next few years, the Bank's capital would be reduced by another $150 million as a result.[7]   The hit to capital caused its ultimate failure.[8]   In the words of Comptroller witness Mark Magee, the Bank had the rug pulled out from under it by the United States government.[9]

Scores of community banks were damaged. Although GSEs were supposedly government sponsored, the Treasury Secretary at the time placed them in

---

[2] *Id.*

[3] *Id.*

[4] Tr. 2221:19-2222:3 (CL151).

[5] *Id.*; Tr. 456:15-20 (CL135).

[6] Tr. 456:21-457:7 (CL135).

[7] *Id.*

[8] *Id.*; Tr. 456:12-14 (CL135).

[9] Tr. 2179:12-19, 2180:12-2181:1 (CL151).

conservatorship and caused their stock to go to zero.[10] This came after community banks across the country were encouraged to invest in GSEs by government actors.[11] The collapse caused capital shocks to community banks from which they could not recover.[12]

Despite the widespread consensus that this was an exogenous shock to the banking system, the OCC blamed the Bank for having invested in Fannie Mae and Freddie Mac,[13] while simultaneously minimizing the role of the Capital Raise Loans the OCC now attacks in this case.[14] The evidence showed that the OCC exhibited significant influence on the drafting of the so-called "independent" OIG Report on the Bank's failure and pushed the OIG not to focus on the Capital Raise Loans.[15] After the OIG Report was safely concluded, the OCC then blamed Petitioners for the lending issues in this case that it had previously told the OIG were immaterial.[16]

<u>Capital Raise Loans</u>

In early 2009, the Bank was forced to raise capital. It was ordered by the OCC to increase its capital during a time when the capital markets were frozen.[17] Legal

---

[10] CLR.Exh8 at 5.
[11] CLR.Exh4 at 9-11; CLR.Exh5; 12 U.S.C. § 24; 12 U.S.C. § 1718(d).
[12] *Id*. at CLR.Exh4 at 6.
[13] *Compare* CLR.Exh3 at 2 *with* CLR.Exh4 at 9-11.
[14] CLR.Exh37 at 12 (Capital Raise Loans did not have "significant impact"); CLR.Exh41 at 1 (calling the Capital Raise Loans immaterial).
[15] CLR.Exh41 at 1; Tr. 177:17-178:17 (CL133).
[16] CLR.Exh37 at 12; CLR.Exh41 at 1.
[17] CLR.Exh3; Tr. 893:17-894:6; 895:1-16 (CL141).

work for this capital raise was handled by well-regarded partners at Hunton & Williams.[18]  Multiple third-party financial advisors were also involved.[19]

With traditional capital-raising modes unavailable, the Holding Company of the Bank turned to its existing investors and customers.  It raised $5 million from David Rogers, Jr. and $1 million from Saul Ortega, among others.[20]  Ultimately, the Holding Company raised over $52 million in cash.

The Comptroller takes issue with the fact that the Holding Company raised one-third ($17 million) of this money from bank customers who borrowed money from the Bank.  These are referred to as the Capital Raise Loans.

A portion of the Capital Raise Loans were reviewed by the Bank's Loan and Discount ("L&D") Committee, and Petitioners were often present and voted to approve them, although they never cast the deciding vote.  However, Petitioners were not members of the loan department, they were not loan experts, and they were not attorneys or CPAs.  In fact, Petitioners rightly believed that such loans were legal as long as they were not made on the security of Holding Company stock.[21]  *See* 12 U.S.C. § 1828(v).  And there is no dispute that these loans were not secured by stock

---

[18] Tr. 894:7-15; 895:17-896:3 (CL141).
[19] *Id*.; 897:6-19 (CL141).
[20] CLO.Exh374A.
[21] Tr. 904:1-905:16 (CL141).

and were legal.[22]   The Bank retained accountants to ensure that requirements were being followed with respect to bank transactions.[23]

The loans were originated by Chief Loan Officer Michael McCarthy and those who ran and operated the loan department of the Bank.   McCarthy approved some of the loans without going to the L&D Committee and without notice to Ortega and Rogers.   Ortega and Rogers relied on the expertise of the loan department.[24]   Their confidence in the skill and integrity of the lenders recommending these loans was very high.[25]

It was undisputed that neither Ortega nor Rogers made a single penny off any of these transactions.   It was also undisputed that all the Capital Raise Loans were made more than five years before this case was brought.[26]

<u>Saul Ortega</u>

Ortega grew up working on his father's farm in the Rio Grande Valley.[27]   He joined the Bank in 1987 and, by 2000, became CFO.   From 2008-2011, Ortega was responsible for back-office operations including branch operations (63 branches)

---

[22] *Id*.; Tr. 1599:5-8 (CL147); CLR.Exh43 at 3 ("From the legal side, the notes were not secured with the bank stock, so as far as I'm aware we do not have violation of law/regulation on the loans.")

[23] Tr. 897:6-19; 915:8-14 (CL141).

[24] Tr. 927:20-929:11 (CL141).

[25] *Id*.

[26] *See infra*., Argument II.

[27] Tr. 804:25-805:11 (CL139).

and deposits, handling over $1.6 billion in deposits.[28]  At no time was he a loan officer or ever in the lending department.[29]

In November 2011, Ortega became the CEO of the Bank after David Rogers departed.[30]  This promotion was at the encouragement of OCC examiners.[31]  Ortega remained in that position until the Bank closed in September 2013.  Regulators observed that Ortega brought a culture of compliance to the Bank.  Examiners noted that Ortega "gets it" and was trying to put together a plan to address the issues at the Bank.[32]  Comptroller witness and bank examiner Ramah Chansen indicated in 2011 that Mr. Ortega demonstrated foresight, implemented change when needed, and devised reasonable plans and solutions to address deficiencies at the Bank.[33]  The records of OCC officials show that Ortega received positive reviews and firm backing from regulators.  In 2012, the OCC commented, "Your new management team, under the direction of President Ortega is much improved. … [B]oth the credit and operations culture is improving."[34] "The underlying culture for both loans and

---

[28] Tr. 808:17-809:9; 811:16-815:4 (CL139).
[29] Tr. 808:11-16 (CL139).
[30] Tr. 825:24-826:3 (CL139).
[31] Tr. 830:9-831:5 (CL139).
[32] CLR.Exh33.
[33] Tr. 1563:6-15 (CL145); CLJ.Exh4 at 38.
[34] CLR.Exh30 at 2.

operations is changing for the positive."[35]  And these written reports were consistent with examiners' words and conduct at the time.[36]

During Ortega's period as CEO, Ortega struggled to save the Bank and worked to ensure compliance with OCC directives.[37]  The stress almost cost him his life.[38]  It was readily apparent that Ortega not only acted with the best of good faith, but went above and beyond the call of duty to aid this struggling bank.[39]

Today, Saul Ortega currently leads Texas National Bank ("TNB").[40]  TNB is a Community Development Financial Institution and a Minority Depository Institution.[41]  TNB is a key member of the south Texas community, actively supporting underserved areas in the Rio Grande Valley.  Mr. Ortega has a record of integrity, community involvement, and positive relationships with regulators.[42]

When Ortega joined TNB, it was in less than satisfactory condition.[43]  TNB received the lowest possible composite rating and all of the component ratings were less than satisfactory.[44]  Within 3 years after becoming involved at TNB, TNB's condition improved such that the bank had a satisfactory composite rating, and all

---

[35] CLR.Exh30 at 3.
[36] Tr. 832:9-834:1 (CL139).
[37] Tr. 839:21-843:4 (CL139); 2268:20-2271:17; 2281:6-2286:22 (CL153).
[38] *Id.*
[39] *Id.*
[40] Declaration of Saul Ortega ¶ 2 (CL195).
[41] *Id.* ¶ 4.
[42] *Id.* ¶ 7.
[43] *Id.* ¶ 5.
[44] *Id.*

component ratings were satisfactory.[45]  The condition of TNB has continued to improve since that time.[46] Today, the bank examiners' ratings are extraordinarily good, and its overall condition is fundamentally sound, with excellent financial performance. The sum of Ortega's performance at TNB shows him to be a safe and sound banker and shows that TNB is operated in a safe and sound manner.[47]  If Ortega is removed from banking it will be a tragedy for Ortega, TNB, and the South Texas community.[48]  Such removal would irreparably harm his reputation and destroy his career as a banker.[49]

David Rogers, Jr.

Rogers became Chairman of the Board of the Bank, largely because he was the largest shareholder of the Bank, during the 1980s.  He was Chairman from 1981 until 2011.[50]  Rogers resigned from the Bank on November 1, 2011.[51]

Rogers's background is in the fresh produce business.[52]  Rogers hired an experienced team of bankers and loan officers to run the Bank day-to-day.[53]  He was

---

[45] *Id.* ¶ 6.
[46] *Id.*
[47] *Id.* ¶ 9.
[48] Declaration of Joe Quiroga at 1-2 (CL195).
[49] Declaration of Saul Ortega ¶ 3 (CL195).
[50] Declaration of David Rogers, Jr. ¶ 2 (CL195).
[51] *Id.*
[52] Tr. 442:7-442:19 (CLR135).
[53] Tr. 445:14-447:8 (CLR135).

never a lender or an officer in the lending department.   Rogers relied on highly qualified executives and banking officers with decades of experience.[54]

His good faith, honesty and fair dealing were beyond reproach.   The OCC had a "strong history" with Rogers.[55]   Examiners praised him for always being honest, up front, and aggressively dealing with problems.[56]   Examiners also acknowledged him for being conservative and that he "has always done what we asked him to do."[57]   Another regulator remarked: "He has ALWAYS done what he said he would do."[58]

The Comptroller has now ordered him banned from banking.  If banned, his personal reputation, as well as his reputation as a banker and businessperson, will be permanently and unjustly damaged, especially in the Rio Grande Valley where he works and resides.[59]   Since his departure from the Bank in 2011, he has been retired from banking and there has been no basis for bank regulators to challenge any of his activities of the last thirteen years.[60]

---

[54] *Id.*
[55] CLR.Exh16.
[56] CLR.Exh15.
[57] CLR.Exh16.
[58] CLR.Exh17.
[59] Declaration of David Rogers, Jr., CL195 ¶ 3.
[60] *Id.* ¶ 5.

Following hundreds of exhibits and over two thousand pages of testimony, there was no evidence admitted of any kind from any source that either Petitioner represents a going-forward danger to banks or the banking system.

