No. 23-60617

# In the
# United States Court of Appeals for the Fifth Circuit

SAUL ORTEGA AND DAVID ROGERS, JR.,

*Petitioners,*

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,

*Respondent.*

Petition for Review of Final Decision of the Comptroller of the Currency
AA-EC-2017-44 and AA-EC-2017-45

**BRIEF OF INDEPENDENT COMMUNITY BANKERS OF
AMERICA AND INDEPENDENT BANKERS ASSOCIATION OF
TEXAS AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS**

Kevin S. Elliker
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219
(804) 788-8200
kelliker@HuntonAK.com

*Counsel for Amici Curiae*

# STATEMENT OF INTERESTED PARTIES

*Ortega v. Office of the Comptroller of the Currency*, No. 23-60617

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record for *amici curiae* Independent Community Bankers of America and Independent Bankers Association of Texas certifies that the following listed persons and entities, in addition to those already listed in Petitioners' principal brief, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| *Amici Curiae* | Counsel for *Amici Curiae* |
|---|---|
| INDEPENDENT COMMUNITY BANKERS OF AMERICA | Kevin S. Elliker HUNTON ANDREWS KURTH LLP |
| INDEPENDENT BANKERS ASSOCIATION OF TEXAS | |
| | */s/ Kevin S. Elliker* Kevin S. Elliker |

# TABLE OF CONTENTS

Statement of Interested Parties...................................................i

Table of Authorities............................................................. iii

Interest of *Amici Curiae* ........................................................1

Argument..........................................................................3

I. The five-year statute of limitations for the OCC's enforcement claims starts with the underlying misconduct. ..............................6

    A. Congress prescribed various avenues for Banking Agencies to enforce penalties for misconduct. ........................7

    B. Under 28 U.S.C. § 2462, a penalty-enforcement claim first accrues at the time of the violation. ....................................10

    C. The latent effects of misconduct do not cause claims for that misconduct to re-accrue.................................................13

II. The Seventh Amendment entitles banks and bankers to a jury trial for civil monetary penalty claims. ........................................19

    A. The Seventh Amendment serves as a check against government overreach...........................................................20

    B. *Jarkesy* confirmed the Seventh Amendment's application to administrative proceedings...............................................22

    C. The Seventh Amendment prohibits Banking Agencies from pursuing civil monetary penalties in a juryless administrative tribunal.............................................................24

        1. Civil monetary penalties pursued under Section 1818(i) are legal remedies...........................................24

        2. The nature of the Comptroller's cause of action confirms that the Seventh Amendment applies..........26

    D. The Public Rights Exception does not eliminate the Seventh Amendment concerns here. ...................................28

Conclusion ......................................................................30

Certificate of Service ..........................................................31

Certificate of Compliance.......................................................32

# TABLE OF AUTHORITIES

**Page**

**Cases**

*3M Co. (Minn. Min. & Mfg.) v. Browner,*
  17 F.3d 1453 (D.C. Cir. 1994)..............................................................18

*Adams v. Woods,*
  6 U.S. (2 Cranch) 336 (1805)..............................................................13

*Blakely v. Washington,*
  542 U.S. 296 (2004)..............................................................................22

*Chauffeurs, Teamster & Helpers, Loc. No. 391 v. Terry,*
  494 U.S. 558 (1990)..............................................................................20

*de la Fuente v. FDIC,*
  332 F.3d 1208 (9th Cir. 2003)............................................................13

*Dimick v. Schiedt,*
  293 U.S. 474 (1935)..............................................................................19

*Erlinger v. United States,*
  602 U.S. 821 (2024)..............................................................................21

*Gabelli v. SEC,*
  568 U.S. 442 (2013).............................. 5, 11, 12, 13, 17, 18, 19

*Granfinanciera, S.A. v. Nordberg,*
  492 U.S. 33 (1989)..........................................................................23, 29

*Hun v. Cary,*
  82 N.Y. 65 (1880)..................................................................................27

*In re Hooper,*
  112 B.R. 1009 (B.A.P. 9th Cir. 1990)................................................27

*Jacob v. United States,*
  13 F. Cas. 267 (C.C.E.D. Va. 1821) (No. 7157)...........................28

*Jarkesy v. SEC,*
  34 F.4th 446 (5th Cir. 2022)..............................................................23

*Jefferson Nat'l Bank of Miami Beach v. Cen. Nat'l Bank in Chicago,*
  700 F.2d 1143 (7th Cir. 1983) ............................................................ 27

*Jordan v. Holt,*
  608 S.E.2d 129 (S.C. 2005) ................................................................. 27

*Parsons v. Bedford,*
  28 U.S. (3 Pet.) 433 (1830) ................................................................. 22

*Proffitt v. FDIC,*
  200 F.3d 855 (D.C. Cir. 2000) .............................................. 7, 14, 16, 17

*R.R. Telegraphers v. Ry. Express Agency,*
  321 U.S. 342 (1944) ............................................................................ 12

*Ross v. Bernhard,*
  396 U.S. 531 (1970) ............................................................................ 19

*Rotella v. Wood,*
  528 U.S. 549 (2000) ............................................................................ 12

