No. 23-60617

# In the United States Court of Appeals
# for the Fifth Circuit

SAUL ORTEGA & DAVID ROGERS,

*Petitioners,*

*v.*

OFFICE OF THE COMPTROLLER OF THE CURRENCY,

*Respondent.*

On Petition for Review from
the Office of the Comptroller of the Currency

**BRIEF *AMICUS CURIAE* OF THE NEW CIVIL LIBERTIES ALLIANCE
IN SUPPORT OF PETITIONERS**

Gregory Dolin
*Counsel of Record*
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
greg.dolin@ncla.legal

November 12, 2024          *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES.................................................. iii

SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES.........vi

CORPORATE DISCLOSURE STATEMENT.........................................vii

STATEMENT REGARDING CONSENT TO FILE AND FINANCIAL
CONTRIBUTIONS................................................................viii

INTEREST OF AMICUS CURIAE............................................1

STATEMENT OF THE CASE ...............................................3

ARGUMENT .....................................................................5

    I. THE SEVENTH AMENDMENT IS NOT MERELY A PERSONAL RIGHT, BUT
       A DIRECT LIMIT ON CONGRESSIONAL POWER TO SET UP
       ADMINISTRATIVE TRIBUNALS...........................................5

       A.   The Sorry Anglo-American History of Non-Jury Tribunals
           Informed the Thinking of the Founding Generation ...........6

       B.   The Seventh Amendment Was Meant to Deny Congress the
           Ability to Create Tribunals Similar to the Hated Vice-
           Admiralty Courts and the Court of Star Chamber .............10

    II. THE SEVENTH AMENDMENT APPLIES TO OCC'S ATTEMPT TO IMPOSE
       CIVIL PENALTIES.......................................................13

       A.   The Nature of the Penalty Sought Is 'All But Dispositive' . 13

       B.   OCC's Cause of Action Is Drawn Directly from Common
           Law or Is Analogous to Common Law Negligence..............15

    III. OCC'S IN-HOUSE ADJUDICATION VIOLATES ARTICLE III OF THE
       CONSTITUTION .........................................................19

IV. OCC's Bases for Rejecting Petitioner's Jury Request Do Not Withstand Legal Scrutiny .......................................................23

V. The Narrow Public Rights Exception Does Not Apply ..........24

CONCLUSION ........................................................................28

CERTIFICATE OF COMPLIANCE........................................30

CERTIFICATE OF SERVICE.................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n,*
   430 U.S. 442 (1977) .......................................................................... 6, 27

*Erlinger v. United States,*
   144 S.Ct. 1840 (2024) ........................................................................ 12

*Faber v. Ciox Health, LLC,*
   944 F.3d 593 (6th Cir. 2019) .............................................................. 17

*Filkins v. McAllister Bros.,*
   695 F.Supp. 845 (E.D. Va. 1988) ....................................................... 17

*Granfinanciera, S.A. v. Nordberg,*
   492 U.S. 33 (1989) ....................................................................... 15, 27

*Greco v. Jones,*
   38 F.Supp.3d 790 (N.D. Tex. 2014) ................................................... 18

*In re U. S. Fin. Sec. Litig.,*
   609 F.2d 411 (9th Cir. 1979) ................................................................ 8

*Kim v. Off. of Thrift Supervision,*
   40 F.3d 1050 (9th Cir. 1994) .............................................................. 17

*Loumiet v. United States,*
   968 F.Supp.2d 142 (D.D.C. 2013) ........................................................ 3

*Lucia v. SEC,*
   138 S. Ct. 2044 (2018) ......................................................................... 4

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
   59 U.S. 272 (1855) ............................................................................. 25

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.,*
   458 U.S. 50 (1982) ....................................................................... 21, 22

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*
   584 U.S. 325 (2018) ........................................................................... 24

*Ross v. Rittenhouse,*
   2 U.S. (2 Dall.) 160 (1792) ................................................................... 9

*Ruiz v. U.S. Att'y Gen.*,
  73 F.4th 852 (11th Cir. 2023) ............................................................ 20

*SEC v. Jarkesy*,
  144 S.Ct. 2117 (2024) .............. 7, 8, 13, 14, 20, 21, 22, 24, 25, 26, 27, 28

*Stern v. Marshall*,
  564 U.S. 462 (2011) ................................................................ 20, 21, 26

*That Walley v. Walley*,
  23 Eng. Rep. 609 (Ch. 1687) ............................................................... 19

*Tull v. United States*,
  481 U.S. 412 (1987) ............................................................... 14, 16, 27

**Constitutional Provisions**

U.S. Const. art. III § 1 ......................................................................... 20

U.S. Const. art. III, § 2, cl. 3 ................................................................. 6

**Statutes**

12 U.S.C. § 1 ........................................................................................ 3

12 U.S.C. § 1818 ...................................................................... 3, 22, 26

12 U.S.C. § 2 ........................................................................................ 3

Judiciary Act of 1789, 1 Stat. 73 ......................................................... 22

