No. 23-60617

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

**SAUL ORTEGA, Former Chief Financial Officer, Director, President, Chief Executive Officer, and Chairman of the Board; DAVID ROGERS, JR., Former Chairman of the Board**

*Petitioners*,

*v.*

**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

*Respondent.*

---

On Petition for Review of the Final Decision of the Comptroller of the Currency
Nos. OCC AA-EC-2017-44, AA-EC-2017-45

---

## BRIEF OF RESPONDENT OFFICE
## OF THE COMPTROLLER OF THE CURRENCY

---

THEODORE J. DOWD, Acting Senior Deputy
Comptroller and Chief Counsel
PATRICIA S. GRADY, Deputy Chief Counsel
PETER C. KOCH, Director for Litigation
HANNAH HICKS, Counsel
JASON FERNANDES, Attorney
ASHLEY C. BURKE, Attorney
JACOB E. COSTELLO, Law Clerk
Attorneys for Respondent Office of
the Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219
202-860-4306

## CERTIFCATE AS TO INTERESTED PERSONS

Respondent Office of the Comptroller of the Currency ("OCC" or "Agency") is not required to provide a certificate of interested persons under Fifth Circuit Rule 28.2.1 because the OCC is a bureau of the U.S. Department of the Treasury.  12 U.S.C. § 1.

## STATEMENT REGARDING ORAL ARGUMENT

Respondent OCC respectfully requests oral argument. This appeal raises multiple issues that could have a significant impact on regulation of the Nation's banking system. Moreover, this Court's decision could potentially affect other administrative enforcement actions initiated by the OCC and by other Federal banking agencies. The OCC therefore believes that oral argument would aid the Court's decision-making.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................................2

TABLE OF AUTHORITIES ........................................................................6

RECORD REFERENCES .........................................................................10

INTRODUCTION ....................................................................................10

STATUTES AND REGULATIONS INVOLVED ...............................................13

COUNTERSTATEMENT OF THE CASE.........................................................13

I.      The OCC.....................................................................................13

II.     OCC Administrative Enforcement Actions...................................15

A.      Section 1818(e) Prohibitions .....................................................16

B.      Section 1818(i) Civil Money Penalties.........................................17

III.    Factual Background and Prior Proceedings ...............................17

A.      The Bank's Failure ...................................................................17

B.      Petitioners' Roles at the Bank ...................................................19

C.      Capital Raise Strategy...............................................................21

        1.      Communications with OCC Following Fannie Mae and Freddie Mac
                Investment Loss ...........................................................21

        2.      Private Placement Memorandum and Everhard Loan .........22

        3.      Implementation of Capital Raise Strategy .........................23

        4.      Ongoing Communications with OCC and Capital Injections...............24

        5.      "Downstreaming" of Loan Proceeds ..................................25

        6.      Features of Capital Raise Loans .......................................26

        7.      Misleading Loan Purposes ..............................................27

        8.      Efforts to Conceal Capital Raise Strategy .........................28

        9.      Losses Associated with the Capital Raise Strategy ............29

D.      OREO Strategy .......................................................................29

E.      Nonaccrual Loan Accounting Practices ......................................31

        1.      Cash-Basis and Cost-Recovery Accounting .......................31

3

2.      The Bank's Accounting System.............................................33

3.      Warnings About the Bank's Accounting Practices............................34

IV.    Procedural History .....................................................36

SUMMARY OF THE ARGUMENT ...............................................37

ARGUMENT ..............................................................39

I.      Congress constitutionally directed the OCC to conduct adjudications of § 1818 violations..............................................39

II.     Petitioners were afforded the relief required by *Lucia*..................49

III.    The charges against Petitioners are timely. ...........................51

IV.    The orders arising from lending-related charges associated with the Capital Raise Strategy are reasonable, in accordance with law, and supported by substantial record evidence.............................................55

A.      Petitioners engaged in actionable misconduct. ....................55

B.      Petitioners demonstrated continuing disregard for the Bank's safety and soundness.......................................................57

C.      The effect prong is satisfied. ....................................60

V.      The orders against Petitioner Ortega arising from accounting-related misconduct are reasonable, in accordance with law, and supported by substantial record evidence.............................................61

A.      Accounting-Related Charges Arising from the Capital Raise Strategy61

B.      Accounting-Related Charges Arising from the OREO Strategy ..........62

C.      Accounting-Related Charges Arising from Nonaccrual Loan Accounting Practices...............................................62

VI.    Petitioners' Alleged Errors ...........................................63

CONCLUSION ............................................................65

CERTIFICATE OF SERVICE .................................................66

STATUTORY ADDENDUM ..................................................68

5 U.S.C. § 706 ...........................................................69

12 U.S.C. § 1 ...........................................................70

12 U.S.C. § 161 .........................................................71

12 U.S.C. § 1813 ...................................................................................73

12 U.S.C. § 1818 ...................................................................................86

12 U.S.C. § 1831n ...............................................................................131

12 U.S.C. § 1831*o* ..............................................................................134

28 U.S.C. § 2462 .................................................................................156

12 C.F.R. § 19.36 ................................................................................157

12 C.F.R. § 19.37 ................................................................................159

12 C.F.R. § 19.39 ................................................................................160

12 C.F.R. § 19.40 ................................................................................161

12 C.F.R. § 304.3 ................................................................................162

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Akin v. OTS*,
  950 F.2d 1180 (5th Cir. 1992) ...................................................47

*AKM LLC v. Secretary of Labor*,
  675 F.3d 752 (D.C. Cir. 2012) ..................................................54

*Blanton v. OCC*,
  909 F.3d 1162 (D.C. Cir. 2018) ....................... 52, 54, 55, 62

*Brickner v. FDIC*,
  747 F.2d 1198 (8th Cir. 1984) ..................................................58

*Carr v. Saul*,
  593 U.S. 83 (2021) ................................................... 49, 52

*Cavallari v. OCC*,
  57 F.3d 137 (2d Cir. 1995) ...................................... 47, 59

*Commodity Futures Trading Commission v. Schor*,
  478 U.S. 833 (1986) ...................................................44

*Commonwealth ex rel. Torrey v. Ketner*,
  92 Pa. 372 (1880) ................................................... 43, 46

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  144 S. Ct. 2440 (2024) ...................................................52

*Crowell v. Benson*,
  285 U.S. 22 (1932) ................................... 40, 41, 45, 46

*Davis v. Elmira Sav. Bank*,
  161 U.S. 275 (1896) ...................................................48

*Delek Refining v. OSHRC*,
  845 F.3d 170 (5th Cir. 2016) ..................................................54

*Den ex dem. Murray v. Hoboken Land & Improvement Co.*,
  59 U.S. 272 (1855) ...................................................44

*Dodge v. OCC*,
  744 F.3d 148 (D.C. Cir. 2014) ..................................................57

*Easton v. Iowa*,
  188 U.S. 220 (1903) ................................... 42, 43, 45, 46

*Fahey v. Mallonee*,
  332 U.S. 245 (1947) ...................................................48

*Farmers' & Mechanics' Nat'l Bank v. Dearing*,
  91 U.S. 29 (1875) ...................................................42

*First Nat. Bank of Hartford, Wis. v. City of Hartford,*
   273 U.S. 548 (1927) ...........................................................................48
*Franklin Nat'l Bank v. New York,*
   347 U.S. 373 (1954) ...........................................................................48
*Gabelli v. SEC,*
   568 U.S. 442 (2013) ...........................................................................52
*Granfinanciera, S.A., v. Nordberg,*
   492 U.S. 33 (1989) ......................................... 38, 39, 40, 41, 44, 45, 47
*Grubb v. FDIC,*
   34 F.3d 956 (10th Cir. 1994) ...................................................... 58, 59
*Gulf Fed. Sav. & Loan Ass'n of Jefferson Par. v. Fed. Home Loan Bank Bd.,*
   651 F.2d 259 (5th Cir. 1981) ..............................................................56
*In the Matter of Adams,*
   2014 WL 8735096 (OCC Sept. 30, 2014) ...................................... 46, 65
*In the Matter of Conover,*
   2016 WL 10822038 (FDIC Dec. 14, 2016) ...................... 56, 58, 59, 64
*In the Matter of Ellsworth,*
   2016 WL 11597958 (OCC Mar. 23, 2016) .................................... 57, 60
*In the Matter of Grubb,*
   1992 WL 813163 (FDIC Aug. 25, 1992) ...................................... 57, 58
*In the Matter of Leuthe,*
   1998 WL 438324 (FDIC Feb. 13, 1998) ..............................................60
*In the Matter of Swanson,*
   1995 WL 329616 (OTS Apr. 4, 1995) .................................................59
*In the Matter of Watkins,*
   2019 WL 6700075 (FDIC Oct. 15, 2019) ...........................................57
*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
   796 F.3d 111 (D.C. Cir. 2015).............................................................51
*Jarkesy v. SEC,*
   34 F.4th 446 (5th Cir. 2022) ...............................................................39
*Kim v. Off. of Thrift Supervision,*
   40 F.3d 1050 (9th Cir. 1994) ..............................................................16
*Landry v. FDIC,*
   204 F.3d 1125 (D.C. Cir. 2000)...........................................................61
*Lucia v. SEC,*
   585 U.S. 237 (2018) ...................................... 12, 14, 15, 38, 50, 51, 52
*Maertinelli v. Hearst Newspapers, L.L.C.,*
   65 F.4th 231 (5th Cir. 2023) ...............................................................47

*Marquette Nat'l Bank of Minneapolis v. First Omaha Serv. Corp.*,
   439 U.S. 299 (1978) ........................................................................48
*Michael v. FDIC*,
   687 F.3d 337 (7th Cir. 2012) ........................................................64
*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982) ..........................................................................41
*Osborn v. Bank of United States*,
   22 U.S. 738 (1824) ..........................................................................42
*Proffitt v. Fed. Deposit Ins. Corp.*,
   200 F.3d 855 (D.C. Cir. 2000) .............................................. 53, 54, 55
*Rollins v. Home Depot*,
   8 F.4th 393 (5th Cir. 2021) ............................................................52
*SEC v. Jarkesy*,
   144 S. Ct. 2117 (2024)................................... 38, 39, 40, 41, 42, 44, 45, 46, 47, 48
*Simpson v. OTS*,
   29 F.3d 1418 (9th Cir. 1994) ........................................................47
*Southland Reship, Inc. v. Flegel*,
   534 F.2d 639 (5th Cir. 1976) ........................................................50
*Steadman v. SEC*,
   450 U.S. 91 (1981) ..........................................................................66
*Tiffany v. Nat'l Bank of Missouri*,
   85 U.S. 409 (1873) ..........................................................................15
*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952) .................................................................. 49, 52

## Constitution

U.S. Const. art. II, § 2, cl. 2 ..............................................................50

## Statutes

5 U.S.C. § 556.....................................................................................65
5 U.S.C. § 706.....................................................................................39
12 U.S.C. § 1 ............................................................................... 15, 44
12 U.S.C. § 161 ..................................................... 30, 36, 39, 45, 62, 63
12 U.S.C. § 1813.................................................................................61
12 U.S.C. § 1818................................................. 10, 16, 17, 55, 58, 62
12 U.S.C. § 1831n............................................................................ 45, 62
12 U.S.C. § 1831*o*.............................................................................18
28 U.S.C. § 2462.................................................................................52

## Rules

Fed. R. App. P. 17 ................................................................................................. 10
Fed. R. App. P. 32 ................................................................................................... 1

## Regulations

12 C.F.R. Part 19 ................................................................................................. 15
12 C.F.R. § 19.36 ................................................................................................. 65
12 C.F.R. § 19.37 ................................................................................................. 49
12 C.F.R. § 19.39 ................................................................................................. 16
12 C.F.R. § 19.40 ................................................................................................. 16
12 C.F.R. § 304.3 ................................................................................................. 62

## Other Authorities

ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES
    (1861) ............................................................................................................. 13
ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES
    (1862) ............................................................................................................. 13
BRAY HAMMOND, BANKS AND POLITICS IN AMERICA: FROM THE REVOLUTION TO
    THE CIVIL WAR 720-22 (1967) .................................................................. 12, 13
*Financial Institutions Supervisory Act of 1966: Hearings on S. 3158 Before the
    House Comm. on Banking and Currency*, 89th Cong., 2d Sess. 49 (1966) ......... 46
Restatement (Second) of Torts § 281 (1965) ......................................................... 46
ROGER LOWENSTEIN, WAYS AND MEANS: LINCOLN AND HIS CABINET AND THE
    FINANCING OF THE CIVIL WAR (2022) .................................................. 12, 13, 14
SEC Accounting Bulletin No. 99, *Materiality* ....................................................... 64

## RECORD REFERENCES

Pursuant to Federal Rule of Appellate Procedure 17(b)(1)(B), the OCC filed a Certified List ("CL") of the administrative record.  Citations herein refer to the CL docket entry and the page number of the document (*i.e.* CL1 at 1).  Citations to Hearing Exhibits contain the letters "R," "O," or "J" for the party offering the exhibit (*i.e.* CLR.Exh1 for Ortega's and Rogers's Exhibit 1; CLO.Exh1 for OCC's Exhibit 1; CLJ.Exh1 for the parties' joint Exhibit 1).

## INTRODUCTION

Acting pursuant to 12 U.S.C. § 1818(e) and (i), the Comptroller of the Currency ("Comptroller")[1] issued orders prohibiting Petitioners Saul Ortega and David Rogers, Jr., former directors and officers of First National Bank, Edinburg, Texas ("Bank"), from further participation in the affairs of banking institutions and assessing against each of them civil money penalties in the amount of $250,000.  In connection with these orders, the Comptroller concluded that Petitioners had engaged in various forms of actionable misconduct, including misconduct in furtherance of a scheme to raise sham regulatory capital using the Bank's existing funds (hereinafter, "Capital Raise Strategy").  The Comptroller also concluded that Petitioner Ortega had engaged in accounting-related misconduct in connection with

---

[1] This Brief refers to the Acting Comptroller of the Currency Michael J. Hsu and the statutory office of Comptroller of the Currency as "Comptroller."

two other discrete series of actions: a strategy to reduce the Bank's Other Real Estate Owned ("OREO") portfolio (hereinafter, "OREO Strategy"); and the Bank's accounting treatment of nonaccrual loans (hereinafter, "Nonaccrual Loan Accounting Practices").

Petitioners do not contest that, at time when the Bank urgently needed to raise its capital ratios and had represented to the OCC that virtually no lending was occurring, they approved dozens of loans to purchase Bank holding company stock, the proceeds of which were then reinjected into the Bank as false regulatory capital. Nor do Petitioners contest that they failed to disclose the Capital Raise Strategy to the OCC, failed to correct misleading Bank records regarding loans associated with the strategy, and failed to ensure that the strategy was reflected in Bank records *in any way whatsoever*. Additionally, Petitioner Ortega does not contest that Call Reports[2] filed until the Bank's failure in 2013 reflected various accounting errors related to its Capital Raise Strategy, OREO Strategy, and Nonaccrual Loan Accounting Practices. Because Petitioners cannot credibly call into question the wrongfulness of their misconduct or reasonableness of the Comptroller's Final Decision, they now

---

[2] Banks are required to periodically file with the OCC a "Call Report" describing the bank's financial condition. *Infra* Argument, Part V.

raise a series of meritless constitutional, statutory, and procedural challenges to the underlying proceedings. The petition should be denied.

## COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the Seventh Amendment precludes Congress from authorizing the OCC to carry out its mission of ensuring the safety and soundness of the national banking system through administrative assessments of civil money penalties.

2. Whether Petitioners were afforded the remedy required by *Lucia v. SEC*, 585 U.S. 237 (2018).

3. Whether the OCC correctly concluded that the applicable five-year statute of limitations did not bar the charges against Petitioners where the *effect* element of the statutory charges against them was satisfied within five years of the issuance of the notice of charges.

4. Whether the OCC acted reasonably, within its discretion, and in accordance with law in assessing, based on substantial evidence, a $250,000 civil money penalty against Petitioner Ortega.

5. Whether the OCC acted reasonably, within its discretion, and in accordance with law in issuing, based on substantial evidence, an order of prohibition against Petitioner Ortega.

6. Whether the OCC acted reasonably, within its discretion, and in accordance with law in assessing, based on substantial evidence, a $250,000 civil money penalty against Petitioner Rogers.

7. Whether the OCC acted reasonably, within its discretion, and in accordance with law in issuing, based on substantial evidence, an order of prohibition against Petitioner Rogers.

## STATUTES AND REGULATIONS INVOLVED

Relevant statutory provisions and applicable regulations are contained in the Addendum to this Brief.

## COUNTERSTATEMENT OF THE CASE

### I.     The OCC

In 1863, President Abraham Lincoln faced an intractable problem: how to finance the Civil War when all avenues of funding had been exhausted.  Prior to 1863, the Department of the Treasury used a combination of loans from state-chartered banks—the only kind of bank in existence at the time—and direct issuance of "United States notes," colloquially known as greenbacks, to fund the enormous outlays required to keep the Union armies supplied.  ROGER LOWENSTEIN, WAYS AND MEANS: LINCOLN AND HIS CABINET AND THE FINANCING OF THE CIVIL WAR 60-61, 100-101, 104 (2022); BRAY HAMMOND, BANKS AND POLITICS IN AMERICA: FROM

THE REVOLUTION TO THE CIVIL WAR 720-22 (1967); ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES 7-12 (1862). After loans from the state banks ran dry, the greenbacks temporarily served a dual purpose of funding the Union and providing a uniform, circulating currency for use by the populace. LOWENSTEIN, *supra,* at 66-68, 76-77, 84-87, 104-105; HAMMOND, *supra,* at 721-22; ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES 7-12, 24 (1862). However, as the Government continued to issue greenbacks at the breakneck speed required to fund the war effort, the greenbacks began to lose the value and stability needed to serve their dual purpose. LOWENSTEIN, *supra,* at 129-30, 169; ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES 20 (1862).

Faced with the imminent exhaustion of funding after a series of losses on the battlefield, Treasury Secretary Salmon Chase revived a solution he initially proposed in his first Annual Report in 1861: the creation of a national banking system. LOWENSTEIN, *supra*, 145-46, 168-69; ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES 18-20 (1861); ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES 15-16 (1862). From the blueprint laid out in Secretary Chase's reports, the National Bank Act was born. Passed in 1863 and amended in 1864, the National Bank Act established a national banking system and created the OCC to oversee it. National Bank Act, ch. 58, § 1,

12 Stat. 665, 665-66 (1863); National Bank Act, ch. 106, § 1, 13 Stat. 99, 99-100 (1864). The new nationally chartered banks were required to issue a uniform currency backed by United States bonds, creating a stable currency for use by the populace and a reliable market for Treasury bonds. National Bank Act of 1864 §§ 16, 21-23, 37; *see also Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873) ("[National banks] were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the General government."). The creation of the OCC and a national banking system, combined with taxation reform, gave the Union the financial edge it needed to supply its troops and outlast the Confederacy. LOWENSTEIN, *supra*, 310-315.

## II. OCC Administrative Enforcement Actions

In furtherance of the OCC's mission of ensuring the safety and soundness of the national banking system, 12 U.S.C. § 1, Congress granted the OCC authority to undertake a variety of administrative enforcement actions against banking institution-affiliated parties ("IAPs"), *e.g., id.* § 1818(e) (proceedings to suspend or remove IAPs from participation in the banking industry), (i) (proceedings to assess civil money penalties). Pursuant to this authority, OCC Enforcement Counsel may initiate an action by issuing a notice of charges detailing the alleged violations. Unless the charges are uncontested, a hearing and related proceedings are conducted by an administrative law judge ("ALJ") pursuant to the Administrative Procedure

Act ("APA") and the OCC's rules of practice and procedure.  *Id.* § 1818(e), (h)-(i); 12 C.F.R. Part 19.  Following a hearing or dispositive motions, the ALJ prepares a recommended decision and full record of the proceedings for submission to the Comptroller; the parties may also file exceptions to the recommended decision with the Comptroller.  12 C.F.R. § 19.39(a).  Upon review of the full record, the Comptroller issues the final decision of the Agency.  12 U.S.C. § 1818(h)(1); 12 C.F.R. § 19.40.

Prohibition proceedings and civil money penalty proceedings arise from different statutory provisions and are premised on different charging elements.

### A. Section 1818(e) Prohibitions

For the Comptroller to enter an order of prohibition against an IAP, Enforcement Counsel must establish the separate elements of *misconduct*, *effect*, and *culpability*. 12 U.S.C. § 1818(e)(1)(A), (B), & (C); *Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir. 1994).  The *misconduct* element may be satisfied by showing that the IAP has "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution . . ." or "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty."  12 U.S.C. § 1818(e)(1)(A).  The *effect* element may be satisfied by showing that, "by reason of" the misconduct, the institution at issue "has suffered or will probably suffer financial loss or other damage."  *Id.* § 1818(e)(1)(B).  Finally, the *culpability*

element may be satisfied when the alleged misconduct "demonstrates willful or continuing disregard . . . for the safety or soundness of such insured depository institution . . .." *Id.* § 1818(e)(1)(C).

## B. Section 1818(i) Civil Money Penalties

The Comptroller may also assess civil money penalties, categorized by escalating "tiers," including first-tier penalties of up to $5,000 per day of continued misconduct and second-tier penalties of up to $25,000 per day of continued misconduct. For the Comptroller to assess a first-tier civil money penalty, Enforcement Counsel must establish one element: *misconduct*, which can take the form of a violation of any law. 12 U.S.C. § 1818(i)(2)(A). To assess a second-tier civil money penalty, Enforcement Counsel must establish two elements: *misconduct* and *effect*. As relevant to the instant proceeding, misconduct can take the form of a violation of law or breach of fiduciary duty. *Id.* § 1818(i)(2)(B)(i). The *effect* prong may be satisfied by establishing that the misconduct "is part of a pattern of misconduct" or that it "causes or is likely to cause more than a minimal loss to such depository institution." *Id.* § 1818(i)(2)(B)(ii).

## III.    Factual Background and Prior Proceedings

### A. The Bank's Failure

The Bank was a community bank headquartered in Edinburg, Texas. It had approximately $3.1 billion in total assets and $2.3 billion in total deposits as of June

30, 2013. CL105 ¶ 5. The Bank was a wholly owned subsidiary of First National Bank Group, Inc. ("Holding Company"), a bank holding company. *Id.* ¶ 6. Beginning in 2008, the Bank's OREO assets began to grow significantly. Such assets are nonperforming and their associated costs can significantly strain a bank's financial condition. CL158 Tr. 370:19-24; 953:14-954:11; 1293:9-22.

The Bank's condition further deteriorated when, in September 2008, government-sponsored enterprises Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") were placed under conservatorship of the Federal Housing Finance Agency. As a result, the Bank's preferred stock in these entities was rendered "virtually worthless" and the Bank realized a $174 million loss upon its sale. CLO.Exh148 at 3. This loss caused the Bank to fall from "well capitalized" to "adequately capitalized" within the meaning of 12 U.S.C. § 1831*o*. 12 U.S.C. § 1831*o*(a), (b)(1). In early 2009, the OCC described the Bank's need for higher capital levels as "exigent" and required that the Bank achieve and maintain higher capital levels and minimum capital ratios and improve accounting for nonaccrual loans. CLO.Exh.147 at 2.

By mid-August 2009, the Holding Company had injected $35 million into the Bank. Nevertheless, over the following years, the Bank continued to experience significant challenges. In February 2011, the OCC issued a consent order that again required the Bank to increase its minimum capital ratios and to correct unsafe or

unsound practices related to loan portfolio management and treatment of nonaccrual loans. CLJ.Exh12. Following a June 2011 OCC examination, Petitioner Rogers resigned, and Petitioner Ortega assumed new roles. The OCC's 2012 Report of Examination found that while new management, under the direction of Petitioner Ortega, had "made some positive strides in changing the corporate culture," the Bank's "problems continue[d] to grow," supervision by management and the Bank's Board of Directors ("Board") "remain[ed] critically deficient," and the new team "ha[d] been ineffective overall in reversing the Bank's negative course." CLJ.Exh6 at 1-2, 38. The OCC described the Bank's capital position as "critically deficient" and identified the Bank's OREO portfolio as a significant problem, stating that it was "at an extremely high and unsafe and unsound level . . . due primarily to a credit culture that fostered poor credit risk selection and lax underwriting standards." *Id.* at 2, 47. By June 2013, the Bank had become critically undercapitalized. On September 13, 2013, the OCC closed the Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. CL105 ¶ 9.

### B. Petitioners' Roles at the Bank

Petitioner Rogers served as Chairman from 1981 to November 2011. CL105 ¶ 2. He was responsible for ensuring that senior executive management followed the Bank's policies and procedures. He was also responsible for participating in reviews of the strategic plan and raising capital funds "as needed to maintain required

capitalization at terms and conditions most advantageous to the Bank."
CLO.Exh373 at 1; CL158 Tr. 76:18-77:18.

Petitioner Ortega served as the Chief Financial Officer from 1994 through
October 2011. CL105 ¶ 2. He was responsible for financial reporting, accounting,
and maintaining the Bank's books and records. With assistance from attorneys and
accountants, he was also responsible for drafting capital plans. CL158 Tr. 499:6-14.
In November 2011, Petitioner Ortega replaced Petitioner Rogers as Chairman; he
served in this capacity until the Bank's failure in 2013. CL105 ¶ 2. Beginning in
January 2012, Petitioner Ortega also served as the Bank's President and Chief
Executive Officer. *Id.*

Petitioners were members of the Board and served as officers and directors of the
Holding Company from at least January 2008 until November 2011. *Id.* ¶ 6. As
members of the Board, Petitioners were responsible for overseeing the Bank's risk
profile. CL158 Tr. 83:24-84:4. Additionally, between 2008 and 2011, Petitioners
served as voting members of the Bank's Loan and Discount Committee ("L&D
Committee"), which was charged with overseeing all lending activities within the
Bank and maintaining a broad perspective of the Bank's overall concentration risk
and capital position. CLJ.Exhs8-10.

