No. 23-60617

# In the United States Court of Appeals for the Fifth Circuit

SAUL ORTEGA, FORMER CHIEF FINANCIAL OFFICER, DIRECTOR, PRESIDENT, CHIEF EXECUTIVE OFFICER, AND CHAIRMAN OF THE BOARD; DAVID ROGERS, JR., FORMER CHAIRMAN OF THE BOARD,

*Petitioners*,

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,

*Respondent*.

*On Petition for Review of Final Decision of the Comptroller of the Currency Entered on December 1, 2023 by the Office of the Comptroller of the Currency Case Nos. AA-EC-2017-44 and AA-EC-2017-45*

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT**

Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation.  In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: December 23, 2024                    */s/ Brianne J. Gorod*
                                            Brianne J. Gorod

                                            *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.................. i

CORPORATE DISCLOSURE STATEMENT ................................... ii

TABLE OF CONTENTS........................................................ iii

TABLE OF AUTHORITIES ................................................... iv

INTEREST OF *AMICUS CURIAE* .......................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

ARGUMENT ................................................................... 5

    I.    Congress Can Assign Adjudication of Claims to Executive Agencies When Agencies Have Historically Adjudicated Similar Claims or When Government Control Is So Total that There Is No Vested Right to Participate ........................................... 5

    II.    The Supervision of Federally Insured Banks Is an Area Where Government Control Is So Total that There Is No Vested Right to Participate ................................................................. 11

    III.    The OCC's Imposition of Penalties and Other Orders on Banks and Bankers Does Not Require Adjudication by an Article III Court....... 23

CONCLUSION ................................................................. 29

CERTIFICATE OF SERVICE ................................................. 1A

CERTIFICATE OF COMPLIANCE ............................................. 2A

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Akin v. Off. of Thrift Supervision Dep't of Treasury*,
  <u>950 F.2d 1180</u> (5th Cir. 1992)................................................ 26

*Att'y Gen. v. Utica Ins. Co.*,
  2 Johns. Ch. 371 (N.Y. Ch. 1817)........................................ 16

*Brown v. President, etc., of Penobscot Bank*,
  <u>8 Mass. 445</u> (1812)............................................................. 16

*Bushnell v. Leland*,
  <u>164 U.S. 684</u> (1897)........................................................... 20

*Commonwealth by the Bank Comm'rs v. President, etc., of Farmers' & Mechs.' Bank*,
  <u>38 Mass. 542</u> (1839)........................................................... 17

*Cuomo v. Clearing House Ass'n, L.L.C.*,
  <u>557 U.S. 519</u> (2009)....................................................... 4, 24

*Decatur v. Paulding*,
  <u>39 U.S. 497</u> (1840)...................................................... 9, 19, 24

*Ex parte Bakelite Corp.*,
  <u>279 U.S. 438</u> (1929)....................................................... 8, 26

*Fahey v. Mallonee*,
  <u>332 U.S. 245</u> (1947)....................................................... 1, 27

*Farmers' & Mechs.' Nat'l Bank v. Dearing*,
  <u>91 U.S. 29</u> (1875)............................................................. 15

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  <u>458 U.S. 141</u> (1982)............................................................. 1

*First Nat'l Bank in Plant City, Fla. v. Dickinson*,
  <u>396 U.S. 122</u> (1969)........................................................... 26

*Horne v. Dep't of Agric.*,
  <u>576 U.S. 350</u> (2015)....................................................... 10, 27

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*McCulloch v. State*,
   17 U.S. 316 (1819) .................................................................... 14

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. 272 (1856) ................................................................... 5-7

*Nat'l Bank v. Fore*,
   25 F. 209 (C.C.E.D. Tex. 1885) ............................................... 24

*Oceanic Steam Navigation Co. v. Stranahan*,
   214 U.S. 320 (1909) .......................................................... 7-9, 12, 26

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984) .................................................................. 27

*Schaake v. Dolley*,
   118 P. 80 (Kan. 1911) ............................................................... 12

*SEC v. Jarkesy*,
   144 S. Ct. 2117 (2024) .................................................. 2-9, 11, 24-28

*Stern v. Marshall*,
   564 U.S. 462 (2011) .................................................................. 6, 7

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985) .............................................. 4, 5, 9-11, 27, 28

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963) ................................................................... 1

*Veazie Bank v. Fenno*,
   75 U.S. 533 (1869) .................................................................... 25


Constitutional Provisions, Statutes, and Legislative Materials

Act of Feb. 25, 1863, ch. 58, 12 Stat. 665 ................................... 13

Act of June 3, 1864, ch. 106, 13 Stat. 99 ........................... 13, 15, 19

Act of Mar. 3, 1873, ch. 269, 17 Stat. 603 .................................. 20

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Banking Act of 1933, ch. 89, Pub. L. No. 73-66, 48 Stat. 162 ................... 18, 21

Banking Act of 1935, Pub. L. No. 74-305, 49 Stat. 684 ........................... 18

Cong. Globe, 37th Cong., 2d Sess. (1862) ................................................ 14, 15

Cong. Globe, 37th Cong., 3d Sess. (1863) ................................................ 15

Cong. Globe, 38th Cong., 1st Sess. (1864) .............................. 3, 13, 14, 20

51 Cong. Rec. (1913) .................................................................................. 18

75 Cong. Rec. (1932) .................................................................................. 21

112 Cong. Rec. (1966) ................................................................................ 25

Federal Reserve Act, ch. 6, Pub. L. No. 63-43, 38 Stat. 251 (1913) .......... 17

Financial Institutions Regulatory and Interest Rate Control Act of 1978,
Pub. L. No. 95-630, 92 Stat. 3641 ......................................................... 23

