# No. 23-60617

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

SAUL ORTEGA AND DAVID ROGERS, JR.

*Petitioners*,

v.

OFFICE OF THE COMPTROLLER OF THE
CURRENCY

*Respondent.*

---

On Petition for Review of Final Decision of the Comptroller of the Currency
Entered on December 1, 2023 by the Office of the
Comptroller of the Currency
Case Nos. AA-EC-2017-44 and AA-EC-2017-45

---

**PETITIONERS' REPLY BRIEF**

---

Bill Sims
4234 Shorecrest Drive
Dallas, Texas 75209
Telephone: (214) 458-6970

Frank C. Brame
The Brame Law Firm PLLC
4514 Cole Ave., Suite 600
Dallas, Texas 75205
(214) 665-9464

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 213-5004

**COUNSEL FOR PETITIONERS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... 4

GLOSSARY ............................................................................. 6

RECORD REFERENCES .......................................................... 6

SUMMARY OF REPLY ........................................................... 7

REPLY ARGUMENT ............................................................... 8

I.    This Proceeding Violated the Seventh Amendment of the Constitution. ............................................................. 8

     A.    The Public Rights Exception Does Not Allow the OCC to Circumvent Petitioners' Constitutional Right to a Jury. ............. 8

         1.    *Jarkesy* Disposes of the OCC's Public Rights Theories. ........ 9

         2.    The OCC's Claims Are Legal Claims Traditionally Entitled to a Jury ................................................................. 11

         3.    Nothing in the "Public Rights" Doctrine Would Treat Securities Regulation and Banking Regulation Differently. . 15

         4.    The Decision In *Akin* Is Consistent With *Jarkesy* and Petitioners' Position. .............................................. 17

     B.    Petitioners' Constitutional Objections Are Timely. .................. 18

     C.    This Proceeding Violated Article III and the Separation Powers ...................................................................... 19

II.    The Statute of Limitations Bars the OCC's Claims ........................ 20

     A.    The Capital Raise Loans Claims (For Both Prohibition and Civil Penalties) are Time-Barred. ................................... 20

     B.    The OCC's Remaining Claims (i.e. the Civil Penalty Claims Against Ortega) – Are Also Time-Barred. ......................... 24

III.    This Proceeding Violated the Appointments Clause. ..................... 25

IV.    Manifest Trial Errors Require Reversal. ...................................... 26

V.    The Comptroller's Ban on Banking Should Be Vacated For Failure to Prove Scienter. ....................................................... 28

VI.    The Comptroller Should Have Applied a Higher Standard of Proof. ............................................................................... 29

CONCLUSION ........................................................................ 30

CERTIFICATE OF SERVICE ....................................................................... 32

CERTIFICATIONS OF ECF FILING STANDARDS ................................. 33

CERTIFICATE OF COMPLIANCE ............................................................ 34

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*, 441 U.S. 418 (1979) ................................................................29

*Akin v. Office of Thrift Supervision Dep't of Treasury*, 950 F.2d 1180 (5th Cir. 1992) ................................................................17

*All. For Hippocratic Med. v. FDA*, 2023 U.S. App. LEXIS 8898 (5th Cir. 2023) .18

*Calcutt v. FDIC*, 37 F. 4th 293 (6th Cir. 2022), *rev'd on other grounds*, 143 S. Ct. 1317 (2023) ................................................................ 15, 18

*Carr v. Saul*, 141 S. Ct. 1352 (2021) ................................................................18

*City of Monterey v. Del Monte Dunes*, 526 U.S. 687 (1999) .................... 11, 14, 15

*Cochran v. SEC*, 20 F. 4th 194 (5th Cir. 2021) ................................................................18

*Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561 (1989) .........................14

*Cruikshank v. Cook*, 2013 U.S. Dist. LEXIS 33201 (D. Mass. 2013) ....................15

*De La Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2002) ...........................................20

*Delek Ref., Ltd. v. OSHRC*, 845 F.3d 170 (5th Cir. 2016).....................................25

*Doolittle v. NCUA*, 992 F.2d 1531 (11th Cir. 1993).............................................29

*Easton v. Iowa,* 188 U.S. 220 (1903).....................................................................10

*FDIC v. Conner*, 20 F.3d 1376 (5th Cir. 1994) ....................................................13

*Feltner v. Columbia Pictures TV*, 523 U.S. 340 (1998) .........................................10

*Full Spectrum Software, Inc. v. Forte Automation Sys.*, 858 F.3d 666 (1st Cir. 2017).......................................................................................................12

*Gabelli v. SEC*, 568 U.S. 442 (2013)......................................................... 8, 20, 23

*Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129 (5th Cir. 1985).................22

*Hun v. Cary*, 82 N.Y. 65 (1880) ...........................................................................14

*In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787 (5th Cir. 2021)..........................17

*Kim v. Office of Thrift Supervision*, 40 F.3d 1050 (9th Cir. 1994).................. 28, 29

*Lucia v. SEC*, 585 U.S. 237 (2018)................................................................. 25, 26

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272 (1856)........9

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)........ 11, 19

*New York v. Niagara Mohawk Power Corp.*, 263 F.Supp. 650 (N.D.N.Y. 2003) ..25

*Proffitt v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000) ....................................................23

*SEC v. Jarkesy*, 144 S. Ct. 2117 (2024)..............................................7-11, 15-17, 19

*Steadman v. SEC*, 450 U.S. 91 (1980) ................................................................29

