No. 23-60617

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

SAUL ORTEGA, Former Chief Financial Officer, Director, President, Chief
Executive Officer, and Chairman of the Board; DAVID ROGERS, JR., Former
Chairman of the Board

Petitioners,

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY

Respondent.

_____

On Petition for Review of the Final Decision of the Comptroller of the Currency
Nos. OCC AA-EC-2017-44, AA-EC-2017-45
_____

**OPPOSITION TO PETITION FOR REHEARING EN BANC**
_____

ADAM J. COHEN
Senior Deputy Comptroller and Chief Counsel
BRIAN P. HUDAK
Deputy Chief Counsel
PETER C. KOCH
Director for Litigation
HANNAH HICKS
DANIEL PRIEVE
Counsel
Attorneys for Respondent
Office of the Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219
202-860-4306

## CERTIFICATE AS TO INTERESTED PERSONS

Respondent Office of the Comptroller of the Currency ("OCC" or "Agency") is not required to provide a certificate of interested persons under Fifth Circuit Rule 28.2.1 because the OCC is a bureau of the U.S. Department of the Treasury. 12 U.S.C. § 1.

## RESPONSE TO RULE 40(b)(2) STATEMENT

The panel applied relevant and authoritative Supreme Court and Fifth Circuit precedent to the facts of the case. "A petition for rehearing en banc is an extraordinary procedure that is intended to bring to the attention of the entire court an error of exceptional public importance or an opinion that directly conflicts with prior Supreme Court, Fifth Circuit or state law precedent." 5th Cir. R. 40 and Internal Operating Procedure 40-5 on Petition for Rehearing En Banc. "[A]lleged errors . . . in the application of correct precedent to the facts of the case" are generally not appropriate for rehearing en banc. *Id.* Petitioners' arguments in support of rehearing en banc consist of mischaracterizations of authoritative precedent and expressions of disagreement with the panel's application of law to facts. This falls well short of demonstrating cause for the extraordinary procedure of en banc review. Petitioners do not (and cannot) satisfy the requirement of establishing error, let alone direct conflict with authoritative precedent.

# TABLE OF CONTENTS

CERTIFICATE AS TO INTERESTED PERSONS ...................................................1

RESPONSE TO RULE 40(b)(2) STATEMENT .......................................................2

TABLE OF AUTHORITIES ....................................................................................4

COUNTERSTATEMENT OF THE ISSUES ASSERTED TO MERIT EN BANC REVIEW .........................................................................................................6

STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION ......6

I.       Nature of the Case .......................................................................................6

         A.       Section 1818(e) Prohibitions ...............................................................7

         B.       Section 1818(i) Civil Money Penalties ................................................7

II.      Prior Proceedings and Disposition .............................................................8

COUNTERSTATEMENT OF FACTS .....................................................................8

I.       Capital Raise Strategy .................................................................................9

II.      Accounting-Related Charges .....................................................................10

ARGUMENT ..........................................................................................................11

I.       The Panel Correctly Concluded That Congress Constitutionally Assigned Section 1818 Actions to Adjudication in the Executive Branch. .................11

         A.       The Panel Opinion Does Not Conflict With *Jarkesy* or Other Supreme Court Precedent. .................................................................12

         B.       The Panel's Opinion Does Not Conflict with This Court's Precedent. .....................................................................................................17

II.      The Panel's Opinion Regarding the Statute of Limitations Does Not Conflict with *Gabelli*. ..............................................................................18