Procedural History

The OCC commenced this proceeding on September 25, 2017, when it issued a Notice of Charges against Petitioners.[61]  The Notice of Charges alleged four causes of action: (i) Capital Raise Loans, (ii) OREO Loans, (iii) nonaccrual Loans, and (iv) loans to entities controlled by David Rogers III.  Each cause of action sought (i) a civil money penalty and (ii) a prohibition from participation in the banking industry. Petitioners timely answered on October 12, 2017.[62]  The unconstitutionally appointed ALJ struck many of Petitioners' pleadings, including because he believed the Fannie Mae disaster and the Financial Crisis to be "irrelevant."[63]  Extensive discovery followed, but not of Fannie or Freddie.  Following the Supreme Court's decision in *Lucia v. SEC*, 585 U.S. 237 (2018), this case was reassigned to a new ALJ.  Discovery was already closed.

The parties filed motions for summary judgment on the statute of limitations and ALJ Jennifer Whang entered an extensive order, dismissing some, but not all,

---

[61] CL1.  The other officers and directors of the Bank did not contest the Comptroller's attacks – only Ortega and Rogers, both non-lenders, fought back.
[62] CL7.
[63] CL19.

of the Comptroller's claims.[64]  On December 18, 2020, the Comptroller issued a wide-ranging statute of limitations ruling that reversed the ALJ and reinstated all the Comptroller's claims.  *See* CL81 ("December 18 Order").

An 11-day hearing took place beginning on January 31, 2022 before ALJ Whang.  During that proceeding, the ALJ received and considered testimony from 13 live witnesses and admitted approximately 450 exhibits into evidence.  The parties filed post-hearing briefs and replies.[65]  On September 30, 2022, the ALJ issued her Recommended Decision.[66]  Among other rulings, the ALJ determined that the OCC failed to meet its burden to ban Petitioners from banking on the Capital Raise Loans claim.[67]  The ALJ issued civil money penalties against both Petitioners, as well as an order of prohibition against Rogers based on Count IV (loans to entities controlled by David Rogers III).  The ALJ did not ban Ortega.

Both the Comptroller and the Petitioners appealed the Recommended Decision to the Comptroller.[68]  Following these appeals, the Comptroller reached its Final Decision on December 1, 2023.[69]  Concurring with the arguments in its appeal to itself, the Comptroller banned both Petitioners from banking based on the Capital

---

[64] CL63.
[65] CL161; CL162; CL168; CL169.
[66] CL176.
[67] *Id.* at 108.
[68] CL185; CL186.
[69] CL194.

Raise Loans claim and imposed civil money penalties of $250,000 against each.[70]

Thereafter, the Comptroller granted a motion to stay its orders pending judicial

review in this Court.[71]

## SUMMARY OF ARGUMENT

The Comptroller's Final Decision should be vacated and set aside for the

following reasons:

(1)     The agency denied Petitioners their Seventh Amendment right to a jury

trial.  Agency in-house adjudications like this one violate Petitioners' constitutional

rights.  *SEC v. Jarkesy*, 144 S. Ct. at 2127-39.  This proceeding seeks civil penalties,

and asserts claims which are not equitable or admiralty claims, entitling Petitioners

to a jury.

(2)     This case is barred by the five-year statute of limitations in 28 U.S.C. §

2462.  This case was commenced on September 25, 2017, and none of the challenged

conduct in this case occurred on or after September 25, 2012.  It is undisputed that

the government could have brought its claims in the Spring of 2009 but did not file

them until 2017.

---

[70] *Id*.  The Comptroller dropped Count IV (loans to entities controlled by David Rogers III) of its claims.
[71] CL195 & 197.

(3)    This case violated the Appointments Clause.  The unconstitutional ALJ initially assigned to this case made rulings that tainted the proceeding and harmed Petitioners.

(4)    Procedural rulings by the ALJ at trial were not in accordance with law, without observance of procedure required by law, and contrary to applicable regulations.

(5)    The Comptroller's decision to overrule the ALJ's determination that Petitioners lacked the requisite scienter with respect to the Capital Raise Loans should be set aside.

(6)    To ban someone from banking, the Comptroller should apply a higher standard of proof than a preponderance standard.

## STANDARD OF REVIEW

This Court reviews constitutional issues and agency interpretations of case law *de novo*.  *Jarkesy v. SEC*, 34 F.4th 446, 451 (5th Cir. 2022), *aff'd*, 144 S. Ct. 2117 (2024); *Emplr. Solutions Staffing Grp. II, LLC v. Office of the Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016).  Review of agency proceedings is also subject to the APA.  12 U.S.C. § 1818(h)(2).  Under the APA, this Court shall set aside agency action if it is: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory authority, or limitations, or short of

statutory right;" "without observance of procedure required by law;" or "unsupported by substantial evidence." 5 U.S.C. § 706(2). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . and need not defer to an agency interpretation of law . . ." *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244, 2273 (2024).

## ARGUMENT

## I. The Comptroller's Decision Should Be Vacated Because Petitioners Were Deprived of Their Right to Trial by Jury.

### A. Under *Jarkesy*, the Seventh Amendment Entitles Petitioners to a Jury.

In light of the Supreme Court's decision in *Jarkesy*, Petitioners were entitled to have this case tried to a jury under the Seventh Amendment of the United States Constitution. This proceeding imposed civil penalties, a type of claim that *Jarkesy* squarely holds is entitled to a jury. *Jarkesy,* 144 S. Ct. at 2122 ("the remedy [of civil penalties] is all but dispositive"). Congress cannot "conjure away" a party's Seventh Amendment rights by placing exclusive jurisdiction in an administrative agency. *Id.* at 2136 (citing *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 52 (1989)). Accordingly, it was error to deny Petitioners a jury trial. *Id*.

### B. The Seventh Amendment Guarantees a Jury.

This case is like the juryless courts of Admiralty that circumvented the law courts and carried out the Stamp Act of 1765. This was one of Americans' greatest grievances leading up to the American Revolution. *See* The Declaration of

Independence, July 4, 1776 (identifying abuses of George III, including "[f]or depriving us in many cases, of the benefits of Trial by Jury"). John Adams declared that "the most cruel" and "unjust Innovation" of the Stamp Act was "the alarming Extension of the Powers of Courts of Admiralty . . . . In these Courts, one Judge alone, presides. No Juries, have any Concern there."[72] In response, the Framers adopted the Seventh Amendment which provides: "In Suits at common law, where the value of the controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, . . ." And, since then, "every encroachment upon it has been watched with great jealousy." *Parsons v. Bedford*, 3 Pet. 433, 446 (1830). The Comptroller's juryless in-house adjudication system, where it acts both as prosecutor and judge, goes to the very core of the Seventh Amendment's origins and purpose.

This Court should address Petitioners' right to a jury by asking two questions: first, whether this action implicates the Seventh Amendment; and, second, whether the "public rights" exception to Article III jurisdiction nevertheless applies. *Jarkesy*, 144 S. Ct. at 2127. As explained below, this case plainly implicates the Seventh Amendment, and these claims have not been recognized under any of the narrow areas of "public rights" allowing the government to evade Article III.

---

[72] Letter from John Adams to Ebenezer Thayer (Sept. 24, 1765), bit.ly/3zl0Ezn.

**C. This Case Implicates the Seventh Amendment.**

The Seventh Amendment extends to a statutory claim if the claim is legal in nature. *Id*. at 2128. This case is on all fours with *Jarkesy* because every cause of action seeks civil penalties, a claim that is legal in nature. In *Jarkesy*, the SEC sought civil penalties, and the Supreme Court held that the case was legal in nature because civil penalties "are a type of remedy at common law that could only be enforced in courts of law." *Id.* at 2129. As a result, Petitioners are entitled to the protections of the Seventh Amendment.

Just as in *Jarkesy*, the penalties sought here are punitive – their purpose is not to restore the status quo or compensate depositors – the goal is to address "culpability, deterrence and recidivism" and the OCC gets to keep the money it collects. *Id*. at 2129-30; 12 U.S.C § 1818(i)(2)(A)-(C), (G), (J) (penalties deposited into the Treasury). Also, like *Jarkesy*, the statutory considerations are based on tiers of culpability – and "such considerations are legal rather than equitable." *Id*.; 12 U.S.C. § 1818(i)(2).[73] These are the hallmarks of a legal claim to which a jury trial right applies. *Jarkesy*, 144 S. Ct. at 2129-30.

Thus, because the Comptroller assessed civil penalties that were "a type of remedy at common law that could only be enforced in courts of law," such

---

[73] In contrast, the Fifth Circuit decided in *Akin v. Office of Thrift Supervision Dep't of Treasury*, 950 F.2d 1180, 1186 (5th Cir. 1992), that a banker was not entitled to a jury trial for equitable relief sought under 12 U.S.C. § 1818(b). This decision is consistent with *Jarkesy* because the Section 1818(b) cease and desist claim sought equitable disgorgement and did not arise at law.

conclusion "effectively decides that this suit implicates the Seventh Amendment right, and that a defendant would be entitled to a jury on these claims." *SEC v. Jarkesy*, 144 S. Ct. at 2130.

The claims for prohibition from banking under Section 1818(e) are also "a penalty," making them a legal remedy as well. *De La Fuente v. FDIC*, 332 F.3d 1208, 1219 (9th Cir. 2002). And it is not just the remedies that make this case legal in nature: as discussed in I.D., below, the claims also bear a "close relationship" to fraud and negligence, both legal claims entitled to a jury. *SEC v. Jarkesy*, 144 S. Ct. at 2130. For all these reasons, the Seventh Amendment applies here.

**D. This Case Does Not Fall Under a "Public Rights" Exception.**

As to the second question – whether the "public rights" exception permitted the government to ignore the Seventh Amendment – the *Jarkesy* court identified the extremely narrow set of cases to which the public rights exception applies, and banking agency cases are not among them. The public rights exception has been held to apply to tax collection, tariffs, immigration, tribal affairs, and granting of public benefits. *Jarkesy*, 144 S. Ct. at 2132-33; *see also id.* at 2146 (Gorsuch, J., concurring) ("the exception does not refer to all matters brought by the government to remedy public harms," and identifying the "narrow class defined and limited by history" as "collection of revenue, customs enforcement, immigration and the grant of public benefits").

There is no basis to extend the public rights exception here.  Where the suit involves the nature of an action at law, "then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." *Jarkesy*, 144 S. Ct. at 2132, 2134 ("Even with respect to matters that arguably fall within the scope of the 'public rights" doctrine, the presumption is in favor of Article III Courts"). Indeed, the public rights exception has "no textual basis in the Constitution." *Id*. Thus, Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Id*. (quoting *Murray's Lessee v. Hoboken Land & Improvement Co*., 18 How. 272, 284 (1856)).  "The Executive Branch can exercise no part of the judicial power no matter how court-like its decisionmaking process might appear." *Jarkesy*, 144 S. Ct. at 2143 (Gorsuch, J., concurring) (citations omitted).