*SEC v. Jarkesy,*
  144 S. Ct. 2117 (2024) ................ 5, 19, 21, 22, 23, 24, 25, 26, 28, 29, 30

*Tull v. United States,*
  481 U.S. 412 (1987) .................................................... 22, 23, 24, 26, 28

*United States v. Core Laboratories, Inc.,*
  759 F.2d 480 (5th Cir. 1985) ........................................................... 5, 11

*United States v. Mundell,*
  27 F. Cas. 23 (C.C.D. Va. 1795) (No. 15,834) ..................................... 28

*Wallace v. Kato,*
  549 U.S. 384 (2007) ............................................................................ 12

*Wilson v. Garcia,*
  471 U.S. 261 (1985) ............................................................................ 13

**Statutes and Regulations**

12 C.F.R. § 4.6 ......................................................................................... 22

12 U.S.C. § 1818(e) .................................................................................... 8

12 U.S.C. § 1818(e)(1)(A) ...................................................... 8

12 U.S.C. § 1818(e)(1)(B) .............................................. 8, 9, 11

12 U.S.C. § 1818(e)(1)(C) ................................................ 8, 10

12 U.S.C. § 1818(i) ................................................................ 9

12 U.S.C. § 1818(i)(1)(B) ................................................... 11

12 U.S.C. § 1818(i)(2) .................................................. 30, 31

12 U.S.C. § 1818(i)(2)(A) ..................................................... 9

12 U.S.C. § 1818(i)(2)(B) ................................................ 9, 10

12 U.S.C. § 1818(i)(2)(C) ................................................... 10

12 U.S.C. § 1818(i)(2)(G) ................................................... 32

12 U.S.C. § 1818(i)(2)(J) .................................................... 32

U.S. Const. amend. VII ...................................................... 27

## Administrative Decisions

*In the Matter of Ortega*, Nos. AA-EC-2017-44, AA-EC-2017-45,
2020 WL 8919757, at *7 (O.C.C. Dec. 18, 2020) ...................... 16, 17, 18

## Other Authorities

1 Annals of Cong. 437 (1789) (Joseph Gales ed., 1834) ........................... 26

3 William Blackstone,
*Commentaries on the Laws of England* (1768) ............................. 24, 25

Am. Ass'n of Bank Directors, *AABD Survey Results on Measuring Bank Director Fear of Personal Liability Are Not Good News* (Apr. 9, 2014), *available at* https://perma.cc/HM6G-WJ7G ........................................... 3

David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1011 (2011) ................................................. 33

S. Rep. No. 363, 89th Cong. 1st Sess. 7 ................................. 13

The Declaration of Independence para. 15 (U.S. 1776) ........................... 26

## INTEREST OF *AMICI CURIAE*[1]

The Independent Community Bankers of America is a national association dedicated exclusively to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services. ICBA's membership comprise more than half of depository institutions in the country. With nearly 50,000 locations nationwide, ICBA's members employ nearly 700,000 Americans and are the only physical banking presence in one in three U.S. counties. Holding $5.8 trillion in assets, $4.8 trillion in deposits, and $3.8 trillion in loans to consumers, small businesses, and the agricultural community, ICBA's members channel local deposits into the Main Streets and neighborhoods they serve, spurring job creation, fostering innovation, and fueling their customers' dreams in communities throughout America.

The Independent Bankers Association of Texas is the largest state community banking organization in the nation, with membership

---

[1] Undersigned counsel for *amici curiae* certifies that this brief was not authored in whole or part by counsel for any of the parties; and no one other than *amici* and its counsel have contributed money for the brief. Counsel for all parties have consented to the filing of this brief.

comprising more than 2,000 banks and branches in 700 Texas communities. Providing safe and responsible financial services to all Texans, IBAT member banks hold assets ranging in size from $27 million to $39 billion with combined assets statewide of nearly $256 billion. IBAT advocates for and represents the interests of its members, who are committed to supporting and investing in their local communities.

*Amici* have an interest in the implications of this case on their members and their members' employees. Both banks and bankers alike enjoy the full protection of the Seventh Amendment, which entitles them to a civil jury trial when the government seeks to impose civil monetary penalties for alleged violations of the law. Without that protection, banks and bankers must defend themselves before the agency itself rather than a jury of their peers. The infirmity of that situation is exacerbated by an interpretation of the applicable five-year limitations period that permits Banking Agencies to impose punishment based on conduct much older than that—well after evidence has become stale and memories have faded. *Amici* acknowledge the need for meaningful oversight. But the Constitution and fundamental fairness require the government to recognize the rights of the bankers and banks it regulates.

# ARGUMENT

Community banks play a vital role in the functioning of the country's financial system, state and local economies, and the day-to-day lives of Americans. As pillars of Main Street, community banks and the bankers who run them support local businesses and help individuals realize their economic potential. The financial wellbeing of our Nation and our neighbors thus depends on a pool of talented, dedicated professionals in the banking industry.