**Regulations**

12 C.F.R. § 19.40 .................................................................................. 4

**Other Authorities**

2 The Complete Anti-Federalist (H. Storing ed. 1981) ......................... 11

3 Max Farrand, The Records of the Federal Convention of 1787
  (1911) ................................................................................................ 10

3 William Blackstone, Commentaries on the Laws of England
  (R. Bell, Philadelphia ed. 1772) ........................................................ 11

5 William Holdsworth, A History of English Law (2d ed. 1937) .............. 7

Act of Cont'l Congress, Nov. 25, 1775 .................................................... 9

iv

Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*,
57 Minn. L. Rev. 639  (1973) ............................................................. 8, 9

Daniel D. Blinka, *Jefferson and Juries: The Problem of Law, Reason, and Politics in the New Republic*,
47 Am. J. Legal Hist. 35 (2005) ............................................................. 9

Decl. of Indep. (1776) ................................................................................ 7

Decl. of Rights & Grievances (1765) ....................................................... 7

Ecclesiastes 1:9 ........................................................................................... 6

Edward P. Cheyney, *The Court of Star Chamber*,
18 Am. Hist. Rev. 727 (1913) .................................................................. 7

*In re Saul Ortega, et al.*,
Nos. AA-EC-2017-44 and AA-EC-2017-45
(O.C.C. Nov. 30, 2023) ............................................................. 16, 17, 18

Leonard W. Levy, Freedom of Speech and Press in Early American History—Legacy of Suppression 281 (1963) ......................................... 9

Restatement (Second) of Torts § 500 (1965) ......................................... 17

Restatement (Second) of Torts § 7 (1965) ............................................. 18

Restatement (Second) of Torts § 874 (1979) ......................................... 19

Roger W. Kirst, *Administrative Penalties and the Civil Jury: The Supreme Court's Assault on the Seventh Amendment*,
126 U. Pa. L. Rev. 1281 (1978) .............................................................. 12

Ryan Patrick Alford, *The Star Chamber and the Regulation of the Legal Profession 1570-1640*, 51 Am. J. Legal Hist. 639 (2011) ............. 6

Suja A. Thomas, *A Limitation on Congress:'In Suits at Common Law'*, 71 Ohio St. L.J. 1071 (2010) ....................................................... 12

The Federalist No. 78 (Alexander Hamilton) (Cooke ed. 1961) ............. 20

The Federalist No. 83 (Alexander Hamilton) (Cooke ed. 1961) ....... 10, 11

William S. McKechnie, Magna Carta: A Commentary on The Great Charter of King John (2d ed. 1914) ..................................................... 14

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel for *amicus curiae* certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1, in addition to those listed in the Petitioners' Certificate of Interested Persons, have an interest in the outcome of the case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

***Amicus:*** The New Civil Liberties Alliance—a nonpartisan, nonprofit corporation exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). It does not have a parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

***Counsel for Amicus:*** Gregory Dolin is Senior Litigation Counsel for the New Civil Liberties Alliance and represents NCLA in this matter. Mark Chenoweth is President and Chief Legal Officer of NCLA.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel states that *amicus curiae* the New Civil Liberties Alliance is a nonprofit organization under the laws of the District of Columbia. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

/s/ Gregory Dolin
Gregory Dolin

## STATEMENT REGARDING CONSENT TO FILE AND FINANCIAL CONTRIBUTIONS

The New Civil Liberties Alliance certifies that it timely sought and received consent from all parties to the filing of this brief.

The New Civil Liberties Alliance states that no counsel for a party authored this brief in whole or in part; and that no person or entity, other than NCLA and its counsel, made a monetary contribution intended to fund the preparation and submission of this brief.

/s/ Gregory Dolin
Gregory Dolin

**INTEREST OF AMICUS CURIAE**

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil-rights organization devoted to defending constitutional freedoms from the administrative state's depredations. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself: due process of law, the right to live under laws made by the nation's elected lawmakers through constitutionally prescribed channels, the right to have executive power exercised only by actors directed by the President, and the right to a trial by jury, which is at stake in this appeal. Yet these selfsame rights are also very contemporary—and in dire need of renewed vindication—because Congress, federal administrative agencies, and even sometimes the courts have neglected them for so long.

NCLA aims to defend civil liberties—primarily by reasserting constitutional constraints on the administrative state. Although Americans still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional

administrative state within the Constitution's United States is the focus of NCLA's concern.

NCLA is particularly disturbed by Congress's channeling punitive enforcement actions away from fora controlled by common citizens—courtrooms with civil juries—and into administrative hearings where bureaucrats serve as prosecutor, judge and jury. That usurpation by the select few of powers that rightfully belong to the people, is present here, where the Office of the Comptroller of the Currency ("OCC") adjudicates claims that are akin to traditional common law causes of action and imposes monetary penalties, all before an administrative tribunal and without a jury. As the Supreme Court recently reaffirmed, the Seventh Amendment limits Congress's powers to create judicial or quasi-judicial bodies that can hear common law cases without juries.