### C. Capital Raise Strategy

#### 1. Communications with OCC Following Fannie Mae and Freddie Mac Investment Loss

In the immediate aftermath of the Bank's Fannie Mae and Freddie Mac investment loss, the Bank received a $24 million injection of capital from the Holding Company, and Petitioner Rogers and Bank management committed to raising an additional $35 million by March 31, 2009. CLJ.Exh1 at 3. Petitioner Rogers represented to the OCC that capital would be raised through selling common stock of the Holding Company. *Id.* at 3, 7. In February 2009, the OCC formally imposed an individual minimum capital ratio ("IMCR") requiring the Bank, by May 10, 2009, to achieve minimum Tier 1 leverage and total risk-based capital ratios, which would require the Bank to raise between $50 million and $75 million in additional capital. CLO.Exh147 at 1. The OCC stated that "there remains an exigent need for the Bank to increase capital" and that the Bank "needs a higher level of capital in order to operate in a safe and sound manner." *Id.* at 4. The OCC required the Bank to develop and submit a capital plan, stating that it would only accept a plan that "is based on realistic assumptions, is likely to succeed in restoring the Bank's capital[,] and will not increase the risk to the Bank." *Id.* at 4-5.

In late February 2009, the Bank submitted its capital plan, which was signed by Petitioner Ortega. CLO.Exh148. It stated that the Holding Company was "actively

pursuing an offering of shares of its common stock to raise capital" and that "any portion" of the proceeds from this offering that were "injected into the Bank would count as Tier 1 capital." *Id.* at 4. On April 3, Petitioners attended a meeting with OCC officials. CLO.Exh548. Bank management discussed the Bank's upcoming offering of Holding Company stock and efforts "to shrink the Bank in order to comply with the IMCR," noting that these efforts had included reducing lending activity such that there was "virtually NO lending occurring." *Id.*; *see also* CL158 Tr. 324:17-325:1. Bank management did not disclose to the OCC any intent to finance purchases of Holding Company stock. CL158 Tr. 124:14-17, 129:2-6, 328:8-12.

### 2. Private Placement Memorandum and Everhard Loan

On April 14, 2009, eleven days after the meeting with OCC officials, two significant events occurred. First, the Holding Company issued a Private Placement Memorandum, which offered up to 650,000 shares of its common stock and stated that a portion of the proceeds of the offering would be used to inject capital into the Bank and that any questions about the memorandum should be directed to Petitioner Ortega. CLO.Exh143 at 2, 8, 23, 31, 75.

The second key event of April 14, 2009 was the L&D Committee's approval of a $500,000 unsecured loan to Kenneth Everhard, a friend of Petitioner Rogers.

CLO.Exh196 at 1; CL158 Tr. 342:9-24.   According to the L&D Committee's meeting minutes, the loan proceeds were "to be used as a revolving line of credit for working capital." CLO.Exh196 at 1; CL158 Tr. 342: 9-24.  Thereafter, on April 29, 2009, Mr. Everhard purchased $500,025 in Holding Company stock.  CLO.Exh158 at 3, 9, 12.   The stock certificate associated with this purchase was delivered to Petitioner Rogers.   *Id.* at 9.   Petitioner Rogers later affirmed that he was contemporaneously aware, despite the loan purpose reflected in the Bank's records, that Mr. Everhard had "borrowed money from the Bank to invest in holding company stock." CL158 Tr. 345:2-5.  Petitioner Rogers also affirmed that if the loan purpose reflected in Bank records was inaccurate based on his knowledge, he should have ensured that it was corrected.  *Id.* Tr. 341:15-18.

### 3.  Implementation of Capital Raise Strategy

The Everhard loan and subsequent stock purchase was the first in a series of transactions (referred to here as the "Capital Raise Strategy") wherein the Bank extended loans ("Capital Raise Loans") that were then used for the purchase of Holding Company stock; meanwhile, the Holding Company reinjected or "downstreamed" between $3 million and $17.3 million in Bank-financed stock purchases into the Bank as purported regulatory capital.  CL158 Tr. 328:13-329:6.

It is uncontroverted that the Bank made loans to investors for the purpose of purchasing Holding Company stock.   *Id.* Tr. 330:16-19, 491:20-492:1.   The

following are included among the Bank loans and corresponding stock purchases made in April and May 2009. CLO.Exh374A, rows 29-34, 36-37, 43, 52-53, 55, 58-60. On April 28, the Bank issued to Margaret Scott a loan of $75,000; the following day, she purchased $75,000 in Holding Company stock. On May 4, the L&D Committee approved a $112,500 loan to Curtis Brockman; on May 8, Mr. Brockman purchased $112,500 in Holding Company stock. CLO.Exh169; CLO.Exh158 at 1; CL158 Tr. 347:9-349:18. Also on May 8, the L&D Committee approved a $250,000 loan to Blanca Gonzalez; on May 11, she purchased $250,050 in Holding Company stock. CLO.Exh226; CLO.Exh228; CLO.Exh237 at 4; CLO.Exh374A, row 48; CL158 Tr. 558:9-559-13.

### 4. Ongoing Communications with OCC and Capital Injections

On April 28, 2009, the Bank's then-President and CEO, Robert Gandy, sent an OCC official a letter stating that the Bank had "communicated with 231 prospective stock purchasers so far," had received $15 million in purchases, and had "firm commitments" of an additional $12 million in purchases. CLO.Exh149 at 1. The letter predicted that the Bank would achieve the required Tier 1 capital ratio by the established May 10, 2009 deadline but would fall short of achieving the required risk-based ratio. *Id.* at 2. Again, the letter did not disclose that the Bank was offering loans to finance the purchase of Holding Company stock. The OCC required that

the Bank submit a new capital plan as soon as possible since it did not expect to meet the risk-based capital ratio by the established deadline.  CLO.Exh336 at 6.

On May 12, Petitioner Ortega reported at a Board meeting that the Bank had achieved the required Tier 1 capital ratio and would submit a revised capital plan to the OCC.  *Id.* at 1.  The revised plan, submitted the same day, noted that the Holding Company "is actively pursuing an offering of shares of its common stock to raise capital" and that "proceeds from such an offering . . . injected into the Bank would count as Tier 1 capital."  CLO.Exh151 at 1, 4.  The revised plan did not disclose to the OCC that the Bank was actively financing purchases of Holding Company stock. CL158 Tr. 132:18-133:24.

In an August 14 letter to the OCC, the Bank's then-President and CEO represented that the Bank had achieved the required minimum capital ratios. CLO.Exh366 at 6.  As with all previous communications about capital raise efforts, the letter did not mention that the Bank had been and continued to be actively financing purchases of Holding Company stock.

### 5.  "Downstreaming" of Loan Proceeds

It is undisputed that somewhere between $3 million and $17.3 million in proceeds from Holding Company stock purchases financed by Capital Raise Loans were reinjected into the Bank as purported regulatory capital.  CL194 at 43; *see also* CL158 Tr. 328:13-20, 493:15-17; CLO.Exh569 at 34:24-35:4.  The ALJ aptly

compared the downstreaming aspect of the strategy to "someone transferring a twenty[-]dollar bill from their left pocket to the kitchen table to their right pocket and then claiming to be twenty dollars richer when they then switch the bill again to the pocket from which it started." CL194 at 43 (citing CL176 at 29). As an OCC witness explained, "For regulatory purposes, a bank can't create capital on its own by creating a loan and extending that money. You know, you're essentially making money out of thin air by orchestrating a scheme like this. So it is not permissible to treat it as regulatory capital." CL158 Tr. 135:14-25. Nevertheless, the Bank reported the total $35 million in capital injections as regulatory capital on its balance sheet and on all subsequent Call Reports until the Bank's failure. The Bank's capital levels from the second and third quarters of 2009 through the remainder of its operations were thus overstated by the amount that Capital Raise Loan proceeds were reinjected into the Bank. *Id.* Tr. 1783:10-16.

### 6. Features of Capital Raise Loans

Capital Raise Loans were issued on concessionary terms. Most were unsecured and offered at a low interest rate of 4.25 percent. CL158 Tr. 146:11-14, 147:5-15, 549:15-18, 1256:5-9. Some provided for interest-only payments for the life of the loan before a balloon payment at maturity. Most were renewed at least once, which "calls into question [the borrower's] ability to repay the debt as originally structured . . .." *Id.* Tr. 1256:20-1257:9. Furthermore, for certain borrowers, the Bank offered

better terms on the unsecured Capital Raise Loans than on any secured loans issued to those same borrowers, which again signals that individual borrowers' ability to repay was not a primary consideration when it came to Capital Raise Loans.

### 7. Misleading Loan Purposes

Despite Bank policy requiring that the purpose of all unsecured loans be clearly stated in Bank records, the stated purposes of Capital Raise Loans were *in all instances* deceptive and misleading. CL158 Tr. 152:9-20. For example, Bank records reflected that the proceeds of a $500,000 loan to Bank director Jack McClelland were "to be used as a revolving line for working capital for personal ventures," even through Petitioner Ortega knew, at the time of the loan's approval, that the proceeds would be used to purchase Holding Company stock. CLO.Exh247 at 2; CLO.Exh143 at 35; CLO.Exh158 at 9; CL158 Tr. 530:12-19; *see also* CLO.Exh246 at 1. Similarly, Bank records reflected that an unsecured $200,000 loan to Bank director Oscar Garza was "for rodeo riding arena event costs and promotions and other business purposes," but the loan was linked to a contemporaneous purchase of Holding Company stock in the amount of $200,025. CLO.Exh237 at 4; CLO.Exh374A, row 88. And the purpose of the aforementioned Capital Raise Loan to Ms. Gonzalez is described in a Bank record as a "business investment," while *in the very same record*, the purpose of a secured loan to another individual is plainly stated as for the purchase of "6,250 shares of Lone Star National

Bank stock." CLO.Exh237 at 4. As this contrast amply shows, the stated loan purposes of Capital Raise Loans were, in the words of the ALJ, "demonstrably deceptive." CL176 at 115.

### 8. Efforts to Conceal Capital Raise Strategy

Although it was imperative for the Bank to disclose the Capital Raise Strategy to the OCC at its inception, the strategy was never described in Bank books or records or revealed in communications with the OCC. CL158 Tr. 155:22-157:14. As an OCC witness explained, "A bank's books and records are critically important. It's the basis by which [the OCC] make[s] decisions about whether the bank is in safe and sound condition or whether there are any necessary corrective actions that the bank needs to undertake." *Id.* Tr. 85:11-16. Petitioners admitted that they had never heard of another bank financing its own capital raise with bank loans. CLO.Exh568 at 37:3-23; CL158 Tr. 494:22-496:9. And an OCC witness testified that if the Bank had disclosed the Capital Raise Strategy to the OCC, the OCC would have informed the Bank that "the capital raised through loans from the bank would not qualify as

Tier 1 capital and would not meet the requirements of the IMCR." CL158 Tr. 158:15-25.

### 9. Losses Associated with the Capital Raise Strategy

On June 12, 2013, the Bank recorded combined losses of $387,240.63 on Capital Raise Loans that it had made to Ms. Gonzalez and Jose Rodriguez. CLO.Exh389 (Bank Loan Losses and Recoveries, 1994 to 7/12/2013), rows 24107, 24108. At the time of the Bank's failure in September 2013, numerous other Capital Raise Loans had not been paid off. CL158 Tr. 1242:13-1243:11. The FDIC, in its capacity as receiver following the Bank's failure, suffered $3,808,058.28 in losses when certain outstanding Capital Raise Loans were charged off as part of the receiver's efforts to maximize recovery on Bank assets for the receivership. CL194 at 51; CL158 Tr. 1994:24-2006:3.

### D. OREO Strategy

Beginning in 2008, as the Bank's OREO portfolio began increasing significantly, OCC examiners and Bank management recognized an urgent need for the Bank to reduce its OREO portfolio. Around this time, Bank management implemented what is herein referred to as the "OREO Strategy," an aggressive approach to selling the Bank's OREO properties at appraised values and on lenient loan terms. CL158 Tr. 377:1-4, 617:3-11, 618:1-12. The interest rates for many OREO Strategy loans were lower than rates established in the Bank's *Market Rate Matrix*, which Board

members, including Petitioner Ortega, approved in December 2009 as an indicator of Bank management's views on what constituted a market rate for OREO loans. CLO.Exh338; CLO.Exh339; CLO.Exh343 at 5, 8, 20 (*Market Rate Matrix*).

The OCC's 2009 Report of Examination determined that the Bank had sold and financed $133 million of OREO with liberal underwriting terms and without ensuring proper accounting. CLJ.Exh2 at 12. The OCC issued a Matter Requiring Attention ("MRA") requiring that the Bank record losses on OREO loans with below-market interest rates by using a present-value-of-future-cash-flows analysis. *Id*. In another MRA issued in connection with the 2011 Report of Examination, the OCC determined that, between 2008 and June 30, 2011, the Bank had originated approximately $309 million in OREO loans with interest rates below the then-market rate of 5.5 percent and had failed to perform present-value calculations and to record discounts on OREO loans with below-market interest rates. CLJ.Exh4 at 11-12, 47-48, 81. The 2011 Report of Examination also cited a violation of 12 U.S.C. § 161(a) on grounds that the Bank's quarterly Call Report filings were inaccurate due to "[t]he Bank's failure to adhere to proper accounting guidelines regarding OREO sales, which were financed below a fair market rate . . . ." *Id.* at 81. The OCC directed the Bank to "review all OREO financings to assure proper

accounting and income recognition," calculate the appropriate losses, and include the adjustment in the December 31, 2011 Call Report. *Id.* at 48.

The Bank recorded only a $4.8 million discount of its $309 million OREO portfolio in the December 31, 2011 Call Report. CLO.Exh363 ¶ 36. According to an OCC witness, the Bank's underlying accounting decisions leading to its $4.8 million discount were inappropriate under Generally Accepted Accounting Principles ("GAAP"), and the Bank's improper accounting of OREO loans caused the Bank's assets and capital to be overstated by at least $9.5 million beginning with the December 31, 2011 Call Report and continuing through the Bank's failure. *Id.* ¶¶ 46-47.

### E. Nonaccrual Loan Accounting Practices

#### 1. Cash-Basis and Cost-Recovery Accounting

When a bank expects to fully collect on a loan, interest accrues on the loan daily, and the bank reports the interest as income earned even though payment for that interest has not yet been received. Loan payments are typically recorded in two parts: principal and interest. The principal payment reduces the balance of the loan receivable, and the bank records the cash proceeds to settle the interest receivable. If, however, there is doubt as to the ultimate collectability of a loan, the bank must

determine whether the loan should be placed on nonaccrual status, in which case the bank does not accrue interest on the loan.  CL194 at 59.

Nonaccrual loans are accounted for using either the cost-recovery method or cash-basis method. Under the cost-recovery method, a bank applies all payments to a loan's principal balance and does not recognize any interest income.  The cash-basis method permits a bank to separate loan payments into principal and interest and treat the interest portion as income (although an interest receivable is not accrued).  *Id.*

At all relevant times, the cost-recovery method was the "general rule" for accounting purposes when a bank had any doubt as to the ultimate collectability of a nonaccrual loan.  CLO.Exh359 at 453-54.  The Instructions for Preparation of Consolidated Reports of Condition and Income ("Call Report Instructions") provide that cash-basis accounting may be used on nonaccrual loans only when the bank determines, after analysis and with supporting documentation, that the remaining recorded asset is fully collectible.  CL161-B ¶ 546.  Specifically, both the June 2009 and March 2012 Call Report Instructions provided that "[a] bank's determination as to the ultimate collectability of the asset's remaining recorded investment must be supported by a current, well documented credit evaluation of the borrower's financial condition and prospects for repayment, including consideration of the borrower's historical repayment performance and other relevant factors."

CLO.Exh359 at 455; CLO.Exh354 at 545.  The OCC's *Bank Accounting Advisory Series* ("BAAS") likewise provided that cash-basis accounting should not be used unless "the bank can demonstrate [that] doubt about the ultimate collectability of principal no longer exists."  CLO.Exh353 at 38.

## 2.  The Bank's Accounting System

Around 2007, the Bank transitioned to a new loan accounting system.  The default setting of this system was to apply cost-recovery accounting to nonaccrual loans.  Enforcement Counsel presented credible and uncontroverted evidence that the Bank changed the default accounting treatment of nonaccrual loans in the vendor's system from the cost recovery method to the cash basis method to conform to Bank management's preferred practice of automatically recording interest income on nonaccrual loans.  CL176 at 79-80.  This change caused the Bank to deviate on a blanket basis from the general rule of the Call Report Instructions that cost recovery accounting be used on all nonaccrual loans unless and until the Bank determines, through "a current, well documented credit evaluation," that a specific loan is fully collectible.  CLO.Exh359 at 455.  Petitioner Ortega, who oversaw the Bank's accounting and information technology departments, was aware or should have been

aware that this inappropriate system change had been made, even if he did not authorize it.

### 3. Warnings About the Bank's Accounting Practices

In January 2009, the OCC and the Bank entered a Memorandum of Understanding ("MOU"), requiring, *inter alia*, that the Bank "immediately reverse or charge off all interest that has been accrued contrary to the requirements" of the Call Report Instructions and directing the Board to "develop and implement a written policy governing the identification of and accounting treatment for nonaccrual loans . . . consistent with the accounting requirements contained in the Call Report Instructions." CLJ.Exh11 at 6-7. Petitioner Ortega was a member of the Bank's MOU Compliance Committee and was thus responsible for ensuring compliance with the January 2009 MOU. CL176 at 81.

By March 2009, the Bank's policy regarding nonaccrual loans had purportedly "been modified to include the accounting requirements specified in the Call Report Instructions." CLO.Exh319 at 1. But the revised policy did not require Bank employees to undertake or document the required analysis to determine that collectability was no longer in doubt before applying cash-basis accounting. Nor did it address the Bank's practice of automatically applying cash-basis accounting to all nonaccrual loans. Rather, the new policy stated that "a bank is allowed to maintain a loan on a cash basis as long as the borrower is able to make regular

payments," which is not the standard articulated by the Call Report Instructions or the OCC's BAAS. *Id.* at 11. The policy further stated that it "is [the Bank's] intent to utilize cash basis nonaccrual accounting whenever it is applicable." *Id.*

In June 2009, the Bank's audit department informed senior Bank management that the "use of cash basis of accounting on all nonaccrual loans" was unsatisfactory and recommended that the Bank set a dollar threshold at which all nonaccrual loans would be required to have a credit evaluation. CLO.Exh321 at 5. There is no indication that Petitioner Ortega or other Bank management responded to the audit department's concerns or recommendations.

Consent orders entered between the Bank and OCC in February 2011 and January 2012 reiterated the 2009 MOU's requirements that the Bank reverse or charge off interest that had been accrued contrary to requirements contained in the Call Report Instructions and that the Bank ensure compliance with the Call Report Instructions. CLJ.Exh12 at 12; CLJ.Exh13 at 16. However, there is no evidence that Petitioner Ortega caused either requirement to be met.

In October and December 2012, the Bank's chief audit officer reiterated, including to Petitioner Ortega, his concerns about the Bank's practice of using cash-basis accounting for nonaccrual loans *en masse* and without supporting documentation. CLO.Exh323; CLR.Exh68; CLO.Exh325. Nevertheless, the Bank

continued to use cash-basis as the default method of accounting for nonaccrual loans. CLR.Exh68.

Following a March 2013 examination, the OCC concluded that Bank management had "failed to follow cost recovery treatment for non-accrual loans and follow guidelines within the Call Report Instructions," noting that the Bank's incorrect practices had "been in place for many years." CLJ.Exh7 at 6. As a result, the Bank's capital and earnings were overstated "for 2011, 2012, and the first quarter of 2013 by $1.4 million, $9.8 million, and $3.6 million, respectively." *Id.* at 2. The Bank refiled its December 2012 Call Report to reduce its reported interest income for 2011 and 2012 and adjusted its March 2013 Call Report before it was filed. The Report of Examination cited the Bank for a violation of 12 U.S.C. § 161(a) based on the inaccurate December 2012 Call Report, finding that the primary cause of the overstatement of income "was inappropriate recognition of interest income for non-accrual loans." *Id.* at 22.

## IV.    Procedural History

OCC Enforcement Counsel initiated this action on September 25, 2017. The notice of charges claimed that Petitioners had engaged in unsafe or unsound practices, breached their fiduciary duties, and filed materially inaccurate Call Reports in violation of 12 U.S.C. § 161. CL1, Arts. III-VI. Following a 12-day

hearing, the ALJ recommended that the Comptroller enter an order of prohibition against Petitioner Rogers and assess civil money penalties of $250,000 against each of the Petitioners.  The Comptroller adopted in part and rejected in part the ALJ's recommendations.  The Final Decision entered orders of prohibition against both Petitioners based on charges arising from their lending-related misconduct associated with the Capital Raise Strategy; assessed a second-tier civil money penalty of $250,000 against Petitioner Rogers based on charges arising from his lending-related misconduct associated with the Capital Raise Strategy; and assessed first-tier and second-tier civil money penalties totaling $250,000 against Petitioner Ortega based on charges arising from his lending-related misconduct associated with the Capital Raise Strategy (second-tier) and accounting-related misconduct associated with the Capital Raise Strategy (first-tier and second-tier), OREO Strategy (first-tier and second-tier), and Nonaccrual Loan Accounting Practices (first-tier and second-tier).  The Comptroller dismissed all other charges against Petitioners.

## SUMMARY OF THE ARGUMENT

Congress authorized the Comptroller to adjudicate violations of banking laws and to impose civil penalties when appropriate.  Because actions arising from regulation of the national banking system are unknown to the common law and implicate public rights, such actions may constitutionally be assigned to and adjudicated by the

Executive Branch. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2132-33, 2138 (2024). "[T]he Seventh Amendment poses no independent bar" to the proceedings underlying this appeal. *Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 53-54 (1989).

Following the Supreme Court's decision in *Lucia*, Petitioners were afforded the full measure of relief that is required when an adjudication has been tainted by an Appointments Clause violation: a new hearing before a properly appointed ALJ. Petitioners' assertion that the ALJ assigned to this matter following *Lucia* merely ratified pre-hearing rulings issued by previously assigned ALJs is flatly contradicted by the record.

The applicable five-year statute of limitations does not bar the charges against Petitioners because the proceedings underlying this appeal were initiated within five years of the date that the claims against them accrued.

The Comptroller's conclusions are in accordance with law and supported by substantial record evidence. In connection with the lending-related charges arising from the Capital Raise Strategy, Petitioners engaged in unsafe or unsound practices and breached their fiduciary duties, resulting in financial loss, and Petitioners demonstrated continuing disregard for the Bank's safety and soundness. Additionally, Petitioner Ortega breached his fiduciary duties and caused the Bank to file materially inaccurate Call Reports in violation of 12 U.S.C. § 161, and this accounting-related misconduct was part of a pattern.

The Petition for Review should be denied.

## STANDARD OF REVIEW

The Court reviews agency action to determine if it is "arbitrary, capricious," or "otherwise not in accordance with law," and whether it is supported by substantial evidence. 5 U.S.C. § 706. This Court reviews constitutional issues *de novo*. *Jarkesy v. SEC*, 34 F.4th 446, 451 (5th Cir. 2022), *aff'd and remanded*, 144 S. Ct. 2117.

## ARGUMENT

### I. Congress constitutionally directed the OCC to conduct adjudications of § 1818 violations.

The Seventh Amendment "preserve[s] the right to jury trial as it existed in 1791" and applies to "statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts" at the Founding. *Granfinanciera*, 492 U.S. at 41-42. In determining whether a federal statute implicates the Seventh Amendment, the Court looks to whether "the claim is 'legal in nature.'" *Jarkesy*, 144 S. Ct. at 2128 (quoting *Granfinanciera*, 492 U.S. at 53). A claim for punitive "money damages" without equitable considerations is a "prototypical common law remedy," *id.* at 2129, and the OCC does not contest that its civil penalty order "implicates the Seventh Amendment," *id.* at 2127.

That, however, is the beginning of the analysis, not the end. The Court next asks "whether Congress may assign" adjudication of the claim "to a non-Article III

adjudicative body that does not use a jury as factfinder."[3] *Granfinanciera*, 492 U.S. at 42; *accord Jarkesy*, 144 S. Ct. at 2127 (employing "the approach set forth in *Granfinanciera*"). That option is available to Congress when an adjudication involves "'public rights,' *e.g.*, where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights." *Granfinanciera*, 492 U.S. at 51. Violations of public rights may be adjudicated by the Executive Branch "free from the strictures of the Seventh Amendment." *Id.*

The Supreme Court has never definitively identified the distinguishing features of public rights. *Jarkesy*, 144 S. Ct. at 2133. But it is well established that the Executive Branch may adjudicate matters related to "the congressional power as to interstate and foreign commerce, taxation, immigration, the public lands, public health, the facilities of the post office, pensions, and payments to veterans." *Crowell v. Benson*, 285 U.S. 22, 51 (1932); *accord Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 n.22 (1982) (quoting *Crowell*'s "attempt[] to catalog some of the matters that fall within the public-rights doctrine"). The Supreme Court has not categorically limited public rights to these specifically

---

[3] Petitioners' brief includes a cursory assertion that the Agency adjudication violated "the Separation of Powers, Article III, and the Due Process Clause." Pet'r's Br. at 36. Petitioners forfeited these arguments by failing to raise them in the administrative adjudication and by failing to adequately brief them on appeal. *Infra* n.8.

identified areas, but it has clarified that that doctrine does not extend to "[w]holly private tort, contract, and property cases, as well as a vast range of other cases." *Granfinanciera*, 492 U.S. at 51.

Recently in *Jarkesy*, the Supreme Court considered whether the Securities and Exchange Commission ("SEC") could use an administrative proceeding to impose civil penalties when a person had violated the federal securities laws' "antifraud provisions [that] replicate common law fraud." *Jarkesy*, 144 S. Ct. at 2127. The Supreme Court explained that although the relevant federal securities law provisions were part of a "newly fashioned regulatory scheme," the alleged fraud violations were "a common law suit in all but name," and so did not involve public rights. *Id.* at 2135-36. Instead, the government's enforcement action "target[ed] the same basic conduct as common law fraud," under a statute that "employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles" to the common law. *Id.* In so holding, *Jarkesy* did not overrule any Supreme Court precedent, recognizing that the Seventh Amendment does not preclude Executive adjudication of public rights, including proceedings to impose civil money penalties.