Financial Institutions Supervisory Act of 1966, Pub. L. No. 89-695,
80 Stat. 1028 ......................................................................................... 3, 22

H.R. Rep. No. 95-1383 (1978) ................................................................... 23

S. Rep. No. 63-133 (1913) .......................................................................... 18

S. Rep. No. 73-77 (1933) ............................................................................ 21

S. Rep. No. 89-1482 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3532 ......... 22

12 U.S.C. § 1818(h)(1) ............................................................................... 3, 22

12 U.S.C. § 1823(a)(2) ............................................................................... 4

U.S. Const. art. I, § 8, cl. 5 ........................................................................ 3, 25

Books, Articles, and Other Authorities

1 *Annual Report of the Comptroller of the Currency* (1892) ..................... 21

# TABLE OF AUTHORITIES – cont'd

                                                                    **Page(s)**

1 *Annual Report of the Comptroller of the Currency* (1884) .................... 21

Lawrence G. Baxter, *Fiduciary Issues in Federal Banking Regulation*,
    56 L. & Contemp. Probs. 7 (1993).......................................... 22, 26

Charles Fisk Beach, *Commentaries on the Law of Private Corporations*
    (1891) ................................................................... 16, 27

Charles T. Boone, *The Law of Banks and Banking* (1892) ....................... 14

John Cleaveland, *The Banking System of the State of New York* (2d ed. 1864)
    (reprinting Acts of May 26, 1841 and Apr. 15, 1854)........................ 16

FDIC, *A Brief History of Deposit Insurance in the United States*
    (1998) ................................................................... 19

Glenn Garrard, *The Law Governing Liquidation* (1935)......................... 20

Alexander Hamilton, *Report of the Secretary of the Treasury on the
    Subject of a National Bank* (1790)........................................ 3, 12, 25

Bray Hammond, *Banks and Politics in America from the Revolution to the
    Civil War* (1957) ........................................................ 13, 16

John Harrison, *Public Rights, Private Privileges, and Article III*,
    54 Ga. L. Rev. 143 (2019) ................................................ 10

Stephen K. Huber, *Enforcement Powers of Federal Banking Agencies*,
    7 Ann. Rev. Banking L. 123 (1988)......................................... 21, 22

3 Lender Liability: Law, Prac. & Prevention § 24:5
    (March 2024 update)....................................................... 24

Lev Menand, *Why Supervise Banks? The Foundations of the American
    Monetary Settlement*, 74 Vand. L. Rev. 951 (2021) ....................... 12, 14, 18, 25

Lev Menand & Morgan Ricks, *Federal Corporate Law and the Business of
    Banking*, 88 U. Chi. L. Rev. 1361 (2021)................................. 27

Caleb Nelson, *Adjudication in the Political Branches*,
    107 Colum. L. Rev. 559 (2007) ............................................ 10, 27

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees and accordingly has an interest in this case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

Banking is "one of the longest regulated and most closely supervised of public callings." *Fahey v. Mallonee*, 332 U.S. 245, 250 (1947). Federal agencies "maintain virtually a day-to-day surveillance of the American banking system," *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 329 (1963), supervising the nation's federally chartered and insured banks from the "cradle to [the] corporate grave," *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 145 (1982).

Petitioners engaged in this public calling as directors and officers of a federally-chartered bank, but according to the government, they failed to adequately review loan packages and issued loans "pursuant to a coordinated effort to artificially inflate the Bank's capital positions rather than on the strength of

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

1

individual credit determinations." Pet. Ex. A-1, at 70-77. After the bank suffered losses that allegedly resulted from Petitioners' actions, *id.* at 77-78, the Office of the Comptroller of the Currency (OCC) closed the bank, and later imposed penalties on Petitioners and entered orders prohibiting them from continuing to work in the banking industry, *id*. at 38, 109-10. Petitioners now contend, among other things, that the Supreme Court's recent decision in *SEC v. Jarkesy* requires this Court to invalidate some of the OCC's core supervisory powers—specifically, its ability to impose penalties and enter orders of prohibition. This is wrong.

In *Jarkesy*, the Supreme Court held that the Seventh Amendment entitles defendants to a jury trial when the Securities Exchange Commission (SEC) seeks civil penalties for securities fraud. *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024). But the Court also confirmed that in "some contexts" the government may seek traditional legal remedies and "extract civil penalties" in administrative tribunals. *Id.* at 2134 n.2. Under the Court's "public rights doctrine," if an agency's action stems from a "historical practice" of agency adjudication or falls within an area of unique and exclusive government power, then "no involvement by an Article III court in the initial adjudication is necessary." *Id.* at 2150, 2152, 2132.

The OCC's penalties and orders of prohibition clearly fit this description. First, unlike the penalties at issue in *Jarksey*, these orders have always been the subject of administrative proceedings. The agency has never had the legal

authority to obtain civil penalties in federal court.  *See* 12 U.S.C. § 1818(h)(1);

Financial Institutions Supervisory Act of 1966, Pub. L. 89-695, § 202, 80 Stat.

1028, 1051 (creating § 1818(h)(1)); *cf. Jarkesy*, 144 S. Ct. at 2126 (emphasizing

that until 2010, Congress permitted the SEC to bring securities fraud claims *only* in

federal court).