*Tull v. U.S.*, 481 U.S. 412 (1987)........................................................................10

*U.S. v. Core Laboratories, Inc.*, 759 F.2d 480 (5th Cir. 1985) .............................20

*U.S. v. ERR, LLC,* 35 F. 4th 405 (5th Cir. 2022) ................................................11

## Statutes & Regulations

5 U.S.C. 706 ...........................................................................................................26

12 U.S.C. § 1818(e) ........................................................................... 21, 23, 28

12 U.S.C. § 1818(i) ............................................................................ 22, 23, 28

15 U.S.C. § 78b.......................................................................................................16

28 U.S.C. § 2462 .................................................................................. 8, 22, 25

42 U.S.C. § 1983 ...................................................................................................10

12 C.F.R. § 7.2000(b) ...........................................................................................15

12 CFR 19.36(d)(2).................................................................................................26

## Other Authorities

David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L.
   Rev. 1011, 1034, 1037 (2011) ..............................................................14

*In re First National Bank*, OCC AA-EC-80-11, 1981 OCC Enf. Dec. LEXIS 5
   (May 28, 1981) .......................................................................................13

Restatement (Second) of Torts § 282.....................................................................13

Restatement (Third) of Torts: Liability for Economic Harm § 16 ..........................15

William Blackstone, *Commentaries on the Laws of England*, Book III .................14

# GLOSSARY

**ALJ** – Administrative Law Judge

**The Bank** – First National Bank of Edinburg, Texas

**Fannie Mae** – Federal National Mortgage Association

**Freddie Mac** – Federal Home Loan Mortgage Corporation

**Final Decision** – Final Decision of the Comptroller of the Currency, December 1, 2023

**GSEs –** Government Sponsored Enterprises Fannie Mae and Freddie Mac

**OCC, Comptroller or Respondent** – Office of the Comptroller of the Currency

**OREO –** Other Real Estate Owned

**Petitioners –** Saul Ortega and David Rogers, Jr.

# RECORD REFERENCES

On January 16, 2024, the OCC filed a Certified List ("CL") of the administrative record under Federal Rule of Appellate Procedure 17(b)(1)(B). On January 10, 2025, Petitioners filed a copy of the record with an index to portions of the brief cited in the record. Citations to the record refer to the CL entry and the page number of the document (i.e., CL1 at 1). Citations to Trial Exhibits on the CL contain a letter "R" or "O" for the party offering the exhibit (i.e., CLR.Exh1 for Ortega and Rogers's Exhibit 1, and CLO.Exh1 for OCC's Exhibit 1).

## <u>SUMMARY OF REPLY</u>

The OCC asks this Court to glean from the Seventh Amendment that a stock broker is entitled to a jury, but a banker is not. It implies that the regulatory regime of the securities industry is so vastly different from that of the banking industry that the government can enforce devastating penalties on one group without reference to a jury, while the other has a fundamental constitutional right to trial by jury before an Article III judge. In so doing, the OCC applies its own rubric for the public rights exception to Article III – one which is based on the extensive nature of the regulatory scheme involved. But the Supreme Court has already rejected this argument in *Jarkesy*. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2135-36 (2024) ("Even when an action originates in a newly fashioned regulatory regime, what matters is the substance of the action, . . . Again, if the action resembles a traditional legal claim, its statutory origins are not dispositive."). Instead, this Court should follow the law in *Jarkesy*: the relevant consideration is whether the specific claims are analogous to legal claims ordinarily entitled to a jury. Here, where the claims – civil penalties, deceit, unsafe/unsound lending practices modeled on negligence, and breach of fiduciary duty – are analogous to legal claims that would be entitled to a jury, the public rights exception does not apply.

This case is also barred by the statute of limitations. The OCC attacks loans made more than five years before this case was commenced. The government's only

real response is claim-splitting – that each missed payment on a loan is a new claim with its own statute of limitations, no matter how long after the loan was made, allowing for delayed accrual. This is contrary to the text of the statute, the decision in *Gabelli*, and basic limitations concepts. The statute begins to run when the claim *first* accrues (28 U.S.C. § 2462), and that, on this record, is when the loan was made.

As discussed further below, this case was also tainted by violations of the Appointments Clause, the ALJ's failure to observe procedure required by law, and the Comptroller's decision to reverse the ALJ's ruling on scienter. The Comptroller also should have applied a higher burden of proof for the penalty of prohibition.

For these reasons, the Court should vacate and set aside the Final Decision of the Comptroller.

## **REPLY ARGUMENT**

### I. **This Proceeding Violated the Seventh Amendment of the Constitution.**

#### A. **The Public Rights Exception Does Not Allow the OCC to Circumvent Petitioners' Constitutional Right to a Jury.**

The OCC does not contest that this case implicates the Seventh Amendment. OCC Brief at 39. It contends, nevertheless, that Rogers and Ortega were not entitled to a jury because the "public rights" exception allows Congress to eliminate the jury trial right. *Id*. at 39-40. To deprive Petitioners of a jury, the OCC relies on an exception that (i) has "no textual basis in the Constitution" (*Jarkesy*, 144 S. Ct. at 2134), (ii) there is a legal presumption against (*id*.), and (iii) the Supreme Court has

8

already decided does not apply to similar claims in the securities industry (*id*. at 2135-36). The OCC's argument is misguided and should be rejected for the following reasons:

1. *Jarkesy* Disposes of the OCC's Public Rights Theories.