CONCLUSION .......................................................................................................22

CERTIFICATE OF SERVICE ...............................................................................23

CERTIFICATE OF COMPLIANCE .......................................................................24

## TABLE OF AUTHORITIES

**Federal Cases**

*AT&T, Inc. v. Fed. Commc'ns Comm'n*,
  149 F.4th 491 (5th Cir. 2025) ..............................................................17
*Axalta Coating Sys., LLC v. Fed. Aviation Admin.*,
  144 F.4th 467 (3d Cir. 2025) ................................................................15
*Blanton v. OCC*,
  909 F.3d 1161 (D.C. Cir. 2018).............................................................19
*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986) ..............................................................................15
*Commonwealth ex rel. Torrey v. Ketner*,
  92 Pa. 372 (1880)...................................................................................18
*Crowell v. Benson*,
  285 U.S. 22 (1932) ................................................................................14
*Davis v. Elmira Savings Bank,*
  161 U.S. 275 (1896) ......................................................................... 14, 16
*De la Fuente v. Fed. Deposit Ins. Corp.*,
  332 F.3d 1208 (9th Cir. 2003) ...............................................................21
*Easton v. Iowa*,
  188 U.S. 220 (1903) ..............................................................................18
*Fahey v. Mallonee*,
  332 U.S. 245 (1947) ..............................................................................14
*Farmers & Mechanics Nat'l Bank v. Dearing*,
  91 U.S. 29 (1875) ..................................................................................14
*Fed. Energy Reg. Comm'n v. Powhatan Energy Fund*,
  949 F.3d 891 (4th Cir. 2020) .......................................................... 20, 21
*First Nat'l Bank of Hartford, Wis. v. City of Hartford*,
  273 U.S. 548 (1927) ..............................................................................14
*Gabelli v. Sec. & Exch. Comm'n*,
  568 U.S. 442 (2013) ......................................................................... 19, 20
*Murray's Lessee v. Hoboken Land & Improvement Co.*,
  18 How. 272 (1856).................................................................................15
*Proffitt v. Fed. Deposit Ins. Corp.*,
  200 F.3d 855 (D.C. Cir. 2000)......................................................... 19, 21
*Sec. & Exch. Comm'n v. Jarkesy*,
  603 U.S. 109 (2024). ............................................... 12, 13, 15, 16, 17

*Stern v. Marshall*,
  564 U.S. 462 (2011) ................................................................ 14, 16, 17
*Tiffany v. Nat'l Bank of Mo.*,
  85 U.S. 409 (1873) ......................................................................14

## Statutes

12 U.S.C. § 1 ............................................................................ 1, 6, 15
12 U.S.C. § 161 ...................................................................... 10, 11, 17
12 U.S.C. § 1818 ..................................... 6, 7, 8, 11, 12, 18, 19, 20, 21
12 U.S.C. § 1831n .........................................................................11
28 U.S.C. § 2462 ................................................................... 18, 20, 21

## Rules

Fifth Circuit Internal Operating Procedure 40-5 on Petition for Rehearing En Banc
  ..................................................................................................2
Fifth Circuit Rule 28.2.1 ...............................................................1
Fifth Circuit Rule 40 .....................................................................2

## Regulations

12 C.F.R. § 19.3 ............................................................................6
12 C.F.R. § 19.39 ..........................................................................7
12 C.F.R. § 19.40 ..........................................................................7
12 C.F.R. Part 19 ...........................................................................7

## Constitutional Provisions

U.S. Const. amend. VII ................................................................11
U.S. Const. art. III ........................................................... 11, 13, 15

## COUNTERSTATEMENT OF THE ISSUES ASSERTED
## TO MERIT EN BANC REVIEW

1.    Whether the panel's conclusion that the public rights doctrine authorizes the OCC to carry out its mission of assuring the safety and soundness of the national banking system through administrative enforcement actions directly conflicts with authoritative precedent.

2.    Whether the panel's conclusion that the five-year statute of limitations did not bar the charges against Petitioners where the "effect" element occurred within five years of the filing of the notice of charges directly conflicts with authoritative precedent.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION

## I.    <u>Nature of the Case</u>

The OCC is a bureau of the U.S. Department of the Treasury charged with assuring the safety and soundness of the national banking system. 12 U.S.C. § 1. Congress has granted federal banking agencies, including the OCC, authority to undertake enforcement actions against banking institution-affiliated parties. *See, e.g.*, *id.* § 1818(e), (i). OCC Enforcement Counsel (defined in 12 C.F.R. § 19.3) may initiate an administrative enforcement action by issuing a notice of charges detailing alleged violations. Unless the charges are uncontested, a hearing and related proceedings are conducted by an administrative law judge ("ALJ") pursuant to the

Administrative Procedure Act and the OCC's rules of practice and procedure. 12 U.S.C. § 1818(e), (h)-(i); 12 C.F.R. Part 19.

Following a hearing or dispositive motions, the ALJ prepares a recommended decision for submission to the Comptroller of the Currency ("Comptroller"). The parties may file exceptions to the recommended decision with the Comptroller. 12 C.F.R. § 19.39(a). Upon review of the full record, the Comptroller issues the Agency's final decision. 12 U.S.C. § 1818(h)(1); 12 C.F.R. § 19.40.