It is no answer to say that the statutory claims arise from a novel federal regulatory scheme – that argument was explicitly rejected by the Court.  *Jarkesy*, 144 S. Ct. at 2136.  Nor can Congress "conjure away" the right to an Article III court and jury by mandating an executive branch tribunal.  *Id*.  Nor does the fact that the government is a party trigger the exception.  *Id*.  Instead, it is straightforward that because this case contains claims – such as civil penalties – that were enforced in courts of law, it necessarily does not fall under the public rights exception.  *Id*.[74]

---

[74] The *Jarkesy* dissent acknowledges that the majority decision may strike down administrative

Furthermore, it is not only the remedies that are legal in nature. Both statutory provisions in this case, under Sections 1818(e) and 1818(i), "trace[] their ancestry to the common law." *Id*. at 2137. The statutory reforms, which were introduced in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 in response to the savings and loan crisis, were crafted to address fraud – a common law claim – and because "pending bank fraud investigations are overwhelming the federal criminal justice system."[75] Thus, these provisions did not create something entirely new, but simply shifted legal claims – traditionally entitled to a jury – over to administrative agencies, taking the "common law soil" with them. *Jarkesy*, 144 S. Ct. at 2130.

The statute also requires a high level of culpability, something that the *Jarkesy* court relied upon.[76] And the Comptroller made (erroneous) conclusions of misrepresentation and knowing false statements, akin to common law fraud.[77] This

processes like this one. *Jarkesy*, 144 S. Ct. at 2174 (Sotomayor, J., dissenting). FERC has also conceded this point: "no trial-type evidentiary hearing will be conducted" following *Jarkesy*. *Total Gas & Power N. Am., Inc*., 2024 FERC LEXIS 1222, *6 (Sept. 19, 2024).

[75] H.R. Rep. 101-54(I), Title IX at 464 (1989) (citing "misconduct, fraud, and abuse" and outlining "tremendous backlog in pending criminal proceedings").

[76] *Doolittle v. NCUA*, 992 F.2d 1531, 1539 (11th Cir. 1993) (statute requires proof of "personal dishonesty" – or disregard which rises to the same magnitude as personal dishonesty).

[77] *Compare* CL194 at 85 (finding "concerted efforts to conceal or misrepresent the Capital Raise Strategy") *with Jarkesy*, 144 S. Ct. at 2130 ("misrepresenting or concealing material facts" was closely related to common law fraud). The Comptroller claims this case is one for deception, and claims for "deception" are undoubtedly "analogous to 18th-century actions at law, such as fraud, deceit or misrepresentation." *Full Spectrum Software, Inc. v. Forte Automation Sys*., 858 F.3d 666, 676 (1st Cir. 2017) (statutory cause of action involving deceptive practice was entitled to trial by jury).

was the same in *Jarkesy* and points to the same conclusion – no exception applies here.

The OCC also made claims for "unsafe and unsound" banking which is analogous to negligence, a legal claim entitled to a jury. Professional negligence considers whether the professional acted with "such skill, prudence and diligence as is reasonable according to the standards of [an] ordinarily competent [professional] performing similar services under like conditions." *St. Eng'g Marine, Ltd. v. Thompson, Maccoll & Bass, LLC, P.A.*, 88 F.4th 27, 34 (1st Cir. 2023). This bears a close relationship to an unsafe/unsound banking practice, one "which is contrary to generally accepted standards of prudent operations, the possible consequence of which, if continued, would be abnormal risk or loss . . ." Final Decision at 69.[78] The unsafe or unsound practices claim thus "target[s] the same basic conduct … pursuant to similar legal principles," *Jarkesy*, 144 S. Ct. at 2136, as the common law claim of negligence, and so is legal in nature.

Finally, *Jarkesy* holds that it is irrelevant that juryless administrative proceedings in the executive branch might prove more efficient than an Article III jury trial. *Jarkesy*, 144 S. Ct. at 2139. Increasing efficiency and reducing costs do

---

[78] The Comptroller itself has analogized unsafe and unsound practices to negligence because "[l]ike negligence" it "entails an analysis of risks and precautions and, also, incorporates in part a community standard." *In re First National Bank*, OCC AA-EC-80-11, 1981 OCC Enf. Dec. LEXIS 5, at *64-65 (May 28, 1981).

not trigger the "public rights" exception. *Id*. Indeed, the Constitution ensures a jury trial "against the passing demands of expediency or convenience." *Id*. at 2128 (citation omitted). "[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *Bowsher v. Synar*, 478 U.S. 714, 736 (1986). And there is nothing to suggest the agency process is more efficient or better: this case has been going on for seven years, and it has been fifteen years since the challenged loans were made.

### E. The Comptroller's Arguments Are Flawed.

The ALJ's position (which the Comptroller adopted) was that the Petitioners' objection was untimely. However, Petitioners' objection was made before the ALJ rendered her decision, before the record was closed on April 3, 2023, and submitted to the Comptroller for decision, and before the Comptroller rendered its decision.

More importantly, there is no timeliness issue for such constitutional issues, and Petitioners were not required to raise the Seventh Amendment before the Comptroller. When a party asserts purely constitutional claims about which an agency has no special expertise and for which the agency can provide no relief, the claim is preserved on appeal even if it was not first presented to the agency. *Carr v. Saul*, 141 S. Ct. 1352, 1361-62 (2021); *Calcutt v. FDIC*, 37 F.4th 293, 312-13 (6th Cir. 2022), *rev'd on other grounds*, 143 S. Ct. 1317 (2023). As the ALJ and

Comptroller pointed out, the regulatory regime does not authorize the ALJ to empanel a jury, thus any objection raised at the agency level would be futile. *Id*. (recognizing a futility exception for constitutional challenges). Just as in *Calcutt*, raising the issue before the agency would have been (and was) "a pointless exercise." *Id*. at 313.

## F. A Juryless Adjudication at the OCC Violates Other Provisions of the Constitution.

Finally, the in-house adjudication employed by the OCC also violated the Separation of Powers, Article III, and the Due Process Clause. *Jarkesy*, 144 S. Ct. at 2140 (Gorsuch, J., concurring). By exercising judicial power over Petitioners, the executive branch invaded the powers reserved to the judiciary branch. The Comptroller brought these charges, prosecuted them before an in-house ALJ, and then appealed to *itself* and changed the ALJ's decisions as it saw fit. This is not the fair trial in a fair court guaranteed by the constitution. *Id*. "There is no liberty if the power of judging be not separated from the legislative and executive powers." *Jarkesy*, 144 S. Ct. at 2131 (quoting The Federalist No. 78, at 466).

In sum, Petitioners were entitled to a jury trial, a fair trial, and a fair court. The deprivation of these rights is a fundamental structural error that requires vacatur of the entire proceeding. *Jarkesy v. SEC*, 34 F.4th at 459. As a result, the Final Decision should be set aside.

## II.    The Comptroller's Claims Are Barred By The Statute of Limitations.

This case was commenced on September 25, 2017.   None of the challenged conduct occurred after September 25, 2012, within the five-year statute of limitations.  ***In fact, Rogers left the Bank in 2011 and was not even there during the five-year period before the commencement of this case***.[79]   And there is no dispute that the Capital Raise Loans (for which Petitioners were banned from banking) were all made more than five years before this case was brought.

This case is subject to the five-year statute of limitations in 28 U.S.C. § 2462:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim ***first accrued*** . . .

28 U.S.C. § 2462 (emphasis added).   Section 2462 applies to both claims for prohibition from banking and for civil money penalties.  *Gabelli v. SEC*, 568 U.S. 442, 445 (2013); *De La Fuente v. FDIC*, 332 F.3d at 1219.

Statutes of limitations set a fixed date when exposure to government enforcement efforts ends.  *Gabelli v. SEC*, 568 U.S. at 448. "Such limits are vital to the welfare of society" and "provide security and stability to human affairs." *Id.* Section 2462 finds its roots in a law enacted nearly two centuries ago.  "Chief Justice Marshall used particularly forceful language in emphasizing the importance of time

---

[79]  Declaration of David Rogers, Jr. ¶ 2 (CL195); CL194 at 38; CL176 at 12-13.

limits on penalty actions, stating that it "would be utterly repugnant to the genius of our laws" if actions for penalties could "be brought at any distance of time." *Gabelli*, 568 U.S.at 452 (quoting *Adams v. Woods*, 6 U.S. 336 (1805)).

And because government enforcement agencies have a role of ongoing supervision, a mission of investigating violations, and legal tools at their disposal to root them out, the government is ***not*** entitled to rely on more flexible accrual rules the way a civil plaintiff would. *See Gabelli*, 568 U.S. at 451. Thus, a unanimous Supreme Court rejected the argument that defendants could be "exposed to Government enforcement action not only for five years after their misdeeds, but for an uncertain time into the future." *Id*. Instead, "the most natural reading of the statute" is that the "five year clock begins to tick" when defendants' wrongful conduct occurred. *Id*. at 448. Thus, "the standard rule is that a claim accrues when the plaintiff has a complete and present cause of action." *Id*.; *Corner Post, Inc. v. Bd. of Governors Fed. Res. Sys*., 144 S. Ct. 2440, 2451 (2024).

When the Comptroller entered the December 18 Order, the Comptroller reversed the ALJ and determined that none of its claims was time-barred.[80] The Comptroller saved its claims only by explicitly rejecting a "strict construction" of Section 2462. *Compare Gabelli*, 568 U.S. at 451-52 *with* December 18 Order, CL81 at 15-16 (rejecting a "strict construction of Section 2462"). And its stale claims were

---

[80] CL81.

allowed to go forward in full. Then, in the Final Decision on December 1, 2023, the Comptroller further "clarified" his prior ruling.[81]

These rulings were flawed because the Comptroller failed to correctly apply *Gabelli* and 28 U.S.C. § 2462. Its position is threefold: (i) accrual is deferred until certain "effects" occur, *i.e.*, bank losses, *not* defendant misconduct, (and such effects can occur many years after the challenged conduct); (ii) a claim can "first accrue" a second time, or a third or fourth time, each time an "effect" occurs, even if, by its own admission, the claim first accrued outside the limitations period (thus, a banker who makes a bad loan which is payable over 30 years is subject to a claim for five years after the last payment is missed, or 35 years after the wrongful conduct), and (iii) the OCC can pick which "effect" it wants to rely on to start the limitations clock and delay accrual by *pleading* a later "effect."[82] Thus, a claim can "first accrue" twice or ten times, depending on the number of "effects" the Bank suffers and which effect the OCC chooses to pursue.[83] The problem with this approach, besides being self-serving nonsense, is there is no support for it in the statutory text of 12 U.S.C. § 1818(e), (i) or 28 U.S.C. § 2462.

---

[81] CL194 at 21.

[82] CL194-at 21-26, 81; CL81 at 14-16.

[83] The OCC's legal position that an accrual under the statute may be deferred indefinitely as each loss is booked was rendered absurd by FDIC witness Mary Jane Locke who testified that the FDIC actually chooses the date of the loss, and to this day, 14 years on, could still book a loss under the receivership. *See* Tr. 2044:11-25, 2047:22-2048:13 (CL149). In this vision of the statute, the United States government chooses when the statute begins to run.