That talent is getting harder and harder to come by. According to one survey, about 1 in 4 banks reported that a bank director had resigned or refused to serve on a loan committee, or that a bank director candidate refused to become a director, for the same reason: the fear of personal liability.[2] The consequences of that liability are not trivial. As part of their regulatory oversight of financial institutions, federal Banking Agencies can bar individuals from the industry and punish banks and bankers with staggering civil monetary penalties for alleged violations of

---

[2] Am. Ass'n of Bank Directors, *AABD Survey Results on Measuring Bank Director Fear of Personal Liability Are Not Good News* (Apr. 9, 2014), *available at* https://perma.cc/HM6G-WJ7G.

banking laws.[3] Those civil monetary penalties may range anywhere from a few thousand to millions of dollars per day.

This case raises two critical issues that highlight the uncertainty bankers face when Banking Agencies seek to impose penalties against them for allegations of misconduct.

*First*, the Office of the Comptroller of the Currency brought this enforcement action against Petitioners in September 2017 based largely on alleged misconduct that took place between 2008 and 2011. The applicable statute of limitations to the OCC's claims is five years, *see* 28 U.S.C. § 2462, making claims based on pre-2012 allegations time-barred. The Comptroller nevertheless concocted an expansive interpretation of the statute of limitations by holding that the latent ripple effects of banker misconduct cause the claims accrue—and re-accrue—every time one of those effects is felt.

---

[3] Several federal agencies may bring charges against and seek civil money penalties from banks and bankers, including the Federal Deposit Insurance Corporation (FDIC), the Federal Reserve Board (FRB), and the Office of the Comptroller of the Currency (OCC) (collectively, the "Banking Agencies"). This case involves an adjudication by the OCC, but the constitutional and statutory issues apply to each Banking Agency.

The Comptroller's accrual rule is wrong and barred by the Supreme Court's decision in *Gabelli v. SEC*, 568 U.S. 442 (2013), and this Court's decision in *United States v. Core Laboratories, Inc.*, 759 F.2d 480 (5th Cir. 1985). Under those decisions, the five-year statute of limitations for government enforcement actions begins when the government can first bring that action—at the time of the violation. That commonsense understanding reflects the underlying policy of statutes of limitations, which are critically important when the government seeks civil penalties.

*Second*, the OCC adjudicated its claims against Petitioners in a juryless administrative tribunal. But because the OCC sought civil monetary penalties—which the Comptroller awarded to the tune of $250,000 against each Petitioner—the OCC's adjudication violated Petitioners' right to a jury trial under the Seventh Amendment. As the Supreme Court recently explained in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), the Seventh Amendment guarantees the right to a jury trial for civil claims seeking legal remedies. In that case, the Court had little trouble concluding that the civil monetary penalties sought by the government fit that description, so the government could not pursue them without going through a jury trial in an Article III court.

The civil monetary penalties imposed on Petitioners here are no different from the ones in *Jarkesy*. The OCC sought money awards premised on Petitioners' alleged culpability and payable to the government. Such awards could never be deemed equitable. And because the OCC's claims resemble actions available at common law, the Seventh Amendment applies.

The errors committed by the OCC in this case exemplify the kind of uncertainty banks and bankers face when regulators are permitted to craft their own rules for when and how they may extract punishment for alleged misconduct. This Court should step in and make clear that Banking Agencies cannot manipulate rules of accrual to extend the life of potential enforcement actions *ad infinitum* and likewise hold that the Seventh Amendment forbids agencies from using juryless administrative tribunals to impose punitive monetary sanctions.

## I. The five-year statute of limitations for the OCC's enforcement claims starts with the underlying misconduct.

The OCC brought claims against Petitioners seeking two remedies: prohibition from banking and the imposition of civil monetary penalties. Federal law imposes a five-year statute of limitations on those claims.

*See* 28 U.S.C. § 2462. That five-year clock begins running "from the date when the claim *first* accrued." *Id.* (emphasis added).

As explained below, the prerequisites for prohibition and civil monetary penalties vary slightly, but they each arise from banker misconduct. Misconduct may have ripple effects far into the future, but a claim based on that misconduct can "first" accrue only once—when the misconduct happens. That is the event that triggers the statute of limitations and starts the five-year clock for an enforcement claim based on that misconduct.

## A. Congress prescribed various avenues for Banking Agencies to enforce penalties for misconduct.

Congress gave Banking Agencies "a great deal of discretion" and the ability "to prosecute a wide range of misconduct." *Proffitt v. FDIC*, 200 F.3d 855, 866 (D.C. Cir. 2000) (Silberman, J., dissenting). The statutes here exemplify the "low threshold" those Agencies must clear to bring a civil enforcement action for alleged misconduct. *Id.*

Under 12 U.S.C. § 1818(e), Banking Agencies may prohibit individuals from participating in banking. The Agency may order prohibition if it concludes the individual committed certain misconduct (such as violating the law, regulations, orders, or government-imposed

conditions) in a particular manner ("involv[ing] dishonesty" or "willful or continuing disregard" for the bank's "safety or soundness") with a particular effect. *Id.* § 1818(e)(1)(A)-(C). As to the required effect, the Banking Agency must conclude that, as a result of the individual's misconduct, (i) the bank "has suffered or will probably suffer financial loss or other damage"; (ii) "the interests" of the bank's "depositors have been or could be prejudiced"; or (iii) the individual "has received financial gain or other benefit" from the misconduct. *Id.* § 1818(e)(1)(B).