Because Congress cannot vest OCC with powers that can only be exercised lawfully by citizen-jurors, the petition for review should be granted and the decision below vacated.

2

## STATEMENT OF THE CASE

Congress created the Office of the Comptroller of the Currency to "assur[e] the safety and soundness of, and compliance with laws and regulations, fair access to financial services, and fair treatment of customers by" financial institutions.  12 U.S.C. § 1(a).  The Comptroller is a Presidentially-appointed and Senate-confirmed officer within the Executive Branch.  *Id.* § 2.  OCC "is the federal supervisor, examiner, and enforcing agency for national banks."  *Loumiet v. United States*, 968 F.Supp.2d 142, 145 (D.D.C. 2013), *aff'd on reconsideration in part*, 65 F.Supp.3d 19 (D.D.C. 2014).  The authorizing statute empowers OCC to investigate violations of law, and, upon a finding of a violation, to impose a variety of penalties including monetary penalties, removal and prohibition orders that operate to destroy reputations and livelihoods, even when exercising only purely civil powers.  *See* 12 U.S.C. § 1818.

OCC conducts hearings in front of an administrative law judge ("ALJ") who issues a written report of findings and recommendations. The final decision on both liability and penalties rests with the

3

Comptroller himself. OCC does not utilize juries and instead relies on ALJs' findings of fact.[1]

In 2013, having concluded that First National Bank, Edinburg, Texas ("Bank") in which Saul Ortega and David Rogers, Jr. (jointly "Petitioners") served as officers, was "critically undercapitalized," OCC closed it and appointed FDIC as a receiver. Four years later, in 2017, OCC's Enforcement Counsel began proceedings against Petitioners. Enforcement Counsel charged Petitioners with a variety of lending-related misconduct that ultimately led to the failure of the Bank. The case was assigned to ALJ Christopher B. McNeil. However, following the Supreme Court's decision in *Lucia v. SEC*, 585 U.S. 237 (2018), the Comptroller reassigned ALJ C. Richard Miserendino. After ALJ Miserendino retired, the case was reassigned to ALJ Jennifer Whang. On September 30, 2022, ALJ Whang issued a "Recommended Decision." Petitioners and Enforcement Counsel both filed exceptions to that recommendation, and on November 30, 2023, the Comptroller issued a

---

[1] The Comptroller may permit oral argument as to exceptions raised by the charged party or the Enforcement Counsel, but the governing rules do not provide for witness presentations before the Comptroller. *See* 12 C.F.R. § 19.40.

"Final Decision" adopting in part and rejecting in part ALJ Whang's recommendations.

The Comptroller issued an order prohibiting Petitioners from "participat[ing] in any manner in the conduct of the affairs of any insured depository institution, agency, or organization," and additionally imposed a $250,000 "civil penalty" against *each* respondent.

Petitioners challenged OCC's action as, *inter alia*, (a) a violation of Article II because ALJs employed by FDIC are unconstitutionally shielded from removal; and (b) a violation of the Seventh Amendment's guarantee of a trial by jury. *Amicus* addresses the Seventh Amendment argument.

## ARGUMENT

Petitioners' arguments that Enforcement Counsel's allegations must be tried to a jury rather than a government bureaucrat are amply supported by the historical record and a proper understanding of the nature of Congressional power vis-à-vis the Constitution.

## I. THE SEVENTH AMENDMENT IS NOT MERELY A PERSONAL RIGHT, BUT A DIRECT LIMIT ON CONGRESSIONAL POWER TO SET UP ADMINISTRATIVE TRIBUNALS

Unlike the right to a jury trial in a criminal case, which was codified

in the original Constitution, *see* U.S. Const. art. III, § 2, cl. 3, a similar right in civil cases was omitted from the draft submitted to the several states for ratification. This was not accidental—it was done by design. The failure to include this right in civil actions became perhaps the biggest obstacle to the ratification of the Nation's charter. The lack of a right to a civil jury trial led the first Congress to propose—and the several States to quickly ratify—the Seventh Amendment.

### A.    *The Sorry Anglo-American History of Non-Jury Tribunals Informed the Thinking of the Founding Generation*

As the saying goes, "there is nothing new under the sun." Ecclesiastes 1:9. So too with administrative tribunals. Ever since the Anglo-American insistence upon jury trials and due process has existed, the government has tried to circumvent the protections that juries provide citizens. Often, these shortcuts are undertaken with expressions of good intentions for a means of "supplying speedy and expert resolutions of the issues involved." *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 461 (1977). *See also* Ryan Patrick Alford, *The Star Chamber and the Regulation of the Legal Profession 1570–1640*, 51 Am. J. Legal Hist. 639, 645 (2011) (noting that

6

"The Court of Star Chamber … responded to the limitations of the common law by dispensing the royal grace in a technically arbitrary, but also speedy, manner [in cases which were] unresolvable at common law or [which] involved issues in which the King might have a particular interest."). Though such processes often began with wide public support,[2] they just as often and just as quickly deteriorated into a system that abused individual rights. *See, e.g.*, Edward P. Cheyney, *The Court of Star Chamber*, 18 Am. Hist. Rev. 727, 740–41 (1913).