Unlike the SEC action in *Jarkesy*, regulation of the national banking system and those acting within it is not modeled on the common law. Rather, the national banking system's origins are firmly rooted in Civil-War-era legislation advancing

distinctly public rights—preservation of the Union and support of its armies through creation of a national banking system. *Supra* Counterstatement of the Case, Part I.

Since the 19th century, the Supreme Court has repeatedly emphasized that national banks organized under the laws of the United States are "instruments designed to be used to aid the government in the administration of an important branch of the public service." *Farmers' & Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 30 (1875). Thus, the Supreme Court has "frequently expressed" that nationally chartered banks are "not considered as a private corporation whose principal object is individual trade and individual profit, but as a public corporation created for public and national purposes." *Easton v. Iowa*, 188 U.S. 220, 229-30 (1903) (quoting *Osborn v. Bank of United States*, 22 U.S. 738, 860 (1824)).

Regulation of national banks was originally and exclusively within Congress's control, and enforcement actions under the National Bank Act and its amendments (including the § 1818 action here) were not drawn from existing common-law action. For example, in 1880, the Supreme Court of Pennsylvania overturned a state conviction based on the offense of embezzlement at a national bank because "the affairs of such banks are exclusively under the control of Congress." *Commonwealth ex rel. Torrey v. Ketner*, 92 Pa. 372, 376 (1880) (hereinafter, "*Torrey*"). The court recognized that national banks were "creatures of another sovereignty"—*i.e.* the federal government—and that, prior to the National Bank Act

of 1863, "*there were no national banks*, nor even a law to authorize their creation." *Id.* (emphasis added). Thus, a claim alleging that the defendant misused funds at a national bank is "not a common-law offence." *Torrey*, 92 Pa. 372, 376.

The U.S. Supreme Court approvingly quoted *Torrey* at length in its decision in *Easton v. Iowa*, 188 U.S. 220 (1903), which held that an Iowa law prescribing punishment for the offense of receiving deposits at a time of bank insolvency was preempted by federal law. The Supreme Court disagreed with the Iowa Supreme Court's conclusion that the state statute could apply to national banks and their officers, concluding that such reasoning was "not based on a correct conception of the Federal legislation creating and regulating national banks." *Id.* at 229. Unlike other commercial entities, national banks are unique creatures of statute that "cannot . . . be viewed as solely organized and operated for private gain." *Id.* The Court concluded "that Congress, having power to create a system of national banks, is the judge as to the extent of the powers which should be conferred upon such banks, and has the sole power to regulate and control the exercise of their operations." *Id.* at 238. As *Torrey* and *Easton* readily demonstrate, Congress has original and exclusive authority to create a scheme that provides for the regulation of national banks and the imposition of penalties against national bank officers.

Section 1818 causes of action are not akin to those under state common law between private parties. The ability to prosecute the substance of these actions

"depends upon the will of congress." *Den ex dem. Murray v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855). Accordingly, absent Congressional action, there is simply no alternative forum to administrative adjudication in which to pursue claims such as those against Petitioners. *Granfinanciera*, 492 U.S. at 58-59, n.14 (noting that "creditors lack an alternative forum to the bankruptcy court in which to pursue their claims"). Unlike the securities laws at issue in *Jarkesy*, which implicate private rights, *Jarkesy*, 144 S. Ct. at 2136, when the OCC brings an action under § 1818, it is vindicating the public's right to a safe and sound banking system. 12 U.S.C. § 1.

The nature of the underlying charges against Petitioners amply demonstrates this point. The remedies that flow from these charges are "completely dependent upon" adjudication of a claim created by federal law. *CFTC v. Schor*, 478 U.S. 833, 856 (1986). This is borne out in the testimony of an OCC witness concerning Petitioners' assertion that the Capital Raise Loans were "legally permissible," Pet'r's Br. at 62. The testimony firmly demonstrates that the charges arising from the Capital Raise Strategy were grounded exclusively in considerations related to bank supervision rather than any matter that might be resolved at common law. CL158 Tr. at 140:15-141:9 (explaining that in similar circumstances, "OCC would require the bank to" issue a disclosure and "submit a revised capital plan," which would allow OCC to "reassess whether or not the capital raise strategy was viable").

44

Moreover, the underlying misconduct by Petitioners arises from longstanding statutory requirements that Congress has assigned to Executive adjudication. For example, Petitioner Ortega violated the requirement (now codified at 12 U.S.C. § 161) that national banks file with the OCC periodic reports accurately describing their financial condition. *See also* National Bank Act, ch. 58, § 24, 12 Stat. 665, 671-72 (1863) (initially codifying this requirement). The purpose of these reports is to support the supervisory efforts of the OCC in its regulation of national banks. 12 U.S.C. § 1831n(a)(1)(B).

Unlike *Jarkesy*, where the petitioners were "prosecuted for fraudulent conduct," *Jarkesy*, 144 S. Ct. at 2138 (internal quotation marks omitted), the charges against Petitioners here are "closely intertwined" with the statutory scheme of regulation of the national banking system, *id.* at 2135 (quoting *Granfinanciera*, 492 U.S. at 54), and underscored by the recognition that the regulation of national banks is "peculiarly suited to examination and determination by an administrative agency specially assigned to that task," *Crowell*, 285 U.S. at 46; *see also Easton*, 188 U.S. at 232 (highlighting special expertise of OCC). Petitioners' contrary arguments fail to give due consideration to the unique nature of regulating national banking

associations and their affiliated persons.[4]  Unlike the fraud claims in *Jarkesy*, OCC

enforcement actions execute Congress's establishment of a safe and sound national

banking system, which did not exist at common law.  And as explained above, courts

have historically recognized that offenses arising from conduct involving national

banks were "not indictable either at common law or under [state] statutes," but only

within the statutory framework that Congress enacted.  *Torrey*, 92 Pa. 372, 377; *see*

*also Easton*, 188 U.S. at 232-39 (collecting cases).  Thus, the enforcement action

here concerns public rights, which have no apt comparison in the pre-existing

common law, and "the mode of determining [such] matters" is "completely within

congressional control."  *Crowell*, 285 U.S. at 50.

　　This Court reached substantially the same conclusion in *Akin v. Office of Thrift*

*Supervision*, which held that the Seventh Amendment did not apply to a § 1818

enforcement action against the president of a Federal savings and loan association

---

[4] Petitioners erroneously assert that the OCC's "unsafe or unsound practice" claims are "analogous to negligence, a legal claim entitled to a jury."  Pet'r's Br. at 34.  The OCC has consistently utilized a definition of "unsafe or unsound practice" derived from legislative materials.  *In the Matter of Adams*, 2014 WL 8735096, at *2-3 (OCC Sept. 30, 2014); *see also Financial Institutions Supervisory Act of 1966: Hearings on S. 3158 Before the House Comm. on Banking and Currency*, 89th Cong., 2d Sess. 49 (1966) (statement of John E. Horne, Chairman of the FHLBB), 112 CONG. REC. 26,474 (1966); *infra* Argument, Part IV.A (setting forth definition).  This standard bears little resemblance to the elements of common law negligence.  Restatement (Second) of Torts § 281 (1965) (setting forth elements of negligence claim).

seeking payment of "over $19 million." 950 F.2d 1180, 1181, 1186 (5th Cir. 1992).

Citing *Granfinanciera*, this Court held that § 1818 claims involved "public rights"

and, therefore, "there [wa]s no right to a jury trial." *Akin*, 950 F.2d at 1186 (citing

*Granfinanciera*, 492 U.S. at 42, 54-55).     The *Jarkesy* Court reaffirmed

*Granfinanciera*, stating that *Granfinanciera* "effectively decide[d]" the case before

it. *Jarkesy*, 144 S. Ct. at 2135.  Given its reliance on *Granfinanciera*, it is not tenable

that *Jarkesy* somehow implicitly overruled *Akin*'s holding that "there is no right to

a jury trial" for an action under § 1818, which can constitutionally be assigned to "a

proper administrative forum for adjudicating public rights." *Akin*, 950 F.2d at 1186.[5]

*Maertinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 234 (5th Cir. 2023) (noting

that this court's precedent may be "implicitly overruled" where an intervening

Supreme Court decision "fundamentally changes the focus of the relevant analysis").

Thus, regulation of national banks falls within the "distinctive areas involving

governmental prerogatives," which "may be resolved outside of an Article III court,

without a jury." *Jarkesy*, 144 S. Ct. at 2127.  Petitioners mistakenly appear to

contend that—contrary to the analysis above—§ 1818 cannot concern public rights

---

[5] Both the Second Circuit and Ninth Circuit have relied on *Akin* to hold that a § 1818 action seeking a legal remedy fell within the public-rights doctrine. *Cavallari v. OCC*, 57 F.3d 137, 145 (2d Cir. 1995); *Simpson v. OTS*, 29 F.3d 1418, 1423 (9th Cir. 1994).

because it was not explicitly listed among the examples of public rights listed in one section of the Supreme Court's *Jarkesy* opinion. Pet'r's Br. at 31-32. That, however, is not what *Jarkesy* held. It did not profess to exclusively limit all areas of public rights, and instead acknowledged that it was not attempting to "definitively explain[] the distinction between public and private rights." 144 S. Ct. at 2133. As "one of the longest regulated and most closely supervised of public callings," *Fahey v. Mallonee*, 332 U.S. 245, 250 (1947), national banking concerns an area of public rights. *Marquette Nat'l Bank of Minneapolis v. First Omaha Serv. Corp.,* 439 U.S. 299, 308 (1978) ("[National banks are] instrumentalit[ies] of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States" (quoting *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896))); *Franklin Nat'l Bank v. New York,* 347 U.S. 373, 375 (1954) ("The United States has set up a system of national banks as federal instrumentalities to perform various functions . . . ."); *First Nat. Bank of Hartford, Wis. v. City of Hartford,* 273 U.S. 548, 550 (1927) ("National banks are not merely private moneyed institutions, but agencies of the United States, created under its laws to promote its fiscal policies." (internal quotation omitted)).

Finally, setting aside the fact that under the public rights doctrine Petitioners are not entitled to a jury trial, Petitioners waived their right to demand a jury trial by failing to assert it in their post-hearing filings and instead raising it for the first time

four months after the administrative hearing and over a year after the deadline for dispositive motions.  12 C.F.R. § 19.37(a)(2) ("Any party who fails to file timely with the ALJ any proposed finding or conclusion is deemed to have waived the right to raise in any subsequent filing or submission any issue not addressed in such party's proposed finding or conclusion.").  As part of these adversarial proceedings, Petitioners were required to develop and exhaust all issues at the appropriate time to preserve them for judicial review.  *Carr v. Saul*, 593 U.S. 83, 88-90 (2021); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("[C]ourts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice").  Moreover, even when a litigant is entitled to a jury trial under the Seventh Amendment, that right can be waived by "acquiescence" to nonjury proceedings. *Southland Reship, Inc. v. Flegel*, 534 F.2d 639, 644 (5th Cir. 1976).

## II.    Petitioners were afforded the relief required by *Lucia*.

The Constitution's Appointments Clause provides that principal officers must be appointed by the President with Senate confirmation, and that Congress may vest the appointment of inferior officers—those who are supervised by principal officers—in the President, the courts, or Department Heads.  U.S. Const. art. II, § 2, cl. 2.  In *Lucia*, the Supreme Court held that SEC ALJs are inferior officers and reaffirmed that "the appropriate remedy for an adjudication tainted with an

appointments violation is a new hearing before a properly appointed official." 585 U.S. at 251 (internal quotation marks omitted).

After *Lucia* was decided—when motions practice was ongoing and before a hearing in the underlying proceedings—the Comptroller reassigned this matter from ALJ Christopher McNeil to ALJ C. Richard Miserendino and then, following Judge Miserendino's retirement, to ALJ Jennifer Whang, who was appointed by Secretary of the Treasury Steven Mnuchin.[6]  CL32; CL49 at 2; CL57.Exhs1-3.[7]

The Comptroller directed Judge Whang to provide the parties an opportunity to file objections to any actions taken by a prior ALJ and to review and "adopt or revise" all such actions as appropriate.  CL49 at 2.  After considering Petitioners' objections, Judge Whang adopted the prehearing actions taken by the previously

---

[6] A significant portion of Petitioners' briefing of the Appointments Clause issue is dedicated to the constitutionality of the appointment of ALJ McNeil and the actions taken by him. But since *Lucia* was decided, the OCC has not disputed that the proceedings under ALJ McNeil were tainted by an Appointments Clause violation. The core inquiry, therefore, is whether Petitioners were afforded the relief required by *Lucia*: a new hearing before a properly appointed ALJ. The record establishes that they were.

[7] Petitioners complain that they were denied discovery regarding ALJ Whang's appointment, but Enforcement Counsel introduced as exhibits the documents related to her appointment. CL57.Exhs1-3.

assigned ALJs, explaining that the actions were consistent with the OCC's rules of practice and procedure, § 1818, and the APA.  CL60 at 3-5.

*Lucia* does not support Petitioners' assertion that a "new hearing" must consist of an entirely new-from-scratch proceeding.  *Lucia*, 585 U.S. at 251, n.5; *see also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 124 (D.C. Cir. 2015).  Petitioners had an opportunity to allege defects in prehearing rulings issued by prior ALJs. They did so, and thereafter, a newly and properly appointed adjudicator independently considered the merits of the prior rulings.  Petitioners were afforded all that *Lucia* required.[8]

### III.    The charges against Petitioners are timely.

The OCC correctly concluded that the statute of limitations does not bar the action against Petitioners.  The Agency has "five years from the date when the claim first accrued" in which to commence proceedings.  28 U.S.C. § 2462.  The notice of charges initiating the underlying action was filed on September 25, 2017. Therefore,

---

[8] Petitioners' brief includes a perfunctory, one-sentence assertion purporting to "preserve . . . their argument that ALJ Whang is insulated from removal in violation of the Appointments Clause, the Take Care Clause, and the Separation of Powers principle." Pet'r's Br. at 56. Petitioners waived this argument by failing to properly develop and exhaust it administratively.  CL194 at 14-15 & n.5; *see also Carr*, 593 U.S. at 88-90; *L.A. Tucker Truck Lines*, 344 U.S. at 37.  Alternatively, because Petitioners failed to adequately brief this argument, this Court should conclude that it is forfeited.  *Rollins v. Home Depot*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal.").

any claim that first accrued on or after September 25, 2012, is timely for purposes of these proceedings.

It is axiomatic that a claim accrues when the plaintiff has a complete and present cause of action—that is, when all elements of an actionable claim have been met and can be pled. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2450 (2024); *Gabelli v. SEC*, 568 U.S. 442, 448 (2013); *see also Blanton v. OCC*, 909 F.3d 1162, 1171 (D.C. Cir. 2018) ("A claim generally accrues 'when the factual and legal prerequisites for filing suit are in place.'" (quoting *Proffitt v. FDIC*, 200 F.3d 855, 862 (D.C. Cir. 2000))).  The prohibition and second-tier civil-money-penalty claims against Petitioners accrued when the effect prong was met. *Proffitt*, 200 F.3d. at 863 ("Because misconduct and effect are separate prongs, the underlying conduct may not always immediately effect a [§ 1818(e)] violation and thus the accrual of the claim").

With respect to the lending-related charges associated with the Capital Raise Strategy, it is undisputed that the date of the earliest alleged financial loss associated with the Capital Raise Strategy is June 12, 2013, a time that is within five years of the filing of the notice of charges. *See, e.g.*, CL186 at 44 (". . . the OCC offered evidence and the ALJ found that the 'effects' prong of the statute was met on June 12, 2013, when the Bank suffered a loss on one of the loans, and when the FDIC suffered losses many years later on other Capital Raise Loans.") (citing CL176 at

42, 117-18).   With respect to the second-tier CMP accounting-related charges against Petitioner Ortega, the Comptroller concluded that the "effect" provided for at § 1818(i)(2)(B)(ii)(I) (requiring that misconduct be "part of a pattern") was satisfied; thus, these claims accrued "each time" Petitioner Ortega breached his fiduciary duty or violated 12 U.S.C. § 161(a) as part of a pattern of misconduct. *Blanton*, 909 F.3d at 1171.[9]   Record evidence establishes that uncorrected Call Reports were filed until the time of the Bank's failure in September 2013, which is well within the five-year limitations period.[10]

Under Petitioners' interpretation that a claim accrues at the time of misconduct, the limitations period would begin to run before the OCC could initiate an action—

_____

[9] Petitioners' reliance on *Delek Refinery, Ltd. v. OSHRC*, 845 F.3d 170, 177 (5th Cir. 2016) and *AKM LLC v. Secretary of Labor*, 675 F.3d 752, 757 (D.C. Cir. 2012) is misplaced.  Pet'r's Br. at 46-49.  Unlike *Delek Refinery* and *AKM*, this matter does not implicate the "continuing violations" doctrine. Rather, each filing of a materially inaccurate Call Report is a distinct violation.  Because Petitioner Ortega signed materially inaccurate Call Reports within the statute of limitations period and these repeated actions were part of a pattern of misconduct, the first- and second-tier accounting-related civil-money-penalty claims against him are timely.

[10] Petitioners and *amici* confuse the ways in which certain rulings by the Comptroller interpreting the statute of limitations relate to the charges in this matter.  In doing so, they invite this Court to issue an advisory opinion reversing an interlocutory ruling that *might* have applied to certain charges that the Comptroller dismissed on grounds unrelated to the statute of limitations.  In an interlocutory order issued in this matter, the Comptroller clarified that because separate occurrences of effects trigger accruals of separate claims, an action is timely if it is commenced within five years of the date of the last effect resulting from the charged misconduct, even if there were an earlier occurrence of an effect of the type on which the action is predicated.

*i.e.*, before all elements have been met and can be pled. Petitioners also argue that certain charges against them were untimely because *alternative* § 1818(e) effect predicates—namely, the onset of *probable* financial loss, *see* § 1818(e)(1)(B)(i)— had previously occurred outside of the limitations period. But this interpretation is inconsistent with the plain language of the statute, which provides for multiple types of effects and further provides that certain such effects can be shown, alternatively, at the time they actually occur or when they "could" or "will probably" occur. *See, e.g.* 12 U.S.C. § 1818(e)(1)(B); *Proffitt*, 200 F.3d. at 864 ("Separate accrual for each alternative effect gives meaning to all of the statutory language."). It cannot be the case that the statute of limitations begins to run at the time of accrual of a *separate action that the Agency did not plead*. *Blanton*, 909 F.3d at 1172 ("[E]ven though the

---

CL194 at 22-26. The Final Decision refers to this interlocutory ruling as "Interlocutory Ruling 2a." *Id.* The facts surrounding the lending-related charges associated with the Capital Raise Strategy and the accounting-related charges against Petitioner Ortega did not require the Comptroller to apply Interlocutory Ruling 2a to deem these charges timely. Rather, these charges were deemed timely through application of the Comptroller's longstanding interpretation of the statute of limitations, which was upheld by the D.C. Circuit in *Proffitt*. *Id.*; *see also Proffitt*, 200 F.3d. at 864 ("Separate accrual for each alternative effect gives meaning to all of the statutory language."). Any charges that *might* have been deemed timely *solely* through application of Interlocutory Ruling 2a were dismissed for reasons unrelated to the statute of limitations. What's more, it is unclear whether *any* claims in this matter would have been deemed timely solely through application of this ruling. CL194 at 25 & n.11.

OCC might well have brought an action earlier, its failure to do so does not make the claims it elected to bring untimely" (internal quotation marks omitted)).

## IV. The orders arising from lending-related charges associated with the Capital Raise Strategy are reasonable, in accordance with law, and supported by substantial record evidence.

### A. Petitioners engaged in actionable misconduct.

Substantial record evidence establishes that Petitioners engaged in unsafe or unsound practices, which include "any action or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." CL194 at 69-70.[11] Petitioners risked the Bank's existing capital by approving dozens of concessionary loans to potentially unqualified borrowers at a time when the Bank urgently needed to increase its capital ratios and had represented to the OCC that virtually no lending was occurring. *In the Matter of Conover*, 2016 WL 10822038, at *16 (FDIC Dec.

---

[11] This Court has additionally required that an unsafe or unsound banking practice have a "reasonably direct effect on an [institution's] financial soundness." *Gulf Fed. Sav. & Loan Ass'n of Jefferson Par. v. Fed. Home Loan Bank Bd.*, 651 F.2d 259, 264 (5th Cir. 1981). The Final Decision noted that "in all instances in which the Comptroller concludes that unsafe or unsound practices are established in connection with this matter, the facts support such a conclusion under either standard." CL194 at 70, n. 34.

14, 2016) ("Failure to properly underwrite a loan by accurately evaluating the borrower's ability to repay constitutes an unsafe and unsound practice.").

The $3 million to $17.3 million in Capital Raise Loan proceeds reinjected into the Bank created reasonably foreseeable heightened risk by masking the Bank's true financial condition, overstating its loan portfolio and capital position, and misleading regulators, investors, potential investors, shareholders, and depositors. Petitioners' failure to ensure that the Bank disclosed to the OCC that it was financing dozens of purchases of Holding Company stock impeded the OCC's ability to effectively supervise the Bank. *Dodge v. OCC*, 744 F.3d 148, 151, 156-58 (D.C. Cir. 2014) (holding that misrepresenting bank's capital condition to regulators is an unsafe or unsound practice).

Substantial record evidence also supports the conclusion that Petitioners breached their fiduciary duty of care, which requires that bank officers and employees act with the care that an ordinarily prudent and diligent person would exercise under similar circumstances. *In the Matter of Watkins*, 2019 WL 6700075, at *7 (FDIC Oct. 15, 2019). Petitioners were required "to act in good faith and in a manner reasonably believed to be in the bank's best interests," *In the Matter of Ellsworth*, 2016 WL 11597958, at *15 (OCC Mar. 23, 2016), and "to act diligently, prudently, honestly, and carefully in carrying out their responsibilities," *In the Matter of Grubb*, 1992 WL 813163, at *28 (FDIC Aug. 25, 1992). The duty of care

also demanded "proper supervision of subordinates" and "constant concern for the safety and soundness of the bank." *Conover*, 2016 WL 10822038, at *19. Petitioners failed to act prudently, diligently, or carefully in the course of their own responsibilities; failed to properly supervise the decisions of subordinates; approved or ratified loans with vague or misleading loan purposes, given that Petitioners knew the true purpose of Capital Raise Loans was to purchase Holding Company stock; and failed to ensure that the proceeds of Capital Raise Loans were not reinjected into the Bank and improperly treated as new regulatory capital. *Id*. at *20 ("Extending credit without adequate assurances of repayment constitutes a breach of fiduciary duty."); *Grubb*, 1992 WL 813163, at *28 (stating that bank directors' and officers' fiduciary duty requires a "duty to investigate, verify, clarify, and explain").

## B. Petitioners demonstrated continuing disregard for the Bank's safety and soundness.

The requisite culpability to support an order of prohibition may be shown by evidence of "continuing disregard" for a bank's safety or soundness. 12 U.S.C. § 1818(e)(1)(C). Continuing disregard is conduct that has been "voluntarily engaged in over a period of time with heedless indifference to the prospective consequences." *Grubb v. FDIC*, 34 F.3d 956, 962 (10th Cir. 1994). It is a mental state "akin to recklessness." *Brickner v. FDIC,* 747 F.2d 1198, 1203, n.6 (8th Cir. 1984). "Recklessness is established by acts committed 'in disregard of[] and evidencing

conscious indifference to a known or obvious risk of a substantial harm.'" *Conover*, 2016 WL 10822038, at *27 (quoting *Cavallari v. OCC*, 57 F.3d 137, 142 (2d Cir. 1995)). It may also be demonstrated through "voluntary and repeated inattention to" unsafe and unsound practices, or the "knowledge of and failure to correct clearly imprudent and abnormal practices that have been ongoing." *In the Matter of Swanson,* 1995 WL 329616, at *5 (OTS Apr. 4, 1995). The "continuing" aspect of "continuing disregard" requires repetition of the misconduct, *id.*, "over a period of time," *Grubb*, 34 F.3d at 962.

The Comptroller rejected the ALJ's conclusion that Enforcement Counsel had not carried its burden of establishing that Petitioners demonstrated continuing disregard for the Bank's safety and soundness, reasoning that the Recommended Decision is internally inconsistent with respect to Petitioners' culpability in connection with the Capital Raise Strategy. CL194 at 84. The ALJ's own findings and analysis—including that Petitioners engaged in "demonstrably *deceptive*" practices, CL176 at 115 (emphasis in original); "admitted habitual inattention," *id.* at 123; and that the Capital Raise Strategy "raised sham capital using the Bank's existing funds," *id.* at 108—conflict with and undermine her conclusions elsewhere that Petitioners acted in "good faith" or took steps "to improve the capital conditions of the Bank," *id.* at 120, 130.

Petitioners voluntarily engaged in repeated misconduct by approving dozens of Capital Raise Loans despite knowing that the stated purposes of such loans were misleading. Their misconduct demonstrated heedless indifference in that it risked the Bank's existing capital through extending liberal and concessionary loans while also failing to generate new capital.

Petitioners' conduct was plainly deliberate, and they knew or should have known—as demonstrated by their contacts with the OCC regarding capital-raise efforts and the Bank's own policies—that such conduct presented grave risks to the Bank. To highlight what is perhaps the plainest demonstration of Petitioners' culpability, their own testimony shows that despite being in virtually continuous contact with the OCC and under an obligation to be fully transparent about the Bank's capital-raise efforts, Petitioners participated in concerted efforts to conceal or misrepresent the Capital Raise Strategy to the OCC and in Bank records. *Supra* Counterstatement of the Case, Part III.C; *cf. Ellsworth*, 2016 WL 11597958, at *17 (holding that IAPs demonstrated continuing disregard by, *inter alia*, "withholding material information from . . . the OCC").