Second, the OCC's regulation of national banks involves distinct

"governmental prerogatives."  *Jarkesy*, 144 S. Ct. at 2127.  Relying in part on its

power to "regulate the [v]alue" of money, U.S. Const. art. I, § 8, cl. 5, Congress

passed the National Bank Act (NBA) to enlist private entities in the "sovereign

right of furnishing and controlling the currency."  Cong. Globe, 38th Cong., 1st

Sess. 1451 (1864) (Rep. Hooper).  Like many of their forebears, these lawmakers

believed that banks exercised a "right on behalf of the government."  Alexander

Hamilton, *Report of the Secretary of the Treasury on the Subject of a National*

*Bank* 35 (1790).  They drew on state-law precedents in which private banks

performed valuable public functions—and received valuable government

benefits—while submitting to state supervision.  Later congresses deepened the

ties between national banks and the federal government by requiring national

banks to join the federal reserve and receive deposit insurance backed by federal funds.

This history makes clear that the OCC does not simply regulate "transactions between private individuals interacting in a pre-existing market." *Jarkesy*, 144 S. Ct. at 2136. Rather, its supervisory powers enable it to protect the assets of federal insurance funds—public funds whose investment is subject to the approval of the Secretary of the Treasury, *see* 12 U.S.C. § 1823(a)(2)—and to exercise its "sovereign" right to monitor the companies to which it extends the privilege of incorporation, *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 526 (2009); *see also* Resp. Br. 43-47 (distinguishing between OCC enforcement actions and common-law claims).

Third, the national banking scheme resembles the types of voluntary programs to which the Court has applied the public rights doctrine in the past. As the Court has explained, where participation in such a program is voluntary, there is no "purely 'private' right" at issue, and "Article III adjudication" is unnecessary. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985) (holding that a law requiring pesticide manufacturers to settle valuable claims outside of an Article III court was constitutional because the program was voluntary, so no "purely 'private' right" was involved). In conferring the public right to operate a national bank on willing bankers, Congress directed the executive

4

to "administer[] a complex regulatory scheme to allocate costs and benefits among voluntary participants." *Id.* In this context, it can permit the assessment of penalties without "providing an Article III adjudication." *Id.*

To be sure, courts must analyze each invocation of the public rights doctrine with "close attention," to ensure that the exception does not "swallow the rule." *Jarkesy*, 144 S. Ct. at 2134. But that is not an issue here. The national banking regime, which serves key public functions, relies on voluntary incorporation, and stems from a "historical practice" of bank supervision, *id.* at 2132, is the paradigmatic context in which the public rights doctrine should apply.

## ARGUMENT

**I.     Congress Can Assign Adjudication of Claims to Executive Agencies When Agencies Have Historically Adjudicated Similar Claims or When Government Control Is So Total that There Is No Vested Right to Participate.**

As the Supreme Court long ago explained, "private right[s]" must be adjudicated in "the common law, . . . equity, or admiralty" courts, while Congress can provide for "matters . . . involving public rights" to be resolved in other forums. *Murray's Lessee v. Hoboken Land & Improvement Co*., 59 U.S. 272, 284 (1856). As the Court recently reiterated in *Jarkesy*, the public rights doctrine applies when Congress's power over an area is so exclusive that no vested rights

5

are involved, such as when it distributes privileges to voluntary participants.  144 S. Ct. at 2132 (citing *Murray's Lessee*, 59 U.S. at 284).

In *Jarkesy*, the Supreme Court considered a Seventh Amendment challenge to a provision permitting the SEC to seek civil penalties before administrative law judges.  *Id*. at 2127.  The Court first determined whether the SEC's action "implicate[d] the Seventh Amendment," or, in other words, if the SEC's claim was "legal in nature."  *Id*. at 2128-29.  This required consideration of "the cause of action and the remedy it provides," with the remedy the more important factor.  *Id*. at 2129.  Although "monetary relief can be legal or equitable," the SEC's penalty was "designed to punish or deter the wrongdoer" rather than restore the status quo, and thus was the "type of remedy at common law" to which the Seventh Amendment applied.  *Id*. at 2129-30.

The Court then considered whether the SEC action fell within "a class of cases concerning what we have called 'public rights,'" a category the Court "first recognized" in 1856.  *Id*. at 2132.  Public rights concern matters that "historically could have been determined exclusively by the executive and legislative branches," *id*. (quoting *Stern v. Marshall*, 564 U.S. 462, 493 (2011) (brackets omitted)), even when they are "presented in such form that the judicial power is capable of acting on them," *id*. (quoting *Murray's Lessee*, 59 U.S. at 284).  Such matters can be adjudicated by administrative agencies.  *Id*. at 2132-33 (discussing cases involving

immigration, foreign commerce, relations with Indian tribes, and the administration of public lands, in which the government sought legal remedies, including monetary penalties, in administrative settings).

As the Court explained, public rights existed in areas where there was a "historical practice" of agency adjudication. *Id.* at 2132. In *Murray's Lessee*, the case in which the Court first articulated the public rights doctrine, it held that the government could use "summary proceedings" to compel its officers to pay public funds owed to the treasury. *Id.* (quoting *Murray's Lessee*, 18 U.S. at 281). According to the *Jarkesy* Court, the presence of an "unbroken tradition" of relying on such non-judicial proceedings supported application of the public rights doctrine in that case. *Id.*; *see also Stern*, 564 U.S. at 504-05 (Scalia, J., concurring) ("an Article III judge is required in *all* federal adjudications, unless there is a firmly established historical practice to the contrary").

Furthermore, the Court explained, administrative officers can enforce penalties in areas "peculiarly within the authority of the legislative department of the Government." *Jarkesy*, 144 S. Ct. at 2133 n.1 (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). It distinguished regulation in these areas from that of "interstate commerce more broadly," *id.* at 2133, stressing that the SEC's regulation of the securities markets fell within the latter category, *id.* at 2136 (emphasizing that "[t]he object of this SEC action is to

regulate transactions between private individuals interacting in a pre-existing market").