In *Jarkesy*, the Supreme Court explained that, "[i]f a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." *Id.* at 2132. The Court acknowledged a "public rights exception" for "matters [that] historically could have been determined exclusively by [the executive and legislative] branches." *Id.* (internal quotation marks omitted). This exception must be "evaluated . . . with care" lest "the exception . . . swallow the rule." *Id.* at 2134. The Court concluded by "emphasiz[ing] one point" when it comes to the public rights exception, namely that "we do not consider congress can . . . withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856)). This means that, "what matters is the substance of the action, not where Congress has assigned it." *Id.* at 2135.

The OCC (and the supporting amicus brief) argue at length regarding the breadth and scope of the regulatory regime surrounding banks and banking – essentially that the extent of that regulation is so pervasive as to eliminate the

constitutional right to a jury trial. The government raised this same argument in *Jarkesy*. The public rights doctrine does not turn on the importance, length, depth, or breadth of the regulatory scheme. Rather, the question is whether the claims in *this* case "resemble" or are "analogous" to legal claims traditionally entitled to a jury. If so, the public rights doctrine does not apply. *Id*. at 2136.

The OCC relies on cases with platitudes about the importance and public nature of banking. But none of these cases addresses the public rights doctrine or is even in the ballpark. The OCC gives particular emphasis to *Easton v. Iowa,* citing it for the proposition that state banking laws (and state courts) were preempted by the federal regulatory scheme, 188 U.S. 220 (1903), as somehow suggesting that the federal banking laws are uniquely immune to courts and juries. This is inapposite. Just because Congress can preempt state law does not mean that Congress can also "conjure away" federal constitutional provisions like Article III and the Seventh Amendment. Numerous federal laws preempt or override state law, including programs with extensive federal regulatory schemes, and yet the Supreme Court has still imposed a Seventh Amendment right to a trial by jury in those statutory cases.[1]

---

[1] The Constitution protects the right to trial by jury for statutory damages under copyright law, an area where Congress chose to preempt state law and the common law. *Feltner v. Columbia Pictures TV*, 523 U.S. 340, 353 (1998). In *Feltner*, the Court, just as in *Jarkesy,* looked at whether the claims were "analogous to common-law causes of action." *Id*. at 348. Similarly, the Clean Water Act has been held to preempt certain (but not all) state law, yet statutory Clean Water Act claims are entitled to a jury. *Tull v. U.S.*, 481 U.S. 412, 427 (1987). And perhaps no area of law reflects Congress's intent to override state law and state action more than 42 U.S.C. § 1983, and yet in those cases civil defendants are still entitled to a trial by jury under the Seventh Amendment.

And in doing so, the Supreme Court applied the same test as in *Jarkesy*, not that discussed by the OCC.[2]  To decide this case, the Court need look no further than *Jarkesy* and apply the "public rights" analysis it contains.

2. The OCC's Claims Are Legal Claims Traditionally Entitled to a Jury.

The OCC's claims contain or are analogous to claims for civil penalties, common law fraud, negligence, and breach of fiduciary duty, any one of which would require this case to be tried before a jury.  As a result, the public rights exception does not apply.  *Jarkesy*, 144 S. Ct. at 2136.  It is not required that the claims be identical to a common law claim (*id*. at 2131), that the claim be brought by a private party (*id*. at 2136), that the claim be non-statutory (*id*.), or that the claim not have "originated in a newly fashioned regulatory scheme" (*id*.).  Instead, this case does not implicate a public right because it asserts claims akin to those tried by juries in courts of law.

Fraud.  In the public rights section of its Brief, the OCC attempts to distinguish *Jarkesy* because the claims in that case were analogous to the common law claim of

---

*City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 722 (1999). Like the banking laws, civil rights laws advance important federal objectives and also emerged following the civil war.  Yet Congress cannot consign civil rights cases to a non-jury tribunal.  *See also U.S. v. ERR, LLC,* 35 F. 4th 405, 414 (5th Cir. 2022) (statutory recoupment claim under Oil Pollution Act entitled to a jury).

[2] *Id*.; *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co*., 458 U.S. 50, 70 n.25 (1982) ("the notion that Congress rather than the Constitution should determine whether there is a need for independent federal courts cannot be what the Framers had in mind.")

fraud. Elsewhere, however, the OCC's Brief acknowledges repeatedly that the claims here actually resemble fraud, too.

A statutory claim involving "'deception' . . . is analogous to 18th-century actions at law, such as fraud, deceit or misrepresentation." *Full Spectrum Software, Inc. v. Forte Automation Sys*., 858 F.3d 666, 676 (1st Cir. 2017). Here, the OCC is forced to acknowledge that its statutory claims for prohibition are based on deception, deceit and misrepresentation (in order to meet its burden to prove scienter).[3] The OCC argues that its claims regarding the Capital Raise Loans should be sustained because they are based on (i) "demonstrably *deceptive* practices,"[4] failure to disclose the loans,[5] "deceptive and misleading" loan documentation,[6] and concealing the capital raise strategy.[7] The OCC's claims on the Capital Raise Loans are based on deceptive practices and therefore are analogous to fraud, deceit and misrepresentation and entitled to a jury trial. What matters is "the substance" of the action, and the OCC's Brief has left no doubt that the substance is analogous to a legal claim.