### A.     Section 1818(e) Prohibitions

For the Comptroller to enter against an institution-affiliated party an order of prohibition from further participation in the conduct of the affairs of federally insured depository institutions, Enforcement Counsel must establish the separate elements of misconduct, effect, and culpability. 12 U.S.C. § 1818(e)(1)(A)-(C). The misconduct element may be satisfied by showing that the party engaged in an unsafe or unsound practice or breached a fiduciary duty. *Id*. § 1818(e)(1)(A). The effect element may be satisfied by showing that the institution suffered or will probably suffer financial loss because of misconduct. *Id.* § 1818(e)(1)(B).

### B.     Section 1818(i) Civil Money Penalties

The Comptroller may also assess civil money penalties, categorized by escalating tiers. To assess a first-tier civil money penalty, Enforcement Counsel must establish one element: misconduct, which may be satisfied by a violation of law.

12 U.S.C. § 1818(i)(2)(A). To assess a second-tier civil money penalty, Enforcement Counsel must establish two elements: misconduct and effect. Misconduct may be satisfied by a violation of law or breach of fiduciary duty. *Id.* § 1818(i)(2)(B)(i). Effect may be satisfied by showing that the misconduct constitutes a pattern of misconduct or that it caused or is likely to cause more than minimal loss to the institution. *Id.* § 1818(i)(2)(B)(ii).

## II.   <u>Prior Proceedings and Disposition</u>

Enforcement Counsel filed a notice of charges ("Notice") in this matter on September 25, 2017. Following an administrative hearing, the Comptroller issued a final decision prohibiting Saul Ortega and David Rogers, Jr. (collectively, "Petitioners"), former directors and officers of First National Bank, Edinburg, Texas ("Bank"), and assessing against each of them a $250,000 civil money penalty.

Petitioners sought review of the final decision pursuant to 12 U.S.C. § 1818(h). On September 8, 2025, a panel of this Court denied the petition for review, holding that because "the public-rights exception applies to federal banking enforcement actions, . . . petitioners had no right to a jury trial" and that "[t]he claims are not time-barred." Op. at 23, 29.

## COUNTERSTATEMENT OF FACTS

Petitioners' misconduct was beyond the pale of prudent behavior and posed material and existential risks to the Bank. Petitioners implemented a plan to

artificially inflate the Bank's regulatory capital using its existing funds (the "Capital Raise Strategy"). This scheme was equivalent to "someone transferring a twenty[-]dollar bill from their left pocket to the kitchen table to their right pocket and then claiming to be twenty dollars richer when they then switch the bill again to the pocket from which it started." CL194 at 43 (citing CL176 at 29).[1]

## I.   **Capital Raise Strategy**

The Bank was a subsidiary of First National Bank Group, Inc. (the "Holding Company"). CL105 ¶ 6. In September 2008, the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation were placed under conservatorship. As a result, the Bank realized a $174 million loss upon selling its preferred stock in these entities. CLO.Exh148 at 3.

In early 2009, the Bank's need for additional capital was "exigent," and the OCC required that the Bank develop a plan to achieve and maintain higher capital levels and minimum capital ratios. CLO.Exh147 at 2, 4-5. The resulting capital plan stated the Bank's intent to offer shares of Holding Company stock to raise capital, but did not disclose any intent to finance the purchases of the stock. CLO.Exh148 at 4; CL158 Tr. 124:14-17, 129:2-6, 328:8-12. Nevertheless, beginning in April

---

[1]     The OCC filed a Certified List ("CL") of the administrative record under Federal Rule of Appellate Procedure 17(b)(1)(B). *See* Dkt. No. 14. Citations herein refer to the CL docket entry and the page number of the document (e.g., CL1 at 1).

2009, Petitioners approved dozens of concessionary loans to purchase Holding Company stock (the "Capital Raise Loans"); meanwhile, the Holding Company reinjected between $3 million and $17.3 million in Bank-financed stock purchases back into the Bank as sham regulatory capital. CL194 at 43; CLO.Exh548; CL158 Tr. 124:14-17, 129:2-6, 324:17-325:1, 328:8-329:6, 330:16-19, 491:20-492:1. Petitioners failed to disclose this strategy to the OCC, failed to correct misleading records regarding Capital Raise Loans, and failed to ensure that the strategy was reflected in Bank records in any way. CL158 Tr. 152:9-20, 155:22-157:14, 530:12-19; CLO.Exh143 at 35; CLO.Exh158 at 9; CLO.Exh247 at 2; *see also* CLO.Exh246 at 1.