As described below, (i) the Comptroller's prohibition claims under 12 U.S.C. § 1818(e) accrued at the time the challenged loans were made because that is when the government "could have filed suit and obtained relief" (*Corner Post, Inc.,* 144 S. Ct. at 2451); (ii) similarly, the Comptroller's civil penalty claims under 12 U.S.C. § 1818(i) accrued at the time the challenged loans were made, and (iii) the Comptroller's civil penalty claims for accounting misconduct against Ortega are also time-barred.

## A. The Comptroller's Ban on Banking Was Time-Barred (12 U.S.C. § 1818(e)).

The Comptroller banned Petitioners from banking under 12 U.S.C. § 1818(e) because of the Capital Raise Loans.  But it is undisputed, and the Comptroller concedes, that all those loans were made more than five years before the case was brought.[84]  Nor is it disputed that Petitioners' conduct – approving the loans as members of the Bank's board – occurred on or before the dates the loans were made. This is on all fours with *De La Fuente* where the Ninth Circuit determined that it was error to ban a banker for a loan made more than five years before commencement of the action.  *De La Fuente*, 332 F.3d at 1219.  The prohibition claims are time-barred.

---

[84] Petitioners contended that the last relevant loan was made August 12, 2009, and the ALJ concurred, noting that any loans after this date would not have been relevant in light of the dates of the capital injections. CL176 at 21, 34.  But the Comptroller found that the last loan occurred in March 2011.  CL194 at 80 & n. 39.  Either way, no loan was made within the limitations period.

To evade this conclusion, the Comptroller found that the "effects" prong of the statute was met on June 12, 2013 when the Bank suffered a loss on one of the loans, and when the FDIC suffered losses many years later on the loans.[85]   This argument fails because the statutory text does not support such a delayed accrual theory – this is not when the claim "first accrued."

A plain reading of the statute, 12 U.S.C. § 1818(e), shows this.   Under this statute the government's claim matures not upon a loss, but right away – when a loan is made where the Bank "will ***probably*** suffer financial loss or other damage" or "depositors . . . ***could*** be prejudiced." 12 U.S.C. § 1818(e)(1)(B) (emphasis added). Thus, Section 1818 doesn't require a "loss" to the Bank – it is drafted so that the OCC has a claim on the date the loans were made.  For this reason, no party disputes that the OCC could have brought an action immediately upon the loans being made. Congress empowered the Comptroller with a very low threshold, allowing a claim to accrue upon the making of a loan that "could" or "will probably" cause harm. Judge Silberman hit the nail on the head when he wrote: "[T]he early running of the statute of limitations seems to me the inevitable price of section 8(e)'s low threshold; the agencies have to take the 'bitter with the sweet.'"  *Proffitt v. FDIC*, 200 F.3d 855, 866 (D.C. Cir. 2000) (Silberman, J., dissenting); *see De La Fuente*, 332 F.3d at 1219-20.

---

[85] CL194 at 77-78, 81; CL176 at 117-18.

Indeed, the Comptroller's main witness and expert testified at trial that at the time the loans were made, they ***"could have prejudiced the depositors"*** (12 U.S.C. § 1818(e)(1)(B)(ii)).[86]    Thus, the OCC conceded that section 1818(e)(1)(B) was triggered, and it could have brought its claims at the time the loans were made. Further, the Comptroller claimed – and its witnesses testified – that the loans were "unsafe and unsound" at the time they were made,[87] which it defines as those loans which involve "an abnormal risk of loss" at the time[88] – a test that is virtually identical to the "***will probably suffer a financial loss***" contained in the statute. 12 U.S.C. § 1818(e)(1)(B)(i).    Similarly, OCC found that at the time they were made the loans involved "abnormal risk"[89] and "grave risk"[90] to the Bank.    Thus, the statute contemplates accrual when the loan was made, and this is when the claim "first accrued."    28 U.S.C. § 2462; *Gabelli v. SEC*, 568 U.S. at 448, 551.

The case law supports Petitioners.    The *Gabelli* decision found that accrual under § 2462 is triggered at the time of the "misdeeds" of Petitioners, *i.e.* when the "wrongful conduct occurred."    *Gabelli*, 568 U.S. at 448, 451-52 (finding that "that is the most natural reading of the statute"); *U.S. v. Core Laboratories, Inc.*, 759 F.2d 480, 482 (5th Cir. 1985).    The *De La Fuente* decision similarly refused to consider

---

[86] Tr. 1593:13-1594:3 (CL147).
[87] Notice of Charges ¶¶ 31, 55(CL1)),
[88] CL194 at 69.
[89] Tr. 1593:13-16 (CL147); 163:16-20 (CL133).
[90] CL194 at 85.

loans made outside the limitations period. *De La Fuente*, 332 F.3d at 1219-20 (applying Section 2462 to an FDIC proceeding under 12 U.S.C. § 1818(e)). In *De La Fuente*, the FDIC had sought to prohibit a bank director from participating in the banking industry under 12 U.S.C. § 1818(e). *Id*. at 1215. The Ninth Circuit reversed the agency, holding that "[t]he FDIC commenced this action on June 11, 1997. Therefore, the agency should not have prosecuted him for transactions that occurred before June 11, 1992." *Id*. at 1219. The court in *De La Fuente* determined that it was error to rely on a loan made more than five years before commencement of the action. *Id*.

The Comptroller rejects *De La Fuente* and *Gabelli*, and instead relies on the D.C. Circuit's earlier, split decision in *Proffitt* to suggest a much different approach. *Proffitt*, 200 F.3d 855. In *Proffitt*, two judges found no limitations bar for six-year old misconduct because the FDIC alleged a loss to the bank that occurred within the limitations period.

The *Proffitt* decision is not persuasive, however. First, the more flexible approach to limitations in *Proffitt* is no longer good law after *Gabelli*, at least insofar as 28 U.S.C. § 2462 is concerned. This was an outcome anticipated by the dissent in *Proffitt*, which contains the best discussion of the statute of limitations issue found in either case law or scholarship. *Proffitt*, 200 F.3d at 866 (Silberman, J., dissenting); *compare Proffitt v. FDIC*, 208 F.3d 1066, 1067 (D.C. Cir. 2000) (Silberman, J.,

dissenting from denial of rehearing *en banc*) ("I think that the panel majority's construction is incorrect and gives those agencies virtually unlimited discretion as to when they initiate proceedings.") *with Gabelli*, 568 U.S. at 452 (rejecting an interpretation of § 2462 that would leave "defendant exposed not only for five years after their misdeeds, but for an additional uncertain period into the future."). The court in *Proffitt* set forth a rule where, under Section 1818(e), a banker's misconduct did not start the clock running – instead, the statute "begins to run when the agency decides it should begin to run." *Proffitt*, 200 F.3d at 866 (Silberman, J., dissenting). *Gabelli* rejects this approach. *Gabelli v. SEC*, 568 U.S. at 448 (§ 2462 "sets a fixed date when exposure to specified Government enforcement efforts ends"); *see also* Recommended Decision at 144-45 (CL176) ("the undersigned … remains hopeful that this [December 18 Order] will be revisited.").

Inventively, the Comptroller argues it pleaded its claims with "a different effect (and thus a different cause of action)."[91] Using mental gymnastics, they acknowledge the claim could have been brought at the time the loans were made, but somehow the claim first accrued a second time later when the government chose which "effects" started the clock. Under the OCC's rubric, not only is accrual deferred until the bank suffers an effect, the OCC gets to ***choose*** which effect starts

---

[91] CL176 at 118; CL194 at 23-24, 85 ("occurrences of alternative statutory effect predicates trigger accruals of separate claims").

the clock. Put another way, the only way these claims survive is if one allows claim-splitting.[92]  This is absurd and is no more than a government agency deciding to overrule Congress and to delete the word "first accrued" from 28 U.S.C.§ 2462.  The Comptroller's view is an unworkable and self-serving approach, and it is contrary to the law set forth in *Gabelli*.  The Capital Raise Loans claims are time-barred.

### B. For the Same Reasons, the Civil Money Penalty Claim for the Capital Raise Loans Was Also Time-Barred.

The Comptroller also assessed a second-tier civil money penalty against Petitioners, under 12 U.S.C. § 1818(i)(2)(B), for the Capital Raise Loans – the same stale conduct addressed in Section A, *supra*.[93]  This civil penalty claim is time-barred for the exact same reasons as explained above.

The second-tier civil penalty statute, Section 1818(i), uses slightly different language than Section 1818(e), but the outcome is the same.  It provides that a claim accrues when a violation occurs that causes or is "likely to cause more than a minimal loss" to the Bank.   12 U.S.C. § 1818(i)(2)(B)(ii)(II).   Again, the Comptroller's own expert testified at trial that, at the time the loans were made, they

---

[92] Claim-splitting is prohibited at law and nothing in the statutory language evinces an intent to abrogate the common law rule.  "Traditionally, the 'single action rule' provides a plaintiff one indivisible cause of action for all damages arising from a defendant's single breach of a legal duty." *Cano v. Everest Minerals Corp.*, 2004 U.S. Dist. LEXIS 3963, *5 (W.D. Tex. 2004) (citations omitted) ("The fact that plaintiff's actual damages may not be fully known until much later does not affect the determination of the accrual date …").  And *Gabelli* holds that the government is not entitled to special accrual rules in Section 2462 cases.  *Gabelli*, 568 U.S. at 451.
[93] CL194 at 6, 69.

would be an "abnormal risk" to the Bank[94] and the Comptroller found that they were a "grave risk" at the time they were made.[95] Thus, Section 1818(i)(2)(B)(ii)(II) was satisfied and the Comptroller could have brought its claims at the time the loans were made. The Comptroller also determined that the loans were unsafe and unsound at the time they were made, which it defines as loans that involve an "abnormal risk of loss."[96] This, too, shows that its civil penalty claims accrued when the loans were made under the language of Section 1818(i)(2)(B)(ii)(II) and are time-barred. For the same reasons discussed above, the Comptroller's delayed accrual theories are wrong.

### C. The Civil Money Penalty Against Ortega For Accounting Conduct Was Also Time Barred.

The Comptroller also assessed first and second tier civil money penalties against Ortega for "accounting-related misconduct."[97] These claims, too, are barred by the five-year statute of limitations.

#### 1. Capital Raise Loan Accounting

The Capital Raise Loans transactions were booked and accounted for at the time they were made in 2009, well outside the limitations period.[98] No one is

---

[94] Tr. 1593:13-1594:3 (CL147).
[95] CL194 at 85.
[96] CL194 at 69.
[97] CL194 at 6, 77, 98, 99.
[98] Tr. 908:22-909:1 (CL141); CL176 at 171 (Call Reports overstated regulatory capital because of capital injections that took place in 2009).

suggesting that Ortega engaged in misconduct within five years before the case was brought. However, with minimal discussion, both the Recommended Decision[99] and the Final Decision[100] nevertheless determined that Ortega violated Section 1818(i) for the accounting treatment of the Capital Raise Loans.