Under 12 U.S.C. § 1818(i), Banking Agencies may impose civil monetary penalties for misconduct. The statute outlines three tiers of increasing penalties. A first-tier penalty (up to $5,000 per day) may be imposed based solely on the fact of misconduct, such as a violation of a law, regulation, order, or some other condition imposed by a Banking Agency. 12 U.S.C. § 1818(i)(2)(A). A second-tier penalty (up to $25,000 per day) may be imposed when specified misconduct (i) "is part of a pattern of misconduct"; (ii) "causes or is likely to cause more than a minimal loss" to the bank; or (iii) "results in pecuniary gain or other benefit" to the individual. *Id.* § 1818(i)(2)(B). A third-tier penalty (up to $1,000,000 or 1 percent of total assets per day) may be imposed if the

Agency concludes that the individual "knowingly or recklessly cause[d] a substantial loss" to the bank or realized "a substantial pecuniary gain or other benefit" due to the specified misconduct. *Id*. § 1818(i)(2)(C).

This enforcement scheme reflects Congress's determination that the severity of a penalty hinges on culpability. A mere violation of the law may be met with a first-tier money penalty, but that is not enough for a prohibition. Instead, the Banking Agency may impose prohibition only when the specified misconduct "involves personal dishonesty" or reflects reckless behavior. *Id*. § 1818(e)(1)(C). Similarly, the difference between a second- and third-tier penalty depends, in part, on the magnitude of the loss or ill-gotten gain attributable to the misconduct. *Id.* § 1818(i)(2)(B)-(C).

Congress also signaled that culpability can be measured in different ways. Prohibition may be appropriate when dishonest or reckless misconduct hurts the bank but not its depositors, vice-versa, or both, but such loss is not required for prohibition if the banker reaped a benefit. *Id.* § 1818(e)(1)(B). A second-tier penalty may be imposed irrespective of any loss when the banker engages in "a pattern of misconduct" or reaps a "pecuniary gain or other benefit." *Id.* § 1818(i)(1)(B)(ii).

Finally, Congress did not require Banking Agencies to wait for alleged misconduct to cause harm before they may initiate an enforcement action. Prohibition can be ordered if the bank "will *probably* suffer" a loss or depositors "*could* be prejudiced." *Id.* § 1818(e)(1)(B)(i), (ii) (emphasis added). Second-tier penalties can be imposed if the misconduct "is *likely* to cause more than a minimal loss." *Id.* § 1818(i)(B)(ii)(II). The enforcement scheme enacted by Congress thus permits an Agency to step in after misconduct has occurred but before a bank realizes a loss, which precludes the accused from mounting a "no harm, no foul" defense.

## B. Under 28 U.S.C. § 2462, a penalty-enforcement claim first accrues at the time of the violation.

Although Congress gave Banking Agencies discretion and a "low threshold" to pursue enforcement actions under 12 U.S.C. § 1818, that discretion is not limitless. As relevant here, enforcement actions seeking prohibition or civil monetary penalties are subject to the statute of limitations imposed under 28 U.S.C. § 2462. Under that provision, the government must bring its enforcement action "within five years from the date when the claim first accrued." *Id.*

Nearly forty years ago, this Court held that a claim first accrues under § 2462 on "the date of the violation." *United States v. Core Labs., Inc.*, 759 F.2d 480, 482 (5th Cir. 1985). Surveying interpretations of the statute, the Court observed "that the date of the underlying violation has been accepted without question as the date when the claim first accrued, and, therefore, as the date on which the statute began to run." *Id.* (collecting cases). The Court also noted that legislative history cross-referencing § 2462 reflected the understanding that "the time is reckoned from the commission of the act giving rise to the liability." *Id.* (quoting S. Rep. No. 363, 89th Cong. 1st Sess. 7). "It is thus abundantly clear," the Court explained, "that both the courts and Congress have construed the 'first accrual' language of § 2462 to mean *the date of the violation*." *Id.* (emphasis added). Otherwise, alternative interpretations of the period risk "derogation of the right to be free of stale claims, which comes in time to prevail over the right to prosecute them." *Id.* at 483.

The Supreme Court bolstered that interpretation of § 2462 in 2013 when it held that the government could not seek civil monetary penalties based on a violation that occurred more than five years before it brought the action. *Gabelli v. SEC*, 568 U.S. 442, 448 (2013). Rejecting

11

application of a discovery rule for enforcement actions, the Court imposed the "standard rule" on government regulators: "a claim accrues when the plaintiff has a complete and present cause of action." *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Thus, "a claim based on fraud accrues—and the five-year clock begins to tick—when a defendant's allegedly fraudulent conduct occurs." *Id.*

Strict application of § 2462 is especially important when it comes to government enforcement actions. The statute "sets a fixed date when exposure to the specified Government enforcement efforts ends, advancing 'the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.'" *Id.* (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). Absent a clear rule, unsuspecting defendants could be "'surprise[d] through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" *Id.* (quoting *R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348-49 (1944)). Such surprise undermines both our sense of justice and societal norms, as "'even wrongdoers are entitled to assume that their sins may be forgotten.'" *Id.*

at 449 (quoting *Wilson v. Garcia*, 471 U.S. 261, 271 (1985)). Invoking Chief Justice Marshall, the Court observed "that it 'would be utterly repugnant to the genius of our laws' if actions for penalties could 'be brought at any distance of time.'" *Id.* at 452 (quoting *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 342 (1805)).