By the time of the American Revolution, the abuses of non-jury-based courts were not only well-known but also expressly provided cause for seeking independence from Great Britain. *See* Decl. of Indep. (1776) (listing "depriving [Americans] in many cases, of the benefits of Trial by Jury" as one of the abuses by and grievances against the King); *see also* Decl. of Rights & Grievances (1765) ("Th[e] trial by jury is the inherent and invaluable right of every British subject in these colonies."); *SEC v. Jarkesy*, 144 S.Ct. 2117, 2143 (2024) (Gorsuch, J., concurring)("The

---

[2] *See, e.g.*, 5 William Holdsworth, A History of English Law 189 (2d ed. 1937) (Court of Star Chamber "commanded popular approval"); Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 Stan. L. Rev. 1189, 1206 (1986) (noting that "the first federal independent regulatory commission was established with the support of overwhelming majorities in both houses of Congress").

abuses of these courts featured prominently in the calls for revolution. In the First Continental Congress, the assembled delegates condemned how Parliament 'extend[ed] the jurisdiction of Courts of Admiralty,' complained how colonial judges were 'dependent on the Crown,' and demanded the right to the 'common law of England' and the 'great and inestimable privilege' of a jury trial.). These pronouncements were grounded not just in things learned from books, but in long-held reactions to abuses well-known in England and directly experienced in the colonies.

Remonstrances in the Declaration of Independence against deprivation of the jury trial right reflect the Colonies' experience with English vice-admiralty courts. These courts were ostensibly set up to deal with criminal matters stemming from smuggling and tax avoidance, but their jurisdiction often bled into traditional common-law actions. *See* Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639, 654 n.47 (1973) (and sources cited therein); *Jarkesy*, 144 S.Ct. at 2142–43 (Gorsuch, J., concurring); *In re U.S. Fin. Sec. Litig.*, 609 F.2d 411, 420 (9th Cir. 1979) ("Colonial administrators had been circumventing the right [to a jury] by trying various cases, both criminal and civil, in the vice-admiralty courts.").

8

Vice-admiralty courts were seen as quite odious, both because they tried their cases without a jury *and because the government alone could choose where to bring cases*—in traditional common-law provincial courts or in the vice-admiralty court. *See* Daniel D. Blinka, *Jefferson and Juries: The Problem of Law, Reason, and Politics in the New Republic*, 47 Am. J. Legal Hist. 35, 79 (2005). Hence, following the American Revolution, *every* new state's constitution guaranteed a right to civil juries. *See* Wolfram, *supra* at 655. "In fact, 'the right to a trial by jury was probably the only one universally secured by the first American state constitutions … .'" *Id.* (quoting Leonard W. Levy, Freedom of Speech and Press in Early American History—Legacy of Suppression 281 (1963)).

So thoroughly did the Founding generation reject jury-less courts, some states even committed "prize" cases (traditionally within admiralty courts' jurisdiction) to juries. *See* Blinka, *supra* at 81; *see also* Act of Cont'l Congress, Nov. 25, 1775 (cited in *Ross v. Rittenhouse*, 2 U.S. (2 Dall.) 160, 162 (1792)). In short, both the English experience with the Court of Star Chamber and colonial injustice in vice-admiralty courts led the Founding Fathers to ensure such tribunals would not administer justice over their lives, liberty and property.

9

B.   *The Seventh Amendment Was Meant to Deny Congress the Ability to Create Tribunals Similar to the Hated Vice-Admiralty Courts and the Court of Star Chamber*

Although experience with jury-less courts caused each state to guarantee jury trials in state courts, when the Constitutional Convention drafted the Constitution to replace the Articles of Confederation, this guarantee was absent.   Anti-Federalists forcefully advocated against ratification of a Constitution that failed to guarantee civil jury trials.

The initial reason for the omission appears to have been that "[t]he cases open to a jury, differed in the different states; [making it] impracticable, on that ground, to have made a general rule" concerning civil juries in federal cases.  3 Max Farrand, The Records of the Federal Convention of 1787 at 101 (1911).  However, in the ratification debates, the justification for omitting the guarantee of the civil jury changed to (or at the very least was supplemented by) Alexander Hamilton's arguments regarding the limitations of the jury system.  In Federalist 83, Hamilton wrote of his "deep and deliberate conviction[] that there are many cases in which the trial by jury is an ineligible one," adding his concern that juries "will sometimes be under the influence of impressions which will not suffer them to pay sufficient regard to those considerations of public

10

policy which ought to guide their enquiries." He argued the Constitution *ought* to leave the right to a civil jury unprotected, leaving "the legislature … at liberty either to adopt that institution, or to let it alone." The Federalist No. 83, at 559, 568 (A. Hamilton) (Cooke ed. 1961). Had Hamilton won, Congress would be able to set up jury-less regulatory adjudication schemes.