No degree of exigency can justify this dishonesty. And contrary to Petitioners' arguments, shifting blame to subordinates is not a colorable defense. *See, e.g.*, *In the Matter of Leuthe*, 1998 WL 438324, at *39 (FDIC Feb. 13, 1998) (noting that "abdication of duty by directors to officers is not a defense," and that IAP's "duty as

a board member, and particularly as Chairman of the Board, was to monitor the activities of bank management, to ensure compliance with laws, regulations, cease and desist orders and the Bank's own loan policy."). Furthermore, Petitioners' misconduct is no less actionable because others contributed to it. 12 U.S.C. § 1813(v) ("violation" under § 1818 includes "any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding and abetting a violation"); *see also Landry v. FDIC*, 204 F.3d 1125, 1139 (D.C. Cir. 2000) (concluding that the fact that others may have been "more guilty" does not absolve individual from responsibility for his actions).

### C. The effect prong is satisfied.

It is undisputed that on June 12, 2013 (a date that is less than five years prior to the issuance of the September 25, 2017 notice of charges), the Bank recorded combined losses of $387,240.63 on two of the Capital Raise Loans.[12] This loss and other losses associated with the Capital Raise Loans occurred "by reason of" Petitioners' misconduct because the Capital Raise Loans would not have been made

---

[12] The FDIC in its capacity as receiver for the failed Bank also suffered $3,808,058.28 in losses when certain outstanding Capital Raise Loans were charged off. *Supra* Counterstatement of the Case, Part III.C.9.

were it not for Bank management's decision to implement the Capital Raise Strategy.[13]  12 U.S.C. § 1818(e)(1)(B).

## V.    The orders against Petitioner Ortega arising from accounting-related misconduct are reasonable, in accordance with law, and supported by substantial record evidence.

Section 161 of the National Bank Act requires banks to file with the OCC periodic Call Reports describing the bank's financial condition.  12 U.S.C. § 161(a); *see also Blanton*, 909 F.3d at 1174.  Call Reports must, *inter alia*, "accurately reflect the capital" of the bank, 12 U.S.C. § 1831n(a)(1)(A); *see also Blanton*, 909 F.3d at 1174, and the bank officer who signs the report must attest that it is "true and correct to the best of his knowledge and belief," 12 U.S.C. § 161(a).  Call Reports must be prepared in accordance with GAAP and the Call Report Instructions.  12 U.S.C. § 1831n(a)(2)(A); 12 C.F.R. § 304.3(a).

### A.  Accounting-Related Charges Arising from the Capital Raise Strategy

Call Reports filed between 2009 and 2013 overstated the Bank's regulatory capital to whatever extent proceeds of Capital Raise Loans were downstreamed from the Holding Company to the Bank, *i.e.*, an amount somewhere between $3 million and $17.3 million.  Petitioner Ortega did not have a reasonable belief that Capital

---

[13] Petitioners assert that they were financially harmed by the transactions at issue in this case, Pet'r's Br. at 52 n.116, 61, but this is irrelevant to the charges against them, CL194 at 35, n.14.

Raise Loan proceeds could be treated as new capital.  Petitioner Ortega's violation of § 161(a) over the course of several Call Reports constituted a pattern of misconduct sufficient to meet the standard for first- and second-tier civil-money-penalty assessments under § 1818(i).

### B.  Accounting-Related Charges Arising from the OREO Strategy

The Bank improperly accounted for its OREO sales by failing to discount loans with below-market interest rates to their present value of future cash flows, and this materially overstated the Bank's earnings and capital. Communications from the OCC in 2009 and 2011 and the Bank's own *Market Rate Matrix* should have alerted Petitioner Ortega that the Bank was not correctly accounting for loans associated with the OREO Strategy. Petitioner Ortega's repeated violations of § 161(a) were part of a pattern that continued into the five-year statute-of-limitations window.

### C. Accounting-Related Charges Arising from Nonaccrual Loan Accounting Practices

The Call Reports filed from June 30, 2009 through December 31, 2012 inappropriately recognized interest income on nonaccrual loans on a blanket basis without documentation or justification, and thus overstated the Bank's earnings and capital for those periods.  The Bank's practice of automatically recognizing interest income on loans that have been placed on nonaccrual status was contrary to the Call Report Instructions and GAAP.  The Call Report inaccuracies were material because

they implicated various considerations found in SEC Accounting Bulletin No. 99, *Materiality* ("SAB 99") and because the applicable Call Report Instructions noted that "[g]uidance on the consideration of all relevant factors when assessing the materiality of misstatements" could be found in SAB 99.  CLO.Exh359 at 380. Petitioner Ortega signed multiple Call Reports during the relevant period even though he did not have a reasonable basis to believe in the accuracy of the Bank's Nonaccrual Loan Accounting Practices due to repeated warnings from the OCC and the Bank's internal auditor.  Petitioner Ortega did not demonstrate constant concern for the safety and soundness of the bank and did not conduct himself as an ordinarily prudent person, acting diligently and carefully, would have in the circumstances. *Conover*, 2016 WL 10822038, at *19; *see also Michael v. FDIC*, 687 F.3d 337, 350-51 (7th Cir. 2012).  Additionally, his failure to address the Bank's improper Nonaccrual Loan Accounting Practices and his signing of multiple Call Reports that he knew or should have known improperly recognized interest income on nonaccrual loans constituted a pattern of misconduct.

## VI.   Petitioners' Alleged Errors

Petitioners assert that the ALJs erred in striking their affirmative defense and declining to admit exhibits related to the circumstances surrounding the failure of Fannie Mae and Freddie Mac.  Pet'r's Br. at 57.  The Comptroller expressly adopted the undisputed factual findings that, in September 2008, the Bank suffered a $174

million investment loss in connection with the failure of Fannie Mae and Freddie Mac and that this loss created an "exigent" need for the Bank to raise capital. CL194 at 35.  Because further factual development regarding the failure of Fannie Mae and Freddie Mac would have little or no probative value with respect to the charges against Petitioners or any colorable defenses thereto, the Comptroller properly concluded that any such development would be unduly repetitive.

Petitioners also assert that Judge Whang erred by prohibiting offers of proof at various points throughout the hearing and by improperly admitting hearsay and sworn statements.  Pet'r's Br. at 59-60.  In the proceedings below, the Comptroller largely deemed Petitioners' various hearsay objections waived because there, as here, argument as to this issue consists of conclusory bullet points with no meaningful analysis.  This Court should likewise deem Petitioners' hearsay argument waived.  *Supra* note 8.  Regardless, the admission of hearsay evidence was not contrary to law.[14]  With respect to alleged errors related to the ALJ's exclusion of proffers, there again is no error because the Comptroller, who is the final Agency decisionmaker, considered Petitioners' written proffers.  CL194 at 36.

---

[14] The OCC's regulations provide that "relevant, material, and reliable evidence that is not unduly repetitive" is admissible in adjudicatory proceedings, even if such evidence is inadmissible under the Federal Rules of Evidence.  12 C.F.R. § 19.36(a).

Finally, Petitioners argue that the Comptroller should have applied a "clear and convincing" standard of proof rather than the "preponderance of the evidence" standard. Pet'r's Br. at 64. However, as the Supreme Court held in *Steadman v. SEC*, Congress is free to designate a preponderance of the evidence standard of proof in cases involving prohibition orders, 450 U.S. 91, 103-04 (1981), and the Comptroller correctly applied the standard of proof prescribed in the APA and the Federal Deposit Insurance Act, *Adams*, 2014 WL 8735096, at *7 ("The FDI Act calls for the Comptroller to review the record established at the hearing to determine whether, in his judgment, Enforcement Counsel has met its burden of supporting allegations by a preponderance of the evidence in the record." (citing 5 U.S.C. § 556(d)).

## CONCLUSION

The Petition for Review should be denied.

Respectfully submitted,

Theodore J. Dowd, Acting Senior Deputy
Comptroller and Chief Counsel
Patricia S. Grady, Deputy Chief Counsel
Peter C. Koch, Director of Litigation
     /s/
Hannah Hicks, Counsel
Jason Fernandes, Attorney
Ashley C. Burke, Attorney
Jacob E. Costello, Law Clerk
Attorneys for Respondent Office of the
Comptroller of the Currency

# CERTIFICATE OF SERVICE

I, Hannah Hicks, counsel for Respondent Office of the Comptroller of the Currency, served the foregoing Brief of Respondent Office of the Comptroller of the Currency, Statutory Addendum, and Certificate of Compliance Pursuant to Rule 32(g) on December 20, 2024, by ECF electronic filing system upon the following:

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 N. Akard Street
Dallas, Texas 75201
Tom@tsleatherburylaw.com

Frank C. Brame
The Brame Law Firm PLLC
4514 Cole Ave., Suite 600
Dallas, Texas 75205
frank@bramelawfirm.com

Bill Sims
4234 Shorecrest Drive
Dallas, Texas 75209
bsims1119@gmail.com
Counsel for Petitioners

/s/
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Hannah Hicks
Counsel for Respondent
Office of the Comptroller of the
Currency
400 7th Street SW
Washington, D.C. 20219

## CERTIFICATE OF COMPLIANCE PURSUANT TO RULE 32(g)

The undersigned counsel hereby certifies that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,971 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/
_____
Hannah Hicks
Counsel for Respondent
Office of the Comptroller of the
Currency
400 7th Street SW
Washington, D.C. 20219

# STATUTORY ADDENDUM

## 5 U.S.C. § 706

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be-

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

# 12 U.S.C. § 1

**(a) Office of the Comptroller of the Currency established**

There is established in the Department of the Treasury a bureau to be known as the "Office of the Comptroller of the Currency" which is charged with assuring the safety and soundness of, and compliance with laws and regulations, fair access to financial services, and fair treatment of customers by, the institutions and other persons subject to its jurisdiction.

**(b) Comptroller of the Currency**

**(1) In general**

The chief officer of the Office of the Comptroller of the Currency shall be known as the Comptroller of the Currency. The Comptroller of the Currency shall perform the duties of the Comptroller of the Currency under the general direction of the Secretary of the Treasury. The Secretary of the Treasury may not delay or prevent the issuance of any rule or the promulgation of any regulation by the Comptroller of the Currency, and may not intervene in any matter or proceeding before the Comptroller of the Currency (including agency enforcement actions), unless otherwise specifically provided by law.

**(2) Additional authority**

The Comptroller of the Currency shall have the same authority with respect to functions transferred to the Comptroller of the Currency under the Enhancing Financial Institution Safety and Soundness Act of 2010 as was vested in the Director of the Office of Thrift Supervision on the transfer date, as defined in section 311 of that Act.

# 12 U.S.C. § 161

**(a) Reports of condition; form; contents; date of making; publication**

Every association shall make reports of condition to the Comptroller of the Currency in accordance with the Federal Deposit Insurance Act. The Comptroller of the Currency may call for additional reports of condition, in such form and containing such information as he may prescribe, on dates to be fixed by him, and may call for special reports from any particular association whenever in his judgment the same are necessary for his use in the performance of his supervisory duties. Each report of condition shall contain a declaration by the president, a vice president, the cashier, or by any other officer designated by the board of directors of the bank to make such declaration, that the report is true and correct to the best of his knowledge and belief. The correctness of the report of condition shall be attested by the signatures of at least three of the directors of the bank other than the officer making such declaration, with the declaration that the report has been examined by them and to the best of their knowledge and belief is true and correct. Each report shall exhibit in detail and under appropriate heads the resources and liabilities of the association at the close of business on any past day specified by the Comptroller, and shall be transmitted to the Comptroller within the period of time specified by the Comptroller. Special reports called for by the Comptroller need contain only such information as is specified by the Comptroller in his request therefor, and publication of such reports need be made only if directed by the Comptroller.

**(b) Payment of dividends**

Every association shall make to the Comptroller reports of the payment of dividends, including advance reports of dividends proposed to be declared or paid in such cases and under such conditions as the Comptroller deems necessary to carry out the purposes of the laws relating to national banking associations in such form and at such times as he may require.

**(c) Reports of affiliates; form; contents; date of making; publication; penalties**

Each national banking association shall obtain from each of its affiliates other than member banks and furnish to the Comptroller of the Currency not less than four reports during each year, in such form as the Comptroller may prescribe, verified by the oath or affirmation of the president or such other officer as may be designated by the board of directors of such affiliate to verify such reports, disclosing the information hereinafter provided for as of dates identical with those for which the Comptroller shall during such year require the reports of the condition of the association. Each such report of an affiliate shall be transmitted to the Comptroller at the same time as the corresponding report of the association, except that the Comptroller may, in his discretion, extend such time for good cause shown. Each such report shall contain such information as in the judgment of the Comptroller of

71

the Currency shall be necessary to disclose fully the relations between such affiliate and such bank and to enable the Comptroller to inform himself as to the effect of such relations upon the affairs of such bank. The Comptroller shall also have power to call for additional reports with respect to any such affiliate whenever in his judgment the same are necessary in order to obtain a full and complete knowledge of the conditions of the association with which it is affiliated. Such additional reports shall be transmitted to the Comptroller of the Currency in such form as he may prescribe.

# 12 U.S.C. § 1813

As used in this chapter--

## (a) Definitions of bank and related terms

## (1) Bank

The term "bank"--

**(A)** means any national bank and State bank, and any Federal branch and insured branch;

**(B)** includes any former savings association.

## (2) State bank

The term "State bank" means any bank, banking association, trust company, savings bank, industrial bank (or similar depository institution which the Board of Directors finds to be operating substantially in the same manner as an industrial bank), or other banking institution which--

**(A)** is engaged in the business of receiving deposits, other than trust funds (as defined in this section); and

**(B)** is incorporated under the laws of any State or which is operating under the Code of Law for the District of Columbia,

including any cooperative bank or other unincorporated bank the deposits of which were insured by the Corporation on the day before August 9, 1989.

## (3) State

The term "State" means any State of the United States, the District of Columbia, any territory of the United States, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, and the Northern Mariana Islands.

## (b) Definition of savings associations and related terms

## (1) Savings association

The term "savings association" means--

**(A)** any Federal savings association;

**(B)** any State savings association; and

**(C)** any corporation (other than a bank) that the Board of Directors and the Comptroller of the Currency jointly determine to be operating in substantially the same manner as a savings association.

**(2) Federal savings association**

The term "Federal savings association" means any Federal savings association or Federal savings bank which is chartered under section 1464 of this title.

**(3) State savings association**

The term "State savings association" means--

**(A)** any building and loan association, savings and loan association, or homestead association; or

**(B)** any cooperative bank (other than a cooperative bank which is a State bank as defined in subsection (a)(2)),

which is organized and operating according to the laws of the State (as defined in subsection (a)(3)) in which it is chartered or organized.

**(c) Definitions relating to depository institutions**

**(1) Depository institution**

The term "depository institution" means any bank or savings association.

**(2) Insured depository institution**

The term "insured depository institution" means any bank or savings association the deposits of which are insured by the Corporation pursuant to this chapter.

**(3) Institutions included for certain purposes**

The term "insured depository institution" includes any uninsured branch or agency of a foreign bank or a commercial lending company owned or controlled by a foreign bank for purposes of section 1818 of this title.

**(4) Federal depository institution**

The term "Federal depository institution" means any national bank, any Federal savings association, and any Federal branch.

**(5) State depository institution**

The term "State depository institution" means any State bank, any State savings association, and any insured branch which is not a Federal branch.

**(d) Definitions relating to member banks**

**(1) National member bank**

The term "national member bank" means any national bank which is a member of the Federal Reserve System.

**(2) State member bank**

The term "State member bank" means any State bank which is a member of the Federal Reserve System.

**(e) Definitions relating to nonmember banks**

**(1) National nonmember bank**

The term "national nonmember bank" means any national bank which--

**(A)** is located in any territory of the United States, Puerto Rico, Guam, American Samoa, the Virgin Islands, or the Northern Mariana Islands; and

**(B)** is not a member of the Federal Reserve System.

**(2) State nonmember bank**

The term "State nonmember bank" means any State bank which is not a member of the Federal Reserve System.

**(f) Mutual savings bank**

The term "mutual savings bank" means a bank without capital stock transacting a savings bank business, the net earnings of which inure wholly to the benefit of its depositors after payment of obligations for any advances by its organizers.

**(g) Savings bank**

The term "savings bank" means a bank (including a mutual savings bank) which transacts its ordinary banking business strictly as a savings bank under State laws imposing special requirements on such banks governing the manner of investing their funds and of conducting their business.

**(h) Insured bank**

The term "insured bank" means any bank (including a foreign bank having an insured branch) the deposits of which are insured in accordance with the provisions of this chapter; and the term "noninsured bank" means any bank the deposits of which are not so insured.

**(i) New depository institution and bridge depository institution defined**

**(1) New depository institution**

The term "new depository institution" means a new national bank or Federal savings association, other than a bridge depository institution, organized by the Corporation in accordance with section 1821(m) of this title.

**(2) Bridge depository institution**

The term "bridge depository institution" means a new national bank or Federal savings association organized by the Corporation in accordance with section 1821(n) of this title.

**(j) Receiver**

The term "receiver" includes a receiver, liquidating agent, conservator, commission, person, or other agency charged by law with the duty of winding up the affairs of a bank or savings association or of a branch of a foreign bank.

**(k) Board of Directors**

The term "Board of Directors" means the Board of Directors of the Corporation.

**(l) Deposit**

The term "deposit" means--

**(1)** the unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally, to a commercial, checking, savings, time, or thrift account, or which is evidenced by its certificate of deposit, thrift certificate, investment certificate, certificate of indebtedness, or other similar name, or a check or draft drawn against a deposit account and certified by the bank or savings association, or a letter of credit or a traveler's check on which the bank or savings association is primarily liable: *Provided*, That, without limiting

the generality of the term "money or its equivalent", any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for checks or drafts or for a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable, or for a charge against a deposit account, or in settlement of checks, drafts, or other instruments forwarded to such bank or savings association for collection.

**(2)** trust funds as defined in this chapter received or held by such bank or savings association, whether held in the trust department or held or deposited in any other department of such bank or savings association.

**(3)** money received or held by a bank or savings association, or the credit given for money or its equivalent received or held by a bank or savings association, in the usual course of business for a special or specific purpose, regardless of the legal relationship thereby established, including without being limited to, escrow funds, funds held as security for an obligation due to the bank or savings association or others (including funds held as dealers reserves) or for securities loaned by the bank or savings association, funds deposited by a debtor to meet maturing obligations, funds deposited as advance payment on subscriptions to United States Government securities, funds held for distribution or purchase of securities, funds held to meet its acceptances or letters of credit, and withheld taxes: *Provided,* That there shall not be included funds which are received by the bank or savings association for immediate application to the reduction of an indebtedness to the receiving bank or savings association, or under condition that the receipt thereof immediately reduces or extinguishes such an indebtedness.

**(4)** outstanding draft (including advice or authorization to charge a bank's or a savings association's balance in another bank or savings association), cashier's check, money order, or other officer's check issued in the usual course of business for any purpose, including without being limited to those issued in payment for services, dividends, or purchases, and

**(5)** such other obligations of a bank or savings association as the Board of Directors, after consultation with the Comptroller of the Currency, and the Board of Governors of the Federal Reserve System, shall find and prescribe by regulation to be deposit liabilities by general usage, except that the following shall not be a deposit for any of the purposes of this chapter or be included as part of the total deposits or of an insured deposit:

**(A)** any obligation of a depository institution which is carried on the books and records of an office of such bank or savings association located outside of any State, unless--

**(i)** such obligation would be a deposit if it were carried on the books and records of the depository institution, and would be payable at, an office located in any State; and

**(ii)** the contract evidencing the obligation provides by express terms, and not by implication, for payment at an office of the depository institution located in any State;

**(B)** any international banking facility deposit, including an international banking facility time deposit, as such term is from time to time defined by the Board of Governors of the Federal Reserve System in regulation D or any successor regulation issued by the Board of Governors of the Federal Reserve System; and

**(C)** any liability of an insured depository institution that arises under an annuity contract, the income of which is tax deferred under section 72 of Title 26.

**(m) Insured deposit**

**(1) In general**

Subject to paragraph (2), the term "insured deposit" means the net amount due to any depositor for deposits in an insured depository institution as determined under sections 1817(i) and 1821(a) of this title.

**(2)** In the case of any deposit in a branch of a foreign bank, the term "insured deposit" means an insured deposit as defined in paragraph (1) of this subsection which--

**(A)** is payable in the United States to--

**(i)** an individual who is a citizen or resident of the United States,

**(ii)** a partnership, corporation, trust, or other legally cognizable entity created under the laws of the United States or any State and having its principal place of business within the United States or any State, or

**(iii)** an individual, partnership, corporation, trust, or other legally cognizable entity which is determined by the Board of Directors in accordance with its regulations to

have such business or financial relationships in the United States as to make the insurance of such deposit consistent with the purposes of this chapter;

and

**(B)** meets any other criteria prescribed by the Board of Directors by regulation as necessary or appropriate in its judgment to carry out the purposes of this chapter or to facilitate the administration thereof.

### (3) Uninsured deposits

The term "uninsured deposit" means the amount of any deposit of any depositor at any insured depository institution in excess of the amount of the insured deposits of such depositor (if any) at such depository institution.

### (4) Preferred deposits

The term "preferred deposits" means deposits of any public unit (as defined in paragraph (1)) at any insured depository institution which are secured or collateralized as required under State law.

### (n) Transferred deposit

The term "transferred deposit" means a deposit in a new bank or other insured depository institution made available to a depositor by the Corporation as payment of the insured deposit of such depositor in a closed bank, and assumed by such new bank or other insured depository institution.

### (o) Domestic branch

The term "domestic branch" includes any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State of the United States or in any Territory of the United States, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, or the Virgin Islands at which deposits are received or checks paid or money lent. The term "domestic branch" does not include an automated teller machine or a remote service unit. The term "foreign branch" means any office or place of business located outside the United States, its territories, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, or the Virgin Islands, at which banking operations are conducted.

**(p) Trust funds**

The term "trust funds" means funds held by an insured depository institution in a fiduciary capacity and includes, without being limited to, funds held as trustee, executor, administrator, guardian, or agent.

**(q) Appropriate Federal banking agency**

The term "appropriate Federal banking agency" means--

**(1)** the Office of the Comptroller of the Currency, in the case of--

**(A)** any national banking association;

**(B)** any Federal branch or agency of a foreign bank; and

**(C)** any Federal savings association;

**(2)** the Federal Deposit Insurance Corporation, in the case of--

**(A)** any State nonmember insured bank;

**(B)** any foreign bank having an insured branch; and

**(C)** any State savings association;1

**(3)** the Board of Governors of the Federal Reserve System, in the case of--

**(A)** any State member bank;

**(B)** any branch or agency of a foreign bank with respect to any provision of the Federal Reserve Act which is made applicable under the International Banking Act of 1978;

**(C)** any foreign bank which does not operate an insured branch;

**(D)** any agency or commercial lending company other than a Federal agency;

**(E)** supervisory or regulatory proceedings arising from the authority given to the Board of Governors under section 7(c)(1) of the International Banking Act of 1978, including such proceedings under the Financial Institutions Supervisory Act of 1966;

**(F)** any bank holding company and any subsidiary (other than a depository institution) of a bank holding company; and

**(G)** any savings and loan holding company and any subsidiary (other than a depository institution) of a savings and loan holding company.

Under the rule set forth in this subsection, more than one agency may be an appropriate Federal banking agency with respect to any given institution.

**(r) State bank supervisor**

**(1) In general**

The term "State bank supervisor" means any officer, agency, or other entity of any State which has primary regulatory authority over State banks or State savings associations in such State.

**(2) Interstate application**

The State bank supervisors of more than 1 State may be the appropriate State bank supervisor for any insured depository institution.

**(s) Definitions relating to foreign banks and branches**

**(1) Foreign bank**

The term "foreign bank" has the meaning given to such term by section 1(b)(7) of the International Banking Act of 1978.

**(2) Federal branch**

The term "Federal branch" has the meaning given to such term by section 1(b)(6) of the International Banking Act of 1978.

**(3) Insured branch**

The term "insured branch" means any branch (as defined in section 1(b)(3) of the International Banking Act of 1978 of a foreign bank any deposits in which are insured pursuant to this chapter.

**(t) Includes, including**

**(1) In general**

The terms "includes" and "including" shall not be construed more restrictively than the ordinary usage of such terms so as to exclude any other thing not referred to or described.

**(2) Rule of construction**

Paragraph (1) shall not be construed as creating any inference that the term "includes" or "including" in any other provision of Federal law may be deemed to exclude any other thing not referred to or described.

**(u) Institution-affiliated party**

The term "institution-affiliated party" means--

**(1)** any director, officer, employee, or controlling stockholder (other than a bank holding company or savings and loan holding company) of, or agent for, an insured depository institution;

**(2)** any other person who has filed or is required to file a change-in-control notice with the appropriate Federal banking agency under section 1817(j) of this title;

**(3)** any shareholder (other than a bank holding company or savings and loan holding company), consultant, joint venture partner, and any other person as determined by the appropriate Federal banking agency (by regulation or case-by-case) who participates in the conduct of the affairs of an insured depository institution; and

**(4)** any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in--

**(A)** any violation of any law or regulation;

**(B)** any breach of fiduciary duty; or

**(C)** any unsafe or unsound practice,

which caused or is likely to cause more than a minimal financial loss to, or a significant adverse effect on, the insured depository institution.

**(v) Violation**

The term "violation" includes any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation.

**(w) Definitions relating to affiliates of depository institutions**

**(1) Depository institution holding company**

The term "depository institution holding company" means a bank holding company or a savings and loan holding company.

**(2) Bank holding company**

The term "bank holding company" has the meaning given to such term in section 1841 of this title.

**(3) Savings and loan holding company**

The term "savings and loan holding company" has the meaning given to such term in section 1467a of this title.

**(4) Subsidiary**

The term "subsidiary"--

**(A)** means any company which is owned or controlled directly or indirectly by another company; and

**(B)** includes any service corporation owned in whole or in part by an insured depository institution or any subsidiary of such a service corporation.

**(5) Control**

The term "control" has the meaning given to such term in section 1841 of this title.

**(6) Affiliate**

The term "affiliate" has the meaning given to such term in section 1841(k) of this title.

**(7) Company**

The term "company" has the same meaning as in section 1841(b) of this title.