In drawing that distinction, *Jarkesy* built on Supreme Court precedent illustrating that the political branches have "traditionally held exclusive power over [a] field" if their power was so complete that they could prohibit action in the field entirely. *See id.* at 2133 (citing *Ex parte Bakelite Corp.*, 279 U.S. 438, 457 (1929)). In *Bakelite Corp.*, for instance, the Court upheld a law that authorized the president to impose tariffs on goods imported by "unfair methods of competition." 279 U.S. at 446. As the Court emphasized in *Jarkesy*, the political branches' power over imports was so total that "the law even authorized [the president] to 'exclude[] foreign goods entirely'" if the unfairness was extreme. 144 S. Ct. at 2133 (quoting *Bakelite*, 279 U.S. at 446). The breadth of that authority illustrated that the "political branches had traditionally held exclusive power over th[e] field and had exercised it," so the public rights doctrine applied. *Id.*

Put another way, the Court has applied the public rights doctrine when Congress's power in an area has been "so total that no party had a 'vested right'" to act in that area without Congress's approval. *Id.* at 2132 (quoting *Oceanic Steam*, 214 U.S. at 335). In *Oceanic Steam,* for example, the Supreme Court upheld a statute permitting administrative officials to impose monetary penalties for violations of a prohibition against bringing certain noncitizens into the United

States.  214 U.S. at 332.  Cautioning against "the interference of the courts with the performance of the ordinary duties of the executive departments," *id.* at 338 (quoting *Decatur v. Paulding*, 39 U.S. 497, 516 (1840)), the Court held that Congress could, "when legislating as to matters exclusively within its control," authorize executive officers to exact "reasonable money penalties . . . without the necessity of invoking the judicial power," *id.* at 339.  As *Jarkesy* recounted, the Court's holding in *Oceanic Steam* rested on the fact that Congress's power over immigration "was so total that no party had a 'vested right' to import anything into the country," making clear that administrative penalties in that area could be assessed without a jury.  144 S. Ct. at 2132 (internal citations omitted).

Relatedly, the Supreme Court has upheld Congress's "power to condition issuance of registrations or licenses" on voluntary participation in a scheme in which rights are adjudicated outside of Article III.  *Union Carbide*, 473 U.S. at 589.  In *Union Carbide*, the Court held that a law requiring pesticide manufacturers to settle valuable claims outside of an Article III court was constitutional because it involved not a "purely 'private' right," but instead a regulatory program in which manufacturers voluntarily participated.  *Id.*  There, the Court considered a statute that required manufacturers to submit research data to the Environmental Protection Agency concerning a pesticide's environmental effects before receiving a license to sell the pesticide.  *Id.* at 571.  The Act allowed subsequent registrants

9

to rely on scientific data submitted by previous registrants after compensating those registrants for the use of their data. *Id.* at 573. If the companies were unable to agree on compensation, the dispute would be arbitrated with limited judicial review. *Id.* at 575.

As the Supreme Court later explained, the producers in *Union Carbide* received a "valuable Government benefit"—a "license to sell dangerous chemicals"—in exchange for participation in the arbitration program. *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015) (internal quotations omitted) (distinguishing the regulation of licenses to sell pesticides, a "special governmental benefit," from the regulation of the sale of raisins). Because Congress used registrants' data to administer a public program in which manufacturers voluntarily participated, the registrants' right to compensation for the data was not a "purely 'private' right." *Union Carbide*, 473 U.S. at 589; *see* Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 580 (2007) (contending that "public rights" extend to areas where the government distributes "mere privileges rather than core private rights," and explaining that privileges do not generate "vested rights"); John Harrison, *Public Rights, Private Privileges, and Article III*, 54 Ga. L. Rev. 143, 198 (2019) (positing that the distribution of privileges or licenses puts the government "in the position of an owner, with a right to exclude and a power to give permission"). The fact that the scheme involved voluntary

10

participants, rather than "unwilling defendant[s]," meant that private rights were not involved and reduced the danger of encroachment on the Article III judicial powers to "a minimum." *Union Carbide*, 473 U.S. at 591.

\* \* \*

In sum, in *Jarkesy*, the Supreme Court confirmed what it had long recognized: Congress can allow executive adjudication when its power over an area is so exclusive that no vested rights are involved, such as when it distributes privileges in exchange for government benefits. Congress produced just such a program when it created the national banking system, as the next Section explains.

## II.     The Supervision of Federally Insured Banks Is an Area Where Government Control Is So Total that There Is No Vested Right to Participate.

The national banking system exists in an area "peculiarly within the authority of the legislative department of the Government." *Jarkesy*, 144 S. Ct. at 2151. This stems from the longstanding and unique public functions that national banks serve and their unique relationship with the federal government. The extensiveness of the OCC's powers over national banks—which initially comprised only the all-encompassing power to end a bank's business and later included the power to impose penalties and issue prohibition orders—makes this especially clear. Because the government has the authority to deny or dissolve national bank charters, it can certainly dictate "the terms upon which a right to

[operate a national bank] may be exercised." *Oceanic Steam*, 214 U.S. at 335 (internal citations omitted).

**A.** At the Founding, when Congress created the Bank of the United States, lawmakers understood banks to be government instrumentalities, working to "expand the money supply on behalf of the government." Lev Menand, *Why Supervise Banks? The Foundations of the American Monetary Settlement*, 74 Vand. L. Rev. 951, 975 (2021). As Alexander Hamilton explained when advocating for a national bank, banks exercised a "right on behalf of the government" by creating the currency underlying the country's economy. Hamilton, *supra*, at 35; Menand, *supra*, at 981-82 ("[L]ike the members of Parliament who built the Bank of England, early U.S. officials viewed money creation as a prerogative of government."); *Schaake v. Dolley*, 118 P. 80, 83 (Kan. 1911) (describing the "banker" as "a trustee of the fiscal affairs of the people and of the state").