Negligence. The OCC denies that its claim for "unsafe and unsound" lending is akin to common law negligence, a legal claim entitled to a jury. But the

---

[3] If this is not a case of deception, then the Comptroller erred in reversing the ALJ who found that the Petitioners acted in good faith. *See* Petitioners' Brief at V (pp. 60-63).
[4] OCC Brief at 58 (emphasis in original).
[5] *Id*. at 22.
[6] *Id*. at 27.
[7] *Id*. at 28.

Comptroller itself has previously analogized unsafe and unsound banking to negligence because, "[l]ike negligence" it "entails an analysis of risks and precautions and, also, incorporates in part a community standard." *In re First National Bank*, OCC AA-EC-80-11, 1981 OCC Enf. Dec. LEXIS 5, at *64-65 (May 28, 1981); *see also FDIC v. Conner*, 20 F.3d 1376, 1378 (5th Cir. 1994) ("[T]he FDIC alleged that the defendants engaged in various 'unsafe, unsound, imprudent or unlawful acts and omissions . . . with respect to the management, conduct, supervision and direction of the Bank.'  These acts and omissions allegedly constituted negligence . . . .").  The Final Decision explains that the test for unsafe and unsound practices is that "which is contrary to generally accepted standards of prudent operations, the possible consequences of which, if continued, would be abnormal risk or loss . . ."  Final Decision at 69 (CL194).  Any fair reading would have to acknowledge this test closely resembles negligence, which is a legal claim entitled to a jury.  *See* Restatement (Second) of Torts § 282 ("[N]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm.").

And it is no response to say an unsafe and unsound banking claim was unknown at common law – all is required is that the claim sound basically in tort: "It is settled law, however, that the Seventh Amendment jury guarantee extends to statutory claims unknown to the common law, so long as the claims can be said to

sound basically in tort and seek legal relief." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 709 (1999).

Moreover, analogous claims against bankers were traditionally held to be claims at law. In *Hun v. Cary*, 82 N.Y. 65 (1880), the court held that where bank trustees "failed in that measure of prudence, care and skill which the law requires. . . . [the case] was properly tried as an action at law." *Id.* at 79. In doing so, the court rejected the argument that "the action was not a proper one to be tried before a jury." *Id.*

Breach of Fiduciary Duty. The Notice of Charges and Final Decision also contained claims for breach of fiduciary duty. This, too, is a claim historically entitled to a jury when monetary relief is sought. Breach of fiduciary duty, known to the common law as a type of trust law, may be found in courts of law as well as courts of equity: according to Blackstone, such trust claims were cognizable in courts of law, especially in the areas of "deposits, and all manner of bailments," among others. *See* William Blackstone, *Commentaries on the Laws of England*, Book III at 432;[8] *see also Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 578-79 (1989) (observing that breach of fiduciary duty claims "involve private rights which are at the core of matters normally reserved to Article III Courts." (citations

[8] *See also* David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1011, 1034, 1037 (2011) ("judges and lawyers of the common law courts developed remedies that we would now identify as recognition and enforcement of fiduciary duties" and identifying "the common law doctrines that gave us some of our important fiduciary duties . . .").

14

omitted)); *Cruikshank v. Cook*, 2013 U.S. Dist. LEXIS 33201, *6 (D. Mass. 2013) (breach of fiduciary duty claim seeking monetary relief was "in the nature of a legal action and a party is thus entitled to a jury trial.").

Furthermore, breach of fiduciary duty is a common law tort, *see* Restatement (Third) of Torts: Liability for Economic Harm, § 16 Breach of Fiduciary Duty,[9] and the Comptroller and other regulatory entities import state common law soil to assess breach of fiduciary duty under the Federal Deposit Insurance Act, *see* 12 C.F.R. § 7.2000(b); *Calcutt v. FDIC*, 37 F.4th 293, 327 (6th Cir. 2022) (fiduciary duties under FDIA "are determined by state law"), *rev'd on other grounds*, 598 U.S. 623 (2023). Again, if a cause of action sounds "basically in tort," a jury trial right exists. *City of Monterey*, 526 U.S. at 709.

3. Nothing in the "Public Rights" Doctrine Would Treat Securities Regulation and Banking Regulation Differently.

The OCC argues, in essence, that federal securities laws involve private rights and the banking laws involve public rights. This, they say, is based on the legislative history and purpose of the various laws and regulations. As discussed in Section A.1 above, this is not the relevant question – the correct test is whether the suit involves the nature of an action at law. *Jarkesy*, 144 S. Ct. at 2132. However, even if it were the relevant question, there is nothing about public rights case law that

---

[9] *Jarkesy* likewise relied on the Restatement to demonstrate the common law nature of claims. 144 S. Ct. at 2130.

suggests the banking industry should be treated differently.  The public rights
doctrine does not apply simply because the OCC can identify a public purpose or
public harms.  *Jarkesy* at 2146 (Gorsuch, J., concurring) ("the exception does not
refer to *all* matters brought by the government to remedy public harms," and
identifying the "narrow class defined and limited by history" as "collection of
revenue, customs enforcement, immigration and the grant of public benefits").