On June 12, 2013, the Bank recorded losses on certain Capital Raise Loans. CLO.Exh389, rows 24107, 24108. On September 13, the OCC closed the Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. CL105 ¶ 9. At the time of the Bank's failure, numerous other Capital Raise Loans had not been paid off. CL158 Tr. 1242:13-1243:11. The FDIC as receiver suffered additional losses when certain Capital Raise Loans were charged off. CL194 at 51; CL158 Tr. 1994:24-2006:3.

## II.    **Accounting-Related Charges**

12 U.S.C. § 161 requires banks to file with the Comptroller periodic reports detailing the bank's financial condition ("Call Reports"). These reports must

"accurately reflect the capital" of the bank. 12 U.S.C. §1831n(a)(1)(A). The signatory must attest that it is "true and correct to the best of his knowledge and belief." *Id.* § 161(a).

Beginning in 2009 and continuing until the Bank's failure, Ortega signed multiple Call Reports containing various material inaccuracies. First, Call Reports overstated the Bank's regulatory capital with the proceeds of Capital Raise Loans that were reinjected into the Bank from the Holding Company. CL158 Tr. 328:13-329:6. Second, the Bank incorrectly accounted for loans associated with its strategy to reduce its other real estate owned portfolio. The Bank failed to discount loans with below-market interest rates to their present value of future cash flows, overstating the Bank's earnings and capital. CLJ.Exh4 at 11-12, 47-48, 81; CLO.Exh363 ¶ 36, 46-47. Third, Call Reports inappropriately recognized interest income on nonaccrual loans without documentation or justification, overstating the Bank's earnings and capital. CLJ.Exh7 at 2, 6, 22.

## ARGUMENT

### I.    The Panel Correctly Concluded That Congress Constitutionally Assigned Section 1818 Actions to Adjudication in the Executive Branch.

The panel opinion correctly held that executive adjudication of § 1818 actions is consistent with both Article III and the Seventh Amendment. Supreme Court precedent has consistently recognized that the public rights doctrine covers matters arising between the Government and persons subject to its authority in connection

with the performance of the constitutional functions of the executive or legislative branches. Section 1818 actions concern matters between the OCC and parties subject to its chartering, regulatory, and supervisory authority. These enforcement actions necessarily arise from the unique supervisory relationship between nationally chartered banking institutions and the Agency. Through these actions, the Government is acting in its sovereign capacity to vindicate the public's longstanding right to a safe and sound banking system. No such relationship between banking regulator and nationally chartered bank existed at common law.

A. **The Panel Opinion Does Not Conflict With *Jarkesy* or Other Supreme Court Precedent.**

The panel opinion represents thoughtful consideration of the Supreme Court's Article III cases, including *SEC v. Jarkesy*, 603 U.S. 109 (2024). Petitioners' contentions to the contrary are ill conceived.

Petitioners assert that "[t]he panel opinion announced a new area of 'public rights[.]'" Pet. at 15. But the Supreme Court has never categorically limited the public rights doctrine to specifically identified areas, and the *Jarkesy* Court acknowledged that it has not attempted to definitively explain the distinction between public and private rights. *Jarkesy*, 603 U.S. at 131. Instead, the Court reasoned that the public rights doctrine did not apply to the securities fraud claims at issue in *Jarkesy* because the Government's action sought "to regulate transactions between private individuals interacting in a pre-existing market" with claims

12

resembling those available at common law. *Id.* at 135. The panel here correctly concluded that, unlike the claims in *Jarkesy*, regulation of the national banking system involves distinctly governmental prerogatives that may be resolved outside of an Article III court and without a jury. Op. at 14.