The government's rationale is that Ortega signed off on and approved call reports in 2012 and 2013, within the limitations period, wherein these accounting errors from 2009 *had not been corrected*.

This argument is unsupported by the case law. Just because accounting records go uncorrected – that does not create a cause of action with no statute of limitations. *Delek Ref., Ltd. v. OSHRC*, 845 F.3d 170, 177 (5th Cir. 2016) (statute of limitations could not be extended where company continued to fail to address PHA recommendations; strictly enforcing six month statute of limitations from date of violation). Such an approach would render Section 2462 meaningless, allowing stale conduct to be actionable more or less forever. *Id*. "The lingering effect of an unlawful act is not itself an unlawful act." *AKM, LLC v. Sec'y of Labor*, 675 F.3d 752, 757 (D.C. Cir. 2012). The "mere failure to right a wrong … cannot be a continuing wrong which tolls the statute of limitations." *Id*. The government's view would allow Section 1818(i) to apply to an accounting error forever, provided

---

[99] CL176 at 174.
[100] CL194 at 73-74.

it had not been corrected.  In the instant case, there was no finding, no evidence, and no allegation that these subsequent Call Reports contained anything more than a carry-through of balances affected by accounting transactions booked in 2009.

Finally, the Comptroller's approach again contravenes the "first accrued" language of the statute.  28 U.S.C. § 2462.  Even if one accepts the government's argument that a claim accrued at this late date, it is not the *first* accrual to leave records "uncorrected."

## 2. OREO Loan Accounting.

Similarly, the attacks on Ortega for OREO loan accounting were time-barred. The Comptroller found, even though all the relevant loans were made and accounted for outside the limitations period, that uncorrected call reports from later periods constituted a timely claim for civil money penalties.[101]  The Recommended Decision[102] and Final Decision[103] contained minimal discussion of these matters.

The OCC's attacks on accounting for OREO were based on the 2011 Report of Exam and accounting transactions which took place before that report.[104] Accordingly, neither the ALJ nor the Comptroller made findings of fact that any loans were booked or accounted for incorrectly on or after September 25, 2012.

---

[101] CL194 at 98.

[102] CL176 at 174 (Call Reports "the effect of which continued into the five-year limitations period . . .").

[103] CL194 at 98-99.

[104] CL176 at 72-73, 75.  This issue was based on the expert report of Christine Salvato, which found that the December 31, 2011 Call Report was incorrect.  *Id*. at 75, 174.

Thus, for the same reasons described in Section C.1, *supra*., the mere continued existence of accounting records does not restart limitations.

    3. <u>Nonaccrual Loan Accounting.</u>

The Comptroller pleaded and the ALJ found that the objectionable non-accrual accounting practice was instituted in 2007, well outside the limitations period, and continued until December 2012, within the limitations period.[105]  Here, the government relies on a continuing violation theory to defer accrual.

The claims against Petitioners "first accrued" in 2007 when the practice began.[106] The ALJ found that in 2007 the Bank set up improper processes in its new accounting software, Jack Henry Silverlake.[107]  Indeed, the OCC knew about this issue as early as 2008 and issued orders to the Bank as early as 2009.[108]  The OCC could have brought a claim on this software issue as early as 2007 and certainly by 2008.  Continual ill effects from a violation do not give rise to a continuing violation. *See SEC v. Jones*, 2006 U.S. Dist. LEXIS 22800, *12 (S.D.N.Y. 2006) (continuing to collect excessive fees within the limitations period, following a failure to disclose relevant information before the limitations period did not allow the SEC to circumvent limitations).  The OCC suggests that every day the Bank failed to have the proper accounting policy in place, the limitations period begins anew.  Such a

---

[105] CL176 at 169-170.
[106] CL176 at 79-80.
[107] *Id.*
[108] CL1 at 22-23 ¶ 94.

conclusion would mean a "*de facto* elimination of any statute of limitation, for the limitation period would never begin to accrue as long as the facility remained in operation." *New York v. Niagara Mohawk Power Corp.*, 263 F.Supp. 650, 661 (N.D.N.Y. 2003). This is what *Gabelli* meant when it rejected an open-ended approach to limitations in cases under 28 U.S.C. § 2462. *Gabelli*, 568 U.S.at 452. Here, a claim accrued in 2007 and the OCC's claims are untimely.

## III. This Proceeding Was Conducted in Violation of the Appointments Clause.

ALJ Christopher McNeil of the Office of Financial Institution Adjudication ("OFIA") handled this case from 2017 to 2018.[109] He was not appointed in accordance with the Appointments Clause of the United States Constitution. U.S. CONST. art. II, §2, cl. 2. Yet he struck Petitioners' pleadings, excluding the Fannie Mae issue from this case. This proceeding was unconstitutional and the Comptroller's decision should be set aside. *Lucia v. SEC*, 585 U.S. at 249.

### A. ALJ McNeil Was Not Constitutionally Appointed.

The United States Supreme Court has determined that ALJs are Officers who must be appointed consistent with the Appointments Clause – by the President or Head of Department. *Lucia v. SEC*, 585 U.S. at 248-49; *Burgess v. FDIC*, 871 F.3d 297, 299 (5th Cir. 2017) (same). ALJ McNeil was not appointed by constitutional

---

[109] CL6; CL33.

methods, but by competitive examination through the Office of Personnel Management ("OPM"). 5 U.S.C. § 1104(a)(2); 5 C.F.R. 930.201. The OPM scored examinations, ranked the candidates, and selected a list of ALJs. 5 C.F.R. 332.401-332.402. Agencies, which are not Heads of Departments, then may select from the list provided by the OPM. 5 U.S.C. § 3317(a), § 3318(a). In this case, the OCC delegated selection of the ALJ to another bureaucracy, OFIA. 12 C.F.R. 19.101. As the whole purpose of the Appointments Clause is "to maintain clear lines of accountability – encouraging good appointments and giving the public someone to blame for bad ones," this confusing and diffuse appointment process goes directly to the policy concerns of the Framers of the Constitution. *Lucia*, 585 U.S. at 253-54 (Thomas, J., concurring) (citing The Federalist No. 76).

### B. Ortega and Rogers Were Prejudiced by the Unconstitutional ALJ's Participation.

ALJ McNeil struck Petitioners' defenses and pleadings.[110] Petitioners made allegations that the 2008 financial crisis was responsible for the failure of the Bank.[111] The ALJ struck those allegations, deeming them "not relevant."[112] Petitioners also averred that the Bank lost 60% of its capital, or $174 million, when, during the crisis, the United States government decided not to support the preferred

---

[110] CL19.
[111] *Id*.; CL7 at 8.
[112] CL19 at 3.

stock of Fannie Mae and Freddie Mac.[113]   The ALJ struck this allegation for the same reason.[114]   These averments were appropriate topics to explore in discovery – and essential to the story of why the Bank suffered losses for which the OCC blamed Petitioners.[115]   Motions to strike pleadings are not even authorized by the procedural Rules contained in 12 C.F.R. 19, except where a party fails to sign a pleading (*see* 12 C.F.R. § 19.7(b)(2)).   Most fundamentally, by ALJ McNeil's striking pleadings, Ortega and Rogers were denied a full and fair hearing.[116]   These rulings narrowed the scope of the case, limited discovery, and deprived Petitioners of an opportunity to be heard.   These rulings affected, for example:

- The types and scope of document requests to the OCC;

- Not sending third-party discovery to Fannie Mae and Freddie Mac;

- The decision to review (or not review), and incur expense of reviewing, and the manner of reviewing, millions of pages produced in this action by the government, knowing that the ALJ would not allow Petitioners to address certain issues even if they reviewed them.

---

[113] CL7 at 8-9.

[114] CL19 at 4.

[115] *See* Statement of the Case, *supra*. 15-17.

[116] Another of the stricken pleadings was that Petitioners did not profit but rather lost as a result of the events described in the Notice of Charges. This is remarkable: a statutory element is whether "such party has received financial gain or other benefit by reason of such violation, practice, or breach." *See* 12 U.S.C. § 1818(e)(1)(B)(iii).

Following *Lucia*, on January 8, 2020, a new ALJ – ALJ Whang – entered the case. On February 28, 2020, Petitioners filed their Motion for Summary Disposition on the Appointments Clause and Objections to ALJ Orders. On March 17, 2020, ALJ Whang denied the Motion and Objection in every respect.[117] ALJ Whang allowed the Comptroller to move forward with this proceeding under a "reassignment and ratification" approach, whereby the new ALJ ratifies the prior void rulings by the unauthorized ALJ.[118]

The Comptroller defends its approach in two ways, both of which, ironically, highlight the prejudice to Petitioners. First, the Comptroller argues that Petitioners received the remedy required by *Lucia*: a new ALJ.[119] However, the history of the Fannie Mae issue under the new ALJ is telling:

- The new ALJ ratified and reaffirmed every order issued by the prior ALJ and granted a motion refusing to consider evidence at trial regarding (i) the Bank's investments in Fannie and Freddie, (ii) regulators' conduct in encouraging the investments in GSEs, (iii) the government's role in bringing about the failure of the Bank, and (iv) attacks on OCC credibility in light of their actions (they encouraged

---

[117] CL59; CL60.
[118] *See id.*
[119] CL194 at 28-30.

investment in GSEs and then after the crisis blamed the Bank for having invested).[120]

- During the first half of the trial, the ALJ continued to stay in lock-step with ALJ McNeil – preventing discussion of the Fannie/Freddie issue and even denying Petitioners the opportunity to make offers of proof.[121]

- However, as the trial proceeded, ALJ Whang began to see the importance of the issue and to let in some testimony on the topic.[122]

- By the time of the Recommended Decision, ALJ Whang had come around, noting that the Fannie Mae issue was "context that must be considered."[123]

What this shows is that the new ALJ felt bound by the unconstitutional ALJ's aggressive rulings, until the extensive context learned at trial persuaded her otherwise. By then it was too late – discovery was closed and the early witnesses at trial had been limited in their testimony.

Second, the Comptroller argues that he, ultimately, considered the Fannie Mae issue in making his decision. Specifically, he found that "the Bank suffered a $174 million loss in connection with the failure of Fannie Mae and Freddie Mac and that

---

[120] CL60; CL124 at 4-5.
[121] *See infra.*, IV.A.
[122] Tr. 2180:12-2181:5 (CL151); 2220:10-2223:10 (CL151); 2260:1-8 (CL153).
[123] CL176 at 169.

this loss created an 'exigent' need for the Bank to raise capital"[124] – the very fact that ALJ McNeil struck from the case. For the Comptroller, it was therefore harmless error to exclude Fannie and Freddie because he ultimately considered it, but what it really shows is that both the Comptroller and ALJ Whang ultimately concede the issue was relevant despite the prior ALJ's narrowing of the case. This, too, shows prejudice.