Application of *Core Laboratories* and *Gabelli* to Petitioners should have been straightforward. Because the OCC brought its enforcement action in September 2017, the underlying violation—that is, the specified misconduct—giving rise to the claims must have taken place no earlier than September 2012. If the alleged misconduct took place before then, it could not provide the basis for the OCC's claims against Petitioners. *See, e.g.*, *de la Fuente v. FDIC*, 332 F.3d 1208, 1219 (9th Cir. 2003) (holding FDIC could not pursue § 1818 claims based on transactions more than five years before bringing enforcement action).

## C. The latent effects of misconduct do not cause claims for that misconduct to re-accrue.

The Comptroller rejected that straightforward application of the statute of limitations in favor of a contorted and problematic accrual rule for § 1818 enforcement actions. According to the Comptroller, "a charge may accrue at the time of the *first* occurrence of an effect *and then re-*

13

*accrue* based on a subsequent occurrence of the same type of effect." *In the Matter of Ortega*, Nos. AA-EC-2017-44, AA-EC-2017-45, 2020 WL 8919757, at *7 (O.C.C. Dec. 18, 2020) (emphasis added).  Indeed, the Comptroller says that each "subsequent occurrence of the same type of effect" gives rise to a new claim.  *Id.* at *7.  Thus, "each separate occurrence of an effect may give rise to separate accrual, regardless of whether an effect of the same type had previously occurred." *Id.* at *8.

The Comptroller rested that conclusion on an application of the D.C. Circuit's decision in *Proffitt v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000). *See In the Matter of Ortega*, 2020 WL 8919757, at *8 (applying § 2462 "consistent with *Proffitt*").  In that case, a split panel of the D.C. Circuit explained that, "[b]ecause misconduct and effect are separate prongs, the underlying conduct may not always immediately effect" the violation "and thus the accrual of the claim." *Proffitt*, 200 F.3d at 863.  "The same misconduct can produce different effects at different times, resulting in separate" enforcement claims "and separate accruals." *Id.*

*Proffitt* was incorrectly decided, and the Comptroller's accrual rule is wrong, misguided, and must be corrected for several reasons.

*First*, the Comptroller's theory of "re-accrual" ignores the statutory command that enforcement proceedings must be "commenced within five years from the date when the claim *first* accrued." 28 U.S.C. § 2462 (emphasis added). There is no statutory basis to conclude that "*a* charge" may "*re*-accrue." *In the Matter of Ortega*, 2020 WL 8819757, at *7 (emphasis added). The five-year clock for a particular claim can begin only once—the *first* time—and it does not reset based on subsequent events.

Moreover, it makes little sense to conclude—as the D.C. Circuit in *Proffitt* did—that different effects or multiple iterations of the same effect lead to new accruals of an enforcement claim for the same misconduct. Under that approach, a single act of alleged misconduct could expose an individual to an enforcement action *ad infinitum*, so long as the Banking Agency could point to some "effect" within the preceding five years. Yet Congress's emphasis on the *first* accrual of a claim implicitly acknowledges that even if the elements of a claim recur, the earliest accrual triggers the statute of limitations.

*Second*, by ignoring the "first accrued" language of § 2462, both the Comptroller and the D.C. Circuit would give the Banking Agencies, "as a

practical matter, the power to determine when the statute of limitations will be triggered." *Proffitt*, 200 F.3d at 865 (Silberman, J., dissenting). Because the Agency could bring a prohibition action under § 1818(e) when "a bank would probably suffer a financial loss," or when "an actual financial loss can [be] demonstrated," or even "based on probable or actual *other* damage," the clock to bring an enforcement claim would "begin[] to run when the agency *decides* it should begin to run." *Id.* at 865-66. There is no basis in the statute to support that extreme application of the statute of limitations.

*Third*, the Comptroller's focus on the various moments in time that different "effect" predicates could take place leads to improper and head-scratching applications of the statute. In the Comptroller's view, a single violation could pinball into countless enforcement claims each time some new consequence arises—once when there was the potential for loss, then once more when an actual loss is realized, then again and again every time new losses occur.

In reality, nearly all qualifying violations will have a requisite contemporaneous effect. When an individual commits misconduct, the extant circumstances should show whether the misconduct involved

personal dishonesty (meriting prohibition), was part of a pattern of misconduct or has caused or will likely cause a loss (meriting a second-tier penalty) or was simply a violation of law with no discernable effect (meriting a first-tier penalty).