However, the Anti-Federalists strongly disagreed. Centinel wrote:

> The policy of this right of juries, (says judge Blackstone) to decide upon fact, is founded on this: That if the power of judging were entirely trusted with the magistrates, or any select body of men, named by the executive authority, their decisions, in spite of their own natural integrity, would have a biass [*sic*] towards those of their own rank and dignity; for it is not to be expected, that the few should be attentive to the rights of the many.

2 The Complete Anti-Federalist 149 (H. Storing ed. 1981) (Letters of Centinel (II)); *accord* 3 William Blackstone, Commentaries on the Laws of England 379–80 (R. Bell, Philadelphia ed. 1772). Anti-Federalists understood that juries provided a bulwark against structural biases of government-employed adjudicators to rule in favor of the government— including vice-admiralty courts where the judges' own compensation depended on the number of vessels seized and fines imposed.

11

The Anti-Federalists carried the day. The First Congress rejected Hamilton's pitch for flexibility, proposing the Seventh Amendment which was adopted by the young nation. The Amendment, though part of the "Bill of *Rights*," was in reality a structural limitation on Congressional power to create non-jury courts. *See Erlinger v. United States*, 144 S.Ct. 1840, 1850 (2024) ("These principles represent not 'procedural formalities' but 'fundamental reservations of power' to the American people.") (quoting *Blakely v. Washington*, 542 U.S. 296, 305–06 (2004) (alterations omitted)); *see also* Suja A. Thomas, *A Limitation on Congress: 'In Suits at Common Law*,' 71 Ohio St. L.J. 1071 (2010). The historical record makes clear that *with respect to rights and remedies that existed at the time the Seventh Amendment was adopted*, Congress could not extinguish the right to trial by jury. *See* Roger W. Kirst, *Administrative Penalties and the Civil Jury: The Supreme Court's Assault on the Seventh Amendment*, 126 U. Pa. L. Rev. 1281, 1339 (1978) ("The seventh amendment *was* added to the Constitution to preserve the common law right as fully as possible and to ensure that any future Congresses would" indeed be rendered powerless to assign fact-finding to administrative agencies).

The historical record unquestionably favors Professor Kirst's view, and the Supreme Court confirmed as much just a few months ago in *Jarkesy*.

## II. THE SEVENTH AMENDMENT APPLIES TO OCC'S ATTEMPT TO IMPOSE CIVIL PENALTIES

### A.   *The Nature of the Penalty Sought Is 'All But Dispositive'*

As the Supreme Court explained just last Term, "the Framers used the term 'common law' in the Amendment 'in contradistinction to equity, and admiralty, and maritime jurisprudence.' The Amendment therefore 'embraces all suits which are not of equity or admiralty jurisdiction, *whatever may be the peculiar form which they may assume.*'" *Jarkesy*, 144 S.Ct. at 2128 (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446–47 (1830) (opinion by Story, J.)) (alterations omitted). The Court further emphasized that "whether th[e] claim is statutory is *immaterial* to this analysis." *Id.* Rather, what matters is the nature of "the cause of action and the remedy it provides," with "the remedy [being] the 'more important' consideration." *Id.* at 2129 (quoting *Tull v. United States*, 481 U.S. 412, 421 (1987)). And where the remedy authorized by statute is a civil monetary penalty, it is "all but dispositive" of the Seventh Amendment question. *Id.* Because "money damages are the prototypical

13

common law remedy," it can "'only be enforced in courts of law.'" *Id.* (quoting *Tull*, 481 U.S. at 422).

This understanding long predates the Constitution. Since the Magna Carta, monetary penalties had to be "fixed, not arbitrarily by the Crown," but rather by "honest men of the neighbourhood" (*i.e.*, a jury) following judicial proceedings. William S. McKechnie, Magna Carta: A Commentary on The Great Charter of King John, 287–88 (2d ed. 1914). "Prior to the enactment of the Seventh Amendment, English courts had held that a civil penalty suit was a particular species of an action in debt that was within the jurisdiction of the courts of law." *Tull*, 481 U.S. at 418. "After the adoption of the Seventh Amendment, federal courts followed this English common law in treating the civil penalty suit as a particular type of an action in debt, requiring a jury trial." *Id.*

The jury-less proceedings before the OCC violate this centuries-old understanding. Under the statute, the Executive, rather than "honest men of the neighbourhood" is permitted to fix the monetary penalty rather arbitrarily, by deciding a) which "tier" of penalty the alleged offense qualifies for, b) how long the alleged offense lasted, and c) fixing any penalty (up to the statutory maximum) that he deems fitting. Thus,

14

under the statute, the Executive decides guilt, the level of culpability, and the appropriate punishment—all decisions traditionally committed to a jury's judgment.

Furthermore, it is well established that "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 61 (1989). Thus, the only question before this Court is whether § 1818 is sufficiently analogous to an action at common law both as to the basis for the claim and the remedy provided. As to the latter, as already stated, the very nature of a monetary civil penalty leads to the conclusion that the action against Petitioners can only be heard by a jury. But the nature of the action itself also strongly counsels in favor of that same result.