**(x) Definitions relating to default**

**(1) Default**

The term "default" means, with respect to an insured depository institution, any adjudication or other official determination by any court of competent jurisdiction, the appropriate Federal banking agency, or other public authority pursuant to which

a conservator, receiver, or other legal custodian is appointed for an insured depository institution or, in the case of a foreign bank having an insured branch, for such branch.

## (2) In danger of default

The term "in danger of default" means an insured depository institution with respect to which (or in the case of a foreign bank having an insured branch, with respect to such insured branch) the appropriate Federal banking agency or State chartering authority has advised the Corporation (or, if the appropriate Federal banking agency is the Corporation, the Corporation has determined) that--

**(A)** in the opinion of such agency or authority--

**(i)** the depository institution or insured branch is not likely to be able to meet the demands of the institution's or branch's depositors or pay the institution's or branch's obligations in the normal course of business; and

**(ii)** there is no reasonable prospect that the depository institution or insured branch will be able to meet such demands or pay such obligations without Federal assistance; or

**(B)** in the opinion of such agency or authority--

**(i)** the depository institution or insured branch has incurred or is likely to incur losses that will deplete all or substantially all of its capital; and

**(ii)** there is no reasonable prospect that the capital of the depository institution or insured branch will be replenished without Federal assistance.

## (y) Definitions relating to Deposit Insurance Fund

## (1) Deposit Insurance Fund

The term "Deposit Insurance Fund" means the Deposit Insurance Fund established under section 1821(a)(4) of this title.

## (2) Designated reserve ratio

The term "designated reserve ratio" means the reserve ratio designated by the Board of Directors in accordance with section 1817(b)(3) of this title.

**(3) Reserve ratio**

The term "reserve ratio", when used with regard to the Deposit Insurance Fund other than in connection with a reference to the designated reserve ratio, means the ratio of the net worth of the Deposit Insurance Fund to the value of the aggregate estimated insured deposits, or such comparable percentage of the assessment base set forth in section 1817(b)(2)(C) of this title.

**(z) Federal banking agency**

The term "Federal banking agency" means the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, or the Federal Deposit Insurance Corporation.

# 12 U.S.C. § 1818

**(a)TERMINATION OF INSURANCE**

**(1)VOLUNTARY TERMINATION** Any insured depository institution which is not—

**(A)**

a national member bank;

**(B)**

a State member bank;

**(C)**

a Federal branch;

**(D)**

a Federal savings association; or

**(E)**

an insured branch which is required to be insured under subsection (a) or (b) [1] of section 3104 of this title,

may terminate such depository institution's status as an insured depository institution if such insured institution provides written notice to the Corporation of the institution's intent to terminate such status not less than 90 days before the effective date of such termination.

**(2)INVOLUNTARY TERMINATION**

**(A)Notice to primary regulator** If the Board of Directors determines that—

**(i)**

an insured depository institution or the directors or trustees of an insured depository institution have engaged or are engaging in unsafe or unsound practices in conducting the business of the depository institution;

**(ii)**

an insured depository institution is in an unsafe or unsound condition to continue operations as an insured institution; or

**(iii)**

an insured depository institution or the directors or trustees of the insured institution have violated any applicable law, regulation, order, condition imposed in writing by the Corporation in connection with the approval of any application or other request by the insured depository institution, or written agreement entered into between the insured depository institution and the Corporation,

the Board of Directors shall notify the appropriate Federal banking agency with respect to such institution (if other than the Corporation) or the State banking supervisor of such institution (if the Corporation is the appropriate Federal banking agency) of the Board's determination and the facts and circumstances on which such determination is based for the purpose of securing the correction of such practice, condition, or violation. Such notice shall be given to the appropriate Federal banking agency not less than 30 days before the notice required by subparagraph (B), except that this period for notice to the appropriate Federal banking agency may be reduced or eliminated with the agreement of such agency.

**(B)Notice of intention to terminate insurance** If, after giving the notice required under subparagraph (A) with respect to an insured depository institution, the Board of Directors determines that any unsafe or unsound practice or condition or any violation specified in such notice requires the termination of the insured status of the insured depository institution, the Board shall—

**(i)**

serve written notice to the insured depository institution of the Board's intention to terminate the insured status of the institution;

**(ii)**

provide the insured depository institution with a statement of the charges on the basis of which the determination to terminate such institution's insured status was made (or a copy of the notice under subparagraph (A)); and

**(iii)**

notify the insured depository institution of the date (not less than 30 days after notice under this subparagraph) and place for a hearing before the Board of Directors (or any person designated by the Board) with respect to the termination of the institution's insured status.

**(3)HEARING; TERMINATION**

If, on the basis of the evidence presented at a hearing before the Board of Directors (or any person designated by the Board for such purpose), in which all issues shall be determined on the record pursuant to section 554 of title 5 and the written findings of the Board of Directors (or such person) with respect to such evidence (which shall be conclusive), the Board of Directors finds that any unsafe or unsound practice or condition or any violation specified in the notice to an insured depository institution under paragraph (2)(B) or subsection (w) has been established, the Board of Directors may issue an order terminating the insured status of such depository institution effective as of a date subsequent to such finding.

**(4)APPEARANCE; CONSENT TO TERMINATION**

Unless the depository institution shall appear at the hearing by a duly authorized representative, it shall be deemed to have consented to the termination of its status as an insured depository institution and termination of such status thereupon may be ordered.

**(5)JUDICIAL REVIEW**

Any insured depository institution whose insured status has been terminated by order of the Board of Directors under this subsection shall have the right of judicial review of such order only to the same extent as provided for the review of orders under subsection (h) of this section.

**(6)PUBLICATION OF NOTICE OF TERMINATION**

The Corporation may publish notice of such termination and the depository institution shall give notice of such termination to each of its depositors at his last address of record on the books of the depository institution, in such manner and at such time as the Board of Directors may find to be necessary and may order for the protection of depositors.

**(7)TEMPORARY INSURANCE OF DEPOSITS INSURED AS OF TERMINATION**

After the termination of the insured status of any depository institution under the provisions of this subsection, the insured deposits of each depositor in the depository institution on the date of such termination, less all subsequent withdrawals from any deposits of such depositor, shall continue for a period of at least 6 months or up to 2 years, within the discretion of the Board of Directors, to be insured, and the depository institution shall continue to pay to the Corporation assessments as in the case of an insured depository institution during such period. No additions to any

such deposits and no new deposits in such depository institution made after the date of such termination shall be insured by the Corporation, and the depository institution shall not advertise or hold itself out as having insured deposits unless in the same connection it shall also state with equal prominence that such additions to deposits and new deposits made after such date are not so insured. Such depository institution shall, in all other respects, be subject to the duties and obligations of an insured depository institution for the period referred to in the 1st sentence from the date of such termination, and in the event that such depository institution shall be closed on account of inability to meet the demands of its depositors within such period, the Corporation shall have the same powers and rights with respect to such depository institution as in case of an insured depository institution.

**(8)TEMPORARY SUSPENSION OF INSURANCE**

**(A)In general**

If the Board of Directors initiates a termination proceeding under paragraph (2), and the Board of Directors, after consultation with the appropriate Federal banking agency, finds that an insured depository institution (other than a savings association to which subparagraph (B) applies) has no tangible capital under the capital guidelines or regulations of the appropriate Federal banking agency, the Corporation may issue a temporary order suspending deposit insurance on all deposits received by the institution.

**(B)Special rule for certain savings institutions**

**(i)Certain goodwill included in tangible capital**

In determining the tangible capital of a savings association for purposes of this paragraph, the Board of Directors shall include goodwill to the extent it is considered a component of capital under section 1464(t) of this title. Any savings association which would be subject to a suspension order under subparagraph (A) but for the operation of this subparagraph, shall be considered by the Corporation to be a "special supervisory association".

**(ii)Suspension order** The Corporation may issue a temporary order suspending deposit insurance on all deposits received by a special supervisory association whenever the Board of Directors determines that—

**(I)**

the capital of such association, as computed utilizing applicable accounting standards, has suffered a material decline;

**(II)**

that such association (or its directors or officers) is engaging in an unsafe or unsound practice in conducting the business of the association;

**(III)**

that such association is in an unsafe or unsound condition to continue operating as an insured association; or

**(IV)**

that such association (or its directors or officers) has violated any applicable law, rule, regulation, or order, or any condition imposed in writing by a Federal banking agency, or any written agreement including a capital improvement plan entered into with any Federal banking agency, or that the association has failed to enter into a capital improvement plan which is acceptable to the Corporation within the time period set forth in section 1464(t) of this title.

Nothing in this paragraph limits the right of the Corporation or the Comptroller of the Currency to enforce a contractual provision which authorizes the Corporation or the Comptroller of the Currency, as a successor to the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board, to require a savings association to write down or amortize goodwill at a faster rate than otherwise required under this chapter or under applicable accounting standards.

**(C)Effective period of temporary order**

Any order issued under subparagraph (A) shall become effective not earlier than 10 days from the date of service upon the institution and, unless set aside, limited, or suspended by a court in proceedings authorized hereunder, such temporary order shall remain effective and enforceable until an order of the Board under paragraph (3) becomes final or until the Corporation dismisses the proceedings under paragraph (3).

**(D)Judicial review**

Before the close of the 10-day period beginning on the date any temporary order has been served upon an insured depository institution under subparagraph (A), such institution may apply to the United States District Court for the District of Columbia, or the United States district court for the judicial district in which the home office of the institution is located, for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order, and such court shall have jurisdiction to issue such injunction.

**(E)Continuation of insurance for prior deposits**

The insured deposits of each depositor in such depository institution on the effective date of the order issued under this paragraph, minus all subsequent withdrawals from any deposits of such depositor, shall continue to be insured, subject to the administrative proceedings as provided in this chapter.

**(F)Publication of order**

The depository institution shall give notice of such order to each of its depositors in such manner and at such times as the Board of Directors may find to be necessary and may order for the protection of depositors.

**(G)Notice by Corporation**

If the Corporation determines that the depository institution has not substantially complied with the notice to depositors required by the Board of Directors, the Corporation may provide such notice in such manner as the Board of Directors may find to be necessary and appropriate.

**(H)Lack of notice** Notwithstanding subparagraph (A), any deposit made after the effective date of a suspension order issued under this paragraph shall remain insured to the extent that the depositor establishes that—

**(i)**

such deposit consists of additions made by automatic deposit the depositor was unable to prevent; or

**(ii)**

such depositor did not have actual knowledge of the suspension of insurance.

**(9)FINAL DECISIONS TO TERMINATE INSURANCE** Any decision by the Board of Directors to—

**(A)**

issue a temporary order terminating deposit insurance; or

**(B)**

issue a final order terminating deposit insurance (other than under subsection (p) or (q));

shall be made by the Board of Directors and may not be delegated.

**(10)LOW- TO MODERATE-INCOME HOUSING LENDER**

In making any determination regarding the termination of insurance of a solvent savings association, the Corporation may consider the extent of the association's low- to moderate-income housing loans.

**(b)CEASE-AND-DESIST PROCEEDINGS**

**(1)**

If, in the opinion of the appropriate Federal banking agency, any insured depository institution, depository institution which has insured deposits, or any institution-affiliated party is engaging or has engaged, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to engage, in an unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to violate, a law, rule, or regulation, or any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request by the depository institution or institution-affiliated party, or any written agreement entered into with the agency, the appropriate Federal banking agency for the depository institution may issue and serve upon the depository institution or such party a notice of charges in respect thereof. The notice shall contain a statement of the facts constituting the alleged violation or violations or the unsafe or unsound practice or practices, and shall fix a time and place at which a hearing will be held to determine whether an order to cease and desist therefrom should issue against the depository institution or the institution-affiliated party. Such hearing shall be fixed for a date not earlier than thirty days nor later than sixty days after service of such notice unless an earlier or a later date is set by the agency at the request of any party so served. Unless the party

or parties so served shall appear at the hearing personally or by a duly authorized representative, they shall be deemed to have consented to the issuance of the cease-and-desist order. In the event of such consent, or if upon the record made at any such hearing, the agency shall find that any violation or unsafe or unsound practice specified in the notice of charges has been established, the agency may issue and serve upon the depository institution or the institution-affiliated party an order to cease and desist from any such violation or practice. Such order may, by provisions which may be mandatory or otherwise, require the depository institution or its institution-affiliated parties to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.

**(2)**

A cease-and-desist order shall become effective at the expiration of thirty days after the service of such order upon the depository institution or other person concerned (except in the case of a cease-and-desist order issued upon consent, which shall become effective at the time specified therein), and shall remain effective and enforceable as provided therein, except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court.

**(3)**

This subsection, subsections (c) through (s) and subsection (u) of this section, and section 1831aa of this title shall apply to any bank holding company, and to any subsidiary (other than a bank) of a bank holding company, as those terms are defined in the Bank Holding Company Act of 1956 [12 U.S.C. 1841 et seq.], any savings and loan holding company and any subsidiary (other than a depository institution) of a savings and loan holding company (as such terms are defined in section 1467a of this title)),[2] any noninsured State member bank and to any organization organized and operated under section 25(a) [1] of the Federal Reserve Act [12 U.S.C. 611 et seq.] or operating under section 25 of the Federal Reserve Act [12 U.S.C. 601 et seq.], in the same manner as they apply to a State member insured bank. Nothing in this subsection or in subsection (c) of this section shall authorize any Federal banking agency, other than the Board of Governors of the Federal Reserve System, to issue a notice of charges or cease-and-desist order against a bank holding company or any subsidiary thereof (other than a bank or subsidiary of that bank) or against a savings and loan holding company or

any subsidiary thereof (other than a depository institution or a subsidiary of such depository institution).

**(4)**

This subsection, subsections (c) through (s) and subsection (u) of this section, and section 1831aa of this title shall apply to any foreign bank or company to which subsection (a) of section 3106 of this title applies and to any subsidiary (other than a bank) of any such foreign bank or company in the same manner as they apply to a bank holding company and any subsidiary thereof (other than a bank) under paragraph (3) of this subsection. For the purposes of this paragraph, the term "subsidiary" shall have the meaning assigned to it in section 2 of the Bank Holding Company Act of 1956 [12 U.S.C. 1841].

**(5)**

This section shall apply, in the same manner as it applies to any insured depository institution for which the appropriate Federal banking agency is the Comptroller of the Currency, to any national banking association chartered by the Comptroller of the Currency, including an uninsured association.

**(6)**AFFIRMATIVE ACTION TO CORRECT CONDITIONS RESULTING FROM VIOLATIONS OR PRACTICES.—The authority to issue an order under this subsection and subsection (c) which requires an insured depository institution or any institution-affiliated party to take affirmative action to correct or remedy any conditions resulting from any violation or practice with respect to which such order is issued includes the authority to require such depository institution or such party to—

**(A)**make restitution or provide reimbursement, indemnification, or guarantee against loss if—

**(i)**

such depository institution or such party was unjustly enriched in connection with such violation or practice; or

**(ii)**

the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the appropriate Federal banking agency;

**(B)**

restrict the growth of the institution;

**(C)**

dispose of any loan or asset involved;

**(D)**

rescind agreements or contracts; and

**(E)**

employ qualified officers or employees (who may be subject to approval by the appropriate Federal banking agency at the direction of such agency); and

**(F)**

take such other action as the banking agency determines to be appropriate.

**(7)AUTHORITY TO LIMIT ACTIVITIES.—**

The authority to issue an order under this subsection or subsection (c) includes the authority to place limitations on the activities or functions of an insured depository institution or any institution-affiliated party.

**(8)UNSATISFACTORY ASSET QUALITY, MANAGEMENT, EARNINGS, OR LIQUIDITY AS UNSAFE OR UNSOUND PRACTICE.—**

If an insured depository institution receives, in its most recent report of examination, a less-than-satisfactory rating for asset quality, management, earnings, or liquidity, the appropriate Federal banking agency may (if the deficiency is not corrected) deem the institution to be engaging in an unsafe or unsound practice for purposes of this subsection.

**(9)**

**(10)STANDARD FOR CERTAIN ORDERS.—**

No authority under this subsection or subsection (c) to prohibit any institution-affiliated party from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property may be exercised unless the appropriate Federal banking agency meets the standards of Rule 65 of the Federal Rules of Civil Procedure, without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

**(c)** TEMPORARY CEASE-AND-DESIST ORDERS

**(1)**

Whenever the appropriate Federal banking agency shall determine that the violation or threatened violation or the unsafe or unsound practice or practices, specified in the notice of charges served upon the depository institution or any institution-affiliated party pursuant to paragraph (1) of subsection (b) of this section, or the continuation thereof, is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the proceedings conducted pursuant to paragraph (1) of subsection (b) of this section, the agency may issue a temporary order requiring the depository institution or such party to cease and desist from any such violation or practice and to take affirmative action to prevent or remedy such insolvency, dissipation, condition, or prejudice pending completion of such proceedings. Such order may include any requirement authorized under subsection (b)(6). Such order shall become effective upon service upon the depository institution or such institution-affiliated party and, unless set aside, limited, or suspended by a court in proceedings authorized by paragraph (2) of this subsection, shall remain effective and enforceable pending the completion of the administrative proceedings pursuant to such notice and until such time as the agency shall dismiss the charges specified in such notice, or if a cease-and-desist order is issued against the depository institution or such party, until the effective date of such order.

**(2)**

Within ten days after the depository institution concerned or any institution-affiliated party has been served with a temporary cease-and-desist order, the depository institution or such party may apply to the United States district court for the judicial district in which the home office of the depository institution is located, or the United States District Court for the District of Columbia, for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order pending the completion of the administrative proceedings pursuant to the notice of charges served upon the depository institution or such party under paragraph (1) of subsection (b) of this section, and such court shall have jurisdiction to issue such injunction.

**(3)**INCOMPLETE OR INACCURATE RECORDS.—

**(A)**Temporary order.—If a notice of charges served under subsection (b)(1) specifies, on the basis of particular facts and circumstances, that an insured depository institution's books and records are so incomplete or inaccurate that the appropriate Federal banking agency is unable, through the normal supervisory process, to determine the financial condition of that depository institution or the details or purpose of any transaction or transactions that may have a material effect on the financial condition of that depository institution, the agency may issue a temporary order requiring—

**(i)**

the cessation of any activity or practice which gave rise, whether in whole or in part, to the incomplete or inaccurate state of the books or records; or

**(ii)**

affirmative action to restore such books or records to a complete and accurate state, until the completion of the proceedings under subsection (b)(1).

**(B)**Effective period.—Any temporary order issued under subparagraph (A)—

**(i)**

shall become effective upon service; and

**(ii)**unless set aside, limited, or suspended by a court in proceedings under paragraph (2), shall remain in effect and enforceable until the earlier of—

**(I)**

the completion of the proceeding initiated under subsection (b)(1) in connection with the notice of charges; or

**(II)**

the date the appropriate Federal banking agency determines, by examination or otherwise, that the insured depository institution's books and records are accurate and reflect the financial condition of the depository institution.

**(4)**FALSE ADVERTISING OR MISUSE OF NAMES TO INDICATE INSURED STATUS.—

**(A)**Temporary order.—

**(i)**In general.—If a notice of charges served under subsection (b)(1) specifies on the basis of particular facts that any person engaged or is engaging in conduct described in section 1828(a)(4) of this title, the Corporation or other appropriate Federal banking agency may issue a temporary order requiring—

**(I)**

the immediate cessation of any activity or practice described, which gave rise to the notice of charges; and

**(II)**

affirmative action to prevent any further, or to remedy any existing, violation.

**(ii)**Effect of order.—

Any temporary order issued under this subparagraph shall take effect upon service.

**(B)**Effective period of temporary order.—A temporary order issued under subparagraph (A) shall remain effective and enforceable, pending the completion of an administrative proceeding pursuant to subsection (b)(1) in connection with the notice of charges—

**(i)**

until such time as the Corporation or other appropriate Federal banking agency dismisses the charges specified in such notice; or

**(ii)**

if a cease-and-desist order is issued against such person, until the effective date of such order.

**(C)**Civil money penalties.—

Any violation of section 1828(a)(4) of this title shall be subject to civil money penalties, as set forth in subsection (i), except that for any person other than an insured depository institution or an institution-affiliated party that is found to have violated this paragraph, the Corporation or other appropriate Federal banking agency shall not be required to demonstrate any loss to an insured depository institution.

**(d)TEMPORARY CEASE-AND-DESIST ORDERS; ENFORCEMENT**

In the case of violation or threatened violation of, or failure to obey, a temporary cease-and-desist order issued pursuant to paragraph (1) of subsection (c) of this section, the appropriate Federal banking agency may apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for an injunction to enforce such order, and, if the court shall determine that there has been such violation or threatened violation or failure to obey, it shall be the duty of the court to issue such injunction.

**(e)REMOVAL AND PROHIBITION AUTHORITY**

**(1)AUTHORITY TO ISSUE ORDER.—**Whenever the appropriate Federal banking agency determines that—

**(A)**any institution-affiliated party has, directly or indirectly—

**(i)**violated—

**(I)**

any law or regulation;

**(II)**

any cease-and-desist order which has become final;

**(III)**

any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or request by such depository institution or institution-affiliated party; or

**(IV)**

any written agreement between such depository institution and such agency;

**(ii)**

engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

**(iii)**

committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;

**(B)**by reason of the violation, practice, or breach described in any clause of subparagraph (A)—

**(i)**

such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;

**(ii)**

the interests of the insured depository institution's depositors have been or could be prejudiced; or

**(iii)**

such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

**(C)**such violation, practice, or breach—

**(i)**

involves personal dishonesty on the part of such party; or

**(ii)**

demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution,

the appropriate Federal banking agency for the depository institution may serve upon such party a written notice of the agency's intention to remove such party from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

**(2)**SPECIFIC VIOLATIONS.—

**(A)**In general.—Whenever the appropriate Federal banking agency determines that—

**(i)**

an institution-affiliated party has committed a violation of any provision of subchapter II of chapter 53 of title 31 and such violation was not inadvertent or unintentional;

**(ii)**

an officer or director of an insured depository institution has knowledge that an institution-affiliated party of the insured depository institution has violated any such provision or any provision of law referred to in subsection (g)(1)(A)(ii);

**(iii)**

an officer or director of an insured depository institution has committed any violation of the Depository Institution Management Interlocks Act [12 U.S.C. 3201 et seq.]; or

**(iv)**

an institution-affiliated party of a subsidiary (other than a bank) of a bank holding company or of a subsidiary (other than a savings association) of a savings and loan holding company has been convicted of any criminal offense involving dishonesty or a breach of trust or a criminal offense under section 1956, 1957, or 1960 of title 18 or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such an offense,

the agency may serve upon such party, officer, or director a written notice of the agency's intention to remove such party from office.

**(B)**Factors to be considered.—

In determining whether an officer or director should be removed as a result of the application of subparagraph (A)(ii), the agency shall consider whether the officer or director took appropriate action to stop, or to prevent the recurrence of, a violation described in such subparagraph.

**(3)**SUSPENSION ORDER.—

**(A)**Suspension or prohibition authorized.—If the appropriate Federal banking agency serves written notice under paragraph (1) or (2) to any institution-affiliated party of such agency's intention to issue an order under such paragraph, the appropriate Federal banking agency may suspend such party from office or

101

prohibit such party from further participation in any manner in the conduct of the affairs of the depository institution, if the agency—

**(i)**

determines that such action is necessary for the protection of the depository institution or the interests of the depository institution's depositors; and

**(ii)**

serves such party with written notice of the suspension order.

**(B)**Effective period.—Any suspension order issued under subparagraph (A)—

**(i)**

shall become effective upon service; and

**(ii)**unless a court issues a stay of such order under subsection (f), shall remain in effect and enforceable until—

**(I)**

the date the appropriate Federal banking agency dismisses the charges contained in the notice served under paragraph (1) or (2) with respect to such party; or

**(II)**

the effective date of an order issued by the agency to such party under paragraph (1) or (2).

**(C)**Copy of order.—

If an appropriate Federal banking agency issues a suspension order under subparagraph (A) to any institution-affiliated party, the agency shall serve a copy of such order on any insured depository institution with which such party is associated at the time such order is issued.

**(4)**

A notice of intention to remove an institution-affiliated party from office or to prohibit such party from participating in the conduct of the affairs of an insured depository institution, shall contain a statement of the facts constituting grounds therefor, and shall fix a time and place at which a hearing will be held thereon. Such hearing shall be fixed for a date not earlier than thirty days nor later than sixty days

after the date of service of such notice, unless an earlier or a later date is set by the agency at the request of (A) such party, and for good cause shown, or (B) the Attorney General of the United States. Unless such party shall appear at the hearing in person or by a duly authorized representative, such party shall be deemed to have consented to the issuance of an order of such removal or prohibition. In the event of such consent, or if upon the record made at any such hearing the agency shall find that any of the grounds specified in such notice have been established, the agency may issue such orders of suspension or removal from office, or prohibition from participation in the conduct of the affairs of the depository institution, as it may deem appropriate. Any such order shall become effective at the expiration of thirty days after service upon such depository institution and such party concerned (except in the case of an order issued upon consent, which shall become effective at the time specified therein). Such order shall remain effective and enforceable except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court.

**(5)**

For the purpose of enforcing any law, rule, regulation, or cease-and-desist order in connection with an interlocking relationship, the term "officer" within the term "institution-affiliated party" as used in this subsection means an employee or officer with management functions, and the term "director" within the term "institution-affiliated party" as used in this subsection includes an advisory or honorary director, a trustee of a depository institution under the control of trustees, or any person who has a representative or nominee serving in any such capacity.

**(6)**PROHIBITION OF CERTAIN SPECIFIC ACTIVITIES.—Any person subject to an order issued under this subsection shall not—

**(A)**

participate in any manner in the conduct of the affairs of any institution or agency specified in paragraph (7)(A);

**(B)**

solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights in any institution described in subparagraph (A);

**(C)**

violate any voting agreement previously approved by the appropriate Federal banking agency; or

**(D)**

vote for a director, or serve or act as an institution-affiliated party.