Congress reiterated that banking was a unique public enterprise when it created the national banking system with the passage of the National Bank Act (NBA). Before the Act, each state bank issued its own notes, the value of which varied widely from place to place, making it "impossible to have a uniform national currency." Bray Hammond, *Banks and Politics in America from the Revolution to the Civil War* 726 (1957) (quoting Sen. Sherman). During the war,

12

Treasury Secretary Salmon Chase and his allies in Congress embarked on a campaign for what would become the NBA, seeking the "sovereign right of furnishing and controlling the currency." Cong. Globe, 38th Cong., 1st Sess. 1451 (1864) (Rep. Hooper).

The NBA's drafters created a scheme in which private banks would be chartered and regulated by the federal government. These banks were supervised by the Currency Bureau, a predecessor to today's OCC. *See* Act of Feb. 25, 1863, ch. 58, § 1, 12 Stat. 665. National banks were given the authority to issue bank notes secured by government bonds, *id.* § 11, 12 Stat. at 668, which would further lawmakers' goal of "secur[ing] the national currency," Cong. Globe, 38th Cong., 1st Sess. 2128 (1864) (Sen. Sumner). Other provisions of the Act established the corporate law applicable to national banks, including the rights of stockholders, the tenure of directors, and the paying of dividends. Others regulated the relationship between the banks and the federal treasury, providing that national banks would act as depositories of government funds and pay duties to the government. Act of June 3, 1864, ch. 106, § 41, 13 Stat. 99, 111.

National banks would serve distinctly public purposes. As one scholar summarized, "[t]he public status of national banks is reflected in the law itself, which recaptured [banks'] profits [for the government] . . . by collecting royalties and refers to each bank as a 'franchise,'" Menand, *supra*, at 997–98—that is, a

private entity "work[ing] primarily for the public," *id*. at 1012. Members of Congress made this even more clear. They described national banks as "instrument[s] in the public service," like a "navy yard," "arsenal," or "mint." Cong. Globe, 38th Cong., 1st Sess. 1894 (1864) (Sen. Sumner). Representative Samuel Hooper, the primary drafter of the law, explained that the banks would act much like the Bank of the United States—an "instrument of the government," *McCulloch v. State*, 17 U.S. 316, 396 (1819)—but "divided into many parts." Cong. Globe, 37th Cong., 2d Sess. 616 (1862) (Rep. Hooper); Cong. Globe, 38th Cong., 1st Sess. 1412 (1864) (Rep. Pruyn) (national banks operate under a "franchise granted by the Government").

Contemporary legal thinkers reiterated Congress's conclusions about the unique role of national banks. As one treatise writer observed, the national banks' "principal office" was "to act as vehicles for the issue and circulation of a currency based upon the credit of the government." Charles T. Boone, *The Law of Banks and Banking* 290 (1892). And the Supreme Court made the same point, calling national banks "instruments designed to be used to aid the government in the administration of an important branch of the public service." *Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. 29, 33 (1875).

In creating this scheme in which national banks would serve important public purposes, the NBA's drafters consciously selected a model of banking

regulation that relied on the voluntary efforts of private bankers. Hopeful that "a combination between the interests of private individuals and the Government" would maintain monetary stability, Cong. Globe, 37th Cong., 3d Sess. 842 (1863) (Sen. Sherman), legislators created a program in which private actors would willingly take on the "privileges" of a federal bank charter, *see* Act of June 3, 1864, § 53, 13 Stat. at 116. In exchange for those charters, bankers would receive a variety of benefits, including limited liability and the power to receive federal funds. *See id.* § 45, 13 Stat. at 113. The government, in turn, would receive a portion of the banks' earnings, *see id.* § 41, 13 Stat. at 111, as well as the currency-stabilizing services that the banks would provide, *see* Cong. Globe, 37th Cong., 2d Sess. 616 (1862) (Rep. Hooper) (noting that the system would provide "all the benefits of the old United States Bank without many of those objectionable features which aroused opposition"); Cong. Globe, 37th Cong., 3d. Sess. 1146 (1863) (Rep. Alley) (explaining that "the Government is really the party who should have all the profit of the circulation").

In fact, the NBA was modeled after state "free banking" laws in which banking was a "privilege conferred by the legislature" in exchange for certain benefits. *Brown v. President, etc., of Penobscot Bank*, 8 Mass. 445, 449 (1812); *Att'y Gen. v. Utica Ins. Co.*, 2 Johns. Ch. 371, 377 (N.Y. Ch. 1817) (describing banking as a "privilege" and a "franchise derived from the grant of the legislature,

and subsisting only in those who can produce the grant"); *see also* Hammond,
*supra*, at 727.  When bankers chose to exercise this privilege under state law, they
subjected themselves to validly enacted regulations that would "prevent and punish
. . . mischief" in the business of banking.  *Brown*, 8 Mass. at 449; Charles Fisk
Beach, *Commentaries on the Law of Private Corporations* 59 (1891) ("[A]ll grants
of corporate privileges and franchises are subject to the condition that they shall
not be abused . . . and to an equally implied condition that the legislature may
prescribe such reasonable regulations as will secure the ends for which the
corporation is organized."); *id.* at 60 (describing the constitutionality of "acts
regulating banks").  Occasionally, these conditions subjected bankers to agency-
administered penalties.  For example, the New York Banking Department had the
discretion to penalize banks or bankers by restraining them from the "further
prosecution of . . . business" in the banking industry, and to retain funds from
banks or bankers when it "appear[ed]" that they were in an "unsound or unsafe
condition to do banking business."  John Cleaveland, *The Banking System of the
State of New York* 131, 201 (2d ed. 1864) (reprinting Acts of May 26, 1841 and
Apr. 15, 1854); *see also Commonwealth by the Bank Comm'rs v. President, etc., of
Farmers' & Mechs.' Bank*, 38 Mass. 542, 557 (1839) (violations of bank charters
"may be considered as an injury to the community at large" and bank

commissioners can temporarily restrain the bank from further business without judicial involvement).