The OCC cites the public features of the banking industry, but these are non-
unique.  If this were dispositive, the *Jarkesy* decision would also have found the SEC
to be asserting public rights.  Securities regulation is addressed to the same public
functions and is also designed to protect the banking system.  Indeed, the Securities
Exchange Act of 1934 uses much the same language as that on which the OCC relies:
"transactions in securities . . . are effected with a ***national public interest*** which
makes it necessary to provide for regulation and control of such transactions . . ."
and the Act's purpose is "to protect interstate commerce, the national credit, the
Federal taxing power, ***to protect and make more effective the national banking***
***system and Federal Reserve System*** . . ."  15 U.S.C. § 78b (emphasis added).  Like
the statutes in this case, the Securities Exchange Act's goal is to protect "the effective
operation of the national banking system and the Federal Reserve System" and to
prevent "the Federal Government [being] put to such great expense as to burden the
national credit."  *Id*.  Both the statutes in *Jarkesy* and here, therefore, have similar

16

"public" purposes, and they also both are targeted at protecting the banking system. Thus, analyzing this case through the prism argued by the OCC does not make the outcome any different than *Jarkesy*.

    4.  <u>The Decision In *Akin* Is Consistent With *Jarkesy* and Petitioners' Position.</u>

In *Akin v. Office of Thrift Supervision Dep't of Treasury*, 950 F.2d 1180, 1186 (5th Cir. 1992), the Fifth Circuit addressed a purely equitable cease and desist claim and held that no jury trial right attached. The OCC seems to suggest that this case somehow favors their position, but all it shows is the application of the law as articulated in *Jarkesy*. When the government seeks equitable relief, this does not implicate the Seventh Amendment. *Jarkesy*, 144 S. Ct. at 2128. Here, the OCC concedes that the Seventh Amendment is implicated because they seek civil penalties rather than equitable relief. OCC Brief at 39. *Akin* is not inconsistent with *Jarkesy* because *Akin* did not raise legal claims or seek civil penalties. And, even if *Akin* supported the OCC's argument (which it does not), such a holding would be effectively overruled by *Jarkesy*. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) ("Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion 'establishes a rule of law inconsistent with' that precedent.") (citation omitted).

**B. Petitioners' Constitutional Objections Are Timely**.

The OCC also briefly argues that Petitioners' arguments are untimely. This is wrong for two reasons: First, the Final Decision and the ALJ's rulings both address (and reject) Ortega's and Rogers's demand for a jury trial; thus it is clear that such issues were indeed raised below.[10] Second, and more crucially, the Supreme Court in *Carr* has already addressed and rejected these timeliness arguments on two independent grounds: first, constitutional claims on which the agency has no special expertise can be raised for the first time on appeal *(Carr v. Saul*, 141 S. Ct. 1352, 1360-61 (2021) (citing cases));[11] and, second, the futility rule holds that objections which the ALJ is without power to correct need not be raised at the administrative level. *Id*. at 1361 ("It makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested").[12] Here, both the Comptroller and the ALJ expressly conceded the futility exception by stating that they were powerless to empanel a jury.[13] As a result, Petitioners' constitutional

---

[10] CL194 at 27; CL173.

[11] *See also Cochran v. SEC*, 20 F.4th 194, 208 (5th Cir. 2021) (ALJs lack expertise in structural constitutional issues).

[12] *All. For Hippocratic Med. v. FDA*, 2023 U.S. App. LEXIS 8898, *43 (5th Cir. 2023) (applying futility rule). The Sixth Circuit has also considered and rejected the OCC's argument in the banking enforcement context. *Calcutt v. FDIC*, 37 F.4th 293, 312-13 (6th Cir. 2022), *rev'd on other grounds*, 143 S. Ct. 1317 (2023).

[13] CL194 at 27; CL173 at 2 ("the undersigned has no authority to grant such relief. [It is] an impossible remedy and must therefore be denied.").

argument that they were deprived of their right to a jury trial did not need to be raised before the ALJ or the Comptroller.

### C. This Proceeding Violated Article III and the Separation of Powers.

In their opening brief, Rogers and Ortega also argued that in-house agency proceedings violate not only the Seventh Amendment but also Article III, the Separation of Powers, and the Due Process Clause. The executive branch cannot, consistent with the Constitution, usurp the judiciary's power to adjudicate disputes – these are fundamental rights guaranteed to litigants: "There is no liberty if the power of judging be not separated from the legislative and executive powers." *Jarkesy*, 144 S. Ct. at 2131 (citations omitted); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 70-71 (1982) (requiring an "exceptional grant of power" by the Constitution before Congress can escape Article III). In this case, the executive branch brought the claims, selected the ALJ and then, if it disagreed with the ALJ, it can – and did – reverse her on appeal and achieve the outcome it wanted all along. Article III and the Separation of Powers exists to save citizens from this injustice.

The OCC's only response to this argument was that Petitioners failed to adequately brief this issue below and on appeal. Petitioners' arguments are timely for the reasons explained in section I.B, above, and its Fifth Circuit brief was undoubtedly adequately briefed, citing applicable sections of the Constitution, the

Federalist Papers, and both *Jarkesy* opinions which directly support Petitioners' argument.  The record cites amply establish – and it is not seriously in dispute – that this case was not handled by an Article III judge and was instead decided by the Comptroller and its ALJ, both members of the executive branch.  Petitioners' Brief refers the Court to the pages of Justice Gorsuch's opinion directly addressing this very issue, and substantial sections of the Brief address the public rights exception, which after all is an exception to Article III.  These arguments were more than sufficient to satisfy this Court's requirements to preserve an issue on appeal.