Next, Petitioners mistakenly suggest that the panel should have ignored "the industry the Petitioners worked in" and the "history of banking regulation," Pet. at 16-17, in conducting its Seventh Amendment analysis. This suggestion ignores *Jarkesy*'s analytical framework. In explaining certain categories of cases that fall within the public rights doctrine, the Court relied extensively on the historical pedigrees of those categories. For example, the Court explained there is "an unbroken tradition—long predating the founding—of using" administrative summary proceedings to adjudicate revenue collection matters. *Jarkesy,* 603 U.S. at 129-30; *see also id.* at 131 (justifying the same as "flow[ing] from centuries-old rules concerning revenue collection by a sovereign"). Accordingly, the panel's consideration of the history of banking regulations (Op. at 11-23) is fully consistent with *Jarkesy*. *See also Jarkesy*, 603 U.S. at 153 (Gorsuch, J., concurring) ("traditionally recognized public rights have at least one feature in common: a serious and unbroken historical pedigree").

Moreover, the panel correctly deployed its history-based approach to examine the national banking system—one of the longest regulated and most closely

supervised of public callings. *Fahey v. Mallonee*, 332 U.S. 245, 250 (1947). National banks were established, in part, for the dual purposes of providing a national currency and to create a market for loans of the Government. *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873). They "are not merely private moneyed institutions but agencies of the United States created under its laws to promote its fiscal policies." *First Nat'l Bank of Hartford, Wis. v. City of Hartford*, 273 U.S. 548, 550 (1927). This longstanding and extensive body of case law—which declares as "axiomatic" the characterization of national banks as federal instrumentalities designed to aid the Government in the administration of the public service, *Davis v. Elmira Savs. Bank,* 161 U.S. 275, 283 (1896); *Farmers & Mechs. Nat'l Bank v. Dearing*, 91 U.S. 29, 30 (1875)—makes clear that actions implicating national banks carry no common law soil and that Congress's plenary authority over regulation of the national banking system is unquestionable.

Petitioners also effectively ask this Court to disregard much of the precedent establishing the public rights doctrine. The panel opinion is in harmony with decisions such as *Stern v. Marshall*, 564 U.S. 462, 490–91 (2011), which explained that "what makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action," *id.*, and *Crowell v. Benson*, 285 U.S. 22, 46 (1932), which recognized that some areas are particularly suited to examination and determination by an administrative agency specifically designed to

that task. *Jarkesy* did not overrule this precedent. *Axalta Coating Sys., LLC v. FAA,* 144 F.4th 467, 475 (3d Cir. 2025).

Further, Petitioners' arguments that the claims here resemble traditional common law claims ignore the fact that these claims are inextricably intertwined with the OCC's enabling statute, which charges the agency with "assuring the safety and soundness" of the national banking system. 12 U.S.C. § 1. Even if unsafe or unsound practice claims arguably bear some resemblance to common law claims, that alone would be insufficient to remove the action from the scope of the public rights doctrine. "Article III does not confer on litigants an absolute right to the plenary consideration of every nature of claim by an Article III court." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986). In determining whether an administrative adjudication runs afoul of Article III, the Supreme Court looks "beyond form to the substance of what Congress has done." *Id.* at 854 (citation modified). Here, the OCC is exercising its exclusive authority to adjudicate misconduct involving the affairs of a national bank. The public rights doctrine allows the executive branch to adjudicate such claims entirely, even if some of the claims "were presented in such form that the judicial power [wa]s capable of acting on them." *Jarkesy*, 603 U.S. at 128 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856)).

15

Petitioners also contend that the panel's "attempts to distinguish *Jarkesy* and the" Securities and Exchange Commission ("SEC") "from banking and the OCC" are "invalid" because the securities laws at issue in *Jarkesy* were also designed to protect the banking system, and the creation of a "new statutory obligation" cannot dispense with constitutional requirements. Pet. at 19-20. This oversimplifies and mischaracterizes the panel's reasoning. Banks chartered under the National Bank Act are creatures of statute. They are organized for distinctly public purposes and are "necessarily subject to the paramount authority of the United States." *Davis*, 161 U.S. at 283. The enforcement actions at issue here are, in substance, those of a federal prudential banking regulator taking action to ensure the systemic integrity of the national banking system. This is a far cry from the substance of the action at issue in *Jarkesy*, which involved the Government adopting common-law fraud standards to bring enforcement actions where it effectively stood in the shoes of an investor asserting a private cause of action of fraud—i.e., the kind of action that "the courts of Westminster" could entertain. *Jarkesy*, 603 U.S. at 128 (quoting *Stern*, 564 U.S. at 484). The panel's opinion correctly recognizes the distinction. Op. at 14-18.