Finally, Appointments Clause violations constitute a structural and fundamental error, regardless of prejudice. The Appointments Clause is "more than a matter of etiquette or protocol." *Edmond v. U.S.*, 520 U.S. 651, 659 (1997). Rather, "it is among the significant structural safeguards of the constitutional scheme." *Id*. The defect in the appointment of the ALJ "goes to the validity" of the entire proceeding. *Freytag v. Commissioner*, 501 U.S. 868, 879 (1991). Thus, an improper adjudicator's participation "affects the … whole adjudicatory framework." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1910 (2016). It undermines the proceeding so fundamentally that "the effects of the error are simply too hard to measure." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017). When such fundamental, structural violations occur, the appropriate remedy is to dismiss the entire proceeding and require that the proceeding be commenced afresh. *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986).

---

[124] CL194 at 35.

### C. Petitioners Were Also Denied the Opportunity to Challenge ALJ Whang's Appointment.

The new ALJ denied Petitioners' request for discovery regarding her appointment, thereby denying them the opportunity to make challenges under the Appointments Clause.[125] The Comptroller upheld the ALJ's denial.[126] If Petitioners are to challenge the appointment, they must be able to obtain the materials showing compliance with the Appointments Clause. *E.g., Lucia*, 585 U.S. at 241 (Justice Kagan relying on discovery materials attached to the petition for certiorari to determine the constitutionality of the appointments).[127] This, too, was error.

Petitioners also preserve here their argument that ALJ Whang is insulated from removal in violation of the Appointments Clause, the Take Care Clause, and the Separation of Powers principle. *Lucia*, 138 S. Ct. at 2060 (Breyer, J., concurring) ("Congress seems to have provided administrative law judges with two levels of protection from removal without cause—just what *Free Enterprise Fund* interpreted the Constitution to forbid.").

### IV. Manifest Trial Errors Require Reversal.

Errors occurred before and during the hearing that were contrary to law and "without observance of procedure required by law." 5 U.S.C. § 706(2).

---

[125] CL59 at 5.

[126] CL194 at 28.

[127] *Id.* ("The SEC currently has five ALJs. Other staff members, rather than the Commission proper, selected them all. *See* App. to Pet. for Cert. 295a-297a.").

**A. Exclusion of Fannie Mae & Freddie Mac Issues at Trial**.

On January 5, 2022, the ALJ granted a motion preventing Petitioners from offering evidence at trial including: the circumstances of the Bank's investments in GSEs, regulators' conduct in encouraging the investments in GSEs, the government's role in bringing about the failure of the Bank, and attacks on OCC witness credibility in light of their actions.[128]    Likewise, the ALJ excluded Petitioners' related trial exhibits, including Exhibits 4-6, 8-14, 18, and 85 relating to the collapse of Fannie and Freddie and their effect on community banks.[129]  The ALJ also prohibited the questioning of witnesses on the Fannie Mae/Freddie Mac issues.[130]

These exhibits and testimony were relevant.  The evidence showed, among other things, the effect of the Fannie Mae collapse on community banks, disparate treatment received by community banks, the harm in Treasury's decisions, including the failure of many community banks, and the unavailability of TARP to community banks.  *See* Statement of the Case at 15-17, *supra*.  This evidence goes not only to OCC witness credibility – regulators who blamed Petitioners for an exogenous shock – but also to the culpability of Petitioners, a central requirement of the OCC's claim. 12 U.S.C. § 1818(e)(1)(C).

---

[128] CL124 at 5.

[129] Tr. 228:4-229:25 (CL133); 233:25-234:14 (CL133); 821:5-15 (CL139); 823:5-10 (CL139); *see also* CL155; CLR.Exh4-6, 8-14, and 85.

[130] Tr. 228:2-229:19 (CL133); 820:11-824:13 (CL139); 1573:9-1576:17 (CL145).

Meanwhile, the Comptroller got to use the Fannie Mae/Freddie Mac disaster for its own purposes and, when it did so, conceded its relevance: "Respondent Rogers exerted 'undue influence' over the Bank's decision to invest in stock in the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation ('Fannie and Freddie'), an investment which ultimately resulted in a $174 million loss to the Bank."[131]  The Comptroller, when successfully arguing for admission of its evidence, pointed out that relevance is viewed broadly under the Uniform Rules, where evidentiary standards are more liberal than those that govern proceedings in federal district courts.[132]  Thus, it was hypocritical, in addition to error, that Ortega and Rogers's evidence was excluded.

## B. Prohibition of Offers of Proof.

The ALJ also erred by prohibiting the making of offers of proof in violation of the Uniform Rules. 12 C.F.R. 19.36(d)(2) provides

> When an objection to a question or line of questioning propounded to a witness is sustained, the examining counsel may make a specific proffer on the record of what he or she expected to prove by the expected testimony of the witness either by representation of counsel or by direct interrogation of the witness.

The ALJ refused to allow offers of proof by direct interrogation of the witness on multiple occasions.[133]  This prevents this Court from knowing what the witness

---

[131] CL104 at 67; *see* CL104 at 7, 69; CL106 at 8, ¶ 37, n.6.

[132] CL112 at 4.

[133] Tr. 219:18-220:20 (CL133); 228:11-229:25 (CL133); 822:18-823:1 (CL139); 1576:5-10

would have said and makes it impossible to provide proper judicial review. There is no way to know now what that evidence would have shown. One of the witnesses was the Comptroller's surprise witness Michael Brickman for whom no deposition was taken – we truly have no idea what he would have said.[134]  *See, e.g., Ledisco Fin. Svcs. v. Viracola*, 533 S.W.2d 951, 959 (Tex. Civ. App.—Texarkana 1976, no writ) (it is reversible error to refuse a party the right to perfect his bill of exceptions).

## C. The ALJ Admitted "Sworn Statements" (i.e., Depositions) of Witnesses Who Were Never Cross-Examined.

The ALJ admitted, and both the ALJ's and the Comptroller's decision relies on, the hearsay "sworn statements" of witnesses.[135]  This was reversible error.

- Such statements are hearsay under the Federal Rules of Evidence and no exception applies.

- Some of these "sworn statements" were not even offered into evidence at trial, but still made their way into the ALJ's ruling.[136]

- The ALJ relied on the deposition of Edna Martinez which was taken without Petitioners' counsel present and without any opportunity to cross-examine.[137]

---

(CL145).

[134] Tr. 219:18-220:20; 228:11-229:25 (CL133).

[135] CLO.Exh571 (Rodriguez); CLO.Exh590 (Pena); *see* CL176 at 13 n.38 (McCarthy); CL176 at 57 n.242 (Rodriguez); CL176 at 97 n.464 (Martinez).

[136] CL176 at 13 n.38 (McCarthy); CL176 at 97 n.464 (Martinez).

[137] CL176 at 97 n. 464 (Martinez).

- The ALJ admitted extraordinary doublehearsay from the OCC examiner who was simply asked to describe the content of "sworn statements" she had previously read at some point in time.[138] These borrowers never appeared at trial, and Petitioners had no opportunity to cross-examine.

## V.    The Decision to Ban Petitioners For the Capital Raise Loans Was Contrary to Law and Unsupported by Substantial Evidence.

The ALJ, after hearing over two weeks of testimony, determined that Petitioners lacked the culpable state of mind necessary to ban them from banking under the relevant statute. CL176 at 120-30 (concluding that Petitioners "found themselves in a difficult and exigent situation with no good solutions" and there was "substantial evidence—backed by credible testimony" that Ortega and Rogers acted in good faith).  This was not surprising given that Petitioners were non-lenders who merely (i) sat on the large committee which approved the loans, and (ii) relied on and trusted the lending experts who recommended the loans.  The ALJ, who was steeped in the hundreds of exhibits and lengthy testimony, found that there was "no evidence that [Ortega and Rogers] acted with recklessness or heedless indifference" and that "[their] actions evinced a good faith concern for the Bank."[139]

---

[138] Tr. 1269:21-1271:13 (CL143); 1374:7-1375:5; 1395:16-1396:4 (CL145).
[139] *See* CL176 at 130.

The Comptroller reversed the ALJ's determination and ruled that Petitioners should be nevertheless banned from banking.  This ruling was contrary to the law and not supported by substantial evidence.  The applicable statute, 12 U.S.C. § 1818(e)(1)(C), requires culpable conduct well beyond "mere negligence." *Kim v. Office of Thrift Supervision*, 40 F.3d 1050, 1054 (9th Cir. 1994); *Lewis v. FDIC*, 2001 U.S. App. LEXIS 32333, *7 (5th Cir. 2001).  It requires proof of "personal dishonesty" – or disregard which rises to the same magnitude as personal dishonesty. *Doolittle v. NCUA*, 992 F.2d 1531, 1539 (11th Cir. 1993).  Simply being on the committee that approved the loans is insufficient to establish culpability under the statute.  *Kim*, 40 F.3d at 1054-55 (simply being among the multiple officers and directors who approved "questionable loans" was insufficient to satisfy scienter requirement; such conduct "in no way involved anything approaching the level of culpability required by 12 U.S.C. § 1818(e)(1)(C) and certainly does not justify the imposition of such a draconian measure as a permanent prohibition order").  The Comptroller failed to apply this law when it banned Petitioners.

It was uncontroverted that neither Ortega nor Rogers made a nickel off any of the transactions at issue in this case. Instead, both invested (and lost) their own money in trying to save the Bank.[140]  Petitioners had no motive to act other than in the best interests of the Bank.

---

[140] At the height of the crisis, Rogers injected $5 million and Ortega $1 million of their own net

Moreover, there was no dispute that they were not loan officers who brought these loans to the Bank.[141]  There was no evidence that Petitioners devised the loans. Ortega, in charge of deposits and back-office operations, and Rogers, a fresh produce businessman, were non-lenders and non-experts on the L&D Committee who were assured that these loans were permissible and appropriate.[142]  *Kim*, 40 F.3d at 1054-55.  This is not enough to meet the statutory requirements.  Petitioners correctly understood these loans were legally permissible, as long as the loans were not made on the security of the shares.[143] 12 U.S.C. § 1828(v).  And it was undisputed that the loans were not made on the security of any shares.[144]

The evidence also showed that Rogers and Ortega were uniquely *not culpable*.[145]  David Rogers's good faith, honesty and fair dealing was well recognized by the regulators.[146]  Saul Ortega's strong record at TNB, and his outstanding record at the Bank, was apparent.[147]  Each of the witnesses, including

---

worth.  CLOExh.374A; CL194 at 45.  At most, Petitioners were negligent and lost their money as a result.  Negligence does not satisfy the legal standard.