On this point, Judge Silberman persuasively explained in his *Proffitt* dissent that the culpability and effect "prongs" of § 1818(e) are better understood "as *characteristics* of a banker's misconduct, which must be present at the time of the wrongful act." *Proffitt*, 200 F.3d at 866 (Silberman, J., dissenting).  Thus, if at the time of the misconduct, a loss is realized or likely, then a claim for a second-tier penalty has accrued. If no loss is likely, then a first-tier penalty may be all that is available. The limitations period must run from the time of the underlying violation, not "at every point that evidence of new consequences flowing from that misconduct is uncovered." *Id.*

*Fourth*, the Comptroller's rule amounts to an end-run around *Gabelli*—which postdated and thus abrogated *Proffitt*.  Allowing a delayed accrual when the ultimate effects of the misconduct are not readily apparent is simply a way of accounting for "latent injuries or injuries difficult to detect."  *3M Co. (Minn. Min. & Mfg.) v. Browner*, 17

F.3d 1453, 1460 (D.C. Cir. 1994). That is the very basis for the "discovery rule," which "rests on the idea that plaintiffs cannot have a tenable claim for the recovery of damages unless and until they have been harmed." *Id.* But the Supreme Court declined "to graft a discovery rule onto the statute of limitations of § 2462." *Gabelli*, 568 U.S. at 453. Government agencies charged with rooting out misconduct have "many legal tools at hand to aid in that pursuit." *Id.* at 451. For example, the Comptroller must conduct a "full-scope, on-site examination" of each regulated institution at least once every 12 to 18 months. 12 C.F.R. § 4.6. There is no reason OCC examiners must be permitted to wait and see if hard-to-find effects reveal themselves after the five-year limitations period for pursuing allegations of misconduct expires. Permitting otherwise runs headlong into *Gabelli*.

*Finally*, the Comptroller's rule undermines the fundamental policy underlying statutes of limitations. When misconduct that has "been allowed to slumber" can be roused awake by ripple effects years later, that which is most important to the accused will be least accessible—evidence lost, memories faded, witnesses gone. *Gabelli*, 568 U.S. at 448. Moreover, "[i]t would leave defendants exposed to Government

enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future." *Id.* at 452. Such circumstances are "utterly repugnant to the genius of our laws." *Id.* (quotation marks omitted).

*   *   *

The Comptroller's application of the statute of limitations to the enforcement claims here reflects an erroneous interpretation of 28 U.S.C. § 2462 that eviscerates the very purpose of limitations periods. This Court should hold, consistent with *Core Laboratories* and *Gabelli*, that enforcement claims under 12 U.S.C. § 1818(e) and § 1818(i) accrue when the specified misconduct occurs.

## II. The Seventh Amendment entitles banks and bankers to a jury trial for civil monetary penalty claims.

"The right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care.'" *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024) (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)). The right, which applies equally to individuals and corporations, *Ross v. Bernhard*, 396 U.S. 531, 532-33 (1970), stands as "a bulwark against those who would restrict a

right our forefathers held indispensable." *Chauffeurs, Teamster & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 578 n.7 (1990) (Brennan, J., concurring).

## A. The Seventh Amendment serves as a check against government overreach.

For centuries, the right to a jury trial stood as a defense against government abuse. William Blackstone referred to the jury-trial right as the "transcendent privilege" enjoyed by a citizen "that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbours and equals." 3 William Blackstone, *Commentaries on the Laws of England*, *377 (1768).

Nowhere is an individual's property, liberty, or person more at stake than when he is confronted by his own government. When "[t]he impartial administration of justice" is "entirely intrusted to the magistracy, a select body of men, and those generally selected by the prince or such as enjoy the highest offices in the state, their decisions, in spite of their own natural integrity, will have frequently an involuntary bias towards those of their own rank and dignity." *Id.* For that reason, Blackstone explained, "[e]very new tribunal, erected for the decision of

facts, without intervention of a jury … is a step towards establishing aristocracy, the most oppressive of absolute governments." *Id.* at *379.

The experience of American colonists proved Blackstone right. "[A]s tensions grew between the British Empire and its American Colonies, imperial authorities responded by stripping away that ancient right" based on the belief that colonial juries "found for defendants too often." *Erlinger v. United States*, 602 U.S. 821, 829 (2024). So "the English began evading American juries by siphoning adjudications to juryless admiralty, vice admiralty, and chancery courts." *Jarkesy*, 144 S. Ct. at 2128. This "tactic proved most effective at securing the verdicts they wished." *Erlinger*, 602 U.S. at 829 (internal quotation marks omitted). It also presaged the American Revolution. *See* The Declaration of Independence para. 15 (U.S. 1776) (listing the grievance of "depriving [the colonists] in many Cases, of the Benefits of Trial by Jury").

It is little wonder, then, that the Framers enshrined the jury right in both criminal and civil cases in the Bill of Rights. The Framers saw trial by jury as an extension of our democratic ideals—"a right resulting from a social compact, which regulates the action of the community, but is as essential to secure the liberty of the people as any one of the pre-

existent rights of nature."  1 Annals of Cong. 437 (1789) (Joseph Gales ed., 1834) (statement of James Madison).  In the United States, the jury "function[s] as circuitbreaker in the State's machinery of justice." *Blakely v. Washington*, 542 U.S. 296, 306 (2004).  The right to a civil jury trial is thus expressly "preserved" in the Seventh Amendment.  U.S. Const. amend. VII.