B.   *OCC's Cause of Action Is Drawn Directly from Common Law or Is Analogous to Common Law Negligence*

In determining whether a statutory claim is analogous to a suit at common law for Seventh Amendment purposes, there need not be a precise, element-by-element, eighteenth-century common law analogue

to the statutory cause of action. *Tull*, 481 U.S. at 421. For example, the *Tull* Court held that a civil-penalty action for violating the Clean Water Act was sufficiently analogous to a common-law action in debt and a public-nuisance action. *Id.* at 422.

Here, OCC's claim rests on an action analogous to negligence—a traditional common-law cause of action. Furthermore, OCC's claim that rests on breach of fiduciary duty is not merely analogous to, but is drawn directly from, common law.

Taking the "unsafe or unsound practices" first, it is evident that OCC's claim is analogous to negligence. Under OCC's own explanation, a cause of action is made out where the Enforcement Counsel establishes "the separate elements of misconduct and effect." *In re Saul Ortega, et al.*, Nos. AA-EC-2017-44 and AA-EC-2017-45 at 20 (O.C.C. Nov. 30, 2023). In turn, "misconduct can take the form of a violation of law, breach of fiduciary duty, or the reckless engagement in an unsafe or unsound practice in conducting the affairs of the institution in question." *Id.* at 21

As any first-year law student knows, in civil context, "a violation of law" is merely negligence *per se* (provided all the other negligence elements are met). *See, e.g., Faber v. Ciox Health, LLC*, 944 F.3d 593,

16

599 (6th Cir. 2019) ("That aptly named doctrine permits a court to treat a statutory violation as a per se breach of the standard of care."). And "recklessness," though a standard higher than mere negligence, *see, e.g.*, *Kim v. Off. of Thrift Supervision*, 40 F.3d 1050, 1054 (9th Cir. 1994), is still a well-known standard in the common law of torts and is applied in the exact same manner as an ordinary negligence standard. *See* Restatement (Second) of Torts § 500 (1965) (defining recklessness); *id.* § 501(a) ("[T]he rules which determine the actor's liability to another for reckless disregard of the other's safety are the same as those which determine his liability for negligent misconduct.").

Next, under OCC's own definition, an "unsafe or unsound practice" includes "any action or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." *In re Ortega*, at 69. This formulation essentially parrots the classic definition of negligence. *See, e.g.*, *Filkins v. McAllister Bros.*, 695 F.Supp. 845, 848 (E.D. Va. 1988) ("The question [in any negligence case] is what does a reasonably prudent person acting prudently do or fail to

17

do, and what is the accepted standard of the industry.").

The OCC also held that the "effect prong incorporates actual and proximate causation" requirements, which are also borrowed directly from the common law of torts. Indeed, the OCC even cited the Restatement of Torts to buttress its conclusion that the causation requirement was met in the present case. *In re Ortega*, at 79–80.

The "effect prong," by definition, also incorporates an injury requirement, and under OCC's own definition requires a showing that as a result of the alleged misconduct, "the [banking] institution at issue 'has suffered or will probably suffer financial loss or other damage,' that the institution's depositors' interests 'have been or could be prejudiced,' or that the charged party 'has received financial gain or other benefit.'" *Id.* at 20 (quoting 12 U.S.C. § 1818(e)(1)(B)). This language parallels the common law's requirement of injury or harm as an element of the negligence tort. *See* Restatement (Second) of Torts § 7 (1965) ("The word "harm" is used throughout the Restatement of this Subject to denote the existence of loss or detriment in fact of any kind to a person resulting from any cause."); *Greco v. Jones*, 38 F.Supp.3d 790, 801 (N.D. Tex. 2014) ("In Texas, a cause of action for negligence requires three elements: a

legal duty owed by one person to another, a breach of that duty, and damages proximately caused by that breach.") (citing *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002)).  Thus, the statutory cause of action for "unsafe or unsound" banking practices is fully analogous to a common law negligence action.

When it comes to OCC's cause of action for breach of fiduciary duties, analogies do not even need to be drawn, because breach of fiduciary duty *is* a common law tort.  *See* Restatement (Second) of Torts § 874 (1979) ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation.").  English courts have dealt with these principles at least as early as 1687.  *See That Walley v. Walley*, 23 Eng. Rep. 609 (Ch. 1687).

Given the type of action brought by the OCC and the remedy sought, it is beyond peradventure that this cause of action must (absent a waiver) be tried to a jury.

## III.    OCC's In-House Adjudication Violates Article III of the Constitution

In addition to violating the Seventh Amendment, OCC's use of executive officers—an ALJ and the Comptroller—to adjudicate the claim

against Petitioners also violates Article III of the Constitution, which establishes an independent judiciary as a "guardian of individual liberty and separation of powers." *Stern v. Marshall*, 564 U.S. 462, 495 (2011). "The judicial Power of the United States" is "vested" in the federal courts, and it secures tenure and salary protection for the judges of those courts, among other protections. U.S. Const. art. III § 1. These protections ensure the independence of the federal courts from the political branches, for "there is no liberty, if the power of judging be not separated from the legislative and executive powers." The Federalist No. 78, at 523 (Alexander Hamilton) (Cooke ed. 1961) (quoting 1 Montesquieu, *The Spirit of the Laws* 181).