**(7)INDUSTRYWIDE PROHIBITION.—**

**(A)**In general.—Except as provided in subparagraph (B), any person who, pursuant to an order issued under this subsection or subsection (g), has been removed or suspended from office in an insured depository institution or prohibited from participating in the conduct of the affairs of an insured depository institution may not, while such order is in effect, continue or commence to hold any office in, or participate in any manner in the conduct of the affairs of—

**(i)**

any insured depository institution;

**(ii)**

any institution treated as an insured bank under subsection (b)(3) or (b)(4), or as a savings association under subsection (b)(9); [1]

**(iii)**

any insured credit union under the Federal Credit Union Act [12 U.S.C. 1751 et seq.];

**(iv)**

any institution chartered under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.];

**(v)**

any appropriate Federal depository institution regulatory agency; and

**(vi)**

the Federal Housing Finance Agency and any Federal home loan bank.

**(B)**Exception if agency provides written consent.—If, on or after the date an order is issued under this subsection which removes or suspends from office any institution-affiliated party or prohibits such party from participating in the

conduct of the affairs of an insured depository institution, such party receives the written consent of—

**(i)**

the agency that issued such order; and

**(ii)**

the appropriate Federal financial institutions regulatory agency of the institution described in any clause of subparagraph (A) with respect to which such party proposes to become an institution-affiliated party,

subparagraph (A) shall, to the extent of such consent, cease to apply to such party with respect to the institution described in each written consent. Any agency that grants such a written consent shall report such action to the Corporation and publicly disclose such consent.

**(C)**Violation of paragraph treated as violation of order.—

Any violation of subparagraph (A) by any person who is subject to an order described in such subparagraph shall be treated as a violation of the order.

**(D)**"Appropriate federal financial institutions regulatory agency" defined.—For purposes of this paragraph and subsection (j), the term "appropriate Federal financial institutions regulatory agency" means—

**(i)**

the appropriate Federal banking agency, in the case of an insured depository institution;

**(ii)**

the Farm Credit Administration, in the case of an institution chartered under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.];

**(iii)**

the National Credit Union Administration Board, in the case of an insured credit union (as defined in section 101(7) of the Federal Credit Union Act [12 U.S.C. 1752(7)]); and

**(iv)**

the Secretary of the Treasury, in the case of the Federal Housing Finance Agency and any Federal home loan bank.

**(E)**Consultation between agencies.—

The agencies referred to in clauses (i) and (ii) of subparagraph (B) shall consult with each other before providing any written consent described in subparagraph (B).

**(F)**Applicability.—

This paragraph shall only apply to a person who is an individual, unless the appropriate Federal banking agency specifically finds that it should apply to a corporation, firm, or other business enterprise.

**(f)**STAY OF SUSPENSION AND/OR PROHIBITION OF INSTITUTION-AFFILIATED PARTY

Within ten days after any institution-affiliated party has been suspended from office and/or prohibited from participation in the conduct of the affairs of an insured depository institution under subsection (e)(3) of this section, such party may apply to the United States district court for the judicial district in which the home office of the depository institution is located, or the United States District Court for the District of Columbia, for a stay of such suspension and/or prohibition pending the completion of the administrative proceedings pursuant to the notice served upon such party under subsection (e)(1) or (e)(2) of this section, and such court shall have jurisdiction to stay such suspension and/or prohibition.

**(g)**SUSPENSION, REMOVAL, AND PROHIBITION FROM PARTICIPATION ORDERS IN THE CASE OF CERTAIN CRIMINAL OFFENSES

**(1)**SUSPENSION OR PROHIBITION.—

**(A)**In general.—Whenever any institution-affiliated party is the subject of any information, indictment, or complaint, involving the commission of or participation in—

**(i)**

a crime involving dishonesty or breach of trust which is punishable by imprisonment for a term exceeding one year under State or Federal law, or

**(ii)**

a criminal violation of section 1956, 1957, or 1960 of title 18 or section 5322 or 5324 of title 31,

the appropriate Federal banking agency may, if continued service or participation by such party posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution (as defined in subparagraph (E)), by written notice served upon such party, suspend such party from office or prohibit such party from further participation in any manner in the conduct of the affairs of any depository institution.

**(B)**Provisions applicable to notice.—

**(i)**Copy.—

A copy of any notice under subparagraph (A) shall also be served upon any depository institution that the subject of the notice is affiliated with at the time the notice is issued.

**(ii)**Effective period.—

A suspension or prohibition under subparagraph (A) shall remain in effect until the information, indictment, or complaint referred to in such subparagraph is finally disposed of or until terminated by the agency.

**(C)**Removal or prohibition.—

**(i)**In general.—

If a judgment of conviction or an agreement to enter a pretrial diversion or other similar program is entered against an institution-affiliated party in connection with a crime described in subparagraph (A)(i), at such time as such judgment is not subject to further appellate review, the appropriate Federal banking agency may, if continued service or participation by such party posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution (as defined in subparagraph (E)), issue and serve upon such party an order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of any depository institution without the prior written consent of the appropriate agency.

**(ii)**Required for certain offenses.—

In the case of a judgment of conviction or agreement against an institution-affiliated party in connection with a violation described in subparagraph (A)(ii), the appropriate Federal banking agency shall issue and serve upon such party an order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of any depository institution without the prior written consent of the appropriate agency.

**(D)**Provisions applicable to order.—

**(i)**Copy.—

A copy of any order under subparagraph (C) shall also be served upon any depository institution that the subject of the order is affiliated with at the time the order is issued, whereupon the institution-affiliated party who is subject to the order (if a director or an officer) shall cease to be a director or officer of such depository institution.

**(ii)**Effect of acquittal.—

A finding of not guilty or other disposition of the charge shall not preclude the agency from instituting proceedings after such finding or disposition to remove such party from office or to prohibit further participation in depository institution affairs, pursuant to paragraph (1), (2), or (3) of subsection (e) of this section.

**(iii)**Effective period.—

Any notice of suspension or order of removal issued under this paragraph shall remain effective and outstanding until the completion of any hearing or appeal authorized under paragraph (3) unless terminated by the agency.

**(E)**Relevant depository institution.—For purposes of this subsection, the term "relevant depository institution" means any depository institution of which the party is or was an institution-affiliated party at the time at which—

**(i)**

the information, indictment, or complaint described in subparagraph (A) was issued; or

**(ii)**

the notice is issued under subparagraph (A) or the order is issued under subparagraph (C)(i).

**(2)**

If at any time, because of the suspension of one or more directors pursuant to this section, there shall be on the board of directors of a national bank less than a quorum of directors not so suspended, all powers and functions vested in or exercisable by such board shall vest in and be exercisable by the director or directors on the board not so suspended, until such time as there shall be a quorum of the board of directors. In the event all of the directors of a national bank are suspended pursuant to this section, the Comptroller of the Currency shall appoint persons to serve temporarily as directors in their place and stead pending the termination of such suspensions, or until such time as those who have been suspended, cease to be directors of the bank and their respective successors take office.

**(3)**

Within thirty days from service of any notice of suspension or order of removal issued pursuant to paragraph (1) of this subsection, the institution-affiliated party concerned may request in writing an opportunity to appear before the agency to show that the continued service to or participation in the conduct of the affairs of the depository institution by such party does not, or is not likely to, pose a threat to the interests of the bank's [3] depositors or threaten to impair public confidence in the depository institution. Upon receipt of any such request, the appropriate Federal banking agency shall fix a time (not more than thirty days after receipt of such request, unless extended at the request of such party) and place at which such party may appear, personally or through counsel, before one or more members of the agency or designated employees of the agency to submit written materials (or, at the discretion of the agency, oral testimony) and oral argument. Within sixty days of such hearing, the agency shall notify such party whether the suspension or prohibition from participation in any manner in the conduct of the affairs of the depository institution will be continued, terminated, or otherwise modified, or whether the order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of the depository institution will be rescinded or otherwise modified. Such notification shall contain a statement of the basis for the agency's decision, if adverse to such party. The Federal

banking agencies are authorized to prescribe such rules as may be necessary to effectuate the purposes of this subsection.

**(h)**HEARINGS AND JUDICIAL REVIEW

**(1)**

Any hearing provided for in this section (other than the hearing provided for in subsection (g)(3) of this section) shall be held in the Federal judicial district or in the territory in which the home office of the depository institution is located unless the party afforded the hearing consents to another place, and shall be conducted in accordance with the provisions of chapter 5 of title 5. After such hearing, and within ninety days after the appropriate Federal banking agency or Board of Governors of the Federal Reserve System has notified the parties that the case has been submitted to it for final decision, it shall render its decision (which shall include findings of fact upon which its decision is predicated) and shall issue and serve upon each party to the proceeding an order or orders consistent with the provisions of this section. Judicial review of any such order shall be exclusively as provided in this subsection (h). Unless a petition for review is timely filed in a court of appeals of the United States, as hereinafter provided in paragraph (2) of this subsection, and thereafter until the record in the proceeding has been filed as so provided, the issuing agency may at any time, upon such notice and in such manner as it shall deem proper, modify, terminate, or set aside any such order. Upon such filing of the record, the agency may modify, terminate, or set aside any such order with permission of the court.

**(2)**

Any party to any proceeding under paragraph (1) may obtain a review of any order served pursuant to paragraph (1) of this subsection (other than an order issued with the consent of the depository institution or the institution-affiliated party concerned, or an order issued under paragraph (1) of subsection (g) of this section) by the filing in the court of appeals of the United States for the circuit in which the home office of the depository institution is located, or in the United States Court of Appeals for the District of Columbia Circuit, within thirty days after the date of service of such order, a written petition praying that the order of the agency be modified, terminated, or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the agency, and thereupon the agency shall file in the court the record in the proceeding, as provided in section 2112 of title 28. Upon the filing of such

petition, such court shall have jurisdiction, which upon the filing of the record shall except as provided in the last sentence of said paragraph (1) be exclusive, to affirm, modify, terminate, or set aside, in whole or in part, the order of the agency. Review of such proceedings shall be had as provided in chapter 7 of title 5. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 1254 of title 28.

**(3)**

The commencement of proceedings for judicial review under paragraph (2) of this subsection shall not, unless specifically ordered by the court, operate as a stay of any order issued by the agency.

**(i)JURISDICTION AND ENFORCEMENT; PENALTY**

**(1)**

The appropriate Federal banking agency may in its discretion apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for the enforcement of any effective and outstanding notice or order issued under this section or under section 1831o or 1831p–1 of this title, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section or under section 1831o or 1831p–1 of this title no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order.

**(2)CIVIL MONEY PENALTY.—**

**(A)**First tier.—Any insured depository institution which, and any institution-affiliated party who—

**(i)**

violates any law or regulation;

**(ii)**

violates any final order or temporary order issued pursuant to subsection (b), (c), (e), (g), or (s) or any final order under section 1831o or 1831p–1 of this title;

**(iii)**

violates any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request by the depository institution or institution-affiliated party; or

**(iv)**

violates any written agreement between such depository institution and such agency,

shall forfeit and pay a civil penalty of not more than $5,000 for each day during which such violation continues.

**(B)** Second tier.—Notwithstanding subparagraph (A), any insured depository institution which, and any institution-affiliated party who—

**(i)**

**(I)**

commits any violation described in any clause of subparagraph (A);

**(II)**

recklessly engages in an unsafe or unsound practice in conducting the affairs of such insured depository institution; or

**(III)**

breaches any fiduciary duty;

**(ii)** which violation, practice, or breach—

**(I)**

is part of a pattern of misconduct;

**(II)**

causes or is likely to cause more than a minimal loss to such depository institution; or

**(III)**

results in pecuniary gain or other benefit to such party,

shall forfeit and pay a civil penalty of not more than $25,000 for each day during which such violation, practice, or breach continues.

**(C)**Third tier.—Notwithstanding subparagraphs (A) and (B), any insured depository institution which, and any institution-affiliated party who—

**(i)**knowingly—

**(I)**

commits any violation described in any clause of subparagraph (A);

**(II)**

engages in any unsafe or unsound practice in conducting the affairs of such depository institution; or

**(III)**

breaches any fiduciary duty; and

**(ii)**

knowingly or recklessly causes a substantial loss to such depository institution or a substantial pecuniary gain or other benefit to such party by reason of such violation, practice, or breach,

shall forfeit and pay a civil penalty in an amount not to exceed the applicable maximum amount determined under subparagraph (D) for each day during which such violation, practice, or breach continues.

**(D)**Maximum amounts of penalties for any violation described in subparagraph (c).—The maximum daily amount of any civil penalty which may be assessed pursuant to subparagraph (C) for any violation, practice, or breach described in such subparagraph is—

**(i)**

in the case of any person other than an insured depository institution, an amount to not exceed $1,000,000; and

**(ii)**in the case of any insured depository institution, an amount not to exceed the lesser of—

**(I)**

$1,000,000; or

**(II)**

1 percent of the total assets of such institution.

**(E)**Assessment.—

**(i)**Written notice.—

Any penalty imposed under subparagraph (A), (B), or (C) may be assessed and collected by the appropriate Federal banking agency by written notice.

**(ii)**Finality of assessment.—

If, with respect to any assessment under clause (i), a hearing is not requested pursuant to subparagraph (H) within the period of time allowed under such subparagraph, the assessment shall constitute a final and unappealable order.

**(F)**Authority to modify or remit penalty.—

Any appropriate Federal banking agency may compromise, modify, or remit any penalty which such agency may assess or had already assessed under subparagraph (A), (B), or (C).

**(G)**Mitigating factors.—In determining the amount of any penalty imposed under subparagraph (A), (B), or (C), the appropriate agency shall take into account the appropriateness of the penalty with respect to—

**(i)**

the size of financial resources and good faith of the insured depository institution or other person charged;

**(ii)**

the gravity of the violation;

**(iii)**

the history of previous violations; and

**(iv)**

such other matters as justice may require.

**(H)**Hearing.—

The insured depository institution or other person against whom any penalty is assessed under this paragraph shall be afforded an agency hearing if such institution or person submits a request for such hearing within 20 days after the issuance of the notice of assessment.

**(I)**Collection.—

**(i)**Referral.—

If any insured depository institution or other person fails to pay an assessment after any penalty assessed under this paragraph has become final, the agency that imposed the penalty shall recover the amount assessed by action in the appropriate United States district court.

**(ii)**Appropriateness of penalty not reviewable.—

In any civil action under clause (i), the validity and appropriateness of the penalty shall not be subject to review.

**(J)**Disbursement.—

All penalties collected under authority of this paragraph shall be deposited into the Treasury.

**(K)**Regulations.—

Each appropriate Federal banking agency shall prescribe regulations establishing such procedures as may be necessary to carry out this paragraph.

**(3)**NOTICE UNDER THIS SECTION AFTER SEPARATION FROM SERVICE.—

The resignation, termination of employment or participation, or separation of a institution-affiliated party (including a separation caused by the closing of an insured depository institution) shall not affect the jurisdiction and authority of the appropriate Federal banking agency to issue any notice or order and proceed under this section against any such party, if such notice or order is served before the end of the 6-year period beginning on the date such party ceased to be such a party with respect to such depository institution (whether such date occurs before, on, or after August 9, 1989).

**(4)PREJUDGMENT ATTACHMENT.—**

**(A)**In general.—In any action brought by an appropriate Federal banking agency (excluding the Corporation when acting in a manner described in section 1821(d)(18) of this title) pursuant to this section, or in actions brought in aid of, or to enforce an order in, any administrative or other civil action for money damages, restitution, or civil money penalties brought by such agency, the court may, upon application of the agency, issue a restraining order that—

**(i)**

prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property; and

**(ii)**

appoints a temporary receiver to administer the restraining order.

**(B)**Standard.—

**(i)**Showing.—

Rule 65 of the Federal Rules of Civil Procedure shall apply with respect to any proceeding under subparagraph (A) without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

**(ii)**State proceeding.—

If, in the case of any proceeding in a State court, the court determines that rules of civil procedure available under the laws of such State provide substantially similar protections to a party's right to due process as Rule 65 (as modified with respect to such proceeding by clause (i)), the relief sought under subparagraph (A) may be requested under the laws of such State.

**(j)CRIMINAL PENALTY**Whoever, being subject to an order in effect under subsection (e) or (g), without the prior written approval of the appropriate Federal financial institutions regulatory agency, knowingly participates, directly or indirectly, in any manner (including by engaging in an activity specifically prohibited in such an order or in subsection (e)(6)) in the conduct of the affairs of—

**(1)**

any insured depository institution;

**(2)**

any institution treated as an insured bank under subsection (b)(3) or (b)(4);

**(3)**

any insured credit union (as defined in section 101(7) of the Federal Credit Union Act [12 U.S.C. 1752(7)]); or

**(4)**

any institution chartered under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.],

shall be fined not more than $1,000,000, imprisoned for not more than 5 years, or both.

**(k)Repealed. Pub. L. 101–73, title IX, § 920(c), Aug. 9, 1989, 103 Stat. 488**

**(l)Notice of service**

Any service required or authorized to be made by the appropriate Federal banking agency under this section may be made by registered mail, or in such other manner reasonably calculated to give actual notice as the agency may by regulation or otherwise provide. Copies of any notice or order served by the agency upon any State depository institution or any institution-affiliated party, pursuant to the provisions of this section, shall also be sent to the appropriate State supervisory authority.

**(m)Notice to State authorities**

In connection with any proceeding under subsection (b), (c)(1), or (e) of this section involving an insured State bank or any institution-affiliated party, the appropriate Federal banking agency shall provide the appropriate State supervisory authority with notice of the agency's intent to institute such a proceeding and the grounds therefor. Unless within such time as the Federal banking agency deems appropriate in the light of the circumstances of the case (which time must be specified in the notice prescribed in the preceding sentence) satisfactory corrective action is effectuated by action of the State supervisory authority, the agency may proceed as provided in this section. No bank or other party who is the subject of any notice or order issued by the agency under this section shall have standing to raise the requirements of this subsection as ground for attacking the validity of any such notice or order.

**(n)ANCILLARY PROVISIONS; SUBPOENA POWER, ETC.**

In the course of or in connection with any proceeding under this section, or in connection with any claim for insured deposits or any examination or investigation under section 1820(c) of this title, the agency conducting the proceeding, examination, or investigation or considering the claim for insured deposits, or any member or designated representative thereof, including any person designated to conduct any hearing under this section, shall have the power to administer oaths and affirmations, to take or cause to be taken depositions, and to issue, revoke, quash, or modify subpoenas and subpoenas duces tecum; and such agency is empowered to make rules and regulations with respect to any such proceedings, claims, examinations, or investigations. The attendance of witnesses and the production of documents provided for in this subsection may be required from any place in any State or in any territory or other place subject to the jurisdiction of the United States at any designated place where such proceeding is being conducted. Any such agency or any party to proceedings under this section may apply to the United States District Court for the District of Columbia, or the United States district court for the judicial district or the United States court in any territory in which such proceeding is being conducted, or where the witness resides or carries on business, for enforcement of any subpoena or subpoena duces tecum issued pursuant to this subsection, and such courts shall have jurisdiction and power to order and require compliance therewith. Witnesses subpoenaed under this subsection shall be paid the same fees and mileage that are paid witnesses in the district courts of the United States. Any court having jurisdiction of any proceeding instituted under this section by an insured depository institution or a director or officer thereof, may allow to any such party such reasonable expenses and attorneys' fees as it deems just and proper; and such expenses and fees shall be paid by the depository institution or from its assets. Any person who willfully shall fail or refuse to attend and testify or to answer any lawful inquiry or to produce books, papers, correspondence, memoranda, contracts, agreements, or other records, if in such person's power so to do, in obedience to the subpoena of the appropriate Federal banking agency, shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $1,000 or to imprisonment for a term of not more than one year or both.

**(o)TERMINATION OF MEMBERSHIP OF STATE BANK IN FEDERAL RESERVE SYSTEM**

Whenever the insured status of a State member bank shall be terminated by action of the Board of Directors, the Board of Governors of the Federal Reserve System shall terminate its membership in the Federal Reserve System in accordance with the provisions of subchapter VIII of chapter 3 of this title, and whenever the insured status of a national member bank shall be so terminated the Comptroller of the Currency shall appoint a receiver for the bank, which shall be the Corporation. Except as provided in subsection (c) or (d) of section 1814 of this title, whenever a member bank shall cease to be a member of the Federal Reserve System, its status as an insured depository institution shall, without notice or other action by the Board of Directors, terminate on the date the bank shall cease to be a member of the Federal Reserve System, with like effect as if its insured status had been terminated on said date by the Board of Directors after proceedings under subsection (a) of this section. Whenever the insured status of an insured Federal savings bank shall be terminated by action of the Board of Directors, the Comptroller of the Currency shall appoint a receiver for the bank, which shall be the Corporation.

**(p)BANKS NOT RECEIVING DEPOSITS**

Notwithstanding any other provision of law, whenever the Board of Directors shall determine that an insured depository institution is not engaged in the business of receiving deposits, other than trust funds as herein defined, the Corporation shall notify the depository institution that its insured status will terminate at the expiration of the first full assessment period following such notice. A finding by the Board of Directors that a depository institution is not engaged in the business of receiving deposits, other than such trust funds, shall be conclusive. The Board of Directors shall prescribe the notice to be given by the depository institution of such termination and the Corporation may publish notice thereof. Upon the termination of the insured status of any such depository institution, its deposits shall thereupon cease to be insured and the depository institution shall thereafter be relieved of all future obligations to the Corporation, including the obligation to pay future assessments.

**(q)ASSUMPTION OF LIABILITIES**

Whenever the liabilities of an insured depository institution for deposits shall have been assumed by another insured depository institution or depository institutions, whether by way of merger, consolidation, or other statutory assumption, or pursuant to contract (1) the insured status of the depository institution whose liabilities are so assumed shall terminate on the date of receipt by the Corporation of

satisfactory evidence of such assumption; (2) the separate insurance of all deposits so assumed shall terminate at the end of six months from the date such assumption takes effect or, in the case of any time deposit, the earliest maturity date after the six-month period. Where the deposits of an insured depository institution are assumed by a newly insured depository institution, the depository institution whose deposits are assumed shall not be required to pay any assessment with respect to the deposits which have been so assumed after the assessment period in which the assumption takes effect.

**(r)**ACTION OR PROCEEDING AGAINST FOREIGN BANK; BASIS; REMOVAL OF OFFICER OR OTHER PERSON; VENUE; SERVICE OF PROCESS

**(1)**

Except as otherwise specifically provided in this section, the provisions of this section shall be applied to foreign banks in accordance with this subsection.

**(2)**An act or practice outside the United States on the part of a foreign bank or any officer, director, employee, or agent thereof may not constitute the basis for any action by any officer or agency of the United States under this section, unless—

**(A)**

such officer or agency alleges a belief that such act or practice has been, is, or is likely to be a cause of or carried on in connection with or in furtherance of an act or practice within any one or more States which, in and of itself, would constitute an appropriate basis for action by a Federal officer or agency under this section; or

**(B)**

the alleged act or practice is one which, if proven, would, in the judgment of the Board of Directors, adversely affect the insurance risk assumed by the Corporation.

**(3)**

In any case in which any action or proceeding is brought pursuant to an allegation under paragraph (2) of this subsection for the suspension or removal of any officer, director, or other person associated with a foreign bank, and such person fails to appear promptly as a party to such action or proceeding and to comply with any effective order or judgment therein, any failure by the foreign bank to secure his removal from any office he holds in such bank and from any further participation in

its affairs shall, in and of itself, constitute grounds for termination of the insurance of the deposits in any branch of the bank.

**(4)**

Where the venue of any judicial or administrative proceeding under this section is to be determined by reference to the location of the home office of a bank, the venue of such a proceeding with respect to a foreign bank having one or more branches or agencies in not more than one judicial district or other relevant jurisdiction shall be within such jurisdiction. Where such a bank has branches or agencies in more than one such jurisdiction, the venue shall be in the jurisdiction within which the branch or branches or agency or agencies involved in the proceeding are located, and if there is more than one such jurisdiction, the venue shall be proper in any such jurisdiction in which the proceeding is brought or to which it may appropriately be transferred.

**(5)**

Any service required or authorized to be made on a foreign bank may be made on any branch or agency located within any State, but if such service is in connection with an action or proceeding involving one or more branches or one or more agencies located in any State, service shall be made on at least one branch or agency so involved.

**(s)**COMPLIANCE WITH MONETARY TRANSACTION RECORDKEEPING AND REPORT REQUIREMENTS

**(1)**COMPLIANCE PROCEDURES REQUIRED

Each appropriate Federal banking agency shall prescribe regulations requiring insured depository institutions to establish and maintain procedures reasonably designed to assure and monitor the compliance of such depository institutions with the requirements of subchapter II of chapter 53 of title 31.

**(2)**EXAMINATIONS OF DEPOSITORY INSTITUTION TO INCLUDE REVIEW OF COMPLIANCE PROCEDURES

**(A)In general**

Each examination of an insured depository institution by the appropriate Federal banking agency shall include a review of the procedures required to be established and maintained under paragraph (1).

**(B)Exam report requirement**

The report of examination shall describe any problem with the procedures maintained by the insured depository institution.

**(3)ORDER TO COMPLY WITH REQUIREMENTS** If the appropriate Federal banking agency determines that an insured depository institution—

**(A)**

has failed to establish and maintain the procedures described in paragraph (1); or

**(B)**

has failed to correct any problem with the procedures maintained by such depository institution which was previously reported to the depository institution by such agency,

the agency shall issue an order in the manner prescribed in subsection (b) or (c) requiring such depository institution to cease and desist from its violation of this subsection or regulations prescribed under this subsection.

**(t)AUTHORITY OF FDIC TO TAKE ENFORCEMENT ACTION AGAINST INSURED DEPOSITORY INSTITUTIONS AND INSTITUTION-AFFILIATED PARTIES**

**(1)RECOMMENDING ACTION BY APPROPRIATE FEDERAL BANKING AGENCY**

The Corporation, based on an examination of an insured depository institution by the Corporation or by the appropriate Federal banking agency or on other information, may recommend in writing to the appropriate Federal banking agency that the agency take any enforcement action authorized under section 1817(j) of this title, this section, or section 1828(j) of this title with respect to any insured depository institution, any depository institution holding company, or any institution-affiliated party. The recommendation shall be accompanied by a written explanation of the concerns giving rise to the recommendation.