After the NBA's passage, Congress continued to employ private bankers in the public venture of currency stabilization. In 1913, Congress enacted the Federal Reserve Act. *See* Federal Reserve Act, ch. 6, Pub. L. No. 63-43, 38 Stat. 251 (1913). Passed to prevent future economic crises, the Act established the Federal Reserve System, which included a governing board and various regional banks. Each bank issued "notes" that would be an "obligation[] of the United States . . . receivable by all national and member banks." *Id.* § 16, 38 Stat. at 265. National banks were required to become shareholders and "member[s]" of the nearest regional bank. *Id.* § 2, 38 Stat. at 252.

Like the lawmakers who passed the NBA, the drafters of the Federal Reserve Act made clear that the banks it supervised served distinct public functions. The law did not just enable the regulation of the banking business—it sought to "furnish an elastic currency," as its title itself makes clear. *See id.* ch. 6, 38 Stat. at 251. As one Senator explained, "it is not the welfare of the bank, nor the welfare of the depositor which is the main object to be attained, but it is the prevention of panic, the protection of our commerce, the stability of business conditions, and the maintenance in active operation of the productive energies of the Nation." 51 Cong. Rec. 1156 (1913) (Sen. Owen); *see also* S. Rep. No. 63-

133, at 4, 7 (1913) (reporting that one of the "chief purposes" of the FRA was to "prevent financial panics"). These Senators believed that it was "not only the sovereign function but the *sovereign duty* of a government to furnish a sound and sufficient volume of money with which to do the business of the country." 51 Cong. Rec. 1066 (1913) (Sen. Borah) (emphasis added).

In 1933, after the Great Depression had accelerated political agitation for "strict supervision of . . . banking," Menand, *supra*, at 1004 (quoting Franklin Delano Roosevelt's inaugural address), Congress created the system of federal deposit insurance. *See* Banking Act of 1933, Pub. L. No. 73-66, § 101, 48 Stat. 162, 168 (recodified into the FDI Act in 1950). Under this system, the Federal Deposit Insurance Corporation (FDIC) was authorized to provide up to $2,500 to depositors in insured banks if those banks failed. *Id.* The FDI Act required national banks to purchase federal insurance. *See* Banking Act of 1935, Pub. L. No. 74-305, § 101(e)(2), (f)(2), 49 Stat. 684, 689-90.

By using federal money to insure national banks' deposit accounts, the FDI Act further cemented the ties between national banks and the federal government. The FDIC's insurance fund came from federal money in addition to banks' insurance premiums. The capital necessary to establish the FDIC was provided by the United States Treasury and the 12 Federal Reserve banks, and the FDIC had— and still has—the authority to borrow money from the Treasury to cover any

losses.  See *generally* FDIC, *A Brief History of Deposit Insurance in the United States* 28, 38, 55 (1998).

**B.**  The FDI Act, the Federal Reserve Act, and the NBA gave the government extensive authority over banks and bankers, including the authority to close banks and revoke their charters.  Over time, Congress empowered the OCC and other banking agencies to issue more tailored, less economically devastating sanctions, including penalties against individual bank directors and officers.  This part of the OCC's history highlights the extensiveness of its power over national banks, underscoring that the regulation of those banks is one of the "ordinary duties of the executive departments."  *Decatur*, 39 U.S. at 516.

When it was first enacted, the NBA provided that a bank could "forfeit[]" its corporate privileges in certain circumstances, including if one of its "officers, agents, or servants" knowingly violated a provision of the act.  Act of June 3, 1864 § 53, 13 Stat. at 116.  The Comptroller was also empowered to close a bank and to appoint a receiver to manage its affairs if certain conditions were met.  *See, e.g.*, *id.* § 31, 13 Stat. at 109 (failure to make good the lawful money reserve); *id.* § 50, 13 Stat. at 114-15 (refusal to pay circulating notes); Act of Mar. 3, 1873, ch. 269, § 1, 17 Stat. 603 (continued impairment of capital).  The receiver, acting as an agent of the government, had the authority to liquidate the bank's estate and return

any remaining money to the treasury, with limited judicial review.  Glenn

Garrard, *The Law Governing Liquidation* 402-03 (1935).

Entrusting the government to liquidate a national bank's assets was a

"momentous departure from common law ways of thinking," in which liquidation

was left to the judicial process, and represented the "idea of public control [over

banks] as exerted in its real ful[l]ness."  *Id.* at 400.  Indeed, when Congress

considered the NBA's insolvency provisions in 1864, one Congressman objected

that the power to appoint a bank receiver had been traditionally vested in the courts

and could not be transferred to an executive officer.  Cong. Globe, 38th Cong., 1st

Sess. 1270 (1864) (Rep. Kernan).  After Congress passed these provisions over his

objections, the Supreme Court rejected the argument as well, noting that the issue

was "not open to further discussion."  *Bushnell v. Leland*, 164 U.S. 684, 685

(1897).