## II.   The Statute of Limitations Bars the OCC's Claims.

### A. The Capital Raise Loans Claims (For Both Prohibition and Civil Penalties) are Time-Barred.

The OCC has no good response to the fact that every Capital Raise Loan was made more than five years (indeed eight years) before this case was commenced. The OCC Brief ignores (i) the decision in *De La Fuente*, which refused to consider loans made more than five years before the case was commenced (*De La Fuente v. FDIC*, 332 F.3d 1208, 1219 (9th Cir. 2002)), (ii) the 9-0 decision in *Gabelli*, which determined that the government is not entitled to special accrual rules and must bring suit within five years of defendants' "misdeeds"  (*Gabelli v. SEC*, 568 U.S. 442, 451-52 (2013)), and (iii) this Court's decision in *Core Labs* marking accrual from the "date of the underlying violation" (*U.S. v. Core Laboratories, Inc.*, 759 F.2d 480, 482 (5th Cir. 1985)).

The OCC also does not address the following facts: (i) its main witness testified that the loans, at the time they were made, "could have prejudiced depositors,"[14] an event which plainly triggers accrual of its claims under the express language of 12 U.S.C. § 1818(e), even according to the "effects" prong approach articulated by the OCC; (ii) the OCC found that the loans, at the time they were made, were a "grave risk" to the Bank[15] which amounts to the statutory effect that depositors "could be" prejudiced or the bank "will probably suffer financial loss or other damage" contained in Section 1818(e); and (iii) David Rogers was retired from banking during the entire five-year period before the commencement of this case.

Instead, the OCC doubles down on its unfounded claim-splitting theory which has no textual connection to any of the relevant statutes. The OCC repeats its mantra that each effect of (i.e., missed payment on) a loan is a different claim altogether and the OCC can delay accrual by simply not *pleading* the earlier effects. Thus, even if the OCC examiner in charge admits (as she did) that the effects prong was triggered at the time the loans were made because they "could have prejudiced depositors," the OCC argues the claims re-accrue and "an action is timely if it is commenced within five years of the date of the ***last effect*** resulting from the charged misconduct, even if there were an earlier occurrence . . . ." OCC Brief at 53 n.9 (emphasis added).

---

[14] Tr. 1593:22-1594:3 (CL147)
[15] OCC Brief at 59; CL194 at 85.

This turns 28 U.S.C. § 2462 on its head – essentially changing "first accrued" in the statute to "last effect" which the OCC would rather it say. Thus, the OCC's interpretation ignores the command of 28 U.S.C. § 2462 and would give it essentially unlimited discretion as to when to bring an action: the clock starts when "the agency decides it should begin to run." *Proffitt v. FDIC*, 200 F.3d 855, 866 (D.C. Cir. 2000) (Silberman J., dissenting).

The OCC's claim-splitting theory is also inconsistent with basic accrual, limitations, and res judicata concepts in the common law. As this Court has stated, "[t]he cause of action inheres in the causative aspects of a breach of a legal duty, the wrongful act itself, and not in the various forms of harm which result therefrom. . . . [Plaintiff] does not have a discrete cause of action for each harm." *Gideon v. Johns-Manville Sales Corp*., 761 F.2d 1129, 1136-37 (5th Cir. 1985) (citations omitted).

The OCC incorrectly states that holding for Petitioners would commence the statute running before the OCC could initiate an action. OCC Brief at 53. This is completely false, and it is important to understand why: the statute expressly and purposely is structured so that the OCC may bring claims regardless of whether a formal loss has been incurred on a loan. First, the statute is crafted so that the OCC can bring a claim upon a simple violation – no "effects" prong is required. 18 U.S.C. § 1818(i)(2)(A). Second, the penalties are greater if the OCC can show it is "likely

to cause more than a minimal loss" – again no actual loss to the bank is required.  18 U.S.C. § 1818(i)(2)(B)(ii)(II).  <u>Third</u>, the greatest penalty – a ban on banking – may be assessed if the depositors "could be prejudiced" (12 U.S.C. § 1818(e)(1)(B)(ii)) *or* the bank "will probably suffer a financial loss or other damage" (12 U.S.C. § 1818(e)(1)(B)(i)) – again, no actual prejudice or loss to the bank is necessary.  Thus "the early running of the statute of limitations seems to me the inevitable price of section 8(e)'s low threshold; the agencies have to take the 'bitter with the sweet.'" *Proffitt*, 200 F.3d at 866 (Silberman, J., dissenting).  The OCC, therefore, could have brought these claims at the time the loans were made.

This statutory language (and Judge Silberman's opinion) both dovetail closely with the approach the Supreme Court subsequently articulated in *Gabelli*: penalty actions by the government are not entitled to deferred accrual or other delays in the running of the statute – because the government has extensive investigatory, enforcement and subpoena powers, the statute runs from time of the "misdeeds." *Gabelli v. SEC*, 568 U.S. at 452.  Here, those extensive powers include the authority to ban someone from banking without an actual loss, but merely a *risk* of prejudice, loss, or other damage.   12 U.S.C. § 1818(e)(1)(B).  Because the OCC found the loans, at the time they were made, were a "grave risk" to the Bank and testified that they could have prejudiced depositors, the OCC had a complete and present cause of action under Section 1818(e) at the time of the "misdeeds."

Thus, because this case was commenced on September 25, 2017, and none of the challenged loans was made within five years of that date, the OCC's claims based on the Capital Raise Loans are barred.

**B. The OCC's Remaining Claims (i.e. the Accounting Claims Against Ortega) – Are Also Time-Barred.**

The OCC's remaining claims are against Mr. Ortega for civil penalties under Section 1818(i) based on accounting violations found by the Comptroller.  These claims, too, are time-barred.  There are three accounting violations addressed in the Final Decision: (i) accounting for the Capital Raise Loans, (ii) accounting for OREO loans, and (iii) non-accrual accounting.