In evaluating whether an adjudication involves public rights, the Supreme Court also considers "whether the actions are closely intertwined with" the statutory scheme and whether jury trials would be "generally incompatible" with the overall

regime. *Jarkesy*, 603 U.S. at 133-34 (citation modified). The specific claims against Petitioners illustrate the extent to which the OCC's enforcement and supervisory powers are intertwined. The charges related to the Capital Raise Strategy were grounded exclusively in considerations related to supervision of capital risk management. Additionally, the Comptroller concluded that Ortega violated § 161, which requires that national banks file Call Reports accurately describing the bank's financial condition. The purpose of these reports is to support the supervisory efforts of the OCC. In short, these violations implicate core banking functions—including capital risk management and filing of accurate Call Reports—and the charges against Petitioners vindicate the public's right to a safe and sound banking system. Thus, "the claim at issue derives from a federal regulatory scheme," and "resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 491.

**B.    The Panel's Opinion Does Not Conflict with This Court's Precedent.**

Petitioners are likewise incorrect that the panel opinion conflicts with *AT&T, Inc. v. FCC*, 149 F.4th 491, 500-04 (5th Cir. 2025). Pet. at 18. In *AT&T*, this Court rejected the argument that the public rights doctrine applied because the action involved common carriers, noting that the common carrier doctrine is deeply rooted in the common law. 149 F.4th at 501. Since the nineteenth century, courts have expressly observed that offenses involving national banks are not indictable at

common law. In *Commonwealth ex rel. Torrey v. Ketner*, 92 Pa. 372, 376 (1880), the Supreme Court of Pennsylvania concluded that a claim alleging that the defendant misused funds at a national bank is "not a common-law offence." *Id.* A few years later, the Supreme Court approvingly quoted *Torrey* in its decision in *Easton v. Iowa*, 188 U.S. 220, 238 (1903), concluding that Congress "has the sole power to regulate and control the exercise of their operations." *Id.* Congress's exclusive power to regulate national banks means that § 1818 actions have no common law analogue and that the public rights doctrine authorizes the Comptroller to adjudicate such actions.

## II.    The Panel's Opinion Regarding the Statute of Limitations Does Not Conflict with *Gabelli.*

Petitioner misreads the panel's opinion as creating an indefinite statute of limitations for banking agencies. Pet. at 22-25. Under 28 U.S.C. § 2462, the Agency has "five years from the date when the claim first accrued" to commence proceedings. Because the Notice was filed on September 25, 2017, any claim that first accrued on or after September 25, 2012, is timely. Petitioners have argued that the claims against them are time-barred because they purportedly "first accrued" within the meaning of § 2462 at the time of the alleged misconduct, and the Notice was filed more than five years later. This argument is premised on an overly expansive reading of case law and disregard for the statutory elements of claims arising under § 1818(e) and (i)(2)(B).

A claim accrues when a complete and present cause of action exists—that is, when all elements of a claim have been met and can be pled. *Gabelli v. SEC*, 568 U.S. 442, 448 (2013); *see also Blanton v. OCC*, 909 F.3d 1161, 1171 (D.C. Cir. 2018). The occurrence of an effect is necessary to initiate an action pursuant to § 1818(e) or (i)(2)(B). However, an effect might not occur—and thus the cause of action would not be complete and present—until after the alleged misconduct. *Proffitt v. FDIC*, 200 F.3d 855, 863 (D.C. Cir. 2000) ("Because misconduct and effect are separate prongs, the underlying conduct may not always immediately effect a [§ 1818(e)] violation and thus the accrual of the claim.").

With respect to the second-tier civil money penalty accounting-related charges against Ortega, the effect was a pattern of misconduct that continued into the limitations period. Each filing of a materially inaccurate Call Report is a distinct violation. Inaccurate Call Reports were filed until the Bank's failure in September 2013, within five years of the filing of the Notice. Because Ortega signed materially inaccurate Call Reports within this period and these repeated actions were part of a pattern of misconduct, the first- and second-tier civil money penalty charges against him were timely. Additionally, with respect to the lending-related charges associated with the Capital Raise Strategy, it is undisputed that the date of the earliest alleged financial loss is June 12, 2013, again within five years of the filing of the Notice.