[141] Tr. 905:17-25; 913:22-914:15 (CL141); *see supra.,* at 17-19.

[142] Tr. 904:4-905:16; 906:18-908:5; 928:14-929:11 (CL141).

[143] Tr. 904:1-905:16 (CL141); 1599:5-8 (CL147); CLR.Exh43 at 3. ("From the legal side, the notes were not secured with the bank stock, so as far as I'm aware we do not have violation of law/regulation on the loans.").

[144] *Id.*

[145] For details regarding Petitioners' honorable conduct, hard work, and remarkable efforts to save the bank through the worst financial crisis in memory, *see* Respondents' Posthearing Brief at 11-22, 29-33 (CL162).

[146] *Supra.*, at 23.

[147] *Supra.*, at 20-22.

Mr. Leal and Mr. Quiroga, reflected Ortega's extraordinary performance and unimpeachable reputation.[148]

In reality, the Petitioners' state of mind was not characterized by culpable intent but by the untenable position of the Bank resulting from the unprecedented financial crisis.   The only motive or intent was to try and cope with the banking crisis – not to engage in misconduct.[149]

In its Final Decision, the Comptroller tries to justify gutting the ALJ's ruling on culpability by pointing to (i) communications with the OCC in early 2009,[150] (ii) communications with the OCC when the capital injections were made,[151] and (iii) alleged misleading loan purposes in the loan documents.[152]   None of this constitutes substantial evidence in support of culpability.   On the first item, although Petitioners communicated with the OCC in early 2009 well *before* the loans were made, there is no evidence that they knew at the time about the Capital Raise Loans and certainly no evidence that they knowingly withheld this information from the OCC – and the Comptroller cites none.[153]   On the second and third items, the Comptroller blames Petitioners for something done by other officers of the Bank: the allegedly

---

[148] CL176 at 103-107 (CL176); Tr. 2268:11-2271:17; 2329:1-2331:14 (CL153); 2398:2-2399:3 (CL156).
[149] CL176 at 103-107
[150] CL194 at 85 (citing Final Decision section IX.C.1)
[151] *Id*. (citing Final Decision section IX.C.4).
[152] *Id*. (citing Final Decision section IX.C.7).
[153] CL194 at 41-42.

misleading communications to the OCC cited by the Comptroller (Final Decision §

IX.C.4) were made by President Gandy, not Petitioners;[154] and the so-called

"misleading loan purposes" (Final Decision § IX.C.7) were put in the loan

documents by the lending department officials, not Petitioners, who are only accused

of failing to object to vague loan descriptions offered to members of the loan

committee.[155]   Again, Petitioners were not lenders, and there was no evidence that

they made misleading loan applications.   None of this comes close to the level of

personal dishonesty.

In sum, the Petitioners did not engage in conduct which rose to the level of 12

U.S.C. § 1818(e)(1)(C) – something the ALJ realized – and the Comptroller

misapplied the law by reversing her.

## VI.    The Comptroller Should Have Applied a "Clear and Convincing" Standard of Proof for the Prohibition Claims.

The draconian penalty of prohibition, permanently disallowing someone from

practicing their chosen profession, is an extraordinarily harsh penalty.   Petitioners

argue and preserve here their position that the application of a preponderance

standard[156] in such a case was inappropriate under the Due Process Clause and 5

---

[154] CL194 at 44-45.
[155] CL194 at 49-50.
[156] CL194 at 19 (applying a preponderance standard).

U.S.C. § 566.  The Comptroller should have required itself to meet at least a "clear and convincing" standard before banning someone from making a living.

The government relies on *Steadman v. SEC*, 450 U.S. 91 (1980), for the proposition that a preponderance standard is the correct one.  However, *Steadman* is a statutory interpretation case.  It did not address the constitutional question of whether the standard of proof in 5 U.S.C. § 566 comports with the Due Process Clause, and Petitioners are not aware of the Court having addressed this issue.[157]

Higher standards of proof have been used in civil proceedings where "[t]he interests at stake in those cases are deemed to be more substantial than mere loss of money . . ." *Addington v. Texas*, 441 U.S. 418, 424 (1979).  Here, the interest at stake is Petitioners' ability to work and earn a living.

The "clear and convincing" standard is utilized in denaturalization, deportation, and civil commitment matters.  *Id*. at 424.  In applying such a standard, the *Addington* opinion identified the following factors:

- Interest more substantial than mere loss of money (*id.*);

- Risk of having reputation tarnished (*id.*);

- "Adverse social consequences" or "stigma" (*id*. at 426);

---

[157] *Steadman*, 450 U.S. at 97 n. 15.  Furthermore, Petitioners preserve here their argument that *Steadman* was wrongly decided.  *See Steadman*, 450 U.S. at 104-06 (Powell J., dissenting).  A more recent decision has acknowledged that 5 U.S.C. § 566 is "poorly worded." *Rodriguez v. VA*, 8 F. 4th 1290, 1299 (Fed. Cir. 2021).

- When possible injury to the individual is significantly greater than any possible harm to the state (*id*. at 427).

The draconian penalty sought here, where Petitioners would be disgraced in their local community and prevented from working in their chosen profession involves each of these. *See* the Declarations of David Rogers, Jr. and Saul Ortega (CL195 at Ex. 1 & 2). And no possible harm to the state exists: both of these Petitioners represent no ongoing danger to the banking community, as shown both by their exemplary histories since the financial crisis and by the OCC's failure to seek any kind of temporary or interim relief in this case. There would be no harm to anyone if Petitioners were not banned from banking and, indeed, it would be a great benefit to the Rio Grande Valley. *See id.*

## CONCLUSION

Petitioners respectfully request that the Court vacate or reverse and set aside the Comptroller's Final Decision. Petitioners also request such other and further relief to which they may be justly entitled.

Dated:   November 5, 2024

Respectfully submitted,

By:    /s/ *Frank Brame*
      Thomas S. Leatherbury
      Texas Bar No. 12095275
      Thomas S. Leatherbury Law, PLLC
      Cumberland Hill School Building
      1901 N. Akard Street
      Dallas, Texas 75201
      Telephone: (214) 213-5004
      Tom@tsleatherburylaw.com

      Frank C. Brame
      Texas Bar No. 24031874
      The Brame Law Firm PLLC
      4514 Cole Ave., Suite 600
      Dallas, Texas 75205
      Telephone: (214) 665-9464
      frank@bramelawfirm.com

      Bill Sims
      Texas Bar No. 18429500
      4234 Shorecrest Drive
      Dallas, Texas 75209
      Telephone: (214) 458-6970
      bsims1119@gmail.com

      **COUNSEL FOR PETITIONERS**

## CERTIFICATE OF SERVICE

I hereby certify that, on November 5, 2024, I caused true and accurate copies of the foregoing to be filed with the Clerk of Court of the Fifth Circuit by CM/ECF and served copies of the foregoing via the Court's CM/ECF system on all counsel of record:

Hannah Hicks
Hannah.hicks@occ.treas.gov
Office of the Comptroller of the Currency
400 7th St. SW Washington, D.C. 20219

Dated: November 5, 2024          /s/ *Frank C. Brame*
                                 Counsel for Petitioners

## CERTIFICATIONS OF ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ *Frank C. Brame*
Counsel for Petitioners

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Fifth Circuit Rule 32.2 because it contains 12,934 words, as determined by the word-count function of Microsoft Word, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief complies with the type-face requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, with 12-point font footnotes.


Dated: November 5, 2024      /s/ *Frank C. Brame*_____
                             Counsel for Petitioners

**ADDENDUM**

1. 28 U.S.C. § 2462

2. 12 U.S.C. § 1818(e)

3. 12 U.S.C. § 1818(i)

§ 2462. Time for commencing proceedings

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

§ 1818. Termination of status as insured depository institution

. . .

**(e) Removal and prohibition authority.**

**(1)** Authority to issue order. Whenever the appropriate Federal banking agency determines that—

**(A)** any institution-affiliated party has, directly or indirectly—

**(i)** violated—

**(I)** any law or regulation;

**(II)** any cease-and-desist order which has become final;

**(III)** any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or request by such depository institution or institution-affiliated party; or

**(IV)** any written agreement between such depository institution and such agency;

**(ii)** engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

**(iii)** committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;

**(B)** by reason of the violation, practice, or breach described in any clause of subparagraph (A)—

**(i)** such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;

**(ii)** the interests of the insured depository institution's depositors have been or could be prejudiced; or

**(iii)** such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

**(C)** such violation, practice, or breach—

**(i)** involves personal dishonesty on the part of such party; or

**(ii)** demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution,

the appropriate Federal banking agency for the depository institution may serve upon such party a written notice of the agency's intention to remove such party from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

**(2)** Specific violations.

**(A)** In general. Whenever the appropriate Federal banking agency determines that—

**(i)** an institution-affiliated party has committed a violation of any provision of subchapter II of chapter 53 of title 31, United States Code [31 USCS §§ 5311 et seq.], and such violation was not inadvertent or unintentional;

**(ii)** an officer or director of an insured depository institution has knowledge that an institution-affiliated party of the insured depository institution has violated any such provision or any provision of law referred to in subsection (g)(1)(A)(ii);

**(iii)** an officer or director of an insured depository institution has committed any violation of the Depository Institution Management Interlocks Act; or

**(iv)** an institution-affiliated party of a subsidiary (other than a bank) of a bank holding company or of a subsidiary (other than a savings association) of a savings and loan holding company has been convicted of any criminal offense involving dishonesty or a breach of trust or a criminal offense under section 1956, 1957, or 1960 of title 18, United States Code, or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such an offense,

the agency may serve upon such party, officer, or director a written notice of the agency's intention to remove such party from office.

**(B)** Factors to be considered. In determining whether an officer or director should be removed as a result of the application of subparagraph (A)(ii), the agency shall consider whether the officer or director took appropriate action to stop, or to prevent the recurrence of, a violation described in such subparagraph.

**(3)** Suspension order.

**(A)** Suspension or prohibition authorized. If the appropriate Federal banking agency serves written notice under paragraph (1) or (2) to any institution-affiliated party of such agency's intention to issue an order under such paragraph, the appropriate Federal banking agency may suspend such party from office or

prohibit such party from further participation in any manner in the conduct of the affairs of the depository institution, if the agency—

**(i)** determines that such action is necessary for the protection of the depository institution or the interests of the depository institution's depositors; and

**(ii)** serves such party with written notice of the suspension order.

**(B)** Effective period. Any suspension order issued under subparagraph (A)—

**(i)** shall become effective upon service; and

**(ii)** unless a court issues a stay of such order under subsection (f), shall remain in effect and enforceable until—

**(I)** the date the appropriate Federal banking agency dismisses the charges contained in the notice served under paragraph (1) or (2) with respect to such party; or

**(II)** the effective date of an order issued by the agency to such party under paragraph (1) or (2).

**(C)** Copy of order. If an appropriate Federal banking agency issues a suspension order under subparagraph (A) to any institution-affiliated party, the agency shall serve a copy of such order on any insured depository institution with which such party is associated at the time such order is issued.