Since its ratification, the Seventh Amendment has been understood to "embrace[] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume."  *Jarkesy*, 144 S. Ct. at 2128 (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447 (1830)).  The Supreme Court has explained that the Seventh Amendment's application to "suits at common law" covered "legal rights" as opposed to cases involving "equitable rights alone."  *Parsons*, 28 U.S. at 446-47.  Whether a suit invoked legal or equitable rights historically depended on the remedy the plaintiff sought.  *See Tull v. United States*, 481 U.S. 412, 421 (1987).

## B.  *Jarkesy* confirmed the Seventh Amendment's application to administrative proceedings.

Earlier this year, in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), the Supreme Court affirmed this Court's judgment and reaffirmed that the

Seventh Amendment applies to juryless administrative adjudications. The case raised a Seventh Amendment challenge to the SEC's in-house enforcement action for securities fraud that resulted in a "civil penalty of $300,000." *Jarkesy v. SEC*, 34 F.4th 446, 449-50 (5th Cir. 2022). After examining the text and history of the Seventh Amendment, this Court explained that the right to a trial in civil cases extends to "suits brought under a statute as long as the suit seeks common-law-like legal remedies." *Id.* at 452. The SEC's enforcement action met that standard, meaning the agency's target "had the right for a jury to adjudicate the facts underlying any potential fraud liability that justifies penalties." *Id.* at 457.

The Supreme Court affirmed. The Seventh Amendment does not toggle off when a "claim is statutory," the Court explained, but instead applies when "a particular statutory claim … is 'legal in nature.'" *Jarkesy*, 144 S. Ct. at 2128 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). In turn, that conclusion depends on the nature of the cause of action and the nature of the remedy, with the remedy posing "the 'more important' consideration." *Id.* at 2129 (quoting *Tull*, 481 U.S. at 421). In *Jarkesy*, both factors showed that the SEC's

securities fraud action was "legal in nature." *Id.* at 2131. The Seventh Amendment therefore barred the SEC's in-house adjudication of that action. *See id.* at 2129-31.

## C. The Seventh Amendment prohibits Banking Agencies from pursuing civil monetary penalties in a juryless administrative tribunal.

*Jarkesy* compels the conclusion that the Comptroller's adjudication here violated the Seventh Amendment. As in *Jarkesy*, both the remedy imposed and the nature of the action are legal rather than equitable.

### 1. Civil monetary penalties pursued under Section 1818(i) are legal remedies.

In *Jarkesy*, "the remedy [was] all but dispositive." 144 S. Ct. at 2129. The same is true here. "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Id.* (quoting *Tull*, 481 U.S. at 422). "Actions by the Government to recover civil *penalties* under statutory provisions therefore historically have been viewed as one type of action in debt requiring trial by jury." *Tull*, 481 U.S. at 418-19 (emphasis added).

Start with the statutory authorization for the remedy obtained by the Comptroller. Under 12 U.S.C. § 1818(i)(2), Banking Agencies may

seek civil money penalties for violations of "any law or regulation," orders issued or conditions imposed by a Banking Agency, or agreements with a Banking Agency. Nothing in the law suggests a restorative purpose rather than "retributive or deterrent purposes." *Jarkesy*, 144 S. Ct. at 2129. Indeed, the statute calls the remedy exactly what it is: a "civil money *penalty*." 12 U.S.C. § 1818(i)(2) (emphasis added).

Similarly—and just like the remedial scheme in *Jarkesy*, *see* 144 S. Ct. at 2131—the statute here establishes three "tiers" of penalties, with each imposing a larger monetary sanction based on the culpability of the defendant. *See* 12 U.S.C. § 1818(i)(2); *supra* at 8. As with the SEC's tiered penalties, "the criteria that divide these tiers are also legal in nature," because "[e]ach tier conditions the available penalty on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied." *Jarkesy*, 144 S. Ct. at 2130.[4]

---

[4] The mitigating factors identified in the statute also reinforce the legal nature of the remedy. *See* 12 U.S.C. § 1818(i)(2)(G) (allowing Banking Agencies to consider "the size of financial resources and good faith" of the charged party, "the gravity of the violation," and "the history of previous violations"). These considerations reinforce focus on the culpability of a charged party, not the need to restore any victim to the status quo ante.

Finally, just like the SEC in *Jarkesy*, the Comptroller "is not obligated to return any money to victims," leaving the civil monetary penalty "no pretense of being equitable." *Id.* Indeed, the offenses for which the Comptroller may seek civil monetary penalties may not even have any "victims." Instead, "[a]ll penalties collected" under this scheme "shall be deposited into the Treasury." 12 U.S.C. § 1818(i)(2)(J). Because these civil penalties are "designed to punish and deter, not to compensate," they are "'a type of remedy at common law that could only be enforced in courts of law.'" *Jarkesy*, 144 S. Ct. at 2130 (quoting *Tull*, 481 U.S. at 422). The Comptroller's pursuit of such remedies entitled Petitioners to a jury trial under the Seventh Amendment.

### 2. The nature of the Comptroller's cause of action confirms that the Seventh Amendment applies.

As in *Jarkesy*, "the remedy is all but dispositive." 144 S. Ct. at 2129. Even so, the "close relationship between the causes of action in this case and common law" claims reinforces the applicability of the Seventh Amendment. *Id.* at 2130.