The Supreme Court clarified over 200 years ago that "Congress couldn't imbue executive officers with judicial authority." *Ruiz v. U.S. Att'y Gen.*, 73 F.4th 852, 864 (11th Cir. 2023) (Newsom, J., concurring) (citing *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 (1792)). More recently, it explained that "[u]nder the basic concept of separation of powers … that flow[s] from the scheme of a tripartite government adopted in the Constitution, the judicial Power of the United States cannot be shared with the other branches." *Jarkesy*, 144 S.Ct. at 2131 (quoting *Stern*, 564

20

U.S. at 483) (internal quotation marks omitted).   The Court thus reaffirmed that "matters concerning private rights may not be removed from Article III courts." *Id.* at 2132.

Here, the Acting Comptroller who issued the civil-penalty order against Petitioners is an Executive Branch officer who may not exercise "the essential attributes of judicial power [that] are reserved to Article III courts." *Stern*, 564 U.S. at 501 (quoting *CFTC v. Schor*, 478 U.S. 833, 851 (1986)) (alteration in original) (internal quotation marks omitted); *see also N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 62 (1982).  "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." *Jarkesy*, 144 S.Ct. at 2132 (citing *Stern*, 564 U.S. at 484).   This analysis proceeds in the same manner as the Seventh Amendment issue.  *See supra.*

As explained above, OCC essentially brought two common law claims against Petitioners—a negligence claim that alleges that Petitioners were engaged in "unsafe or unsound" practices, *i.e.*, practices that are "contrary to generally accepted standards of prudent operation," and a breach of fiduciary duty claim.  *See* 12 U.S.C.

21

§ 1818(i)(2)(B)(i). Because these claims "target the same basic conduct as common law [causes of action], employ the same terms of art, and operate pursuant to similar legal principles," *Jarkesy*, 144 S.Ct. at 2136, they squarely fall within traditional suits at common law brought in English courts of law and impact Petitioners' private rights.

Moreover, § 1818(i) "provide[s] civil penalties, a punitive remedy that [courts] have recognized 'could only be enforced in courts of law.'" *Id.* (quoting *Tull*, 481 U.S. at 422). A statutory action by the government to recover monetary penalties deprives a person of vested property rights and thus requires a *judicial* determination. The 1789 Judiciary Act, for instance, provided that the Article III courts would have "exclusive original cognizance … of all suits for penalties and forfeitures incurred, under the laws of the United States." Judiciary Act of 1789, 1 Stat. 73, 77 § 9. The civil penalty claim OCC brought against Petitioners is therefore "inherently … judicial." *N. Pipeline*, 458 U.S. at 68–70 (citing *Ex Parte Bakelite Corp.*, 279 U.S. 438, 458 (1929)). Determining liability—and the civil penalty amount—require an exercise of judicial power to adjudicate private property rights. Such power is forbidden to executive officers such as the ALJ and Comptroller, so OCC's civil

22

penalty claim must be brought in an Article III court.

## IV. OCC'S BASES FOR REJECTING PETITIONER'S JURY REQUEST DO NOT WITHSTAND LEGAL SCRUTINY

OCC rejected Petitioners' request for a jury trial on both procedural and substantive grounds.  Neither basis is legally meritorious.

As to the procedural rejection, OCC blamed Petitioners for requesting a jury trial months after the hearing before ALJ Whang had been completed.  But that is entirely irrelevant.  Because jury trials can only be had before a properly constituted Article III court, *see ante*, the timing of the request to ALJ Whang is immaterial, for at no time was ALJ Whang (or for that matter the Comptroller) able to grant the request, as neither is an Article III judge.

As to the rejection on a substantive ground, OCC's argument is entirely circular.  The Comptroller concluded that Petitioners are not entitled to a jury trial because "the governing statute and regulations do not authorize the empanelment of a jury."  In other words, Petitioners are not entitled to a jury trial because the statute does not grant such an entitlement.  But this argument misses the fundamental point that the entitlement to a jury trial stems not from any statute, but from the

23

Seventh Amendment to the Constitution, and as a result, Congress is simply unable to divest Petitioners of that right via statute.

## V.    THE NARROW PUBLIC RIGHTS EXCEPTION DOES NOT APPLY

In its order below, OCC has not relied on the "public rights" exception to the Seventh Amendment and Article III strictures.  It is nonetheless important to understand that this exception does not apply to the case at hand, because it is never applicable to "traditional legal claims" like OCC's civil penalty for Petitioners' alleged failure to exercise reasonable care. *Jarkesy*, 144 S.Ct. at 2136, 2137 (citing *Granfinanciera*, 492 U.S. at 52).