**(2)FDIC'S AUTHORITY TO ACT IF APPROPRIATE FEDERAL BANKING AGENCY FAILS TO FOLLOW RECOMMENDATION**If the appropriate Federal banking agency does not, before the end of the 60-day period beginning on the date on which the agency receives the recommendation under paragraph (1), take the enforcement action recommended by the Corporation or provide a plan acceptable to the Corporation for responding to the Corporation's concerns, the Corporation may take the

recommended enforcement action if the Board of Directors determines, upon a vote of its members, that—

**(A)**

the insured depository institution is in an unsafe or unsound condition;

**(B)**

the institution or institution-affiliated party is engaging in unsafe or unsound practices, and the recommended enforcement action will prevent the institution or institution-affiliated party from continuing such practices;

**(C)**

the conduct or threatened conduct (including any acts or omissions) poses a risk to the Deposit Insurance Fund, or may prejudice the interests of the institution's depositors or [4]

**(D)**

the conduct or threatened conduct (including any acts or omissions) of the depository institution holding company poses a risk to the Deposit Insurance Fund, provided that such authority may not be used with respect to a depository institution holding company that is in generally sound condition and whose conduct does not pose a foreseeable and material risk of loss to the Deposit Insurance Fund; [5]

**(3)EFFECT OF EXIGENT CIRCUMSTANCES**

**(A)Authority to act**

The Corporation may, upon a vote of the Board of Directors, and after notice to the appropriate Federal banking agency, exercise its authority under paragraph (2) in exigent circumstances without regard to the time period set forth in paragraph (2).

**(B)Agreement on exigent circumstances**

The Corporation shall, by agreement with the appropriate Federal banking agency, set forth those exigent circumstances in which the Corporation may act under subparagraph (A).

**(4)CORPORATION'S POWERS; INSTITUTION'S DUTIES**For purposes of this subsection—

**(A)**

the Corporation shall have the same powers with respect to any insured depository institution and its affiliates as the appropriate Federal banking agency has with respect to the institution and its affiliates; and

**(B)**

the institution and its affiliates shall have the same duties and obligations with respect to the Corporation as the institution and its affiliates have with respect to the appropriate Federal banking agency.

**(5)**REQUESTS FOR FORMAL ACTIONS AND INVESTIGATIONS

**(A)Submission of requests**

A regional office of an appropriate Federal banking agency (including a Federal Reserve bank) that requests a formal investigation of or civil enforcement action against an insured depository institution or institution-affiliated party shall submit the request concurrently to the chief officer of the appropriate Federal banking agency and to the Corporation.

**(B)Agencies required to report on requests**

Each appropriate Federal banking agency shall report semiannually to the Corporation on the status or disposition of all requests under subparagraph (A), including the reasons for any decision by the agency to approve or deny such requests.

**(6) [6]** POWERS AND DUTIES WITH RESPECT TO DEPOSITORY INSTITUTION HOLDING COMPANIESFor purposes of exercising the backup authority provided in this subsection—

**(A)**

the Corporation shall have the same powers with respect to a depository institution holding company and its affiliates as the appropriate Federal banking agency has with respect to the holding company and its affiliates; and

**(B)**

the holding company and its affiliates shall have the same duties and obligations with respect to the Corporation as the holding company and its affiliates have with respect to the appropriate Federal banking agency.

**(6) [6] REFERRAL TO BUREAU OF CONSUMER FINANCIAL PROTECTION**

Subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.], each appropriate Federal banking agency shall make a referral to the Bureau of Consumer Financial Protection when the Federal banking agency has a reasonable belief that a violation of an enumerated consumer law, as defined in the Consumer Financial Protection Act of 2010, has been committed by any insured depository institution or institution-affiliated party within the jurisdiction of that appropriate Federal banking agency.

**(u) PUBLIC DISCLOSURES OF FINAL ORDERS AND AGREEMENTS**

**(1) IN GENERAL** The appropriate Federal banking agency shall publish and make available to the public on a monthly basis—

**(A)**

any written agreement or other written statement for which a violation may be enforced by the appropriate Federal banking agency, unless the appropriate Federal banking agency, in its discretion, determines that publication would be contrary to the public interest;

**(B)**

any final order issued with respect to any administrative enforcement proceeding initiated by such agency under this section or any other law; and

**(C)**

any modification to or termination of any order or agreement made public pursuant to this paragraph.

**(2) HEARINGS**

All hearings on the record with respect to any notice of charges issued by a Federal banking agency shall be open to the public, unless the agency, in its discretion, determines that holding an open hearing would be contrary to the public interest.

**(3) TRANSCRIPT OF HEARING**

A transcript that includes all testimony and other documentary evidence shall be prepared for all hearings commenced pursuant to subsection (i). A transcript of public hearings shall be made available to the public pursuant to section 552 of title 5.

**(4)**DELAY OF PUBLICATION UNDER EXCEPTIONAL CIRCUMSTANCES

If the appropriate Federal banking agency makes a determination in writing that the publication of a final order pursuant to paragraph (1)(B) would seriously threaten the safety and soundness of an insured depository institution, the agency may delay the publication of the document for a reasonable time.

**(5)**DOCUMENTS FILED UNDER SEAL IN PUBLIC ENFORCEMENT HEARINGS

The appropriate Federal banking agency may file any document or part of a document under seal in any administrative enforcement hearing commenced by the agency if disclosure of the document would be contrary to the public interest. A written report shall be made part of any determination to withhold any part of a document from the transcript of the hearing required by paragraph (2).

**(6)**RETENTION OF DOCUMENTS

Each Federal banking agency shall keep and maintain a record, for a period of at least 6 years, of all documents described in paragraph (1) and all informal enforcement agreements and other supervisory actions and supporting documents issued with respect to or in connection with any administrative enforcement proceeding initiated by such agency under this section or any other laws.

**(7)**DISCLOSURES TO CONGRESS

No provision of this subsection may be construed to authorize the withholding, or to prohibit the disclosure, of any information to the Congress or any committee or subcommittee of the Congress.

**(v)**FOREIGN INVESTIGATIONS

**(1)**REQUESTING ASSISTANCE FROM FOREIGN BANKING AUTHORITIESIn conducting any investigation, examination, or enforcement action under this chapter, the appropriate Federal banking agency may—

**(A)**

request the assistance of any foreign banking authority; and

**(B)**

maintain an office outside the United States.

**(2)PROVIDING ASSISTANCE TO FOREIGN BANKING AUTHORITIES**

**(A)In general**

Any appropriate Federal banking agency may, at the request of any foreign banking authority, assist such authority if such authority states that the requesting authority is conducting an investigation to determine whether any person has violated, is violating, or is about to violate any law or regulation relating to banking matters or currency transactions administered or enforced by the requesting authority.

**(B)Investigation by Federal banking agency**

Any appropriate Federal banking agency may, in such agency's discretion, investigate and collect information and evidence pertinent to a request for assistance under subparagraph (A). Any such investigation shall comply with the laws of the United States and the policies and procedures of the appropriate Federal banking agency.

**(C)Factors to consider**In deciding whether to provide assistance under this paragraph, the appropriate Federal banking agency shall consider—

**(i)**

whether the requesting authority has agreed to provide reciprocal assistance with respect to banking matters within the jurisdiction of any appropriate Federal banking agency; and

**(ii)**

whether compliance with the request would prejudice the public interest of the United States.

**(D)Treatment of foreign banking authority**

For purposes of any Federal law or appropriate Federal banking agency regulation relating to the collection or transfer of information by any appropriate Federal banking agency, the foreign banking authority shall be treated as another appropriate Federal banking agency.

**(3)RULE OF CONSTRUCTION**

Paragraphs (1) and (2) shall not be construed to limit the authority of an appropriate Federal banking agency or any other Federal agency to provide or receive assistance or information to or from any foreign authority with respect to any matter.

**(w)TERMINATION OF INSURANCE FOR MONEY LAUNDERING OR CASH TRANSACTION REPORTING OFFENSES**

**(1)IN GENERAL**

**(A)Conviction of title 18 offenses**

**(i)Duty to notify**

If an insured State depository institution has been convicted of any criminal offense under section 1956 or 1957 of title 18, the Attorney General shall provide to the Corporation a written notification of the conviction and shall include a certified copy of the order of conviction from the court rendering the decision.

**(ii)Notice of termination; pretermination hearing**

After receipt of written notification from the Attorney General by the Corporation of such a conviction, the Board of Directors shall issue to the insured depository institution a notice of its intention to terminate the insured status of the insured depository institution and schedule a hearing on the matter, which shall be conducted in all respects as a termination hearing pursuant to paragraphs (3) through (5) of subsection (a).

**(B)Conviction of title 31 offenses**

If an insured State depository institution is convicted of any criminal offense under section 5322 or 5324 of title 31 after receipt of written notification from the Attorney General by the Corporation, the Board of Directors may initiate proceedings to terminate the insured status of the insured depository institution in the manner described in subparagraph (A).

**(C)Notice to State supervisor**

The Corporation shall simultaneously transmit a copy of any notice issued under this paragraph to the appropriate State financial institutions supervisor.

**(2)FACTORS TO BE CONSIDERED**In determining whether to terminate insurance under paragraph (1), the Board of Directors shall take into account the following factors:

**(A)**

The extent to which directors or senior executive officers of the depository institution knew of, or were involved in, the commission of the money laundering offense of which the institution was found guilty.

**(B)**

The extent to which the offense occurred despite the existence of policies and procedures within the depository institution which were designed to prevent the occurrence of any such offense.

**(C)**

The extent to which the depository institution has fully cooperated with law enforcement authorities with respect to the investigation of the money laundering offense of which the institution was found guilty.

**(D)**

The extent to which the depository institution has implemented additional internal controls (since the commission of the offense of which the depository institution was found guilty) to prevent the occurrence of any other money laundering offense.

**(E)**

The extent to which the interest of the local community in having adequate deposit and credit services available would be threatened by the termination of insurance.

**(3)**NOTICE TO STATE BANKING SUPERVISOR AND PUBLICWhen the order to terminate insured status initiated pursuant to this subsection is final, the Board of Directors shall—

**(A)**

notify the State banking supervisor of any State depository institution described in paragraph (1), where appropriate, at least 10 days prior to the effective date of the order of termination of the insured status of such depository institution, including a State branch of a foreign bank; and

**(B)**

publish notice of the termination of the insured status of the depository institution in the Federal Register.

**(4) TEMPORARY INSURANCE OF PREVIOUSLY INSURED DEPOSITS**

Upon termination of the insured status of any State depository institution pursuant to paragraph (1), the deposits of such depository institution shall be treated in accordance with subsection (a)(7).

**(5) SUCCESSOR LIABILITY**

This subsection shall not apply to a successor to the interests of, or a person who acquires, an insured depository institution that violated a provision of law described in paragraph (1), if the successor succeeds to the interests of the violator, or the acquisition is made, in good faith and not for purposes of evading this subsection or regulations prescribed under this subsection.

**(6) "SENIOR EXECUTIVE OFFICER" DEFINED**

The term "senior executive officer" has the same meaning as in regulations prescribed under section 1831i(f) of this title.

# 12 U.S.C. § 1831n

**(a) In general**

**(1) Objectives**

Accounting principles applicable to reports or statements required to be filed with Federal banking agencies by insured depository institutions should--

**(A)** result in financial statements and reports of condition that accurately reflect the capital of such institutions;

**(B)** facilitate effective supervision of the institutions; and

**(C)** facilitate prompt corrective action to resolve the institutions at the least cost to the Deposit Insurance Fund.

**(2) Standards**

**(A) Uniform accounting principles consistent with GAAP**

Subject to the requirements of this chapter and any other provision of Federal law, the accounting principles applicable to reports or statements required to be filed with Federal banking agencies by all insured depository institutions shall be uniform and consistent with generally accepted accounting principles.

**(B) Stringency**

If the appropriate Federal banking agency or the Corporation determines that the application of any generally accepted accounting principle to any insured depository institution is inconsistent with the objectives described in paragraph (1), the agency or the Corporation may, with respect to reports or statements required to be filed with such agency or Corporation, prescribe an accounting principle which is applicable to such institutions which is no less stringent than generally accepted accounting principles.

**(3) Review and implementation of accounting principles required**

Before the end of the 1-year period beginning on December 19, 1991, each appropriate Federal banking agency shall take the following actions:

**(A) Review of accounting principles**

Review--

**(i)** all accounting principles used by depository institutions with respect to reports or statements required to be filed with a Federal banking agency;

**(ii)** all requirements established by the agency with respect to such accounting procedures; and

**(iii)** the procedures and format for reports to the agency, including reports of condition.

**(B) Modification of noncomplying measures**

Modify or eliminate any accounting principle or reporting requirement of such Federal agency which the agency determines fails to comply with the objectives and standards established under paragraphs (1) and (2).

**(C) Inclusion of "off balance sheet" items**

Develop and prescribe regulations which require that all assets and liabilities, including contingent assets and liabilities, of insured depository institutions be reported in, or otherwise taken into account in the preparation of any balance sheet, financial statement, report of condition, or other report of such institution, required to be filed with a Federal banking agency.

**(b) Uniform accounting of capital standards**

**(1) In general**

Each appropriate Federal banking agency shall maintain uniform accounting standards to be used for determining compliance with statutory or regulatory requirements of depository institutions.

**(2) Transition provision**

Any standards in effect on December 19, 1991, under section 1833d of this title shall continue in effect after December 19, 1991, until amended by the appropriate Federal banking agency under paragraph (1).

**(c) Reports to banking committees**

**(1) Annual reports required**

The Federal banking agencies shall jointly submit an annual report to the Committee on Banking, Finance and Urban Affairs of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate containing a

description of any difference between any accounting or capital standard used by any such agency and any accounting or capital standard used by any other agency.

**(2) Explanation of reasons for discrepancy**

Each report submitted under paragraph (1) shall contain an explanation of the reasons for any discrepancy between any accounting or capital standard used by any such agency and any accounting or capital standard used by any other agency.

**(3) Publication**

Each report under this subsection shall be published in the Federal Register.

# 12 U.S.C. § 1831*o*

## (a) Resolving problems to protect Deposit Insurance Fund

### (1) Purpose

The purpose of this section is to resolve the problems of insured depository institutions at the least possible long-term loss to the Deposit Insurance Fund.

### (2) Prompt corrective action required

Each appropriate Federal banking agency and the Corporation (acting in the Corporation's capacity as the insurer of depository institutions under this chapter) shall carry out the purpose of this section by taking prompt corrective action to resolve the problems of insured depository institutions.

## (b) Definitions

For purposes of this section:

### (1) Capital categories

### (A) Well capitalized

An insured depository institution is "well capitalized" if it significantly exceeds the required minimum level for each relevant capital measure.

### (B) Adequately capitalized

An insured depository institution is "adequately capitalized" if it meets the required minimum level for each relevant capital measure.

### (C) Undercapitalized

An insured depository institution is "undercapitalized" if it fails to meet the required minimum level for any relevant capital measure.

### (D) Significantly undercapitalized

An insured depository institution is "significantly undercapitalized" if it is significantly below the required minimum level for any relevant capital measure.

### (E) Critically undercapitalized

An insured depository institution is "critically undercapitalized" if it fails to meet any level specified under subsection (c)(3)(A).

**(2) Other definitions**

**(A) Average**

**(i) In general**

The "average" of an accounting item (such as total assets or tangible equity) during a given period means the sum of that item at the close of business on each business day during that period divided by the total number of business days in that period.

**(ii) Agency may permit weekly averaging for certain institutions**

In the case of insured depository institutions that have total assets of less than $300,000,000 and normally file reports of condition reflecting weekly (rather than daily) averages of accounting items, the appropriate Federal banking agency may provide that the "average" of an accounting item during a given period means the sum of that item at the close of business on the relevant business day each week during that period divided by the total number of weeks in that period.

**(B) Capital distribution**

The term "capital distribution" means--

**(i)** a distribution of cash or other property by any insured depository institution or company to its owners made on account of that ownership, but not including--

**(I)** any dividend consisting only of shares of the institution or company or rights to purchase such shares; or

**(II)** any amount paid on the deposits of a mutual or cooperative institution that the appropriate Federal banking agency determines is not a distribution for purposes of this section;

**(ii)** a payment by an insured depository institution or company to repurchase, redeem, retire, or otherwise acquire any of its shares or other ownership interests, including any extension of credit to finance an affiliated company's acquisition of those shares or interests; or

**(iii)** a transaction that the appropriate Federal banking agency or the Corporation determines, by order or regulation, to be in substance a distribution of capital to the owners of the insured depository institution or company.

**(C) Capital restoration plan**

The term "capital restoration plan" means a plan submitted under subsection (e)(2).

**(D) Company**

The term "company" has the same meaning as in section 1841 of this title.

**(E) Compensation**

The term "compensation" includes any payment of money or provision of any other thing of value in consideration of employment.

**(F) Relevant capital measure**

The term "relevant capital measure" means the measures described in subsection (c).

**(G) Required minimum level**

The term "required minimum level" means, with respect to each relevant capital measure, the minimum acceptable capital level specified by the appropriate Federal banking agency by regulation.

**(H) Senior executive officer**

The term "senior executive officer" has the same meaning as the term "executive officer" in section 375b of this title.

**(I) Subordinated debt**

The term "subordinated debt" means debt subordinated to the claims of general creditors.

**(c) Capital standards**

**(1) Relevant capital measures**

**(A) In general**

Except as provided in subparagraph (B)(ii), the capital standards prescribed by each appropriate Federal banking agency shall include--

**(i)** a leverage limit; and

**(ii)** a risk-based capital requirement.

**(B) Other capital measures**

An appropriate Federal banking agency may, by regulation--

**(i)** establish any additional relevant capital measures to carry out the purpose of this section; or

**(ii)** rescind any relevant capital measure required under subparagraph (A) upon determining (with the concurrence of the other Federal banking agencies) that the measure is no longer an appropriate means for carrying out the purpose of this section.

**(2) Capital categories generally**

Each appropriate Federal banking agency shall, by regulation, specify for each relevant capital measure the levels at which an insured depository institution is well capitalized, adequately capitalized, undercapitalized, and significantly undercapitalized.

**(3) Critical capital**

**(A) Agency to specify level**

**(i) Leverage limit**

Each appropriate Federal banking agency shall, by regulation, in consultation with the Corporation, specify the ratio of tangible equity to total assets at which an insured depository institution is critically undercapitalized.

**(ii) Other relevant capital measures**

The agency may, by regulation, specify for 1 or more other relevant capital measures, the level at which an insured depository institution is critically undercapitalized.

**(B) Leverage limit range**

The level specified under subparagraph (A)(i) shall require tangible equity in an amount--

**(i)** not less than 2 percent of total assets; and

**(ii)** except as provided in clause (i), not more than 65 percent of the required minimum level of capital under the leverage limit.

**(C) FDIC's concurrence required**

The appropriate Federal banking agency shall not, without the concurrence of the Corporation, specify a level under subparagraph (A)(i) lower than that specified by the Corporation for State nonmember insured banks.

**(d) Provisions applicable to all institutions**

**(1) Capital distributions restricted**

**(A) In general**

An insured depository institution shall make no capital distribution if, after making the distribution, the institution would be undercapitalized.

**(B) Exception**

Notwithstanding subparagraph (A), the appropriate Federal banking agency may permit, after consultation with the Corporation, an insured depository institution to repurchase, redeem, retire, or otherwise acquire shares or ownership interests if the repurchase, redemption, retirement, or other acquisition--

**(i)** is made in connection with the issuance of additional shares or obligations of the institution in at least an equivalent amount; and

**(ii)** will reduce the institution's financial obligations or otherwise improve the institution's financial condition.

**(2) Management fees restricted**

An insured depository institution shall pay no management fee to any person having control of that institution if, after making the payment, the institution would be undercapitalized.

**(e) Provisions applicable to undercapitalized institutions**

**(1) Monitoring required**

Each appropriate Federal banking agency shall--

**(A)** closely monitor the condition of any undercapitalized insured depository institution;

**(B)** closely monitor compliance with capital restoration plans, restrictions, and requirements imposed under this section; and

**(C)** periodically review the plan, restrictions, and requirements applicable to any undercapitalized insured depository institution to determine whether the plan, restrictions, and requirements are achieving the purpose of this section.

**(2) Capital restoration plan required**

**(A) In general**

Any undercapitalized insured depository institution shall submit an acceptable capital restoration plan to the appropriate Federal banking agency within the time allowed by the agency under subparagraph (D).

**(B) Contents of plan**

The capital restoration plan shall--

**(i)** specify--

**(I)** the steps the insured depository institution will take to become adequately capitalized;

**(II)** the levels of capital to be attained during each year in which the plan will be in effect;

**(III)** how the institution will comply with the restrictions or requirements then in effect under this section; and

**(IV)** the types and levels of activities in which the institution will engage; and

**(ii)** contain such other information as the appropriate Federal banking agency may require.

**(C) Criteria for accepting plan**

The appropriate Federal banking agency shall not accept a capital restoration plan unless the agency determines that--

**(i)** the plan--

**(I)** complies with subparagraph (B);

**(II)** is based on realistic assumptions, and is likely to succeed in restoring the institution's capital; and

**(III)** would not appreciably increase the risk (including credit risk, interest-rate risk, and other types of risk) to which the institution is exposed; and

**(ii)** if the insured depository institution is undercapitalized, each company having control of the institution has--

**(I)** guaranteed that the institution will comply with the plan until the institution has been adequately capitalized on average during each of 4 consecutive calendar quarters; and

**(II)** provided appropriate assurances of performance.

**(D) Deadlines for submission and review of plans**

The appropriate Federal banking agency shall by regulation establish deadlines that--

**(i)** provide insured depository institutions with reasonable time to submit capital restoration plans, and generally require an institution to submit a plan not later than 45 days after the institution becomes undercapitalized;

**(ii)** require the agency to act on capital restoration plans expeditiously, and generally not later than 60 days after the plan is submitted; and

**(iii)** require the agency to submit a copy of any plan approved by the agency to the Corporation before the end of the 45-day period beginning on the date such approval is granted.

**(E) Guarantee liability limited**

**(i) In general**

The aggregate liability under subparagraph (C)(ii) of all companies having control of an insured depository institution shall be the lesser of--

**(I)** an amount equal to 5 percent of the institution's total assets at the time the institution became undercapitalized; or

**(II)** the amount which is necessary (or would have been necessary) to bring the institution into compliance with all capital standards applicable with respect to such institution as of the time the institution fails to comply with a plan under this subsection.

**(ii) Certain affiliates not affected**

This paragraph may not be construed as--

**(I)** requiring any company not having control of an undercapitalized insured depository institution to guarantee, or otherwise be liable on, a capital restoration plan;

**(II)** requiring any person other than an insured depository institution to submit a capital restoration plan; or

**(III)** affecting compliance by brokers, dealers, government securities brokers, and government securities dealers with the financial responsibility requirements of the Securities Exchange Act of 1934 and regulations and orders thereunder.

**(3) Asset growth restricted**

An undercapitalized insured depository institution shall not permit its average total assets during any calendar quarter to exceed its average total assets during the preceding calendar quarter unless--

**(A)** the appropriate Federal banking agency has accepted the institution's capital restoration plan;

**(B)** any increase in total assets is consistent with the plan; and

**(C)** the institution's ratio of tangible equity to assets increases during the calendar quarter at a rate sufficient to enable the institution to become adequately capitalized within a reasonable time.

**(4) Prior approval required for acquisitions, branching, and new lines of business**

An undercapitalized insured depository institution shall not, directly or indirectly, acquire any interest in any company or insured depository institution, establish or acquire any additional branch office, or engage in any new line of business unless--

**(A)** the appropriate Federal banking agency has accepted the insured depository institution's capital restoration plan, the institution is implementing the plan, and the agency determines that the proposed action is consistent with and will further the achievement of the plan; or

**(B)** the Board of Directors determines that the proposed action will further the purpose of this section.

**(5) Discretionary safeguards**

The appropriate Federal banking agency may, with respect to any undercapitalized insured depository institution, take actions described in any subparagraph of subsection (f)(2) if the agency determines that those actions are necessary to carry out the purpose of this section.

**(f) Provisions applicable to significantly undercapitalized institutions and undercapitalized institutions that fail to submit and implement capital restoration plans**

**(1) In general**

This subsection shall apply with respect to any insured depository institution that--

**(A)** is significantly undercapitalized; or

**(B)** is undercapitalized and--

**(i)** fails to submit an acceptable capital restoration plan within the time allowed by the appropriate Federal banking agency under subsection (e)(2)(D); or

**(ii)** fails in any material respect to implement a plan accepted by the agency.

**(2) Specific actions authorized**

The appropriate Federal banking agency shall carry out this section by taking 1 or more of the following actions:

**(A) Requiring recapitalization**

Doing 1 or more of the following:

**(i)** Requiring the institution to sell enough shares or obligations of the institution so that the institution will be adequately capitalized after the sale.

**(ii)** Further requiring that instruments sold under clause (i) be voting shares.

**(iii)** Requiring the institution to be acquired by a depository institution holding company, or to combine with another insured depository institution, if 1 or more grounds exist for appointing a conservator or receiver for the institution.

**(B) Restricting transactions with affiliates**

**(i)** Requiring the institution to comply with section 371c of this title as if subsection (d)(1) of that section (exempting transactions with certain affiliated institutions) did not apply.

**(ii)** Further restricting the institution's transactions with affiliates.

**(C) Restricting interest rates paid**

**(i) In general**

Restricting the interest rates that the institution pays on deposits to the prevailing rates of interest on deposits of comparable amounts and maturities in the region where the institution is located, as determined by the agency.

**(ii) Retroactive restrictions prohibited**

This subparagraph does not authorize the agency to restrict interest rates paid on time deposits made before (and not renewed or renegotiated after) the agency acted under this subparagraph.

**(D) Restricting asset growth**

Restricting the institution's asset growth more stringently than subsection (e)(3), or requiring the institution to reduce its total assets.

**(E) Restricting activities**

Requiring the institution or any of its subsidiaries to alter, reduce, or terminate any activity that the agency determines poses excessive risk to the institution.