But the government's power to close a bank was cumbersome and dangerous

in practice, and regulators soon learned that revoking a bank's charter or putting it

in receivership would not protect the public from bank failures because the banks

were, in essence, too big to fail.  Put differently, the power to revoke a bank's

charter would, if used, "assure the swift demise of the institution," making it too

"extreme and inflexible to be of any real use."  Stephen K. Huber, *Enforcement

Powers of Federal Banking Agencies*, 7 Ann. Rev. Banking L. 123, 129 (1988).

As a result, regulators began advocating for more moderate regulatory powers, including the power to remove a bank's officers and directors.  *See* 1 *Annual Report of the Comptroller of the Currency* 42 (1892) (noting that the power to revoke a bank's charter was "so severe as to render it nugatory"); 1 *Annual Report of the Comptroller of the Currency* LVI (1884) ("In [the case of an officer's exceeding loan limits] the Comptroller has no means of enforcing the law, except by bringing a suit for forfeiture of charter, and this course might result . . . [in] loss to many innocent stockholders of the banks.").

Congress eventually responded to this advocacy.  By the 1930s, lawmakers were convinced that "there should be a less drastic penalty" than "clos[ing] up the banks."  75 Cong. Rec. 9890 (1932) (Sen. Glass).  In the Banking Act of 1933, Congress authorized the Board of Governors of the Federal Reserve System to remove national bank directors who committed "unsafe or unsound" banking practices or violated federal banking law.  Banking Act of 1933, § 30, 48 Stat. at 193-94.  This would, Congress thought, provide regulators with a tool to address the "weakness of the banking system," and enable "closer and stronger supervision" of bankers.  S. Rep. No. 73-77, at 11, 17 (1933).

Lawmakers once again expanded banking agencies' supervisory powers in the 1960s.  In 1966, Congress gave federal regulators the power to issue cease-and-desist orders against banks to target unsafe or unsound practices, as well as to

temporarily suspend and permanently prohibit directors, officers, and other bank

managers from "further participation in any manner in the conduct of the affairs of

the bank" in certain circumstances.  Financial Institutions Supervisory Act of 1966,

§ 202, 80 Stat. at 1046-49.  These orders were "intermediate remedies" that would

help the OCC to protect the "interests of the Government which underwrites the

insuring agencies," without terminating a bank's insurance or appointing a bank

receiver—remedies that had "proven inadequate" and "cumbersome" in practice.

*See* S. Rep. No. 89-1482 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3532, 3545,

3533-34.  To address these goals while reducing the "danger of abuse" of agencies'

powers, Congress required agencies to provide banks and bankers with an

administrative hearing and limited judicial review.  *Id*. at 3557 (describing 12

U.S.C. § 1818(h)(1)).

Following a series of bank failures in the 1970s, Congress concluded that

banking agencies needed even more adaptable enforcement powers.  Huber, *supra*,

at 141-42.  In 1978, it gave the OCC the power to impose limited civil monetary

penalties on banks, and to impose penalties, enter prohibition orders, and issue

cease-and-desist orders against individual officers, directors, employees, or agents

of banks.  Financial Institutions Regulatory and Interest Rate Control Act of

1978, Pub. L. No. 95-630, § 101, 92 Stat. 3641; *see generally* Lawrence G. Baxter,

*Fiduciary Issues in Federal Banking Regulation*, 56 L. & Contemp. Probs. 7, 26-27 (1993).

Once again, these individual remedies were designed to give the agency the flexibility to avoid imposing harsher penalties against institutions.  H.R. Rep. No. 95-1383, at 17 (1978) ("Presently, an agency is often faced with the option of having to ignore a violation or imposing a penalty it often considers to be overkill.").  Regulators and lawmakers hoped that these penalties would help them "tailor solutions and responses to specific problems" affecting the safety or soundness of the banks.  *Id.*

\* \* \*

In short, the NBA created a voluntary scheme in which national banks perform key public functions.  The OCC's power to penalize bankers complements these public functions by protecting the public from bank failure.  Because of these aspects of the regulatory scheme—features that are significantly different than those the Court considered in *Jarkesy*—the public rights doctrine applies, and the OCC can issue orders and fines without Article III adjudication, as the next Section explains.

## III.    The OCC's Imposition of Penalties and Other Orders on Banks and Bankers Does Not Require Adjudication by an Article III Court.

As this history makes clear, the OCC's supervision of national banks falls within the public rights doctrine.  In addition to the "historical practice" of agency

adjudication in the field, *Jarkesy*, 144 S. Ct. at 2132, this is an area in which the

power of the "political branches" is long-standing and has traditionally been

"exclusive," making the public rights doctrine applicable. *Id.* at 2133.

As an initial matter, and as courts have long recognized, national banks are

"the creatures of congressional legislation." *Nat'l Bank v. Fore*, 25 F. 209, 210

(C.C.E.D. Tex. 1885). The OCC does not oversee national banks as a regulator of

private individuals engaging in economic transactions, but as a "sovereign"

exercising "general supervision" over companies within its jurisdiction. *Cuomo*,

557 U.S. at 526. Its supervision also aims to protect federal assets rather than

regulate private transactions in a "pre-existing market." *Jarkesy*, 144 S. Ct. at

2136. After all, the "risk" of damage to "the agencies administering the insurance

funds" factors into the OCC's assessment of which banking practices should be

considered unsafe and unsound. 3 Lender Liability: Law, Prac. & Prevention

§ 24:5 (March 2024 update). These features make the OCC's supervisory

activities more akin to "ordinary duties of the executive departments" than to other

economic regulation. *Decatur*, 39 U.S. at 516.