The parties seem to agree that the "continuing violations" doctrine does not extend the limitations period here.  OCC Brief at 53 n.9.  Nor does the OCC dispute that the challenged transactions were booked outside the five-year statute of limitations (and therefore *first accrued* outside the limitations period).  Instead, the OCC's position, which has the virtue of simplicity, is that "uncorrected Call Reports" filed in 2013 gave rise to a timely cause of action.

Ortega does not dispute that these accounting transactions booked in 2009-2012 were never corrected in the Bank's final Call Reports in 2013 before the Bank closed.  However, that does not mean a new cause of action first accrued in 2013. For example, under GAAP, land purchased in the year 1925 for $1000 remains on a bank's balance sheet at $1000 in 2025.  If it was misstated in 1925 as $2000, that

24

error would be carried through to this day and in each Call Report. There is nothing under the "first accrued" language of 28 U.S.C. § 2462 that would allow such a claim to re-accrue every single year, *ad infinitum*. Such a rule would make bank officers and directors liable for accounting mistakes indefinitely, effectively repealing any statute of limitations for old transactions. And as described in the Petitioners' opening brief, the balance of the case law supports Petitioners on this point. *Delek Ref., Ltd. v. OSHRC*, 845 F.3d 170, 177 (5th Cir. 2016); *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (N.D.N.Y. 2003). For these reasons, the accounting claims, too, are barred by the statute of limitations.

## III.  This Proceeding Violated the Appointments Clause.

The OCC does not dispute that ALJ McNeil was unconstitutionally appointed. OCC Brief at 50 n.6. The OCC argues instead that the Petitioners received the remedy for such appointments clause violations – a new ALJ – as provided by *Lucia v. SEC*, 585 U.S. 237, 251-52 (2018). Rogers and Ortega acknowledge that they received a new ALJ as required by *Lucia*. But *Lucia* does not reach Petitioners' situation – just because a new ALJ is necessary under *Lucia* does not mean it is sufficient. Here, unlike *Lucia*, Petitioners suffered actual prejudice as a result of the OCC's adherence to the unconstitutional judge's rulings, and nothing in *Lucia* prevents this Court from granting greater relief than that in *Lucia*.

As shown in Petitioners' opening brief, the Final Decision and the Recommended Decision both considered and discussed the Fannie Mae and Freddie Mac issues, but they ratified the unconstitutional ALJ's rulings which struck that very issue and narrowed the discovery process. In other words, the Comptroller – both as prosecutor and judge – got to use the Fannie Mae debacle for its own purposes, but denied Petitioners the right to do the same. The record suggests that this series of events would not likely have happened without the unconstitutional ALJ setting it in motion. *See* Petitioners' Brief at 52-54. As Justice Kagan opined, the court should design remedies "to create incentives to raise Appointments Clause challenges." *Lucia v. SEC*, 585 U.S. at 251 n.5 (citation omitted).

## IV. Manifest Trial Errors Require Reversal.

Petitioners' fourth point of error challenges the ALJ's pretrial and trial rulings which were "without observance of procedure required by law." 5 U.S.C. § 706(2).

<u>First</u>, the OCC fails entirely to address the ALJ's failure to allow offers of proof by direct interrogation. *See* 12 C.F.R. 19.36(d)(2). This happened on multiple occasions. In particular, and over Petitioners' objection,[16] the Comptroller called Michael Brickman, as an expert and fact witness, despite having failed to identify him on either their fact or expert witness lists.[17]

---

[16] *See* CL114 at 5.

[17] The deadline to designate expert witnesses was on October 22, 2018. CL15 at 2. The deadline to submit fact witness lists was September 3, 2018. *Id.* Michael Brickman did not appear on either of these lists. Expert reports were due on October 29, 2018. *Id.* Michael Brickman did not

The OCC relies on Brickman's testimony.  *See* OCC Brief at 20, 22, 26, 27, 28.[18]  Petitioners were denied the opportunity to make a record of certain of his answers on cross-examination.[19]

Second, the OCC responds that the Fannie Mae and Freddie Mac issue was rightfully excluded because further factual development would have little or no probative value.  But the OCC fails to explain why.  As shown in their opening brief, Petitioners amply demonstrated the importance of the GSEs to this case, which should have been fully explored and admitted into the record.  Petitioners' Brief at 15-17, 57.

Third, the OCC defends its admission of "sworn statements" which were hearsay on the grounds that Petitioners' arguments were conclusory.  This argument should be rejected.  Petitioners' Brief explained exactly what happened and cited the relevant exhibits and transcript excerpts:  the Comptroller took depositions without Petitioners present; and in some instances, the Comptroller did not offer the transcripts but asked for the OCC examiner's independent recollection of the interviews, and the ALJ relied on that recollection in her ruling.  This is sufficient to establish that this case proceeded without observance of procedure required by law.

---

file a report by this deadline – indeed, he never filed a report.  Michael Brickman was first disclosed on December 10, 2021 on the OCC's final trial witness list (along with other surprise witnesses) less than 60 days before trial.

[18] *See also* CL194 at 47; CL176 at 32 n.139.

[19] Tr. 219:18-220:20; 228:11-229:25 (CL133).