Petitioners argue that the Supreme Court's decision in *Gabelli*, 568 U.S. at 442, established a rule that the statute of limitations for administrative enforcement actions begins to run when the alleged misconduct occurs. This is not so. *Gabelli* concerned the application of the fraud discovery rule to § 2462 in an SEC enforcement action. *Id.* at 444. The Court rejected the SEC's argument that because the underlying violations sounded in fraud, the discovery rule should apply, and the claim should "first accrue" at the time the agency became aware of the violations. Instead, the Court held that the fraud discovery rule was unavailable in SEC enforcement actions. *Id.* at 448-49, 454.

*Gabelli* does not support the conclusion that, as applied to all statutory schemes, § 2462's five-year limitations period for administrative enforcement actions begins to run at the time of the alleged misconduct. *See, e.g.*, *Fed. Energy Reg. Comm'n v. Powhatan Energy Fund*, 949 F.3d 891, 899 (4th Cir. 2020) ("*Gabelli*, did not, as appellants contend, adopt an 'unconditional ruling that government claims for civil penalties must face a fixed expiration date, five years from when the disputed conduct occurred.'"). The *Gabelli* Court did not analyze a cause of action comprised of multiple elements that might not occur contemporaneously—e.g., § 1818(e) or 1818(i)(2)(B). Rather, the elements of the claim at issue in *Gabelli* were "complete and present" at the time of the misconduct.

*Powhatan*, 949 F.3d at 899 (noting that in *Gabelli*, "the SEC had a complete and present cause of action at the time of the disputed conduct").

As with their overly expansive reading of *Gabelli*, Petitioners read too much into the Ninth Circuit's decision in *De la Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2003). Although the panel linked the beginning of the limitations period to the date of the alleged misconduct, *id.* at 1219, the question of claim accrual was not before the *De la Fuente* court. It was also unclear whether the charged effects occurred contemporaneously with the misconduct. *Id.* at 1223, 1225.

Contrary to Petitioners' hyperbole, the panel's opinion preserves the five-year statute of limitations and limits the Agency's discretion to initiate charges. Op. at 27 ("[T]he government cannot merely wait in the wings until an effect takes place or substantively harms an individual if it knew or determined that the very misdeed causing the harm would 'probably' could such harm down the line."). The panel did not fully adopt the *Proffitt* court's reading of § 1818(e) and instead limited the OCC from electing to pursue charges predicated on any one of the several alternative effects. Op. at 26 ("We do not precisely align with the underlying reasoning of the statement that 'separate accrual for each alternative effect gives meaning to all of the statutory language.'" (quoting *Proffitt*, 200 F.3d at 864)). Through a thoughtful analysis of sections 1818 and 2462, the panel reached a reasoned conclusion

regarding an issue of statutory interpretation for which there exists no directly binding authority.

## CONCLUSION

For these reasons, the Court should deny en banc review.

Respectfully submitted,

ADAM J. COHEN
Senior Deputy Comptroller and Chief Counsel

BRIAN P. HUDAK
Deputy Chief Counsel

PETER C. KOCH
Director for Litigation


_/s/_____
HANNAH HICKS
DANIEL PRIEVE
Counsel

*Attorneys for Respondent Office of the Comptroller of the Currency*

## CERTIFICATE OF SERVICE

I, Hannah Hicks, counsel for Respondent Office of the Comptroller of the Currency, served the foregoing Opposition to Petition for Rehearing En Banc and Certificate of Compliance on December 18, 2025, by ECF electronic filing system upon the following:

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 N. Akard Street
Dallas, Texas 75201
Tom@tsleatherburylaw.com

Frank C. Brame
The Brame Law Firm PLLC
4514 Cole Ave., Suite 600
Dallas, Texas 75205
frank@bramelawfirm.com

Bill Sims
4234 Shorecrest Drive
Dallas, Texas 75209
bsims1119@gmail.com
Counsel for Petitioners

_____/s/_____
Hannah Hicks
Counsel for Respondent Office of the
Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 40(d)(3) because it contains 3,897 words, as determined by the word-count function of Microsoft Word, excluding the parts of the Response exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

        /s/
Hannah Hicks
Counsel for Respondent Office of the
Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219