**(4)** A notice of intention to remove an institution-affiliated party from office or to prohibit such party from participating in the conduct of the affairs of an insured depository institution, shall contain a statement of the facts constituting grounds therefor, and shall fix a time and place at which a hearing will be held thereon. Such hearing shall be fixed for a date not earlier than thirty days nor later than sixty days after the date of service of such notice, unless an earlier or a later date is set by the agency at the request of (A) such party, and for good cause shown, or (B) the Attorney General of the United States. Unless such party shall appear at the hearing in person or by a duly authorized representative, such party shall be deemed to have consented to the issuance of an order of such removal or prohibition. In the event of such consent, or if upon the record made at any such hearing the agency shall find that any of the grounds specified in such notice have been established, the agency may issue such orders of suspension or removal from office, or prohibition from participation in the conduct of the affairs of the depository institution, as it may deem appropriate. Any such order shall become

effective at the expiration of thirty days after service upon such depository institution and such party concerned (except in the case of an order issued upon consent, which shall become effective at the time specified therein). Such order shall remain effective and enforceable except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court.

**(5)** For the purpose of enforcing any law, rule, regulation, or cease-and-desist order in connection with an interlocking relationship, the term "officer" within the term "institution-affiliated party" as used in this subsection means an employee or officer with management functions, and the term "director" within the term "institution-affiliated party" as used in this subsection includes an advisory or honorary director, a trustee of a depository institution under the control of trustees, or any person who has a representative or nominee serving in any such capacity.

**(6)** Prohibition of certain specific activities. Any person subject to an order issued under this subsection shall not—

**(A)** participate in any manner in the conduct of the affairs of any institution or agency specified in paragraph (7)(A);

**(B)** solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights in any institution described in subparagraph (A);

**(C)** violate any voting agreement previously approved by the appropriate Federal banking agency; or

**(D)** vote for a director, or serve or act as an institution-affiliated party.

**(7)** Industrywide prohibition.

**(A)** In general. Except as provided in subparagraph (B), any person who, pursuant to an order issued under this subsection or subsection (g), has been removed or suspended from office in an insured depository institution or prohibited from participating in the conduct of the affairs of an insured depository institution may not, while such order is in effect, continue or commence to hold any office in, or participate in any manner in the conduct of the affairs of—

**(i)** any insured depository institution;

**(ii)** any institution treated as an insured bank under subsection (b)(3) or (b)(4), or as a savings association under subsection (b)(9);

**(iii)** any insured credit union under the Federal Credit Union Act [12 USCS §§ 1751 et seq.];

**(iv)** any institution chartered under the Farm Credit Act of 1971;

**(v)** any appropriate Federal depository institution regulatory agency; and

**(vi)** the Federal Housing Finance Agency and any Federal home loan bank.

**(B)** Exception if agency provides written consent. If, on or after the date an order is issued under this subsection which removes or suspends from office any institution-affiliated party or prohibits such party from participating in the conduct of the affairs of an insured depository institution, such party receives the written consent of—

**(i)** the agency that issued such order; and

**(ii)** the appropriate Federal financial institutions regulatory agency of the institution described in any clause of subparagraph (A) with respect to which such party proposes to become an institution-affiliated party,

subparagraph (A) shall, to the extent of such consent, cease to apply to such party with respect to the institution described in each written consent. Any agency that grants such a written consent shall report such action to the Corporation and publicly disclose such consent.

**(C)** Violation of paragraph treated as violation of order. Any violation of subparagraph (A) by any person who is subject to an order described in such subparagraph shall be treated as a violation of the order.

**(D)** Appropriate Federal financial institutions regulatory agency defined. For purposes of this paragraph and subsection (j), the term "appropriate Federal financial institutions regulatory agency" means—

**(i)** the appropriate Federal banking agency, in the case of an insured depository institution;

**(ii)** the Farm Credit Administration, in the case of an institution chartered under the Farm Credit Act of 1971;

**(iii)** the National Credit Union Administration Board, in the case of an insured credit union (as defined in section 101(7) of the Federal Credit Union Act [12 USCS § 1752(7)]); and

**(iv)** the Secretary of the Treasury, in the case of the Federal Housing Finance Agency and any Federal home loan bank.

**(E)** Consultation between agencies. The agencies referred to in clauses (i) and (ii) of subparagraph (B) shall consult with each other before providing any written consent described in subparagraph (B).

**(F)** Applicability. This paragraph shall only apply to a person who is an individual, unless the appropriate Federal banking agency specifically finds that it should apply to a corporation, firm, or other business enterprise.

§ 1818. Termination of status as insured depository institution

. . .

**(i) Jurisdiction and enforcement; penalty.**

**(1)** The appropriate Federal banking agency may in its discretion apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for the enforcement of any effective and outstanding notice or order issued under this section or under section 38 or 39 [12 USCS § 1831o or 1831p-1], and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section or under section 38 or 39 [12 USCS § 1831o or 1831p-1] no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order.

**(2)** Civil money penalty.

**(A)** First tier. Any insured depository institution which, and any institution-affiliated party who—

**(i)** violates any law or regulation;

**(ii)** violates any final order or temporary order issued pursuant to subsection (b), (c), (e), (g), or (s) or any final order under section 38 or 39 [12 USCS § 1831o or 1831p-1];

**(iii)** violates any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request by the depository institution or institution-affiliated party; or

**(iv)** violates any written agreement between such depository institution and such agency,

shall forfeit and pay a civil penalty of not more than $5,000 for each day during which such violation continues.

**(B)** Second tier. Notwithstanding subparagraph (A), any insured depository institution which, and any institution-affiliated party who—

**(i)**

**(I)** commits any violation described in any clause of subparagraph (A);

**(II)** recklessly engages in an unsafe or unsound practice in conducting the affairs of such insured depository institution; or

**(III)** breaches any fiduciary duty;

**(ii)** which violation, practice, or breach—

**(I)** is part of a pattern of misconduct;

**(II)** causes or is likely to cause more than a minimal loss to such depository institution; or

**(III)** results in pecuniary gain or other benefit to such party,

shall forfeit and pay a civil penalty of not more than $25,000 for each day during which such violation, practice, or breach continues.

**(C)** Third tier. Notwithstanding subparagraphs (A) and (B), any insured depository institution which, and any institution-affiliated party who—

**(i)** knowingly—

**(I)** commits any violation described in any clause of subparagraph (A);

**(II)** engages in any unsafe or unsound practice in conducting the affairs of such depository institution; or

**(III)** breaches any fiduciary duty; and

**(ii)** knowingly or recklessly causes a substantial loss to such depository institution or a substantial pecuniary gain or other benefit to such party by reason of such violation, practice, or breach,

shall forfeit and pay a civil penalty in an amount not to exceed the applicable maximum amount determined under subparagraph (D) for each day during which such violation, practice, or breach continues.

**(D)** Maximum amounts of penalties for any violation described in subparagraph (C). The maximum daily amount of any civil penalty which may be assessed pursuant to subparagraph (C) for any violation, practice, or breach described in such subparagraph is—

**(i)** in the case of any person other than an insured depository institution, an amount to not exceed $1,000,000; and

**(ii)** in the case of any insured depository institution, an amount not to exceed the lesser of—

**(I)** $1,000,000; or

**(II)** 1 percent of the total assets of such institution.

**(E)** Assessment.

**(i)** Written notice. Any penalty imposed under subparagraph (A), (B), or (C) may be assessed and collected by the appropriate Federal banking agency by written notice.

**(ii)** Finality of assessment. If, with respect to any assessment under clause (i), a hearing is not requested pursuant to subparagraph (H) within the period of time allowed under such subparagraph, the assessment shall constitute a final and unappealable order.

**(F)** Authority to modify or remit penalty. Any appropriate Federal banking agency may compromise, modify, or remit any penalty which such agency may assess or had already assessed under subparagraph (A), (B), or (C).

**(G)** Mitigating factors. In determining the amount of any penalty imposed under subparagraph (A), (B), or (C), the appropriate agency shall take into account the appropriateness of the penalty with respect to—

**(i)** the size of financial resources and good faith of the insured depository institution or other person charged;

**(ii)** the gravity of the violation;

**(iii)** the history of previous violations; and

**(iv)** such other matters as justice may require.

**(H)** Hearing. The insured depository institution or other person against whom any penalty is assessed under this paragraph shall be afforded an agency hearing if such institution or person submits a request for such hearing within 20 days after the issuance of the notice of assessment.

**(I)** Collection.

**(i)** Referral. If any insured depository institution or other person fails to pay an assessment after any penalty assessed under this paragraph has become final, the

agency that imposed the penalty shall recover the amount assessed by action in the appropriate United States district court.

**(ii)** Appropriateness of penalty not reviewable. In any civil action under clause (i), the validity and appropriateness of the penalty shall not be subject to review.

**(J)** Disbursement. All penalties collected under authority of this paragraph shall be deposited into the Treasury.

**(K)** Regulations. Each appropriate Federal banking agency shall prescribe regulations establishing such procedures as may be necessary to carry out this paragraph.

**(3)** Notice under this section after separation from service. The resignation, termination of employment or participation, or separation of an institution-affiliated party (including a separation caused by the closing of an insured depository institution) shall not affect the jurisdiction and authority of the appropriate Federal banking agency to issue any notice or order and proceed under this section against any such party, if such notice or order is served before the end of the 6-year period beginning on the date such party ceased to be such a party with respect to such depository institution (whether such date occurs before, on, or after the date of the enactment of this paragraph [enacted Aug. 9, 1989]).

**(4)** Prejudgment attachment.

**(A)** In general. In any action brought by an appropriate Federal banking agency (excluding the Corporation when acting in a manner described in section 11(d)(18)) pursuant to this section, or in actions brought in aid of, or to enforce an order in, any administrative or other civil action for money damages, restitution, or civil money penalties brought by such agency, the court may, upon application of the agency, issue a restraining order that—

**(i)** prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property; and

**(ii)** appoints a temporary receiver to administer the restraining order.

**(B)** Standard.

**(i)** Showing. Rule 65 of the Federal Rules of Civil Procedure shall apply with respect to any proceeding under subparagraph (A) without regard to the

requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

**(ii)** State proceeding. If, in the case of any proceeding in a State court, the court determines that rules of civil procedure available under the laws of such State provide substantially similar protections to a party's right to due process as Rule 65 [Federal Rule of Civil Procedure 65] (as modified with respect to such proceeding by clause (i)), the relief sought under subparagraph (A) may be requested under the laws of such State.