The claims against Petitioners include allegations that they breached their fiduciary duties. Although such claims sometimes may be brought in equity, "judges and lawyers of the common law courts

developed remedies that we would now identify as recognition and enforcement of fiduciary duties."  David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1011, 1034 (2011); *see In re Hooper*, 112 B.R. 1009, 1012 (B.A.P. 9th Cir. 1990) (observing that a money-damages action for "breach of fiduciary duty" was "the type of action that would have been brought in a court of law in the courts of England prior to the merger of law and equity").

For example, in *Hun v. Cary*, a bank receiver sought money damages from bank trustees for breach of fiduciary duty showing "improvidence and reckless extravagance."  82 N.Y. 65, 66 (1880).  The New York Court of Appeals rejected the defendants' argument that "the action was not a proper one to be tried before a jury, and should be tried before the equity branch of the court."  *Id.* at 79.  Instead, the action "was properly tried as an action at law" because the plaintiff sought "a money judgment."  *Id.*; *see also Jordan v. Holt*, 608 S.E.2d 129, 131 (S.C. 2005) ("[A] claim of breach of fiduciary duty is an action at law."); *Jefferson Nat'l Bank of Miami Beach v. Cen. Nat'l Bank in Chicago*, 700 F.2d 1143, 1149 (7th Cir. 1983) (affirming jury right in an action based on a breach

of fiduciary duty calling for the immediate payment of money "arising out of a breach of trust").

Suits for civil monetary penalties can also trace their roots to the actions of debt triable to a jury. *See, e.g.*, *Jacob v. United States*, 13 F. Cas. 267, 268-70 (C.C.E.D. Va. 1821) (No. 7157) (action in debt to recover penalty tried before a jury); *United States v. Mundell*, 27 F. Cas. 23 (C.C.D. Va. 1795) (No. 15,834) (same). Indeed, at the founding, "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Tull*, 481 U.S. at 422.

Here, OCC sought and obtained money awards against Petitioners by seeking civil monetary penalties for the alleged breach of fiduciary duties. The "close relationship between" the Comptroller's claim against Petitioners and traditional common law causes of action "confirms that this action is 'legal in nature.'" *Jarkesy*, 144 S. Ct. at 2131 (citation omitted). The Seventh Amendment thus applies.

## D. The Public Rights Exception does not eliminate the Seventh Amendment concerns here.

The above analysis leaves little doubt that the Seventh Amendment guarantees the right to a jury trial for the claims brought by the

Comptroller.  The "public rights" exception to that right does not alter that conclusion.

Under the public rights exception, "Congress may assign the matter for decision to an agency without a jury, consistent with the Seventh Amendment." *Jarkesy*, 144 S. Ct. at 2131.  Even so, the government "cannot 'conjure away the Seventh Amendment by mandating that traditional legal claims be … taken to an administrative tribunal.'" *Id.* at 2136 (ellipses in original) (quoting *Granfinanciera*, 492 U.S. at 52). "[W]hat matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled." *Id.*  "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is *mandatory*." *Id.* at 2132 (emphasis added).  The public rights exception intercedes only through "close attention to the basis for each asserted application of the doctrine" and must do so based on "background legal principles," not "practical considerations." *Id.* at 2134.

Here, no background principles support application of the public rights doctrine.  Long before federalized supervision of banks through the New Deal and the expansion of that oversight in the 1980s, banks and

bankers could be subject to common-law actions for the kind of conduct complained of here.  *See supra* Part II.C.2.  Although Congress has authorized the Banking Agencies to pursue these penalties in-house, "what matters is the substance of the action, not where Congress has assigned it."  *Jarkesy*, 144 S. Ct. at 2135.  And "the substance points in only one direction":  common-law adjudication of private rights.  *Id.*

## CONCLUSION

Because banks and bankers have a right to be free from the possibility of enforcement actions based on stale allegations, the Court should reject the Comptroller's interpretation of 28 U.S.C. § 2462.  And because the Seventh Amendment applies to civil monetary penalties sought under § 1818(i), the Court should hold that the government cannot obtain such penalties except through a jury trial.

Respectfully submitted,

*/s/ Kevin S. Elliker*
Kevin S. Elliker
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219
(804) 788-8200
kelliker@HuntonAK.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I caused the foregoing brief to be filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit. The Court's CM/ECF system was used to file the brief, and service will therefore be accomplished on all counsel of record.

> */s/ Kevin S. Elliker*
> Kevin S. Elliker
> HUNTON ANDREWS KURTH LLP
> Riverfront Plaza, East Tower
> 951 E. Byrd Street
> Richmond, Virginia 23219
> (804) 788-8200
> kelliker@HuntonAK.com
>
> *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(5), (a)(6), and 5th Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Century Schoolbook 14-point font.

I further certify that this brief complies with Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,004 words, excluding those portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

*/s/ Kevin S. Elliker*
Kevin S. Elliker
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219
(804) 788-8200
kelliker@HuntonAK.com

*Counsel for Amici Curiae*