The "public rights" exception "has no textual basis in the Constitution" and instead relies on "background legal principles" to allow Congress to assign certain matters to an agency without a jury. *Jarkesy*, 144. S.Ct. at 2134.  It is a narrow exception limited to only matters that "'could have been determined exclusively by' [the executive and legislative] branches," *Stern*, 564 U.S. at 493 (quoting *N. Pipeline*, 458 U.S. at 68), and therefore "from their nature do not require judicial determination." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (citation omitted).

For instance, because the government has absolute discretion regarding its own funds, it could rely on a jury-less "summary proceeding" to compel customs officers to "pay such balances of the public money" into the Treasury "as may be in their hands." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 281, 285 (1855). The Court has also recognized the "public rights" exception in matters concerning immigration, public benefits, and patents, *Jarkesy*, 144 S.Ct. at 2132–33 (collecting cases), *i.e.*, disposition of government property or otherwise falling within the government's exclusive discretion. While the Court has not "definitively explained" the precise bounds of public rights, it has made clear that the exception is narrow and does not apply to "any matter which, from its nature, is the subject of a suit at the common law." *Jarkesy*, 144 S.Ct. at 2133–34 (quoting *Murray's Lessee*, 59 U.S. at 284) (internal quotation marks omitted) (citation for first quotation omitted). As explained above, both the relief sought—a civil penalty—and the nature of the claims—negligence and breach of fiduciary duty—mark OCC's enforcement action as the subject of a suit at common law.

"[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III

courts." *Id.* at 2134 (alteration in original) (quoting *N. Pipeline*, 458 U.S. at 69 n.23 (plurality opinion)) (internal quotation marks omitted). That means it is not incumbent upon Petitioners to identify a common-law analogue for OCC's enforcement action—though they can (and do) easily meet that burden. *See ante.* Rather, OCC bears the burden of rebutting the presumption in favor of Article III courts by establishing that its enforcement action falls within the narrow "public rights" exemption. It cannot do so because its claims against Petitioners have nothing to do with public funds, public benefits, nor any other matter that could be "determined exclusively" by an executive official. *Stern*, 564 U.S. at 493. To the contrary, by OCC's own standards, liability attaches only when there is "more than a minimal loss to [a] depository institution" or to the depositors themselves. 12 U.S.C. § 1818(i)(2)(B)(ii) (quoted in *In re Ortega*, at 21). Banks and bank depositors are, of course, private parties controlling private funds. Thus, the "public rights" exception does not apply because this case concerns private rights, namely Petitioners' private property that OCC seeks to claim as a civil penalty.

*Atlas Roofing*, 430 U.S. 442, does not compel a contrary conclusion. That case, which upheld jury-less administrative proceedings for

26

violations of the Occupational Safety and Health ("OSH") Act, represents the "public rights" exception's high-water mark. 430 U.S. at 443. The Court has since retreated from that position. A mere decade after *Atlas Roofing*, the Court held that a party has a right to a jury trial whenever the government seeks to impose a statutory civil penalty. *Tull*, 481 U.S. at 522–23. Two years later, in *Granfinanciera*, the Court further clarified that "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity." 492 U.S. at 61. *Granfinanciera* was such a sharp break with *Atlas Roofing* that the latter's own author acknowledged that "[p]erhaps … *Atlas Roofing* is no longer good law" because *Granfinanciera* "can be read as overruling or severely limiting" it. *Id.* at 79, 71 n.1 (White, J., dissenting).

Most recently, *Jarkesy* explained "*Atlas Roofing* represents a departure from our legal traditions," 144 S.Ct. at 2138 n.4, and cautioned against the overbroad reading of that case to extend the "public rights" exception to "new statutory obligations" that "impose[] civil penalties for their violation." *Id.* at 2136 (citation omitted).

27

While *Jarkesy* did not *explicitly* overrule *Atlas Roofing*, it certainly "leaves open th[at] possibility." *Id*. at 2168 n.8 (Sotomayor, J., dissenting). At best, *Atlas Roofing* has been cabined to its facts: "self-consciously novel" statutory causes of action that do not "reiterate common law terms of art" and "instead resemble[] a detailed building code," *id*. at 2137, may, perhaps, continue to be adjudicated by administrative and jury-less tribunals. By contrast, § 1818(i) authorizes a civil penalty for a person who "violates any law or regulation," "recklessly engages in an unsafe or unsound practice," or "breaches any fiduciary duty," causing damage thereby. These causes of action reiterate numerous common law terms of art and therefore do not fall into the public-rights exemption under *Atlas Roofing*, even assuming that case is still good law.

## CONCLUSION

The petition for review should be granted and OCC's decision vacated.

Respectfully submitted,

/s/ Gregory Dolin
Gregory Dolin
    *Counsel of Record*
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
greg.dolin@ncla.legal

Dated: November 12, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 5,503 words. This brief also complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ Gregory Dolin
Gregory Dolin

# CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ Gregory Dolin
Gregory Dolin