**(F) Improving management**

Doing 1 or more of the following:

**(i) New election of directors**

Ordering a new election for the institution's board of directors.

**(ii) Dismissing directors or senior executive officers**

Requiring the institution to dismiss from office any director or senior executive officer who had held office for more than 180 days immediately before the institution

became undercapitalized. Dismissal under this clause shall not be construed to be a removal under section 1818 of this title.

### (iii) Employing qualified senior executive officers

Requiring the institution to employ qualified senior executive officers (who, if the agency so specifies, shall be subject to approval by the agency).

### (G) Prohibiting deposits from correspondent banks

Prohibiting the acceptance by the institution of deposits from correspondent depository institutions, including renewals and rollovers of prior deposits.

### (H) Requiring prior approval for capital distributions by bank holding company

Prohibiting any bank holding company having control of the insured depository institution from making any capital distribution without the prior approval of the Board of Governors of the Federal Reserve System.

### (I) Requiring divestiture

Doing one or more of the following:

### (i) Divestiture by the institution

Requiring the institution to divest itself of or liquidate any subsidiary if the agency determines that the subsidiary is in danger of becoming insolvent and poses a significant risk to the institution, or is likely to cause a significant dissipation of the institution's assets or earnings.

### (ii) Divestiture by parent company of nondepository affiliate

Requiring any company having control of the institution to divest itself of or liquidate any affiliate other than an insured depository institution if the appropriate Federal banking agency for that company determines that the affiliate is in danger of becoming insolvent and poses a significant risk to the institution, or is likely to cause a significant dissipation of the institution's assets or earnings.

### (iii) Divestiture of institution

Requiring any company having control of the institution to divest itself of the institution if the appropriate Federal banking agency for that company determines

that divestiture would improve the institution's financial condition and future prospects.

**(J) Requiring other action**

Requiring the institution to take any other action that the agency determines will better carry out the purpose of this section than any of the actions described in this paragraph.

**(3) Presumption in favor of certain actions**

In complying with paragraph (2), the agency shall take the following actions, unless the agency determines that the actions would not further the purpose of this section:

**(A)** The action described in clause (i) or (iii) of paragraph (2)(A) (relating to requiring the sale of shares or obligations, or requiring the institution to be acquired by or combine with another institution).

**(B)** The action described in paragraph (2)(B)(i) (relating to restricting transactions with affiliates).

**(C)** The action described in paragraph (2)(C) (relating to restricting interest rates).

**(4) Senior executive officers' compensation restricted**

**(A) In general**

The insured depository institution shall not do any of the following without the prior written approval of the appropriate Federal banking agency:

**(i)** Pay any bonus to any senior executive officer.

**(ii)** Provide compensation to any senior executive officer at a rate exceeding that officer's average rate of compensation (excluding bonuses, stock options, and profit-sharing) during the 12 calendar months preceding the calendar month in which the institution became undercapitalized.

**(B) Failing to submit plan**

The appropriate Federal banking agency shall not grant any approval under subparagraph (A) with respect to an institution that has failed to submit an acceptable capital restoration plan.

**(5) Discretion to impose certain additional restrictions**

The agency may impose 1 or more of the restrictions prescribed by regulation under subsection (i) if the agency determines that those restrictions are necessary to carry out the purpose of this section.

**(6) Consultation with other regulators**

Before the agency or Corporation makes a determination under paragraph (2)(I) with respect to an affiliate that is a broker, dealer, government securities broker, government securities dealer, investment company, or investment adviser, the agency or Corporation shall consult with the Securities and Exchange Commission and, in the case of any other affiliate which is subject to any financial responsibility or capital requirement, any other appropriate regulator of such affiliate with respect to the proposed determination of the agency or the Corporation and actions pursuant to such determination.

**(g) More stringent treatment based on other supervisory criteria**

**(1) In general**

If the appropriate Federal banking agency determines (after notice and an opportunity for hearing) that an insured depository institution is in an unsafe or unsound condition or, pursuant to section 1818(b)(8) of this title, deems the institution to be engaging in an unsafe or unsound practice, the agency may--

**(A)** if the institution is well capitalized, reclassify the institution as adequately capitalized;

**(B)** if the institution is adequately capitalized (but not well capitalized), require the institution to comply with 1 or more provisions of subsections (d) and (e), as if the institution were undercapitalized; or

**(C)** if the institution is undercapitalized, take any 1 or more actions authorized under subsection (f)(2) as if the institution were significantly undercapitalized.

**(2) Contents of plan**

146

Any plan required under paragraph (1) shall specify the steps that the insured depository institution will take to correct the unsafe or unsound condition or practice. Capital restoration plans shall not be required under paragraph (1)(B).

## (h) Provisions applicable to critically undercapitalized institutions

### (1) Activities restricted

Any critically undercapitalized insured depository institution shall comply with restrictions prescribed by the Corporation under subsection (i).

### (2) Payments on subordinated debt prohibited

### (A) In general

A critically undercapitalized insured depository institution shall not, beginning 60 days after becoming critically undercapitalized, make any payment of principal or interest on the institution's subordinated debt.

### (B) Exceptions

The Corporation may make exceptions to subparagraph (A) if--

(i) the appropriate Federal banking agency has taken action with respect to the insured depository institution under paragraph (3)(A)(ii); and

(ii) the Corporation determines that the exception would further the purpose of this section.

### (C) Limited exemption for certain subordinated debt

Until July 15, 1996, subparagraph (A) shall not apply with respect to any subordinated debt outstanding on July 15, 1991, and not extended or otherwise renegotiated after July 15, 1991.

### (D) Accrual of interest

Subparagraph (A) does not prevent unpaid interest from accruing on subordinated debt under the terms of that debt, to the extent otherwise permitted by law.

### (3) Conservatorship, receivership, or other action required

**(A) In general**

The appropriate Federal banking agency shall, not later than 90 days after an insured depository institution becomes critically undercapitalized--

**(i)** appoint a receiver (or, with the concurrence of the Corporation, a conservator) for the institution; or

**(ii)** take such other action as the agency determines, with the concurrence of the Corporation, would better achieve the purpose of this section, after documenting why the action would better achieve that purpose.

**(B) Periodic redeterminations required**

Any determination by an appropriate Federal banking agency under subparagraph (A)(ii) to take any action with respect to an insured depository institution in lieu of appointing a conservator or receiver shall cease to be effective not later than the end of the 90-day period beginning on the date that the determination is made and a conservator or receiver shall be appointed for that institution under subparagraph (A)(i) unless the agency makes a new determination under subparagraph (A)(ii) at the end of the effective period of the prior determination.

**(C) Appointment of receiver required if other action fails to restore capital**

**(i) In general**

Notwithstanding subparagraphs (A) and (B), the appropriate Federal banking agency shall appoint a receiver for the insured depository institution if the institution is critically undercapitalized on average during the calendar quarter beginning 270 days after the date on which the institution became critically undercapitalized.

**(ii) Exception**

Notwithstanding clause (i), the appropriate Federal banking agency may continue to take such other action as the agency determines to be appropriate in lieu of such appointment if--

**(I)** the agency determines, with the concurrence of the Corporation, that (aa) the insured depository institution has positive net worth, (bb) the insured depository institution has been in substantial compliance with an approved capital restoration plan which requires consistent improvement in the institution's capital since the date of the approval of the plan, (cc) the insured depository institution is profitable or has

an upward trend in earnings the agency projects as sustainable, and (dd) the insured depository institution is reducing the ratio of nonperforming loans to total loans; and

**(II)** the head of the appropriate Federal banking agency and the Chairperson of the Board of Directors both certify that the institution is viable and not expected to fail.

### (i) Restricting activities of critically undercapitalized institutions

To carry out the purpose of this section, the Corporation shall, by regulation or order--

**(1)** restrict the activities of any critically undercapitalized insured depository institution; and

**(2)** at a minimum, prohibit any such institution from doing any of the following without the Corporation's prior written approval:

**(A)** Entering into any material transaction other than in the usual course of business, including any investment, expansion, acquisition, sale of assets, or other similar action with respect to which the depository institution is required to provide notice to the appropriate Federal banking agency.

**(B)** Extending credit for any highly leveraged transaction.

**(C)** Amending the institution's charter or bylaws, except to the extent necessary to carry out any other requirement of any law, regulation, or order.

**(D)** Making any material change in accounting methods.

**(E)** Engaging in any covered transaction (as defined in section 371c(b) of this title).

**(F)** Paying excessive compensation or bonuses.

**(G)** Paying interest on new or renewed liabilities at a rate that would increase the institution's weighted average cost of funds to a level significantly exceeding the prevailing rates of interest on insured deposits in the institution's normal market areas.

### (j) Certain Government-controlled institutions exempted

Subsections (e) through (i) (other than paragraph (3) of subsection (e)) shall not apply--

**(1)** to an insured depository institution for which the Corporation or the Resolution Trust Corporation is conservator; or

**(2)** to a bridge depository institution, none of the voting securities of which are owned by a person or agency other than the Corporation or the Resolution Trust Corporation.

**(k) Reviews required when Deposit Insurance Fund incurs losses**

**(1) In general**

If the Deposit Insurance Fund incurs a material loss with respect to an insured depository institution on or after July 1, 1993, the inspector general of the appropriate Federal banking agency shall--

**(A)** make a written report to that agency reviewing the agency's supervision of the institution (including the agency's implementation of this section), which shall--

**(i)** ascertain why the institution's problems resulted in a material loss to the Deposit Insurance Fund; and

**(ii)** make recommendations for preventing any such loss in the future; and

**(B)** provide a copy of the report to--

**(i)** the Comptroller General of the United States;

**(ii)** the Corporation (if the agency is not the Corporation);

**(iii)** in the case of a State depository institution, the appropriate State banking supervisor; and

**(iv)** upon request by any Member of Congress, to that Member.

**(2) Material loss incurred**

For purposes of this subsection:

**(A) Loss incurred**

The Deposit Insurance Fund incurs a loss with respect to an insured depository institution--

**(i)** if the Corporation provides any assistance under section 1823(c) of this title with respect to that institution; and--

**(I)** it is not substantially certain that the assistance will be fully repaid not later than 24 months after the date on which the Corporation initiated the assistance; or

**(II)** the institution ceases to repay the assistance in accordance with its terms; or

**(ii)** if the Corporation is appointed receiver of the institution, and it is or becomes apparent that the present value of the outlays of the Deposit Insurance Fund with respect to that institution will exceed the present value of receivership dividends or other payments on the claims held by the Corporation.

### (B) Material loss defined

The term "material loss" means any estimated loss in excess of--

**(i)** $200,000,000, if the loss occurs during the period beginning on January 1, 2010, and ending on December 31, 2011;

**(ii)** $150,000,000, if the loss occurs during the period beginning on January 1, 2012, and ending on December 31, 2013; and

**(iii)** $50,000,000, if the loss occurs on or after January 1, 2014, provided that if the inspector general of a Federal banking agency certifies to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives that the number of projected failures of depository institutions that would require material loss reviews for the following 12 months will be greater than 30 and would hinder the effectiveness of its oversight functions, then the definition of "material loss" shall be $75,000, 000 for a duration of 1 year from the date of the certification.

### (3) Deadline for report

The inspector general of the appropriate Federal banking agency shall comply with paragraph (1) expeditiously, and in any event (except with respect to paragraph (1)(B)(iv)) as follows:

**(A)** If the institution is described in paragraph (2)(A)(i), during the 6-month period beginning on the earlier of--

**(i)** the date on which the institution ceases to repay assistance under section 1823(c) of this title in accordance with its terms, or

**(ii)** the date on which it becomes apparent that the assistance will not be fully repaid during the 24-month period described in paragraph (2)(A)(i).

**(B)** If the institution is described in paragraph (2)(A)(ii), during the 6-month period beginning on the date on which it becomes apparent that the present value of the outlays of the Deposit Insurance Fund with respect to that institution will exceed the present value of receivership dividends or other payments on the claims held by the Corporation.

### (4) Public disclosure required

### (A) In general

The appropriate Federal banking agency shall disclose any report on losses required under this subsection, upon request under section 552 of Title 5 without excising--

**(i)** any portion under section 552(b)(5) of that title; or

**(ii)** any information about the insured depository institution under paragraph (4) (other than trade secrets) or paragraph (8) of section 552(b) of that title.

### (B) Exception

Subparagraph (A) does not require the agency to disclose the name of any customer of the insured depository institution (other than an institution-affiliated party), or information from which such a person's identity could reasonably be ascertained.

### (5) Losses that are not material

### (A) Semiannual report

For the 6-month period ending on March 31, 2010, and each 6-month period thereafter, the Inspector General of each Federal banking agency shall--

**(i)** identify losses that the Inspector General estimates have been incurred by the Deposit Insurance Fund during that 6-month period, with respect to the insured depository institutions supervised by the Federal banking agency;

**(ii)** for each loss incurred by the Deposit Insurance Fund that is not a material loss, determine--

**(I)** the grounds identified by the Federal banking agency or State bank supervisor for appointing the Corporation as receiver under section 1821(c)(5) of this title; and

**(II)** whether any unusual circumstances exist that might warrant an in-depth review of the loss; and

**(iii)** prepare and submit a written report to the appropriate Federal banking agency and to Congress on the results of any determination by the Inspector General, including--

**(I)** an identification of any loss that warrants an in-depth review, together with the reasons why such review is warranted, or, if the Inspector General determines that no review is warranted, an explanation of such determination; and

**(II)** for each loss identified under subclause (I) that warrants an in-depth review, the date by which such review, and a report on such review prepared in a manner consistent with reports under paragraph (1)(A), will be completed and submitted to the Federal banking agency and Congress.

**(B) Deadline for semiannual report**

The Inspector General of each Federal banking agency shall--

**(i)** submit each report required under paragraph (A) expeditiously, and not later than 90 days after the end of the 6-month period covered by the report; and

**(ii)** provide a copy of the report required under paragraph (A) to any Member of Congress, upon request.

**(6) GAO review**

The Comptroller General of the United States shall, under such conditions as the Comptroller General determines to be appropriate, review reports made under paragraph (1) and recommend improvements in the supervision of insured depository institutions (including the implementation of this section).

**(l) Implementation**

**(1) Regulations and other actions**

Each appropriate Federal banking agency shall prescribe such regulations (in consultation with the other Federal banking agencies), issue such orders, and take such other actions as are necessary to carry out this section.

**(2) Written determination and concurrence required**

Any determination or concurrence by an appropriate Federal banking agency or the Corporation required under this section shall be written.

**(m) Other authority not affected**

This section does not limit any authority of an appropriate Federal banking agency, the Corporation, or a State to take action in addition to (but not in derogation of) that required under this section.

**(n) Administrative review of dismissal orders**

**(1) Timely petition required**

A director or senior executive officer dismissed pursuant to an order under subsection (f)(2)(F)(ii) may obtain review of that order by filing a written petition for reinstatement with the appropriate Federal banking agency not later than 10 days after receiving notice of the dismissal.

**(2) Procedure**

**(A) Hearing required**

The agency shall give the petitioner an opportunity to--

**(i)** submit written materials in support of the petition; and

**(ii)** appear, personally or through counsel, before 1 or more members of the agency or designated employees of the agency.

**(B) Deadline for hearing**

The agency shall--

**(i)** schedule the hearing referred to in subparagraph (A)(ii) promptly after the petition is filed; and

**(ii)** hold the hearing not later than 30 days after the petition is filed, unless the petitioner requests that the hearing be held at a later time.

**(C) Deadline for decision**

Not later than 60 days after the date of the hearing, the agency shall--

**(i)** by order, grant or deny the petition;

**(ii)** if the order is adverse to the petitioner, set forth the basis for the order; and

**(iii)** notify the petitioner of the order.

**(3) Standard for review of dismissal orders**

The petitioner shall bear the burden of proving that the petitioner's continued employment would materially strengthen the insured depository institution's ability--

**(A)** to become adequately capitalized, to the extent that the order is based on the institution's capital level or failure to submit or implement a capital restoration plan; and

**(B)** to correct the unsafe or unsound condition or unsafe or unsound practice, to the extent that the order is based on subsection (g)(1).

**(o) Transition rules for savings associations**

Subsections (e)(2), (f), and (h) shall not apply before July 1, 1994, to any insured savings association if--

**(1)** before December 19, 1991--

**(A)** the savings association had submitted a plan meeting the requirements of section 1464(t)(6)(A)(ii) of this title; and

**(B)** the Director of the Office of Thrift Supervision had accepted the plan;

**(2)** the plan remains in effect; and

**(3)** the savings association remains in compliance with the plan or is operating under a written agreement with the appropriate Federal banking agency.

## 28 U.S.C. § 2462

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

# 12 C.F.R. § 19.36

(a) Admissibility—

(1) Except as is otherwise set forth in this section, relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law.

(2) Evidence that would be admissible under the Federal Rules of Evidence is admissible in a proceeding conducted pursuant to this subpart.

(3) Evidence that would be inadmissible under the Federal Rules of Evidence may not be deemed or ruled to be inadmissible in a proceeding conducted pursuant to this subpart if such evidence is relevant, material, reliable and not unduly repetitive.

(b) Official notice—

(1) Official notice may be taken of any material fact which may be judicially noticed by a United States district court and any material information in the official public records of any Federal or State government agency.

(2) All matters officially noticed by the ALJ or the Comptroller must appear on the record.

(3) If official notice is requested or taken of any material fact, the parties, upon timely request, must be afforded an opportunity to object.

(c) Documents—

(1) A duplicate copy of a document is admissible to the same extent as the original, unless a genuine issue is raised as to whether the copy is in some material respect not a true and legible copy of the original.

(2) Subject to the requirements of paragraph (a) of this section, any document, including a report of examination, supervisory activity, inspection, or visitation, prepared by an appropriate Federal financial institutions regulatory agency or by a State regulatory agency, is admissible either with or without a sponsoring witness.

(3) Witnesses may use existing or newly created charts, exhibits, calendars, calculations, outlines, or other graphic material to summarize, illustrate, or simplify the presentation of testimony. Such materials may, subject to the ALJ's discretion, be used with or without being admitted into evidence.

(d) Objections—

(1) Objections to the admissibility of evidence must be timely made and rulings on all objections must appear on the record.

(2) When an objection to a question or line of questioning propounded to a witness is sustained, the examining counsel may make a specific proffer on the record of what the examining counsel expected to prove by the expected testimony of the witness either by representation of counsel or by direct questioning of the witness.

(3) The ALJ will retain rejected exhibits, adequately marked for identification, for the record, and transmit such exhibits to the Comptroller.

(4) Failure to object to admission of evidence or to any ruling constitutes a waiver of the objection.

(e) Stipulations. The parties may stipulate as to any relevant matters of fact or the authentication of any relevant documents. Such stipulations must be received in evidence at a hearing and are binding on the parties with respect to the matters therein stipulated.

(f) Depositions of unavailable witnesses—

(1) If a witness is unavailable to testify at a hearing, and that witness has testified in a deposition to which all parties in a proceeding had notice and an opportunity to participate, a party may offer as evidence all or any part of the transcript of the deposition, including deposition exhibits, if any.

(2) Such deposition transcript is admissible to the same extent that testimony would have been admissible had that person testified at the hearing, provided that if a witness refused to answer proper questions during the depositions, the ALJ may, on that basis, limit the admissibility of the deposition in any manner that justice requires.

(3) Only those portions of a deposition received in evidence at the hearing constitute a part of the record.

## 12 C.F.R. § 19.37

(a) Proposed findings and conclusions and supporting briefs—

(1) Using the same method of service for each party, the ALJ will serve notice upon each party that the certified transcript, together with all hearing exhibits and exhibits introduced but not admitted into evidence at the hearing, has been filed. Any party may file with the ALJ proposed findings of fact, proposed conclusions of law, and a proposed order within 30 days following service of this notice by the ALJ or within such longer period as may be ordered by the ALJ.

(2) Proposed findings and conclusions must be supported by citation to any relevant authorities and by page references to any relevant portions of the record. A post-hearing brief may be filed in support of proposed findings and conclusions, either as part of the same document or in a separate document. Any party who fails to file timely with the ALJ any proposed finding or conclusion is deemed to have waived the right to raise in any subsequent filing or submission any issue not addressed in such party's proposed finding or conclusion.

(b) Reply briefs. Reply briefs may be filed within 15 days after the date on which the parties' proposed findings, conclusions, and order are due. Reply briefs must be strictly limited to responding to new matters, issues, or arguments raised in another party's papers. A party who has not filed proposed findings of fact and conclusions of law or a post-hearing brief may not file a reply brief.

(c) Simultaneous filing required. The ALJ will not order the filing by any party of any brief or reply brief in advance of the other party's filing of its brief.

## 12 C.F.R. § 19.39

(a) Filing exceptions. Within 30 days after service of the recommended decision, findings, conclusions, and proposed order under § 19.38, a party may file with the Comptroller written exceptions to the ALJ's recommended decision, findings, conclusions, or proposed order, to the admission or exclusion of evidence, or to the failure of the ALJ to make a ruling proposed by a party. A supporting brief may be filed at the time the exceptions are filed, either as part of the same document or in a separate document.

(b) Effect of failure to file or raise exceptions—

(1) Failure of a party to file exceptions to those matters specified in paragraph (a) of this section within the time prescribed is deemed a waiver of objection thereto.

(2) No exception need be considered by the Comptroller if the party taking exception had an opportunity to raise the same objection, issue, or argument before the ALJ and failed to do so.

(c) Contents.—

(1) All exceptions and briefs in support of such exceptions must be confined to the particular matters in, or omissions from, the ALJ's recommendations to which that party takes exception.

(2) All exceptions and briefs in support of exceptions must set forth page or paragraph references to the specific parts of the ALJ's recommendations to which exception is taken, the page or paragraph references to those portions of the record relied upon to support each exception, and the legal authority relied upon to support each exception.

# 12 C.F.R. § 19.40

(a) Notice of submission to the Comptroller. When the Comptroller determines that the record in the proceeding is complete, the Comptroller will serve notice upon the parties that the proceeding has been submitted to the Comptroller for final decision.

(b) Oral argument before the Comptroller. Upon the initiative of the Comptroller or on the written request of any party filed with the Comptroller within the time for filing exceptions, the Comptroller may order and hear oral argument on the recommended findings, conclusions, decision, and order of the ALJ. A written request by a party must show good cause for oral argument and state reasons why arguments cannot be presented adequately in writing. A denial of a request for oral argument may be set forth in the Comptroller's final decision. Oral argument before the Comptroller must be on the record.

(c) Comptroller's final decision—

(1) Decisional employees may advise and assist the Comptroller in the consideration and disposition of the case. The final decision of the Comptroller will be based upon review of the entire record of the proceeding, except that the Comptroller may limit the issues to be reviewed to those findings and conclusions to which opposing arguments or exceptions have been filed by the parties.

(2) The Comptroller will render a final decision within 90 days after notification of the parties that the case has been submitted for final decision, or 90 days after oral argument, whichever is later, unless the Comptroller orders that the action or any aspect thereof be remanded to the ALJ for further proceedings. Copies of the final decision and order of the Comptroller will be served upon each party to the proceeding, upon other persons required by statute, and, if directed by the Comptroller or required by statute, upon any appropriate State or Federal supervisory authority.

# 12 C.F.R. § 304.3

(a) Consolidated Reports of Condition and Income, Forms FFIEC 031, 041, and 051. Pursuant to section 7(a) of the Federal Deposit Insurance Act (12 U.S.C. 1817(a)) and other applicable law, every insured depository institution is required to file Consolidated Reports of Condition and Income (also known as the Call Report) in accordance with the instructions for these reports. All assets and liabilities, including contingent assets and liabilities, must be reported in, or otherwise taken into account in the preparation of, the Call Report. The FDIC uses Call Report data from all insured depository institutions to calculate deposit insurance assessments and monitor the condition, performance, and risk profile of individual banks and the banking industry. Reporting banks must also submit annually such information on small business and small farm lending as the FDIC may need to assess the availability of credit to these sectors of the economy. The report forms and instructions can be obtained from the Division of Insurance and Research (DIR), FDIC, 550 17th Street NW, Washington, DC 20429 or through the website of the Federal Financial Institutions Examination Council, http://www.ffiec.gov/.

(b) Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, Form FFIEC 002. Pursuant to section 7(a) of the Federal Deposit Insurance Act (12 U.S.C. 1817(a)) and other applicable law, every insured U.S. branch of a foreign bank is required to file a Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks in accordance with the instructions for the report. All assets and liabilities, including contingent assets and liabilities, must be reported in, or otherwise taken into account in the preparation of the report. The FDIC uses the reported data to calculate deposit insurance assessments and monitor the condition, performance, and risk profile of individual insured branches and the banking industry. Insured branches must also submit annually such information on small business and small farm lending as the FDIC may need to assess the availability of credit to these sectors of the economy. Because the Board of Governors of the Federal Reserve System collects and processes this report on behalf of the FDIC, the report forms and instructions can be obtained from Federal Reserve District Banks or through the website of the Federal Financial Institutions Examination Council, http://www.ffiec.gov/.

(c) Summary of Deposits, Form FDIC 8020/05. Form 8020/05 is a report on the amount of deposits for each authorized office of an insured depository institution with branches; institutions with only a main office are exempt from reporting.

Reports as of June 30 of each year must be submitted no later than the immediately succeeding July 31. The report forms and the instructions for completing the reports will be furnished to all such institutions by, or may be obtained upon request from, the Division of Insurance and Research (DIR), FDIC, 550 17th Street NW, Washington, DC 20429.

(d) Notification of Performance of Bank Services, Form FDIC 6120/06. Pursuant to section 7 of the Bank Service Company Act (12 U.S.C. 1867), as amended, FDIC–supervised institutions must notify the agency about the existence of a service relationship within thirty days after the making of the contract or the performance of the service, whichever occurs first. Form FDIC 6120/06 may be used to satisfy the notice requirement. The form contains identification, location, and contact information for the institution, the servicer, and a description of the services provided. In lieu of the form, notification may be provided by letter. Either the form or the letter containing the notice information must be submitted to the regional director—Division of Risk Management Supervision (RMS) of the region in which the institution's main office is located.