Furthermore, Congress's power over banking is completely different from

its authority to regulate private securities transactions. *Jarkesy*, 144 S. Ct. at 2136.

The architects of the nation's banking system understood banking to be "not a

mere matter of private property, but a political machine of the greatest importance

to the state."  Hamilton, *supra*, at 30.  When enacting federal banking laws,

Congress made clear that banks performed unique federal functions.  That is why

members of Congress, when creating the OCC and empowering it to seek

penalties, referred to Congress's powers to borrow and coin money, *see* U.S.

Const. art. I, § 8, cl. 5.  When advocating for the NBA, Senator Sherman invoked

Congress's authority to "emit bills of credit" and "regulate the value of coin,"

which he viewed as an "exclusive authority . . . to regulate the national currency."

Hammond, *supra*, at 726 (quoting Sen. Sherman); *see also* Menand, *supra*, at 1000

(quoting Sherman's explanation that "the power to issue a bank note is the same as

the power to coin money"); *cf. Veazie Bank v. Fenno*, 75 U.S. 533, 548-49 (1869)

(observing that a variety of congressional powers, including "the power to provide

a circulation of coin," permitted Congress to "supply a currency for the entire

country," which included "notes of the National banks"); 112 Cong. Rec. 24,983

(1966) (Rep. Patman) (noting that Congress was "carrying out [its] mandate

under article I, section 8, clause 5, of the Constitution to assure the public of a

sound monetary system" when creating the penalties in 12 U.S.C. § 1818).

These features explain why Congress's power over national banks, like its

power over immigration or foreign trade, is "total" within the meaning of *Jarkesy*.

144 S. Ct. at 2132 (internal citations omitted).  The political branches have

"absolute authority over national banks," *First Nat'l Bank in Plant City, Fla. v.*

*Dickinson*, 396 U.S. 122, 131 (1969), including the power to revoke a bank's charter, liquidate its assets, or appoint a receiver.  Indeed, as explained earlier, these authorities—what one scholar has called the agencies' "'death-penalty' powers," Baxter, *supra*, at 25—underlie the OCC's ability to authorize penalties and prohibition orders.  *See supra* Section II.

The fact that political actors can eliminate a bank's business "entirely," *Bakelite*, 279 U.S. at 446, underscores that this is an area in which the political branches "traditionally held exclusive power over th[e] field and ha[ve] exercised it," *Jarkesy*, 144 S. Ct. at 2133.  Because the political branches have always been able to "directly" prohibit banks from receiving a federal charter, they can certainly dictate "the terms upon which a right to [operate a federally chartered bank] may be exercised." *Oceanic Steam*, 214 U.S. at 335 (internal citations omitted).  This is why the OCC—in stark contrast to the SEC—has *always* issued penalties exclusively in administrative proceedings.  *Jarkesy*, 144 S. Ct. at 2126; *see Akin v. Off. of Thrift Supervision Dep't of Treasury*, 950 F.2d 1180, 1186 (5th Cir. 1992) (rejecting Seventh Amendment challenge to reimbursement order under 12 U.S.C. § 1818(b)).

Put another way, national banking involves voluntarily acquired "privileges," Nelson, *supra*, at 580, rather than "vested right[s]," *Jarkesy*, 144 S. Ct. at 2132 (internal citations omitted).  By electing to receive the benefits of a

federal charter, national banks receive a "valuable Government benefit" in exchange for consent to participate in a complex regulatory scheme. *Horne*, <u>576 U.S. at 366</u> (quoting *Ruckelshaus v. Monsanto Co.,* <u>467 U.S. 986, 1007</u> (1984)). Indeed, the "perks" associated with a national bank charter have only grown since the enactment of the NBA. Lev Menand & Morgan Ricks, *Federal Corporate Law and the Business of Banking*, 88 U. Chi. L. Rev. 1361, 1367 (2021) (describing "highly valuable perks, including exemption from many state consumer-lending laws, access to discount-window loans from the Federal Reserve . . . and special exemptions from federal securities and investment company laws"). The enforcement system in § 1818 is a "condition" on which national banks' "corporate privilege[]" is granted. Beach, *supra*, at 59; *see Fahey*, <u>322 U.S. at 256</u> ("It would be intolerable that the Congress should endow an Association with the right to conduct a public banking business . . . [but] remove the limitations intended for public protection."). As the Supreme Court has instructed, this type of licensure scheme does not implicate "purely 'private' right[s]." *Union Carbide*, <u>473 U.S. at 589</u>. Like the regulated businesses in *Union Carbide*, national banks are "voluntary participants" in a complex regulatory scheme, rather than "unwilling defendant[s]." *Id.* at 589, 591.

* * *

27

In 1863, Congress authorized the OCC to provide valuable federal benefits to national banks in exchange for supervision that would protect the nation from financial panics. The regulation of national banks is an area in which no "vested right[s]" are involved, *Jarkesy*, 144 S. Ct. at 2132 (internal citations omitted), and the OCC can assess—and long has assessed—penalties against them "without providing an Article III adjudication," *Union Carbide*, 473 U.S. at 589. No court has ever held that the Seventh Amendment is implicated in this context, and this Court should not do so either.

## CONCLUSION

For the foregoing reasons, this Court should reject Petitioners' Seventh Amendment challenge to the OCC's adjudication of penalties and prohibition orders.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: December 23, 2024

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of December 2024, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: December 23, 2024

*/s/ Brianne J. Gorod*
Brianne J. Gorod

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,485 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: December 23, 2024

*/s/ Brianne J. Gorod*
Brianne J. Gorod