**V.  The Comptroller's Ban on Banking Should Be Vacated For Failure to Prove Culpability.**

The Comptroller, as prosecutor, argued that Ortega's and Rogers's conduct in approving the Capital Raise Loans met the culpability prong of 12 U.S.C. § 1818(e)(1)(C). But the ALJ disagreed and found that while the conduct rose to the level of a civil money penalty under §1818(i), Ortega and Rogers lacked the requisite culpability to be banned.  Then the Comptroller, as judge, overruled the ALJ and concurred with itself that Ortega and Rogers should be banned from banking.  This ruling by the Comptroller was wrong and unsupported.  *Kim v. Office of Thrift Supervision*, 40 F.3d 1050, 1054-55 (9th Cir. 1994) (being among the multiple officers and directors who approved "questionable loans" was insufficient to satisfy scienter requirement; such conduct "in no way involved anything approaching the level of culpability required by 12 U.S.C. § 1818(e)(1)(C) and certainly does not justify the imposition of such a draconian measure as a permanent prohibition order").

The OCC Brief reiterates the ways in which the Comptroller allegedly overcame the ALJ's ruling, but none of these holds water: the OCC says that Ortega and Rogers concealed the Capital Raise Loan strategy in their communications with the OCC in February 2009, but no evidence suggests that they knew about the strategy at that time, or that the strategy even existed at that point;  (ii) the OCC says that Bank President Robert Gandy sent a misleading letter to the OCC on April 28,

2009, but no evidence ties Ortega or Rogers to the letter, and (iii) the OCC says that the loan applications contained misleading statements of the loans' purposes, but no evidence shows that Ortega or Rogers did this – again, being among the non-lender board members who approved "questionable loans" does not rise to the level of a ban on banking. *Kim*, 40 F.3d at 1054-55. The law requires "personal dishonesty" – or disregard which rises to the same magnitude as personal dishonesty. *Doolittle v. NCUA*, 992 F.2d 1531, 1539 (11th Cir. 1993). And no such dishonesty has been proven here.

## VI.  The Comptroller Should Have Applied a Higher Standard of Proof.

Finally, the OCC fails to address the constitutional argument that the preponderance standard is inadequate for a penalty of prohibition. The OCC cites *Steadman v. SEC*, 450 U.S. 91 (1980), which does not reach the constitutional issue and is therefore inapposite. The correct analysis is found not in *Steadman*, but in *Addington v. Texas,* 441 U.S. 418, 424 (1979). As shown in Petitioners' opening brief, the prohibition penalty applied by the OCC satisfies *Addington* for a higher standard of proof: (i) an interest more substantial than mere loss of money, (ii) risk of having reputation tarnished, (iii) "stigma", and (iv) possible injury to the individual significantly greater than any possible harm to the state. *Id*. at 424, 426, 427. The last point is particularly relevant because in this case the OCC has never contended that either Ortega or Rogers is an ongoing danger to banking and, if there

was any possible harm to the state, the OCC would have sought interim relief over the last twelve years.   The OCC's Brief fails to address *Addington* and therefore fails to address the appellate point raised by Petitioners.

## CONCLUSION

Petitioners respectfully request that the Court vacate and set aside the Comptroller's Final Decision.  Petitioners also request such other and further relief to which they may be justly entitled.

Dated:  January 17, 2025

Respectfully submitted,

By:  <u>/s/ *Frank Brame*            </u>
Thomas S. Leatherbury
Texas Bar No. 12095275
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 213-5004
Tom@tsleatherburylaw.com

Frank C. Brame
Texas Bar No. 24031874
The Brame Law Firm PLLC
4514 Cole Ave., Suite 600
Dallas, Texas 75205
Telephone: (214) 665-9464
frank@bramelawfirm.com

Bill Sims
Texas Bar No. 18429500
4234 Shorecrest Drive
Dallas, Texas 75209
Telephone: (214) 458-6970
bsims1119@gmail.com

**COUNSEL FOR PETITIONERS**

## **CERTIFICATE OF SERVICE**

I hereby certify that, on January 17, 2025, I caused true and accurate copies of the foregoing to be filed with the Clerk of Court of the Fifth Circuit by CM/ECF and served copies of the foregoing via the Court's CM/ECF system on all counsel of record:

Hannah Hicks
Hannah.hicks@occ.treas.gov
Office of the Comptroller of the Currency
400 7th St. SW
Washington, D.C. 20219

Celeste May Embrey
celeste@texasbankers.com
Texas Bankers Association
203 W. 10th Street
Austin, TX 78701

Kevin Spencer Elliker
kelliker@huntonak.com
Hunton Andrews Kurth, L.L.P.
951 E. Byrd Street
Riverfront Plaza E. Tower
Richmond, VA 23219-4074

Gregory Dolin
Greg.Dolin@NCLA.legal
New Civil Liberties Alliance
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203

Brianne Jenna Gorod
brianne@theusconstitution.org
Constitutional Accountability Center
1200 18th Street, N.W., Suite 501
Washington, DC 20036

Dated: January 17, 2025

/s/ *Frank C. Brame*
Counsel for Petitioners

## **CERTIFICATIONS OF ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ *Frank C. Brame*
Counsel for Petitioners

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) and Fifth Circuit Rule 32.2 because it contains 6282 words, as determined by the word-count function of Microsoft Word, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the type-face requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, with 12-point font footnotes.


Dated: January 17, 2025          */s/ Frank C. Brame*_____
                                 Counsel for Petitioners